UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN CATLIN, | Case No. 1:07-cv-01466-LJO-SAB |
| Petitioner, | **DEATH PENALTY CASE** |
| v. | MEMORANDUM AND ORDER: |
| RON DAVIS, Warden of San Quentin State Prison, | (1) DENYING CLAIMS 1-68; (2) DENYING PETITIONER'S MOTION FOR EVIDENTIARY DEVELOPMENT, RECORD EXPANSION AND EVIDENTIARY HEARING, (3) DENYING PETITION FOR WRIT OF HABEAS CORPUS, and (4) ISSUING CERTIFICATE OF APPEALABILITY FOR CLAIMS 10, 11, 26(A), 35(A), 35(B), 35(C), and 35(F) |
| Respondent.[1] | (Doc. Nos. 25, 84) |
| | CLERK TO VACATE ANY AND ALL SCHEDULED DATES AND SUBSTITUTE RON DAVIS AS RESPONDENT WARDEN AND ENTER JUDGMENT |

Petitioner Steven David Catlin (hereinafter "Petitioner") is a state prisoner, sentenced to death, proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is represented in this action by appointed counsel Saor Stetler and Richard Novak.

Respondent Ron Davis (hereinafter "Respondent") is named as Warden of San Quentin State

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Ron Davis, Warden of San Quentin State Prison, is substituted as respondent in place of his predecessor wardens.

Prison. He is represented in this action by supervising deputy attorney general Kenneth Sokoler.

Before the court for decision are (i) the petition for writ of habeas corpus filed in this proceeding on September 24, 2008 and its claims 1-68 including subclaims,[2] and (ii) Petitioner's motion for evidentiary development, expansion of the record to include post-conviction proceedings pursuant to Penal Code section 1054.9,[3] and for evidentiary hearing.[4]

Having carefully reviewed the parties' filings and the relevant case law and for the reasons set out below, the undersigned finds that the petition for writ of habeas corpus and all claims therein shall be denied, the motion for evidentiary development, expansion of the records, and evidentiary hearing shall be denied, and certificate of appealability shall issue only for claims 10, 11, 26(A), 5(A), 35(B), 35(C), and 35(F).

## I. BACKGROUND

### A. Overview

Petitioner was convicted of murdering his fourth wife, Joyce Catlin, a mother of eight children (hereinafter "Joyce"), his fifth wife, Glenna Catlin, (hereinafter "Glenna"), and his adoptive mother, Martha Catlin, (hereinafter "Martha") by poisoning them with the herbicide paraquat. Joyce's murder occurred in 1976. The murders of Glenna and Martha occurred in 1984.

The conviction for the first-degree murder of Glenna was rendered in 1986 in Monterey County Superior Court (following a change of venue from Fresno County Superior Court) for which Petitioner was sentenced to life without parole (hereinafter "LWOP"), with judgment entered thereon. The convictions for the first-degree murders of Joyce and Martha were rendered in 1990 in Kern County Superior Court and resulted in sentences of LWOP and death respectively, with judgment entered thereon.

This habeas corpus proceeding involves only the Kern County judgment.

### B. Procedural Posture

Petitioner is currently in the custody of the California Department of Corrections and

---

[2] The petition contains two claims numbered "67" so the petition totals sixty-nine claims. (*See* Doc. No. 25 at 641-56.)
[3] Penal Code section 1054.9 requires prosecution and law enforcement agencies disclose all discovery to which the defendant would have been entitled to at the time of trial. *See In re Steele*, 32 Cal. 4th 682, 694-98 (2004).
[4] Any reference to state law is to California law unless otherwise noted.

Rehabilitation pursuant to July 6, 1990 entry of judgment of the Superior Court of California, County of Kern imposing the death sentence following his conviction following jury trial in Kern County Superior Court case number 30594.[5]  (CT 2079.)  The conviction was affirmed by the California Supreme Court on automatic appeal.  *People v. Catlin*, 26 Cal.4th 81 (2001).  The United States Supreme Court denied petitioner's writ for certiorari on April 1, 2002.  *Catlin v. California*, 535 U.S. 976 (2002).

Petitioner was arrested on February 14, 1985 (RT 3483-86).  On December 23, 1985, Petitioner was charged by information filed in Kern County, with the 1976 murder Joyce (Penal Code § 187) and the 1984 murder of Martha Catlin (Penal Code § 187). (CT 1348-50.)  It was alleged that the murder of Martha Catlin was committed for financial gain (Penal Code § 190.2(a)(1)), that the murder was intentionally committed by the administration of poison (Penal Code § 190.2(a)(19)), and that Petitioner was convicted of more than one offense of murder in that proceeding (Penal Code § 190.2(a)(3)).  (*Id.*)

On September 7, 1988, the information was amended to include an allegation that Petitioner had been convicted in 1986 in Monterey County of the 1984 first-degree murder of Glenna Catlin (Penal Code § 190.2(a)(2)).  (CT 1777.)  Count I of the amended information charged Petitioner with first-degree murder of Joyce and Count II charged petitioner with the first-degree murder of Martha.  (*Id.*)  Additionally, the amended information alleged four special circumstances in connection with Count II, i.e. (i) the murder was carried out for financial gain within the meaning of Penal Code section 190.2(a)(1); (ii) Petitioner was charged with committing more than one murder in the first or second-degree within the meaning of Penal Code section 190.2(a)(3); (iii) Petitioner intentionally killed the victim by administration of poison (i.e., the herbicide paraquat) within the meaning of Penal Code section 190.2(a)(19); and (iv) Petitioner had previously been convicted of the first-degree murder of Glenna within the meaning of Penal Code section 190.2(a)(2) and sentenced to life without parole in 1986.[6]  (*See* 1SHCP Ex. 102 at 1159; 1SHCP Ex. 100 at 409.)

---

[5] Unless otherwise indicated, throughout this order, "1SHCP" refers to the first state habeas corpus petition; "2SHCP" refers to the second state habeas corpus petition; "CT" refers to the clerk's transcript on appeal, "RT" to the reporter's transcript on appeal, "SRT" to the supplemental reporter's transcript on appeal, and "SCT" to the supplemental clerk's transcript on appeal. Other transcripts are referenced by date.  Reference to page numbering is to: ECF page numbering for documents filed electronically in CM/ECF, Bates numbering for CT documents and where otherwise expressly noted, and internal pagination for all other documents.

[6] The prior murder conviction special circumstance was bifurcated in the Kern County proceeding as required by Penal Code § 190.1(a).

3

Petitioner's Kern County trial began on April 23, 1990. Pursuant to statute, the jury was not informed of the fourth alleged special circumstance, concerning a prior murder conviction. On June 1, 1990, the jury found Petitioner guilty of murder in the first-degree on both Counts I and II and found the first three special circumstances to be true. (CT 2028-2030.) Petitioner then admitted his prior (June 16, 1986) conviction for the first-degree murder of Glenna and the jury was informed that Petitioner had stipulated to the truth of the fourth (prior murder conviction) special circumstance. (CT 2025.)

On June 5, 1990, the penalty phase began before the same jury that heard the guilt phase. (CT 2034.)

On June 6, 1990, the jury returned sentencing verdicts of LWOP for the murder of Joyce and death for the murder of Martha. (CT 2074-75.) The trial court then imposed those sentences. (CT 2079-2082.)

On July 6, 1990, the trial court denied petitioner's motion for new trial and modification of death penalty verdict and entered judgment upon the jury's verdicts. (CT 2079-85.)

In May of 1993, attorneys Horace Freedman and Jeffrey Schwartz were appointed by the California Supreme Court to represent Petitioner on direct appeal and collateral review. In March of 2000, the California Supreme Court ordered that Freedman represent Petitioner solely in the direct appeal and that Schwartz represent Petitioner solely in the habeas proceeding.

On March 27, 1998, petitioner filed his automatic appeal with the California Supreme Court. On July 16, 2001; that court affirmed the judgment and sentence on direct appeal. *People v. Catlin*, 26 Cal. 4th 81 (2001). On September 26, 2001, the California Supreme Court denied the petition for rehearing. *Id.*, *as modifi*ed, (2001) (unpub.).

Petition for writ of certiorari was denied by the United States Supreme Court on April 1, 2002. *Catlin v. California*, 535 U.S. 976 (2002).

On August 9, 2000, petitioner filed his first petition for writ of habeas corpus with the California Supreme Court. *In re Catlin*, California Supreme Court Case No. S090636. On September 25, 2007, the California Supreme Court summarily denied the first petition for writ of habeas corpus without issuing and order to show cause, stating that:

> The petition, filed on August 9, 2000, is denied.
> Each claim and subclaim, except Claim XIX, is denied on the merits.

In addition, Claims IX (to the extent it alleges error in the destruction of tissue samples) and XVI (to the extent it alleges error in the denial of petitioner's motions for severance and separate guilt and penalty phase juries) are denied on the ground they were raised and rejected on appeal (*In re Harris* (1993) 5 Cal.4th 813, 825; *In re Waltreus* (1965) 62 Cal.2d 218, 225), and Claims VI, VIII, IX (to the extent it alleges error in the loss of Bakersfield Police reports), XV and XVI (except to the extent it alleges error in the denial of petitioner's motions for severance and separate guilt and penalty phase juries) are denied on the ground that they could have been, but were not, raised on appeal (*In re Harris*, supra, 5 Cal.4th at p. 825, fn. 3; *In re Dixon* (1953) 41 Cal.2d 756, 759). Claim XIX is denied as premature without prejudice to its renewal after an execution date is set.

*In re Catlin,* California Supreme Court Case No. S090636.

On October 5, 2007, Petitioner began these federal proceedings. On November 2, 2007, the Court appointed attorneys Lynne Coffin and Saor Stetler to represent Petitioner. The instant federal petition was filed on September 24, 2008.

On October 24, 2008, respondent filed his answer asserting affirmative defenses, admitting certain jurisdictional and preliminary allegations, asserting procedural defenses, and denying all claims.

On April 15, 2009, the Court ordered these proceedings held in abeyance pursuant to *Rhines v. Weber*, 544 U.S. 269, 277 (2005), while Petitioner completed exhaustion in state court. *In re Catlin*, California Supreme Court Case No. S173793.

On June 15, 2009, Petitioner filed his second (exhaustion) state habeas petition. On March 27, 2013, the California Supreme Court summarily denied the second petition for writ of habeas corpus without issuing and order to show cause, stating that:

The petition for writ of habeas corpus, filed on June 15, 2009, is denied.

Claim 67 is denied as premature, without prejudice to its renewal after an execution date is set.

Claims 16, 20, subclaim R of Claim 26, 32, subclaim F of Claim 35, 39, 40, 42, 47, 48, 50, 53, 57, 58 (to the extent it challenges the constitutionality of the death penalty law), 59, 62, 66, 68 and 69 are denied on the merits.

Claims 1-38, 41-46, 49, 51, 52, 54-56, 58 (except to the extent it challenges the constitutionality of the death penalty law), 60 and 61 are barred as untimely. *In re Robbins* (1998) 18 Cal.4th 770, 780-81.)

Claims 1, 2, 4-7, 15-20, subclaims F, P, and Q of Claim 26, 28-30, 33, subclaims D and E of Claim 35, 41, 46, 49, 51, 52, 54, 58 (except to the extent it challenges the constitutionality of the death penalty law), 60 and 61 are barred as successive, in that they could have been, but were not, raised in petitioner's prior petition for writ of habeas

5

corpus, No. S090636. (*In re Clark*, 1993) 5 Cal.4th 750, 767-68.) Claims 3, 8, 10, 11, 14, 21-25, subclaims B, J, and K of Claim 26, and 38 are likewise barred as successive to the extent aspects of the claims were not raised in the prior petition. (*Ibid.*)

Claims 9, 12, 13, subclaims A, C, D, E, G, H, I, L, M, N, and O of Claim 26, 27, 31, 34, subclaims A, B, and C of Claim 35, 36, and 37 are barred as repetitive, in that they were raised in petitioner's prior petition for writ of habeas corpus. (*In re Miller* (1941) 17 Cal.2d 734, 735.) Claims 3, 8, 10, 11, 14, 21-24, subclaims B, J, and K of Claim 26, and 38 are likewise barred are repetitive to the extent aspects of the claims were raised in the prior petition. (*Ibid.*)

Claims 8, 24, 36, 37, 45, 60 and 61 are barred on the ground that they could have been, but were not, raised on appeal. (In re Dixon (1953) 41 Cal.2d 756, 759.) Except to the extent they allege ineffective assistance of counsel, and except to the extent they challenge the constitutionality of the death penalty law, claims 3, 5-7, 17-19, 21, 22, 25, 43, 46, 49, and 58 are likewise barred to the extent aspects of the claims could have been, but were not, raised on appeal. (*Ibid.*)

Claims 1, 2, 4, 15, 28-30, 41, 42, and 44 are barred on the ground that they were raised and rejected on appeal. (*In re Waltreus* (1965) 62 Cal.2d 218, 225.) Except to the extent they allege ineffective assistance of counsel, and except to the extent they challenge the constitutionality of the death penalty law, claims 3, 5-7, 17-19, 21, 22, 25, 43, 46, 49, and 58 are likewise barred to the extent aspects of the claims were raised and rejected on appeal. (*Ibid.*)

Claim 30 is not cognizable on habeas corpus. (*In re Lindley* (1947) 29 Cal.2d 709, 723.)

*In re Steven David Catlin on Habeas Corpus*, S173793. (Doc. No. 48.)

On June 30, 2015, Petitioner filed his motion to expand the record and for evidentiary development and hearing. (Doc. No. 84.)

On June 1, 2016, Respondent filed his answering brief on the merits and opposition to the motions for expansion of the record, factual development and evidentiary hearing. (Doc. No. 88.)

On February 14, 2017, Petitioner replied to Respondent's answering brief and opposition to the noted motions. (Doc. No. 95.)

## II. STATEMENT OF FACT

This factual summary is taken from the California Supreme Court's summary of the facts in its July 16, 2001 opinion. Pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1), the state supreme court's summary of facts is presumed correct. Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state supreme court. *Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

### A. *Guilt phase evidence*

#### 1. *The murder of Joyce Catlin*

Joyce Catlin, defendant's fourth wife, died in Bakersfield on May 6, 1976. She had developed what appeared to be flu-like symptoms about three weeks before her death and, upon consulting a physician, was admitted to a hospital. Before admission, she complained of back pain, vomiting, and a sore throat. She was transferred to the hospital's intensive care unit the day after her admission. Her lungs appeared to be affected. Dr. Einstein, a lung specialist, treated her without success for possible viral or bacterial infection. She did not respond to various antibiotic medications. Her lungs failed to oxygenate her body sufficiently, and she required mechanical ventilation. Nineteen days after admission to the hospital, her lungs failed entirely, and she died.

An autopsy disclosed gross pulmonary fibrosis. Pathologist Dr. Bruce Swinyer, who performed the autopsy, testified that Joyce's lungs were extremely heavy and fibrotic and that there was no indication of viral or bacterial infection that could have caused death. The death certificate listed the cause of death as acute respiratory failure due to unknown microorganisms, but attending physicians suspected poisoning by paraquat, a highly toxic poison used in agriculture to control weeds. (Although several witnesses referred generally during the course of the proceedings to paraquat as a pesticide, technically it is an herbicide.)

Dr. Einstein testified that the cause of death was pulmonary fibrosis. In this condition, the lungs develop massive scarring and are unable to function to exchange oxygen and carbon dioxide. He could not identify any natural cause of this condition. He testified that in 1976, toxicological tests that could disclose the presence of paraquat more than 72 hours after administration did not exist. Tissue collected during the autopsy was preserved in formalin, which precluded later testing for the presence of paraquat. At trial, Dr. Einstein stated his opinion that Joyce died of paraquat poisoning, based in part on the opinion of Dr. Kilburn, a lung pathologist, and in part on the absence of any natural agent that could have caused her death. He also relied upon the clinical course of Joyce's symptoms and the appearance of her lungs after death.

Dr. Kilburn, a professor of medicine and expert in lung pathology, examined tissue samples sent to him in 1976 by Dr. Swinyer. He testified that Joyce's lung tissue almost was destroyed by fibrosis, that the fibrosis was caused by a chemical, and that the only chemical that could produce such fibrosis was paraquat. He explained that it could take up to 30 days or as little as 12 hours for paraquat to cause death, depending upon the dose. When he showed the slides to a visiting professor who was an expert in paraquat poisoning, the latter said that they constituted a perfect example of paraquat poisoning.

Dr. Ford, a clinical toxicologist employed by the Chevron Environmental Health Center, explained that paraquat poisoning progressed in typical stages. Initially, the patient experiences a burning sensation in the mouth, and then after about 12 hours develops symptoms such as nausea, vomiting, and diarrhea. These symptoms may persist for a few days, but by the seventh day after ingestion the patient may feel somewhat better. Some kidney impairment may follow, but normally is resolved after 14 days. The lungs become affected about a week after ingestion, and by the third week they typically are so fibrotic that they cannot function. He noted that consistent with these typical stages, Joyce experienced vomiting and other gastrological symptoms for about seven days, then developed some kidney dysfunction. As that resolved, she complained of shortness of breath, and X-rays disclosed some marking of the lungs and edema. Her lungs continued to deteriorate, and the autopsy disclosed a fibrotic condition typical of paraquat poisoning.

Dr. Stephens, then the Chief Medical Examiner of the City and County of San Francisco, reviewed Joyce's medical records and slides of her tissues. He also found the course of Joyce's symptoms consistent with paraquat poisoning, and testified that he believed she died of such poisoning.

In sum, these medical and toxicological experts gave their opinions at trial that the cause of Joyce's death was paraquat poisoning, relying in large part upon her distinctive clinical symptoms and upon tissue analysis.

The prosecution did not introduce direct evidence regarding the manner in which paraquat was administered to Joyce. There was evidence that shortly before she became ill, Joyce and defendant attended a party where she showed signs of intoxication, and that shortly thereafter she developed severe gastric symptoms, including violent vomiting. There also was evidence that shortly after her hospitalization, defendant supplied Joyce with a milkshake.

The following evidence related to defendant's potential motive for killing Joyce. Joyce had credit life insurance, which was used to pay off a $6,741 debt on an automobile, as well as an insurance policy paying up to $2,000 and a $5,000 life insurance policy, the benefits of which were paid to defendant. When Joyce was in the hospital, defendant said to her sister that he thought the credit life insurance covered both the couple's house and their automobile. There also was evidence that defendant had engaged in extramarital affairs while married to Joyce, and that the couple had argued over a girlfriend of his.

Edith Ballew, who had been defendant's third wife, testified that she and others suspected shortly after Joyce's death that defendant was responsible for it.

There was evidence that access to paraquat was controlled under state law, but that defendant had access to it in 1976 and 1977 when he worked as a mechanic for a large agricultural enterprise. Several witnesses recounted defendant's statements-some statements from 20 years before trial-indicating his belief that paraquat was an effective herbicide that was extremely dangerous to human beings, that he was aware of the effect of paraquat on the lungs, that he possessed agricultural poisons he had acquired at work, and that he had shown the father of his second wife a container of a poison he said would kill anything or anybody, a poison that he believed to be ideal for use in a murder because it could not be detected and because there was no antidote. In 1975, defendant cautioned Joyce's son not to enter his garage, which contained dangerous agricultural poisons, and warned the boy regarding the danger of contact with paraquat.

## 2. *The murder of Martha Catlin*

Martha Catlin, defendant's 79-year-old mother, died in Bakersfield on December 8, 1984, after an illness lasting two or three days.

In 1982, Martha had a mild stroke. At that time, Edith Ballew contacted Martha's physician, Dr. Sproule, and suggested that Martha had been poisoned with paraquat. Dr. Sproule reported finding no sign of poisoning.

In September 1984, Martha again visited Dr. Sproule. She had not been taking her medication for hypertension, and her blood pressure was high. When she returned to the physician on October 31, 1984, she complained of poor memory and reported poor eating habits. Against medical advice, she had been drinking wine. Dr. Sproule prescribed a cough syrup with codeine at that time.

Edith Ballew visited Martha on Thursday, November 29, 1984, when Martha appeared in her usual state of health. On Thursday, December 6, 1984, however, Martha telephoned her friend Anna Stonebraker to request assistance because of a serious illness. Mrs. Stonebraker testified that Martha appeared very ill, exhibiting swollen purple lips and mouth as well as dark circles under her eyes. When Martha presented herself at Dr. Sproule's office, she had a reddish purple tongue and throat and had a temperature of 102 degrees. Dr. Sproule treated her with penicillin and asked her to return the next day. Mrs. Stonebraker was unable to care for Martha and left a message for defendant, asking his assistance, but he called back later and stated he was unable to come from his home in Fresno to Bakersfield, where Martha lived. Defendant telephoned Dr. Sproule the next day and stated that he would send someone to stay with his mother.

Mrs. Stonebraker took Martha back to Dr. Sproule on Friday, December 7, 1984. At that time Martha's throat was still sore and purplish, and she had difficulty eating. The next day at 5:30 a.m., Dr. Sproule received a call reporting that Martha appeared to be dead. He sent an ambulance, and Martha was pronounced dead on her arrival at the hospital.

Edith Ballew learned of Martha's death on Sunday, December 9, 1984, and called at Martha's home. She found defendant there, and he stated that he had been to visit that week, heard that his mother had the flu, and sent a woman to come stay with her.

An autopsy was performed, and tissue samples from Martha's lungs and kidneys were sent to a Chevron laboratory in Richmond. The toxicological report concluded that Martha had ingested a significant amount of paraquat. Dr. Ford, the clinical toxicologist whose testimony with regard to Joyce Catlin's death is described above, explained that until two or three years before trial, Chevron had been the sole distributor of paraquat in the United States. He stated it was probable that Martha had ingested diluted paraquat six or seven days before her death. Dr. Dollinger, the pathologist who performed the autopsy, concluded after receiving the toxicological report that the cause of death was paraquat poisoning.

Dr. Kilburn testified that Martha had lung damage consistent with paraquat poisoning. Dr. Kilburn reported that Martha was killed by the ingestion of paraquat, probably three to six days before her death, but that due to her frail condition, she died before the paraquat rendered her lungs highly fibrotic.

Dr. Stephens testified that, although it was possible Martha died of a heart attack, he believed her death was caused by paraquat poisoning. She had early signs of paraquat poisoning and had sufficient paraquat in her system to cause death.

In sum, toxicological evidence and clinical symptoms led prosecution medical and toxicological experts to state that their opinion beyond a reasonable doubt was that Martha had died of paraquat poisoning.

Defendant had made statements indicating a concern that his mother planned to alter her will to make the African Violet Society rather than defendant her primary beneficiary. Although defendant faithfully had visited and cared for his mother in her later years, and planned to have her move from Bakersfield to Fresno to be closer to him, he had made statements indicating that he was tired of caring for her and wished she "would hurry up and die." In addition, there was evidence that Martha disapproved of his many divorces and remarriages. Cash withdrawn by defendant and Martha from Martha's bank account in November 1984 and intended as a down payment on a new home for her had not been used for that purpose, and apparently remained in defendant's possession. Defendant was the sole beneficiary of Martha's will.

Defendant was a weekly or biweekly visitor to Martha at the time of her death. Initially, the prosecution presented testimony of defendant's employee that defendant had been absent from work during most of the week preceding Martha's death, but the witness later concluded that he had been mistaken. The witness then reported that defendant, who lived in Fresno, left for Bakersfield either Thursday December 6, or Friday, December 7, 1984. Defendant had visited his mother on Sunday, December 2, 1984.

After defendant's arrest for the murder of his mother, a bottle of paraquat dated April 1977 was discovered in a garage or workshop used by defendant and his former father-in-law in their independent auto-related businesses. The cap of this bottle bore defendant's fingerprint.

A jailhouse informant testified that defendant solicited his assistance in intimidating Edith Ballew, defendant's third wife, who persistently had urged the authorities to investigate the charged crimes and to prosecute defendant for murder. The informant also recounted that defendant had stated: "I killed the bitches."

### 3. *Uncharged crime*

In addition to the evidence recounted above, a large volume of uncharged crime evidence was introduced indicating that defendant had murdered his fifth wife, Glenna Kaye Catlin, by administering paraquat. She died on March 14, 1984, after 22 days of hospitalization. Overwhelming evidence from clinical records and toxicological reports from tissue samples demonstrated that she had died of paraquat poisoning. There was evidence of a public argument between Glenna and defendant a few days before she began exhibiting symptoms, as well as evidence that defendant had considered their marriage to be one of convenience, that he had been unfaithful, and that Glenna had become jealous. He received $56,785 in life insurance proceeds following her death, and there was evidence that he had displayed grief at her funeral but immediately thereafter had exhibited high spirits. There was also evidence establishing that in 1977, defendant had warned Glenna's half brother regarding the dangers of paraquat, noting in particular that it would damage the lungs.

Evidence that defendant previously had been convicted at a separate trial of the murder of Glenna was not introduced until after the jury in the present case returned its verdict on the murder charges and the special circumstance allegations other than the one alleging the prior conviction for the murder of Glenna. At that point, defendant stipulated to the prior-murder-conviction special-circumstance allegation.

### 4. *Defense case*

Defendant testified at length in his own behalf, denying that he had poisoned any of the victims. n.2 He denied making statements indicating his belief that paraquat would be an ideal poison for a murder. He denied knowingly possessing paraquat and, through his own testimony and the testimony of others, demonstrated that the area in the garage or workshop in which the paraquat was found was an area devoted to his father-in-law's automotive business. It was established that persons other than defendant and his father-in-law also had access to this garage.

--------------------FOOTNOTE--------------------

n.2  Defendant's credibility was impeached with a 1966 forgery conviction.

--------------------END FOOTNOTE--------------------

10

Defendant's roommate testified that defendant had returned to his Fresno home around 8:00 or 9:00 p.m. on December 6, 1984, the night Mrs. Stonebraker telephoned to report Martha's illness. There was evidence that defendant had been in Fresno conducting business on December 3, 4, 6, and 7, 1984.

In addition, defense evidence demonstrated that defendant's home and place of business had been subjected to a thorough police search at the time of defendant's arrest and that no paraquat bottle had been discovered. The defense also presented evidence indicating that defendant's father-in-law (Glenna's father) had searched their joint workplace without finding the bottle of paraquat, but that when the police asked him to search again, he invited two boys to help him and found the bottle within a few minutes. Defendant also attempted to establish through the testimony of an expert witness that a fingerprint could have been planted on the bottle of paraquat, and pointed out the lax procedures under which the bottle had been transported to the police station and stored pending testing. A person employed at the agricultural enterprise where defendant had been employed testified that defendant had worked there only as a mechanic, and the circumstances of his employment would have made it unlikely he could have obtained paraquat on the job.

Defendant also pointed to evidence suggesting that his third wife, Edith Ballew, had been engaged in a vendetta against him, having urged the authorities to investigate each death involved in the present case as a murder. He presented witnesses who testified that he appeared to have a flourishing business and did not appear to be in need of funds.

Friends of defendant's recalled that shortly before Joyce's hospitalization, defendant learned, upon his return from a trip to Mexico, that Joyce had fallen ill.

Dr. Bayer, a toxicologist who had some experience with paraquat poisoning, testified that he could not determine beyond a reasonable doubt that Joyce had died from paraquat poisoning. He was of the opinion that her death might be attributable to an unknown virus.

Dr. Buteau, a Chevron toxicologist, testified that Martha's medical records reflected she may have ingested as little as a tablespoon of paraquat (still a fatal dose in his opinion) and that she may have ingested it between two and seven days before her death. Dr. Russell, a pathologist at the University of California, Davis Medical School, testified that although Joyce's lung damage was consistent with paraquat poisoning, it was also possible that it was caused by agents other than paraquat. Dr. Buteau had a reasonable doubt as to the cause of Joyce's death.

Carol Johnson, a woman who had been dating defendant at the time of Martha's death (and later married and divorced him), testified that she and defendant had visited Martha on Sunday, December 2, when she and defendant brought Martha a new television set. Martha complained that she had a sore throat, her ears were bothering her, and she was taking medication for flu-like symptoms. Johnson testified that defendant was not alone with his mother that day.

After considering the evidence, the jury found defendant guilty of the first degree murders of Joyce and Martha, and found true the murder for financial gain, murder by poison, and multiple-murder special-circumstance allegations submitted to it as to the murder of Martha. As previously noted, after the jury returned its verdict, defendant stipulated to the truth of the special circumstance allegation that he previously had been convicted of the first degree murder of Glenna.

B. *Penalty phase evidence*

At the penalty phase of the trial, the prosecution introduced evidence establishing that in 1966, defendant assaulted his first wife in a fit of jealousy, choking her and throwing her out of the automobile in which they were travelling. Later defendant picked her up, went to obtain aspirin, and returned home.

Defendant presented the testimony of a number of members of a family he befriended who described his loyalty and helpfulness as a friend. A witness testified that defendant had saved her son's life. Defendant also presented evidence of his exceptionally positive adjustment in prison. Dr. Haney, a professor of psychology at the University of California, Santa Cruz, testified regarding the security precautions and the circumstances of confinement facing prisoners serving life sentences, and stated that such prisoners usually are compliant inmates. His review of defendant's prison record caused him to predict a smooth adjustment to such confinement. Kenneth Howard, a sergeant at the state prison where defendant was incarcerated after his conviction for the murder of Glenna, testified regarding the circumstances of confinement and reported that defendant was a model prisoner. Two supervisors at the prison testified regarding defendant's excellent work habits and positive effect on other inmates.

At the conclusion of the penalty phase, the jury returned a verdict of death.

*People v. Catlin*, 26 Cal. 4th 81, 99-106 (2001) (as modified Sept. 26, 2001)).

## III. JURISDICTION

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. §§ 2241(c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. §§ 2241(d), 2254(a).

This action was initiated after April 24, 1996. Therefore, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, apply. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir. 2000) (*overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)).

## IV. STANDARDS OF REVIEW

### A. Legal Standard - Habeas Corpus

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

(1) [R]esulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States; or

(2) [R]esulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Lockyer,* 538 U.S. at 70-71; *Williams*, 529 U.S. at 413.

"[A] state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review of the merits." *Brown v. Walker*, Case No. C 09-04663 JSW, 2014 WL 4757804, at *5 (N.D. Cal. Sept. 24, 2014) (*citing Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004)).

As a threshold matter, this court must "first decide what constitutes clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* In addition, the Supreme Court decision must "squarely address [] the issue in th[e] case; otherwise, there is no clearly established Federal law for purposes of review under AEDPA." *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) (quoting *Wright v. Van Patten*, 552 U.S. 120, 125 (2008)); *see also Panetti v. Quarterman*, 551 U.S. 930, 949 (2007); *Carey v. Musladin*, 549 U.S. 70, 74 (2006).

If no clearly established Federal law exists, the inquiry is at an end and the court must defer to the state court's decision. *Carey*, 549 U.S. 70; *Wright*, 552 U.S. at 126; *Moses*, 555 F.3d at 760. In addition, the Supreme Court has clarified that habeas relief is unavailable in instances where a state court arguably refuses to extend a governing legal principle to a context in which the principle should have controlled. *White v. Woodall*, 572 U.S. 415, 425-26 (2014). The Supreme Court stated: "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *Id. (quoting Yarborough v.*

*Alvarado*, 541 U.S. 652, 666 (2004)).

If the court determines there is governing clearly established Federal law, the court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." *Lockyer*, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13; *see also Lockyer*, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Williams*, 529 U.S. at 405 (quoting *Webster's Third New International Dictionary* 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.*

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101, *citing Yarborough*, 541 U.S. at 664. Therein the Supreme Court stated that

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

*Id.* at 101-05. In other words, so long as fair-minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. *Id.* at 98-99. In applying this standard, "a habeas court must determine what arguments or theories supported ... or could have supported the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those

14

arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 101-03. This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d). *Hibbler v. Benedetti*, 693 F.3d 1140, 1146-47 (9th Cir. 2012). If the court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.6 (9th Cir. 2000); *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

The AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and "evidence introduced in federal court has no bearing on 2254(d)(1) review." *Id.* at 185. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003), *citing* 28 U.S.C. § 2254(e)(1). However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. *Townsend v. Sain*, 372 U.S. 293, 319 (1963) (overruled by *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)) (superseded by status as stated in *Williams v. Taylor*, 529 U.S. 420 (2000)).

If a petitioner satisfies either subsection (1) or (2) of § 2254 for a claim, then the federal court considers that claim *de novo*. *See Panetti*, 551 U.S. at 953 (when § 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires."); *accord Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008).

In this case, some of petitioner's claims and allegations were raised and rejected by the California Supreme Court on direct appeal while others were raised in his state habeas petitions to that court and summarily denied. In the case of summary denial, where the state court decision is

unaccompanied by an explanation, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. The Supreme Court stated that "a habeas court must determine what arguments or theories supported or ... *could have supported*, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 101-03 (emphasis added). Petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98). "Crucially, this is not a *de novo* review of the constitutional question," *id.*, as "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id. (*quoting *Richter,* 562 U.S. at 102); *see also Murray v. Schriro*, 745 F.3d 984, 996-97 (9th Cir. 2014).

When reviewing the California Supreme Court's summary denial of a petition, this court must consider that the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that

> [T]he claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief. It appears that the court generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, and will also review the record of the trial ... to assess the merits of the petitioner's claims.

*Pinholster*, 563 U.S. 181 n.12 (quoting *In re Clark*, 5 Cal. 4th 750, 770 (1993)); *see also Johnson v. Williams*, 568 U.S. 289, 300–01 (2013) (holding that even where the state court does not separately discuss a federal claim there is a presumption that that state court adjudicated the federal claim on the merits); *see also Richter*, 562 U.S. at 99–100 (holding that "2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits."

Accordingly, if this court finds petitioner has unarguably presented a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable. *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) (overruled on other grounds by *Garcia v. Robertson*, 2019 WL 3938507 (9th Cir. Aug. 20, 2019)); *see also Nunes v. Mueller*, 350 F.3d 1045, 1054-55 (9th Cir. 2003).

For any habeas claim that has not been adjudicated on the merits by the state court, the federal

court reviews the claim *de novo* without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1). *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). For example, claims denied solely on procedural grounds are reviewed *de novo*. *Vang v. Nevada*, 329 F.3d 1069, 1072 (9th Cir. 2003). In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply. *Pinholster*, 563 U.S. 185 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*, 313 F.3d at 1167–68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is *de novo*).

According to the Ninth Circuit:

> In a habeas corpus proceeding, we do not review a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). This doctrine "applies to bar federal habeas review when the state court has declined to address the petitioner's federal claims because he failed to meet state procedural requirements." *McKenna v. McDaniel,* 65 F.3d 1483, 1488 (9th Cir.1995). If a petitioner has procedurally defaulted, we do not review the claim unless the petitioner "can establish cause and prejudice or that a miscarriage of justice would result in the absence of our review." *Moran v. McDaniel,* 80 F.3d 1261, 1270 (9th Cir.1996).

*Vang*, 329 F.3d at 1072.

> Procedural default is an affirmative defense. *Bennett v. Mueller,* 322 F.3d 573, 585 (9th Cir.2003). Generally, the state must assert the procedural default as a defense to the petition before the district court; otherwise the defense is waived. *Franklin v. Johnson,* 290 F.3d 1223, 1229 (9th Cir.2002). However, the district court retains discretion to consider the issue sua sponte if the circumstances warrant. *Boyd v. Thompson,* 147 F.3d 1124, 1128 (9th Cir.1998).
>
> In *Boyd,* we recognized that the district court may, sua sponte, raise the issue of procedural default when the default is obvious from the face of the petition and when recognizing the default would "further the interests of comity, federalism, and judicial efficiency." *Id.*

*Id.*, at 1073.

"A state procedural rule is "adequate" if it is "clear, consistently applied, and well-established at the time of the petitioner's purported default." *Calderon v. United States Dist. Court,* 96 F.3d 1126, 1129 (9th Cir.1996)." *Id.*

"A state procedural bar is "independent" if the state court explicitly invokes the procedural rule

as a separate basis for its decision. *McKenna v. McDaniel,* 65 F.3d 1483, 1488 (9th Cir. 1995). For a state law ground to be "independent," it must not be interwoven with federal law. *See La Cross v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001). A state court's decision is not "independent" if the application of a state's default rule depends on a consideration of federal law. *Park v. California,* 202 F.3d 1146, 1152 (9th Cir.2000). If the state court's decision fails "to specify which claims were barred for which reasons," we have held that the ambiguity serves to defeat the independence of the state procedural bar. *Valerio v. Crawford,* 306 F.3d 742, 775 (9th Cir. 2002).

## V. PROCEDURAL BARS

As noted, certain of petitioner's claims or aspects thereof were denied by the California Supreme Court as procedurally barred. As to those claims, Respondent has invoked the noted independent state ground doctrine, pursuant to which a federal court will not review a question of federal law decided by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Vang*, 329 F.3d at 1069 (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

Since "cause and prejudice" can excuse a procedurally defaulted claim, *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (citing *Coleman*, 501 U.S. at 750), and "prejudice" essentially requires a merits analysis, the court will proceed to the merits of claims found to be procedurally defaulted and review them *de novo* without determining whether the state procedural default is adequate and independent to bar relief in federal court. *Id.* (citing *Coleman*, 501 U.S. 732-35); *see also Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (courts empowered to reach the merits if on their face clearly not meritorious despite asserted procedural bar); *Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (an application for habeas corpus may be denied on the merits even if unexhausted in state court); *Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011) (relief may be denied on the merits where petition is clearly not meritorious despite asserted procedural bar).

Under *Martinez v. Ryan*, 566 U.S. 1, (2012), the procedural default of a substantial claim of ineffective assistance of trial counsel is excused where state law requires that all claims be brought in the initial collateral review proceeding and counsel in that proceeding was ineffective. *See Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). A substantial claim of claim of ineffective assistance of

trial counsel is one which has "some merit." *Id.*, citing *Martinez*, 566 U.S. at 14-16. Conversely, an insubstantial claim of ineffective assistance of trial counsel "does not have any merit or [ ] is wholly without factual support." *Id.*

"Thus, to establish cause and prejudice in order to excuse the procedural default of his ineffective assistance of trial counsel claim, Ramirez must demonstrate the following: (1) post-conviction counsel performed deficiently; (2) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different, *Id.*; and (3) the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Ramirez*, 937 F.3d at 1242.

To the extent claims already adjudicated were later denied on procedural grounds, the Court finds these claims remain ripe for federal adjudication. *See e.g.*, *Cone*, 556 U.S. 449, 466-67 (2009); *see also Forrest v. Vasquez*, 75 F.3d 562, 564 (9th Cir. 1996) (applying look through doctrine to *Waltreus* bars); *Kim v. Villalobos*, 799 F.2d 1317, 1319 n.1 (9th Cir. 1986) (applying look through doctrine to *Miller* bars).

## VI. PRELIMINARY MATTERS

The court takes judicial notice of the certified record on appeal to the California Supreme Court, all documents on file in the California Supreme Court in the case of *People v. Catlin*, Case No. S016718, (Kern County Superior Court No. CR30954), and all declarations, witness statements, and records filed on petitioner's behalf in his first state habeas corpus proceeding before the California Supreme Court, *In re Catlin*, Case No. S090636 including portions of the Reporter's Transcript and Clerk's Transcript in *People v. Steven D. Catlin* (Monterey County Superior Court No. CR 11388) (*see* 1SHCP Ex.'s 100-102), and in his second state habeas corpus proceeding before the California Supreme Court, *In re Steven David Catlin*, Case No. S173793 (*see* Doc. No. 98).[7]

Petitioner's request for judicial notice of the entire record in *People v. Steven D. Catlin* (Monterey County Superior Court No. CR 11388) and its associated appeal in the Sixth District Court of Appeal (Cal Ct. App. Case No. H002078, June 13, 1988) is denied because he has not demonstrated

---

[7] To the extent Petitioner requests to expand the record to include the noted state appeal and habeas records already included in the state record, the request is denied as moot. (*See* Doc. No. 25 at n.9.)

that those materials were before the state supreme court at the time it rendered its decision, or properly the subject of record expansion.[8]  28 U.S.C. § 2254(d)(2; *Pinholster*, 563 U.S. at 181, 185.

## VII. REVIEW OF CLAIMS[9]

### A.  Claims Alleging Trial Court Error at the Guilt Phase

1.  Legal Standard

Trial court error violates due process where it renders the resulting criminal trial fundamentally unfair.  *Chambers v. Mississippi*, 410 U.S. 284, 294, 303 (1973).

In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge. *Spivey v. Rocha*, 194 F.3d 971, 976 (1999). "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner. *Boyde v. California*, 494 U.S. 370, 380 (1990).

Additionally, a reviewing court does not engage in a technical parsing of the instruction's language, but instead approaches the instructions in the same way that the jury would -- with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Johnson v. Texas*, 509 U.S. 350, 368 (1993).  Lastly, federal courts presume that juries follow instructions, including cautionary instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *see also Boyde*, 494 U.S. at 381-85; *Tan v. Runnels*, 413 F.3d 1101, 1115 (2005).

Any error in the state court's determination of whether state law supported an instruction in this case cannot form the basis for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 71 (1991) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

Even if constitutional instructional error has occurred, the federal court must still determine whether petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict

---

[8]  The prior conviction issued in Monterey County is final and presumed valid.  *See Lackawanna County District Attorney, et al., v. Coss* (*Lackawanna*), 532 U.S. 394, 402-04 (2001).
[9]  The petition numbers claim "57" as claim "47" (Doc. No. 25 at 521), fails to number claims 58 (Doc. No. 25 at 566) and 59 (Doc. No. 25 at 589), and includes two claims 67 (Doc. No. 25 at 641-56) which hereinafter are referred to by the court as claims 67(1) and 67(2).

had the instruction been given. *Clark*, 450 F.3d at 916.

2. Claims 1, 2 and 4

Petitioner alleges the trial court erred by admitting evidence of the prior Monterey County proceeding on the death of Glenna as evidence of an uncharged crime (i.e. claim 1) committed for "financial gain" (i.e. claim 2), and instructing the jury thereon (i.e. claim 4), denying him due process, equal protection, an impartial jury, a fair trial, a reliable sentence and placing him in double jeopardy, violating his rights under the Fifth, Sixth, Eighth and Fourteenth. (Doc. No. 25 at 68-86, 95-97.)

**a. State Court Direct and Collateral Review**

*i. Claim 1*

Petitioner's allegation that admission of "other crimes" evidence violated his state and federal rights to due process, equal protection, a fair trial, a reliable conviction and sentence, and freedom from double jeopardy, under the Fifth, Eighth and Fourteenth Amendments was considered on direct appeal and denied on the merits and as procedurally defaulted. *Catlin*, 26 Cal. 4th at 119-23.

The claim was raised in the second state habeas petition and denied on procedural grounds including raised and rejected on direct appeal (*In re* Waltreus).[10] (Order No. S173793.)

*ii. Claim 2*

Petitioner's allegation that admission of testimony that he gained financially from Glenna's murder violated his Fifth (double jeopardy) and Eighth (reliable sentence) rights was considered on direct appeal and denied on the merits. Catlin, 26 Cal. 4th at 123-28.

The claim was raised in the second state habeas petition and denied on procedural grounds including raised and rejected on direct appeal (*In re* Waltreus). (Order No. S173793.)

*iii. Claim 4*

Petitioner's allegation that the jury instructions regarding the uncharged crime evidence denied him due process, an impartial jury and a reliable conviction and sentence pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments was considered on direct appeal and denied on the merits. *Catlin*,

---

[10] A federal habeas court looks through a *Waltreus* order to the prior state court decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991).

26 Cal. 4th at 144-47.

The claim was raised in the second state habeas petition and denied on procedural grounds including raised and rejected on direct appeal (*In re Waltreus*). Order No. S173793.

**b.    Analysis**

*i.    Admission of Uncharged Crime Evidence*

Petitioner argues the Kern County trial court, over defense objection (RT 37-39, 49-56; CT 1892-99) errantly admitted subject to proper foundation evidence from the Monterey proceeding concerning the death of Glenna as other crimes evidence, finding it probative. (*Id.*) He argues his federal constitutional claims were not addressed on the merits by the California Supreme Court and that factfinding by that court was unreasonable and that rejection of the claim by that court should be reviewed *de novo* by this Court. (*See e.g.*, Doc. No. 95 at 98.)

Petitioner's arguments are discussed separately, below.

**(1)    Paraquat Poisoning**

Petitioner argues that even though the Kern County jury was not formally informed prior to its guilt phase verdict of Petitioner's conviction in Monterey County for the first-degree murder of Glenna (as required by Penal Code § 190.1(a)); (*see* RT 5352-54), the other crimes evidence that had been admitted suggested Petitioner poisoned Joyce with paraquat just as he poisoned Glenna (RT 37, 49; CT 1883) prejudicially confusing and distracting the jury with improper criminal propensity evidence. (*See* Doc. No. 25 at 68 citing *Smith v. Massachusetts*, 543 U.S. 462 (2005); *Brazzel v. Washington*, 491 F.3d 976, 981 (9th Cir. 2007).

He notes that prosecution experts in the Monterey proceeding, Drs. Kilburn and Stephens, testified there that paraquat was one of a number of possible causes of Joyce's death (RT 4033-36 [Dr. Kilburn]; RT 3765 [Dr. Stephens]). Petitioner suggests that admission of the evidence impermissibly lessened the prosecution's burden of proving the charged offenses.

The state supreme court denied the allegations on direct appeal, stating that:

Defendant contends the court erred in permitting the prosecution to introduce evidence regarding the murder of Glenna. As noted, defendant's prior *conviction* for this crime was not admitted until after the jury reached its guilty verdict (see § 190.1, subds. (a) & (b) [trial of a special circumstance allegation that the defendant has suffered a prior murder conviction shall be held only after the jury has reached a guilty verdict and made

22

findings on any other special circumstance allegation]), but *evidence* regarding the murder of Glenna was admitted as evidence of an uncharged crime made admissible by Evidence Code section 1101. Defendant, however, contends that the murder of Glenna did not bear common marks with the charged murders of Joyce and Martha. He contends the evidence relating to Glenna was not material to the issue of identity and did not tend to establish a common scheme or plan.

Before trial, the prosecutor moved to admit evidence that defendant had murdered Glenna by administering paraquat. The prosecutor contended this evidence tended to demonstrate that Martha and Joyce were poisoned by a criminal agency, that this criminal agency was paraquat, and that defendant was the person responsible for the murders. Defendant objected on the basis of Evidence Code section 1101, subdivision (b). The trial court announced that it would review the preliminary hearing transcript and the transcript of the hearing held on a motion pursuant to section 995. The following day, defense counsel urged that the evidence concerning Glenna was weak, did not establish beyond a reasonable doubt defendant's responsibility for her murder, had little probative value in the present trial, but would have considerable prejudicial impact. The court ruled that the evidence was probative and could be admitted.

We review the trial court's determination for an abuse of discretion, examining the evidence in the light most favorable to the court's ruling. (*People v. Kipp*, *supra*, 18 Cal.4th at pp. 369, 370.)

We have observed above that, despite the prohibition against admitting evidence of an uncharged crime to demonstrate a defendant's criminal propensity, such evidence is admissible to show identity or the existence of a common scheme or plan. (*People v. Kipp*, *supra*, 18 Cal.4th at p. 369.) This type of evidence, when offered on the issue of identity, "must be highly similar to the charged offenses." (*Ibid.*) Evidence tending to establish a common plan or design should demonstrate " 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

In the present case, the charged and uncharged crimes bore a number of highly distinctive common marks. As we already have discussed in connection with defendant's severance claim, each victim was a close female relative of the defendant-wife or mother. In each instance, the defendant stood to gain financially from the victim's death. In the case of Glenna and Martha, it was overwhelmingly established that the victims had ingested paraquat before death. Expert opinion evidence based on observations regarding the clinical course of each woman's illness established that the cause of death for all three victims was paraquat poisoning. Such poisoning is rare and is unlikely to be the cause of death for three persons closely related to one individual. Rather, the occurrence of three similar poisonings of related persons supports inferences regarding identity and a common plan. (See *People v. Diaz*, *supra*, 3 Cal.4th at pp. 561-562 [multiple lidocaine poisonings]; *People v. Ruiz*, *supra*, 44 Cal.3d at pp. 605-606 [repeated disappearances of the wives of the defendant]; *People v. Archerd*, *supra*, 3 Cal.3d at pp. 621, 638 [multiple insulin poisonings of relatives of defendant].) The murders of Glenna and Joyce bore other common marks-in each case the victim was the defendant's wife, each woman was healthy, then initially suffered flu-like symptoms, followed by respiratory collapse over a period of days. Evidence that defendant had poisoned one wife was relevant to establish that another apparently healthy wife had died through a criminal agency, namely poison. (See *People v. Ruiz*, *supra*, 44 Cal.3d at p. 606.)[6] The trial court did not abuse its discretion in determining that the evidence of the uncharged crime was relevant to identity and to show a common scheme or plan.

n.6 Defendant improperly refers to statements of the trial court in the Monterey County prosecution that led to his conviction for the murder of Glenna. We denied defendant's request to augment the record on appeal to include the transcript of the Monterey County trial, and that transcript is not part of the record on appeal in the present case.

--------------------END FOOTNOTE--------------------

Defendant complains that evidence establishing that Glenna died by paraquat poisoning should not have been introduced to show that Joyce died of the same cause. He contends that toxicological evidence existed to demonstrate that paraquat was the cause of Glenna's death, but that there was no toxicological evidence supporting the opinions of the prosecution's expert witnesses who had concluded that Joyce died of paraquat poisoning. In fact, he complains, the expert opinion evidence pertaining to Joyce was based not solely upon clinical observations regarding the course of her illness but also in part upon the evidence demonstrating that Glenna and Martha had died by paraquat poisoning. He accuses the prosecution of *creating* the common marks between the killing of Glenna and Joyce, rather than relying upon existing features in common between the two killings.

As we have observed, the common marks between the murders of Glenna, Martha, and Joyce certainly were relevant to establish that all three died pursuant to a common design. It was not necessary that the prosecution be able to prove that Joyce died of paraquat poisoning by evidence entirely *independent* of the evidence relating to the murder of Glenna.[7] And, of course, the evidence relating to the uncharged murder of Glenna was not the only evidence tending to show the cause of Joyce's death. Evidence relating to the charge that defendant killed his mother Martha by paraquat poisoning had the same effect vis-a-vis the murder of Joyce. Strong expert opinion testimony based on clinical evidence and postmortem examination of tissue also supported the conclusion that Joyce died of paraquat poisoning.

--------------------FOOTNOTE--------------------

n.7 Defendant emphasizes that the information charging that he murdered Joyce did not include an allegation that the murder was committed by means of poison. We do not believe that this circumstance strengthens defendant's claim that the evidence pertaining to Glenna was not relevant to show identity or a common scheme or plan. As noted, the murder of Glenna was relevant to show a criminal agency in the death of Joyce, and to support an inference as to the identity of her murderer.

--------------------END FOOTNOTE--------------------

Defendant makes a related claim that the evidence of the uncharged crime was more prejudicial than probative. He contends the evidence that was related to Glenna was unduly prejudicial, because the jury necessarily would realize that defendant had suffered a prior conviction for murder.

Evidence of an uncharged crime may be admitted only if its substantial probative value is not outweighed by a danger of undue prejudice, of confusion of the issues, or of misleading the jury. "On appeal, a trial court's resolution of these issues is reviewed for

24

abuse of discretion. [Citation.] A court <u>abuses</u> its discretion when its ruling 'falls outside the bounds of reason.'" (*People v. Kipp, supra*, 18 Cal.4th at p. 371.)

The jury was not informed that defendant had suffered a conviction for the murder of Glenna until after it had returned its guilty verdict. Clearly, evidence regarding the circumstances of the murder of Glenna was of substantial probative value. In ruling upon the motion to admit evidence of Glenna's murder, the trial court reasonably could conclude that the probative value of the evidence outweighed the risk that the jury might suspect that defendant had been convicted of the murder of Glenna, despite the procedural protection provided by section 190.1. As respondent claims, the prospect of undue prejudice arising from a suspicion regarding a prior conviction was speculative, because the prosecutor did not plan to offer evidence of the conviction until after the guilty verdict. When at trial, as defendant now complains, an expert witness undergoing defense cross-examination referred to his testimony in a "prior trial," defendant did not object or seek an admonition to the jury, and that prior testimony, of course, was not before the trial court when it ruled on the motion pursuant to Evidence Code section 1101.

Defendant claims that the trial court erred prejudicially in failing to place on the record the process by which it concluded that the probative value of the evidence outweighed its prejudicial impact, but such explanations are not required. (*People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].) In any event, it is clear that the court carefully considered lengthy transcripts, written motions, and the arguments of counsel in reaching its conclusion, taking the matter under submission for a day in order to complete its review.

Defendant's contention that the admission of the other-crimes evidence violated his state and federal constitutional right to a fair trial is waived because it was not raised below. (*People v. Carpenter* (1997) 15 Cal.4th 312, 385 [63 Cal.Rptr.2d 1, 935 P.2d 708].)[8] In addition, he does not provide authority establishing that a state law permitting the admission of evidence of uncharged crimes violates a defendant's right to a fair trial. Reference to two federal cases discussing due process limitations on the admission of *irrelevant* character or criminal propensity evidence is unpersuasive; in both instances, the federal court determined that the disputed evidence was not material to any legitimate issue. (See *Henry v. Estelle* (9th Cir. 1994) 33 F.3d 1037, 1042, revd. on another point in *Duncan v. Henry* (1995) 513 U.S. 364 [115 S.Ct. 887, 130 L.Ed.2d 865]; *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1382-1385; see also *People v. Falsetta* (1999) 21 Cal.4th 903, 913-914 [89 Cal.Rptr.2d 847, 986 P.2d 182].) By contrast, we have determined that the disputed evidence in the present case was material to issues of identity and common scheme or plan and was admissible under Evidence Code section 1101.

--------------------FOOTNOTE--------------------

n.8 Defendant also claims perfunctorily that the admission of this evidence violated his right under the state and federal Constitutions to a reliable guilt and penalty determination. This claim, too, is waived and in any event is without merit. (See *People v. Jenkins, supra*, 22 Cal.4th at p. 1044.)

--------------------END FOOTNOTE--------------------

*Catlin*, 26 Cal. 4th at 119-23.

The state supreme court reasonably denied these allegations for the reasons stated by that court and the claim otherwise lacks merit upon *de novo* review, as discussed below.  As noted by that court, under state law, while "other crimes" evidence "is inadmissible when offered to prove [a person's] conduct on a specified occasion" (Doc. No. 25 at 70, citing Evid. Code. § 1101(a)), "evidence that a person committed crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident)" is not prohibited (*id.*, citing Evid. Code § 1101(b)).  The state supreme court, given the record before it reasonably could find the probative value of "other crimes" evidence outweighed inherent prejudice as argued by Petitioner.  (*See* Doc. No. 25 at 97 citing Evid. Code § 1101.)

Particularly, that court reasonably could find Petitioner failed to demonstrate on the record the jurors were confused and distracted the evidence (*see* Doc. No. 25 at 69), or that the prosecutor improperly used the evidence to show a propensity to commit the charged crimes.  (See *id.,* 69-70, citing Evid. Code § 1101(a)).  Petitioner's speculates the prosecutor's presentation and argument of the "other crimes" evidence at the beginning and end of the state's case in the Kern County trial prejudiced the jury's determination of the cause of death of Joyce and Martha (Doc. No. 25 at 74-75) but fails to show how this admissible evidence resulted in an unfair proceeding.

The state supreme court reasonably could find the extensive and disparate expert opinion evidence, otherwise admissible, presented a question of persuasive weight for the jury rather than raising an inference of prejudice.  Petitioner points out that while in 1976, Dr. Kilburn was unable to form an opinion whether paraquat was the cause of Joyce's death (RT 4034-35), at the 1990 Kern County trial, with the benefit of information that "came out in a previous [Monterey County] trial for the death of Glenna" and other information received in the investigation of the deaths of Glenna and Martha, Dr. Kilburn testified that paraquat was the "most likely" cause of Joyce's death.  (RT 4037.) He observes that similarly, Dr. Stephens opinion of cause of Joyce's death was influenced by the "investigative and clinical course" as well as microscopic findings.  (RT 3765.)   While Dr. Stephens concluded Joyce died of paraquat poisoning (RT 3765-3771), he testified on cross-examination that if he only had the "the microscopic slides on Joyce, [he] . . . would have to consider a viral infection" as the cause of death.  (RT 3823, 3810.)  However, the state supreme court reasonably could find such

matters went to weight rather than admissibility.

The state supreme court reasonably could find Petitioner failed to show constitutional error arising from what he characterizes as cumulative evidence relating to the Glenna and Martha homicides bootstrapping otherwise insufficient evidence that Joyce died from paraquat poisoning.  (*See* Doc. No. 25 at 74; *citing* 1SHCP Ex. 102 at 112, 181, 184, 189-95, 1161.)  He points out the autopsy following Joyce's 1976 death found no trace of paraquat in her tissues or evidence of foul play (RT 3217, 3452-58); Count I of the amended information did not allege that Joyce had been killed by the administration of poison (*see* CT 1395-96); and there was no direct tissue analysis evidence showing Joyce died from paraquat poisoning (*see* Doc. No. 25 at 70 n.38 citing Evid. Code §352; *see also* Doc. No. 25 at 73-74 citing 1SHCP Ex. 102 at 181).

However, the argument reasonably could be seen as unavailing for the reasons stated above by the state supreme court in finding the trial court did not err in admitting the "other crimes" evidence. Petitioner does not demonstrate the evidence was inadmissible to the extent it may have been probative of only circumstantial evidence.  (*See* Doc. No. 25 at 77.)

Furthermore, Petitioner's argument the "other crimes" evidence allowed the Kern County jury to conclude petitioner had been convicted of Glenna's murder during the guilt phase, contrary to Penal Code section 190.1(a), was reasonably rejected by the state supreme court.[11]  The jury presumably understood and followed their instructions as to the criminal counts and evidence before them during guilt deliberations, which did not include the prior conviction.  (CT 1926.)

Notably, this is not a case like *McKinney v. Rees*, 993 F.2d 1378, 1386 (9th Cir. 1993), relied upon by Petitioner.  (See Doc. No.95 at 98.)  The *McKinney* court found prejudice under *Brecht* "because of the lack of a weighty case against McKinney, and pervasiveness of the erroneously admitted evidence throughout the trial, we think it highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict."  *McKinney*, 993 F.2d at 1386.  Such is not the case here, for

---

[11] Penal Code section 190.1(a) provides in pertinent part as follows: "A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows: (a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted of the offense of murder in the first or second degree."

the reasons stated.

State law error, if any there be, is not alone a basis for relief. *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988),

### (2) Financial Gain

Petitioner faults the trial court for admission of evidence regarding financial gain in connection with the murder of Glenna Catlin, evidence relating to a special circumstance allegation that was dismissed by the Monterey trial court. (*See* Doc. No. 25 at 78, *citing* RT 3511-14, 1SHCP Ex. 102 at 840-44.) He states that the trial court in the Kern County proceeding admitted evidence of Petitioner's alleged financial gain motive in Glenna's murder, that he had received over $112,000 in death benefits. (*See* 1SHCP Ex. 102 at 548-53; RT 3514-19, 4054-55.) He argues this financial gain evidence suggested to the jury that Petitioner had the same motive in the Joyce and Martha homicides. (Doc. No. 25 at 79.) He argues his rights to due process, a reliable sentence, and freedom from double jeopardy were violated thereby.

The states supreme court denied the allegation, stating that:

> Defendant contends that evidence that he received life insurance proceeds after Glenna died should have been excluded under the collateral estoppel doctrine. He claims violations of the federal constitutional protection against being placed twice in jeopardy and of his federal constitutional right to a fair trial and a reliable verdict.

> At trial, defendant made an in limine motion to exclude evidence regarding the payment defendant had received as the beneficiary of Glenna's life insurance policy. He contended the evidence should be excluded under the doctrine of collateral estoppel because, on motion of the defense pursuant to section 1118.1, the court entered a not true finding as to the special circumstance alleging murder for financial gain. In support, he offered one page from the clerk's transcript of that trial-a minute order indicating the granting of the section 1118.1 motion as to that special circumstance allegation. The trial court in the present case determined that although the trial court in the Monterey County trial had found the evidence presented in *that* trial insufficient to support a true finding that the murder of Glenna had been undertaken for financial gain, that ruling did not preclude the introduction of evidence relating to defendant's motive for killing Glenna in the separate trial for the murders of Joyce and Martha.

> Under the collateral estoppel doctrine, which is a component of the Fifth Amendment's double jeopardy clause (*People v. Santamaria* (1994) 8 Cal.4th 903, 912, fn. 3 [35 Cal.Rptr.2d 624, 884 P.2d 81]), "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (*Ashe v. Swenson* (1970) 397 U.S. 436, 443 [90 S.Ct. 1189, 1194, 25 L.Ed.2d 469].) In the present case, however, defendant was not on trial for the murder of Glenna, and the question whether defendant murdered her for financial gain within the meaning of section 190.2, subdivision (a)(1), was not an issue of ultimate fact to be determined in the present proceeding.

We observe that the collateral estoppel doctrine does not prohibit the admission of evidence that has been introduced in a trial resulting in an acquittal from being admitted for all purposes at a subsequent proceeding. As the United States Supreme Court declared in *Dowling v. United States* (1990) 493 U.S. 342, 348 [110 S.Ct. 668, 672, 107 L.Ed.2d 708], the doctrine does not "exclude in all circumstances ... relevant and probative evidence that is otherwise admissible ... simply because it relates to alleged criminal conduct for which a defendant has been acquitted." The *Dowling* case is instructive because, like the present case, it involved evidence of uncharged crimes. The defendant in *Dowling* had been acquitted of burglary and attempted robbery, but evidence relating to those charges nonetheless was introduced against him in a subsequent prosecution for a different robbery. The evidence of the uncharged crime was relevant to establish the defendant's modus operandi. Introduction of such evidence did not violate the collateral estoppel doctrine, because "the prior acquittal did not determine an ultimate issue in the present case." (*Id.* at p. 348 [110 S.Ct. at p. 672].) Because in the subsequent trial the prosecution was not required to establish beyond a reasonable doubt the defendant's identity as the robber in the uncharged crime involved in the prior trial, collateral estoppel principles did not bar introduction of that evidence in the subsequent unrelated trial.

Also instructive is this court's decision in *People v. Santamaria*, *supra*, 8 Cal.4th 903. In that case we determined that (assuming the doctrine of collateral estoppel applied to retrial of the same case) a prior not true finding on an allegation that a defendant had used a knife in connection with a murder did not, at a subsequent retrial for the murder, bar evidence establishing the defendant's use of the knife. We explained: "[T]he jury's not true finding on the enhancement allegation does not mean defendant did not use the knife, only that there was a reasonable doubt that he did. In *Ashe* [*v. Swenson*, *supra*, 397 U.S. 436], the verdict, viewed realistically, showed the jury had a reasonable doubt as to the defendant's identity as the robber. That doubt necessarily precluded conviction of the robbery charge. But the same doubt as to the knife use did not preclude a murder conviction here, although it did mandate a not true enhancement finding. [¶] Evidence that defendant personally used a knife was highly relevant to show that he was guilty of murder as that offense is defined by statute. That evidence, together with the evidence that if he did not use a knife, he was guilty as the aider and abettor, combined to permit the murder conviction. But the specific fact of personal use does not have to be proved beyond a reasonable doubt to find defendant guilty of murder. Hence, personal use is not an 'ultimate fact' of murder." (*People v. Santamaria*, *supra*, 8 Cal.4th at p. 922, italics omitted.)

Examining the same case, the Ninth Circuit Court of Appeals agreed: "In this case, the State failed to prove beyond a reasonable doubt the ultimate fact that Santamaria used a knife for the weapon enhancement in the first trial. However, to convict him of murder under California law, the State is not required to prove beyond a reasonable doubt that Santamaria used a knife. [Citation.] Therefore, the use of a knife is not an ultimate fact for the retrial, and the State cannot be precluded from presenting evidence that Santamaria stabbed the victim." (*Santamaria v. Horsely* (9th Cir. 1998) 133 F.3d 1242, 1247; see also *People v. Memro* (1995) 11 Cal.4th 786, 821-822 [12 Cal.4th 783d, 47 Cal.Rptr.2d 219, 905 P.2d 1305] [the trier of fact's finding at a prior trial that a felony-murder special circumstance was not true did not collaterally estop the retrial of the murder charge on a felony-murder theory].) As with the not true finding on the knife-use allegation in *Santamaria*, and the felony-murder allegation in *Memro*, the not true finding on the murder for financial gain special-circumstance allegation in the trial for Glenna's murder merely established that the state in the prior proceeding had been unable to prove beyond a reasonable doubt that defendant had murdered Glenna for financial gain as charged in the murder for financial gain special circumstance. In the present case, however, the prosecution was not required to establish that fact beyond a reasonable doubt or, indeed, to prove it at all.

Defendant claims that special circumstance allegations necessarily are part of the prosecutor's burden of proof in a capital case, unlike the personal use of a knife in a prosecution for murder. He contends that "determination of a special circumstance is an ultimate fact" and that the financial-gain special-circumstance allegation relating to the murder of Glenna could not be relitigated. His contention is unpersuasive, because although the financial-gain special-circumstance allegation formed part of the prosecutor's burden of proof in the trial for the murder of Glenna, there was no special circumstance allegation in the present case that defendant had murdered Glenna for financial gain. Such an allegation relating to the murder of Glenna was not charged and was not part of the prosecutor's burden of proof at the guilt phase in the present case and, indeed, it was not being relitigated at all in this proceeding.

Defendant relies upon *Bullington v. Missouri* (1981) 451 U.S. 430 [101 S.Ct. 1852, 68 L.Ed.2d 270] in support of his claim that once a special circumstance allegation is found not true, it may not be retried.

The court in *Bullington* determined on double jeopardy grounds that the prosecution could not seek the death penalty on retrial of a case in which the jury originally had imposed a life sentence. Under Missouri law, the prosecution was required to prove certain facts beyond a reasonable doubt at the penalty hearing, and the jury's penalty determination had "the hallmarks of the trial on guilt or innocence." (*Bullington v. Missouri*, *supra*, 451 U.S. at p. 439 [101 S.Ct. at p. 1858].) Accordingly, the defendant could not be subject to retrial as to penalty after the trial court granted his motion for new trial on the basis of guilt phase error.

The *Bullington* case does not assist defendant's present claim, because the court in that case did not determine that in a trial for *different* capital crimes, evidence regarding a crime of which the defendant was convicted but for which the death penalty was not imposed could not be admitted. The case merely established that factual findings favorable to the defendant made at the penalty phase of a capital trial barred retrying the penalty determination in that case. The *Bullington* case does not stand for the proposition that evidence relevant to a special circumstance allegation that was found not true-and also relevant to the underlying murder, of which a defendant was convicted-cannot be admitted for the purpose of establishing guilt of different crimes in a separate trial.[9]


--------------------FOOTNOTE--------------------

n.9 Contrary to defendant's claim, this evidence was not made inadmissible by section 1118.2, which provides: "A judgment of acquittal entered pursuant to the provisions of Section 1118 or 1118.1 shall not be appealable and is a bar to any other prosecution for the same offense." Defendant was not being prosecuted for the murder of Glenna, and no appeal of the not true finding on the financial gain special circumstance was attempted.


--------------------END FOOTNOTE--------------------

Defendant maintains, however, that it was "inherently unfair" to admit evidence of financial gain related to the murder of Glenna after the not true finding on the financial-gain special-circumstance allegation in the trial for Glenna's murder. He continues: "Although, technically appellant was not being tried a second time for Glenna's murder, the introduction of the Glenna financial gain evidence had that effect. The prosecution's sole purpose for introducing financial gain evidence from appellant's Monterey County trial [involving Glenna's murder] into appellant's Kern County case was to support the

prosecution's theory that Joyce was murdered, rather than died of natural causes, and that the financial gain special circumstance charged in Count II, Martha's homicide, was true."

Defendant's own argument rebuts the claim that the introduction of evidence of financial gain constituted a retrial of the charge involving the murder of Glenna. The evidence was admitted to establish facts regarding the murders of Joyce and Martha, not to relitigate defendant's responsibility for murdering Glenna for the purpose of financial gain. Defendant claims that when, in the present case, the jury learned that defendant had received a sentence of life without possibility of parole for Glenna's murder, they decided to punish him more severely. This claim is speculative and is unrelated to defendant's claim that the evidence at the trial for Glenna's murder should have been excluded at the guilt phase. We observe additionally that this argument was not raised below as a basis for excluding the evidence at the guilt phase, and is waived on appeal. (See *People v. Ashmus*, *supra*, 54 Cal.3d at p. 973, fn. 10.)

Defendant objects to the manner in which the prosecutor employed evidence of defendant's financial motivation to kill Glenna. Defendant refers to the prosecutor's use of this evidence to support the claim that defendant also murdered Joyce and Martha in part for financial reasons. Defendant contends that the evidence was irrelevant to the charge that defendant murdered Joyce, because no financial gain special circumstance was alleged as to her. This claim is not persuasive, because evidence of defendant's motive for killing Joyce was relevant to the charge that defendant had murdered her, even without a financial gain special circumstance. He makes the additional claim that the evidence regarding defendant's receipt of life insurance proceeds on Glenna's death "lent undue weight" to the "weak" evidence that defendant killed Martha for financial gain. Defendant's claim goes to the weight, and not to the admissibility, of the evidence. As long as the evidence properly was admitted, as we have determined it was, the weight to be accorded the evidence was for the jury to decide.

Defendant also notes that the jury was not instructed at the guilt phase of the present case that the financial-gain special-circumstance allegation in the trial for Glenna's murder had been found not true. Defendant did not request such an instruction and, indeed, made every effort not to disclose to the jury that he had been tried for Glenna's murder. An instruction that the special circumstance allegation that he had murdered Glenna for financial gain had been found not true could give rise to an inference that, despite the not true finding on the special circumstance allegation, he previously had been tried and convicted of the murder of Glenna. Because of the potential for prejudice arising from the instruction which defendant now claims should have been given, no sua sponte duty to give such an instruction should be imposed. (See § 190.1, subd. (b) [providing for trial of a prior murder conviction special-circumstance allegation only after a guilty verdict has been reached on the charged crimes].)

Defendant claims that as part of the guaranty against cruel and unusual punishment provided by the Eighth Amendment of the United States Constitution, any evidence is unreliable that relates to a crime as to which the defendant has been acquitted. He cites in support *Beck v. Alabama* (1980) 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392]. That opinion does not support his claim. In *Beck*, the high court disapproved a state rule limited to capital cases, that prohibited the fact finder from considering a lesser included offense within the capital charge, thereby forcing an all-or-nothing choice between the death penalty and acquittal. (*Id.* at p. 637 [100 S.Ct. at pp. 2389-2390]; see also *People v. Waidla*, *supra*, 22 Cal.4th at p. 736, fn. 15; *People v. Breverman* (1998) 19 Cal.4th 142, 166-167 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) Although the high court in that case observed that it has "invalidated procedural rules that tended to diminish the reliability of the sentencing determination" and of the guilt determination (*Beck v. Alabama*, *supra*, 447 U.S. at p. 638 [100 S.Ct. at p. 2390]), defendant has not produced any authority suggesting that otherwise admissible evidence relating to an allegation found not true necessarily

31

must be excluded as unreliable at the guilt phase of a capital trial for a *different* crime. (See *People v. Jenkins*, *supra*, 22 Cal.4th at p. 1044 [discussing the scope of the reliability requirement under the Eighth Amendment of the United States Constitution].)

Catlin, 26 Cal. 4th at 123-28.

The state supreme court reasonably rejected the allegation and the claim otherwise lacks merit upon *de novo* review. For the reasons stated by that court and those discussed below, Petitioner was not twice placed in jeopardy as he alleges.

Petitioner argues that the uncharged crimes evidence was unreliable and biased the jury toward death (Doc. No. 25 at 82, *citing Beck v. Alabama*, 447 U.S. 625, 637-38 at n.13 (1980)); and that presentation of this evidence in the Kern County proceeding was barred by collateral estoppel as incorporated into the double jeopardy clause. (Doc. No. 25 at 80.) He argues the prosecution used this evidence to circumstantially support its case that Joyce was murdered for money (rather than died of natural causes) (*see e.g.*, RT 5296-97); the financial gain special circumstance charged in Martha's homicide was true (*See* Doc. No. 25 at 84 citing RT 37-38, 49, 50, 55-56, 5196-99, 5290-97; CT 1882); and to argue in aggravation at the sentencing phase that Petitioner killed for money (Doc. No. 25 at 84-85 *citing* RT 5488).

Petitioner argues the Kern County court denied him due process and placed him in double jeopardy by relitigating a special circumstance allegation as to Martha (i.e., murder for financial gain) after the Monterey County court had acquitted Petitioner of the allegation. (Doc. No. 25 at 81, citing *Bullington v. Missouri*, 451 U.S. 430, 444-45 (1981) (special circumstance allegations shall be determined by the trier of fact on the evidence presented).

The record reflects the Monterey County trial court granted a defense *in limine* motion for acquittal on the financial gain special circumstance under Penal Code section 1118.1 and that issue did not reach the jury and was not subject of jury's findings embodied in the final Monterey County judgment. (*See* RT 3511-14; 1SHCP Ex. 102 at 840-44.)

Here, Petitioner has not pointed to clearly established Supreme Court law precedent that admission of uncharged crimes evidence violates double jeopardy or equal protection rights. Nor has he demonstrated that he was twice put in jeopardy for the same offense. (CT 1777-79.) Petitioner

acknowledges he was not retried in Kern County for Glenna's murder, but argues the introduction of the financial gain evidence was so unfair that it had the effect of a retrial. (Doc. No. 25 at 82.)

The state supreme court reasonably could find Petitioner merely surmises the Kern County jury likely used the Monterey County evidence to effectively modify the conviction and LWOP sentence he received in Monterey County and punish him more severely through the Kern County conviction and sentence. (*Id.*) It remains that Petitioner was not retried in Kern County for Glenna's killing. The state supreme court reasonably could find the other uncharged crimes evidence was properly admitted in the Kern County proceeding, for the reasons stated by that court. *Catlin*, 26 Cal. 4th 124 citing *Dowling v. United States*, 493 U.S. 342, 348 (1990) (evidence relating to an acquittal is not excluded for all purposes under collateral estoppel doctrine).

Petitioner's related argument the Monterey other crimes evidence of acquittal on the financial gain special circumstance went to an ultimate issue in the Kern County proceeding and should have been precluded under collateral estoppel document, reasonably is unpersuasive, for the reasons stated. The murder of Glenna was not a charged offense in Kern County. Petitioner cannot rely upon *Ashe* in this regard. In *Ashe*, collateral estoppel applied where defendant was acquitted in the first trial and to have convicted him in the second trial would have required the second jury reach a directly contrary conclusion. *See Dowling*, 493 U.S. at 348, citing *Ashe*, 397 U.S. at 445. Petitioner reasonably has not demonstrated that was the case here, for the reasons stated. (*See* e.g. Doc. No. 25 at 84 n.52.) Petitioner has not demonstrated the Ninth Circuit's holding in *Santamaria v. Horsely* is authority otherwise or dictates a difference result. 133 F.3d 1242 (9th Cir. 1998). To the extant *Santamaria* is authority that an acquittal is an acknowledgment the government failed to prove the essential elements of the offense beyond a reasonable doubt, 133 F.3d at 1246, it is of no assistance to Petitioner, for the reasons stated.

Petitioner's further suggestion the Monterey County finding of insufficient evidence to support the financial gain special circumstance precludes the prosecution's introduction of such evidence in the Kern County proceeding to argue the same theory of relevance (*see* Doc. No. 95 100-101), is unsupported by clearly established Supreme Court authority.

At bottom, whether Petitioner killed Glenna for financial gain was not an ultimate issue in the Kern County proceeding. *See Dowling*, 493 U.S. at 348. Petitioner does not properly invoke and satisfy

either double jeopardy or collateral estoppel doctrine. Whether he killed Glenna for financial gain was not an ultimate issue in the Kern County proceeding. The allegation thus fails even if recast as a due process violation. *See Sattazahn v. Pennsylvania*, 537 U.S. 101, 116 (2003) (due process claim fails where merely a double-jeopardy claim in different clothing).

### ii. Jury Instruction on Uncharged Crime Evidence

Petitioner alleges the trial court improperly instructed the jury with a modified version of CALJIC 2.50 that allowed the uncharged crime evidence to be considered in determining cause of death for Joyce and Martha, denying him a fair trial, an impartial jury, and a reliable conviction and sentence. He argues the erroneous instruction lessened the prosecution burden of proof. (Doc. No. 95 at 105.)

The state supreme court rejected the allegation on direct appeal, stating that:

> Defendant contends the court erred in instructing the jury that it could consider other-crimes evidence in determining the cause of death in the charged crimes, particularly with respect to the murder of Joyce.
>
> The trial court instructed the jury, regarding their evaluation of other-crimes evidence, according to a modified version of CALJIC No. 2.50. Over defense objection, the trial court granted the prosecutor's request that the instruction be modified to state that other-crimes evidence may be considered not only for the purpose of establishing the identity of the person responsible for the charged offenses, but also for the purpose of determining the cause of death of the victims in the charged offenses.[16]

--------------------FOOTNOTE--------------------

n.16 The court instructed the jury: "Evidence has been introduced for the purpose of showing that the Defendant committed ... crimes other than [those] for which he is on trial. Such evidence, if believed, was not received and may not be considered by you to prove that Defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show the cause of death of the victims in the crimes, if any[,] of which the Defendant is accused, the identity of the person who committed the crimes, if any[,] of which the Defendant is accused[.] For the limited purpose of which you may consider such evidence you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

--------------------END FOOTNOTE--------------------

Defendant contends that he was "convicted of a capital offense on evidence which would not satisfy the reasonable doubt standard." In support, he claims that uncharged

crimes evidence that he killed Glenna improperly was admitted in the present case. We already have determined that the evidence properly was admitted.

Defendant also contends that the court violated his right to a fair trial and to a reliable penalty determination by giving the modified version of CALJIC No. 2.50, because the modified instruction "lessened the prosecution's burden of proof on the crucial issue of cause of death." If defendant means that the prosecutor's burden of proof was lightened because the instruction entitled the jury to consider improperly admitted evidence of cause of death, it suffices to note that we already have rejected the contention that this evidence was admitted improperly.

Defendant's principal contention seems to be that other-crimes evidence may be admitted only for the purpose of proving intent, identity, motive, knowledge, and conspiracy. Cause of death, he claims, is not an appropriate object of proof for other-crimes evidence. Rather, he asserts, cause of death may be proved only by expert opinion testimony.

Evidence Code section 1101, subdivision (b), permits the admission of other-crimes evidence against a defendant "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ...) other than his or her disposition to commit such an act." Section 1101 prohibits the admission of other-crimes evidence for the purpose of showing the defendant's bad character or criminal propensity. It recognizes, however, that there are facts other than criminal propensity to which other-crimes evidence may be relevant. (*People v. Ewoldt, supra,* 7 Cal.4th at p. 393.) The categories listed in section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence but, contrary to defendant's contention, the list is not exclusive. (*People v. Key* (1984) 153 Cal.App.3d 888, 894 [203 Cal.Rptr. 144]; see also *People v. Thompson* (1980) 27 Cal.3d 303, 315, fn. 14 [165 Cal.Rptr. 289, 611 P.2d 883]; 1 Witkin, Cal. Evidence, *supra,* Circumstantial Evidence, § 75, p. 411.) As we have explained, the admissibility of other-crimes evidence depends upon the materiality of the fact sought to be proved or disproved, the tendency of the uncharged crime to prove or disprove the material fact, and the existence of any policy requiring exclusion of the evidence. (*People v. Thompson*, *supra*, 27 Cal.3d 303, 315.) In order to be material, the fact in dispute "may be either an ultimate fact in the proceeding or an intermediate fact 'from which such ultimate fact[] may be ... inferred.' " (*Ibid.*, fn. omitted.)

Defendant's not guilty plea put in issue all the elements of the charged offenses. (*People v. Balcom* (1994) 7 Cal.4th 414, 422 [27 Cal.Rptr.2d 666, 867 P.2d 777].) Evidence tending to demonstrate the cause of death was relevant to demonstrate that a murder-and not a natural death-had occurred. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 171 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Scheid* (1997) 16 Cal.4th 1, 15 [65 Cal.Rptr.2d 348, 939 P.2d 748].) Evidence that defendant previously had murdered his wife Glenna by poisoning her with paraquat was relevant to the issue of the cause of death in the charged crimes, because it tended to corroborate the other evidence establishing that Joyce and Martha died of paraquat poisoning. (See *People v. Diaz*, *supra*, 3 Cal.4th at pp. 561-562; *People v. Ruiz*, *supra*, 44 Cal.3d at pp. 605-606; *People v. Montalvo* (1971) 4 Cal.3d 328, 332 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518] [evidence that defendant previously injected a young girl with heroin, causing certain reactions, was relevant to prove that in the charged crime, a substance that caused the same reactions when injected also was heroin].)

We are not persuaded by defendant's contention that the cause of death may be established only through expert opinion testimony and not through other-crimes evidence. Cases he cites in support declare only that expert opinion testimony on the question of cause of death also is admissible. (See *People v. Mayfield*, *supra*, 14 Cal.4th

at p. 766; *People v. Cole* (1956) 47 Cal.2d 99, 103-104 [301 P.2d 854, 56 A.L.R.2d 1435].) Other evidence relevant to cause of death also is admissible. (See, e.g., *People v. Mendoza*, *supra*, 24 Cal.4th at p. 171; *People v. Scheid*, *supra*, 16 Cal.4th at p. 15; *People v. Diaz*, *supra*, 3 Cal.4th at pp. 561-562.)

Defendant complains that the instruction informed the jurors that in the event they found that Glenna died of paraquat poison, they could find from that fact alone that both Joyce and Martha died of paraquat poison. We do not believe, however, that the instruction conveyed that impression. It directed the jury to consider "if" the other-crimes evidence "tends" to demonstrate cause of death and identity, and directed the jury to weigh the evidence in the same manner as it would weigh all other evidence in the case.

Defendant claims that the giving of the instruction violated his state and federal constitutional rights to due process of law and to a fair trial. He contends that by permitting the jury to convict him on the basis of evidence of his criminal propensity, the instruction relieved the prosecution of its full burden of proof on the issue of the cause of the victims' deaths. We have concluded already, however, that the instruction did not permit the jury to rely on evidence of defendant's criminal propensity, and that it did not direct that the jury could determine the cause of Joyce's and Martha's deaths solely from evidence establishing that the cause of Glenna's death was paraquat poisoning.

Defendant also complains that the modified instruction failed to explain exactly what type of other-crimes evidence could be considered. In support, he cites *People v. Rollo* (1977) 20 Cal.3d 109 [141 Cal.Rptr. 177, 569 P.2d 771]. In that case this court stated that when evidence of a prior conviction has been admitted for impeachment purposes and other-crimes evidence also has been admitted pursuant to Evidence Code section 1101, subdivision (b), the trial court should instruct the jury as to which evidence is referred to in the CALJIC No. 2.50 instruction, in order to avoid confusion. (*Rollo*, *supra*, 20 Cal.3d at p. 123, fn. 6.) In the present case, in addition to the other-crimes evidence, evidence that defendant had suffered a prior forgery conviction was admitted for impeachment purposes. Even if we consider this claim as invoking the federal Constitution, with its exacting standard of prejudice, we conclude that any error in failing to modify CALJIC No. 2.50 was harmless beyond a reasonable doubt. The jury was instructed that the evidence of a prior conviction could be considered only for the purpose of impeachment. We believe there is no reasonable possibility that the jury considered the prior forgery conviction in making its determinations, in accordance with CALJIC No. 2.50, on the issues of cause of death and the identity of the perpetrator. (See *Chapman v. California*, *supra*, 386 U.S. 18, 24 [87 S.Ct. 824, 828].)

*Catlin*, 26 Cal. 4th at 144-47.

Petitioner has not shown the state supreme court acted reasonably and the claim otherwise lacks merit on *de novo* review. In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge. *Spivey*, 194 F.3d at 976. "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. Additionally, a reviewing court does not engage in a technical parsing of the instruction's

language, but instead approaches the instructions in the same way that the jury would -- with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Johnson,* 509 U.S. at 368. Lastly, federal courts presume that juries follow instructions, including cautionary instructions. *Weeks*, 528 U.S. at 234; *see also Boyde*, 494 U.S. at 381-85; *Tan*, 413 F.3d at 1115.

Petitioner argues the trial court erred in giving the following modified CALJIC 2.50 instruction given to the jury in the Kern County proceeding over defense objection (RT 5160):

> Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: The cause of death of the victims in the crimes, if any, of which the defendant is accused; The identify [sic] of the person who committed the crimes, if any, of which the defendant is accused.

CT 1947.

Petitioner suggests this instruction, given in the abstract and without reference to the evidence to which it related, improperly lessen the prosecution burden of the charges. (Doc. No. 25 at 95 *citing Francis v. Franklin*, 471 U.S. 307, 314 (1985) (jury instructions violate due process if they relieve the of the burden of persuasion on an element of an offense). This is so, he reasons, because CALJIC 2.50 allows consideration of "other crimes" evidence only where it tends to show intent, identity, motive, knowledge and conspiracy (see Doc No. 25 at 96), not cause of death as the prosecution used it here (*see* RT 5309; CT 1947). He argues that cause of death is established by medical expert testimony. (Doc. No. 25 at 96.) He suggests the "other crimes" evidence and modified instruction were prejudicial because they allowed the jury to find that Joyce and Martha died from paraquat poisoning based on the "other crimes" evidence from the Monterey County proceeding and without regard to the relevant expert medical testimony on this issue in the Kern County proceeding. (Doc. No. 25 at 96.)

Yet the state supreme court reasonably could find the uncharged crimes evidence from the Monterey proceeding was probative of the crimes charged in the Kern County proceeding and properly admitted therein, as stated by that court. Particularly, evidence suggesting Petitioner killed Glenna by poisoning her with paraquat tended to corroborate other evidence that he killed Joyce and Martha by a plan of poisoning them with paraquat. *See Catlin*, at 146; *(see also* RT 3765-71, 4037.)

Here again, Petitioner has not pointed to clearly established Supreme Court precedent as a basis for relief. *See Blystone*, 494 U.S. at 305 (it is sufficient that "jury be allowed to consider and give effect to all relevant mitigating evidence").

Nor has Petitioner demonstrated to a level exceeding surmise that on the factual record this instruction and evidence lessened the prosecution's burden of proving the charged offenses beyond a reasonable doubt. Even if the modified instruction was improper as a matter of state law, that alone is not a basis for federal habeas relief. *Dunckhurst*, 859 F.2d at 114.

In sum, the state supreme court reasonably could find the challenged instruction, considered in a common-sense fashion in the context of all the instructions given and presumably followed by the jurors did not deny Petitioner his federal rights. *Weeks*, 528 U.S. at 243.

### iii. Harmless Error

Even if the trial court erred as alleged, the California Supreme Court reasonably could find such error had no substantial and injurious effect on the outcome. *Brecht*, 507 U.S. at 620. The other crimes evidence was properly admitted, for the reasons stated. Petitioner has not demonstrated on the evidentiary record any reasonable likelihood the jury applied the trial court's total instructional charge so as to preclude consideration of constitutionally relevant evidence.

A common-sense application of the instructions given to the facts and circumstances of this case suggests the possibility of prejudice from the omitted instructions is only remote.

Moreover, federal courts may not interfere with a state evidentiary ruling unless the evidence was so prejudicial that its admission violated fundamental due process and the right to a fair trial. *Jeffries v. Blodgett*, 5 F.3d 1180, 1192) (9th Cir. 1993). Here, the noted evidence against Petitioner was substantial. (*See e.g.*, claims 30, 31.)

### c. Conclusions

The state supreme court reasonably could find trial court did not err by admitting evidence of the prior Monterey County proceeding on the death of Glenna as evidence of an uncharged crime, committed for "financial gain," and instructing the jury thereon.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claims 1, 2, and 4 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Aspects of the claims considered *de novo* fail for the reasons stated.

Claims 1, 2, and 4 shall be denied.

3.      Claim 3

Petitioner alleges the trial court erred by admitting testimony by successor prosecution expert Dr. Ford on issues alleged time of ingestion of paraquat, onset of symptoms and progression of illness in the deaths of Glenna and Martha that differed from testimony in the Monterey County proceeding by predecessor prosecution expert Dr. Buteau on the same issues, denying due process, a fair trial, confrontation of evidence, effective assistance of counsel, and a reliable conviction and sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[12]  (Doc. No. 25 at 87.)

**a.      State Court Direct and Collateral Review**

The claim was raised on direct appeal as prosecutorial misconduct and a denial of due process, equal protection, and a fair trial under the Fifth and Fourteenth Amendments and found inappropriate for resolution on appeal.  *Catlin*, 26 Cal. 4th at 143-44.

The claim was raised in the first state habeas petition on Sixth and Fourteenth Amendment grounds and denied on the merits.  (Order No. S090636.)

The same claim was raised in the second state habeas petition on Fifth, Sixth, Eighth, and Fourteenth Amendment grounds and denied on procedural grounds including to the extent aspects of the claim other than ineffective assistance of counsel and the constitutionality of the death penalty were raised and rejected on direct appeal (*In re Waltreus*) and raised and reached in the prior state habeas petition (*In re Miller*).   (Order No. S173793).

**b.      Analysis**

Petitioner faults the trial court for admitting prosecution proffered expert opinion on events of

---

[12] Claimed prosecutorial misconduct and ineffective assistance of counsel are analyzed separately, below.

ingestion, onset of symptoms and progression of illness in the Monterey County proceeding and Kern County preliminary hearing (relating to the charged murder of Glenna and the uncharged homicides of Joyce and Martha) that differed from and allegedly were inconsistent with expert opinion on the same events it offered in the Kern County trial proceeding (relating to the charged murders of Joyce and Martha and the special circumstances prior murder of Glenna).

The state supreme court found aspects of the claim inappropriate for resolution on direct appeal, stating that:

> Defendant contends that the testimony of Dr. Buteau, a prosecution expert witness at the Monterey County trial for the death of Glenna, was substantially different from the testimony of Dr. Ford, a prosecution expert witness who testified at the trial in the present case. He complains that at the first trial and at the preliminary hearing in the present case, Dr. Buteau suggested that Glenna and Martha would have exhibited symptoms of paraquat poisoning within 12 to 24 hours of ingestion of paraquat.[15] Under facts developed by defendant in the present case, it would have been unlikely or less likely that defendant could have administered the poison if the 12 to 24-hour timeframe were accurate. At trial in the present case, Dr. Ford, another expert, testified that Martha's symptoms were consistent with an earlier administration of the poison, and Glenna's with a later administration of the poison-in each instance times at which defendant had the opportunity to administer the poison. Defendant claims that the prosecutor committed misconduct in violation of defendant's right to a fair trial by prosecuting the present case under a different theory and with different evidence than was presented at the earlier trial for the murder of Glenna.

--------------------FOOTNOTE--------------------

n.15 As noted above, the trial record in the Monterey County case is not part of the record on appeal in the present case.

--------------------END FOOTNOTE--------------------

> To the extent defendant's claim is based upon inconsistencies between the testimony of Dr. Ford in the present case and that of Dr. Buteau at a different trial, those inconsistencies could be explored on cross-examination and through the presentation of defense evidence. In fact, Dr. Ford was cross-examined regarding these inconsistencies, and defendant called Dr. Buteau as a defense witness. With respect to the possibility that separate trials relating to the same crime improperly may have been tried under inconsistent theories, we examined a similar claim in *People v. Sakarias* (2000) 22 Cal.4th 596 [94 Cal.Rptr.2d 17, 995 P.2d 152]. (29) In that case, we determined that a contention that inconsistent theories of prosecution give rise to a claim that the prosecution wrongfully has employed different theories at two separate trials best is examined in connection with a petition for writ of habeas corpus, where the record of the prior trial may be examined and the reasons for the discrepancies may be analyzed and explained. (*Id.* at pp. 635-636.) For the same reason, we determine that the issue is not appropriate for resolution on direct appeal in the present case.

40

*Catlin*, 26 Cal. 4th at 143-44.

As discussed below, the state supreme court reasonably denied the claim on the merits to the extent raised in the first state habeas petition and the claim otherwise lacks merit upon *de novo* review, as discussed below.

    *i.    Allegedly Inconsistent Prosecution Theories*

Petitioner argues prosecution expert Dr. Ford opined at the Kern County proceeding paraquat ingestion timelines that varied from such timelines offered by predecessor prosecution expert Dr. Buteau in the Monterey proceeding and Kern County preliminary hearing. He suggests this change in theory was meant to avoid Petitioner's alibi defenses.

**(1)    Differing Testimony of Drs. Buteau and Ford**

Petitioner observes that as to Glenna, in the Monterey County proceeding and Kern County preliminary hearing prosecution expert, Chevron toxicologist Dr. Buteau, testified that given the concentration of paraquat in her tissue Glenna's symptoms of nausea and vomiting would have begun 12 to 24 hours after ingestion of paraquat. (Doc. No. 25 at 87 *citing* 1SHCP Ex. 102 at 307-08, 1273*; see also* RT 3943-44.)

Petitioner argues Dr. Buteau's opinion tended to support his alibi defense. He points to testimony from Glenna's mother that Glenna showed some symptoms beginning more than 48 hours after she had seen Petitioner (RT 3077-80) – suggesting Petitioner could not have administered the paraquat within the timeframe provided by Dr. Buteau.

Petitioner goes on to argue that in the Kern County trial, the prosecution used a different expert, Chevron toxicologist Dr. Ford, who opined that the symptoms observed by Glenna's mother were unrelated to subsequent paraquat induced symptoms he believes Glenna suffered within 12 to 24 hours of Petitioner having contact with her upon return from Las Vegas (RT 3928-30). Dr. Ford opined Glenna ingested paraquat on the day she became acutely ill. (*Id.*; *see also* RT 3971-73, 3981.) Dr. Ford's testimony tended not to support Petitioner's alibi defense.

Petitioner observes that as to Martha, in the Monterey County proceeding and Kern County preliminary hearing Dr. Buteau testified that given the concentration of paraquat found in her tissue, Martha ingested paraquat on December 5th or 6th, 1984, with symptoms beginning December 6th and

death following on December 8th. (1SHCP Ex. 102 at 298-313; CT 769-74.) Dr. Buteau suggested a presenting complication could be cardiac arrest. (1SHCP Ex. 102 at 298.)

Petitioner points to evidence in both his proceedings that he had no access to Martha during the period following December 2, 1984 and up to her death on December 8, 1984 (1SHCP Ex. 102 at 941-943, 947, 954-964, 986-87; RT 4415, 4428-4429, 4471-4473, 4589-4593, 4601-4608, 4709-12) – suggesting Petitioner could not have administered the paraquat within the timeframe provided by Dr. Buteau.

Petitioner goes on to argue that in the Kern County proceeding, Dr. Ford opined that Martha probably ingested paraquat 6 or 7 days prior to her death, within the period Petitioner had access to Martha. (RT 3921, 3957-61, 3984-85.)

Petitioner also argues that prosecution witness Mark Skinner, an employee of Petitioner, changed his testimony in order to place Petitioner in Martha's home within the paraquat ingestion timeline stated by Dr. Ford. (*Cf.* RT 3557-66 with RT 4251-72.)

*ii.        The Expert Testimony was Properly Admitted*

Petitioner has not demonstrated the noted expert testimony was improperly admitted. The jury presumably considered and weighed the expert opinion consistent with their instructions. Petitioner has not shown this process was materially unfair. Especially so, given the issue of ingestion timeline was not an ultimate issue in the charged offenses. *Cf.*, *Thompson v. Calderon*, 120 F.3d 1045, 1056-57 (9th Cir. 1997) (reversed and remanded in *Calderon v. Thompson*, 523 U.S. 538 (1998)) (state presented inconsistent theories as to the identity and motive of the killer in separate trials against two defendants charged with the same murder).

Petitioner argues that he was denied the right to confront the above noted "diametrically differing" and "inherently unfair" expert opinion. (Doc. No. 95 at 103.) Evidence, he argues was altered in the Kern County proceeding by the prosecution knowingly taking different positions with respect to the same events, denying him a due process right to a fair trial. (Doc. No. 25 at 92.) He suggests the prosecution is judicially estopped from taking such inconsistent positions (*see* Doc. No. 25 at 93 citing *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir. 1990) (judicial estoppel bars "making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one")

and should not have been allowed to introduce evidence of Glenna's murder not presented in the Monterey trial. He suggests the evidence admitted in the Kern County proceedings was akin to false testimony. (Doc. No. 95 at 93, 103.)

However, Petitioner fails to demonstrate that he was denied fair confrontation of properly admitted expert opinion in the Kern County trial. The record shows that counsel in the Kern County proceeding used Dr. Buteau's prior testimony in cross-examining prosecution witnesses including Dr. Ford. The defense also called Dr. Buteau to testify in that proceeding, asking no questions about Glenna's death, and eliciting testimony from Dr. Buteau that Martha ingested paraquat anywhere from a couple days to a week prior to her death (RT 4532-37) following his review of additional information including Dr. Ford's testimony. (RT 4546-49.) Dr. Buteau's modified testimony was not necessarily inconsistent with Dr. Ford's noted testimony because the suggested ingestion timelines somewhat overlapped.

Additionally, the opinions of other experts in Petitioner's Monterey and Kern County proceedings appear to be somewhat equivocal, qualified and inconclusive as to time Glenna and Martha might have ingested paraquat. For example, defense expert, Dr. Russell, testified in the Kern County proceeding that she was unable to say when Glenna ingested paraquat, but that she believed Glenna's symptoms while in Las Vegas were the result of paraquat. (RT 4389-90.) Dr. Russell further opined that Martha ingested paraquat approximately forty-eight hours before her death, conceding this timeline was variable depending upon other factors. (*See* RT 4388-4402.)

Dr. Stephens testified in the Kern County proceeding that he was uncertain when Glenna ingested the paraquat. (RT 3796.) Dr. Stephens did not opine on when Martha ingested paraquat, but he found it unlikely she ingested a large amount within 2 days of her death. (RT 3792-94, 3827.) Dr. Kilburn stated Martha's symptoms were consistent with having ingested paraquat 3 to 6 days before her death. (RT 4049.)

Petitioner's re-argued collateral estoppel theory, that he was convicted in the Kern County proceeding of murdering Martha and Joyce even though the Monterey county trial judge (i) ruled no rational trier of fact could be persuaded beyond a reasonable doubt that he poisoned Martha (thereby excluding evidence of Martha's death from the Monterey penalty phase) (*see* Doc. No. 25 at 90 citing 1SHCP Ex. 102 at 112, 183-94, 1161), and (ii) found that Petitioner's culpability for Joyce's murder

43

could not be proved by even a preponderance of evidence (thereby totally excluded evidence of that crime from Petitioner's Monterey County trial) (*id.* at 91 *citing* 1SHCP Ex. 102 at 181. RT 25-27). This re-argument fails for reasons stated in the discussion of claims 1, 2 and 4, above.

Similarly, Petitioner argument that in effect, he was unconstitutionally forced to stand trial on the charged and uncharged counts in both Monterey and Kern counties, denying him due process and equal protection, is unpersuasive, for the reasons stated. (*See* Doc. No. 25 at 90.) Prosecutors in both proceedings theorized that Petitioner poisoned Glenna and Martha with paraquat and that timelines for paraquat ingestion were somewhat variable. Petitioner has not demonstrated prosecution use of false expert testimony (*Napue v. Illinois*, 360 U.S. 264, 269 (1959) (prosecutor's knowing presentation of false testimony violates due process), or fundamental unfairness arising from admission of this evidence (*Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (verdict must be based upon the evidence developed at trial), for the reasons stated.

### c. Conclusions

The state supreme court reasonably could find trial court did not err by admitting the noted expert testimony.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claim 3 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

The balance of the allegations fails on *de novo* review, for the reasons stated.

Claim 3 allegations of trial court error shall be denied.

### 4. Claim 5

Petitioner alleges the Kern County trial court erred by admitting evidence of deaths of Joyce and Martha that was found legally insufficient as "other crimes" evidence in the Monterey County proceeding, denying him a fair trial and placing him in double jeopardy in the Kern County proceedings, violating his rights under the Fifth and Fourteenth Amendments. (Doc. No. 25 at 98.)

### a.      State Court Direct and Collateral Review

Petitioner's claim that the admission of evidence from the Monterey County proceeding in the form of preliminary hearing testimony regarding the killing of Martha and Joyce denied him a fair trial and placed him in double jeopardy was considered on direct appeal and partially denied on procedural grounds as to Martha and entirely denied on the merits as to the double jeopardy allegation. *Catlin*, 26 Cal. 4th at 128-30.

The claim was raised in the second state habeas petition and as to other than ineffective assistance of counsel and the constitutionality of the death penalty, it was denied on procedural grounds as raised and rejected on appeal (*In re Waltreus*).  (Order No. S173793.)

### b.      Analysis

Petitioner alleges the prosecution in the Kern County trial court was collaterally estopped from relitigating issues and testimony of the deaths of Joyce and Martha that were decided found insufficient as other crimes evidence in the Monterey County proceeding.  (Doc. No. 25 at 98-99 citing 1SHCP Ex. 102 at 112, 181-94, 1161.)

Specifically, he argues the Monterey County court considered uncharged crime evidence and necessarily found Petitioner was not culpable for the deaths of Joyce and Martha and that the Kern County court should have been bound by these findings.  (*See* Doc. No. 95 at 106.)  He invokes *Ashe* in arguing that relitigation of the issue in Kern County violated his federal rights.  (*See* 397 U.S. at 445.) However, the allegation lacks merit upon deferential and *de novo* review, as follows.

####  i.      Collateral Estoppel Regarding Monterey County Rulings on Other Crimes Evidence

Petitioner argues the Monterey County court finally determined that evidence relating to Joyce's murder was inadmissible, i.e. that:

> [The evidence] falls short of the degree of proof that is required for admissibility. The Court instructs us that we have to, when they're [uncharged crimes] [ ] use extreme caution in something like that. I thought Dr. Russell's testimony was very convincing. I do not [sic] feel that some of the other experts unconsciously are affected by the fact of what transpired since 1976. Where you look at the evidence relating to the defendant's guilt relative to Joyce's death, unaffected by the other deaths, I think it does not amount to proof by a preponderance of the evidence. So, I'll grant the motion for the defense to not admit that [evidence of Joyce's death] into the trial.

(Doc. No. 25 at 100 *citing* 1SHCP Ex. 102 at 181.)

Petitioner argues the Kern County court was bound by this finding at his later trial for the charged crime of murdering Joyce because "the issues in the two trials vis-à-vis the Joyce Catlin homicide were identical." (Doc. No. 25 at 100.)

Petitioner also argues the Monterey County court finally determined that evidence presented there was insufficient to show beyond a reasonable doubt that he committed the (therein uncharged) murder of Martha (*see* Doc. No. 25 at 99 *citing* 1SHCP Ex. 102 at 112), precluding such aggravating evidence at the penalty phase. Petitioner argues the Kern County court was bound by this finding at Petitioner's later trial for the charged crime of murdering Martha wherein "substantially the same evidence" was used against Petitioner. (Doc. No. 25 at 99.)

Petitioner argues the prosecution improperly relitigated such matters in the Kern County proceeding denying him due process and exposing him to double jeopardy. (*Id.* at 100.)

The state supreme court, in rejecting these allegations, stating that:

> Defendant contends that, under the collateral estoppel doctrine of the state and federal Constitutions, rulings by the trial court at his Monterey County trial for the murder of Glenna should have barred the trial court in the present case from admitting evidence concerning the murders of Martha and Joyce. As we shall explain, this contention clearly lacks merit.
>
> Defendant alleges that in the Monterey County trial, the court had before it the preliminary hearing transcripts for the charged murders of Joyce and Martha, and the prosecution sought to introduce evidence of both of those murders at the guilt phase of the Monterey proceedings, pursuant to Evidence Code section 1101, subdivision (b). According to defendant, the trial court excluded from the guilt phase of the Monterey County trial all evidence suggesting that defendant had murdered Joyce, on the ground that the prosecution had not established defendant's commission of that crime even by a preponderance of the evidence. Defendant further alleges that although the trial court permitted the prosecution to introduce evidence of Martha's murder at the guilt phase of the Monterey County trial, the court subsequently refused to permit the prosecution to rely upon that murder as a factor in aggravation at the penalty phase, on the ground that the prosecution's evidence failed to establish beyond a reasonable doubt defendant's culpability for murdering Martha.
>
> As noted, defendant contends that these alleged rulings by the trial court in the Monterey County proceeding operated, by virtue of the collateral estoppel doctrine, to preclude the trial court in the present proceeding from admitting evidence concerning the murders of Martha and Joyce. In essence, defendant claims that the charges should have been dismissed, because without evidence of the murders of Martha and Joyce the prosecution would be unable to carry its burden of proof.
>
> Defendant did move at trial in the present case to dismiss count one, involving the murder of Joyce, on collateral estoppel grounds. He did not move to dismiss count two, involving

46

the murder of Martha. His claim as to that count may not be raised for the first time on appeal. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1201 [65 Cal.Rptr.2d 240, 939 P.2d 354] [plea of once in jeopardy cannot be raised for the first time on appeal except in the context of a claim of ineffective assistance of counsel]; *People v. Marshall* (1996) 13 Cal.4th 799, 824, fn. 1 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) To the extent any failure on the part of counsel to raise a meritorious claim below could have constituted ineffective assistance of counsel, we reach the merits of the claim as to each count. (See *People v. Marshall*, *supra*, 13 Cal.4th at p. 824, fn.1.)

The record in the present case does not contain the hearing in the Monterey County trial court with respect to the evidence of the murders of Martha and Joyce, so we cannot comment on the basis for the Monterey trial court's determination. Even if we assume that defendant's assertions regarding the Monterey trial court's ruling are correct, however, it is clear that defendant's guilt or innocence of the crimes of murdering either Martha or Joyce were not issues of ultimate fact to be determined in the Monterey County trial for the murder of Glenna. Defendant was not acquitted of the murders of Joyce and Martha in Monterey County. (See *Gikas v. Zolin* (1993) 6 Cal.4th 841 [25 Cal.Rptr.2d 500, 863 P.2d 745]; see also *People v. Davis* (1995) 10 Cal.4th 463, 514 [41 Cal.Rptr.2d 826, 896 P.2d 119].) Further, just as the trial court in the present case, involving defendant's prosecution for the murders of Joyce and Martha, properly could admit evidence supporting the inference that defendant had killed Glenna for financial gain despite the finding of the trial court in a separate trial for the murder of Glenna that the murder for financial gain special circumstance had not been proved, the trial court properly could permit defendant's prosecution for the murders of Martha and Joyce despite the circumstance that in another trial on a different charge, a court had determined that the evidence then before the court at a hearing on the admissibility of evidence of other crimes did not establish defendant's guilt of the murders of Martha and Joyce. Defendant does not provide authority, and our research has not produced support, for the claim that a murder may not be prosecuted if in a prior prosecution for a *different* crime, evidence regarding that murder was not considered strong or reliable enough to be admitted as evidence of guilt or as evidence supporting a factor in aggravation.

*Catlin*, 26 Cal. 4th at 128-30.

The state supreme court reasonably rejected the claim for the reasons stated by that court. The claim otherwise fails on *de novo* review. The record reflects that Petitioner was not charged with the murders of Joyce and Martha in the Monterey County proceeding. Whether Petitioner murdered Joyce or Martha was not an issue of ultimate fact before the Monterey County court; no ruling thereon, conviction or acquittal, was rendered by the Monterey court. Accordingly, principles of collateral estoppel are not implicated. *See Dowling*, 493 U.S. at 349.

The jury presumably considered the admissible other crimes evidence consistent with its instructions. Petitioner has not demonstrated constitutional error in this regard. State law error, if any there be, alone is not a basis for federal habeas relief.

Accordingly, it does not appear that the California Supreme Court's rejection of aspects of claim

5 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

The claim otherwise lacks merit upon de *novo* review, for the reasons stated.

### c. Conclusions

The state supreme court reasonably could find trial court did not err by admitting evidence of deaths of Joyce and Martha that was found legally insufficient as "other crimes" evidence in the Monterey County proceeding.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claim 5 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

The balance of the allegations fails on *de novo* review, for the reasons stated.

Claim 5 shall be denied.

### 5. Claims 6 and 19[13]

Petitioner alleges the trail court erred by denying counsel's motion to sever amended information Count I (1976 murder of Joyce) from Count II (1984 murder of Martha) (i.e. claim 6), and by failing to provide separate juries for the guilt and penalty phases (i.e. claim 19), denying him due process, a fair trial, an impartial jury, and freedom from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 102, 192; *see also* CT 1762-66, 1781-85; RT 57-59.)

### a. State Court Direct and Collateral Review

### i. *Claim 6*

Petitioner's allegation that the joint trial on counts I and II violated his rights to due process and

---

[13] Petitioner repeats aspects of claims 6 and 19 in his claim 37.

48

a fair trial under the Fifth and Fourteenth Amendments was considered on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 110-113.

The claim was raised in the second state habeas petition and (as to other than ineffective assistance of counsel and the constitutionality of the death penalty) it was denied on procedural grounds as raised and rejected on appeal (*In re Waltreus*). (Order No. S173793.)

*ii.    Claim 19*

Petitioner's allegation that trying the guilt and penalty phases before the same jury violated his rights to a fair trial, due process, a reliable determination of guilt and penalty by an impartial jury, and freedom from cruel and unusual punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 113–15.

The claim was raised in the second state habeas petition and denied on procedural grounds (as to other than ineffective assistance of counsel and the constitutionality of the death penalty) as raised and rejected on appeal (*In re Waltreus*). (Order No. S1736793.)

**b.    Analysis**

Petitioner alleges the trial court erred by denying counsel's motion to sever counts I and II, and by failing to provide separate juries for guilt and penalty phases.

The claims lack merit upon deferential and *de novo* review, as follows.

*i.    Failure to Sever Counts I and II*

Petitioner argues that the trial court's failure to try the counts separately improperly allowed the jury to consider all the evidence when deciding each count where the evidence "was neither of equal strength nor cross-admissible." (Doc. No. 25 at 102 *citing Williams v. Superior Court*, 36 Cal 3d. 441, 451-452 (1984) (joinder of crimes which are not cross-admissible so prejudicial as to violate due process) (superseded by statute as stated in *People v. Simon*, 1 Cal. 5 th 98, 124 (2016); *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993) (introduction of other bad acts violated defendants' right to a fundamentally fair trial).

Petitioner argues the erroneous failure to sever the counts confused the jury regarding the evidence and law relating to separate murders of Joyce and Martha and resulted in the improper aggregation of evidence from the separate counts so as to alter the outcome at trial. (Doc. No. 25 at 104

*citing People v. Sandoval*, 4 Cal. 4th 155, 172-73 (1992) (requirements under Penal Code section 954 for joint trial met where both counts involved the same class of crimes – murder); *id.* at 109 citing *People v. Smallwood*, 42 Cal.3d 415, 427 (1986) ("Clearly joinder should never be a vehicle for bolstering either one or two weak cases against one defendant particularly where conviction in both will give rise to a possible death sentence.").

Especially so here, he argues, as the jury in his Kern County proceeding was death qualified and thus more conviction prone. (*See* Doc. No. 25 at 108 citing *Hovey v. Superior Court*, 28 Cal. 3d 1, 81 (1980) (superseded by statute as stated in *People v. Jackson*, 1 Cal. 5 th 269, 357 (Cal. 2016) (providing for individual, sequestered death penalty qualification voir dire); *cf. Lockhart v. McCree*, 476 U.S. 162, 173 (1986) (death qualification without more not a denial of due process).

Petitioner argues the effect of this error was prejudicial because the evidence supporting each count was not cross-admissible; the weight of the evidence supporting Count II was greater and more inflammatory than that supporting the more remote in time Count I concerning the apparently natural death of Joyce eight years earlier (*see* CT 366-408, 1524-26; RT 3135, 3239-43, 3457-59, 3810-12, 3823); the prosecution sought the death penalty only on Count II; and a death qualified jury heard the non-capital Count I. (*See* Doc. No. 25 at 103-04, *citing People v. Sully*, 53 Cal. 3d 1195, 1222-1223 (1991) (factors to be considered in severance analysis include whether the evidence is cross-admissible, certain charges are inflammatory or involve the death penalty, and a weak case joined with a stronger case). As an example of this prejudicial spillover effect, Petitioner notes that the medical experts were uncertain as to the cause of Joyce's death until made aware of subsequently developed evidence presented in the murders of Glenna and Martha.

Then effective Penal Code section 954 provided that:

> An accusatory pleading may charge two or more different offenses connected together in their commission ... or two or more different offenses of the same class of crimes ... provided that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately.

The California Supreme Court considered and denied the failure to sever allegation on direct appeal, stating that:

Defendant contends that the court abused its discretion in denying his motions to sever count one, charging him with the murder of Joyce, from count two, charging him with the murder of Martha. He contends the error constituted a denial of his constitutional right to due process of law and a fair trial.

Section 954 provides that "[a]n accusatory pleading may charge ... two or more different offenses of the same class of crimes or offenses, under separate counts, ... provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately ...." The offenses in the present case were of the same class, and accordingly joinder was permissible. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

As we have explained: "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.] [¶] ... Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak case has been joined with a strong case, or with another weak case, so that the spillover effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case." (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1315.) Significantly, "if evidence on each of the joined crimes would have been admissible in a separate trial of the other crimes, such cross-admissibility ordinarily dispels any inference of prejudice ...." (*Id.* at p. 1316.) We examine the record before the trial court at the time of its ruling to determine whether the court abused its discretion in denying the severance motion. (*People v. Price* (1991) 1 Cal.4th 324, 388 [3 Cal.Rptr.2d 106, 821 P.2d 610].)[3]


--------------------FOOTNOTE--------------------

n.3 New constitutional and statutory provisions adopted by Proposition 115, adopted in June 1990 (see Cal. Const., art. I, § 30, subd. (a); Pen. Code, § 954.1) were not in effect at the time of the ruling on the severance motion and are not considered here. (*See People v. Bradford*, *supra*, 15 Cal.4th at p. 1314, fn. 13.)


--------------------END FOOTNOTE--------------------

In a separate trial for the murder of Joyce, evidence that defendant had murdered Martha by paraquat poisoning would have been cross-admissible pursuant to Evidence Code section 1101. "Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. [Citation.] Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) In addition, "[t]o be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses." (*Ibid.*) The similarity, considering the degree of similarity and the number of common marks, should amount to a signature. (*Id.* at p. 370.)

51

In order to be relevant as a common design or plan, "evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].) We have explained that "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts," and that "evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the *same* design or plan he or she used in committing the uncharged acts." (*Id.* at p. 403, italics added.)

In the present case, each count bore a number of distinctive common marks. In each instance, the victim was a close female relative of the defendant-wife or mother. In each instance, the defendant stood to gain financially from the victim's death. In Martha's case, it was overwhelmingly established that the victim had ingested paraquat before death. Strong expert opinion evidence based on observations regarding the clinical course of the illness and the appearance of tissue removed at the autopsy established that the cause of death for Joyce also was paraquat poisoning. Paraquat poisoning is rare, and its occurrence with respect to two close relatives of one person is unlikely to be a matter of chance or to be the result of a spontaneous impulse. When evidence of a third instance of the same type of poisoning is introduced, as it properly was in the present case, the inference regarding a common design or plan becomes very strong. (See *People v. Diaz* (1992) 3 Cal.4th 495, 561-562 [11 Cal.Rptr.2d 353, 834 P.2d 1171] [when defendant claimed that hospital patient victims died of natural causes or due to negligence of hospital personnel, evidence that in an uncharged crime another victim attended by defendant died of lidocaine poisoning was relevant and admissible under Evid. Code, § 1101, subd. (b), to refute defendant's claim as to the cause of death and to establish identity and modus operandi]; *People v. Ruiz* (1988) 44 Cal.3d 589, 605-606 [244 Cal.Rptr. 200, 749 P.2d 854] [the abrupt disappearance of one wife under suspicious circumstances indicating foul play would be admissible to show identity of the perpetrator of the murder of defendant's fifth wife, who disappeared under similar circumstances]; *People v. Archerd, supra,* 3 Cal.3d at pp. 621, 628 [evidence that defendant had killed relatives by insulin poisoning was admissible evidence of modus operandi and knowledge of the means used to prove that he murdered other relatives by insulin poisoning].) We believe that these circumstances "dispel any inference of prejudice" arising from the joinder of the two counts. Even if we consider defendant's other claims of prejudice, we observe that neither crime was more inflammatory than the other. Further, contrary to defendant's claim, it cannot be said that the evidence of defendant's guilt of the murder of Joyce was particularly weak, especially in light of the proper admission of the evidence of the murder of Glenna by the same common plan.

Defendant also claims prejudice on the ground that his right to an impartial jury was impaired because the joinder subjected the jury to voir dire on prospective jurors' attitudes concerning the death penalty. Defendant contends that at a separate trial on the noncapital count charging defendant with the murder of Joyce, the jury would not have been death qualified and persons opposed to the death penalty would not have been excluded. The exclusion from a jury of persons opposed to the death penalty, however, does not violate the state or federal constitutional right to an impartial jury. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1198 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Ashmus* (1991) 54 Cal.3d 932, 956-957 [2 Cal.Rptr.2d 112, 820 P.2d 214].) In a case in which defendants are tried jointly, a defendant charged with a noncapital crime does not have a right to severance on the ground that his or her jury no longer will be impartial if exposed to the death qualification voir dire required by a codefendant's capital charges. (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 794 [7 Cal.Rptr.2d 152].) Under defendant's theory, a capital and a noncapital offense never could be joined - a proposition that certainly is

not supported by our case law.

Defendant finally contends that joinder was prejudicial because having heard evidence of both crimes, the jury would believe "the only way to properly punish appellant for committing two murders (Joyce and Martha) was to find him guilty of Martha's murder and thereby assure the death penalty." We agree with respondent that the claim is speculative and is particularly unpersuasive because the matter of penalty was not under consideration at the time the guilty verdict was rendered. In addition, because the evidence would have been cross-admissible even in separate trials, severance would not have avoided the result surmised by defendant. We conclude that the trial court did not abuse its discretion in denying defendant's motion to sever the trial of counts one and two.

*Catlin*, 26 Cal. 4th at 110-113.

The state supreme court reasonably denied the allegations. Misjoinder violates the constitution only where the prejudicial effect denies defendant a fair trial. *United States v. Lane*, 474 U.S. 438, 446, n.8 (1986).

Petitioner argues the state supreme court erroneously found the failure to sever the counts did not deny him a fair trial. (*See* Doc. No. 95 at 108 citing *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997) (considering whether a joint trial denied due process).

However, the evidence relating to counts I and II reasonably appeared cross-admissible for the reasons stated by the California Supreme Court. Petitioner's reliance upon *McGuire v. Estella*, a case not involving joined claims, is not authority otherwise. 873 F.2d 1323 (9th Cir. 1989) (opinion withdrawn and superseded by *McGuire v. Estelle*, 902 F.2d 749 (1990)) (reversed by *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)) (a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States).

Notably, the Kern County jury was instructed that counts I and II charged separate crimes which were to be decided separately. (RT 5320-25.) The jury was aware that the forensic and expert opinion varied as to whether and the extent to which paraquat might have been involved in Joyce's death. For example, the jury heard testimony that the autopsy report on Joyce made no mention of paraquat. (RT 3238.) The jury was aware the coroner's death certificate stated the cause of death as respiratory failure due to severe bilateral pneumonitis due to undetermined micro-organisms. (RT 3239-40.)

Joyce's treating physician, Dr. Einstein, agreed with this cause of death, but opined at the 1990 Kern County trial that Joyce nonetheless died from paraquat damaged lungs. (RT 3219, 3240-43.)

Prosecution expert Dr. Ford testified that based upon his review of Joyce's medical records and Dr. Einstein's testimony, he believed Joyce died from paraquat ingestion. (RT 3916.)

Dr. Kilburn, a USC medical professor, testified that based upon his 1976 examination of Joyce's lung tissue received from autopsy physician Dr. Swinyer and prosecution forensic medical expert Dr. Stephens, his initial belief was that Joyce's lung damage could have been caused by any number of agents including paraquat poisoning (RT 4010-29); and that subsequently upon learning information presented in the Monterey proceeding he came to believe beyond a reasonable doubt that paraquat was the cause of Joyce's death. (RT 4032-45.)

Dr. Stephens, considering similar information, also opined that Joyce died from paraquat poisoning beyond a reasonable doubt. (RT 3826.)

Defense expert Dr. Russell testified that upon review of Joyce's autopsy records and medical history, she believed her lung damage could have been caused by any number of agents including paraquat poisoning (RT 4377-86.)

Defense toxicology and poison expert Dr. Bayer testified that upon his review of Joyce's medical records, he believed her symptoms were more consistent with infection that paraquat poisoning. (RT 5036-52.)]

The state supreme court reasonably could find these expert opinions admissible and for the jury to weigh, as discussed above. (*See* claims 1-5, *ante*.) Petitioner has not demonstrated otherwise.

Petitioner's further argument that prejudice was apparent in juror confusion over whether Joyce was a capital count (*see* Doc. No. 95 at 108 citing Ex.'s 143, 145, 147) reasonably could be found unpersuasive. As noted, the Kern County jury was instructed that counts I and II charged separate crimes which were to be decided separately. (RT 5320-25; *see also* claim 37, *post*.) The evidence relating to counts I and II was cross-admissible for the reasons stated by the California Supreme Court. (*See Catlin*, 26 Cal. 4th at 110.)

### ii. Failure to Empanel Separate Guilt and Penalty Phase Juries

Petitioner argues that the trial court erred in denying counsel's motion for separate juries. (*See* RT 46-47, 57-59; CT 1785, 1857-60; *see also* CT 1490.) He argues the inflammatory effect his prior conviction for Glenna's murder likely had on the Kern County jury's guilt determination. He argues

California's death penalty statute acknowledges as much by requiring that where, as here, a prior murder special circumstance is charged, the special circumstance shall be tried separately from the guilt trial. Penal Code § 190.1(a-b).

Particularly, Petitioner argues prejudice resulting from exposing the Kern County jury, already biased due to death qualification, to facts relating to the three murders, Glenna, Joyce and Martha. (CT 1859; RT 18-20); *Bruton v. United States*, 391 U.S. 123, 131, n.6 (1968)) (right to an impartial jury requires exclusion of other crimes evidence where such evidence would inordinately prejudice the jury); *see also Williams,* 36 Cal 3d. at 451-452 (joinder of crimes which are not cross-admissible so prejudicial as to violate due process). He argues the deaths of Joyce and Martha were distinct and distant events similar only by inference – such that cross-admissibility of evidence was improper. Especially so, he argues, as the prosecution case in Martha's death was much stronger that in Joyce's death, and given juror bias from death qualification and confusion arising from the uncharged crime evidence from Glenna's proceeding.

California law provides that the same jury that determined guilt shall determine the penalty, "unless for good cause shown, the court discharges that jury in which case a new jury shall be drawn." Penal Code § 190.4(c); *People v. Rowland*, 4 Cal.4th 238, 268 (1992) ("[C]ontrary to the Court of Appeal's conclusion, [in People v. Superior Court [Rowland] . . . the court had authority to entertain the motion, [for separate juries] even though it was made prior to trial.").

The state supreme court rejected the allegations, stating that:

> Defendant contends that the trial court erred in denying his motion for separate guilt and penalty phase juries. He claims a violation of his federal constitutional rights to an impartial jury, to a fair trial, and to a reliable sentencing determination. Referring to the special circumstance allegation that he committed the murder of Martha after having previously been convicted of another murder (§ 190.2, subd. (a)(2)), defendant contends it is inherently unfair to have the same jury try the guilt and penalty phases of a capital case when one of the special circumstances is a prior murder allegation. He contends that although the jury did not learn of the prior-murder-conviction special-circumstance allegation until after it had rendered its verdict in the guilt phase, he was forced to voir dire the potential jurors on their attitude toward a prior murder conviction in order to secure an unbiased penalty phase jury. He claims that this circumstance prejudiced the guilt phase deliberations, because voir dire questions hinted that defendant had suffered a prior murder conviction. He also contends that trial of both phases by the same jury produced a penalty phase jury that, knowing now of the prior conviction, would be prejudiced by defendant's earlier denials regarding the murder of Glenna.
>
> Defense counsel's motion for separate juries was denied without prejudice to renewal at

the conclusion of the guilt phase. It does not appear from our examination of the record that the motion was renewed. Defendant claims, however, that the trial court totally failed to exercise its discretion with respect to his motion, because it denied the motion for separate juries solely under the mistaken belief that the motion could be entertained only at the conclusion of the guilt phase.

It is true that the trial court erred in directing that the motion could be entertained only after the guilt phase verdict. (See *People v. Rowland* (1992) 4 Cal.4th 238, 268 [14 Cal.Rptr.2d 377, 841 P.2d 897].) The court apparently did not consider the merits of defendant's motion. We believe, however, that the error was harmless. As section 190.4, subdivision (c), provides: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider ... the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record ...."

(9) As we have explained, there is a " 'long-standing legislative preference for a single jury to determine both guilt and penalty.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 483 [48 Cal.Rptr.2d 525, 907 P.2d 373].) "[T]he 'mere desire' of defense counsel 'to voir dire in one way for the guilt phase and a different way for the penalty phase,' " we have said, "does not constitute good cause for deviating from the clear legislative mandate ...." (*People v. Rowland*, *supra*, 4 Cal.4th at p. 268 [counsel's desire to voir dire guilt and penalty phase jurors differently depending on whether or not they would be exposed to other evidence of defendant's other crimes did not require the empanelling of separate juries].) We do not believe that defendant's concern regarding the asserted necessity for hypothetical voir dire questions regarding juror attitudes toward a prior murder conviction would establish as a " ' "demonstrable reality" ' " that members of the jury panel would be " ' "[unable] to perform the functions of a juror." ' " (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1354.) Rather, defense counsel's concern was one that commonly may occur when defense strategy changes between the guilt and penalty phases of a capital trial.

We have observed, however, that "[i]n almost every capital trial, regardless of the special circumstances alleged, there will be evidence introduced at the penalty phase ... which would otherwise be irrelevant or inadmissible in the determination of guilt. Defense counsel are routinely faced with difficult tactical decisions in having to fashion voir dire inquiries that probe for possible penalty phase biases regarding such evidence, while stopping short of revealing information otherwise prejudicial and excludable in the guilt phase. Certainly such will almost always be the case where the special circumstance alleged is a prior murder or murders. [Citation.] The mere desire to lessen or eliminate such tactical decisions in the voir dire of a capital jury, without more, ... does not constitute 'good cause' for deviating from the clear legislative mandate ... that both the guilt and penalty phases of a capital trial be tried by the same jury." (*People v. Nicolaus* (1991) 54 Cal.3d 551, 573-574 [286 Cal.Rptr. 628, 817 P.2d 893].)

As respondent points out, if defendant's claim constituted good cause for separate juries, the policy of section 190.4, subdivision (c), would be circumvented in every case in which a prior-murder special circumstance was alleged. In any event, it seems clear that because of the other-crimes evidence deemed admissible in the present case, prudent counsel would voir dire prospective guilt phase jurors-even for a separate guilt phase jury-extensively on their attitudes toward the other-crimes evidence, so that an additional question about actual convictions would add little if any prejudice. Defendant, in fact, does not point to any specific voir dire question that might have informed jurors who served on defendant's jury that defendant previously had been convicted of the murder of Glenna. Finally, the jury was instructed prior to the penalty phase that statutory provisions required they not be informed of the prior murder conviction until after the guilt verdict, out of concern for the defendant's right to a fair trial, that neither defendant nor the

prosecution had been permitted to disclose the evidence previously, and that this procedure was not to influence the verdict at the penalty phase.

Similarly, defendant's claim that at the penalty phase the jury might have blamed defendant, because at the guilt phase he denied having committed the murder of Glenna, is speculative and would not constitute good cause requiring separate guilt and penalty phase juries. (See *People v. Pride* (1992) 3 Cal.4th 195, 252 [10 Cal.Rptr.2d 636, 833 P.2d 643] [danger that the jury might blame the defense for failing to disclose prior violent crimes at the guilt phase does not require separate juries].) This danger constitutes a common problem arising out of inconsistent defense strategies at the guilt and penalty phases of trial, yet such inconsistencies do not, without more, constitute good cause for empanelling separate guilt and penalty phase juries. (See *People v. Bradford*, *supra*, 15 Cal.4th at pp. 1354-1355, and cases cited; *People v. Lucas*, *supra*, 12 Cal.4th at pp. 482-483; *People v. Pride*, *supra*, 3 Cal.4th at pp. 252-253; see also *People v. Ray* (1996) 13 Cal.4th 313, 357 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

We conclude that defendant was not prejudiced by the trial court's error in directing that the motion for separate juries could be entertained only after the guilt phase verdict, and that this error did not implicate his constitutional rights. (See *People v. Rowland*, *supra*, 4 Cal.4th at p. 269, fn. 7.)

*Catlin*, 26 Cal. 4th at 113–15.

The state supreme court reasonably denied the allegations. Petitioner does not point to clearly established Supreme Court law supporting this claim. *See Spencer v. Texas*, 385 U.S. 554, 656 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure.") Nor has Petitioner demonstrated that any state law trial court error as to when the motion for separate juries should have been brought is cognizable in federal court and more than harmless. *See Estelle*, 502 U.S. at 68.

Particularly, Petitioner has not demonstrated that death qualification in the capital count denied him an impartial jury on the non-capital count. (*See* claims 60, 61, post); *see also McCree*, 476 U.S. at 173-184 (death qualification does not violate fair cross-section requirement of the Sixth Amendment or the constitutional right to an impartial jury). As noted, California law also calls for a single jury to determine both guilt and penalty.

Although the guilt phase jury also had been exposed to hypothetical prior murder conviction voir dire questioning that related to Petitioner's ultimate admission to his conviction for murdering Glenna following the Kern County convictions (*see* Doc. No. 25 at 192-96), Petitioner has not established that these questions disclosed to prospective jurors the prior conviction for Glenna's murder.

57

Petitioner points out that in the Monterey proceeding on Glenna's murder separate guilt and penalty phase juries were used, the result of which was an LWOP sentence. (Doc. No. 25 at 196 citing 1SHCP Ex. 100 at 395, 409.) However, the Monterey County trial judge so ruled based upon the quantum of uncharged crime evidence presented during the Monterey County guilt phase proceeding. (*See e.g.,* 1SHCP Ex. 102 at 112, 183-184, 189-94, 1161.) As discussed *ante* and *post*, other and further evidence was presented in the Kern County proceeding, and no judicial estoppel effect arose therefrom as to the Kern County proceeding. Moreover, the trial court gave a limiting instruction regarding "other crimes" evidence. (RT 5353-54.) The jury was informed at the penalty phase of the statutory requirement precluding earlier disclosure of the prior conviction. (*Id.*) Jurors are presumed to understand and following instructions. *Weeks*, 528 U.S. at 234.

Additionally, the state supreme court reasonably could find the uncharged crimes evidence was properly admitted. (*See* claim 1-5, *ante*; *see also People v. Davis*, 46 Cal. 4th 539, 626 (2009) (statutory preference for a single jury to decide both guilt and penalty does not violate a capital defendant's federal or state rights to due process, to an impartial jury, or to a reliable death judgment); *People v. Prince*, 40 Cal. 4th 1179, 1087-88 (2007) (good cause to discharge the guilt phase jury in a capital case and to impanel a new one for the penalty phase must be based on facts that appear in the record as a demonstrable reality, showing the jury's inability to perform its function).

### c. Conclusions

The state supreme court reasonably could find trial court did not err by denying counsel's motion to sever counts I and II and by failing to provide separate juries for the guilt and penalty phases.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of aspects of claims 6 and 19 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

The balance of the allegations fails on *de novo* review, for the reasons stated.

Claims 6 and 7 shall be denied.

58

6.     Claims 7, 8 and 9

Petitioner claims the trial court erred by denying his *Batson/Wheeler* motion (Claim 7) and his objection the jury did not represent a fair cross-section of the Kern County community (Claims 7 and 8) and by conducting insufficient voir dire to ensure an impartial jury (Claim 9), denying his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 25 at 76-96.)

**a.     State Court Direct and Collateral Review**

*i.     Claim 7*

Petitioner's allegations that the Kern County venire pool underrepresented African Americans; the prosecution used peremptory challenges to remove the only (two) African American jurors who made it into the jury box; and the trial court erred in denying counsel's related *Batson/Wheeler* motion were considered on direct appeal on equal protection grounds and denied on the merits.  *Catlin*, 26 Cal. 4th at 115-19.

The same allegation was raised in the second state habeas petition and denied on procedural grounds including that aspects of the claim other than ineffective assistance of counsel and the constitutionality of the death penalty were raised and rejected on appeal (*In re Waltreus*).  (Order No. S173793.)

*ii.     Claim 8*

Petitioner's allegation that he was denied a jury panel drawn from a fair cross-section of the Kern County community because the venire pool underrepresented Hispanics and African-Americans was raised in his first state habeas petition and denied on the merits and on procedural grounds.  (Order No. S090636.)

The allegation that he was denied a jury panel drawn from a fair cross-section of the Kern County community because the venire pool underrepresented Hispanics and African-Americans, Native Americans, persons with low income, young people, older people, people opposed to the death penalty, and people with less than a college education, was raised in the second state habeas petition and denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*).  (Order No. S173793.)

*iii.     Claim 9*

Petitioner's allegation that he was denied individual sequestered voir dire and the opportunity to question prospective jurors on their exposure to media concerning the case was raised in the first state habeas petition and denied on the merits. (Order No. S090636.)

Petitioner presented the allegation in his second state habeas petition and it was denied on procedural grounds including as repetitive of the first state habeas petition (*In re Miller*). (Order No. S173793.).

### b. Analysis

Petitioner claims the trial court erred by denying his *Batson* motion and empaneling a jury not drawn from a fair cross-section of the community upon voir dire adequate to ensure juror impartiality.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Skilling*, 561 U.S. at 377-78. In a capital case, "a prospective juror may be excluded for cause because of his or her views on capital punishment . . . if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (citing *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Thus, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). Likewise, a juror who would automatically impose the death penalty if a defendant is found guilty is not impartial and must be removed for cause. *Id.* at 733; *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).

The Equal Protection Clause prohibits a prosecutor from using peremptory challenges to exclude potential jurors solely on account of their race, e.g., on the assumption that black jurors as a group are unable to impartially consider the case against a black defendant. *Id.* at 79.

Under *Batson* and its state corollary, *Wheeler*, in order to contest the discriminatory use of peremptory challenges by the prosecution, a defendant must establish a prima facie case of discrimination by showing circumstances indicating that the exclusion of jurors was based on their race. *Batson*, 476 U.S. at 1723; *Wheeler*, 22 Cal. 3d at 281. These circumstances include but are not limited to a pattern of striking members of a certain racial group, or voir dire questions that reveal the prosecutor's intent to strike solely for racial reasons. *Id.* Once a defendant puts forth a prima facie case, the prosecutor must

come forward with "clear and reasonably specific" neutral explanations for the peremptory strikes.  *Id.*

In *Purkett v. Elem*, 514 U.S. 765, 767 (1995), the Supreme Court provided a three-step *Batson* analysis: (1) the opponent of the peremptory challenge makes a prima facie showing of racial discrimination, (2) the burden of proof then shifts to the proponent of the strike to present a race-neutral explanation, noting that unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race-neutral, and (3) the court then determines whether the opponent of the strike has proved purposeful discrimination.  In 1991, the Supreme Court decided *Powers v. Ohio*, 499 U.S. 400, 402 (1991), which expanded the *Batson* rule to cases where, as here, the petitioner and excluded jurors are not of the same ethnicity.

In considering a *Batson* objection or ruling, all of the circumstances that bear upon the issue of racial animosity must be consulted.  *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (citing *Miller-El v. Dretke,* 545 U.S. 231, 239 (2005)).  In the Ninth Circuit, the first prong under *Batson*, the prima facie showing of racial discrimination, is accorded deferential review in habeas proceedings.  *Tolbert v. Page*, 182 F.3d 677, 682 (9th Cir. 1999).

Petitioner's allegations, considered separately below, lack merit upon deferential and *de novo* review, as follows:

### i.     Batson/Wheeler

Petitioner argues the trial court erred by denying his *Batson/Wheeler* motion based on alleged under representation of African Americans in the venire pool and the prosecution's dismissal through peremptory challenge of the only two African American jurors who made it to the jury box. Ms. Roberson and Mr. Wheeler.  (*See* Doc. No. 25 at 111; *see also* RT 2871-75.)

The state supreme court rejected the claim on direct appeal, as follows:

> Defendant contended at trial that the prosecutor exercised peremptory challenges against two prospective jurors based upon their race. He moved for a mistrial, citing *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. The trial court determined that defendant had made a prima facie showing that the prosecutor had excused the prospective jurors on the basis of their race. The prosecutor explained: "[T]he People's reason for excluding Mr. [W.] is because of his statements regarding the death penalty. He says that he believes everyone should live. He says that God is the only one who has the right to take a life. His answer is that if everyone agreed to the death penalty, that he would abide by that, but my interpretation is that he is not a strong believer in the death penalty and that he would be very reluctant to impose that penalty in any type of case [¶] I didn't make a challenge for cause at that time because he did say in some cases

he could do it." The prosecutor explained that his reasoning was the same with respect to the other prospective juror in question, R. He stated that she had doubts about imposing the death penalty, and that she stated she would be reluctant to impose it. He referred to her religious affiliation, stating that his experience was that members of the church "would lean away from imposing the death penalty." He urged that he was not excusing the two prospective jurors because they were African-American and suggested that apart from their views on the death penalty, he did not view the prospective jurors as pro-defense.

The trial court stated that it was persuaded that the prosecutor had excused the jurors because of their attitude toward the death penalty, and not on the basis of racial bias. The court recalled that the prosecution nearly had succeeded in excusing one of the two jurors for cause because of her attitudes and concluded that statements made by both jurors supported the exercise of peremptory challenges on the basis of their attitude toward the death penalty.

"In [*Wheeler*] ... we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in *Batson v. Kentucky* (1986) 476 U.S. 79, 84-89 [90 L.Ed.2d 69, 79-83, 106 S.Ct. 1712] ... the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. African-Americans are a cognizable group for purposes of both *Wheeler* [citation] and *Batson* [citation]." (*People v. Alvarez* (1996) 14 Cal.4th 155, 192-193 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Whether a *Wheeler* or a *Batson* claim (*Batson v. Kentucky*, *supra*, 476 U.S. 79) is raised, "the defendant need not be a member of the group in question in order to complain." (*People v. Alvarez*, *supra*, 14 Cal.4th at p. 193.)[4]

--------------------FOOTNOTE--------------------

n.4 Respondent contends that defendant did not refer to *Batson* or equal protection principles at the time of trial, and that he thereby waived any claim based upon those principles. Because essentially the same standard applies under either *Wheeler* or *Batson* (see *People v. Alvarez*, *supra*, 14 Cal.4th at p. 193; *People v. Clair* (1992) 2 Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705]), and because defendant fails to persuade us that his rights under the California Constitution were violated, the point is moot.

--------------------END FOOTNOTE--------------------

"This court established in *Wheeler*, *supra*, 22 Cal.3d 258, 'that peremptory challenges may not be used to remove prospective jurors solely on the basis of presumed group bias. We defined group bias as a presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic or similar grounds. [Citations.]' ... [¶] A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing that one or more jurors has been excluded on the basis of group or racial identity. The high court has explained that the defendant is required to 'raise an inference' that the exclusion was based on group or race bias. [Citation.] Once a prima facie showing has been made, the prosecutor then must carry the burden of showing that he or she had genuine nondiscriminatory reasons for the challenges at issue." (*People v. Jenkins* (2000) 22 Cal.4th 900, 993 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) A prosecutor legitimately may exercise a peremptory challenge against a juror who is skeptical about imposing the death penalty. (*People v. Jones* (1997) 15 Cal.4th 119, 163, fn. 13 [61 Cal.Rptr.2d 386, 931 P.2d 960], disapproved on other grounds

in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn.1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Defendant contends that the prosecutor did not provide legitimate, nondiscriminatory reasons for excusing the jurors, and claims that the prosecutor believed improperly that because defendant is White, defendant had no basis upon which to object to the exclusion of African-American jurors. Defendant also claims that the prosecutor proffered other discriminatory reasons for excusing the jurors, namely that he excused them on the basis of their religion. He also contends that the trial court rejected his motion without adequate inquiry or reflection.

We have explained that "we review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges 'with great restraint.' " (*People v. Ervin* (2000) 22 Cal.4th 48, 74 [91 Cal.Rptr.2d 623, 990 P.2d 506].) The trial court's determination is a factual one, and as long as "the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal[,]" when they are supported by substantial evidence. (*Id.* at pp. 75, 76.)

Prospective Juror R. stated that she was uncertain whether she could decide upon the penalty, observing that: "To tell you the truth, I'm so tenderhearted, I just feel sorry for people[] and it would be kind of hard for me to do." When asked how she felt about the death penalty, she stated: "If you want to know the truth by me, I hate to see anybody kill anybody.... [B]ut when it come[s] down to, you know, convicting somebody, I just really hate to do it." When asked whether, as a juror, she could impose either the death penalty or life imprisonment, she said "I don't think I could. I don't feel like I could." Regarding imposing the death penalty, she said: "I guess if I was on [a] jury and I had to I could go ahead and do it, but I would hate to do it." She repeated this reservation under questioning by defense counsel. She elaborated that she was tenderhearted and that the death penalty "is killing somebody," and that she would have compassion for defendant because she would imagine one of her own relatives in his position. Responding to questions by the prosecutor, she later stated that she would not join 11 other jurors in imposing the death penalty and that she truly did not believe she could vote for the death penalty in any case. She stated that she was religious and that she thought that imposing the death penalty violated the commandment "Thou shalt not kill." "My feeling and my religion don't agree for me to do things like that." The court overruled the prosecutor's challenge for cause, stating: "She said that she would, if the evidence was sufficiently strong, she could impose the death penalty, very obviously reluctant to do so, but I think this is more a factor to be considered in peremptory challenges. I think she could not be excused for cause ...." The juror's statements very clearly reflect serious reservations about the death penalty, a race-neutral ground upon which the prosecutor legitimately could exercise a peremptory challenge.

Prospective Juror W. stated that "I belong to what's called the Church of Christ. God, I believe, is the only person that has the right to take someone's life." He also stated that he believed in the commandment "Thou shalt not kill" and seemed to feel that the state should abide by that rule.

The record supports the conclusion that the trial court made a "sincere and reasoned effort" to evaluate the prosecutor's justifications, and substantial evidence supports its conclusion that the prosecutor had race-neutral reasons for excusing the two jurors. That the jurors were equivocal about their ability to impose the death penalty was relevant to a challenge for cause, but did not undercut the race-neutral basis for the prosecutor's decision to excuse the prospective jurors peremptorily. References to religion did not reflect bias against a particular religion or against religion in general, but rather a concern that the prospective jurors' religious beliefs would make them reluctant to impose the death penalty. This concern was a permissible ground for the exercise of a peremptory challenge. (*People v.*

*Ervin*, *supra*, 22 Cal.4th at p. 76.) The prosecutor's statements concerning defendant's ethnic group did not suggest that the prosecutor excused the jurors because of their race, but were offered as further proof that the prosecutor had not acted out of racial bias. Even assuming the prosecutor was confused on this point, the trial court's statements did not reflect that *it* doubted that a White defendant has standing to raise a Sixth Amendment challenge to the exercise of peremptory challenges against African-American jurors. Finally, the court's statements indicate that it carefully reviewed defendant's motion, and further inquiry or statements on the record were not required. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1282 [18 Cal.Rptr.2d 796, 850 P.2d 1].)[5]

--------------------FOOTNOTE--------------------

n.5 We reject, as we have in the past, defendant's contention that we should compare the responses of jurors who were excused with the responses of those who were not excused in analyzing whether the trial court's reasoned effort to evaluate the prosecutor's claims satisfied *Wheeler* and *Batson*. (*People v. Ervin*, *supra*, 22 Cal.4th at p. 76; *People v. Jones*, *supra*, 15 Cal.4th at p. 162.)

--------------------END FOOTNOTE--------------------

Defendant contends that although the trial court determined that the prosecutor had proffered race-neutral reasons for excusing the two prospective jurors, the court failed to determine whether the prosecutor actually was motivated by these neutral reasons. (See *People v. Alvarez*, *supra*, 14 Cal.4th at pp. 197-198.) We believe that the statement of the trial court belies this claim. The court observed in denying defendant's motion: "However, the explanations offered by [the prosecutor] convince the Court that excusing Mr. [W.] and Mrs. [R.] *was not because of* their race but *was based on* permitted reasons for exercising peremptories, and that is their attitude toward the death penalty."

*Catlin*, 26 Cal. 4th at 115-19.

Petitioner has not shown the state supreme court unreasonably rejected these allegations.

Petitioner argues the prosecutor made purposefully discriminatory use of preemptory challenges to remove Adell Roberson and George Wheeler, the only two African American potential jurors remaining in the jury box (RT 2871-75). He argues the prosecutor's race neutral reasons for the strikes were pretextual and improperly based upon the religion of these jurors. (*See* RT 2874.) He argues the trial court did not make the requisite detailed and reasoned inquiry into the prosecutor's justifications. *See People v. Fuentes*, 54 Cal. 3d 707, 715 (1991) (the trial court must make " 'a sincere and reasoned' " attempt to evaluate the prosecutor's justifications.").

**(1)      Race-Neutral Reasons to Challenge**

The record reflects three African-Americans were seated in the jury box; the prosecutor struck

two, and counsel struck one.  (RT 2871-2873.)  The trial court held a *Batson* inquiry regarding the peremptory challenge of Ms. Roberson and Mr. Wheeler.  *See Catlin,* 26 Cal. 4th at 115-119.  The prosecutor posited race neutral reasons for his peremptory challenges, pointing to answers provided during death qualification voir dire.  He stated that he challenged Ms. Roberson because:

> [S]he was a Pentecostal. We have had other Pentecostals that would lean away from imposing the death penalty. She made the statement that she would be reluctant to do it [vote for the death penalty]. It was almost like she could only do it [vote for death penalty] if you forced her.

(RT 2874.)

The prosecutor explained that he challenged Mr. Wheeler because:

> He says that God is the only one who has the right to take a life. His answer is that if everyone agreed to the death penalty, that he would abide by that, but my interpretation is that he is not a strong believer in the death penalty and that he would be very reluctant to impose that penalty in any type of case.

(Id.)

The trial court then denied the *Batson/Wheeler* motion, finding that "jurors Roberson and Wheeler were challenged not because of their race, but because of their views toward the death penalty, a permissible reason for excluding them."  (Doc No. 25 at 116 *citing* RT 2871-75.)

The state supreme court reasonably could find both Roberson's and Wheeler's views on capital punishment would have prevent or substantially impair their performance of the duties of juror in accordance with the court's instructions and the juror's oath.  *See Witt*, 469 U.S. at 423-24.  The trial judge's findings in this regard is entitled to deference.  *See Morales v. Mitchell*, 507 F.3d 916, 941 (6th Cir. 2007) (isolated statements indicating an ability to impose the death penalty do not suffice to preclude the prosecution from showing that, taken together, the responses show a lack of ability or failure to comprehend responsibilities as a juror).

Petitioner concedes these two prospective jurors expressed scruples over the death penalty including on religious grounds, but he argues they each expressed the ability to impose the death penalty where the judge's instructions and the evidence warranted.  (*See* RT 1019-37 re Roberson; RT 1266-78 re Wheeler).  He points out that potential juror Roberson stated during voir dire and death qualification

that although hard for her, she could following instructions (*see* RT 1019-38); that she felt "no different as to the life sentence than the death penalty" (RT 1028); and that she might impose the death penalty "if [the evidence was] strong enough" (RT 1035). He points out the prosecutor's for cause challenge of Ms. Roberson was denied. (RT 1037.)

He points out that similarly, potential juror Wheeler stated during voir dire and death qualification that he believed he could impose the death penalty where the evidence so warranted (RT 1269), such that the prosecutor passed on Wheeler for cause (RT 1278).

However, Roberson and Wheeler each made statements reasonably suggesting an inability to perform as juror in a capital case. Roberson stated that "I don't want to see nobody kill nobody" (RT 1022); that "I don't think I could [impose the death penalty or life imprisonment without parole based on the evidence" (RT 1023); that "like I say, I've got a heart and I just feel if a death penalty, you know, is killing somebody …"; (RT 1029); that "I really don't think I would [cast the last vote for death because] it would be too much on my conscience" (RT 1032); that voting the death penalty "would be violating [the commandment "though shalt not kill" (RT 1033); that "my feeling and my religion don't agree for me to do things like [impose the death penalty]" (RT 1034-35).

Wheeler stated that "I've never really thought about the death penalty" but he "believe[s] everyone should live" (RT 1268); that he "belong[s] to what's called the Church of Christ. God, I believe, is the only person what has the right to take someone's life. That's just the way I feel, but I have seen instances where I thought maybe a person should" (RT 1271); that he believes "the commandment Thou shalt not kill" (RT 1275).

Furthermore, that court reasonably could find the prosecutor, during the *Wheeler* motion, did not imply a racially discriminatory animus. Petitioner points to the prosecutor's statement in support of striking potential juror Wheeler that:

> This is a white defendant, I believe that it would probably be beneficial for the defense to have a white jury if they anticipate that his criminal activity is the result of some type of poor childhood, because I don't think that would be very acceptable to someone who has had to suffer discrimination during their entire life.

(RT 2874.) Petitioner argues this statement implies that Roberson and Wheeler were challenged on the

basis of race (Doc. No. 25 at 119), or that the trial court and prosecutor erroneously believed that as a Caucasian, Petitioner could not bring a *Batson/Wheeler* challenge for the removal of an African American juror (id., at 111-12).

However, the state supreme court reasonably could find the prosecutor was supporting race neutral challenge by pointing out that striking African Americans provided no strategic advantage to the prosecution and did not purposefully discriminate on the basis of race. Petitioner's suggestion the trial court and prosecutor errantly believed he lacked standing to raise exclusion of another race is based only on speculation. *See Holland v. Illinois*, 493 U.S. 474, 476 (1990) ("[T]he threshold question is whether petitioner, who is white, has standing to raise a Sixth Amendment challenge to the exclusion of blacks from his jury. We hold that he does."); see also *People v. Allen*, 212 Cal. App. 3d 306, 316 (1989) ("The exclusion of disproportionate numbers of minority jurors per se" does not automatically establish a prima facie case of discrimination under *Wheeler*); *cf. Johnson v. California*, 545 U.S. 162, 172-73 (2005) (inference of discriminatory statistical disparity found where African-American petitioner being tried for murdering his Caucasian girlfriend's daughter objected to prosecutor's challenge of all three African-American's on the jury panel).

**(2)    Comparative Juror Responses**

Petitioner argues that had the trial court compared responses of Roberson and Wheeler to those of non-minority jurors who were retained, the prosecution's racial motivation in striking Roberson and Wheeler would have been apparent. (*See* Doc. No. 95 at 112-13; *see also Murray*, 745 F.3d at 1005 (review of a *Batson* claim under AEDPA often will require a formal comparative juror analysis); *Lewis v. Lewis*, 321 F.3d 824, 830-831 (9th Cir. 2003) (comparative analysis "is a well-established tool" for exploring the possibility race-neutral reasons are a pretext for discrimination); *see also Miller-El v. Cockrell, 537 U.S. 322, 331* (approving "comparative analysis of the venire members demonstrates that African-Americans were excluded from petitioner's jury in a ratio significantly higher than Caucasians were").

Petitioner argues the record on voir dire does not suggest the excluded potential jurors were biased against the death penalty. (Doc. No. 25 at 114.)    He observes that "[a] prosecutor's disparate treatment of the members of the excluded group and the unchallenged jurors who have the same characteristics has

67

been deemed to constitute a strong indicator of group bias. (Doc. No. 25 at 116; *see also Lewis*, 321 F.3d at 832 (finding "a comparative analysis of [the struck juror] with empaneled jurors reveals that a finding of pretext was warranted.").

However, the state supreme court reasonably could find that Petitioner has not demonstrated comparative juror analysis was clearly established law at the time Petitioner's decision became final on April 7, 2002.[14] *See Miller-El*, 537 U.S. at 331.

Furthermore, the state supreme court reasonably could find the jurors selected by Petitioner for comparative analysis not to suggest purposeful discrimination by the prosecution given the facts and circumstances in this case.

Petitioner points in comparison to trial juror Patricia Bolen, a Caucasian who like Roberson was a Pentecostal and referenced church doctrine including forgiveness. (*See* Doc. No. 25 at 112; RT 683-84, 2874.) However, the record suggests Bolen showed no scruples about imposing the death penalty. (RT 674-81), she stated that she "believe[s] strongly in the death penalty [in certain circumstances such as premeditated murder] but "would like to hear [mitigating evidence] (RT 688).

Petitioner points in comparison to prospective juror Lewis Tucker (RT 2252-69) who was not an empaneled juror. (Doc. No. 25 at 118.) Tucker, a Pentecostal minister, stated that although he "invariably" followed the scripture (RT 2252), as to the death penalty he did not see any "conflict of belief or interest" (RT 2255); did not oppose capital punishment for premeditated killing (RT 2255-61); and would choose death or life in prison without parole based upon the evidence (*id*.). Tucker stated that "the Bible carries out death penalties under certain circumstances (RT 2267) and that he did not consider execution by the state to be immoral or the equivalent of murder (RT 2269). Tucker stated that "if it was a crime that required death, then I would give it." (RT 2267-69.)

Petitioner points in comparison to alternate juror Sandra Greemore, a Caucasian, whom he suggests gave equivocal answers when asked whether she could impose the death penalty. (*See* RT 2166-71; CT 328; 2 Supp. CT 328.) However, Greemore that she did not have set feelings about the death

---

[14] Respondent contends this claim is not cognizable because it creates and retroactively applies a "new rule" of constitutional law under *Teague v. Lane*, 489 U.S. 288 (1989). Respondent advances this argument as to numerous other claims as well. Unless otherwise noted, the Court declines to address Respondent's *Teague* arguments where the claim lacks merit.

penalty (RT 2166) would keep an open-mind at the penalty phase consider mitigating evidence (RT 2157-64). She suggested religious beliefs would not influence her penalty verdict (RT 2166), she appeared unequivocal that she was not averse to imposing the death penalty where warranted. (RT 2166-71.) Greemore stated that she would not have a problem imposing the death penalty if she felt strongly about it (RT 2170), rather than avoiding imposing the death penalty. (RT 2171.)

Given the foregoing, the state supreme court reasonably could find *Batson* does not require anything more than what the prosecutor put on the record. *Purkett v. Elem*, 514 U.S. 765, 767-69 (1995). (Doc. No. 88 at 298 21-27.)

   ii.     *Fair Cross-Section of the Community*

Petitioner argues the trial court denied him a petit jury drawn from "fair cross-section" of the population of Kern County in 1990. (Doc. No. 25 at 121-28, *citing Powers*, 499 U.S. at 422.) He argues standing to raise these grounds notwithstanding he is Caucasian. (*Id.*)      He argues that at the time of his trial:

> The Kern County venire systematically under represented Latinos, African-Americans, Native Americans, persons with low income, young people, older people, and people with less than a college education … [and] those who had any opposition to the death penalty, including religious people, African-Americans, other minorities, and women.

(Doc. No. 25 at 121.)

Petitioner contends under representation of these groups made his Kern County proceeding fundamentally unfair, structural error. (*Id.*) He argues particularly that in 1990, Kern County's use of voter registration lists and DMV records as the two main sources for the jury master list resulted in under representation and systematic exclusion of Hispanics and African Americans from the venire. He argues that these sources used to form a jury master list in Kern County in 1990 were not representative of the population in Kern County.

The record reflects that counsel moved *in limine* for a county-wide jury panel including prospective jurors from East Kern County whom he stated were excused under informal rule. Petitioner argued a panel drawn only from the Bakersfield area was insufficient to ensure an impartial jury. (RT 15-17, 42-43; CT 1838.) The trial court denied the motion, stating that:

69

The motion for the county-wide panel is denied. First of all the clerk of this Court has reminded me that several of the recent jury trials held in this courtroom, we have had people serve on the juries from Ridgecrest, which is East Kern County, they did not involve offenses which occurred in the east side of the county; so in practice, it seems that we are getting East Kern jurors into these trials.

I understand that the Board of Supervisors has directed the Jury Commissioner to limit jury summons for trials in Bakersfield to 75 miles from Bakersfield which includes portions of East Kern, with the exception most notably [sic] of the city of Ridgecrest, which is one hundred and twenty miles from Bakersfield. The Court is of the opinion that the greater percentage of the county population which is estimated at about five hundred and fifty thousand, that around thirty hundred thousand [sic] of that is located around the Bakersfield area, that the city of Ridgecrest which is approximately 30 thousand, comprises the appropriate population of East Kern. There is no discrimination against the defendant by using persons within 75 miles.

As to the code section, Civil Procedure Section 191, that's the initiation of state policy that deals with opportunities and obligation of the citizens to serve as trial jurors, in my opinion does not establish any statutory rights as far as any particular defendant is concerned in a jury trial. The courts [sic] is of the opinion that Mr. Catlin will receive a fair representation of the citizens of this county by the present system and the motion is denied.

(RT 44-45.) That court noted that Petitioner "has presented no demographics that Eastern Kern County people are different than Western Kern County people. (RT 44.)

On habeas, Petitioner argues statistical data suggesting at that time of his trial in 1990, Hispanics comprised 28% of the Kern County population and 19% of the voting age population, while African Americans comprised 5.5% of the total population and 3.7% of the voting age population. (Doc. No. 25 at 124-25.) He argues that in his case, approximately 8.6% of the 140-person venire was comprised of Hispanics and approximately 1.4% of that venire consisted of African Americans. (Doc. No. 25 at 124 citing RT 2873.) He argues that only two such jurors were left in the petit jury and both were removed by prosecution peremptory challenges. (RT 2871-2873.)

Petitioner argues these statistics show unconstitutional underrepresentation, i.e. that the absolute disparity between the voting Hispanic population and the number of Hispanics in his venire pool is 10.4%, exceeding the Ninth Circuit 7.7% benchmark for constitutional error. (Doc. No. 25 at 126 citing *See United States v. Sanchez-Lopez*, 879 F.2d 541, 548 (9th Cir. 1989); *United States v. Cannady*, 54 F.3d 544, 548 (9th Cir. 1995)). He argues this disparity resulted from unconstitutional systematic exclusion of these groups from the jury selection process. *Duran v. Missouri*, 439 U.S. 357,

366 (1979).

(1)     **Impartial Jury Drawn from Fair Cross-Section**

The Sixth Amendment guarantees trial by a jury drawn from a representative cross-section of the community. *United States v. Torres-Hernandez*, 447 F.3d 699, 703 (9th Cir. 2006); *Batson*, 476 U.S. at 96-98; *see also Taylor v. Louisiana*, 419 U.S. 522, 526-27 (1975) ("The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community.").

A defendant asserting violation of the fair cross-section requirement must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which jurors are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren*, 439 U.S. at 364.

Once a defendant establishes a prima facie case, the burden shifts to the government to show that a significant state interest is "manifestly and primarily advanced by those aspects of the jury -selection process ... that result in the disproportionate exclusion of a distinctive group." *See U.S. v. Rodriguez*, 924 F.Supp.2d. 1108, 1118 (C.D. Cal. 2013) (quoting *Duren,* 439 U.S. at 367–68).

In this case, the state supreme court reasonably could find that Petitioner's argued statistical disparity in venire representation of Hispanics and African Americans insufficient to show systematic exclusion of these groups in the jury-selection process.[15]  (*See* Doc. No. 95 at 117-18); *see also Sanders v. Woodford*, 373 F.3d 1054, 1070 (9th Cir. 2004) (judgment reversed on other grounds by *Brown v. Sanders*, 546 U.S. 212 (2006).  Petitioner's statistics do not reflect the number of members of these groups who were then eligible for jury service. *See Torres–Hernandez,* 447 F.3d at 703–04 ("[T]o prove Hispanics are underrepresented in a given district's jury pools, the ultimate basis for comparison is the district's actual percentage of jury-eligible Hispanics.").

This Court previously considered and rejected Petitioner fair cross-section allegation based upon the same data presented in this case, stating that:

---

[15] Petitioner does not argue with sufficient particularity the application of the *Duren* standard to allegedly distinctive groups other than Hispanics and African Americans.

71

The statistics relied on by Montiel are figures compiled by Dr. Terry Newell from a study of Kern County venires from 1980 to 1981, which were previously presented in the federal habeas petition of Ronald Sanders. The Ninth Circuit rejected Sanders' claim, asserting Dr. Newell's study was highly likely to have substantially overstated the disparity between the percentage of Hispanics in the county and in the jury venire, as no attempt was made to control for illegal immigration. *See Sanders v. Woodford,* 373 F.3d 1054, 1069–70 (9th Cir.2004) *(overruled on other grounds by Brown v. Sanders,* 546 U.S. 212, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006)). Another under-representation challenge which was based the comparison on the number of Hispanics in the jury venire versus the total population, was also rejected by the Ninth Circuit because the relevant comparison population to the venire should have been the number of Hispanics who were jury-eligible citizens, not the total population. *United States v. Artero,* 121 F.3d 1256, 1262 (9th Cir.1997).

[---]

No published court decisions, empirical studies, or statistics of the racial composition of Kern County jury panels, trial juries or jury selection practices are offered. Even if such alleged discriminatory jury selection practices existed in the Kern County District Attorney's office, no objective evidence shows it impacted Montiel's trial.

Montiel's proffered statistics of 8.0% absolute disparity between adult Hispanics in the total population and the Hispanics on the jury venire is not significantly greater than the 7.7% disparity found by the Ninth Circuit to be within allowable limits. *United States v. Suttiswad,* 696 F.2d 645, 650 (9th Cir.1982).

In addition, Montiel offers only these statistics to prove systematic exclusion. This evidence is substantially less persuasive than evidence which has been found to show unconstitutional discrimination. A disparity of 14% combined with the government's stipulation that no black had served on any jury in the county in the past 25 years was sufficient to show purposeful discrimination. *Hernandez v. State of Texas,* 347 U.S. 475, 480–81, 74 S.Ct. 667, 98 L.Ed. 866 (1954). A trio of cases from Georgia found that disparities ranging from 14.7% to 19.7% were sufficient when combined with jury selection procedures using tax rolls which required blacks to file on yellow paper and whites on white paper. *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); *Jones v. Georgia,* 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); *Sims v. Georgia,* 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967). Similarly, a 16% disparity combined with selection process which identified race on the jury form constituted prima facie evidence of discrimination. *Alexander v. Louisiana,* 405 U.S. 625, 63031, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).

None of the evidence Montiel presented to the state court, nor proposes to present in support of this claim, presents a prima facie case that the fair cross-section requirement was violated.

*Montiel v. Chappell*, No. 1:96-CV-05412-LJO, 2014 WL 6686034, at *83–84 (E.D. Cal. Nov. 26, 2014).

Furthermore, Petitioner has not made out a prima facie case under the third *Duren* prong to the extent he failed to allege what procedures Kern County utilized to systematically exclude these groups.

A showing that a jury venire underrepresents an identifiable group is, without more, an insufficient showing of systematic exclusion under the third prong of the *Duren* test. If underrepresentation by itself were sufficient to support a holding of unconstitutionality, the second and third prong of *Duren* would effectively collapse into one inquiry.

*Randolph v. California,* 380 F.3d 1133, 1141 (9th Cir. 2004). Petitioner reasonably failed to satisfy *Duren's* third prong because he failed to demonstrate the alleged underrepresentation of Hispanics and African Americans is due to the system Kern County uses to assemble the venire." *Id.* He failed to allege with any sufficient specificity the process by which jurors were selected for Kern County venires. Notably, Petitioner does not account for Kern County's jury selection systematic practices in 1990 including its use of Department of Motor Vehicles data in addition to voter registration records. (*See* 1SHCP at 59-65; 1SHCP Ex. 18.)

To the extent Petitioner argues he was denied a Sixth Amendment fair cross-section as to his petit jury, the claim fails, and the state supreme court reasonably could so find. The fair cross section requirement applies only to the larger jury pool or venire and is not applicable to petit juries. *See McCree,* 476 U.S. at 173–74.

The Supreme Court has found that the Constitution does not demand a precisely proportional representative jury, but only a non-discriminatory process by which to choose a jury [that fairly and reasonably represents cognizable groups in the community. *Holland*, 493 U.S. at 480. The California Supreme Court has found it sufficient to obtain prospective jurors from voter registration lists, records or registered drivers, and holders of state ID cards). *People v. Burgener*, 29 Cal.4th 833, 857 (2003).

For the reasons stated, Petitioner has not demonstrated he was denied a jury drawn from a representative cross-section of the community, and the state supreme court reasonably could so find.

(2)     **Fifth Amendment Challenge to Venire**

To establish a violation of the Fifth Amendment right to equal protection, "the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda v. Partida,* 430 U.S. 482, 494 (1977). To establish a prima facie equal protection claim, the defendant must (1) show the group is "a recognizable, distinct class, singled out for different treatment under the laws . . ."; (2) "prove the degree of underrepresentation,

by comparing the proportion of the group in the total population to the proportion called to serve as ... jurors, over a significant period of time"; and (3) show "a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." *Id.*; accord *U.S. v. Hernandez-Estrada,* 749 F.3d 1154, 1166 (9th Cir. 2014).

Once a defendant establishes a prima facie case, the burden shifts to the government to rebut the presumption "by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Castaneda,* 430 U.S. at 494.

In this case, Petitioner does not show underrepresentation of an identifiable group to which he belongs. He does not show Kern County's jury selection procedure is susceptible of abuse or not racially neutral, or any other discriminatory intent on the part of Kern County.

The Ninth Circuit has rejected the proposition that "the mere susceptibility of a selection procedure to abuse, even where accompanied by evidence that a given group is substantially underrepresented on a single venire, establishes a prima facie case of intentional discrimination as a matter of law." *Hirst v. Gertzen,* 676 F.2d 1252, 1258 (9th Cir.1982).

### iii. *Voir Dire To Ensure Impartial Jury*

Petitioner argues the trial court denied him the voir dire necessary to ensure an impartial jury. (Doc. No. 25 at 129; *see also* Doc. No. 95 at 120.)

Petitioner argues the trial court improperly denied the parties' request for individual sequestered voir dire or counsel questions and/or questionnaires regarding hidden biases including as related to media exposure and/or strong feeling in the community about issues in Petitioner's case and/or close ties to law enforcement and/or religious influences. (Doc. No. 25 at 129-31 citing RT 13-15); *Irvin*, 366 U.S. at 722 (the right to jury voir dire sufficient to give reasonable assurances that the jury will be impartial); *United States v. Jones*, 722 F.2d 528, 529-530 (9th Cir. 1983) (specific questioning may be needed to ensure impartial jury where the case involves matters commonly known to harbor strong feelings in the community significantly skewing deliberations).

Especially so here, he argues, given trial issues relating to domestic violence, matricide and violence against women and potential hidden juror biases in relation thereto as suggested by juror habeas declarations. (*See* Doc. No. 25 at 130; *see also* Doc. No. 95 at 119 citing 1SHCP Ex.'s 145-150.)

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan*, 504 U.S. at 729. "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). "[T]he trial court retains great latitude in deciding what questions should be asked on voir dire." *Mu'Min v. Virginia*, 500 U.S. 424, (1991). No hard-and-fast formula dictates the necessary depth or breadth of voir dire, *see United States v. Wood*, 299 U.S. 123, 145-46 (1936), and "[t]he Constitution . . . does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Morgan*, 504 U.S. at 729.

A trial court's failure to ask certain questions does not violate the Constitution unless it "render[s] the defendant's trial fundamentally unfair." *Id.* at 426.

Two specific inquires of voir dire are constitutionally compelled: inquiries into racial prejudice against a defendant charged with a violent crime against a person of a different racial group, *id.* at 424; and, in a capital case, inquiries into a juror's views on capital punishment. *Morgan*, 504 U.S. at 730-32. Detailed questioning on publicity is not constitutionally required. *Mu'Min v. Virginia*, 500 U.S. 415, (1991).

State law vested the trial court with discretion to limit voir dire so long as counsel had an opportunity to participate in the process of selecting an impartial jury. *See e.g., People v. Hardy*, 2 Cal.4th 86, 130-32 (1992).

Here, the record reflects that counsel was not denied an opportunity to participate in general voir dire and the records suggests otherwise. (*See e.g.*, RT 393-404, 413-22, 436-42, 556-58, 596-606, 675-82, 846, 1002, 1640-49, 1773-82.) While counsel's request for a written juror questionnaire (RT 13-14) was denied by the trial court as not worth the extra time and effort (RT 41-42), Petitioner fails identify clearly established Supreme Court precedent that juror questionnaires are required.

Additionally, Petitioner has not demonstrated his jury was partial due to pretrial publicity, racial bias, or pro-death penalty bias; or that defense counsel was denied an opportunity to probe such issues during voir, for the reasons discussed in claim 26(E) below. *See McCree,* 476 U.S. at 178 (quoting *Wainwright,* 469 U.S. at 423) ("[A]n impartial jury consists of nothing more than jurors who will

consciously apply the law and find the facts."); *Cf., United States v. Baldwin*, 607 F.2d 1295, 1298 (9th Cir. 1983) (counsel denied opportunity at voir dire to meaningfully question on sources of likely prejudice).

### iv.    Conclusions

The state supreme court reasonably could find trial court did not err by denying his *Batson*/*Wheeler* motion and his jury objection on fair cross-section and equal protection grounds and by conducting voir dire to ensure an impartial jury.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claims 7, 8, and 9 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

The balance of the allegations fails on *de novo* review, for the reasons stated.

Claims 7, 8, and 9 shall be denied.

### 7.    Claims 10, 11, 12 and 13

Petitioner claims the trial court erred by engaging in *ex parte* communications with jurors in the jury room (Claim 10), off the record and without notice to and the presence of counsel (Claim 11), without the presence of Petitioner (Claim 12), and by failing to declare a mistrial based upon resulting juror bias (Claim 13), regarding an incident where juror Christine McAvoy Sherman (hereinafter "McAvoy") was allegedly stalked and intimidated by prosecution witness and jailhouse informant Hardin, violating Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 25 at 132-42.)

### a.    State Court Direct and Collateral Review

#### i.    Claim 10

Petitioner's allegation that the trial court's *ex parte* communication with jurors violated constitutional rights was raised in the first state habeas petition on Sixth, and Fourteenth Amendment grounds and denied on the merits.  (Order No. S090636.)

These allegations were raised in the second state habeas petition on the same and Eighth Amendment grounds and denied on the merits and on procedural grounds as repetitive. (*In re Miller*). (Order No. S173793.)

  *ii.*  *Claim 11*

Petitioner's allegation that the trial court's jury room discussion of witness Hardin's alleged intimidation of juror McAvoy without the knowledge and presence of counsel violated the Sixth and Fourteenth Amendments was raised in the first state habeas petition and denied on the merits. (Order No. S090636.)

The same allegation was raised in the second state habeas petition on Fifth, Sixth, Eighth and Fourteenth Amendments grounds and denied on procedural grounds as repetitive (*In re Miller*). (Order No. S173793.)

  *iii.*  *Claim 12*

Petitioner's allegation that he was denied the right to be present during a critical stage of the proceeding, i.e., during the noted *ex parte* incident, was raised in the first state habeas petition on Sixth, and Fourteenth Amendment grounds and denied on the merits. (Order No. S090636.)

The allegation asserting Fifth, Sixth, Eighth, and Fourteenth Amendment grounds was raised in the second state habeas petition and denied on procedural grounds including repetitive of the first state petition (*In re Miller*). (Order No. S173793.)

  *iv.*  *Claim 13*

Petitioner's allegation that the trial court erred by failing to declare a mistrial was raised in the first state habeas petition on Fifth, Sixth, Eighth, and Fourteenth Amendment grounds and denied on the merits. (Order No. S090636.)

The same allegation and constitutional grounds were raised in the second state habeas petition and denied on procedural grounds including as repetitive of the first state petition (*In re Miller*). (Order No. S173793.)

  **b.**  **Analysis**

Petitioner alleges the trial court erred by engaging in *ex parte* communication with jurors in the jury room outside the present of counsel and Petitioner and by failing to declare a mistrial based thereon.

The claims lack merit upon deferential and *de novo* review, as follows.

### i.        *Denial of Impartial Jury*

Petitioner argues the trial judge improperly interviewed juror Christine McAvoy about her report to a bailiff being stalked by prosecution witness Conward Hardin as she walked home from the courthouse, tainting McAvoy and the entire jury with unconstitutional bias.  (*See* claim 14, *post; see also* 1SHCP Ex. 148.)  He argues the interview took place in the jury room, off the record, in the presence of the other jurors and outside his presence and that of counsel, denying him due process, a fair trial, the assistance of counsel, confrontation of witnesses, and a reliable verdict.  (Doc. No. 25 at 132; see also 1SHCP Ex.'s 145, 148, 198.)

The trial judge told McAvoy "this won't be tolerated" (Doc. No. 25 at 132; *see also* 1SHCP Ex. 148), left and returned soon thereafter to inform McAvoy that witness Hardin was supposed to be taking the bus to Fresno (*id.*) and reassured her that she was safe (*id.*).

Petitioner argues the stalking incident was an attempt to intimidate and influence juror McAvoy (*id.*) and that McAvoy was frightened and biased as a result (*id.*)  He argues Hardin had testified on the day of the alleged stalking that he had been arrested for violent assaults on his girlfriend and for false imprisonment.  (Doc. No. 25 at 146 citing 1SHCP Ex. 148.)  Petitioner suggests that the trial judge likely contacted witness Hardin and law enforcement.  (*Id.*)   He argues that the trial judge never informed defense counsel of this incident or the judge's role in it.   (Doc. No. 25 at 133.)

Petitioner argues he had a right to be present when the judge questioned juror McAvoy about this incident and might have removed her from the jury as a result.  *See United States v. Gay*, 522 F.2d 429, 435 (9th Cir. 1975) (district judge erred by engaging in discussions with members of the jury after it was impaneled regarding excuses out of the presence of the defendant and without giving notice to defense counsel).

Petitioner argues structural error from this incident because the extent to which the jury was tainted was never determined; he had no opportunity to confront the jurors and trial judge regarding the incident and *ex parte* communication between judge and jury; and he had no opportunity to make appropriate motions, juror challenges, and move for a mistrial.  (Doc. No. 25 at 133 *citing United States v. Thompson*, 827 F.2d 1254, 1259 (9th Cir. 1987) (absent compelling justification, *ex parte* proceedings

are "anathema in our system of justice and, in the context of a criminal trial, may amount to a denial of due process."); id. at 134 citing *Remmer v. United States*, 347 U.S. 227, 229 (1954) (in a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial).

The record reflects that McAvoy, in her habeas declaration, stated that:

I did have one scary experience during the trial when a witness followed me home one day. The witness was the kid who had been in jail with Catlin. He was the guy who talked about "baseball bats." I got the impression from his testimony that he was still in custody, so I was terrified when he followed me the same day he testified. I first noticed him when I was walking down Truxton Avenue. At first, he was on the opposite side of the street, then he crossed to my side of the street. I crossed the street to get away from him and he followed me across. After hearing his testimony about baseball bats, I was quite frightened. He appeared intimidating. After he had followed me for five of six blocks I went into the post office for about twenty minutes waiting for him to go. When I came out, he was gone. I was still so scared that I went home a roundabout way to be sure he did not learn where I lived. After I got home, I told my kids that they could not go out to play. I did not want that guy even seeing my family.

The next morning, as I recall, I told the bailiff about this witness following me. Judge King came into the jury room and asked me some questions about the incident in the presence of the other jurors. He said something like "This won't be tolerated." The judge went back into his chambers. A half hour later, the judge came back to the jury room and said the witness was supposed to be taking the bus to Fresno. He assured me that nothing would happen to me. I do not recall any defense attorney being present.

(1SHCP Ex. 148.)

Juror Terrazas mentioned the incident in her habeas declaration, as follows

I remember that one of the lady jurors was followed by the jail house informant who testified against Catlin. I think the judge was alerted to the problem.

(1SHCP Ex. 145.) Similarly, alternate juror Sandra Greemore stated on habeas that she "remember[ed] hearing that one of the jurors was followed home one day by a witness." (1SHCP Ex. 198.)

The state supreme court reasonably rejected aspects of the allegations and the allegations otherwise lack merit on *de novo* review.

While the trial court generally should disclose trial related *ex parte* communications to counsel, *see e.g., Rushen v. Spain*, 464 U.S. 114, 119 (1983), Petitioner has not demonstrated that here any such error was structural, *see Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991), or more than harmless.

*Brecht*, 507 U.S. at 630, noting *Chapman's* harmless beyond a reasonable doubt standard.

The alleged stalking incident, if it were harmful, was more likely to prejudice the prosecution than the defense. Hardin was a prosecution informant witness and his actions reasonably would be attributable to the prosecution.

Moreover, it does not appear the *ex parte* encounter occurred during jury deliberations, involved law or evidence, or that the encounter occurred during a critical stage of the trial so as to implicate the right to counsel. The trial judge's explanation that Hardin was headed for the bus station suggested the possibility he coincidentally took the same route as McAvoy. Notable Hardin and McAvoy did not make contact or exchange words. Nothing in the records shows Hardin was aware of McAvoy at the time of the alleged encounter. Petitioner alleges but fails to support on the record that the trial judge admonished McAvoy and the other jurors and considered changing the composition of the jury.

Additionally, the jury was expressly instructed to decide the case based upon the evidence (RT 5297-5301) and to follow the instructions given them (CT 1926-28). Petitioner has not demonstrated on the record that any juror disregarded the instructions because of the *ex parte* incident, or that deliberations were impacted by it.

### ii.      Denial of Right to Counsel

Petitioner argues the trial court erred by excluding counsel (Eyherabide and Dellostritto) from the ex parte interview of juror Christine McAvoy about her alleged "intimidation" by prosecution witness Hardin. (Doc. No. 25 at 136.)

Petitioner argues the *ex parte* communication following the alleged event of witness intimidation was a "critical stage" of his proceeding, i.e. a stage concerning whether the composition of the jury would change, at which he was not represented by counsel. (*See* Doc. No. 25 at 136-37 *citing Arizona v. Washington*, 434 U.S. 497, 503 (1978) (defendant has a "valued right" to have his trial completed by the jury he selected); *id.* citing *United States v. Wade*, 388 U.S. 218, 226 (1967) (the right to counsel attaches whenever "counsel's absence might derogate from the accused's right to a fair trial."). He argues that denial of counsel is per se reversible error. (Doc. No. 25 at 137 citing *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984); *see also* Doc. No. 95 at 128-29.)   In the alternative, he argues prejudice under *Brecht*. (*See* Doc. No. 25 at 137.)

The Ninth Circuit has observed that:

> The right to a public trial under the Sixth Amendment, "taken together with the right to due process, includes a right of . . . defendant[] and [his] counsel to be present at all stages of the trial from arraignment to verdict and discharge of the jury." *Polizzi v. United States*, 550 F.2d 1133, 1137 (9th Cir. 1976) (concluding that a defendant's presence was not required during the judge's questioning of the jurors after the verdict). This right, however, "is not absolute." *Id.* The defendant "has a due process right 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934), *overruled in part by Malloy v. Hogan*, 378 U.S. 1 (1964)). However, it is not a guaranteed right "when presence would be useless, or the benefit but a shadow," *id.* at 745 (quoting *Snyder*, 291 U.S. at 106–07), or when the defendant "could have done nothing had [he] been at the conference, nor would [he] have gained anything by attending," *United States v. Gagnon*, 470 U.S. 522, 527 1985) (per curiam) (concluding that a defendant's presence was not required at an *in camera* discussion between the judge and a juror). "Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Stincer*, 482 U.S. at 745. The "exclusion of a defendant from a trial proceeding should be considered in light of the whole record." *Gagnon*, 470 U.S. at 526–27.

*Clark v. Chappell*, 936 F.3d 944, 991 (9th Cir. 2019).

Here, for the reasons discussed above, the state supreme court reasonably could find the ex parte jury room discussions merely related to Hardin and McAvoy traveling by the same route following the day's trial proceedings as she headed home and he headed for the bus and did not deny a fair trial or constitute a critical stage of the trial. Petitioner's surmise the ex parte conversation necessarily related to reconstituting the jury is unsupported in the record.

Even if there was trial court error, the state supreme court reasonably could find it harmless, for the reasons stated.

### iii. Proceedings Conducted Outside Petitioner's Presence

Petitioner argues the trial court erred by excluding him from the *ex parte* discussions because these jury room discussions were critical parts of his trial.

As discussed above, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). The "exclusion of a defendant from a trial proceeding should be considered in light of the whole record." *U.S. v. Gagnon*, 470 U.S. 522, 526–27 (1985). That is, a defendant has a federal due process right to be present at court proceedings if his presence has a

reasonably substantial relation to his ability to defend himself. *Id.* Absence does not violate due process where presence is not needed to insure fundamental fairness and the defendant could not have added to or gained from being present. *Stincer*, 482 U.S. at 745.

Petitioner argues the communication between the trial court and Juror McAvoy, like the original voir dire, was a "critical stage" of his proceeding, i.e. a stage concerning whether the composition of the jury would change, at which he was denied his statutory and common law right to be present. (Doc. No. 25 at 138 citing Penal Code §§ 977, 1043 (providing a statutory right of presence).

Petitioner argues that denial of his right to be present during a critical stage of his proceeding constituted reversible error with any need to show prejudice. (Doc. No. 25 at 139; *see also* Doc. No. 95 at 126 citing Federal Rule 43(a) regarding the taking of testimony in open court.)

However, the allegation fails for the reasons discussed above. Petitioner has not demonstrated the *ex parte* discussions involved anything more than that Hardin and McAvoy traveled by the same route following the day's trial proceedings as she headed home, and he headed for the bus and did not constitute a critical stage of the trial. Petitioner's surmise the *ex parte* conversation necessarily related to reconstituting the jury is unsupported in the record.

iv. *Failure to Declare a Mistrial*

Petitioner faults the trial court for its failure to declare a mistrial in light of its alleged errors discussed above, which denied him an impartial jury. (Doc. No. 25 at 141 citing *Irvin*, 366 U.S. at 722 (presence of even a single biased juror denies defendant Sixth Amendment rights); *Remmer*, 347 U.S. 229-30 (1954) (court must hold hearing to determine if juror had improper communication with third-party). However, the trial court has discretion regarding the nature of the investigation of juror misconduct. *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003).

In this case, Petitioner merely re-argues that McAvoy's impartiality was tainted by the stalking incident. (Doc. No. 25 at 141.) He argues that the impartiality of the rest of the jury was tainted when the trial court interviewed McAvoy about the incident in the jury room. (*Id.*) He argues the trial court was bound to declare a mistrial once the entire jury learned of the attempted intimidation. (Doc. No. 25 at 142.) He argues structural error, or alternatively prejudice under Brecht. (*Id.*)

Petitioner has not identified clearly established Supreme Court law entitling him to a mistrial in

the noted circumstances. *See e.g., Sims v. Rowland*, 414 F.3d 1148, 1149-1157 (9th Cir. 2005) (state court's failure to hold an evidentiary hearing *sua sponte* when presented with evidence of juror bias is not contrary to Supreme Court precedent.]

Furthermore, for the reasons stated *ante* and *post*, the state supreme court reasonably could find Petitioner failed to show the *ex parte* incident constituted juror misconduct or denied him an impartial jury. (*See* claim 14, *post*.) He fails to show prejudice from the *ex parte* incident, for the reasons discussed above.

    *v.    Conclusions*

The state supreme court reasonably could find trial court did not err by engaging in *ex parte* communications with jurors in the jury room, off the record and without notice to and the presence of counsel and Petitioner, and by failing to declare a mistrial based for juror bias regarding the noted incident involving juror McAvoy and prosecution witness Hardin.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claims 10, 11, 12, and 13 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

The balance of the allegations fails on *de novo* review, for the reasons stated.

Claims 10, 11, 12, and 13 shall be denied.

    8.    Claim 15

Petitioner alleges the trial court erred by admitting marital communications between Petitioner and his third wife, Edith Ballew, that were confidential under state law, violating his rights under the Fifth, Eighth, and Fourteenth Amendments. (Doc. No. 25 at 162-64.)

    **a.    State Court Direct and Collateral Review**

The claim was raised on direct appeal and denied on the merits and on procedural grounds. *Catlin*, 26 Cal. 4th at 130-31.

The same claim was raised in the second state habeas petition and denied on procedural grounds including raised and rejected on direct appeal (*Waltreus*). (Order No. S173793).

**b. Analysis**

Petitioner faults the trial court for admitting statements he made to Ballew during his marriage to her that were confidential under state law.

Ballew testified that "[Petitioner] made the statement on several occasions that if his parents were angry with him or disappointed in him, they would threaten to take him out of their Will." (RT 3992.) He argues this marital communication was prejudicial because it provided motive to murder and support for the financial gain special circumstance. This, he argues rendered his Kern County trial fundamentally unfair such that reversal is mandated. (Doc. No. 25 at 164 *citing Beck v. Alabama*, 447 U.S. 625, 637-38 at n.13 (1980)) (heightened reliability required in capital proceedings).

Petitioner points to state law providing that:

> Subject to Section 912 [waiver] and as except as otherwise provided in this article, a spouse ... whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife.

Evidence Code § 980.

The record reflects that the trial court overruled defense "marital communication" objection to Ballew's testimony following a hearing outside the jury's presence. It appears the trial court was persuaded that Petitioner was still married to his second wife, Sherry Catlin, when he married Ballew and thus the marital privilege did not apply; a matter litigated and decided in the Monterey County trial in Glenna's death. (*See* Doc. No. 25 at 162 citing RT 3988-90.)

Nevertheless, Petitioner argues the state martial privilege was applicable here regardless of whether the marriage between Petitioner and Ballew was void or voidable given the underlying public policy of free communication between spouses. (Doc. No. 25 at 163 citing *People v. Godines*, 17 Cal.App.2d 721, 727 (1936) (marital communication privilege barred admission of communication between spouses to a subsequently annulled marriage).

The state supreme court denied the claim, stating that:

Defendant contends that the trial court erred in denying his motion to exclude the testimony of Edith Ballew recounting that defendant had told her that his parents previously had threatened to disinherit him when they were displeased with his conduct. Defendant, asserting that he was married to Ballew at the time of this communication, contends that the court should have excluded this testimony as a confidential marital communication pursuant to the marital privilege. (Evid. Code, § 980.)

Defendant and Ballew were not legally married at the time of the communication, because defendant's divorce from his second wife was not final when he and Ballew went through a marriage ceremony. The marital privilege applies only in the case of a valid marriage. (*People v. Badgett* (1995) 10 Cal.4th 330, 363 [41 Cal.Rptr.2d 635, 895 P.2d 877].) This court specifically has held that the privilege does not apply when a person enters into a second marriage before his or her first marriage legally is dissolved. (*People v. Gallego* (1990) 52 Cal.3d 115, 176-177 [276 Cal.Rptr. 679, 802 P.2d 169].)

Defendant requests that we reconsider our holding in *People v. Gallego*, *supra*, 52 Cal.3d 115. He acknowledges that there are two strands to the marital privilege and that it may be appropriate to deny the privilege not to testify against a spouse when the purported marriage is void, because that element of the privilege is based upon the common law rule that spouses are incompetent to testify against each other. He claims, however, that a different rule should apply to that element of the spousal privilege protecting confidential marital communications. In order to promote marital harmony and free communication, he asserts, the privilege should extend to void and voidable marriages. In addition, he claims that our decision in *People v. Gallego*, *supra*, 52 Cal.3d 115, erroneously fails to distinguish between intentional bigamy and bigamy entered into in a good faith but mistaken belief that a prior marriage has been dissolved legally.

We do not believe that defendant has offered persuasive grounds for reconsidering the rule that the marital privilege applies only in the case of a valid marriage. The rule expressed in the *Gallego* opinion is the rule in most, if not all, other jurisdictions (see 81 Am.Jur.2d (1992) Witnesses, § 300, pp. 285-286; Note, "*Honey, the Judge Says We're History*": *Abrogating the Marital Privileges via Modern Doctrines of Marital Worthiness* (1992) 77 Cornell L.Rev. 843, 850), and defendant has not provided authority to support his contrary claim. Defendant also has not provided authority directing that a bona fide belief in the validity of a marriage constitutes a basis for the application of the marital privilege. Further, defendant did not claim at trial that he had a good faith belief in the validity of his marriage that should support application of the marital privilege, and in any event, even if he could establish error, any error was harmless given the relative insignificance of the challenged testimony.[10]

--------------------FOOTNOTE--------------------

n.10 Defendant's perfunctory claim that the admission of this evidence constituted a denial of due process of law and a violation of the Eighth Amendment guarantee of a reliable guilt and penalty determination was not raised below, and it is without merit.

--------------------END FOOTNOTE--------------------

*Catlin*, 26 Cal. 4th at 130-31.

The state supreme court reasonably denied the claim. It appears Petitioner raises only state law

evidentiary error. Accordingly, federal courts may not interfere with a state evidentiary ruling but only consider whether the evidence was so prejudicial that its admission violated fundamental due process and the right to a fair trial. *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008).

Here, for the reasons stated by the state supreme court, it appears the evidence of marital statements was properly admitted. Even if there was error, Petitioner has not demonstrated it was more than harmless because the jury was otherwise aware of evidence Petitioner was tired of taking care of his mother and wished "she would hurry up and die" (RT 4150; RT (Bates) 8625) and that he concerned his mother might list a charitable organization as beneficiary under her will. (RT 3534.)

### c. Conclusions

The state supreme court reasonably could find trial court did not err by admitting the noted communications between Petitioner and Edith Ballew.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claim 15 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claim 15 shall be denied.

9. **Claims 16 and 17**

Petitioner alleges that the trial court erred in allowing prosecution experts Drs. Ford and Dollinger to testify beyond their respective areas of expertise (claim 16), and in allowing Dr. Ford and prosecution expert Dr. Kilburn to present hearsay testimony (claim 17), violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 165-74.)

### a. State Court Direct and Collateral Review

#### i. *Claim 16*

The claim that admission of testimony from prosecution experts Drs. Ford and Dollinger denied due process was raised on Fifth and Fourteenth Amendment grounds on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 131-33.

The same claim was raised in the second state habeas petition and denied on the merits and on procedural grounds. (Order No. S173793.)

ii.    Claim 17

The claim that admission of hearsay testimony from prosecution experts Drs. Ford and Kilburn denied the right to confront and examine declarant witnesses was raised on direct appeal on Sixth and Fourteenth Amendment grounds and denied on the merits and on procedural grounds. *Catlin*, 26 Cal. 4th at 136-39.

The same claim alleging denial of due process, the right to confront and examine witnesses, and a reliable conviction and sentence on Fifth, Sixth, Eighth, and Fourteenth Amendment grounds was raised in the second state habeas petition and (as to other than ineffective assistance of counsel and the constitutionality of the death penalty allegations) denied on procedural grounds as raised and rejected on appeal (*In re Waltreus*). (Order No. S173973.)

**b.    Analysis**

Petitioner argues the trial court errantly admitted unqualified and prejudicial testimony from Drs. Ford, Dollinger, and Kilburn suggesting paraquat was the cause of Joyce's death.

The claims lack merit upon deferential and *de novo* review, as follows.

i.    *Unqualified Expert Testimony*

Petitioner argues that Chevron toxicologist Dr. John Ford was improperly allowed to testify on victims' alleged paraquat ingestion timelines, presentation and progression of symptom and cause of death including the medical effects of pre-existing medication conditions and age. (*See* Doc. No. 25 at 165-66 citing *Gardner v. Florida*, 430 U.S. 349, 357-358 (1977) (heightened reliability required in capital cases.) In support, he points to areas in which Dr. Ford's testimony regarding the probable time of paraquat ingestion allegedly conflicted with the testimony of predecessor prosecution expert, Dr. Buteau.

The record reflects Dr. Ford held a Ph.D. in physiology and pharmacology and that he was not a medical doctor or pathologist. (Doc. No. 25 at 165 *citing* RT 3880-82, 3932.) Dr. Ford testified as an expert toxicology witness familiar with paraquat. (*Id.*) He testified to his involvement in about sixty paraquat poisonings (RT 3882, 3932-33), providing consultation to attending physicians in three of

those cases (RT 3883).

Petitioner complains the trial court, over defense objection based on lack of foundation (RT 3916-18), allowed Dr. Ford to testify about the cause of Joyce's death (RT 3916) as well as ingestion time scenarios that implicated how Martha's advanced age and pre-existing medical conditions may have affected the ability of Martha's kidneys to excrete paraquat from here system (RT 3918-21), and the issue of when Glenna may have ingested paraquat (3930) and the cause of Glenna's death.  (RT 3928.)

Additionally, Petitioner complains the trial court erred by allowing Kern County pathologist Dr. Armand Dollinger to testify, over defense objection on grounds of lack of foundation, that Paraquat was the cause of Martha's death even though Dr. Dollinger had earlier concluded in his 1985 autopsy report that Martha died of a heart attack (RT 3257-58, RT 3260-63).  Petitioner argues that Dr. Dollinger changed his opinion on cause of death after he received a toxicology report from Chevron Oil Company indicating the presence of Paraquat in Martha's lung and liver tissue.  (RT 3259-60.)

Petitioner argues that Dr. Dollinger was unqualified to state an opinion that Martha's death resulted from Paraquat poisoning.  He points to Dr. Dollinger's conceded his lack of knowledge of and experience with Paraquat and Dr. Dollinger's testimony that he had not been involved in any prior autopsy where Paraquat was a suspected cause of death (RT 3264-65).

At bottom, Petitioner contends medical causation can only be determined by expert medical testimony.  (Doc. No. 25 at 166 citing *Salasguevara v. Wyeth Lab, Inc*., 222 Cal.App.3d 379, 385 (1990)) (medical causation can only be determined by expert medical testimony).  That is, by testimony from a witness "[having] sufficient skill or experience in the particular field so that his testimony would be likely to assist the jury in the search for the truth."  *Salasguevara*, 222Cal. App. 3d. at 385.

Petitioner points to then applicable state law providing that:

> If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is . . . (b) Based on matter (including his special knowledge, skill, experience, training and education) perceived by or personally known to the witness . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates.

Evid. Code § 801.  He points to then applicable law that:

A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion.

Evid. Code § 802.

The California Supreme Court considered and rejected the allegations, stating that:

Defendant contends that the trial court erred in permitting unqualified witnesses to give expert opinion testimony. He claims that Dr. John Ford, a clinical toxicologist employed at the Chevron Environmental Health Center, with a Ph.D. in physiology and pharmacology, was not qualified to testify regarding the cause of Joyce's death or regarding the effect that hypertension and age would have had on Martha's kidney function. He also contends Dr. Ford was unqualified to testify as an expert regarding the time at which Glenna might have ingested paraquat in order to produce the symptoms she displayed.[11] He maintains that because Dr. Ford was not a medical doctor and did not have training in pathology, he was unqualified to render an opinion on these subjects.

--------------------FOOTNOTE--------------------

n.11 Respondent contends this claim with respect to Glenna was waived because defendant failed to object below. The record is equivocal with respect to the basis for defendant's objection, and we reach the merits of the claim in order to avoid uncertainty in the event of a later claim of ineffective assistance of counsel.
*People v. Catlin*, 26 Cal. 4th 81, 131, 26 P.3d 357 (2001), as modified (Sept. 26, 2001).

--------------------END FOOTNOTE--------------------

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) An expert witness's testimony in the form of an opinion is limited to a subject "that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact ...." (Evid. Code, § 801, subd. (a).) A claim that expert opinion evidence improperly has been admitted is reviewed on appeal for abuse of discretion. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1207 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

Qualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion. (*People v. Villarreal* (1985) 173 Cal.App.3d 1136, 1142 [219 Cal.Rptr. 371] ["Because of the dramatic growth of diverse interdisciplinary studies in recent times, often individuals of different nonphysician professions are called upon to give medical opinions or at least opinions involving some medical expertise"]; see *People v. Fierro* (1991) 1 Cal.4th 173, 224 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *Brown v. Colm* (1974) 11 Cal.3d 639, 645 [114 Cal.Rptr. 128, 522 P.2d 688] [referring to an "unmistakable general trend in recent years ... toward liberalizing the rules relating to the testimonial qualifications of medical experts"].)

We are persuaded that the trial court did not abuse its discretion in determining that Dr. Ford was qualified to testify on the points disputed by defendant. Dr. Ford had advanced

training in occupational medicine, physiology, and pharmacology, and had worked in the area of agricultural poison toxicology for 18 years. He had specialized experience in paraquat toxicology, having been employed at a health center operated by the sole distributor of paraquat in the United States, having consulted and advised physicians in many cases of paraquat poisoning, having participated in many research projects and in biannual conferences on the subject of paraquat toxicology, and having provided laboratory services to analyze human tissue samples connected with incidents of paraquat poisoning.

Defendant raises a similar claim with respect to the testimony of Dr. Armand Dollinger, a medical doctor who specialized in pathology and who conducted the autopsy on Martha. Defendant contends that because Dr. Dollinger had no previous experience with the particular field of paraquat poisoning, he had no basis for stating an opinion, based on a toxicology report disclosing the presence of paraquat in Martha's lungs and liver, that she had died of paraquat poisoning. "Permitting Dr. Dollinger to so testify," defendant asserts, "is analogous to permitting a psychiatrist to testify as an expert on oncology, based on a third-party report stating his patient had cancer. In neither instance does the third-party report confer expert status on the doctor so as to qualify him to render a valid opinion on cause of death."

We believe that the analogy drawn by defendant is flawed. Whether or not psychiatrists, by virtue of their medical training, might be qualified to interpret laboratory reports relating to cancer, a pathologist commonly has expertise in interpreting both the clinical evidence of disease or tissue damage and laboratory results showing the presence of disease agents or toxic materials in human tissue. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 766 [60 Cal.Rptr.2d 1, 928 P.2d 485] [the pathologist who conducts an autopsy generally is permitted to testify as to cause, means, and time of death].) Dr. Dollinger testified that he had performed in excess of 11,000 postmortem examinations or autopsies and that he had studied the medical and scientific literature regarding paraquat toxicology. We do not believe that Dr. Dollinger's reliance upon laboratory results performed by other professionals required the trial court to find him unqualified to offer an expert opinion on the cause of Martha's death. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Opinion Evidence, § 331, p. 564 ["A doctor may base an opinion on a diagnosis or examination made by another doctor"].) Dr. Dollinger had sufficient specialized training, in addition to the particular experience of having performed the autopsy on Martha, to have reached an informed conclusion as to the cause of her death, despite the circumstance that he had not previously performed an autopsy in a case in which the cause of death was paraquat poisoning.[12]


--------------------FOOTNOTE--------------------

n.12 We do not reach defendant's claim that error by the trial court in admitting the expert opinion testimony constituted a violation of various constitutional rights, because we have determined that the trial court did not abuse its discretion in admitting this evidence.


--------------------END FOOTNOTE--------------------

*Catlin*, 26 Cal. 4th at 131-33.

Petitioner has not shown the state supreme court unreasonably denied these aspects of the allegations.

Petitioner's further suggestion Drs. Ford and Dollinger must have been unqualified to provide medical causation testimony because of the disparate causation opinions given by the other experts in in criminal proceedings reasonably goes to weight rather than admissibility. (*See e.g.,* Doc. No. 25 at 167-68); *see also People v. Hogan*, 31 Cal. 3d 815, 852 (1982), disapproved on other grounds by *People v. Cooper*, 53 Cal. 3d 771, 836 (1991) (the qualifications of an expert must be related to the particular subject upon which he is giving expert testimony).

Moreover, to the extent the claim raises only state evidentiary issues, it presents no federal question. 28 U.S.C. § 2254(a); *Estelle,* 502 U.S. at 67-68 (a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States). As noted, federal courts may not interfere with a state evidentiary ruling unless the evidence was so prejudicial that its admission violated fundamental due process and the right to a fair trial. *Jeffries,* 5 F.3d at 1192. Only if no permissible inferences can be drawn from admitted evidence will due process be violated. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991)

Petitioner in any event has not shown more than harmless error. Even without the testimony of Drs. Ford and Dollinger, the California Supreme Court could have found no reasonable probability and likelihood that the result of the proceeding would have changed. The noted evidence of Petitioner's guilt was substantial. (*See* claims 30, 31, *post*.)

*ii.*    *Hearsay Expert Testimony*

Petitioner argues the trial court erred by admitting testimony of prosecution experts that included incompetent hearsay statements by other physicians.

Petitioner faults the trial court for allowing Dr. Kaye Kilburn, a prosecution expert and professor of Medicine at the University of Southern California, to testify (over defense objection) to hearsay statements from prosecution expert Dr. Stephens (Doc. No. 25 at 170-74.) Dr. Kilburn was allowed to testify that Dr. Stephens told him tissue slides Dr. Kilburn reviewed were from tissues of Joyce. (Doc. No. 25 at 170 citing RT 4010-15.) Petitioner argues the hearsay statement was insufficient to establish chain of custody for these slides. (Doc. No. 25 at 172.)

Petitioner faults the trial court for allowing Dr. Kilburn to testify to statements made to him by Dr. Thurlbeck, a consulting pathologist, that "[y]ou've got a perfect example of paraquat poisoning here.

91

. . Oh, when I was in England for a couple of years I saw many of the cases that were written up. They were sent to us at Middlesex. . . There's no doubt in my mind what you have here." (*Id. citing* RT 4023.)

Petitioner faults the trial court for allowing Dr. Ford's testimony as to hearsay statements Glenna made to attending physicians that suggested severe irritation of the gastro-intestinal tract. (Doc. No. 25 at 172-73 citing RT 3928-30.)  Petitioner argues Glenna's statements, used by Dr. Ford to support his paraquat ingestion timeline, were incompetent hearsay because they were made "[to] one of the [unnamed] physicians at St. Agnes [Hospital]," who in turn repeated the information to Dr. Ford (*id.*); and it allowed Dr. Ford to "guess" at the ingestion time reflected in his cause of death opinion (Doc. No. 25 at 173).

The California Supreme Court considered and rejected aspects of the allegations, as follows:

Defendant contends the trial court erred in overruling hearsay objections to testimony by Dr. Kilburn and Dr. Ford.

In 1976, Dr. Kilburn, a specialist in lung pathology, received lung tissue gathered by Dr. Swinyer at Joyce's autopsy, which he caused to be prepared into slides. He also received lung tissue slides from Dr. Stephens in 1986. Both samples of Joyce's tissue revealed the same structural damage to the lungs-destruction of the alveolar structure and replacement of alveolar spaces with dense collagenous connective tissue. He testified: "The predominant process was that the alveoli, the alveolar spaces were filled with this exuberant scarring, and in some places the alveolar walls themselves were scarring in this manner. And what this ... did was totally exclude the possibility of air going into those areas. Air must go into the alveoli for gas exchange, for oxygen to be taken up out of the air to go into the blood. There are almost no areas in any of the sections I looked at, whether they were from those that I had made in my laboratory or that Dr. Stephens had made, that showed air spaces, and none of the air spaces, even when they were present, were normal. They had lost their lining. They had lost their normal blood vessels and instead were replaced by this gristly, dense, connective tissue." He had observed this kind of damage in cases of known paraquat poisoning. When asked his opinion of what caused the fibrosis in Joyce's lungs, he answered: "Well, the clinical course, the appearance of the tissue and the time after her illness, the failure to see any regeneration or repair or anything, really, in the way of inflammation bespeaking infection, all pointed to this being chemical in its origin, and of the chemicals, paraquat is the only one that produces this kind of fibrotic proliferative change and does it cataclysmically, I mean does it within days ...."

When asked whether he consulted any other persons regarding Joyce's tissue, he stated that a few days after he received the tissue in 1976 and prepared the slides, he showed the slides to a colleague. Without ever telling this expert, Dr. Thurlbeck, anything about their origin, Dr. Kilburn asked him to examine the slides. Dr. Kilburn testified that Dr. Thurlbeck examined them for two minutes and said, "You've got a perfect example of paraquat poisoning here." Dr. Thurlbeck stated that he had experience with cases of paraquat poisoning in England, and that he did not have any doubt that the slides of Joyce's tissues exhibited such poisoning. Defendant's hearsay objection was overruled, the court observing that the hearsay was elicited for the purpose of explaining Dr. Kilburn's opinion testimony. When the prosecutor asked Dr. Kilburn what effect Dr. Thurlbeck's opinion

had on his own opinion, the witness stated: "I was already convinced from my experience, but, you know, it's comforting to know that another person ... comes to the same conclusion and comes to it without any prompting or without any additional information."

We have explained that "[a]n expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible, which may 'reasonably ... be relied upon' for that purpose. [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. However, prejudice may arise if, under the guise of reasons, the expert's detailed explanation [brings] before the jury incompetent hearsay evidence. (*People v. Montiel* (1993) 5 Cal.4th 877, 918 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; see Evid. Code, § 801, subd. (b); *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 [59 Cal.Rptr.2d 356, 927 P.2d 713].) In this context, the court may exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value." (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 403.)

Nonetheless, "[b]ecause an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment." (*People v. Montiel*, *supra*, 5 Cal.4th at p. 919.)

Although it is appropriate for a physician to base his or her opinion in part upon the opinion of another physician (*People v. Campos* (1995) 32 Cal.App.4th 304, 308 [38 Cal.Rptr.2d 113]; see also *Whitfield v. Roth* (1974) 10 Cal.3d 874, 895 [112 Cal.Rptr. 540, 519 P.2d 588]; Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 801, p. 19 ["A physician may ... rely on reports and opinions of other physicians"]), it generally is not appropriate for the testifying expert to recount the details of the other physician's report or expression of opinion. (*People v. Campos*, *supra*, 32 Cal.App.4th at p. 308; see *People v. Coleman* (1985) 38 Cal.3d 69, 92 [211 Cal.Rptr. 102, 695 P.2d 189]; *Whitfield v. Roth*, *supra*, 10 Cal.3d at pp. 894-895; 1 Jefferson, Cal. Evidence Benchbook (3d ed. 1997) §§ 29.42-29.43, pp. 597-598; Méndez, *supra*, Cal. Evidence, § 16.03, pp. 312-313; *138 Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 1999) ¶ 8.763.)

In the present case, we need not determine whether Dr. Kilburn's account of the comments of a nontestifying physician went beyond the proper purpose of permitting the jury to evaluate the basis for Dr. Kilburn's testimony, because even if error occurred it was not prejudicial. The court twice stated that the evidence was being received only for the purpose of indicating the basis for the witness's opinion. Dr. Kilburn's reference to Dr. Thurlbeck was brief and, moreover, other reliable expert witnesses testified consistently and explained that in their opinion, the slides of Joyce's lungs reflected paraquat poisoning. The prosecutor did not refer to Dr. Thurlbeck's opinion in his argument to the jury, and even Dr. Kilburn's testimony was relied upon only to a limited degree. It is not reasonably probable that a result more favorable to defendant would have occurred in the absence of the admission of this evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[14]

--------------------FOOTNOTE--------------------

n.14 Defendant also contends that any such error constituted a violation of his Sixth Amendment right to confrontation and of parallel rights under the California Constitution, reviewable under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065] [harmless beyond a reasonable doubt]). Defendant did not object on this ground below, and thus his constitutional claim has not been preserved for appeal. (*People v. Waidla*, *supra*, 22

93

Cal.4th at p. 726, fn. 8; *People v. Rowland*, *supra*, 4 Cal.4th at p. 265, fn. 4; see *People v. Carpenter*, *supra*, 15 Cal.4th at p. 385; *People v. Mickey* (1991) 54 Cal.3d 612, 689 [286 Cal.Rptr. 801, 818 P.2d 84].) Further, even assuming for the purpose of discussion that the admission of Dr. Thurlbeck's declarations implicated defendant's rights under the confrontation clause, any error would be harmless beyond a reasonable doubt. *People v. Catlin*, 26 Cal. 4th 81, 138, 26 P.3d 357 (2001), as modified (Sept. 26, 2001).

--------------------END FOOTNOTE--------------------

Defendant claims perfunctorily that the trial court should have sustained his hearsay objection to Dr. Kilburn's statement that Kilburn had been informed by Dr. Stephens that the slides Kilburn received from Stephens were from Joyce. We readily reject this claim. The testimony was permissible under Evidence Code section 801, subdivision (b), and even if that were not the case, any error would be harmless, because the chain of custody was established satisfactorily through other testimony.

Defendant also contends that Dr. Ford should not have been permitted to testify that he based his opinion regarding the time that Glenna had ingested paraquat in part on her statements, as recorded in her medical records, that she had vomited violently and had tarry stools on February 20, 21, and 22, 1984, after her return from a trip to Las Vegas that was made without defendant. Dr. Ford's testimony explaining the basis for his opinion clearly was permissible under Evidence Code section 801, subdivision (a). (See *People v. Wilson* (1944) 25 Cal.2d 341, 348 [153 P.2d 720]; 1 Witkin, Cal. Evidence, *supra*, Opinion Evidence, § 33, pp. 564-565; 1 Jefferson, Cal. Evidence Benchbook, *supra*, § 29.41, p. 596.) His ability, as a nonphysician, to interpret medical records and patient symptoms went to the weight, and not the admissibility, of his testimony. As we have determined above, Dr. Ford was qualified to give opinion testimony of a medical nature.

*Catlin*, 26 Cal. 4th at 136-39.

Petitioner has not demonstrated the state supreme court was unreasonable in rejecting the allegations.   As above, Petitioner has not demonstrated the prosecution trial experts were incompetent or unqualified.

The jury was properly instructed on consideration of expert opinion and limitations thereon. (CT 1952- 54; see also Evid. Code §§ 801, 802.)   For example, the record reflects the trial court gave a limiting instruction as to Dr. Ford's testimony and admitted Glenna's hearsay statement solely as the basis for Dr. Ford opinion and not for its truth (RT 3929-30).  Petitioner's argument that the evidence was in fact used by the jury for its truth because Dr. Ford used it to "guess" that Paraquat ingestion occurred outside Petitioner's alibi timeline (*see* Doc. No. 25 at 173) reasonably could be seen as only speculation.

The hearsay objections reasonably can be rejected including those aspects before the state

94

supreme court noted above. Dr. Kilburn's testimony that Dr. Stephens told him certain tissue slides reviewed by Dr. Kilburn were from Joyce reasonably could inform the basis for Dr. Kilburn's opinion rather than for the truth of the statement. Moreover, any such alleged chain of custody error reasonably appears harmless as chain of custody otherwise appears sufficiently established, for the reasons stated. (*See* claim 20, *post*.)

Similarly, Dr. Kilburn's testimony of Dr. Thurlbeck's concurring opinion reasonably could permissibly inform the basis for Dr. Kilburn's opinion rather than impermissibly provide independent proof of facts in issue. In his regard, Petitioner argues that "an expert witness may base his opinion on reliable hearsay, but he may not under the guise of reasons for his opinion, bring before the jury incompetent hearsay testimony." (Doc. No. 25 at 171 citing *Continental Airlines. Inc. v. McDonald Douglas Corp*, 216 Cal.App.3d 388, 414 (Cal. Ct. App. 1989); accord *Whitfield v. Roth*, 10 Cal.3d 874, 894 (1974). He argues the alleged Dr. Thurlbeck's statement was not offered as a basis for Dr. Kilburn's opinion but rather as "independent proof of the facts." *Whitfield*, 10 Cal. 3d. at 895. However, Dr. Kilburn testified that he considered Dr. Thurlbeck's statement for its concurrence value. (RT 4023-24.) It does not appear that Dr. Kilburn testified as to facts and details underlying Dr. Thurlbeck's statement as independent proof of issues in Petitioner's proceeding. (*Id.*)

Petitioner's further argument that he had no opportunity to confront and cross-examine the hearsay statements reasonably could be rejected including on the grounds state by the California Supreme Court. (*See* Doc. No. 25 at 172 citing *Idaho v. Wright, 497 U.S. 805, 812 (1990)* ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.") Particularly, to the extent Petitioner argues that admission of Dr. Thurlbeck's statement violated his confrontation rights under *Crawford v. Washington* (*see* Doc. No. 95 at 141-42 citing 541 U.S. 36, 68 (2004) (testimonial hearsay excluded under Confrontation Clause unless witness is unavailable and defendant had opportunity to cross-examine)), he does not to explain how, or cite clearly established Supreme Court authority that *Crawford* limits an expert's reliance upon expert hearsay in forming an opinion, or gives rise to constitutional error on these facts.

In any event, such alleged failure to confront error reasonably appears no more than harmless. Petitioner has not shown he was unable fully to cross-examine Drs. Kilburn, Ford, and Stephens as to

their opinions which considered the alleged hearsay.  As noted, the jury was properly instructed as to its consideration of expert testimony.  The evidence against Petitioner was substantial.  (*See e.g.,* claims 30, 31, *post*.)  In sum, Petitioner has not shown a reasonable probability or likelihood of a different outcome absent the alleged hearsay, or a fundamentally lack of fairness.

To the extent Petitioner raises only state evidentiary issues, no federal question is presented.  28 U.S.C. § 2254(a); *Estelle,* 502 U.S. at 67-68 (a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States).

### iii.    Conclusions

The state supreme court reasonably could find trial court did not err in admitting the noted testimony by prosecution experts Drs. Ford, Dollinger, and Kilburn.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claims 16 and 17 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

The balance of the allegations fails on *de novo* review, for the reasons stated.

Claims 16 and 17 shall be denied.

### 10.    Claim 18

Petitioner faults the trial court for giving erroneous guilt phase jury instructions, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 25 at 175-91.)

### a.    State Court Direct and Collateral Review

The  aspects of the claim alleging erroneous guilt phase jury instructions denied him due process, an impartial jury, a fair trial, and a reliable conviction and sentence on Fifth, Sixth, Eighth and Fourteenth Amendment grounds (i.e., subclaims A-H and J) and effective assistance of counsel on Sixth Amendment grounds (i.e., subclaim I) were considered on direct appeal and denied on the merits.  *See Catlin*, 26 Cal. 4th at 144-57.

The claim that erroneous guilt phase instructions denied him effective assistance of counsel was

raised in the first state habeas petition on Fifth, Sixth, Eighth, and Fourteenth Amendment grounds and denied on the merits.  (Order No. S090636.)

The claim in its entirety with the addition of a confrontation clause claim to subclaims B-H and J was raised in the second state habeas petition and (as to other than ineffective assistance of counsel and the constitutionality of the death penalty) aspects of the claim were denied on procedural grounds as raised and rejected on appeal (*In re Waltreus*).  (Order S173973.)

### b.  Analysis

Petitioner argues in multiple subclaims that the guilt phase jury instructions were erroneous. Erroneous jury instructions must infect the entire trial in order to establish a due process violation. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  The instruction in issue must violate some due process right protected by the Fourteenth Amendment.  *Cupp v. Naughton*, 414 U.S. 141, 147 (1973).  Jurors are presumed to follow the instructions.  *Weeks*, 528 U.S. at 234.  The burden on petitioner is especially heavy "where ... the alleged error involves the failure to give an instruction." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).

A single instruction is not viewed in isolation, but in the context of the overall change to the jury.  *Boyde*, 494 U.S. at 378; *Middleton v. McNeil*, 541 U.S. 433, 435-36 (2004) (finding that an erroneous instruction was cured by the spillover effect of correct instruction on the law elsewhere). *Cupp*, at 147.  The *Brecht* harmless error standard applies to state court resolutions of instructional error claims.  *Calderon v. Coleman*, 525 U.S. 141, 147 (1998).

Petitioner's subclaims are considered separately, below.

### i.      Subclaim A - Other Crimes Evidence in Death of Joyce - Modified CALJIC 2.50

Petitioner alleges the Kern County court erroneously instructed the jury that it could consider other crimes evidence (from the Monterey County trial) in determining the cause of Joyce's death. (Doc. No. 25 at 176-77 citing RT 5193.)

The record reflects that over counsel's objection (*see* RT 5160), the jury was instructed with a modified CALJIC 2.50 instruction regarding "Evidence of Other Crimes," as follows:

> Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial.

97

Such evidence, if believed, was not received and may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes.

Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show:

The cause of death of the victims in the crimes, if any, of which the defendant is accused;

The identity of the person who committed the crimes, if any, of which the defendant is accused;

For the limited purpose of which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.

You are not permitted to consider such evidence for any other purpose.

(CT 1947.)

Petitioner argues this erroneous instruction allowed the jury to convict Petitioner based upon an inference of criminal propensity from the erroneously admitted other crimes evidence in Glenna's Monterey County proceeding (*see* claims 1-5) rather than beyond a reasonable doubt on every element of the charged offenses, denying him a fair trial. (Doc. No. 25 at 176-77 *citing* RT 5193; *see also* Doc. No. 95 at 143; *In re Winship*, 397 U.S. 358, 364 (1970) (prosecutor must prove every element of the charged offense beyond a reasonable doubt).)

The California Supreme Court considered and rejected the allegation on direct appeal, stating that:

Defendant contends the court erred in instructing the jury that it could consider other-crimes evidence in determining the cause of death in the charged crimes, particularly with respect to the murder of Joyce.

The trial court instructed the jury, regarding their evaluation of other-crimes evidence, according to a modified version of CALJIC No. 2.50. Over defense objection, the trial court granted the prosecutor's request that the instruction be modified to state that other-crimes evidence may be considered not only for the purpose of establishing the identity of the person responsible for the charged offenses, but also for the purpose of determining the cause of death of the victims in the charged offenses.[16]

--------------------FOOTNOTE--------------------

n.16 The court instructed the jury: "Evidence has been introduced for the purpose of showing that the Defendant committed ... crimes other than [those] for which he is on trial. Such evidence, if believed, was not received and may not be considered by you to prove that Defendant is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the

98

limited purpose of determining if it tends to show the cause of death of the victims in the crimes, if any[,] of which the Defendant is accused, the identity of the person who committed the crimes, if any[,] of which the Defendant is accused[.] For the limited purpose of which you may consider such evidence you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

--------------------END FOOTNOTE--------------------

Defendant contends that he was "convicted of a capital offense on evidence which would not satisfy the reasonable doubt standard." In support, he claims that uncharged crimes evidence that he killed Glenna improperly was admitted in the present case. We already have determined that the evidence properly was admitted.

Defendant also contends that the court violated his right to a fair trial and to a reliable penalty determination by giving the modified version of CALJIC No. 2.50, because the modified instruction "lessened the prosecution's burden of proof on the critical issue of cause of death." If defendant means that the prosecutor's burden of proof was lightened because the instruction entitled the jury to consider improperly admitted evidence of cause of death, it suffices to note that we already have rejected the contention that this evidence was admitted improperly.

Defendant's principal contention seems to be that other-crimes evidence may be admitted only for the purpose of proving intent, identity, motive, knowledge, and conspiracy. Cause of death, he claims, is not an appropriate object of proof for other-crimes evidence. Rather, he asserts, cause of death may be proved only by expert opinion testimony.

Evidence Code section 1101, subdivision (b), permits the admission of other-crimes evidence against a defendant "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ...) other than his or her disposition to commit such an act." Section 1101 prohibits the admission of other-crimes evidence for the purpose of showing the defendant's bad character or criminal propensity. It recognizes, however, that there are facts other than criminal propensity to which other-crimes evidence may be relevant. (*People v. Ewoldt, supra,* 7 Cal.4th at p. 393.) The categories listed in section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence, but, contrary to defendant's contention, the list is not exclusive. (*People v. Key* (1984) 153 Cal.App.3d 888, 894 [203 Cal.Rptr. 144]; see also *People v. Thompson* (1980) 27 Cal.3d 303, 315, fn. 14 [165 Cal.Rptr. 289, 611 P.2d 883]; 1 Witkin, Cal. Evidence, *supra,* Circumstantial Evidence, § 75, p. 411.) As we have explained, the admissibility of other-crimes evidence depends upon the materiality of the fact sought to be proved or disproved, the tendency of the uncharged crime to prove or disprove the material fact, and the existence of any policy requiring exclusion of the evidence. (*People v. Thompson*, *supra*, 27 Cal.3d 303, 315.) In order to be material, the fact in dispute "may be either an ultimate fact in the proceeding or an intermediate fact 'from which such ultimate fact[] may be ... inferred.' " (*Ibid.*, fn. omitted.)

Defendant's not guilty plea put in issue all the elements of the charged offenses. (*People v. Balcom* (1994) 7 Cal.4th 414, 422 [27 Cal.Rptr.2d 666, 867 P.2d 777].) Evidence tending to demonstrate the cause of death was relevant to demonstrate that a murder-and not a natural death-had occurred. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 171 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Scheid* (1997) 16 Cal.4th 1, 15 [65 Cal.Rptr.2d 348, 939 P.2d 748].) Evidence that defendant previously had murdered his wife Glenna by poisoning her with paraquat was relevant to the issue of the cause of death in the charged crimes, because it tended to corroborate the other evidence establishing that Joyce and Martha died of paraquat poisoning. (See *People v. Diaz, supra,* 3 Cal.4th at pp. 561-

562; *People v. Ruiz, supra*, 44 Cal.3d at pp. 605-606; *People v. Montalvo* (1971) 4 Cal.3d 328, 332 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518] [evidence that defendant previously injected a young girl with heroin, causing certain reactions, was relevant to prove that in the charged crime, a substance that caused the same reactions when injected also was heroin].)

We are not persuaded by defendant's contention that the cause of death may be established only through expert opinion testimony and not through other-crimes evidence. Cases he cites in support declare only that expert opinion testimony on the question of cause of death also is admissible. (See *People v. Mayfield, supra*, 14 Cal.4th at p. 766; *People v. Cole* (1956) 47 Cal.2d 99, 103-104 [301 P.2d 854, 56 A.L.R.2d 1435].) Other evidence relevant to cause of death also is admissible. (See, e.g., *People v. Mendoza, supra*, 24 Cal.4th at p. 171; *People v. Scheid, supra*, 16 Cal.4th at p. 15; *People v. Diaz, supra*, 3 Cal.4th at pp. 561-562.)

Defendant complains that the instruction informed the jurors that in the event they found that Glenna died of paraquat poison, they could find from that fact alone that both Joyce and Martha died of paraquat poison. We do not believe, however, that the instruction conveyed that impression. It directed the jury to consider "if" the other-crimes evidence "tends" to demonstrate cause of death and identity, and directed the jury to weigh the evidence in the same manner as it would weigh all other evidence in the case.

Defendant claims that the giving of the instruction violated his state and federal constitutional rights to due process of law and to a fair trial. He contends that by permitting the jury to convict him on the basis of evidence of his criminal propensity, the instruction relieved the prosecution of its full burden of proof on the issue of the cause of the victims' deaths. We have concluded already, however, that the instruction did not permit the jury to rely on evidence of defendant's criminal propensity, and that it did not direct that the jury could determine the cause of Joyce's and Martha's deaths solely from evidence establishing that the cause of Glenna's death was paraquat poisoning.

Defendant also complains that the modified instruction failed to explain exactly what type of other-crimes evidence could be considered. In support, he cites *People v. Rollo* (1977) 20 Cal.3d 109 [141 Cal.Rptr. 177, 569 P.2d 771]. In that case this court stated that when evidence of a prior conviction has been admitted for impeachment purposes and other-crimes evidence also has been admitted pursuant to Evidence Code section 1101, subdivision (b), the trial court should instruct the jury as to which evidence is referred to in the CALJIC No. 2.50 instruction, in order to avoid confusion. (*Rollo, supra*, 20 Cal.3d at p. 123, fn. 6.) In the present case, in addition to the other-crimes evidence, evidence that defendant had suffered a prior forgery conviction was admitted for impeachment purposes. Even if we consider this claim as invoking the federal Constitution, with its exacting standard of prejudice, we conclude that any error in failing to modify CALJIC No. 2.50 was harmless beyond a reasonable doubt. The jury was instructed that the evidence of a prior conviction could be considered only for the purpose of impeachment. We believe there is no reasonable possibility that the jury considered the prior forgery conviction in making its determinations, in accordance with CALJIC No. 2.50, on the issues of cause of death and the identity of the perpetrator. (See *Chapman v. California, supra*, 386 U.S. 18, 24 [87 S.Ct. 824, 828].)

*Catlin*, 26 Cal. 4th at 144–47.

The state supreme court reasonably denied the subclaim for the reasons stated by that court.

The instruction set out above included limiting language precluding the jury's consideration of the

other crimes evidence for criminal disposition. The jurors also were instructed the prosecution had the burden of proving guilt beyond a reasonable doubt. (CT 1955 regarding CALJIC 2.90.) The jury presumably understood and followed their instructions. *Weeks*, 528 U.S. at 234.

Furthermore, the state supreme court reasonably could find Petitioner has not demonstrated that he was convicted other than on proof beyond a reasonable doubt as to every element of the charged offenses. (*See* claims 30 and 31, *post*.) He has not demonstrated instruction with modified CALJIC 2.50 denied him a fair trial, for the reasons stated. *See Marin-Cuevas*, 147 F.3d at 893 (stating the test for error is whether the jury instructions "taken as a whole were misleading or represented a statement inadequate to guide the jury's deliberations").

Even if there was state law error, Petitioner has not demonstrated constitutional error, for the reasons stated.

### ii.     Subclaim B - Malice – Modified CALJIC 8.11; CALJIC 8.20

Petitioner alleges the trial court's instructions on malice were incomplete and contradictory, precluding a jury finding of deliberate and premeditated murder, denying a fair trial and reliable verdict. (Doc. No. 25 at 177-78.)

Petitioner observes that pursuant to agreement between the parties and the trial court that the evidence could not support express malice, the jurors were given a modified version of CALJIC 8.11 regarding Malice Aforethought – Defined, that struck references to express malice and instructed solely on the definition of implied malice (RT 5165; CT 1961) as follows:

> Malice is implied when: 1. The killing resulted from an intentional act, 2. The natural consequences of the act are dangerous to human life, and 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. When it is shown that a killing resulted from the intentional doing of an act with implied malice, no other mental state need be shown to establish the mental state of malice aforethought.

(Doc. No. 25 at 178 n.80.)

Petitioner observed the jurors also were given an unmodified CALJIC 8.20 instruction regarding Deliberate and Premeditated Murder, that referred to undefined express malice (CT 1962) as follow:

> [A]ll murder which is perpetrated by any kind of willful, deliberate and premeditated killing with *express malice* aforethought is murder of the first degree.

(Doc. No. 25 at 178 citing CT 1962 emphasis added.)

Petitioner argues these two instructions were contradictory, incomplete and confusing concerning malice such that jurors could not have found willful, deliberate and premeditated murder, rendering the verdict unreliable. (Doc. No. 25 at 178.)

The California Supreme Court considered and rejected the allegation on direct appeal, stating that

> Defense counsel requested that the court delete reference to express malice in CALJIC No. 8.11. Apparently, defense counsel believed there was no evidence of express malice, and the prosecutor, although he pointed to some potential evidence of express malice, concurred in the request to delete the reference in this instruction to express malice. Accordingly, a modified version of CALJIC No. 8.11 was read to the jury, as noted in the margin.[17]

--------------------FOOTNOTE--------------------

> n.17 The jury was instructed that "Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder ...." Malice was defined as follows: "Malice is implied when the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life and the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life. [¶] When it is shown that a killing resulted from the intentional doing of an act with implied malice, no other mental state needs to be shown to establish the mental state of malice aforethought. [¶] The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed. [¶] The word aforethought does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

--------------------END FOOTNOTE--------------------

> The court also gave CALJIC No. 8.20, which began: "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with *express malice* aforethought is murder of the first degree." (Italics added.)[18]

--------------------FOOTNOTE--------------------

> n.18 The instruction continued: "The word willful as used in these instructions means intentional. The word deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word premeditated means considered beforehand. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the Defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of

passion or other condition precluding the idea of deliberation, it is murder of the first degree. [¶] The law does not undertake to measure in units of time the length of [the] period in which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. [¶] The time will vary with different individuals and under different varying circumstances. [¶] The true test is not in the duration of time but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time but a mere unconsidered and rash impulse, even though it included an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and having in mind the consequences, he decides to and does kill."

--------------------END FOOTNOTE--------------------

Defendant complains that despite the agreement of the parties, the jury was instructed in CALJIC No. 8.20 that express malice aforethought was required to find murder in the first degree. "To reach a first degree murder verdict, jurors were instructed to make a determination about a concept left completely undefined by the court's instructions .... A reasonable juror would have been confused by this lapse. Due to this confusion, the jury could not have found first degree murder on the basis of premeditation and deliberation. For Joyce, in particular, for whom the prosecutor proceeded on a theory of premeditated and deliberate murder, based on the court's instructions, the jury could not properly have found appellant guilty of first degree murder." Defendant claims that confusion over elements of the charged offenses constituted a violation of his constitutional right to due process of law and that the asserted error also violated his constitutional right to a reliable penalty determination under the Eighth and Fourteenth Amendments to the United States Constitution.

As we understand defendant's contention, he claims that a jury that does not know the meaning of the term "express malice" could not properly have determined that defendant was guilty of first degree murder on a premeditated murder theory, because such a theory requires proof of express malice. Alternatively, defendant may mean that because there was no evidence of express malice, it was error not to delete the term express malice from CALJIC No. 8.20, and that the alleged error deprived defendant of the chance that the jury would find only implied malice.

It is difficult to understand why the prosecutor and the court agreed to omit the definition of express malice contained in CALJIC No. 8.11, because there was ample evidence of express malice. The prosecutor's agreement is particularly perplexing, because implied malice murder normally constitutes only murder in the second degree. (See *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102-104 [13 Cal.Rptr.2d 864, 840 P.2d 969].) We surmise that the prosecutor agreed with the proposal because for each count, the prosecution was attempting to prove murder by poison, which constitutes a first degree murder whether malice is express or implied. (See *People v. Diaz*, *supra*, 3 Cal.4th at p. 538; *People v. Mattison* (1971) 4 Cal.3d 177, 182-183 [93 Cal.Rptr. 185, 481 P.2d 193]; see also 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 130, p. 748 ["Killing by poison may be criminally negligent and amount only to manslaughter ... or may be second degree felony-murder .... But killing with malice aforethought, when perpetrated by means of poison, is first degree murder"].)

To the extent defendant claims that the giving of CALJIC No. 8.20 without modification constituted error, we observe that defendant did not request a modification of this standard instruction, an instruction that was appropriate under the facts of this case.

103

"'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 [76 Cal.Rptr.2d 239, 957 P.2d 928]; see also *People v. Bolin* (1998) 18 Cal.4th 297, 328 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Alvarez*, *supra*, 14 Cal.4th at p. 223; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142 [36 Cal.Rptr.2d 235, 885 P.2d 1]; but see *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [instructional error affecting the defendant's substantial rights may be reviewed on appeal in the absence of an objection].)

To the extent defendant claims that the jury should have been instructed on express malice if they were to be instructed on premeditated murder, the Attorney General contends that any error was invited. It was defendant's proposal, with which the prosecutor somewhat reluctantly agreed, to omit the definition of express malice from CALJIC No. 8.11. (32) When defense counsel makes a " 'conscious, deliberate tactical choice' " to request an instruction, any error in the giving of the instruction is invited and cannot be raised on appeal. (*People v. Wader*, *supra*, 5 Cal.4th at p. 657; see also *People v. Lucero* (2000) 23 Cal.4th 692, 723-724 [97 Cal.Rptr.2d 871, 3 P.3d 248].) Counsel's choice appears to have been deliberate.

Even if the claim is not barred, defendant's claim clearly is untenable on the merits. Defendant's premise that there was no evidence of express malice is faulty. The evidence was strong that defendant had formed an intent to kill Joyce, Glenna, and Martha unlawfully through the common scheme of administering paraquat. (See § 188; *People v. Swain* (1996) 12 Cal.4th 593, 601 [49 Cal.Rptr.2d 390, 909 P.2d 994].) Indeed, as noted below, the jury's special circumstance finding constituted an express determination that defendant possessed a deliberate intent to kill Martha unlawfully.

Further, even if for some reason defendant was entitled to the removal of the term "express malice" from CALJIC No. 8.20, any error under California law was harmless (see *People v. Flood* (1998) 18 Cal.4th 470, 490 [76 Cal.Rptr.2d 180, 957 P.2d 869] [applying a standard posing the question whether there is a reasonable probability that the error affected the outcome, when instructional error under California law is found]), because defendant would be guilty of first degree murder whether the jury found express or implied malice. The evidence established as to each charge that if defendant committed murder, he committed it by means of poison. With respect to Martha, the jury specifically found that the murder was intentional, and that it was committed by means of poison, when it returned a true finding on the murder-by-poison special circumstance. The evidence was equally compelling that if defendant murdered Joyce, he did so by means of poison. As noted above, whether the jury found express or implied malice, as long as it found one or the other form of malice, the murders were in the first degree. As noted, all murder that is committed by means of poison is murder in the first degree. (*People v. Diaz*, *supra*, 3 Cal.4th at pp. 538, 568; *People v. Mattison*, *supra*, 4 Cal.3d at pp. 182-184; see also *People v. Cobler* (1934) 2 Cal.App.2d 375, 380 [37 P.2d 869]; 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against the Person, § 130, p. 748; *id.*, § 190, p. 800.) In fact, the question whether defendant acted with express or implied malice did not figure in either party's closing arguments to the jury.

Defendant complains that the jury was faced with determining whether express malice had been established without ever having received an instruction on express malice. This problem, of course, was caused by the request on the part of defense counsel, with the concurrence of the prosecution, to delete the definition of express malice.

Considering the instructions as a whole, we do not find any reasonable likelihood that the omission would confuse the jury or relieve the prosecution of any of its burden of proof (*People v. Smithey*, *supra*, 20 Cal.4th at p. 981; see *People v. Castillo* (1997) 16

Cal.4th 1009, 1016 [68 Cal.Rptr.2d 648, 945 P.2d 1197]; *People v. Cain* (1995) 10 Cal.4th 1, 35-36 [40 Cal.Rptr.2d 481, 892 P.2d 1224]), because the instruction on premeditation adequately informed the jury of the state of mind required for first degree premeditated murder. As noted, "proof of unlawful 'intent to kill' is the functional equivalent of express malice" (*People v. Swain, supra*, 12 Cal.4th at p. 601), and the premeditation instruction included a requirement that the jury find a "killing ... preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill." (CALJIC No. 8.20.) The jury would understand the requirements of express malice under the instructions as a whole.

Further, even assuming that the alleged error constituted an improper description of or an omission of an element of the offenses in violation of the federal Constitution, as defendant contends, any error was harmless beyond a reasonable doubt. (See *People v. Flood, supra*, 18 Cal.4th at pp. 490, 502-503 [harmless error]; see also *People v. Cox* (2000) 23 Cal.4th 665, 676-677 & fn. 6 [97 Cal.Rptr.2d 647, 2 P.3d 1189] [harmless error]; *People v. Sakarias, supra*, 22 Cal.4th at p. 625 [same].) Even if the jury relied upon a premeditation theory of first degree murder rather than a murder-by-poison theory as to Joyce, it could not find premeditation and deliberation without determining that defendant had a state of mind constituting express malice. If the jury believed the prosecution had proved only implied malice, and that the prosecution had failed to prove that the murder was committed by means of poison, it is nonetheless significant that the jury was properly instructed on implied malice and was given a second degree murder instruction. That instruction directed that if the jury found only implied malice, it should return a verdict of second degree rather than first degree murder. It is clear beyond a reasonable doubt that any error did not contribute to the verdict.

*Catlin*, 26 Cal. 4th at 147–51.

Petitioner has not demonstrated the state supreme court acted unreasonably. For the reasons stated by that court, the instructions given adequately addressed the requirement for a joint concurrence of requisite intent and act with regard to first-degree murder and the alternative of second-degree murder. *See e.g., People v. Rodrigues*, 8 Cal. 4th 1060, 1142-43 (1994) (holding that the court's instructions as a whole properly guided the jury's consideration of the evidence because CALJIC No. 8.20 "adequately expressed the need for joint operation of act and intent [for first-degree murder]"). Moreover, "[t]he availability of a better instruction is not a ground for reversal" under federal law. *United States v. Ward*, 914 F.2d 1340, 1344 (9th Cir. 1990) (citing *United States v. Bustillo*, 789 F.2d 1364, 1367 (9th Cir. 1986)).

Additionally, to the extent that Petitioner complains of a state law violation, this Court must defer to the ruling by the California Supreme Court. The issue before this Court is whether any violation of state law regarding these instructions occurred that rose to the level of a deprivation of a right guaranteed by the federal Constitution. For the reasons stated, it did not.

### iii.	Subclaim C - Burden of Proof in Death of Joyce – Special Instruction No. 8

Petitioner alleges the trial court erred by refusing to give defense special instruction No. 8 that:

> The prosecution has the burden of proving beyond a reasonable doubt that the cause of the death of Joyce Catlin was paraquat poisoning. If the evidence introduced in this case relating to the cause of death of Joyce Catlin fails to prove beyond a reasonable doubt that the cause of death of Joyce Catlin was paraquat poisoning, you must give Mr. Catlin the benefit of that doubt and find him not guilty of Count One.

(Doc. No. 25 at 179 *citing* CT 2007.)

Petitioner observes the trial court refused the instruction without stating a reason (RT 5177), even though the prosecutor agreed the instruction, though cumulative, was a correct statement of the law (RT 5176-77.)  Petitioner argues the trial court was required to give the instruction because it was supported by the evidence; necessary given the prosecution theory that Petitioner poisoned Joyce with paraquat; not cumulative in that the only comparable instruction given applied only to Martha; and necessary given the extensive and confusing "uncharged crimes" evidence relating to Glenna's murder.  (Doc. No. 25 at 180; *see also* RT 5193-99, 5281-85; CT 1965.)  Particularly so, according to Petitioner in that the prosecutor's primary purpose for introducing evidence of Glenna's uncharged murder was to show that Joyce was murdered by Paraquat poisoning and that Petitioner was the killer.  (Doc. No. 25 at 180 citing RT 37.)

Petitioner argues the failure to give this instruction denied him a presumption of innocence and lessened the prosecution's burden of proof, denying due process rights.  (Doc. No. 25 at 180-81 citing *Yates v. Evatt*, 500 U.S. 391, 402 (1991) (disapproved on other grounds by *Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991).)

The California Supreme Court considered and rejected the allegation on direct appeal, stating that:

> Defendant requested that the court instruct the jury as follows: "The prosecution has the burden of proving beyond a reasonable doubt that the cause of death of Joyce Catlin was paraquat poisoning. If the evidence introduced in this case relating to the cause of death of Joyce Catlin fails to prove beyond a reasonable doubt that the cause of death ... was paraquat poisoning, you must give Mr. Catlin the benefit of the doubt and find him not guilty of Count One." The prosecutor objected on the ground that the instruction was cumulative. He stated: "The jury is instructed that they have to find beyond a reasonable doubt that Mr. Catlin did intentional acts that resulted in the death of Joyce Catlin, and that's covered in the instructions defining murder and reasonable doubt." The trial court declined to give the instruction requested by defendant.

Defendant claims that the giving of the special instruction was imperative, because of the circumstance that most of the prosecution's evidence with respect to Joyce related to the issue of cause of death, and he points out that the court granted his request for a similar instruction with respect to the murder of Martha. He surmises that the asymmetry in instructions would cause the jury to believe a lesser level of proof was required to establish the cause of Joyce's death, thereby improperly relieving the prosecution of its full burden of proof. He points to the introduction of other-crimes evidence to establish the cause of Joyce's death, contending that in order to avoid a guilt determination on the basis of a finding of criminal propensity, it was particularly important to require that the cause of Joyce's death be proved beyond a reasonable doubt. Finally, he contends the instruction was necessary to clear up the confusion caused by the malice instructions discussed above.

The trial court properly could refuse the instruction on the ground that the point adequately was covered in the instructions related to the prosecution's burden of proof and the elements of murder, as well as in the instruction on proximate cause. (See *People v. Garceau* (1993) 6 Cal.4th 140, 192-193 [24 Cal.Rptr.2d 664, 862 P.2d 664] [the court may refuse a request for an instruction the point of which was covered adequately by the instruction requiring proof beyond a reasonable doubt].)

Defendant did not contend at trial that the instruction was necessary because a similar one was to be given with respect to the murder of Martha, or that the asymmetry in instructions as to the two murders would confuse the jury. Even assuming his claim was not waived, we do not believe that, viewing the instructions as a whole, it is reasonably likely (see *People v. Clair*, *supra*, 2 Cal.4th at p. 663) that the jury would be misled simply because it received a pinpoint instruction directing it to determine whether the cause of Martha's death was, beyond a reasonable doubt, paraquat poisoning, but did not receive a similar pinpoint instruction with respect to the death of Joyce. As noted above, in light of the instructions on proof beyond a reasonable doubt, on the elements of the crimes charged, and on proximate cause, the jury would not be misled as defendant claims, particularly because neither the defense nor the prosecution argued to the jury that a different standard applied as between the two charged murders. It is not reasonably likely that under the instructions as a whole, jurors mistakenly would conclude that defendant could be convicted of the murder of Joyce even if they had a reasonable doubt that she might have died of natural causes, or that they would conclude that defendant could be convicted of the murder of Joyce on the basis of evidence of defendant's criminal propensity. The circumstance that causation was a major issue in the trial would not add to the risk that the jury would be misled with respect to the burden of proof. We have rejected the contention that the other-crimes evidence constituted evidence of criminal propensity, and observe that the jury properly was instructed on the limited purpose for which they could consider the evidence of other crimes. Finally, we do not believe the proposed instruction could have had any effect on the jury's understanding of the instructions on malice discussed above. In sum, the requested instruction was unnecessary, and the trial court did not err in refusing to give it.

*Catlin*, 26 Cal. 4th at 151–53.

The state supreme court did not act unreasonably in these regards. The instructions given to the jury, noted by the state supreme court, required the specified elements of the charged offense be found beyond a reasonable doubt. The significance of an omitted instruction is evaluated by a comparison of the omitted instruction with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Kibbe,* 431 U.S. at 156).

Although an instruction comparable to that requested was given as to Martha, the state supreme court could note Petitioner was charged with a murder-by-poison special circumstance in the death of Martha but not in the death of Joyce. (CT 1965.) Petitioner has not demonstrated that the admission of the "uncharged crimes" evidence relating to Glenna's murder provided reason to find otherwise, for the reasons stated. (See claims 1-5, *ante*.)

Even if the state court erred as a matter of state law in refusing to give the requested instruction, state law error alone does not support federal habeas relief. *Dunckhurst*, 859 F.2d at 114.

iv. *Subclaim D - Evidence Specific to Charged Crime – Special Instruction No. 7*

Petitioner alleges the trial court erred in refusing to give defense special instruction No. 7 that:

> The evidence applicable to each offense charged must be considered as if it were the only accusation before the jury.

(Doc. No. 25 at 181 *citing* CT 2006.)

The prosecutor objected on ground the jury can consider the other offenses in deciding each separate count. (RT 5176.) The trial court refused the instruction on grounds it was "cumulative also." (*Id.*)

Petitioners cites to *People v. Kemp*, 55 Cal. 2d 458, 477 (1961) (evidence applicable to each offense to be considered as if only accusation before jurors), arguing the instruction was not cumulative and that it was necessary given the trial court's refusal to sever the counts and the absence of any instruction informing the jury that evidence for each crime should be considered on its own merits subject to the prosecutions burden of proving guilt beyond a reasonable doubt. (Doc. No. 25 at 181 citing to claim 6.)

Petitioner argues prejudice because the unaggregated evidence relating to the separate counts I and II is insufficient to support a conviction on either count beyond a reasonable doubt. (Doc. No. 25 at 182-83.) He argues the uncharged crimes evidence was improperly admitted to fill evidentiary gaps. (*Id.*) Here again, he argues the failure to properly instruct served to lessen the prosecution's burden of proof, violated his due process rights.

The California Supreme Court considered and rejected the allegation on direct appeal, stating

108

that:

> Defendant contends the trial court erred in refusing to give a proposed special instruction stating: "Evidence applicable to each offense charged must be considered as if it were the only accusation before the jury."
>
> The court correctly refused to give the instruction. Contrary to the import of the proposed special instruction, under Evidence Code section 1101 the jury properly could consider other-crimes evidence in connection with each count, and also could consider evidence relevant to one of the charged counts as it considered the other charged count. (See *People v. Beagle* (1972) 6 Cal.3d 441, 456 [99 Cal.Rptr. 313, 492 P.2d 1], overruled on other grounds in *People v. Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].) As explained above, evidence regarding the murder of Joyce would have been cross-admissible in a separate trial for the murder of Martha, and vice versa. To the extent that defendant requested the instruction in order to require the jury to arrive at a verdict on each count separately, his requested instruction was cumulative, because that purpose was served by the giving of the following rendition of CALJIC No. 17.02: "Each count charges a distinct crime. You must decide each count ... separately. The Defendant may be found guilty or not guilty of either or both of the crimes charged. Your finding as to each count must be stated in a separate verdict." Defendant's claim of instructional error is unpersuasive.

*Catlin*, 26 Cal. 4th at 153.

The state supreme court reasonably rejected the allegation. As discussed by that court, the instructions given jury required the specified elements of each charged offense be found beyond a reasonable doubt. Petitioner's requests to sever the counts and provide for separate juries properly were rejected including on grounds of cross-admissibility of evidence. (*See* claim 6, *ante*.) Petitioner has not demonstrated that the admission of the "uncharged crimes" evidence relating to Glenna's murder provided reason to find otherwise. (*See* claims 1-5, *ante*.)

As above, any state law instructional error is not alone a basis for relief in this proceeding. *Dunckhurst*, 859 F.2d at 114.

> v.      *Subclaim E - Intentional Administration of Poison – Martha's Murder – CALJIC 8.81.19*

Petitioner alleges that as to the poison-murder special circumstance charged in the death of Martha (*see* Penal Code section 190.2(a)(19)), the trial court erred by failing to instruct the jury that it had to find Petitioner killed Martha "by the intentional administration of poison." (Doc. No. 25 at 184.)

The record reflects the jury was instructed with CALJIC 8.81.19 that:

> To find that the special circumstance, referred to in these instructions as murder by

administration of poison, is true, each of the following facts must be proved: 1. The killing was intentional, and 2. Defendant committed the murder by the administration of poison. The word "poison" means any substance introduced into the body by any means which by its chemical action is capable of causing death. Paraquat is a poison.

(Doc. No. 25 at 184 citing CT 1980.)

Petitioner argues the instruction improperly omitted "the intent to use a particular means" (Doc. No. 25 at 185) allowing the jury to find the special circumstance true based solely upon the "intent to kill." (Doc. No. 25 at 184.) That is, he argues "a special circumstance which merely duplicates the findings necessary for a first-degree murder by means of poison fails to narrow the class of capital crimes sufficiently to meet the requirements of the Eighth Amendment. (Doc. No. 25 at 185 citing *Wade v. Calderon*, 29 F.3d 1312, 1320 (9th Cir. 1994) (overruling recognized by *Pensinger v. Chappell*, 787 F.3d 1014, 1030 (9th Cir. 2015) (torture murder special circumstance instruction constitutionally insufficient where it failed to require intent to torture); *see also Zant v. Stephens*, 462 U.S. 862, 876-877 (1983) (regarding failure to narrow the class of persons eligible for the death penalty); *People v. Davenport*, 41 Cal. 3d 247, 266 (1985) (addressing need for "principled basis for distinguishing capital murder from any other murder.").

Petitioner argues the omission of a necessary element of a special circumstance, that Petitioner killed Martha by the intentional administration of poison, is structural error requiring reversal without any showing of prejudice. (Doc. No. 25 at 185.)

The California Supreme Court considered and rejected the claim on direct appeal, stating that:

Section 190.2, subdivision (a)(19), defines the murder-by-poison special circumstance as a murder in which "[t]he defendant intentionally killed the victim by the administration of poison." Defendant contends that in instructing the jury, the court omitted an essential element that defendant describes variously as a "specific intent to bring about a death by poison," or an "intent to administer poison," or an "intent to administer poison for the purpose of killing the victim." The instruction given, he claims, required only proof of intent to kill. The instruction omitted an essential element of the special circumstance allegation, he claims, in violation of the due process clause of the federal Constitution. Automatic reversal without regard to prejudice is required, according to defendant.

The trial court instructed the jury pursuant to CALJIC No. 8.81.19, with slight variations, as follows: "To find that the special circumstance [] referred to in these instructions as murder by administration of poison is true, each of the following elements must be proved: [¶] One, that the killing was intentional and two, the Defendant committed the murder by the administration of poison." It also instructed: "The word poison means any substance introduced into the body by any means which by its chemical action is capable of causing death. Paraquat is a poison."

110

As respondent contends, the instruction given by the court reasonably would be understood as requiring proof that the defendant administered poison with the intent to kill the victim. The instruction required proof that there was an intentional killing and that the defendant "committed the murder *by* the administration of poison." Read together in a commonsense fashion, a jury would understand from this language that proof is required that defendant administered the poison with the intent to kill the victim.

In any event, even if the instruction actually had omitted an element of the special circumstance charge (which, we reiterate, we have concluded was not the case), under the evidence presented in this case and the arguments of counsel, it is not reasonably possible that the jury could have found that defendant had the intent to kill Martha and that the murder occurred by means of poison, but that the defendant did not intend to use poison to kill Martha. Any error would be harmless beyond a reasonable doubt. (See *Neder v. United States* (1999) 527 U.S. 1, 9, 18 [119 S.Ct. 1827, 1833-1834, 1838, 144 L.Ed.2d 35] [applying harmless error standard to instructional error omitting an element of an offense]; *People v. Cox, supra,* 23 Cal.4th at pp. 676-677 & fn. 6.)

*Catlin,* 26 Cal. 4th at 153–54.

Petitioner has not shown the state supreme court acted unreasonably in reject the allegation. As noted, in evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge. *Spivey,* 194 F.3d at 976. "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner. *Boyde,* 494 U.S. at 380. A reviewing court does not engage in a technical parsing of the instruction's language, but instead approaches the instructions in the same way that the jury would -- with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Johnson,* 509 U.S. at 368. Lastly, federal courts presume that juries follow instructions, including cautionary instructions. *Weeks,* 528 U.S. at 234; *see also Boyde,* 494 U.S. at 381-85.

Here, upon application of the above standards, it is unlikely a reasonable juror would interpret the instructions in the manner suggested by Petitioner, for the reasons suggested by the state supreme court. Especially so, as the burden on petitioner is especially heavy "where ... the alleged error involves the failure to give an instruction." *Clark,* 450 F.3d at 904.

Petitioner has not demonstrated instructional error that infected the entire trial denying him a fair trial. *Kibbe,* 431 U.S. at 154. Nor has he reasonably demonstrated prejudice under *Brecht*.

    *vi.*       *Subclaims F, G, H, I - Proximate Cause Instructions – CALJIC 3.41, 8.55, 8.58*

Petitioner alleges the trial court erred by giving proximate cause instructions, CALJIC 8.55 as

modified and CALJIC 8.58, which included a confusing and later disapproved definition of proximate cause. (Doc. No. 25 at 187-90 citing *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1054 (1991). He argues particularly that here, the disapproved language allowed an act to be considered the proximate cause of death as a matter of law where death occurred in "a natural and continuous sequence" with that act, such that the jury was able to find him guilty of Martha's death even though she died from pre-existing circulatory disease. (Doc. No. 25 at 186-87 citing RT 3260-63.)

The record reflects the trial court with the agreement of defense counsel (*see* RT 5166) instructed the jury that:

> To constitute murder there must be, in addition to the death of a human being, an unlawful act which was a proximate cause of that death.
>
> The proximate cause of a death is a cause which, in natural; and continuous sequence, produces the death, and without which the death would not have occurred.
>
> In this case, the prosecution has the burden of proving beyond a reasonable doubt that paraquat poisoning was a proximate cause of Marth Catlin's death. If the evidence in this case fails to prove beyond a reasonable doubt that paraquat poisoning was a proximate cause [of] Martha Catlin's death, Mr. Catlin is entitled to a verdict of not guilty as to Count Two.

(CALJIC 8.55 as modified; CT 1965.)

> If a person unlawfully inflicts a physical injury upon another person and that injury is a proximate cause of the latter's death, such conduct constitutes an unlawful homicide even though the injury inflicted was not the only cause of the death. Moreover, that conduct constitutes unlawful homicide even if: 1. The person injured had been already weakened by disease, injury physical condition or other cause, 2. It is probable that a person in sound physical condition injured in the same way would not have died from the injury, 3. It is probable that the injury only hastened the death of the injured person, and 4. The injured person would have died soon thereafter from another cause or other causes.

(CALJIC 8.58; CT 1966.)

Petitioner argues the trial court compounded its error by rejecting the defense request to give CALJIC 3.41 regarding More Than One Proximate Cause/Concurrent Cause, which provides for concurrent causation by two or more persons where each was a substantial factor contributing to death. (Doc. No. 188 citing CT 2010.) Petitioner observes the prosecutor believed CALJIC 3.41 had to be given unless waived. (Doc. No. 25 at 188 citing RT 5163.) Yet the trial court, following deferral of

112

discussions at the request of the defense (RT 5163-64), ultimately refused the instruction, apparently in favor of the above noted modified CALJIC 8.55 and CALJIC 8.58.  (RT 5166).

Petitioner argues CALJIC 3.41 would have cured the alleged noted deficiencies he found in CALIC 8.55 and 8.58.

CALJIC 3.41, had it been given would have instructed the jury that:

More Than One Proximate Cause/Concurrent Cause

There may be more than one proximate cause of the --- (result of the crime).   When the conduct of two or more persons contributes concurrently as a proximate cause of the --- (result of the crime), the conduct of each is a proximate cause of the --- (result of the crime) if that conduct was also a substantial factor contributing to the result.  A cause is concurrent if it was operative at the moment of the --- (result of the crime) and acted with another cause to produce the --- (result of the crime).

[If you find that the defendant's conduct was a proximate cause of ---(injury, death, etc.) to another person, then it is not defense that the conduct of some other person [, even the [injured] [deceased] person,] contributed to the – (injury, death, etc.).]

(CT 2010.)

Petitioner argues that juror confusion over the term "proximate cause" rendered his murder conviction and sentence unreliable.  (Doc. No. 25 at 189.)  He argues that in Martha's case, these defective instructions may have removed Martha's existing medical conditions and treatment from the jury's proximate cause deliberations.  (Doc. No. 25 at 190.)  He argues that jurors may have convicted him of the capital charge if Martha's death "sequentially followed" his unlawful act even if the act did not bring about the death (Doc. No. 25 at 187), denying him a presumption of innocence and lessening the prosecution's burden of proof so as to deprive him of due process.  (Doc. No. 25 at 190 citing *Yates*, 500 U.S. at 402.)

Petitioner points to the testimony of the autopsy physician, Dr. Dollinger, who initially opined that absent any other cause of death Martha died from "acute coronary insufficiency", citing her age (79 years) and pre-existing coronary artery disease.  (*Id.*, *citing* RT 3260-63.)  Petitioner's trial defense was that he denied poisoning Martha and contends that he did not have access to her at the time she would have ingested paraquat.  (Doc. No. 25 at 186; *see* RT (Bates) 8645-46.)

The California Supreme Court considered and rejected the allegation on direct appeal, stating that:

113

Defendant contends that the jury instructions on proximate cause erroneously would have permitted conviction for the murder of Martha even if the jury believed that the principal cause of her death was a circulatory disease.

The court instructed the jury on the issue of proximate cause pursuant to modified versions of former CALJIC Nos. 8.55 and 8.58, as follows: "[¶] To constitute murder, there must be, in addition to the death of a human being, an unlawful act which was the proximate cause of that death. [¶] The proximate cause of a death is a cause which in natural and continuous sequence, produces the death and without which the death would not have occurred. [¶] In this case, the Prosecution has the burden of proving beyond a reasonable doubt that paraquat poisoning was a proximate cause of Martha Catlin's death. If the evidence in this case fails to prove beyond a reasonable doubt that paraquat poisoning was a proximate cause of Martha Catlin's death, Mr. Catlin is entitled to a verdict of not guilty as to Count II. [¶] If a person unlawfully inflicts a physical injury upon another person and that injury is a proximate cause of the latter's death, such conduct constitutes an unlawful homicide, even though the injury inflicted was not the only cause of the death. [¶] Moreover, that conduct constitutes unlawful homicide even if one, the person injured had been already weakened by disease, injury, physical condition or other cause. [¶] Two, it is probable that a person in sound physical condition injured in the same way would not have died from the injury and three, it's probable that the injury only hastened the death of the injured person and four, the injured person would have died soon thereafter from another cause or causes."

Defendant claims that these instructions misstated the law by permitting the jury to return a guilty verdict on a charge of murder if it found concurrent causes of death, even if the criminal act was not a principal cause of death. The law provides, however, that as long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death. Rather, it is required that the cause was a substantial factor contributing to the result: " ' [N]o cause will receive judicial recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a *substantial factor* in bringing about the particular result.' " (*People v. Caldwell* (1984) 36 Cal.3d 210, 220 [203 Cal.Rptr. 433, 681 P.2d 274]; see also *In re M.S.* (1995) 10 Cal.4th 698, 719-720 [42 Cal.Rptr.2d 355, 896 P.2d 1365].)

This is true even if the victim's preexisting physical condition also was a substantial factor causing death. (*People v. Wattier* (1996) 51 Cal.App.4th 948, 953 [59 Cal.Rptr.2d 483].) "So long as a victim's predisposing physical condition, regardless of its cause, is not the *only* substantial factor bringing about his death, that condition ... in no way destroys the [defendant's] criminal responsibility for the death." (*People v. Stamp* (1969) 2 Cal.App.3d 203, 210 [82 Cal.Rptr. 598]; see also *People v. Wattier*, *supra*, 51 Cal.App.4th at p. 953; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1523 [28 Cal.Rptr.2d 758]; 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements, § 37, p. 243 ["A defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause"].)

Defendant also contends that the court should have given CALJIC No. 3.41, which states expressly that when there are concurrent causes of death, the defendant's conduct is a proximate cause of death "if that conduct was also a substantial factor contributing to the result."

Even if defendant is correct that the clarifying instruction should have been given, we do not believe it was reasonably probable that its omission affected the verdict. (See *People v. Flood*, *supra*, 18 Cal.4th at p. 490.) The evidence was overwhelming that Martha and Joyce died of paraquat poisoning and not from natural causes, and even as to Martha, who

had some preexisting physical problems, the evidence was overwhelming that paraquat poisoning was at least a substantial factor in, if not the sole cause of, her death.

Defendant also complains that the instructions the court gave on causation subsequently were criticized by this court in *People v. Roberts* (1992) 2 Cal.4th 271, 311-313 [6 Cal.Rptr.2d 276, 826 P.2d 274]. He complains that under the instructions as given, "some jurors may have believed that [he] did an unlawful act which nevertheless did not bring about Martha's death; however, based on the instructions read, those jurors could have erroneously convicted [him] of a capital offense if they concluded Martha's death sequentially followed that act."

We do not believe that under the instructions given, requiring that defendant's act constitute a cause that "produces ... death and without which the death would not have occurred," the jurors reasonably could have concluded that they could convict defendant of the murder of Martha if they believed defendant committed an unlawful act that did not bring about her death, but was only followed temporally by her death. The instructions made it clear that the prosecution had the burden of proving that defendant's administration of paraquat was a cause of Martha's death, not just that it occurred near the time of her death. In fact, as respondent points out, at defendant's request the jury also was instructed on attempted murder to cover just the eventuality posited by defendant here-an attempt to poison Martha that did not cause her death.

As for our criticism of the proximate cause instruction in *People v. Roberts*, *supra*, 2 Cal.4th 271, we acknowledged a concern previously expressed in *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1050-1051 [1 Cal.Rptr.2d 913, 819 P.2d 872], in the context of another instruction, that the proximate cause instruction placed "undue emphasis on physical or temporal nearness." (*People v. Roberts*, *supra*, 2 Cal.4th at p. 313.) We had expressed the fear in *Mitchell v. Gonzales*, *supra*, 54 Cal.3d 1041, that the proximate cause instruction might cause jurors "to focus improperly on the cause that is spatially or temporally closest to the harm." (*Id.* at p. 1052.) But in the present case, as we also explained in *Roberts*, "any such confusion on the jury's part could only benefit defendant," because defendant's act was not necessarily close in time-or place-to the death of each victim. (*People v. Roberts*, *supra*, 2 Cal.4th at p. 313.)

*Roberts* also recognized that the instruction on proximate cause might be confusing simply because of its poor grammar and the uncertainty of the meaning of the term "proximate cause." (*People v. Roberts*, *supra*, 2 Cal.4th at p. 313.) We do not believe, however, that these ambiguities in the instruction could have caused a juror to conclude that defendant's act might be a proximate cause of either victim's death simply because it occurred near the time of the death or illness of the victim, even though that juror did not believe that defendant's act caused the death.

Defendant contends that the proximate cause instructions lightened the prosecutor's burden of proof because they "removed from the jury's consideration other factors concerning Martha's medical condition and treatment which should have been considered in the jury's determination of 'proximate cause." He claims a violation of his right to due process of law and to a reliable determination of guilt and penalty.

Defendant does not specify what "other factors" he believes the jury should have been permitted to consider. The instructions did not direct the jury to ignore evidence regarding Martha's poor health or her age. Rather, they asked the jury to determine whether defendant's administration of poison was a cause without which Martha would not have died. The instructions did not relieve the prosecution of any of its burden of proof.

Defendant claims that cumulatively, the instructional errors he has alleged violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

United States Constitution. Because we do not find any error of substance, we do not agree.

*Catlin*, 26 Cal. 4th at 154–57.

The state supreme court reasonably rejected the allegation. Any state law instructional error is not along a basis for federal habeas relief. *Dunckhurst*, 859 F.2d at 114. The instructions given required the jury find Petitioner's criminal acts were a factor without which Martha's death would not have occurred even if her allegedly predisposing medical conditions also contributed. The instructions reasonably did not suggest temporal proximity alone constituted proximate cause. Moreover, the jury was required to make its findings of the essential elements of the charged crimes beyond a reasonable doubt. (See CT 1955.)

Additionally, the state supreme court reasonably could find the evidence that Martha died from paraquat poisoning was substantial. (*See* claims 30 and 31, *post.*)

*vii.* *Subclaim J - Cumulative Error – Guilt Phase Instructions*

Petitioner argues the foregoing alleged instructional errors taken as a whole violated his noted constitutional rights and resulted in structural error and were not harmless under *Brecht*. (Doc. No. 25 at 175, 191.)

The California Supreme Court considered and rejected the allegation on direct appeal, stating that:

Defendant claims that cumulatively, the instructional errors he has alleged violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Because we do not find any error of substance, we do not agree.

*Catlin*, 26 Cal. 4th at 157.

Petitioner has not shown the state supreme court was unreasonable in these regards. The Ninth Circuit has stated "the Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Here, for the reasons stated *ante*

and *post*, there were no individual errors to cumulate.

*viii.    Conclusions*

The state supreme court reasonably could find trial court did not err by giving erroneous guilt phase jury instructions.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations, individually or cumulatively.

Accordingly, it does not appear that the California Supreme Court's rejection of claim 18 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claim 18 shall be denied.

11.    Claim 20

Petitioner alleges that the trial court erred by overruling defense chain of custody objections to testimony relating to unidentified and poorly preserved tissue evidence from Joyce's body, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 197-201.)

**a.    State Court Direct and Collateral Review**

The claim state agents failed to properly preserve Joyce's tissue evidence and the trial court erred in overruling defense foundational objection based on this evidence was raised on direct appeal and denied on state law chain of custody grounds.  *Catlin*, 26 Cal. 4th at 133–36.

The claim was raised in the second state habeas petition asserting denial of a fair trial, the right to confront evidence, and the right to a reliable conviction and sentence under the Fifth, Sixth, and Eighth Amendments and denied on the merits and on procedural grounds.  (Order No. S173793.)

**b.    Analysis**

Petitioner argues that the trial court, over counsel's objection, allowed prosecution expert Dr. Stephens to testify about the cause of Joyce's death based upon slides of her tissue notwithstanding the prosecution's failure to establish chain of custody as to the tissue slides.  (Doc. No. 25 at 197-99 citing *People v. Diaz*, 3 Cal.4th 495, 559 (1992) (burden is on the party offering the evidence to show to a

reasonable certainty there was no alteration).

Petitioner points to the allegedly deficient chain of custody evidence running from the May 6, 1976 autopsy by Dr. Swinyer to Dr. Stephens' 1984 examination of the tissue slides. He argues the ten labelled blocks of preserved tissue were stored at Mercy Hospital in Bakersfield for some unknown time; transferred to the Kern County coroner's office; mailed to Standard University in 1984 for examination by pathologist Dr. Charles Carrington; and then sent to Dr. Stephens for examination. (*See* Doc. No. 25 at 197-201 citing RT 3188-3205, 3448-50, 3683-90, 3730-69, 3801-02, 3844-56.)

Petitioner argues that of the ten paraffin blocks received by Dr. Stephens, three of the blocks did not have originally labelling as coming from Joyce's body or any particular source. (*Id.*) He argues that the prosecution failed to fully account for possession and custody of the tissue removed from Joyce's body such that it is not reasonably certain the evidence was unaltered. (Doc. No. 25 at 200 citing *Diaz*, 3 Cal. 4th at 559.) He argues that there is no way of knowing whether the tissue examined by Dr. Stephens supporting his conclusions as to cause of death Joyce's death came from Joyce's body. (Doc. No. 25 at 200.)

The state supreme court rejected the claim, stating that:

> Defendant contends that there was a break in the chain of custody of the tissue that was removed from Joyce's body during the autopsy. He contends that this break cast doubt on the origin of the tissue ultimately analyzed by Dr. Stephens and relied upon by him to support the conclusion that Joyce died of paraquat poisoning. He asserts that although the tissue blocks were labeled when they were removed, prepared for analysis, and deposited in the hospital safe after the autopsy in 1976, some of the tissue received at Stanford Hospital in 1984 and thereafter transmitted to Dr. Stephens for analysis was not marked with the coroner's label. Defendant also contends that the prosecution failed to fulfill its duty properly to preserve material evidence, but he fails to offer any authority or argument in support of this claim, so it is not considered here. (See *People v. Hardy* (1992) 2 Cal.4th 86, 150 [5 Cal.Rptr.2d 796, 825 P.2d 781].)

> At trial, defendant objected to testimony by Dr. Stephens that the slides analyzed by him reflected that Joyce died of paraquat poisoning, on the ground that there was an inadequate foundation for this opinion testimony. On each occasion, the trial court overruled the objection without prejudice to renewal if further prosecution witnesses were unable to supply links in the chain of custody. Defendant does not assert that the objection was renewed, and our reading of the record does not disclose further objection. Respondent contends that defendant waived his chain of custody claim because, at the close of the prosecutor's case-in-chief, defendant stipulated that although the medical records relied upon by the various expert witnesses would not be presented to the jury, the jury could rely, for the truth of that testimony, upon the expert witnesses' testimony characterizing the contents of the medical records. We do not believe that this stipulation clearly constituted a waiver of the chain of custody claim. The trial court already had rejected defendant's objection to Dr. Stephens's opinion testimony on chain of custody grounds.

118

The stipulation merely served to relieve the jury of the burden of examining voluminous medical records, and did not constitute a withdrawal of the previous chain of custody objection.

Whether or not there was a waiver, either because of the stipulation or because of defendant's apparent failure to renew the objection after the prosecution supplied additional chain of custody witnesses, we reject on the merits defendant's contention that Dr. Stephens's opinion testimony that Joyce died of paraquat poisoning should have been excluded on chain of custody grounds.

In a chain of custody claim, " '[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight.' [Citations.]" (*People v. Diaz, supra,* 3 Cal.4th at p. 559; see also Méndez, Cal. Evidence (1993) § 13.05, p. 237 ["While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering"].) The trial court's exercise of discretion in admitting the evidence is reviewed on appeal for abuse of discretion. (*County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1448 [232 Cal.Rptr. 471].)

We conclude that the trial court did not abuse its discretion in overruling defendant's objection to Dr. Stephens's testimony based on chain of custody.[13] The tissue was removed at the autopsy and immediately was labeled with the autopsy number A-26-76. It was cut into pieces and placed in a cassette marked A-26-76 and transmitted to a technician who processed it into slides that also were labeled with the autopsy number. The labeled tissue blocks were placed in a container in a drawer and went into storage at Mercy Hospital.



-------------------FOOTNOTE-------------------

n.13 We do not reach defendant's contention that any failure to preserve the claim for appeal constituted ineffective assistance of counsel or that error in admitting the evidence constituted a due process violation, because we reject the claim that the prosecution failed to establish an adequate chain of custody.



-------------------END FOOTNOTE-------------------

In 1984, a labeled box of slides was transferred from Mercy Hospital storage to the Kern County Coroner's Office storage safe. A Kern County Coroner's Office investigator obtained a box labeled A-26-76 from the safe and mailed the labeled box to a physician at the Stanford University School of Medicine's Department of Pathology. The package contained 10 tissue blocks, two of which were missing their labels. Each of the 10 tissue blocks received at Stanford was assigned a Stanford number. A technician at Stanford prepared two sets of slides from tissue from each of the 10 blocks. The tissue was sent to Dr. Boyd Stephens in San Francisco. Dr. Stephens examined one or more slides from each of the 10 tissue blocks. It was based upon the examination of these slides that Dr. Stephens testified that he believed that Joyce died by paraquat poisoning.

We do not agree with defendant that Dr. Stephens's opinion was based upon tissue samples

of unknown origin. Although some of the tissue blocks prepared at the time of the autopsy lost their identifying labels while they were stored at Mercy Hospital, all of the blocks were contained in a box bearing the label A-26-76, and there is no indication of tampering. We note that the storage area had some security in that it required persons entering to sign in. In addition, Dr. Stephens examined slides from all the tissue blocks -most of which were labeled properly-and formed the opinion not only that the tissue indicated paraquat as a cause of death, but that all the slides came from the same person. Dr. Stephens reached the latter opinion not because of anything distinctive about the tissue itself, but because of the matching shape and outline of the samples as they had been cut from the tissue blocks. The circumstance that Dr. Swinyer and Dr. Kilburn testified that unlabeled tissue slides could not be identified as coming from the same person, at least without DNA testing, went to the weight of Dr. Stephens's opinion, not the admissibility of the evidence.

Dr. Stephens's opinion was based upon an examination of the slides, the great majority of which came from tissue blocks that at all times had been properly labeled. All the tissue blocks, including the unlabeled ones, were stored together at Mercy Hospital and arrived in a container labeled A-26-76. The trial court could conclude with reasonable certainty that no alteration of evidence had occurred.

In addition, Dr. Stephens's opinion was not based solely on the tissue analysis, but also on the hospital records of the clinical course of Joyce's illness as well as autopsy observation of pulmonary fibrosis.

Finally, we note that the cause of Joyce's death was not established solely through examination of the tissue sent to Dr. Stephens, as to which there was a chain of custody objection. Other tissue obtained by Dr. Swinyer at the time of Joyce's autopsy was sent in 1976 to Dr. Kilburn, an expert on lung pathology, and he too formed the opinion that the cause of death was paraquat poisoning.

*Catlin*, 26 Cal. 4th at 133–36.

Petitioner has not shown the California Supreme Court's rejection of the claim was unreasonable. Particularly as that court noted, Petitioner has not demonstrated gaps in the chain of custody raising serious questions as to foundation and tampering. The tissue was removed during autopsy, processed for histological review, labelled with the distinctive number A-26-76 as being from Joyce's autopsy, placed in a single box also labelled as A26-76 and placed into secured storage at Bakersfield's Mercy Hospital. (RT 3731-44).

The box with the tissue blocks was transferred to the Kern County Coroner in 1984, who then mailed it to Stanford University's pathology department. Stanford technicians observed the original autopsy number and renumbered the ten tissue blocks, prepared slides from each block and sent the blocks to Dr. Stephens. (RT 3683-87, 3844-50.) Dr. Stephens also observed the original autopsy number on at least some of the blocks (RT 3769) and had slides made from the blocks and examined at least one slide from each block. (RT 3759-69, 3801-02.) Nothing in the records suggests any interruption in the

chain of possession or that the tissue blocks were lost, separated, altered, or contaminated.  The state supreme court could find to a reasonable certainty the tissue Dr. Stephens examined came from Joyce's autopsy.

Moreover, Dr. Stephens testified that he looked at least one slide from each block.  (RT 3802.) Most of the slides Dr. Stephens examined had been harvested from tissue blocks that at all times had been properly labelled.  He was able to opine that all the slides came from the same tissue donor given the matching characteristics of the tissue samples cut from the ten paraffin blocks. (See RT 3815-16, 3824-25.)  His opinion was corroborated by consideration of Joyce's hospital and autopsy records including observed pulmonary fibrosis.  (RT 3764-65.)

Petitioner claims that state agents failed to properly preserve autopsy slides of tissue from Joyce's body is discussed separately below as prosecutorial misconduct.

c.      **Conclusions**

Petitioner has not demonstrated that: the California Supreme Court was unreasonable in rejecting the chain of custody claim regarding Joyce's tissue evidence, and counsel's objection to Dr. Stephens's testimony thereon was improperly denied.  28 U.S.C. § 2254(d)(1), (2).

It does not appear that the California Supreme Court's rejection of claim 20 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claim 20 allegations of trial court error shall be denied.

12.     Claim 25

Petitioner alleges the trial court erred by denying defense counsel's oral pre-trial motion to limit the attorney general's contact with personnel of the Kern County District Attorney's Office, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 25 at 248-51.)

a.      **State Court Direct and Collateral Review**

Petitioner's allegation that denial of his motion to limit contact between the Attorney General's Office and the Kern County District Attorney's office denied his right to a confidential attorney-client relationship, violating the Fifth and Sixth Amendments was raised on direct appeal and denied on

procedural grounds as abandoned at trial. *Catlin*, 26 Cal. 4th at 162.

Petitioner raised the claim in his second state habeas petition on Fifth, Sixth, Eighth, and Fourteenth Amendment grounds asserting denial of rights to a fair trial, due process, a reliable guilt and penalty determination, and freedom form cruel and unusual punishment. The California Supreme Court denied the claim on procedural grounds (as to other than ineffective assistance of counsel and the constitutionality of the death penalty), as raised and rejected on appeal (*In re Waltreus*). (Order S173793.)

**b.    Analysis**

Petitioner argues the trial court erred by failing to grant counsel's post-recusal oral motion to limit ongoing contact between the deputy attorney general Jesse Witt and the previously recused offices of the Kern County District Attorney; contact which allegedly included Witt's use of District Attorney offices and resources. (Doc. No. 25 at 249 citing RT 62-64; *see also* Cal. Penal Code § 1424 (providing for granting recusal of prosecutor based upon conflict of interest).) Petitioner argues that here, the recusal order became the law of the case. (Doc. No. 25 at 250.)

Petitioner argues that Witt, through district attorney investigator Wally Newport, who had previously worked on the case and for Petitioner's prior defense counsel, Lee Felice, may have gained access to confidential defense information including information Petitioner provided to Felice during their attorney-client relationship. (Doc. No. 25 at 248, 249. 251, *citing* RT 59-66.) Petitioner argues Witt thereby intentionally violated the recusal order. (CT 59-63; *see also* Doc. No. 25 at 235 citing the recusal order; CT 1781-A, 1782.)

Petitioner points to Witt's alleged improper ongoing contact with and use of offices and resources of the Kern County District Attorney. (Doc. No. 25 at 234, 249 citing RT 62-64.) He argues Felice continued to work with Newport and Newport continued to work on Petitioner's case. (Doc. No. 25 at 236 citing CT 1773-75.) Petitioner suggest all this amounted to invasion of the defense camp and compromised confidential defense strategy. (Doc. No. 25 at 236, 245.)

The record reflects that on September 14, 1988, the trial court recused from the case the entire Kern County District Attorney's Office because Petitioner's prior counsel, Lee Felice, had gone to work for that office. (Doc. No. 25 at 248 citing CT 1587-90, 1781-A-1782.) The recusal order was affirmed

in an unpublished decision of the Court of Appeal for the Fifth Appellate District (SCT Vol. IX-B at 3-11) and according to Petitioner became law of the case. *Clemente v. State of California*, 40 Cal.3d 202, 211-212 (1985) (principle or rule necessary to decision on appeal becomes the law of the case and must be adhered to throughout its subsequent progress). Thereupon the Office of the California Attorney General undertook prosecution of the case. (*See* Doc. No. 25 at 249.)

Just before the start of trial, defense counsel orally motioned the trial court to limit ongoing contact between Witt and the Kern County District Attorney's Office. (Doc. No. 25 at 249; RT 59-64.) Petitioner notes the trial court deferred ruling pending briefing and never revisited the issue. (*Id. citing* RT 66.)

The state supreme court rejected aspects of the claim on direct appeal, stating that:

> Defendant speculates that an investigator in the Kern County District Attorney's Office passed confidential information to the deputy attorney general who prosecuted the case, despite an order recusing the Kern County District Attorney's Office from prosecuting the case. Defendant is unable to provide evidence in the record indicating that any such conduct took place. On the contrary, the deputy attorney general who prosecuted the case stated on the record that the former deputy district attorney whose prior contact with defendant necessitated the recusal order never had disclosed confidential information to the investigator, and that neither the former deputy district attorney nor the investigator had disclosed confidential information to the deputy attorney general who prosecuted the case. Defendant counters that the recusal order required the recusal of the *entire* Kern County District Attorney's Office, and that this order was affirmed by the Court of Appeal. Defendant claims that contrary to the order, the deputy attorney general continued to use the resources of the Kern County District Attorney's Office, including the services of Newport, an investigator who previously had worked for Felice, the deputy district attorney whose contact with defendant necessitated the recusal order.
>
> As respondent points out, however, defendant abandoned this claim at the trial level, never asking the court, which had declined to rule before submission of points and authorities, for a ruling on the motion and never filing the points and authorities requested by the trial court. (See People v. Pinholster (1992) 1 Cal.4th 865, 931 [4 Cal.Rptr.2d 765, 824 P.2d 571]; People v. Kaurish (1990) 52 Cal.3d 648, 680 [276 Cal.Rptr. 788, 802 P.2d 278].)

*Catlin*, 26 Cal. 4th at 162.

Petitioner argues that counsel did not abandon the motion, but rather the trial court effectively denied the motion even though Witt continued to "prosecute this case from, and with the cooperation of, the Kern County District Attorney's Office." (Doc. No. 25 at 249; Doc. No. 95 at 162.) This, he contends was contrary to and negated the noted Fifth Appellate District opinion, law of the case.

However, even if the claim was not abandoned at the trial level as Petitioner contends, it

nonetheless lacks merit on *de novo* review.

The record reflects former defense counsel Felice, who was appointed to represent Petitioner at his 1985 arraignment in municipal court (CT 1344-45) previously and subsequently worked for the Kern County District Attorney's Office which initially prosecuted Petitioner through deputy district attorney Baird who had the assistance of district attorney investigator Newport. (CT 1589-1606; *see also* Doc. No. 25 at 235, 248 *citing* CT 1344-1345, 1602-24, 1754-56, 1781-A-1782; 8/23/88 RT 4-28.)

On August 24, 1988, the trial court denied a defense motion to recuse the Kern County District Attorney's Office, after taking testimony from Felice and Newport. (CT 1587-99; 8/23/88 RT 4-28.) Still, the trial court ordered that Felice was not to supervise or be supervised by (then) prosecuting deputy district attorney Baird or utilize Newport in case investigations. (8/24/88 RT 14-16.) After the Kern County District Attorney informed the trial court certain of these conditions could not be met, the trial court recused the entire District Attorney's Office in September of 1988. (CT 1781-A-1782.) Deputy attorney general Witt then undertook prosecution of the case. (*See* Doc. No. 25 at 249.)

Prior to voir dire, counsel moved the trial court to limit contact between Witt and the Kern County District Attorney's Office, allegedly pursuant to the recusal order. The trial court considered the matter, but did not rule, stating that:

> [The recusal order was concerned with] whether Mr. Witt is going to learn something that Mr. Felice learned from [Catlin], which would be possibly adverse to Mr. Catlin and so long as the Attorney General is not obtaining that possible information from Mr. Felice, I don't see any problem with him using the facilities there, obtaining the files, investigative reports, but I'll give it some more thought. I'll ask for points and authorities by both sides.

(CT 66-67.) As noted, the motion was not revisited.

Petitioner has not supported his argument that Witt contravened the recusal order. As noted, the trial court explained recusal was motivated by the need to isolate Baird and Newport from Felice. The Court of Appeal for the Fifth Appellate District in affirming the recusal order in an unpublished November 8, 1989 decision also found the need for isolation was the basis for the recusal. (*See* SCT Vol. IX_B at 3-11.) During the 1988 recusal hearing, Felice and Newport testified that no confidential information had been passed or would be passed. (8/23/88 RT 17.) Witt, prior to trial, confirmed that he had not and would not have any contact with Felice and that Newport had not disclosed

any information about Petitioner received from Felice. (RT 3274.) The isolation of Felice from Petitioner's proceeding required by the trial judge reasonably was meant to ensure Baird and Newport would not become tainted by Felice.

Petitioner's suggestion that Witt, upon replacing Baird as prosecutor somehow became tainted by his alleged use of Kern County District Attorney offices and resources is supported only by speculation. Petitioner does not demonstrate how Witt's alleged use of Kern County District Attorney offices, office resources, and investigator Newport impinged upon the isolation upon which recusal was based.

### c.    Conclusions

The claim lacks merit on *de novo* review.

Claim 25 shall be denied.

13.    Claim 29

Petitioner alleges that he was denied a public trial because the court on its own motion summarily and repeatedly cleared the courtroom during his trial, denying his First, Sixth and Fourteenth Amendment rights. (Doc. No. 25 at 322.)

### a.    State Court Direct and Collateral Review

Petitioner's allegation that he was denied a public trial, violating rights under the Fifth, Sixth, and Fourteenth Amendments, was raised on direct appeal and denied as procedurally defaulted for failure to contemporaneously object at trial. *Catlin*, 26 Cal. 4th at 160-62.

### b.    Analysis

Petitioner argues the trial court repeatedly ordered spectators cleared from the courtroom during mainly evidentiary and case management matters, without prior notice to the parties, resulting in structural error. (Doc. No. 25 at 322-23.)

Petitioner argues these closed sessions denied him a public trial. He argues even a temporary or partial exclusion violated that right. *See* Doc. No. 25 at 322-27 citing *Waller v. Georgia*, 467 U.S. 39, 48-49 (1984) (closure of entire suppression hearing without sufficient finding of necessity violated public trial guarantee); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 509 (1984) ("closed proceedings [here involving voir dire], although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness."); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603, 606-07

(1984) (although right of access to criminal trials is not absolute, denial of that right must be supported by a compelling governmental interest and must be narrowly tailored to meet that interest).

Petitioner points to multiple occasions during trial where the judge excluded the public without findings on the record. (*See* Doc. No. 25 at 323 citing RT 3130-31 [regarding prosecutor's control of his witness with jury and public absent]; RT 3201 [regarding defense evidentiary motion with jury and public absent]; RT 3267-76 [regarding expected testimony covered by recusal order with jury and public absent]; RT 3324-25 [regarding judge's questioning and colloquy with prosecution witness with jury and public absent]; RT 3336-41 [regarding discussion of defense evidentiary objection with jury and public absent]; RT 3352-54 [regarding prosecution evidentiary objection with jury and public absent]; RT 3691-95 [regarding admissibility of proposed prosecution witness testimony with jury and public absent]; RT 3754-56 [regarding defense evidentiary objection with jury and public absent]; RT 3941-45 [regarding prosecution issue with expert testimony with jury and public absent]; RT 4081-84 [regarding admissibility of prosecution witness testimony with jury and public absent]; RT 4166 [regarding prosecution evidentiary objection with courtroom cleared]; RT 4273-92 [regarding defense evidentiary objection with jury and public absent]; RT 4493 [hearsay issue regarding witness testimony]; RT 4576 [scheduling of witnesses]; and RT 4598 [relevance of witness testimony].)

Petitioner argues the trial court did not engage in the requisite balancing of "competing concerns" or "higher needs" before excluding the public. (*See Doc. No. 25 at 323* citing *People v. Woodward*, 4 Cal. 4th at 382-383 (exclusion of the public can be justified only by a competing "higher value" and the trial court must balance the competing interests). He faults the trial court's failure to make "specific, written findings" regarding exclusion of the public sufficient for review thereof. (*Id.*).

Petitioner argues these errors were structural, *Fulminante*, 499 U.S. at 310, and that he need not demonstrate prejudice. *Waller*, 467 U.S. at 49. Alternatively, he argues the exclusion of the public in his case was prejudicial because it variously occurred during presentation of expert and lay testimony and evidentiary motions and argument thereon – major issues which he argues implicated the fundamental fairness of his trial. (Doc. No. 25 at 327.)

The California Supreme Court considered and rejected the claim on direct appeal, stating that:

Every person charged with a criminal offense has a constitutional right to a public trial,

126

that is, a trial which is open to the general public at all times." (*People v. Woodward* (1992) 4 Cal.4th 376, 382; see also *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1213-1215 [discussing applicability of right of public access to proceedings at which the jury is not present]; *id.*, at p. 1205 [First Amendment and Sixth Amendment rules are coextensive].)

Defendant contends he was denied his state and federal constitutional right to a public trial, because on 15 occasions during the trial the judge cleared the courtroom of spectators. He also contends that the court violated section 686, subdivision 1, which provides that the defendant in a criminal case is entitled to a public and speedy trial.

On each occasion upon which spectators were asked to leave the courtroom, defendant and defense counsel remained, and a transcript of the proceedings was made and kept without being placed under seal. It appears that the trial court several times cleared the courtroom of spectators when it properly asked the jury to leave the room. For example, on two occasions when a prosecution witness was testifying and appeared to be volunteering information, the court asked the jury and spectators to leave the courtroom. The court then discussed the problem of controlling the witness, and admonished the witness or established the scope of questions that would be permitted. On another occasion, when defense counsel requested a hearing outside the presence of the jury in order to make a motion to strike the testimony of a witness, the court cleared the courtroom of jurors and spectators alike. When the prosecutor requested a hearing outside the presence of the jury regarding the proposed testimony of witnesses, the court cleared the courtroom. The court also cleared the courtroom to discuss the merits of two defense evidentiary objections and several prosecution evidentiary objections. On one occasion the court cleared the courtroom and determined that because a prosecution witness was unable to identify defendant, she would not be permitted to testify further. Defense counsel, the prosecutor, and the court discussed the scope of the anticipated testimony of two prosecution witnesses outside the presence of the jury and spectators, reaching an agreement as to the scope of the testimony in some respects and permitting the court to rule on evidentiary objections made by the defense. The court cleared the courtroom to discuss the prosecutor's claim that defense cross-examination of a prosecution expert regarding the time at which he had formed his opinion was intended to suggest that the prosecutor had tampered with the witness, thereby giving the prosecutor the right to rebut the claim by reference to the prior trial of defendant. There also was one occasion on which the court cleared the courtroom to discuss the scheduling of testimony of several witnesses.

At trial, defendant did not object that these proceedings violated his right to a public trial. Failure to object in these circumstances constitutes a waiver of the claim on appeal. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1046-1047, and cases cited; see also *Peretz v. United States* (1991) 501 U.S. 923, 936 [noting that many basic rights are subject to waiver or forfeiture, including the right to a public trial]; *Levine v. United States* (1960) 362 U.S. 610, 619 [failure to request a public proceeding at the conclusion of properly closed proceedings constitutes a waiver of the claim, at least when defense counsel is present and there is not "the kind of secrecy that deprived petitioner of effective legal assistance and rendered irrelevant his failure to insist upon the claim he now makes"].) We previously have declined to reconsider our holdings in this respect (*People v. Bradford, supra*, 14 Cal.4th at pp. 1046-1047), and we are not persuaded that we should do so by defendant's general contention that "under certain circumstances constitutional issues can be raised for the first time on appeal," or by his contention that different rules should apply in capital cases.

127

*Catlin*, at 160-162.

The claim lacks merit on *de novo* review. The closure cited by Petitioner all were relative brief, did not implicate the core purposes of the public trial guarantee, were conducted in his present and that of counsel, and were memorialized in the public record.

The Constitution guarantees the right to a public trial. *In re Oliver*, 333 U.S. 257, 266-72 (1948). This right is applicable to the states. *Duncan v. Louisiana*, 391 U.S. 145, 148 (1968). But as noted, the right to public trial is not absolute. "The presumption of openness maybe overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Waller*, 467 U.S. at 45 (quoting Press-*Enterprise Co.*, 464 U.S. at 510).

The Ninth Circuit has observed that:

> *Waller* addressed *total* closure of a suppression hearing and does not necessarily govern partial closures. *See, e.g., Jones v. Henderson,* 809 F.2d 946, 951 (2d Cir.1987); *Douglas v. Wainwright,* 739 F.2d 531, 533 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). In *Press–Enterprise* itself, the Court alluded to the distinction between total and partial closures by stating that when limited closure is ordered, "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time." 464 U.S. at 512, 104 S.Ct. at 825.
>
> Finding no cases in this circuit that discuss *Waller* in the context of limited closures, we note that the Eleventh Circuit has applied a more lenient test to partial closures. *Douglas,* 739 F.2d at 533 (upholding its prior decision even after the Supreme Court vacated it and remanded for reconsideration in light of *Waller*). It found that the impact of the partial closure did not reach the level of a total closure, and therefore "only a 'substantial' rather than 'compelling' reason for the closure was necessary." *Id.* (citations omitted). It found further that a "substantial reason—protection of the witness from unnecessary insult to her dignity—existed that justified the partial closure." *Id.* In cases "where only a partial closure is involved, a court must look to the particular circumstances to see if the defendant still received the safeguards of the public trial guarantee." *Id.* at 532; *see Sielaff,* 561 F.2d at 694–95.
>
> We conclude that *Waller* is distinguishable from this case. Here we do not have a true "closure" of proceedings, but a temporary exclusion from the courtroom of defendants' families during one witness's testimony. We must determine, in light of the defendants' right to a public trial, whether the trial judge had a substantial reason for the closure. We also must decide whether the closure was narrowly tailored to exclude spectators only to the extent necessary to satisfy the purpose for which it was ordered.

*United States v. Sherlock*, 962 F.2d 1349, 1356–57 (9th Cir. 1989).

In determining whether a closure is too trivial to implicate the public trial guarantee, the Ninth Circuit has looked to:

> [W]hether the closure involved the values that the right to a public trial serve. [Citation] Those values, as we have explained, include: ensuring fair proceedings; reminding the prosecutor and judge of their grave responsibilities; discouraging perjury; and encouraging witnesses to come forward.

*United States v. Rivera*, 682 F.3d 1223, 1229 (9th Cir. 2012)

Here, applying the above standards, Petitioner has not supported a violation of his right to a public trial. The noted record reflects that Petitioner and counsel remained during the brief occasions when the public was excluded and that a transcript of proceedings then conducted was made available to the public. It further appears that the jury mainly was absent during these periods when the public was excluded, and no rulings were made affecting Petitioner's substantial rights. Counsel's failure to object to closure reasonably suggests as much. Petitioner has not demonstrated the closures implicated the noted values underlying the public trial right.

To the extent the trial court did not make express findings regarding exclusion of the public, the noted nature of proceedings conducted while the public was absent, and the records thereon reasonably serves that purpose.

### c. Conclusions

For the reasons stated, Petitioner has not demonstrated error, structural or otherwise.

The claim lacks merit on *de novo* review.

Claim 29 shall be denied.

14. Claim 46

Petitioner alleges the trial court erred by failing to independently re-weigh aggravating and mitigating circumstances upon his automatic application for modification under Penal Code section 190.4(e), violating his rights under the Fifth, Eighth, and Fourteenth Amendments. (Doc. No. 25 at 475-77.)

### a. State Court Direct and Collateral Review

Petitioner's claim that the trial court's failure to properly review the jury's verdict denied him state law rights was raised on direct appeal as a request for state law remand and denied on that basis. *Catlin*, 26 Cal. 4th at 177-78.

Petitioner raised the claim on Fifth, Eighth, and Fourteenth Amendment grounds in his second state habeas petition. The California Supreme Court denied the claim on procedural grounds (as to other than ineffective assistance of counsel and the constitutionality of the death penalty), as raised and rejected on appeal (*In re Waltreus*). (Order No. S173793.)

### b. Analysis

Petitioner argues the trial court did not reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict as required by state law. *See* Penal Code □190.4(e); (RT 5519-31.) He suggests the trial court, in reviewing his application for modification improperly considered factors not included in Penal Code section 190.3. (Doc. No. 25 at 475.) For example, he points out that court considered:

> [T]he victims in this case did nothing to provoke the murders. The victims were defenseless and did not deserve to die. Mr. Catlin was in a position of trust regarding the victims, they being either his wife [Joyce] or his mother. Mr. Catlin had no moral justification for these murders. No one forced Mr. Catlin, (sic) no one encouraged him to commit these murders.... The Court is not aware of any remorse by Mr. Catlin.

(Doc. No. 25 at 475 *citing* RT 5523-24.) Petitioner argues that "[n]one of the foregoing factors are proper considerations under Penal Code section 190.3, nor were these "factors in aggravation" considered by the jury. (Doc. No. 25 at 476.) He argues the trial court did not independently reweigh the aggravating and mitigating evidence, but rather engaged in "a primarily random commentary on the absence of provocation, justification and duress; defenses that were never presented by Petitioner." (Doc. No. 95 at 229.) He argues the trial court improperly engaged in an independent *de novo* penalty determination.

The state supreme court denied the state law claim, stating that:

> Defendant claims that in ruling on his automatic motion to modify the verdict (§ 190.4, subd. (e)), the trial court improperly considered nonstatutory factors in aggravation and failed to determine whether the weight of the evidence supported the jury's verdict.

> Section 190.4, subdivision (e), requires a court ruling upon a motion for modification to "reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict. [Citations.] The trial court must consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in section 190.3. (People v. Crittenden (1994) 9 Cal.4th 83, 150 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

In support of his claim, defendant points to the following language: "[T]he victims in this case did nothing to provoke the murders. The victims were defenseless and did not deserve to die. Mr. Catlin was in a position of trust regarding the victims, they being either his wife or his mother. Mr. Catlin had no moral justification for these murders. No one forced Mr. Catlin, no one encouraged him to commit these murders.... [¶] The Court is not aware of any remorse by Mr. Catlin...."

The quoted statements regarding the conduct and vulnerability of the victims reflect that the court properly was engaged in considering evidence relating to section 190.3, factor (a), the circumstances of the crimes. (See People v. Riel (2000) 22 Cal.4th 1153, 1220-1221 [96 Cal.Rptr.2d 1, 998 P.2d 969].) Statements regarding the absence of evidence that would tend to mitigate the defendant's moral culpability-such as coercion or remorse-also reflect that the court was considering appropriate factors. (People v. Marshall, supra, 13 Cal.4th at p. 865; People v. Crittenden, supra, 9 Cal.4th at pp. 150-151.)

Defendant contends that the court failed to engage in an independent, de novo penalty determination, and failed to reweigh the evidence of aggravating and mitigating evidence to determine whether the weight of the evidence supported the jury's verdict. As we have explained, "the trial judge's 'function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury's verdict" (People v. Proctor (1992) 4 Cal.4th 499, 551 [15 Cal.Rptr.2d 340, 842 P.2d 1100], italics omitted.) Defendant's contention that the court applied the incorrect standard is refuted by the court's statement: "The Court has made its independent determination that the weight of the evidence supports the jurors' findings and verdict."

Defendant also contends the court's ruling was undermined by its mistaken belief that the murder of Joyce was a capital offense, despite the circumstance that the murder was committed in 1976, when there was no valid death penalty statute in effect.

The record reflects that at the time sentence was imposed, the court was prepared to sentence defendant to a sentence of death for each of the two charged murders. When the prosecutor reminded the court that the murder of Joyce occurred when there was no valid death penalty statute, so that a life term was appropriate as to that count, the court concurred. We conclude that the court's misapprehension was immaterial and did not prejudice its consideration of the automatic motion for reconsideration. The circumstance that defendant had been convicted of Joyce's murder properly could be considered as a basis for imposing the death penalty for the murder of Martha, whether or not the murder of Joyce could be characterized as a separate capital offense. It is not reasonably possible that the court's misapprehension affected its decision not to modify the death penalty imposed for the murder of Martha. (See People v. Clark (1992) 3 Cal.4th 41, 171 [10 Cal.Rptr.2d 554, 833 P.2d 561].) Defendant fails to provide any support for his related but pro forma contention that the court's mistake "infected not only the court's obligation under Penal Code section 190.4, but his entire handling of the case."

*Catlin*, 26 Cal. 4th at 177-78.

The state supreme court reasonably denied the claim on the state law grounds stated. As that court observed, in ruling on a motion for automatic modification "the trial judge's function is not to make an independent and *de novo* penalty determination, but rather to independently reweigh the evidence of aggravation and mitigating circumstances and then to determine whether, in [his] . . . independent

judgment the weight of the evidence supports the jury verdict. . ." *People v. Lang*, 49 Cal.3d 991, 1045 (1989) (abrogated on other grounds by *People v. Diaz*, 60 Cal. 4th 1176 (2015)). The aggravating and mitigating circumstances set out in Penal Code section 190.4(e) shall guide the trial judge in her review. (*Id.* at 1068-69.)

Here, Petitioner argues that the trial judge did not reweigh the evidence but impermissibly conducted a *de novo* review. However, the record reflects that trial court reviewed the verdicts, considered and discussed the aggravating and mitigating circumstances and factors, and based thereon determined that the weight of the evidence supported the jury's verdicts. (*See* RT 5523-5529; Cal. Penal Code, § 190.4(e); *Wainwright v. Goode*, 464 U.S. 78, 84 (1983) ("[T]here is no sound basis for concluding that the procedures following by the State produced an arbitrary or freakish sentence forbidden by the Eighth Amendment").

Petitioner also argues as he did on appeal that the trial court erred in its 190.4(3) determination because it mistakenly believed Count I (alleging Joyce's murder in 1976 at which time California did not have a valid death penalty statute) was a capital count. (Doc. No. 25 at 476 citing RT 5530-31.) However, the trial court acknowledged on the record before denying the modification motion that Count I was a non-capital count. (*Id.*) Petitioner's suggestion that the trial court's apparent uncertainty in this regard at sentencing prevented it from "properly perform[ing] its function" under Penal Code section 190.4(e) appears unsupported by facts and merely conjecture.

Petitioner fails to demonstrate the state court did not fairly consider and rule upon his motion to modify the verdict consistent with state law. He fails to demonstrate a state law violation that denied him federal rights.

**c.     Conclusions**

The claim lacks merit upon *de novo* review.

Claim 46 shall be denied.

**B.     Claims Alleging Juror Misconduct at the Guilt Phase**

1.     Legal Standard

Due process requires that the defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *see also U.S. v. Plache*,

913 F.2d at 1377-78 ("It is well-settled that a single partial juror deprives a defendant of his Sixth Amendment right to a trial by an impartial jury.").

A jury's consideration of extraneous evidence violates a criminal defendant's right to trial by jury. *Turner,* 379 U.S. at 471-73.

The introduction of prejudicial extraneous influences into the jury room constitutes misconduct which may result in the reversal of a conviction. *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966).

When a defendant alleges improper contact between a juror and an outside party, the court asks at step one whether the contact was "possibly prejudicial" *Mattox*, 146 U.S. at 150, (superseded by rule as stated in *Pena-Rodriguez v. Colorado*, 137 S.Ct. 885, (2017)), that is "sufficiently improper to raise a credible risk affecting the outcome." *Godoy v. Spearman*, 861 F.3d 956, 967-68 (2017). If so, the contact is "deemed presumptively prejudicial" and the court moves to step two, where the "burden rests heavily upon the [state] to establish" the contact was actually "harmless." *Remmer*, 347 U.S. at 229, that is whether "the sufficiently improper contact gives rise to a "credible risk of affecting the outcome of the case." *Id.* at 967. If the state does not prove harmlessness, the court sets aside the verdict." *Godoy*, 861 F.3d at 962.

"Courts consider[] the full context of the contact to determine whether a credible risk of prejudice exists." *Godoy*, 861 F.3d at 967. Factors for consideration include: the length and nature of the contact, the identity and role at trial of the parties involved, evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction." *Id.*, citing *Caliendo v. Warden of Cal. Men's Colony*, 365 F.3d 691, 697–98 (9th Cir. 2004).

On collateral review, juror misconduct claims "are generally subject to a 'harmless error' analysis, namely, whether the error had 'substantial and injurious' effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638; *Fields v. Brown*, 503 F.3d 755, 781 n.19 (noting that *Brecht* provides the standard of review for harmless error in cases involving unconstitutional juror misconduct); *Jeffries*, 5 F.3d at 1190 (a habeas petitioner must show that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict.").

2.      Claim 14

Petitioner alleges the jurors engaged in various misconduct, violating his rights under the Fifth,

Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 143-61.)

### a. State Court Direct and Collateral Review

Petitioner raised the claim on the noted constitutional grounds in the first state habeas petition and it was denied on the merits. (Order No. S090636.)

The claim was raised the noted constitutional grounds in the second state habeas petition and it was denied on procedural grounds including as repetitive (*In re Miller*). (Order No. S173793).

### b. Analysis

Petitioner argues in multiple subclaims that juror misconduct exposed the jury to extraneous information, influences, and improper contact with third parties, violating his federal rights. (Doc. No. 25 at 143 *citing McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984) (juror partiality affects fundamental fairness of trial); *Green v. White*, 232 F.3d 671, 676-78 (9th Cir. 2000) (in extraordinary circumstances court may presume juror bias).)

The Ninth Circuit has recognized "the practical impossibility of shielding jurors from all contact with the outside world, and also that not all such contacts risk influencing the verdict." *Clark*, 936 F.3d at 970. "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Id.*

A claim that jurors were exposed to extrajudicial evidence is considered based on an objective standard - whether the evidence would have affected a reasonable juror's consideration of the evidence. *Fields*, 503 F.3d, at 781 n.22.

The Ninth Circuit has found juror misconduct warranting reversal in cases involving extended external influences or confirmed juror bias. *See e.g.*, *Henry v. Ryan*, 720 F.3d 1073, 1086 (9th Cir. 2013).

Here, the state supreme court reasonably could reject the subclaims, discussed separately below.

### i. Juror McAvoy's Stalking Incident and the Trial Court's Ex Parte Communcations

Petitioner argues prosecution witness Hardin followed juror McAvoy from the courthouse, allegedly in an attempt to intimidate and influence her. (*See also* claims 10-13, *ante*; 1SHCP Ex. 148.) He argues that the trial judge's noted *ex parte* conversation with McAvoy about the incident made all jurors aware of the it and "focused [their] attention on perceived danger from alleged criminal elements and inflamed their emotions." (Doc. No. 25 at 147 citing 1SHCP Ex.'s 145, 198.) He argues this jury

room incident left the jury and the judge biased against him.  (*Id.*)

However, for the reasons discussed above, summarized here, Petitioner has not demonstrated the alleged stalking incident amounted to anything more that these two individuals walking in the same direction on the same street toward separate destinations.  (*See* claims 10-13, *ante*.)  Upon inquiry, the trial judge determined that Hardin was bound for the bus terminal, a destination which took him down the street where the alleged incident with McAvoy took place.   The record does not suggest that Hardin contacted McAvoy, or that he was aware of her presence.  It does not appear the jurors discussed the alleged incident or that it played a role in their deliberations.  Especially, Petitioner does not support in the factual record that the jury or any juror was biased against him as a result of Hardin's alleged actions.

Clearly established United State Supreme Court precedent does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties.  *Tracey*, 341 F.3d at 1045; *see also Estrada v. Scribner*, 512 F.3d 1227, 1241 (9th Cir. 2008) (no abuse of discretion in declining to hold hearing on juror bias where state court was not unreasonable in finding no actual or presumptive bias based on jurors' honesty during voir dire); *Sims,* 414 F.3d at 1153 (trial court need not order a hearing sua sponte whenever presented with evidence juror bias).

ii.     *Juror Ties to the Criminal Justice System*

Petitioner argues that the following jurors had family or friends involved in law enforcement, the criminal justice system, and corrections (Doc. No. 25 at 147), and that their verdicts were improperly influenced thereby.

**(1)     Juror Robert Geivet**

Petitioner states Geivet was a former police officer then employed at a minimum security private prison for parole violators and had knowledge of security classifications for prisoners.  (*See* 1SHCP Ex. 147; *see also* RT 2135-37, 2761-62.)  Petitioner suggests Geivet shared with other jurors his personal knowledge of criminal justice matters including adjustment to prison life, prison security classification and LWOP.  (Doc. No. 25 at 148 citing 1SHCP Ex. 147.)  Petitioner suggests Geivet planted a seed with the other jurors that Petitioner, if given LWOP might be placed in a minimum-security prison.  (Doc. No. 25 at 149 citing 1SHCP Ex. 148.)   This, he suggests caused jurors to discount testimony by defense prison system expert Dr. Craig Haney that a person given LWOP would be sent to a maximum-security

135

prison. (Doc. No. 25 at 148; *see also* RT 5398-5422.)

However, Dr. Haney testified at length on prison conditions and security levels including aspects of LWOP. Petitioner has not demonstrated that juror Geivet's statements in his habeas declaration conceding he discussed such issues during deliberations constitute extraneous information exceeding the scope of Dr. Haney's testimony considered by the jury during deliberations. (*See* 1SHCP Ex. 147; RT 2135-37.) Jurors bring with them their life experiences and beliefs. *See Hunt v. Galaza*, Case No. CIV S-03-1723 MCE EFB P 2009 WL 5183835 at *10 (E.D. Cal. Dec. 21, 2009).

Moreover, Petitioner's speculation about juror thought processes is not based upon the evidentiary record and is not a basis for habeas relief. *See* Fed. R. Evid. 606(b); Evid. Code § 1150.

Petitioner also suggests Geivet failed to disclose his above noted views, biased toward the prosecution, on voir dire and failed to follow his juror oath to decide the case on the evidence. (Doc. No. 25 at 149 citing 1SHCP Ex. 147.) He argues this was especially prejudicial here because the prosecution argued future dangerousness at the penalty phase (*see* RT 5488), and the jurors allegedly considered improper definitions of LWOP. (*See* Doc. No. 25 at 150.) However, Petitioner has not shown that juror Geivet was other than forthcoming during voir dire regarding his correctional background. (*See* RT 2135-37.) Petitioner did not challenge Geivet.

In any event, the state supreme court reasonably could find Geivet's comments to the other jurors during deliberations regarding his views of life while incarcerated were harmless under *Brecht*. Dr. Haney testified at length regarding prison condition and the jury presumably weighed his testimony consistent with their instructions.

### (2)    Juror Christine McAvoy

Petitioner argues that during voir dire, juror McAvoy failed to disclose that she was living with her brother, then a guard at Tehachapi State Prison working in the Administrate Segregation Unit where petitioner was housed. (*See* 1SHCP Ex. 148.) He argues that McAvoy was presumably biased against an LWOP sentence given her day-to-day life with such an "expert" on life at Tehachapi, along with concern for her brother's safety relative to guarding inmates such as petitioner, and her fright from the noted alleged stalking by Hardin. (Doc. No. 25 at 150.) He suggests McAvoy propagated this bias among the other jurors.

However, McAvoy on voir dire acknowledged that her brother was a correctional officer in Tehachapi. (*See* RT 2344, 2525.) Moreover, she denied talking to her brother about prison life and prison conditions. (RT 2344.)

Petitioner argues that McAvoy's evaluation of the testimony of two defense witnesses at the penalty phase, Sgt. Kenneth Howard and Charles McKillip, employees at Tehachapi (RT 5439-58), was biased due to her connection with law enforcement.

However, during death qualification voir dire, McAvoy stated that she had "a brother that's a correctional officer in Tehachapi, he's new, within the last six months, but we don't have any conversation as far as that, but he is an officer there." (RT 2343-2344.) Later, during general voir dire, she again noted that her brother was a correctional officer (RT 2525). She indicated that she could be a fair and neutral evaluator of police testimony and could consider the possibility of police error. (RT 2326-46). Counsel apparently did not question McAvoy during voir dire about her views on defense correctional witnesses.

Petitioner argues that during his trial, McAvoy interviewed for a correctional officer position at Wasco State Prison and met the warden there. (Doc. No. 25 at 151 citing 1SHCP Ex. 148.) He suggests this gave McAvoy extraneous and specialized knowledge, equivalent to a crime scene visit, which further biased her deliberations and anti-LWOP view. (Doc. No. 25 at 151). However, Petitioner does not point to facts suggesting McAvoy's pursuit of a correctional position gave her knowledge which she improperly considered during deliberations. Petitioner's speculation in these regards is not a basis for relief.

### iii. Juror Consideration of Extraneous and Erroneous Definitions of LWOP

Petitioner argues that juror Mario Rodriguez, the jury foreperson whom other jurors thought to be a probation or parole officer, and juror Geivet provided their own erroneous views of what it meant to be sentenced to LWOP and suggested Petitioner would not be incarcerated for life if given that sentence. (Doc. No. 25 at 151-52 citing 1SHCP Ex.'s 145, 146 and 148.)

Still, the record reflects the trial court instructed the jurors that LWOP meant "life without the possibility of parole" (RT 5505, 5510; CT 2042); that they "must accept and follow the law that [the court] shall state to you, whether or not your agree with the law" (RT 5505; CT 2043); and that they were

137

to decide the penalty "based on the evidence." (RT 5506; CT 2043.)

The jury was instructed that:

> In deciding whether death or life imprisonment without the possibility of parole is the appropriate sentence you may not consider for any reason whatsoever the deterrent or nondeterrent effect of the death penalty or the monetary cost to the State of execution or maintaining a prisoner for life.

(CT 2053.)

To the extent of Juror Rodriguez's statement on habeas that he "felt that it was possible Catlin could get out in 40 or 50 years and that he might kill again […] [and that] I did not believe the judicial system could keep him locked up until he died" (1SHCP Ex. 146), such reasonably could be seen as inadmissible juror thought process unsupported by any evidence in the record and apparently not communicated to other jurors.

*iv.*      *Jurors were Biased Toward the Death Penalty*

Petitioner argues post-trial interviews showed juror Randall Lefler impermissibly prejudged the penalty phase in favor of death. (Doc. No. 25 at 152 citing 1SHCP Ex. 143.) He points to Lefler's statement that "Once I was convinced he was guilty, I was certain that death was the appropriate penalty." (1SHCP Ex. 143.)

Petitioner argues additionally that an unnamed juror, upon hearing mitigating testimony that Petitioner was a model prisoner at Tehachapi Prison, commented that Tehachapi Prison was "a country club." (Doc. No. 25 at 152.) However, Petitioner does not point to facts in the record supporting this allegation. It reasonably appears that such a comment could have had its genesis in evidence considered by the jury that "inmates receive three meals a day, have recreational activities, television sets in cells, music, movies, libraries, including a law library, and contact visits." (RT 5424-26.)

As noted, statements regarding juror thought processes are inadmissible except in cases not presented here. Fed. R. Evid. 606(b); Evid. Code § 1150; *see also Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006) (jury's discussion of the practical effect of imposing a sentence of life without parole not reversible error).

In any event, Petitioner's characterization of such statements reasonably appears speculative, as does his suggestion of juror bias based upon penalty phase deliberations of only one day before returning the death verdict.

    *v.*    *Jurors Required Petitioner Prove his Innocence*

Petitioner argues the jurors ignored the trial court's instruction that he be presumed innocent until proven guilty beyond a reasonable doubt and instead reversed that standard of proof. (Doc. No. 25 at 153.) In support, he refers to the post-trial declaration of juror Diane Danley Bryson, whom he argues stated that the jury voted to convict Petitioner after finding he had not proven his ex-wife Edith Ballew was guilty of the crimes. (*Id. citing* 1SHCP Ex.'s 149; *see also* 1SHCP Ex. 149.)

But Petitioner's arguments in these regards reasonably could be seen as speculative and based upon inadmissible post-conviction statement of a juror. *See also* Fed. R. Evid. 606(b); Evid. Code § 1150. Even if juror Bryson's habeas statement regarding her deliberative considerations could be admissible, she merely states therein that:

> During the guilt phase of the trial, I thought all the testimony about Glenna's death up in Fresno was a little confusing. In my mind, I kept coming back to Edith Ballew. I thought she could have killed Joyce and Martha. Finally, I voted guilty with the other jurors, after ruling Edith Ballew out.

(1SHCP Ex. 149 at 1.) Petitioner's speculative argument that this statement is evidence the jury presumed him guilt is not based on facts in the records and reasonably could be rejected by the state supreme court.

Moreover, the jury was instructed on the presumption of innocence and the standard of proof and presumably understood and followed their instructions. *Weeks*, 528 U.S. at 234; (see also CT 1932, 1955.) The state supreme court reasonably Petitioner has not demonstrated otherwise on the factual record.

    *vi.*    *Jurors Considered Religious Material*

Petitioner argues post-conviction interviews suggest jurors discussed their personal religious beliefs and that a Bible was allegedly brought into the jury room. (Doc. No. 25 at 153-54 citing 1SHCP Ex.'s 145, 146.) He argues jury consideration of this extrinsic information and material was constitutional error requiring reversal. (Doc. No. 25 at 154.)

Here, the state supreme court reasonably could find juror habeas declarations suggesting a short

general prayer for the strength to do the right thing, as well as individual juror discussions to the same effect (*see e.g.*, 1SHCP Ex. 143, 145, 146, 148), did not rise to the level of religious bias.

Petitioner has not pointed to clearly established Supreme Court authority precluding references to religion in the jury room. *See Fields v. Brown*, 503 F.3d at 776-81 (citing *McDowell v. Calderon*, 107 F.3d 1351, 1367 (9th Cir. 1997)) (quoting *Hard v. Burlington N.R.R. Co.,* 870 F.2d 1454, 1461 (9th Cir.1989)) (noting that "[t]he type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings and bias that every juror carries into the jury room.").

Petitioner has not demonstrated that jurors may not assess evidence in the context of their personal religious beliefs. *See U. S. v. Navarro-Garcia*, 926 F.2d 818, 821-22 (1991) ("[A] juror's past personal experiences may be an appropriate part of the jury's deliberations. Inevitably, [j]urors must rely on their past personal experiences when hearing a trial and deliberating on a verdict."). Petitioner's reliance upon *Zant v. Stephens* in arguing otherwise is misplaced. In that case, the Supreme Court had before it the matter of improper consideration of religion as an aggravating factor, which was not the case here. *See Stephens*, 462 U.S. at 885.

Nor has Petitioner shown to a level greater than speculation that a bible or biblical verse was present in the jury room during deliberations (*see* 1SHCP Ex. 143, 145, 146, 148, 146), or that extrinsic religious material or considerations overrode the court's instructions.

Here again, the jurors presumably understood and followed their instruction to consider only the evidence placed before them. *Weeks*, 528 U.S. at 234; (*see also* CT 1926-27, 1930).

vii.    *Jurors Confused by Evidence Relating to Uncharged Murder of Glenna*

Petitioner revisits claims 1-3, *ante*, and argues that evidence presented during the guilt phase relating to the uncharged murder of Glenna confused the Kern County jury. (Doc. No. 25 at 154.) He points to the habeas declaration of juror Janet Cook that:

> During the guilt phase of the trial, I remember being a little confused by all the testimony about Glenna Catlin's death. There was all this information of witnesses from another time and I was not sure what it had to do with Catlin's mother.

(1SHCP Ex. 150; *see also* Doc. No. 25 at 154.)

140

Petitioner argues the prosecution strategy was to confuse the jury by presenting the seemingly stronger evidence of Glenna's death before reaching the perceived weaker evidence in the murders of Joyce and Martha. (Doc. No. 25 at 154-55.)

But for the reasons stated, the other crimes evidence was properly admitted such that any weight accorded thereto was a matter for the jury. (*See* claim 1-6, 19, *ante*.) Petitioner has not demonstrated that the jury asked any questions in this regard. Particularly, juror Cook (then named Kuntz) acknowledged the jury's verdict in open court. (RT 5516-17.)

To the extent Petitioner revisits claim 4, *ante*, and argues confusing jury instructions and extrinsic information in the jury room (*see* Doc. No. 25 at 154-56) such allegations lack merit for the reasons stated, summarized here. (*See* claim 4, *ante*.) The state supreme court reasonably could find the uncharged crimes evidence from the Monterey proceeding was probative of the crimes charged in the Kern County proceeding and properly admitted therein. Particularly, evidence suggesting Petitioner killed Glenna by poisoning her with paraquat tended to corroborate other evidence that he killed Joyce and Martha by poisoning them with paraquat – especially so given the relative rarity of murder by poison. *See Catlin*, 26 Cal. 4th at 159.

### viii. *Bailiff Advances to Holdout Juror*

Petitioner argues that juror Diane Danley Bryson, "a young, blonde juror" and self-described "beach bum", who gained attention from male jurors and courtroom staff, (Doc. No. 25 at 155 citing 1SHCP Ex. 145; RT 2879), was flattered to receive roses during the trial from the bailiff who was in charge of the jury (1SHCP Ex.'s 145, 198).

Petitioner surmises the flowers were an attempt to influence juror Danley Bryson, who had a hard time deciding for the death penalty (1SHCP Ex. 149) and constituted prejudicial misconduct. *Parker v. Gladden*, 385 U.S. 363 (1966).

However, the state supreme court reasonably could reject the allegation as unsupported in the record. Surmise alone is insufficient in support of the allegation. Notably, juror Bryson's habeas declaration does not mention the flowers or suggest to any extent that her verdict was influenced by the bailiff. (1SHCP Ex. 149 at 1-2.) Instead, Bryson's habeas statements, even if admissible, suggest her deliberation on the evidence and with the other jurors. *(See* 1SHCP Ex. 149 at 1.)

141

ix.     *Jurors Considered News Stories and Previous Knowledge Relating to the Case*

Petitioner argues that his arrest and criminal case received an unusual amount of publicity in Kern County. (Doc. No. 25 at 156 *citing* claims 24 and 26, *ante*; 1SHCP Ex.'s 143, 145.)  He argues that jurors were exposed to prejudicial and inadmissible information about the case (Doc. No. 25 at 156), including a newspaper article published during guilt phase deliberations containing information about Petitioner's prior conviction in the murder of Glenna and trial counsel's arguments otherwise to the Kern County jury (*see* 1SHCP Ex. 139; RT 5335-36), and suggestions that Petitioner had murdered his father.  (*Id.*; *see also* 1SHCP Ex. 149; claims 25, 26, *post.*)

Particularly, Petitioner argues that prior to the guilt phase, at least two jurors knew about Glenna's murder case.  (*See e.g.*, 1SHCP Ex.'s 143, 145-150.)  He argues that during voir dire, the trial court did not question jurors about knowledge of Glenna's death even though the judge knew evidence relating to Glenna's death would be presented to the jury.  (*See e.g.,* RT 1227-28.)

However, as required by Penal Code section 190.1(b), the trial court ordered there be no mention of the Monterey trial and conviction by any witness during the guilt phase.  (*See e.g.*, RT 4637-38.)  Petitioner fails to support with facts that the jury was aware of and partial due to the prior case and conviction.

Petitioner notes the voir dire testimony and post-conviction declaration of juror Randall Lefler, that "maybe, vaguely some time ago" he had been exposed to media coverage of the murders (RT 563); and that Lefler was a farmer who had used Paraquat.  (1SHCP Ex. 143; RT 2945-47.)  But Lefler went on to testify during voir dire that he had not formed an opinion about the case and would decide the case solely on the evidence.  (RT 563.)

Petitioner notes the post-conviction declaration of juror Olivia Terrazas, who stated that during the guilt phase, she "heard something on the radio about the case"; and that jurors asked to be escorted out the back door of the courthouse to avoid the press.  (1SHCP Ex. 145 at 1.)

However, the state supreme court reasonably could find Petitioner failed to demonstrate jurors were aware of facts of the case prior to trial or became aware of such facts in Glenna's case outside of the evidence.  Similarly, the jurors' noted habeas declarations do not attest to any specific press coverage or media attention or suggest even an inference of bias therefrom.  (*See* 1SHCP Ex.'s 143-149, 150, 198.)

For example, the habeas declaration of juror Rodriguez suggests his awareness Petitioner' case was one of high publicity but fails to attest to any level of press coverage or media attention or suggest even an inference of bias therefrom. (1SHCP Ex. 146.)

Petitioner also observes that an alternate juror, Linda Houts, was friends with defense investigator Pat McGregor and worked as a legal secretary for attorneys who represented Petitioner in Martha's then active probate case and practiced criminal defense. (Doc. No. 25 at 159; *see also* 1SHCP Ex. 77-78.) He argues Houts had an actual conflict of interest to the extent she was familiar with legal concepts in general and matters relating to Martha's probate case in particular. (Doc. No. 25 at 159-60.) He suggests Houts had the opportunity to provide and did provide extraneous information to the jury on such matters. (Doc. No. 25 at 160.)

However, the record shows that juror Houts stated during voir dire that her employer was handling Martha's probate and that she was not involved and could be an impartial juror. (Doc. No. 25 at 160 citing RT 3037-38.) Petitioner does not point to any facts showing juror Houts provided information not in evidence to the other jurors or discussed any such information with them. Petitioner has not demonstrated Houts or any seated jurors provided a habeas declaration supporting Petitioner's noted contention, or that Houts deliberated with the seated jurors.

*x.     Conclusions*

The state supreme court reasonably could find the jury did not engage in the alleged misconduct.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claim 14 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claim 14 shall be denied.

**C.     Claims Alleging Prosecutorial Misconduct at Guilt Phase**

1.     Legal Standard

143

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also* T*an*, 413 F.3d at 1112; *Floyd v. Filson*, 940 F.3d 1082, 1102 (9th Cir. 2019).

To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also United States v. Agurs*, 427 U.S. 97, 98 (1976); *Phillips*, 455 U.S. at 221 (ordinary trial errors by a prosecutor do not suffice; the misconduct must be egregious enough to deny the defendant a fair trial).

"Before a federal court may overturn a conviction resulting from a state trial ... it must be established not merely that the [State's action] is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Phillips*, 455 U.S. at 221 (quoting *Cupp*, 414 U.S. at 146).

If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in *Brecht*. *See Thompson*, 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless."). A petitioner is entitled to relief in this context only where the constitutional violations exerted a "substantial and injurious" effect on the judgment. *Brecht*, 507 U.S. at 620; *Fields v. Woodford*, 309 F.3d 1095, 1109 (9th Cir. 2002), *amended* 315 F.3d 1062 (9th Cir. 2002) (stating the Ninth Circuit applies *Brecht* if misconduct of constitutional dimension is established).

Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. *Greer*, 483 U.S. at 765-66; *United States v. Weitzenhoff*, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Phillips*, 455 U.S. at 219. "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996) (quoting *Jeffries*, 5 F.3d at 1191).

Furthermore, the Supreme Court has stated:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence ... and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.

*Boyde*, 494 U.S. at 384-85.

### 2. Claim 3

Petitioner revisits aspects of allegations discussed in claim 3, *ante*, regarding use of allegedly altered expert testimony from the Monterey County proceeding relating to alleged time of ingestion of paraquat, onset of symptoms and progression of illness. These allegations, discussed above as alleged trial court error, are recasts here as alleged prosecutorial misconduct violating petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 87-94.)

### a. State Court Direct and Collateral Review

The claim was raised on direct appeal as prosecutorial misconduct and a denial of due process and a fair trial under the Fifth and Fourteenth Amendments and was denied on the merits as to inconsistent testimony and denied as inappropriate for resolution on appeal as to alleged inconsistent prosecution theories. *Catlin*, 26 Cal. 4th at 143-44.

The same claim was raised in the second state habeas petition on Fifth, Sixth, Eighth, and Fourteenth Amendment grounds and denied on procedural grounds including to the extent aspects of the claim were raised and rejected on direct appeal (*Waltreus*). (Order No. S173793).

### b. Analysis

Petitioner alleges his trial was unfair because the prosecution knowingly altered expert opinion presented in the Monterey proceeding on issues of alleged paraquat ingestion including the time of ingestion, onset of symptoms, and the progression of illness when the same issues were presented in his Kern County proceeding. (*See* Doc. No. 25 at 87.)

As observed above, the state supreme court rejected the claim, stating that:

Defendant contends that the testimony of Dr. Buteau, a prosecution expert witness at the Monterey County trial for the death of Glenna, was substantially different from the testimony of Dr. Ford, a prosecution expert witness who testified at the trial in the present case. He complains that at the first trial and at the preliminary hearing in the present case, Dr. Buteau suggested that Glenna and Martha would have exhibited symptoms of paraquat poisoning within 12 to 24 hours of ingestion of paraquat.[15] Under facts developed by defendant in the present case, it would have been unlikely or less likely that defendant could have administered the poison if the 12 to 24-hour timeframe were accurate. At trial in the present case, Dr. Ford, another expert, testified that Martha's symptoms were consistent with an earlier administration of the poison, and Glenna's with a later administration of the poison-in each instance times at which defendant had the opportunity to administer the poison. Defendant claims that the prosecutor committed misconduct in violation of defendant's right to a fair trial by prosecuting the present case under a different theory and with different evidence than was presented at the earlier trial for the murder of Glenna.

--------------------FOOTNOTE--------------------

n.15 As noted above, the trial record in the Monterey County case is not part of the record on appeal in the present case.

--------------------END FOOTNOTE--------------------

To the extent defendant's claim is based upon inconsistencies between the testimony of Dr. Ford in the present case and that of Dr. Buteau at a different trial, those inconsistencies could be explored on cross-examination and through the presentation of defense evidence. In fact, Dr. Ford was cross-examined regarding these inconsistencies, and defendant called Dr. Buteau as a defense witness. With respect to the possibility that separate trials relating to the same crime improperly may have been tried under inconsistent theories, we examined a similar claim in *People v. Sakarias* (2000) 22 Cal.4th 596 [94 Cal.Rptr.2d 17, 995 P.2d 152]. (29) In that case, we determined that a contention that inconsistent theories of prosecution give rise to a claim that the prosecution wrongfully has employed different theories at two separate trials best is examined in connection with a petition for writ of habeas corpus, where the record of the prior trial may be examined and the reasons for the discrepancies may be analyzed and explained. (*Id.* at pp. 635-636.) For the same reason, we determine that the issue is not appropriate for resolution on direct appeal in the present case.

*Catlin*, 26 Cal. 4th at 143-44.

Petitioner's specific arguments are considered separately, below.

i.    *Inconsistent Expert Testimony*

Petitioner reargues that the testimony of prosecution expert Dr. Buteau on these issues offered in the Monterey proceeding and the preliminary hearing in the Kern County proceeding differed from the testimony of subsequent prosecution expert Dr. Ford offered on the same issues offered in the Kern

146

County trial. Petitioner alleges the prosecution presented such altered evidence to defeat Petitioner's alibi defense in the Kern County proceeding and comport with the prosecution theory at that trial. (Doc. No. 25 at 89.) Similarly, he argues the lay witness testimony of Petitioner's employee, Mark Skinner, in the Kern County proceeding relating to dates Petitioner was in Bakersfield and had access to Martha in the days leading up to her death, was altered to defeat the alibi defense. (*Id.*)

Particularly, Petitioner argues that he was denied the right to confront in the Kern County trial the inconsistent prior expert opinions of Dr. Buteau. (Doc. No. 25 at 92.) He suggests this misconduct by the prosecution was especially prejudicial given a lower standard of proof applied by the trial court for circumstantial evidence of uncharged criminal conduct. (*See* Doc. No. 25 at 90.) He points out that he was convicted in the Kern County proceeding of murdering Martha and Joyce even though the Monterey county trial judge, when considering uncharged crime evidence before that court (i) "ruled no rational trier of fact could be persuaded beyond a reasonable doubt that Petitioner poisoned [Martha]" (Doc. No. 25 at 90 citing 1SHCP Ex. 102 at 112, 183-184, 1161) and excluded evidence of Martha's death from the penalty phase (1SHCP Ex. 102 at 112, 184, 189-94), and (ii) "found that Petitioner's culpability for Joyce's murder could not be proved by even a preponderance of evidence, and excluded evidence of that crime from both phases of Petitioner's Monterey County trial" (*id.* at 91 *citing* 1SHCP Ex. 102 at 181; RT 25-27).

However, the Court finds the noted aspects of the claim rejected on the merits were reasonably rejected by the state supreme court, for the reasons discussed in claim 3 above, summarized here. The expert testimony was properly admitted. Petitioner as not pointed to clearly established law that an expert's modified opinion upon consideration of additional information and assumptions constitutes false or misleading evidence. Counsel was able to and did examine Drs. Buteau and Ford including as to expert opinions expressed in the Kern County proceeding which varied from those expressed in the Monterey County proceeding. (RT 4532-37, 4546-49.) Dr. Buteau's modified testimony was not necessarily inconsistent with Dr. Ford's noted testimony because the suggested ingestion timelines somewhat overlapped. Moreover, the noted opinions of other experts in Petitioner's Monterey and Kern County proceedings appear to be somewhat equivocal, qualified and inconclusive as to time Glenna and Martha ingested paraquat. (*See e.g.*, RT 3794-96, 4049, 4388-4402.)

The state supreme court reasonably could find no unfairness relating to these opinions. Nor has Petitioner pointed to related statements by the prosecution which made his proceeding unfair and denied him due process.

ii.      *Inconsistent Prosecution Theories*

Petitioner reargues that consistent with due process requirements, the prosecution cannot offer inconsistent theories regarding the same crime absent new significant evidence. *Thompson*, 120 F.3d at 1058 (reversed and remanded in *Calderon v. Thompson*, 523 U.S. 538 (1998)) (state presented inconsistent theories as to the identity and motive of the killer in separate trials against two defendants charged with the same murder). He argues that a conviction cannot stand where it is obtained by the prosecutor's use of false evidence. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). He argues the prosecution is estopped from changing the theory it advanced and supported in the Monterey trial at the later Kern County trial. (Doc. No. 25 at 93 *citing Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir. 1990) (judicial estoppel is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process).

However, these aspects of the claim analyzed *de novo* similarly lack merit.

Petitioner has not demonstrated inconsistent prosecution theories in the Monterey and Kern County proceedings, or prosecutorial misconduct in the updated expert opinions. cf., *Thompson v. Calderon*, 120 F.3d 1045, 1056-57 (9th Cir. 1997) (reversed and remanded in *Calderon v. Thompson*, 523 U.S. 538 (1998)) (state presented inconsistent theories as to the identity and motive of the killer in separate trials against two defendants charged with the same murder). Here, prosecutors in both proceedings theorized that Petitioner poisoned Glenna and Martha with paraquat and that timelines for paraquat ingestion were somewhat variable. Notably, the paraquat ingestion timelines variously opined by the experts were not an ultimate issue in the charged offenses.

Petitioner has not demonstrated the prosecutor used false expert testimony (*see Napue*, 360 U.S. at 269), or fundamental unfairness arising from admission of this evidence (*Turner*, 379 U.S. at 472). As noted, Dr. Buteau testified at the Kern County proceeding to his modified ingestion timeline and the additional information he considered and was subject to cross-examination. The jury presumably considered and weighed the expert testimony consistent with their instructions. Petitioner has not

148

shown he was denied confrontation or fair process in these regards.

Moreover, counsel in the Kern County proceeding used Dr. Buteau's prior testimony in cross-examining prosecution witnesses including Dr. Ford. The defense also called Dr. Buteau to testify in that proceeding, asking no questions about Glenna's death, and eliciting testimony that Martha ingested paraquat from a couple days up to a week before she died; conclusions not inconsistent with Petitioner's alibi defense. (RT 4532-37, 4546-49.) As noted, Dr. Buteau admitted he changed his earlier opinions upon receiving additional information and reviewing Dr. Ford's testimony. (*Id.*)

Petitioner re-argued collateral estoppel theory fails for reasons stated in the discussion of claims 1, 2 and 4, above.

*iii. Conclusions*

The state supreme court reasonably rejected claimed prosecutorial misconduct relating to allegedly altered expert testimony. Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of the noted aspects of claim 3 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Petitioner fails to demonstrate upon *de novo* review prosecutorial misconduct relating to alleged inconsistent theories of prosecution.

Claim 3 allegations of prosecutorial misconduct shall be denied.

3.      Claim 7

Petitioner revisits aspects of allegations discussed above in claims 7 and 9 as trial court error, here cast as prosecutorial misconduct relating to racially motivated peremptory challenges of African American prospective jurors, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 111-20.)

**a.      State Court Direct and Collateral Review**

The California Supreme Court considered on direct appeal aspects of the claim alleging

149

prosecutorial misconduct in removal of two African Americans from the petit jury and counsel's related *Batson/Wheeler* motion, on equal protection grounds, and denied the claim on the merits. *Catlin*, 26 Cal. 4th at 115-19.

The same aspect of the allegation was raised in the second state habeas petition and denied on procedural grounds including that aspects of the claim (other than ineffective assistance of counsel and the constitutionality of the death penalty) were raised and rejected on appeal (*In re Waltreus*). (Order No. S173793.)

**b. Analysis**

Petitioner argues the prosecutor made purposefully discriminatory use of preemptory challenges to remove Adell Roberson and George Wheeler, the only two African American potential jurors in the jury box. He argues the prosecutor's race neutral reasons for the strikes, i.e. their responses on death qualification, were pretextual and improperly based upon the religion of these jurors.

However, the claim fails as discussed in claims 7 and 9 above, summarized here.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722. In a capital case, "a prospective juror may be excluded for cause because of his or her views on capital punishment . . . if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424. Thus, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan*, 504 U.S. at 728. Likewise, a juror who would automatically impose the death penalty if a defendant is found guilty is not impartial and must be removed for cause. *Id.* at 733.

The Equal Protection Clause prohibits a prosecutor from using peremptory challenges to exclude potential jurors solely on account of their race, e.g., on the assumption that black jurors as a group are unable to impartially consider the case against a black defendant. *Id.* at 79.

As noted, the state supreme court rejected the claim on direct appeal, stating that:

Defendant contended at trial that the prosecutor exercised peremptory challenges against two prospective jurors based upon their race. He moved for a mistrial, citing *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. The trial court determined that defendant had made a prima facie showing that the prosecutor had excused the prospective jurors on the basis of their race. The prosecutor explained: "[T]he

150

People's reason for excluding Mr. [W.] is because of his statements regarding the death penalty. He says that he believes everyone should live. He says that God is the only one who has the right to take a life. His answer is that if everyone agreed to the death penalty, that he would abide by that, but my interpretation is that he is not a strong believer in the death penalty and that he would be very reluctant to impose that penalty in any type of case [¶] I didn't make a challenge for cause at that time because he did say in some cases he could do it." The prosecutor explained that his reasoning was the same with respect to the other prospective juror in question, R. He stated that she had doubts about imposing the death penalty, and that she stated she would be reluctant to impose it. He referred to her religious affiliation, stating that his experience was that members of the church "would lean away from imposing the death penalty." He urged that he was not excusing the two prospective jurors because they were African-American, and suggested that apart from their views on the death penalty, he did not view the prospective jurors as pro-defense.

The trial court stated that it was persuaded that the prosecutor had excused the jurors because of their attitude toward the death penalty, and not on the basis of racial bias. The court recalled that the prosecution nearly had succeeded in excusing one of the two jurors for cause because of her attitudes, and concluded that statements made by both jurors supported the exercise of peremptory challenges on the basis of their attitude toward the death penalty.

[---]

"In [Wheeler] ... we held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. Subsequently, in Batson v. Kentucky (1986) 476 U.S. 79, 84-89 [90 L.Ed.2d 69, 79-83, 106 S.Ct. 1712] ... the United States Supreme Court held that such a practice violates, inter alia, the defendant's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. African-Americans are a cognizable group for purposes of both Wheeler [citation] and Batson [citation]." (People v. Alvarez (1996) 14 Cal.4th 155, 192-193 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Whether a Wheeler or a Batson claim (Batson v. Kentucky, supra, 476 U.S. 79) is raised, "the defendant need not be a member of the group in question in order to complain." (People v. Alvarez, supra, 14 Cal.4th at p. 193.)[4]

--------------------FOOTNOTE--------------------

n.4 Respondent contends that defendant did not refer to Batson or equal protection principles at the time of trial, and that he thereby waived any claim based upon those principles. Because essentially the same standard applies under either Wheeler or Batson (see People v. Alvarez, supra, 14 Cal.4th at p. 193; People v. Clair (1992) 2 Cal.4th 629, 652 [7 Cal.Rptr.2d 564, 828 P.2d 705]), and because defendant fails to persuade us that his rights under the California Constitution were violated, the point is moot.

--------------------END FOOTNOTE--------------------

"This court established in Wheeler, supra, 22 Cal.3d 258, 'that peremptory challenges may not be used to remove prospective jurors solely on the basis of presumed group bias. We defined group bias as a presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic or similar grounds. [Citations.]' ... [¶] A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing that one or more jurors has been excluded on the basis of group or racial identity. The high court has explained that

the defendant is required to 'raise an inference' that the exclusion was based on group or race bias. [Citation.] Once a prima facie showing has been made, the prosecutor then must carry the burden of showing that he or she had genuine nondiscriminatory reasons for the challenges at issue." (*People v. Jenkins* (2000) 22 Cal.4th 900, 993 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) A prosecutor legitimately may exercise a peremptory challenge against a juror who is skeptical about imposing the death penalty. (*People v. Jones* (1997) 15 Cal.4th 119, 163, fn. 13 [61 Cal.Rptr.2d 386, 931 P.2d 960], disapproved on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn.1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

Defendant contends that the prosecutor did not provide legitimate, nondiscriminatory reasons for excusing the jurors, and claims that the prosecutor believed improperly that because defendant is White, defendant had no basis upon which to object to the exclusion of African-American jurors. Defendant also claims that the prosecutor proffered other discriminatory reasons for excusing the jurors, namely that he excused them on the basis of their religion. He also contends that the trial court rejected his motion without adequate inquiry or reflection.

We have explained that "we review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges with great restraint." (*People v. Ervin* (2000) 22 Cal.4th 48, 74 [91 Cal.Rptr.2d 623, 990 P.2d 506].) The trial court's determination is a factual one, and as long as "the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal" when they are supported by substantial evidence. (*Id.* at pp. 75, 76.)

Prospective Juror R. stated that she was uncertain whether she could decide upon the penalty, observing that: "To tell you the truth, I'm so tenderhearted, I just feel sorry for people[] and it would be kind of hard for me to do." When asked how she felt about the death penalty, she stated: "If you want to know the truth by me, I hate to see anybody kill anybody.... [B]ut when it come[s] down to, you know, convicting somebody, I just really hate to do it." When asked whether, as a juror, she could impose either the death penalty or life imprisonment, she said "I don't think I could. I don't feel like I could." Regarding imposing the death penalty, she said: "I guess if I was on [a] jury and I had to I could go ahead and do it, but I would hate to do it." She repeated this reservation under questioning by defense counsel. She elaborated that she was tenderhearted and that the death penalty "is killing somebody," and that she would have compassion for defendant because she would imagine one of her own relatives in his position. Responding to questions by the prosecutor, she later stated that she would not join 11 other jurors in imposing the death penalty and that she truly did not believe she could vote for the death penalty in any case. She stated that she was religious and that she thought that imposing the death penalty violated the commandment "Thou shalt not kill." "My feeling and my religion don't agree for me to do things like that." The court overruled the prosecutor's challenge for cause, stating: "She said that she would, if the evidence was sufficiently strong, she could impose the death penalty, very obviously reluctant to do so, but I think this is more a factor to be considered in peremptory challenges. I think she could not be excused for cause ...." The juror's statements very clearly reflect serious reservations about the death penalty, a race-neutral ground upon which the prosecutor legitimately could exercise a peremptory challenge.

Prospective Juror W. stated that "I belong to what's called the Church of Christ. God, I believe, is the only person that has the right to take someone's life." He also stated that he believed in the commandment "Thou shalt not kill" and seemed to feel that the state should abide by that rule.

The record supports the conclusion that the trial court made a "sincere and reasoned effort" to evaluate the prosecutor's justifications, and substantial evidence supports its conclusion

that the prosecutor had race-neutral reasons for excusing the two jurors. That the jurors were equivocal about their ability to impose the death penalty was relevant to a challenge for cause, but did not undercut the race-neutral basis for the prosecutor's decision to excuse the prospective jurors peremptorily. References to religion did not reflect bias against a particular religion or against religion in general, but rather a concern that the prospective jurors' religious beliefs would make them reluctant to impose the death penalty. This concern was a permissible ground for the exercise of a peremptory challenge. (*People v. Ervin*, *supra*, 22 Cal.4th at p. 76.) The prosecutor's statements concerning defendant's ethnic group did not suggest that the prosecutor excused the jurors because of their race, but were offered as further proof that the prosecutor had not acted out of racial bias. Even assuming the prosecutor was confused on this point, the trial court's statements did not reflect that *it* doubted that a White defendant has standing to raise a Sixth Amendment challenge to the exercise of peremptory challenges against African-American jurors. Finally, the court's statements indicate that it carefully reviewed defendant's motion, and further inquiry or statements on the record were not required. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1282 [18 Cal.Rptr.2d 796, 850 P.2d 1].)[5]

--------------------FOOTNOTE--------------------

n.5 We reject, as we have in the past, defendant's contention that we should compare the responses of jurors who were excused with the responses of those who were not excused in analyzing whether the trial court's reasoned effort to evaluate the prosecutor's claims satisfied *Wheeler* and *Batson*. (*People v. Ervin*, *supra*, 22 Cal.4th at p. 76; *People v. Jones*, *supra,* 15 Cal.4th at p. 162.)

--------------------END FOOTNOTE--------------------

Defendant contends that although the trial court determined that the prosecutor had proffered race-neutral reasons for excusing the two prospective jurors, the court failed to determine whether the prosecutor actually was motivated by these neutral reasons. (See *People v. Alvarez*, *supra*, 14 Cal.4th at pp. 197-198.) We believe that the statement of the trial court belies this claim. The court observed in denying defendant's motion: "However, the explanations offered by [the prosecutor] convince the Court that excusing Mr. [W.] and Mrs. [R.] *was not because of* their race but *was based on* permitted reasons for exercising peremptories, and that is their attitude toward the death penalty."

*Catlin*, 26 Cal. 4th at 115-19.

Petitioner has not shown the state supreme court unreasonably rejected these allegations.

Petitioner argues the prosecutor made purposefully discriminatory use of preemptory challenges to remove Adell Roberson and George Wheeler, the only two African American potential jurors remaining in the jury box (RT 2871-75). He argues the prosecutor's race neutral reasons for the strikes were pretextual and improperly based upon the religion of these jurors. (*See* RT 2874.) He argues the trial court did not make the requisite detailed and reasoned inquiry into the prosecutor's justifications. *See People v. Fuentes*, 54 Cal. 3d 707, 715 (1991) (the trial court must make "a sincere and reasoned"

153

attempt to evaluate the prosecutor's justifications).

However, the prosecutor stated that he challenged Ms. Roberson because:

[S]he was a Pentecostal. We have had other Pentecostals that would lean away from imposing the death penalty. She made the statement that she would be reluctant to do it [vote for the death penalty]. It was almost like she could only do it [vote for death penalty] if you forced her.

(RT 2874.)

The prosecutor explained that he challenged Mr. Wheeler because:

He says that God is the only one who has the right to take a life. His answer is that if everyone agreed to the death penalty, that he would abide by that, but my interpretation is that he is not a strong believer in the death penalty and that he would be very reluctant to impose that penalty in any type of case.

(*Id.*)

The state supreme court reasonably could find the feelings both Roberson and Wheeler harbored on capital punishment would have prevented or substantially impaired their performance as jurors in accordance with the court's instructions and the juror's oath. *See Witt*, 469 U.S. at 423-24.

Petitioner concedes these two prospective jurors expressed scruples over the death penalty including on religious grounds, but he argues they each expressed the ability to impose the death penalty where the judge's instructions and the evidence warranted. (*See* RT 1019-37 re Roberson; RT 1266-78 re Wheeler). He points out that potential juror Roberson stated during voir dire and death qualification that although hard for her, she could following instructions (*see* RT 1019-38); that she felt "no different as to the life sentence than the death penalty" (RT 1028); and that she might impose the death penalty "if [the evidence was] strong enough" (RT 1035). He points out the prosecutor's for cause challenge of Ms. Roberson was denied. (RT 1037.)

He points out that similarly, potential juror Wheeler stated during voir dire and death qualification that he believed he could impose the death penalty where the evidence so warranted (RT 1269), such that the prosecutor passed on Wheeler for cause (RT 1278).

However, Roberson and Wheeler each made statements reasonably suggesting an inability to

perform as juror in a capital case. Roberson stated that "I don't want to see nobody kill nobody" (RT 1022); that "I don't think I could [impose the death penalty or life imprisonment without parole based on the evidence" (RT 1023); that "like I say, I've got a heart and I just feel if a death penalty, you know, is killing somebody …"; (RT 1029); that "I really don't think I would [cast the last vote for death because] it would be too much on my conscience" (RT 1032); that voting the death penalty "would be violating [the commandment "though shalt not kill" (RT 1033); that "my feeling and my religion don't' agree for me to do things like [impose the death penalty]" (RT 1034-35).

Wheeler stated that "I've never really thought about the death penalty" but he "believe[s] everyone should live' (RT 1268); that he "belong[s] to what's called the Church of Christ. God, I believe, is the only person what has the right to take someone's life. That's just the way I feel, but I have seen instances where I thought maybe a person should" (RT 1271); that he believes "the commandment Thou shalt not kill" (RT 1275).

Furthermore, that court reasonably could find the prosecutor, during the Wheeler motion, did not imply a racially discriminatory animus. Petitioner points to the prosecutor's statement in support of striking potential juror Wheeler that:

> This is a white defendant, I believe that it would probably be beneficial for the defense to have a white jury if they anticipate that his criminal activity is the result of some type of poor childhood, because I don't think that would be very acceptable to someone who has had to suffer discrimination during their entire life.

(RT 2874.) Petitioner argues this statement implies that Roberson and Wheeler were challenged on the basis of race (Doc. No. 25 at 119), or that the trial court and prosecutor erroneously believed that as a Caucasian, Petitioner could not bring a *Batson/Wheeler* challenge for the removal of an African American juror (id., at 111-12). However, the state supreme court reasonably could find the prosecutor was supporting race neutral challenge by pointing out that striking African Americans provided no strategic advantage to the prosecution and did not purposefully discriminate on the basis of race.

Petitioner's reliance upon comparative juror responses is unavailing. Petitioner has not demonstrated comparative juror analysis was clearly established law at the time Petitioner's decision became final on April 7, 2002. *See Miller-El*, 537 U.S. at 331.

Furthermore, the state supreme court reasonably could find the jurors selected by Petitioner for comparative analysis do not to suggest purposeful discrimination by the prosecution given the facts and circumstances in this case. Petitioner points in comparison to trial juror Patricia Bolen, a Caucasian who like Roberson (see RT 2874) was a Pentecostal and referenced church doctrine including forgiveness. (*See* Doc. No. 25 at 112; RT 683-84, 2874.) However, the record suggests Bolen showed no scruples about imposing the death penalty. (RT 674-81), she stated that she "believe[s] strongly in the death penalty [in certain circumstances such as premeditated murder] but "would like to hear [mitigating evidence] (RT 688).

Petitioner points in comparison to prospective juror Lewis Tucker (RT 2252-69) who was not an empaneled juror. (Doc. No. 25 at 118.) Tucker, a Pentecostal minister, stated that although he "invariably" followed the scripture (RT 2252), as to the death penalty he did not see any "conflict of belief or interest" (RT 2255); did not oppose capital punishment for premediated killing (RT 2255-61); and would choose death or life in prison without parole based upon the evidence (*id.*). Tucker stated that "the Bible carries out death penalties under certain circumstances (RT 2267) and that he did not consider execution by the state to be immoral or the equivalent of murder (RT 2269). Tucker stated that "if it was a crime that required death, then I would give it." (RT 2267-69.)

Petitioner points in comparison to alternate juror Sandra Greemore, a Caucasian, whom he suggests gave equivocal answers when asked whether she could impose the death penalty. (*See* RT 2166-71; CT 328; 2 Supp. CT 328.) However, Greemore that she did not have set feelings about the death penalty (RT 2166) would keep an open-mind at the penalty phase consider mitigating evidence (RT 2157-64). She suggested religious beliefs would not influence her penalty verdict (RT 2166), she appeared unequivocal that she was not averse to imposing the death penalty where warranted. (RT 2166-71.) Greemore stated that she would not have a problem imposing the death penalty if she felt strongly about it (RT 2170), rather than avoiding imposing the death penalty. (RT 2171.)

Petitioner's equal protection allegation fails because he complains of removal of jurors not of his distinctive group. *See Partida,* 430 U.S. at 494.

### c. Conclusions

The state supreme court reasonably rejected claimed prosecutorial misconduct relating to alleged

racially motivated peremptory challenges of African American prospective jurors.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of the noted aspects of claim 7 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claim 7 allegations of prosecutorial misconduct shall be denied.

4.      Claims 21 and 22

Petitioner alleges that prosecution agents in bad faith: (i) failed to discover, concealed, failed to preserve and destroyed material exculpatory investigatory and witness reports and fingerprint and other forensic evidence in possession of the Bakersfield Police Department relating to the 1976 "suspicious death" of Joyce (i.e. claim 21), and (ii) failed to discover, preserve, or disclose a letter from Bethesda Naval Hospital regarding analysis of Joyce's tissue samples for evidence of paraquat poisoning as well as a Kern County coroner's jar containing Joyce's tissue samples (i.e. claim 22), denying him rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.[16]  (Doc. No. 25 at 202-16.)

**a.      State Court Direct and Collateral Review**

*i.      Claim 21*

Petitioner's allegation that prosecution agents in bad faith failed to discover, and concealed, destroyed, and failed preserve exculpatory evidence including reports and tissue and fingerprint evidence and other material evidence in possession of the Bakersfield Police Department, denying him Fifth, Sixth, Eighth, and Fourteenth Amendments rights was raised in the first state habeas petition and denied on the merits and on procedural grounds including that aspects of the claim were raised and rejected on appeal (*Waltreus*). (Order No. S090636.)

_____

[16] Petitioner's request to incorporate by reference the clerk's transcript and reporter's transcript on appeal in case S016718 is denied as moot because these materials are included in the state record.  Petitioner's request to incorporate by reference the clerk's transcript and reporter's transcript on appeal in case S006559 relating to appeal of his Monterey County conviction and judgment denied by the California Supreme court on September 29, 1988 is denied pursuant to *Pinholster*.  563 U.S. at 181.

The claim was raised in the second state habeas petition and denied on procedural grounds including as repetitive (*In re Miller*) and (as to other than ineffective assistance of counsel and the constitutionality of the death penalty) as raised and rejected on appeal (*In re Waltreus*).   (Order No. 173793.)

  *ii.*  *Claim 22*

  Petitioner's allegation the state failed to preserve or disclose material evidence including a letter from Bethesda Naval Hospital stating that a jar of Joyce's incorrectly prepared tissue samples sent to them for forensic analysis suggested characteristics similar to paraquat poisoning but that no trace of paraquat was found, and the jar of Joyce's tissue samples last in possession of the Kern County coroner that was destroyed prior to Petitioner's Kern County proceeding, thereby denying him due process was raised on direct appeal on Fourteenth Amendment grounds and denied on the merits.  *Catlin*, 26 Cal. 4th at 159-60.

  The allegation relating to Joyce's tissue samples was raised in the first state habeas petition and denied on the merits and on procedural grounds including as raised and rejected on direct appeal (*Waltreus*).  (Order No. S090636.)

  The claim in its entirety was raised in the second state habeas petition and denied on procedural grounds including as repetitive (*In re Miller*) and (as to other than ineffective assistance of counsel and the constitutionality of the death penalty) denied as raised and rejected on appeal (*In re Waltreus*). (Order No. S173793.)

  **b.**  **Analysis**

  Petitioner argues that the prosecution and its agents, in bad faith, suppressed, failed to disclose and destroyed the material exculpatory evidence discussed below which could have exonerated him where comparable evidence could not be obtained by other reasonably available means.  (Doc. No. 25 at 202-03 citing *California v. Trombetta*, 467 U.S. 479, 488-489 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Brady v. Maryland, 3*73 U.S. 83, 87 (1963).

  In *Brady*, the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  *Brady*, 373 U.S. at 87.

If the state fails to disclose exculpatory evidence in violation of *Brady,* the conviction cannot stand if the evidence is material, i.e. if there is a reasonable probability that the evidence, considered cumulatively, would have produced a different result at trial. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). If a habeas petitioner establishes the "reasonable probability" of a different result, the error cannot subsequently be found harmless. *Id.* at 436.

There are three components to a *Brady* violation: (1) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State either willfully or inadvertently; and (3) prejudice must have ensued. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

A *Brady* violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (quoting *Kyles*, 514 U.S. at 437, 438) ("The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

"The prosecutor, although 'not required to deliver his entire file to defense counsel,' is required to turn over evidence that is both favorable to the defendant and material to the case." *Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014) (quoting U.S. v. *Bagley*, 473 U.S. 667, 675 (1985)).

The duty to disclose such evidence is applicable even though there has been no request by the accused. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

"[T]here is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281. Once the materiality of the suppressed evidence is established, no further harmless error analysis is required. *Kyles*, 514 U.S. at 435-36; *see also Silva v. Brown*, 416 F.3d 980, 986 (2005). "When the government has suppressed material evidence favorable to the defendant, the conviction must be set aside." *Silva*, 416 F.3d at 986.

Where a criminal defendant alleges failure to preserve potentially useful evidence, there is no denial of due process absent a showing of bad faith on the part of the police. *Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988)

*i.      Documentary and Tissue Evidence*

Petitioner argues state agents and the prosecution intentionally and in bad faith concealed and destroyed material evidence including Bakersfield Police reports, witness statements and tissue samples from Joyce's body that would have shown Petitioner did not cause Joyce's death by paraquat poisoning.  (Doc. No. 25 at 204.)  Petitioner argues that he has been denied certain related discovery notwithstanding his informal and state records act requests.  (*See* 1SHCP Ex.'s 202-204.)

Petitioner argues that notwithstanding discovery requests and orders and the prosecution's *Brady* obligations certain unspecified Bakersfield Police and Kern County District Attorney records and unidentified forensic evidence relating to Joyce's death including alleged tissue and organ evidence was destroyed. (Doc.  No. 25 at 206.)  He notes that by the time of trial in 1990 records from Joyce's 1976 suspicious death "were no longer … in existence at the Bakersfield Police Department" (Doc. No. 25 at 205); that all paperwork relating to the police investigation of Joyce's death had been destroyed (*id. citing* CT 1221-31); and the memory of investigating Bakersfield detective sergeant Singleton was very poor by the time of the Monterey County (1986) and Kern County (1990) trials (*id.*).

Petitioner suggests these records "may be in the hands of not only the Kern County District Attorney's Office, but also the Attorney General's office, trial division, who tried this case."  (Doc. No. 25 at 205 *citing* Respondent's Brief (on direct appeal), Arg. XV); Doc. No. 95 at 151; *see also* CT 1221-1231.)  He argues that the police and the prosecution are part of the same prosecution team and information in possession of one is imputed to the other.  (Doc. No. 25 at 203 *citing Giglio v. United States*, 405 U.S. 150, 153 (1972)) (deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice).

The record reflects that the Bakersfield Police investigated Joyce's death as a "suspicious circumstance" death; that the investigation was brief and involved contact with the coroner and co-workers of Petitioner of Joyce; and that the records were destroyed several years after Joyce's death.  (CT 1221-1231.)

Here, the state supreme court reasonably could find Petitioner merely surmises this unspecified and unidentified evidence must have been exculpatory because otherwise "charges would have been filed years before."  (Doc. No. 25 at 206.)  *See e.g.*, *United States. v. Hernandez*, 109 F.3d 1450, 1455 (9th Cir.

1997)) (*citing Mitchell v. Goldsmith*, 878 F.2d 319, 322 (9th Cir. 1989)) ("[T]he mere failure to preserve evidence which could have been subjected to tests which might have exonerated the defendant does not constitute a due process violation[.]") Petitioner has not identified material information allegedly in these reports. Petitioner does not point to facts in the records suggesting more than inadvertent destruction of subject records. (*See e.g.*, CT 1221-23, 1229.)

Moreover, Petitioner does not suggest the prosecution presented any inculpatory evidence that Joyce's tissue samples tested positive for paraquat, seemingly obviating any need for exculpation.

### ii.     Fingerprint Evidence from Bottle of Paraquat

Petitioner argues the prosecution and its agents who allegedly found Petitioner's fingerprint on the paraquat bottle cap seized from Petitioner's East American Avenue premises (Doc. No. 25 at 208 *citing* RT 3134-36, 3433-36, 3614-24, 3464-77, 3492, 3658, 4112-4128, 4250), recklessly and in bad faith destroyed exonerating aspects of such evidence (Doc. No. 25 at 207 *citing* RT 3483-92).

Particularly, Petitioner argues: (i) the bottle was mishandled by law enforcement and forensic technicians, improperly seized and left unattended for days in an office prior to being booked into evidence for storage in the property room (Doc. No. 25 at 208 *citing* 1SHCP Ex. 101 at 125, 183, 186; 1SHCP Ex. 207; RT 4114-39); (ii) the bottle and cap were not examined effectively and pursuant to standard forensic protocol and procedures (*id. citing* RT 4114-27; 1SHCP Ex. 207); (iii) the absorbent paper label portion of the bottle (spanning sixty percent of the bottle) was not examined for fingerprints (Doc. No. 25 at 209 *citing* RT 4133); and (iv) other items around the bottle when discovered were not examined for preservation of relevant evidence (*id.*). He argues exonerating evidence relating to the fingerprint that became unavailable due to the foregoing (*see* Doc. No. 25 at 212 citing 1SHCP Ex.'s 183, 207) was material to his defense and otherwise unavailable. *See Trombetta*, 467 U.S. at 488-89.

Petitioner surmises that "bad faith" was involved because "the prosecution's conduct indicates that the evidence could form a basis for exonerating the defendant[.]" *Youngblood*, 488 U.S. at 57-58.

However, the state supreme court reasonably could reject these allegations. Petitioner discounted the evidentiary value of the bottle and fingerprint during his testimony. He told the jury the bottle of paraquat was not his and that if he touched the bottle he did so unknowingly while reaching into the cabinet where the bottle was stored. (RT 4810-11, 4837, 4934-35.)

161

The chain of custody of the paraquat bottle and cap is reasonably supported in the record. The bottle was photographed at the time of recovery from the American Avenue property by Fresno County Sheriff's Department technical investigator Ralph Preheim. Fresno Sheriff Detective Little seized this evidence and took it to the Fresno County Sheriff's Office where it was placed in the custody of the physical evidence department supervisor, Don Justice, in secure storage area pending examination; it was not directly booked into evidence due to its hazardous contents. (1SHCP Ex. 101 at 931; RT 4114-26, 4136). Technical investigator Ralph Preheim examined the bottle and cap the following day (RT 4114) and found and lifted a fingerprint on the cap (RT 4128-33) later determined to be Petitioner's print. The bottle and cap were later booked into evidence (RT 4136-38). Preheim further testified that he did not retain possession of the bottle upon seizure because he did not have a secure storage area in his office. (RT 4139.)

Petitioner faults the prosecution's failure to check for prints items found near the bottle. However, Preheim testified that at the request of detective Little, he examined for fingerprints certain items in proximity the bottle but found no prints. (RT 4133.)

Petitioner points to testimony of defense trial expert Marc Taylor, a criminalist, who opined that Petitioner's fingerprint could have been forged onto the bottle cap. (RT 4663-85.) However, the state supreme court reasonably could find this opinion untethered to the facts of this case and speculative. Taylor himself conceded that he was not opining the print lifted by Preheim was forged. (RT 4685.) Taylor conceded on cross-examination that he found no obvious signs of tampering with the cap. (RT 4686.)

Petitioner points to the habeas opinion of defense expert Graham Ford, a criminalist, who opined the bottle was mishandled and ineffectively examined preventing discovery of additional prints that might have been on the bottle. (1SHCP Ex. 207.) However, the state supreme court reasonably could find the opinion alone not evidence that material fingerprint evidence was undiscovered and destroyed. Especially so given Preheim's testimony regarding precautions he took to avoid tainting the evidence he examined. (*See* RT 4131-32.)

Additionally, the state supreme court reasonably could find Petitioner's argument the state acted in bad faith to be supported only by his own surmise. At most, the state supreme court reasonably

could find Petitioner to argue no more than destruction of potentially exonerating fingerprint evidence in the absence of bad faith. *See Youngblood* (1988) 488 U.S. at 57, (defendant must show more than failure to preserve evidence which might have exonerated him).

### iii.    Letter from Bethesda Naval Hospital and Jar Containing Joyce's Tissue

Petitioner argues that the prosecution suppressed or failed to disclose material and obviously exculpatory evidence by failing to preserve both a letter from the Bethesda Naval Hospital stating that "their laboratory found no trace of paraquat in Joyce's tissue", and a jar containing samples of tissue taken from Joyce's body prior to its cremation and preserved in formalin. (Doc. No. 25 at 214-15.)

Petitioner suggests the missing Bethesda Naval Hospital letter was entirely exculpating. (Doc. No. 25 at 215.) He argues the letter contained exculpating opinion based on forensic testing and that thus it was not necessary to show bad faith in order to establish a due process violation. (*See* Doc. No. 95 at 154.)

Petitioner argues that the prosecution suppressed, failed to disclose and destroyed "the jar containing Joyce's body parts [which] . . . had it not been destroyed, could have provided exculpatory evidence that Joyce's death was not the result of paraquat poisoning." (Doc. No. 25 at 215.) He further argues the Kern County coroner must have acted in bad faith in destroying the tissue because that office was on notice the tissue sample related to a death by poisoning investigation. (Doc. No. 95 at 155.)

The state supreme court rejected the claim, stating that:

> Defendant contends that the failure of the state to preserve the letter from the Bethesda Naval Hospital and to preserve the jar of Joyce's tissue constituted a violation of his right to due process of law under the state and federal Constitutions.
>
> Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence that might be expected to play a significant role in the suspect's defense. (California v. Trombetta (1984) 467 U.S. 479, 488 [104 S.Ct. 2528, 2534, 81 L.Ed.2d 413]; accord, People v. Beeler (1995) 9 Cal.4th 953, 976 [39 Cal.Rptr.2d 607, 891 P.2d 153].) To fall within the scope of this duty, the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. (California v. Trombetta, supra, 467 U.S. at p. 489 [104 S.Ct. at p. 2534]; People v. Beeler, supra, 9 Cal.4th at p. 976.) The state's responsibility is further limited when the defendant's challenge is to the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. (Arizona v. Youngblood (1988) 488 U.S. 51, 57 [109 S.Ct. 333, 337, 102 L.Ed.2d 281].) In such case, unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. (Id. at p. 58 [109 S.Ct. at p.

337]; accord, People v. Beeler, supra, 9 Cal.4th at p. 976.)" (People v. Roybal (1998) 19 Cal.4th 481, 509-510 [79 Cal.Rptr.2d 487, 966 P.2d 521].)

We already have concluded that the evidence in question was of minimal value to the defense. We do not believe that this evidence had any significant exculpatory value that would have been evident before the evidence was lost or destroyed. The letter stated that the tissue sample bore characteristics consistent with paraquat poisoning, and the authorities were informed-apparently correctly-that the jar of tissue was without evidentiary value, because it had been preserved improperly. In addition, defendant did not present any evidence suggesting that there was any bad faith in connection with the loss of the letter or the destruction of the tissue samples. The evidence reflected that the tissue had been retained beyond the usual period required by coroner's office policy, but ultimately that it was discarded when a new coroner took office "not knowing the ramifications of it."

*Catlin*, 26 Cal. 4th at 159-60].

Petitioner has not shown the state supreme court unreasonably rejected the claim. The letter and tissue samples could be seen to lack potential exculpatory value. As the state supreme court observed, the tissue samples analyzed by the Bethesda laboratory apparently showed characteristics of paraquat poisoning and the jar of tissue could not be definitively tested for the presence of paraquat because it was preserved by formalin rather than by freezing. (9/07/88 RT 97; *see also* 9/21/88 RT 122-39.) As discussed above, tissue harvested from Joyce's body at autopsy and preserved in paraffin blocks was otherwise available for examination and evaluation. (*See e.g.*, claims 1-4, 16-17, *ante*.)

Additionally, the state supreme court could find Petitioner's suggestion the prosecution and its agents acted in bad faith is based upon inference insufficiently supported by facts. Petitioner appears to rely upon an inference of bad faith arising from Kern County coroner's destruction of evidence that related to a suspicious death/poisoning investigation. However, Petitioner has not pointed to facts in the record demonstrating the state supreme court was unreasonable in finding and destruction of such evidence was without knowledge of circumstances surrounding Joyce's death requiring retention. See *Catlin*, 26 Cal. 4th at 159-60.

### iv. Conclusions

The state supreme court reasonably rejected claimed prosecutorial misconduct relating to alleged bad faith failure to discover, disclose and preserve, and destruction of: (i) material exculpatory investigatory and witness reports and fingerprint and other forensic evidence in Joyce's death last in possession of the Bakersfield Police Department, and (ii) a letter from Bethesda Naval Hospital regarding analysis of Joyce's tissue samples and a jar containing Joyce's tissue samples last in the possession of

164

the Kern County Coroner's Office.

Accordingly, it does not appear that the California Supreme Court's rejection of claims 21 and 22 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claims 21 and 22 shall be denied.

5.      Claim 20

Petitioner revisits the claim 20 allegations discussed above as trial court error and recast here as prosecutorial misconduct regarding chain of custody of poorly preserved tissue slide evidence from Joyce's body, denying his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 197-201.)

**a.      State Court Direct and Collateral Review**

The claim that state agents failed to properly preserve autopsy slides of tissue from Joyce's body was raised on direct appeal and denied on state law chain of custody grounds. *Catlin*, 26 Cal. 4th at 133–36.

The claim was raised in the second state habeas petition asserting denial of a fair trial, the right to confront evidence, and the right to a reliable conviction and sentence under the Fifth, Sixth, and Eighth Amendments and denied on the merits and on procedural grounds. (Order No. S173793.)

**b.      Analysis**

Petitioner revisits his argument that prosecution agents failed to fully account for possession and custody of all ten of the paraffin blocks of tissue removed from Joyce's body at autopsy, such that it is not reasonably certain the evidence was not altered. (Doc. No. 25 at 199-200; *see* claim 20, *ante*.) He points to the chain of custody running from the May 6, 1976 autopsy by Dr. Swinyer to Dr. Stephens' 1984 examination of the tissue slides. As discussed above, he observes that of the ten tissue embedded paraffin blocks prepared following Joyce's 1976 autopsy by Dr. Swinyer at Bakersfield Mercy hospital, three of the blocks had lost the original autopsy label by the time prosecution expert Dr. Stephens evaluated the tissue samples and opined paraquat poisoning. (*See* Doc. No. 25 at 198-200.)

Petitioner suggests there is no way of knowing whether the tissue examined by Dr. Stephens

supporting his conclusions as to cause of death Joyce's death came from Joyce's body. (Doc. No. 25 at 200.) Particularly so, he argues given what he characterizes as the weakness of the prosecution's case concerning the death of Joyce. (*Id.* at 200-01.)

As noted, the California Supreme Court in rejected the claim, stating that:

> Defendant contends that there was a break in the chain of custody of the tissue that was removed from Joyce's body during the autopsy. […] Defendant also contends that the prosecution failed to fulfill its duty properly to preserve material evidence, but he fails to offer any authority or argument in support of this claim, so it is not considered here. (See *People v. Hardy* (1992) 2 Cal.4th 86, 150 [5 Cal.Rptr.2d 796, 825 P.2d 781].)
>
> At trial, defendant objected to testimony by Dr. Stephens that the slides analyzed by him reflected that Joyce died of paraquat poisoning, on the ground that there was an inadequate foundation for his opinion testimony. On each occasion, the trial court overruled the objection without prejudice to renewal if further prosecution witnesses were unable to supply links in the chain of custody. Defendant does not assert that the objection was renewed, and our reading of the record does not disclose further objection.
>
> […]
>
> Whether or not there was a waiver, either because of the stipulation or because of defendant's apparent failure to renew the objection after the prosecution supplied additional chain of custody witnesses, we reject on the merits defendant's contention that Dr. Stephens's opinion testimony that Joyce died of paraquat poisoning should have been excluded on chain of custody grounds.
>
> In a chain of custody claim, " '[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. […]
>
> We conclude that the trial court did not abuse its discretion in overruling defendant's objection to Dr. Stephens's testimony based on chain of custody.[13] The tissue was removed at the autopsy and immediately was labeled with the autopsy number A-26-76. It was cut into pieces and placed in a cassette marked A-26-76 and transmitted to a technician who processed it into slides that also were labeled with the autopsy number. The labeled tissue blocks were placed in a container in a drawer and went into storage at Mercy Hospital.

--------------------FOOTNOTE--------------------

n.13 We do not reach defendant's contention that any failure to preserve the claim for appeal constituted ineffective assistance of counsel or that error in admitting the evidence constituted a due process violation, because we reject the claim that the prosecution failed to establish an adequate chain of custody.

--------------------END FOOTNOTE--------------------

166

In 1984, a labeled box of slides was transferred from Mercy Hospital storage to the Kern County Coroner's Office storage safe. A Kern County Coroner's Office investigator obtained a box labeled A-26-76 from the safe and mailed the labeled box to a physician at the Stanford University School of Medicine's Department of Pathology. The package contained 10 tissue blocks, two of which were missing their labels. Each of the 10 tissue blocks received at Stanford was assigned a Stanford number. A technician at Stanford prepared two sets of slides from tissue from each of the 10 blocks. The tissue was sent to Dr. Boyd Stephens in San Francisco. Dr. Stephens examined one or more slides from each of the 10 tissue blocks. It was based upon the examination of these slides that Dr. Stephens testified that he believed that Joyce died by paraquat poisoning.

We do not agree with defendant that Dr. Stephens's opinion was based upon tissue samples of unknown origin. Although some of the tissue blocks prepared at the time of the autopsy lost their identifying labels while they were stored at Mercy Hospital, all of the blocks were contained in a box bearing the label A-26-76, and there is no indication of tampering. […] In addition, Dr. Stephens examined slides from all the tissue blocks -most of which were labeled properly-and formed the opinion not only that the tissue indicated paraquat as a cause of death, but that all the slides came from the same person. Dr. Stephens reached the latter opinion not because of anything distinctive about the tissue itself, but because of the matching shape and outline of the samples as they had been cut from the tissue blocks. The circumstance that Dr. Swinyer and Dr. Kilburn testified that unlabeled tissue slides could not be identified as coming from the same person, at least without DNA testing, went to the weight of Dr. Stephens's opinion, not the admissibility of the evidence.

Dr. Stephens's opinion was based upon an examination of the slides, the great majority of which came from tissue blocks that at all times had been properly labeled. All the tissue blocks, including the unlabeled ones, were stored together at Mercy Hospital and arrived in a container labeled A-26-76. The trial court could conclude with reasonable certainty that no alteration of evidence had occurred.

In addition, Dr. Stephens's opinion was not based solely on the tissue analysis, but also on the hospital records of the clinical course of Joyce's illness as well as autopsy observation of pulmonary fibrosis.

Finally, we note that the cause of Joyce's death was not established solely through examination of the tissue sent to Dr. Stephens, as to which there was a chain of custody objection. Other tissue obtained by Dr. Swinyer at the time of Joyce's autopsy was sent in 1976 to Dr. Kilburn, an expert on lung pathology, and he too formed the opinion that the cause of death was paraquat poisoning.

*Catlin*, 26 Cal. 4th at 133–36.

The state supreme court reasonably could find the claim of prosecutorial misconduct unpersuasive for the reasons stated by that court as discussed above in claim 20 and those discussed below. (*See* claim 20, *ante*.)

Petitioner has not demonstrated the noted actors in the chain of custody of this evidence were agents of the prosecution. Nor has he shown gaps in the chain of custody raising serious questions as to foundation and tampering. The tissue was removed during autopsy, processed for histological review,

labelled with the distinctive number A-26-76 as being from Joyce's autopsy, placed in a single box also labelled as A26-76 and placed into secured storage at Bakersfield's Mercy Hospital. (RT 3731-44).

The box with the tissue blocks was transferred to the Kern County Coroner's Office in 1984, from where it was mailed to Stanford University's pathology department. Stanford technicians observed the original autopsy number and renumbered the ten tissue blocks, prepared slides from each block and sent the blocks to Dr. Stephens. (RT 3683-87, 3844-50.) Dr. Stephens also observed the original autopsy number on at least some of the blocks (RT 3769) and had slides made from the blocks and examined at least one slide from each block. (RT 3759-69, 3801-02.)

Nothing in the records suggests any interruption in the chain of possession or that the tissue blocks were lost, separated, altered, or contaminated. The state supreme court could find to a reasonable certainty the tissue Dr. Stephens examined came from Joyce's autopsy. Dr. Stephens testified that he looked at least one slide from each block. (RT 3802.) Most of the slides Dr. Stephens examined had been harvested from tissue blocks that had been properly labelled. Dr. Stephens was able to opine that all the slides came from the same tissue donor given the matching characteristics of the tissue samples cut from the ten paraffin blocks. (*See* RT 3815-16, 3824-25.) Moreover, his opinion was corroborated by consideration of Joyce's hospital and autopsy records including observed pulmonary fibrosis. (RT 3764-65.)

Petitioner has not demonstrated on the factual record that the chain of custody suggests any interruption, loss, alteration, or contamination of the tissue blocks.

The state supreme court reasonably could find Petitioner failed to show structural error or more than harmless error under *Brecht*, for the reasons stated and given the weight of the evidence that Joyce died from paraquat poisoning. (*See* e.g. claims 30 and 31, *post.*)

### c.    Conclusions

Petitioner has not demonstrated that the California Supreme Court was unreasonable in rejecting prosecutorial misconduct allegations relating to chain of custody of poorly preserved tissue slide evidence from Joyce's body. 28 U.S.C. § 2254(d)(1), (2).

It does not appear that the California Supreme Court's rejection of these aspects of claim 20 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the

168

Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claim 20 allegations of prosecutorial misconduct shall be denied.

6.      Claim 23

Petitioner alleges in multiple subclaims prosecutorial misconduct by presentation of false evidence (i.e. subclaims C, E) and concealment of evidence (i.e. subclaims A, B, D) relating to benefits given to prosecution informant witness Conward Hardin, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 25 at 217-33.)

**a.      State Court Direct and Collateral Review**

Petitioner's claim the prosecution presented false evidence and failed to disclose benefits conferred upon informant Hardin violating his due process rights under the Fifth and Fourteenth Amendments was raised in the first state habeas petition and denied on the merits (Order No. S090636).

The claim in its entirety was presented in petitioner's second state habeas petition and denied on procedural grounds as repetitive (*In re Miller*).  (Order No. 173793.)

**b.      Analysis**

Petitioner argues the prosecutor engaged in misconduct by: (i) failing to fully disclose a 1985 deal made with, and benefits provided to Hardin in exchange for his testimony, (ii) presenting false testimony by Deputy Johansen and Hardin relating to such benefits and improper argument based thereon, and (iii) failing to disclose impeachment evidence relating to Hardin's mental health history. (Doc. No. 25 at 217-33.)  He argues the misconduct denied him due process and a fair trial at the guilt and penalty phases.  (*Id.*)

As discussed above, in *Brady* the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  *Brady*, 373 U.S. at 87.

If the state fails to disclose exculpatory evidence in violation of *Brady,* the conviction cannot stand if the evidence is material, i.e. if there is a reasonable probability that the evidence, considered cumulatively, would have produced a different result at trial.  *Kyles*, 514 U.S. at 434.  If a habeas

169

petitioner establishes the "reasonable probability" of a different result, the error cannot subsequently be found harmless. *Id.* at 436; *see also Silva*, 416 F.3d at 986. "When the government has suppressed material evidence favorable to the defendant, the conviction must be set aside." *Silva*, 416 F.3d at 986.

There are three components to a *Brady* violation: (1) the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State either willfully or inadvertently; and (3) prejudice must have ensued. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281–82.

A *Brady* violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor." *Youngblood*, 547 U.S. at 870 (quoting *Kyles*, 514 U.S. at 437, 438) ["the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"]).

 "The prosecutor, although not required to deliver his entire file to defense counsel, is required to turn over evidence that is both favorable to the defendant and material to the case." *Amado*, 758 F.3d at 1134 (quoting U.S. v. *Bagley*, 473 U.S. 667, 675 (1985)).

The duty to disclose such evidence is applicable even though there has been no request by the accused. *Agurs*, 427 U.S. at 107.

Also, the knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional. *Napue*, 360 U.S. at 269 (prosecutor's knowing presentation of false testimony violates due process). In *Napue*, the Supreme Court held that the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared. *Id.* The Court explained that the principle that a state may not knowingly use false testimony to obtain a conviction - even false testimony that goes only to the credibility of the witness - is "implicit in any concept of ordered liberty." *Id.*

A conviction obtained by the knowing use of perjured testimony "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Bagley*, 473 U.S. at 678. Nevertheless, simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony. *United States v. Zuno–Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995). "Discrepancies in . . . testimony . . . could as easily flow from errors in

170

recollection as from lies." *Id.*

To warrant habeas relief under *Napue* Petitioner must establish that: 1) the testimony or evidence was actually false; 2) the prosecution knew or should have known it to be false; and 3) the false evidence was material, i.e., there is a reasonable likelihood that the false testimony could have affected the jury's verdict. *Reis-Campos v. Biter*, 832 F.3d 968, 976 (9th Cir. 2016); *accord Tayborn v. Scott*, 251 F.3d 1125, 1130 (7th Cir. 2001).

While the Supreme Court has clearly established that the prosecution's *Brady* duty encompasses evidence "known only to police investigators and not to the prosecutor," *Kyles*, 514 U.S. at 437–38, 115 S.Ct. 1555, it is *not* clearly established that a police officer's knowledge of false testimony may be attributed to the prosecution under *Napue*. *See Briscoe v. LaHue*, 460 U.S. 325, 326 n.1 (1983) (noting that while the Supreme Court had "held that the prosecutor's knowing use of perjured testimony violates due process," the Court had "not held that the false testimony of a police officer in itself violates constitutional rights"); *accord Reis-Campos*, 832 F.3d at 977; *Browning v. Baker*, 875 F.3d 444, 459–60 (9th Cir. 2017).

The alleged events of misconduct are discussed separately below.

i.      *Hardin's 1985 Deal to Testify Against Petitioner*

Petitioner argues the prosecution was obligated to but failed to disclose all the benefits Hardin received under the deal struck during his June 20, 1985 deal with Fresno County detectives Johansen and Little and Kern County deputy Lage. (*See* 1SHCP Ex. 2); *see also United States v. Shaffer,* 789 F.2d 682, 690 (9th Cir. 1986) (facts which imply an agreement regarding material evidence must be disclosed). He argues the prosecution presented Hardin in a false light because of such undisclosed favorable treatment on subsequent charges by or within the constructive knowledge of the Fresno County District Attorney, the Kern County District Attorney and the California Attorney General's Office. (Doc. No. 25 at 219-29; *see also* 1SHCP Ex.'s 1, 3-9, 10, 12-16, 49, 51; RT 4167.) He argues all three agencies were chargeable with disclosing this evidence which was within their constructive knowledge. *See Fulminante*, 499 U.S. at 300 (recognizing that benefits conferred by authorities may motivate a witness to lie); *Maxwell v. Roe*, 628 F.3d 486, 510 (9th Cir. 2010) ("The undisclosed benefits that the informant received added significantly to the benefits that were disclosed and certainly would have cast a shadow

on [the informant's] credibility.")

Hardin, an alleged drug addict, repeat offender, and jailhouse snitch (*see* 1SHCP Ex.'s 1, 3-9, 10, 12-16, 49, 51), was housed with petitioner at Kern County Jail in 1985 when Petitioner allegedly confessed to him that "I killed those bitches." (RT 4164.) Hardin testified to Petitioner's confession at the Monterey County trial (1SHCP Ex. 102 at 650) and the Kern County trial (RT 4164.) Petitioner argues prosecutor Witt in the Kern County proceeding focused on the admission during the guilt phase closing argument. (RT 5297.)

The record reflects that at the time of Petitioner's alleged confession, Hardin was in custody in Kern County on charges of assault with a deadly weapon and resisting arrest relating to a fight with his girlfriend, Katherine Shrum, and he had had other charges pending relating to a Kentucky probation violation and a failure to appear in Fresno County. (*See* 1SHCP Ex.'s 1, 3, 4, 5; Doc. No 25 at 219.)

**(1)     The 1985 Deal**

Hardin testified in the Kern County proceeding that his noted 1985 deal included favorable treatment in the following then pending matters:

> (i)  Proceedings related to a probation violation on a 1984 conviction for robbery and unlawful imprisonment out of Kentucky. (*See* RT 4157-59; 1SHCP Ex. 3 re Kern County Case No. 41228; 1SHCP Ex. 16 re Kentucky Case No. 83CR0698.)
>
> (ii)  Kern charges relating to assault upon his girlfriend, Katherine Shrum. (*See* RT 4149, 4159, 4168-75, 4215, 4625-28; 1SHCP Ex. 1 re Kern County Felony Case No. 41135.)
>
> (iii) A Fresno County failure to appear relating to a loaded firearm in a vehicle charge. (*See* 1SHCP Ex. 4 re Fresno case #89995-5.)
>
> (iv) A Fresno County failure to report to jail/work detail relating to a petty theft. (*See* RT 4168, 4176; *see also* 1SHCP Ex. 5 re Fresno County Case No. F006037-6.)

Hardin acknowledged during his testimony that as a result of his deal he avoided jail time in these cases. (RT 4209-10; *see also* 1SHCP Ex. 2 at 14.)

**(2)     Allegedly Undisclosed Benefits**

Petitioner argues Hardin received additional benefits, essentially a "get-out-of-jail-free card" for the five plus year period between 1985 deal and his 1990 testimony in the Kern County trial. (RT 5266-67; *see also* Doc. No. 25 at 223-30 citing 1SHCP Ex.'s 12, 13, 14, 15, 49, 51.) Although these allegations are not entirely clear, he seemingly points to the following matters in which Hardin allegedly received

favorable treatment for testifying against him:

(i)  A 1985 disturbing the peace disturbance charge in Clovis that was dismissed.  (*See* 1SHCP Ex. 6 re Fresno County Case No. M006924-5.)

(ii)  A 1986 battery and resisting arrest charge in Clovis involving Shrum that was dismissed.  (*See* RT 4178; *see also* 1SHCP Ex.'s 7 and 8 re Fresno Case No. M008109-1.)

(iii)  A 1988 weapon-in-a-vehicle charge in Fresno that was dismissed.  (*See* RT 4179. 4210; *see also* 1SHCP Ex.'s 9, 11 re Fresno Case No. M020148-3.)

(iv) An April 1989 petty theft charge in Fresno to which Hardin pled guilty and was sentenced to work detail.  (*See* RT 4176-79; *see also* 1SHCP Ex. 12 re Fresno County Case No. M029533-7.)

(v)  A September 3, 1989 theft and battery charge in Kerman involving Ms. Shrum in which a bench warrant issued in February of 1990 on which Hardin was arraigned in July 1990 and subsequently pled guilty and was sentenced.  (*See* 1SHCP Ex. 13 re Fresno County Case No. FCR2569.)

(vi)  Violations of a Fresno County 1989 restraining order issued to Ms. Shrum, with unspecified resolution upon orders to show cause.   (*See* Doc. No. 25 at 224-25 citing Ex. 14 re Fresno Case No. 407121-3.)

(vii)  A January 1990 arrest for spousal abuse and inflicting injury upon child (Hardin's daughter) which was dismissed in February of 1990.  (*See* Doc. No. 25 at 224-25 citing 1SHCP Ex. 15 re Fresno Case No. 90-040159-6.)

(viii)  Unspecified payment for groceries and motel rooms by detectives.  (1SHCP Ex. 49.)

**(3)        State Supreme Court Reasonably Rejected these Allegations**

The state supreme court reasonably could find Petitioner failed to support his claim Hardin received material, undisclosed benefits in the above matters in exchange for his testimony.

Hardin testified during the Kern County trial that Fresno County charges for offenses against his girlfriend Shrum were dismissed because she would not and did not testify against him.  (*See e.g.*, RT 4216.)  The record suggests as much.  For example, Hardin's 1990 charge for felony spousal abuse and assault and inflicting injury upon a child, Fresno Case No. 90-040159-6 above, was dismissed because Shrum failed to appear in court.  (*See* 1SHCP Ex. 15; *see also* 1SHCP Ex.'s 49, 51.)  The state supreme court reasonably could find no favorable treatment in these matters.

The state supreme court reasonably could Petitioner failed to show favorable treatment in the balance of Hardin's above matters.  Therein, no favorable intervention by state actors is apparent in the record with the exception of the 1988 weapon-in-a-vehicle charge in Fresno County.  (*See* 1SHCP Ex.'s 9, 11 re Fresno Case No. M020148-3.)  Although reduction of the "wobbler" charge in that case from a

173

felony to a misdemeanor need not reasonably suggest favorable treatment (*see* Doc. No. 25 at 222), Kern County deputy district attorney Baird did disclose in a letter to counsel his intercession with the Fresno County District Attorney's Office. Baird, in his letter, asserted that Hardin initially placed the weapon in his vehicle out of fear for his safety in matters unrelated to Petitioner's proceeding. (1SHCP Ex. 10.) The state supreme court reasonably could find Baird's explanation not a basis to link the intercession to Hardin's testimony here.

Hardin otherwise denied receiving consideration for his testimony additional to that he concedes was part of his 1985 deal. (RT 4178-80, 4218, 4233-34.) Notably, counsel had Hardin's rap sheet prior to Kern County trial. (*See* Doc. No. 25 at 228:13-14; RT 4166-67; *see also* 1SHCP Ex.'s 1-11.) Petitioner fails to identify facts in Hardin's criminal background included in his habeas proffer which refer to a disposition related to the 1985 deal. Particularly, Petitioner concedes that "[t]rial counsel had obtained through his own investigation copies of Hardin's court files from Fresno County case numbers M008109-1, M008200-8, M006924-5, M005694-5, 029533-7, 040159-6, and M005693-7. Exhibits 8, 7, 6, 5, 4, 12, 15 [and that] [n]othing in those court files … states the terms of Hardin's deal in exchange for his testimony." (Doc. No. 25 at 230 n.91.)

Petitioner's proffer of the habeas declarations of his girlfriend Ms. Shrum and Shrum's mother Ollie York appears unavailing in these regards. (*See* 1SHCP Ex.'s 49, 51, respectively.) Petitioner does not point to evidentiary facts therein supporting the alleged undisclosed benefits. (*Id.*) Particularly, the generalized averments that Hardin suggested to these declarants he was released from jail because of his status as a witness in Petitioner's case reasonably could be seen as merely consistent with his 1985 deal. (1SHCP Ex. 49 at 8, Ex. 51 at 5.) Moreover, their generalized averments that detectives Little and Johansen got Hardin a motel room "a couple times" and bought food for his family "once about $100 worth" (1SHCP Ex. 49 at 8), even if arguendo competent evidence, reasonably could be seen not to cumulate to a "reasonable probability" of a different result given the substantial evidence against Petitioner. (See *Kyles*, 514 U.S. at 434; *see also* claims 30, 31, *post*.)

To the extent Hardin may have believed additional benefits would come his way once his testimony in Petitioner's case concluded (*see* Doc. No. 25 at 227 *citing* 1SHCP Ex. 49), Petitioner has not demonstrated on the factual record any such additional benefits were provided, for the reasons stated.

Any continuing benefit Hardin received under the 1985 deal regarding supervision of this Kentucky probation during the period 1985-1990 reasonably could be seen as subsumed within the disclosed deal. (*See* Doc. No. 25 at 225, citing 1SHCP Ex. 16.)

Finally, Petitioner's open-ended suggestion that Fresno County authorities were complicit in providing undisclosed benefits to Hardin in the Kern County proceeding because Fresno County missed out on a death sentence in Glenna's (Fresno County) homicide prosecution (see Doc. No. 25 at 228 n.90) is based only on speculation.

### ii. *Presentation of False Testimony*

Petitioner argues prosecutor Witt presented false testimony by Fresno County Sheriff's Deputy Johansen and Hardin regarding the 1985 deal and benefits thereunder. (Doc. No. 25 at 230-31.) He argues prosecutor Witt knew or should have known their testimony was false, yet he did nothing to correct this false testimony. *See Napue*, 360 U.S. 264 (1959) (where reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of deals violates due process).

Petitioner argues detective Johansen's testimony that he did not intercede on Hardin's behalf following the latter's "September 4, 1989 arrest" was false and contradicted prosecutor Witt's statement on the record outside the presence of the jury that Johansen in fact made a telephone call interceding on Hardin's behalf. (*See* Doc. No. 25 at 230 *citing* RT 4167, 4628.)

Still, the record reasonably suggests at most inconsistent testimony in this regard. Counsel characterizes the arrest in issue as an arrest "in Fresno County for robbery, false imprisonment on September 4th of 1989." (RT 4166.) However, Petitioner has not identified such an arrest in his habeas proffer of Hardin's criminal records. As noted above, Hardin was arrests on September 3, 1989 on charges of spousal abuse and child endangerment. Petitioner has not demonstrated on the evidentiary record that Johansen assisted Petitioner in the September 3, 1989 arrest and prosecution, or that Witt, Johansen or Hardin stated as much. Notably, Hardin testified that Johansen did not intervene on his behalf during 1987-89 and that the 1989 charge was dismissed by the court because it was untrue. (RT 4179-80, 4210, 4626.)

Witt, believing the "September 4, 1989" arrest referred to by counsel related to the Kentucky conviction on such charges and related supervised probation violation matter (*see* RT 4167), stated that

175

Johansen had intervened (*id.*).  A statement by Witt that Johansen intervened in the Kentucky matter on Hardin's behalf pursuant to the 1985 deal is consistent with the record.  (*See* RT 4217.)  Petitioner seems to concede that Prosecutor Witt understood the reference to a September 4, 1989 arrest related to the Kentucky matter covered by the 1985 deal.  (*See* Doc. No. 25 at 228.)

Petitioner argues Johansen testified falsely as to matters pending in 1985 that were covered by the deal.  Petitioner argues detective Johansen falsely testified to the effect that he knew of only one case that was dismissed under the deal, as follows:

> Q. Did he [Hardin] get some cases pending against him in 1985 dismissed, that is, Fresno County cases dismissed because of his cooperation with you in this case?
> A. He got two that I know of.
>
> Q. What were those two, do you know?
> A. Spousal abuses and assaults on his wife that she came to me and asked me to drop.
>
> MR. EYHERABIDE: I'm going to move to strike as hearsay.
> THE COURT: Motion granted. Just answer the question that's asked you, please.
> THE WITNESS: Yes, sir.
>
> MR. EYHERABIDE: I'm interested in the cases that were dismissed because of his cooperation with you or your office in connection with the Catlin case.
> A. I only know of the one.

(RT 4627-4628.)

Petitioner argues this testimony was false because:

> [A]t the June 20, 1985 meeting between Hardin, Johansen and other deputies, Hardin specifically mentioned two Fresno cases that the deputies had promised to "take care of" in exchange for his testimony: one was a Penal Code section 12031 charge (Exhibit 4: Fresno case M89995-5) and the other was a Penal Code section 488 conviction on which Hardin failed to report to jail in order to serve his sentence (Exhibit 5: Fresno case #F006037-6).

(Doc. No. 25 at 231.)  However, the record reasonably suggests mere confusion and failure to recollect resulting in discrepant testimony on the part of Johansen.  Johansen, at the June 20, 1985 meeting where the deal was memorialized, appears to believe both Case No. M89995-5 and F006037-6 related to "the work program" in Fresno.  (1SHCP Ex. 2 at 14.).  Hardin corrected him that "there's two separate ones" to which Johansen responded "okay."  (*Id.*)  Johansen, in testifying to his recollection,

176

reasonably could be seen to lapse back to the confusion he demonstrated at the June 20, 1985 meeting, rather than to provide actually false testimony. *Reis-Campos*, 832 F.3d at 976.

Petitioner's further arguments reasonably could be rejected. He argues Johansen falsely testified that spousal abuse and assault charges were dismissed under the deal given that Hardin had no such charges pending against him in 1985. (*See* Doc. No. 25 at 231; see also RT 4627-28.) However, the testimony was stricken by the trial court. (RT 4627-28.)

Petitioner argues Witt falsely implied that the 1985 deal related only to the 1985 Monterey proceeding and not the 1990 Kern County proceeding. (*See* Doc. No. 25 at 228-229 citing 1SHCP Ex. 2.) However, he fails to show on the factual record that Witt's statement that "I don't know what dismissals [of Hardin's cases] related to [Catlin's] case" was actually false. (*See* RT 4167.)

Petitioner argues detectives Little and Johansen provided Hardin with a transcript of his prior testimony against Petitioner so that Hardin might "keep his story straight" (Doc. No. 25 at 231 citing 1SHCP Ex.'s 49, 51.) However, he has not demonstrated Hardin's testimony was actually false, for the reasons stated. His further argument Witt presented perjured testimony by Hardin fails for the same reasons. (*See* Doc. No. 25 at 232-33.)

### iii.    *Hardin's Mental Health*

Petitioner argues prosecutor Witt failed to disclose to defense counsel evidence that Hardin had "serious substance abuse problems, had been treated for mental illness and was a chronically aggressive abuser of women." (Doc. No. 25 at 232.) He argues this evidence could have been used to impeach Hardin's credibility and testimony. (*Id. citing* 1SHCP Ex.'s 49, 51.)

However, Petitioner appears to support this argument only with the declarations of his habeas witnesses Ms. Shrum and her mother Ms. York. (Doc. No. 25 at 232.) Even assuming arguendo these proffered declarations contained admissible fact, Petitioner fails to demonstrate the evidence was possessed and suppressed by Witt. *Brady*, 373 U.S. at 87.

### iv.    *Prejudice and Materiality*

Petitioner argue the misconduct discussed above made his trial and sentence fundamentally unfair. (Doc. No. 25 at 232.) He argues the prosecution case was largely based on Hardin's confession. He points to Witt's statement to the jury during closing that "I think you know that you're gonna have to

believe Mr. Hardin to convict Mr. Catlin." (RT 5293.) He argues the trial defense was denied the opportunity to impeach Hardin. (Doc. No. 25 at 217-18.)

However, even if the prosecution engaged in misconduct as alleged, the state supreme court could find no reasonable probability that the allegedly suppressed evidence, considered cumulatively, would have produced a different result at trial, *Kyles,* 514 U.S. at 434, and that there was no reasonable likelihood that the allegedly false testimony could have affected the judgment of the jury, *Bagley*, 473 U.S. at 678. Counsel extensively cross-examined Hardin including as to matters of impeachment relating to his criminal background, status as an informant, the circumstances of Petitioner's confession, and benefits received in exchange for his testimony. (*See* RT 4164-4238.) Moreover, the evidence against Petitioner was substantial. (See e.g., claims 30 and 31, *post*.) The jury was free to, and presumably did consider the credibility and recollective abilities of Hardin and Johansen consistent with their instructions. *Weeks*, 528 U.S. at 234.

### v. Conclusions

The state supreme court reasonably rejected claimed prosecutorial misconduct by presentation of false evidence and concealment of exculpatory evidence relating to benefits given to prosecution informant witness Conward Hardin in exchange for this testimony in the Kern County trial.

Accordingly, it does not appear that the California Supreme Court's rejection of the noted aspects of claim 23 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Aspects of Petitioner's claim 23 not adjudicated by the state supreme court fail on *de novo* review, for the reasons stated.

Claim 23 shall be denied.

7.    Claim 24

Petitioner alleges in multiple subclaims that the prosecutor engaged in misconduct by violating the trial court's recusal order (i.e. subclaims A, B, F); presenting altered and tainted expert testimony (i.e. subclaims C, D); and presenting false evidence relating to credibility of prosecution witnesses (i.e.

subclaim E), violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 25 at 234-47.)

### a.     State Court Direct and Collateral Review

The aspect of the claim alleging improper ongoing contact between deputy attorney general Witt and the previously recused offices of the Kern County District Attorney was considered and denied on direct appeal on procedural grounds.  *Catlin*, 26 Cal. 4th at 162.

The aspect of the claim alleging prosecutorial misconduct by failing to abide by the recusal order was raised in the first state habeas petition on Fifth, Sixth, Eighth, and Fourteenth Amendments and denied on the merits.  (Order No. S090636.)

The aspect of the claim alleging prosecutorial misconduct by introduction of allegedly altered evidence was raised on direct appeal and aspects were denied merits and other aspects were denied on procedural grounds.  *Catlin*, 26 Cal. 4th at 143-44.

The aspect of the claim alleging prosecutorial misconduct by manipulating and modifying evidence between Petitioner's Monterey and Kern County proceedings was raised in the first state habeas petition and denied on the merits.  (Order No. S090636.)

The aspect of the claim alleging prosecutorial misconduct by presenting false evidence relating to the credibility of prosecution witness Ballew and other witnesses was raised in the first state habeas petition on Fifth, Sixth, Eighth, and Fourteenth Amendments and denied on the merits.  (Order No. S090636.)

Petitioner raised the claim in its entirety in the second state habeas petition which was denied on procedural grounds as repetitive (*In re Miller*).  (Order No. 173793.)

### b.     Analysis

Petitioner alleges that deputy attorney general Witt violated the Kern County Superior Court's order recusing the Kern County District Attorney's Office, manipulated and modified expert opinion evidence in the Monterey and Kern County proceedings, and presented false evidence bolstering the credibility of prosecution witnesses including Petitioner's former wife, Edith Ballew.

The *Brady* standard for failure to disclose material evidence and the *Napue* standard for the knowing use of false testimony are set out above.  (*See* claim 23, *ante*.)

179

The state supreme court reasonably could find the claim lacks merit, for the reasons discussed below.

### i.     The Recusal Order

Petitioner revisits allegations discussed as trial court error in claim 25 *ante*, recast here as prosecutorial misconduct. Petitioner observes that former defense counsel Felice, who was appointed to represent Petitioner at his 1985 arraignment in municipal court (CT 1344-45) previously and subsequently worked for the Kern County District Attorney's Office alongside deputy district attorney Baird who initially prosecuted the case against Petitioner, and Kern County District Attorney investigator Newport. (CT 1589-1606; *see also* Doc. No. 25 at 235, 248 *citing* CT 1344-1345, 1602-24, 1754-56, 1781-A-1782; 8/23/88 RT 4-28.)

As noted, on August 24, 1988, the trial court denied a defense motion to recuse the Kern County District Attorney's Office, after taking testimony from Felice and Newport. (CT 1587-99; 8/23/88 RT 4-28.) Still, the trial court ordered that Felice was not to supervise or be supervised by (then) prosecuting deputy district attorney Baird or utilize Newport in case investigations. (8/24/88 RT 14-16.) After the Kern County District Attorney informed the trial court certain of these conditions could not be met, the trial court recused the entire District Attorney's Office in September of 1988. (CT 1781-A-1782.) Deputy Attorney General Witt then undertook prosecution of the case. (*See* Doc. No. 25 at 249.)

Just before the start of trial, counsel orally motioned the trial court to limit ongoing contact between Witt and the Kern County District Attorney's Office. (Doc. No. 25 at 249; RT 59-64.) Petitioner notes the trial court deferred ruling pending briefing and never revisited the issue. (*Id. citing* RT 66.)

The state supreme court rejected aspects of the claim on direct appeal, stating that:

> Defendant speculates that an investigator in the Kern County District Attorney's Office passed confidential information to the deputy attorney general who prosecuted the case, despite an order recusing the Kern County District Attorney's Office from prosecuting the case. Defendant is unable to provide evidence in the record indicating that any such conduct took place. On the contrary, the deputy attorney general who prosecuted the case stated on the record that the former deputy district attorney whose prior contact with defendant necessitated the recusal order never had disclosed confidential information to the investigator, and that neither the former deputy district attorney nor the investigator had disclosed confidential information to the deputy attorney general who prosecuted the case. Defendant counters that the recusal order required the recusal of the *entire* Kern County District Attorney's Office, and that this order was affirmed by the Court of Appeal.

180

Defendant claims that contrary to the order, the deputy attorney general continued to use the resources of the Kern County District Attorney's Office, including the services of Newport, an investigator who previously had worked for Felice, the deputy district attorney whose contact with defendant necessitated the recusal order.

As respondent points out, however, defendant abandoned this claim at the trial level, never asking the court, which had declined to rule before submission of points and authorities, for a ruling on the motion and never filing the points and authorities requested by the trial court. (See People v. Pinholster (1992) 1 Cal.4th 865, 931 [4 Cal.Rptr.2d 765, 824 P.2d 571]; People v. Kaurish (1990) 52 Cal.3d 648, 680 [276 Cal.Rptr. 788, 802 P.2d 278].)

*Catlin*, 26 Cal. 4th at 162.

Petitioner argues Witt continued to "prosecute this case from, and with the cooperation of, the Kern County District Attorney's Office." (Doc. No. 25 at 249; Doc. No. 95 at 162.) This, he contends was contrary to and negated the Fifth Appellate District opinion upholding recusal, law of the case.

Petitioner argues Witt intentionally violated the recusal order. (CT 59-63; *see also* Doc. No. 25 at 235; CT 1781-A, 1782.) He argues Felice continued to work with Newport and Newport continued to work on Petitioner's case. (Doc. No. 25 at 236 citing CT 1773-75.) He argues Witt improperly maintained contact with district attorney staff and used of district attorney offices and resources. (Doc. No. 25 at 234, 249 citing RT 62-64; Cal. Penal Code § 1424 (providing for granting recusal of a prosecutor based upon conflict of interest).) He argues Witt's conduct amounted to invasion of the defense camp and compromised confidential defense strategy. (Doc. No. 25 at 236, 245; *see also* SCT Vol. IX-B at 4-5.)

However, as discussed in claim 25 above, summarized here, Petitioner has not supported his argument that Witt contravened the recusal order. The trial court explained recusal was motivated by the need to isolate Baird and Newport from Felice. The Court of Appeal for the Fifth Appellate District in affirming the recusal order in an unpublished November 8, 1989 decision also found the need for isolation was the basis for the recusal. (*See* SCT Vol. IX-B at 3-11.) During the 1988 recusal hearing, Felice and Newport testified that no confidential information had been passed or would be passed. (8/23/88 RT 17.) Witt, prior to trial, confirmed that he had not and would not have any contact with Felice and that Newport had not disclosed any information about Petitioner received from Felice. (RT 3274.) The isolation of Felice from Petitioner's proceeding required by the trial judge reasonably was meant to ensure Baird and Newport would not become tainted by Felice.

Petitioner's suggestion that Witt, upon replacing Baird as prosecutor somehow became tainted by his alleged use of Kern County District Attorney offices and resources is supported only by speculation. Petitioner does not demonstrate how Witt's alleged use of Kern County District Attorney offices, office resources, and investigator Newport impinged upon the isolation upon which recusal was based. Moreover, the trial judge who issued the recusal order found that such conduct, if true, would not transgress the order. (*See* RT 66-67.)

At bottom, the state supreme court reasonably could find this aspect of the claim unsupported and unpersuasive.

### ii. *False and Supressed Evidence*

Petitioner revisits allegations that prosecutor Witt manipulated testimony proffered in the Monterey County proceeding relating to paraquat ingestion timelines, discussed above as trial court error and recast here as prosecutorial misconduct. (Doc. No. 25 at 237 citing *Napue*, 360 U.S. at 269; *see* claim 3, *ante*.) Particularly, he argues Witt "altered witnesses' recollections and introduced testimony by experts whose opinion was tainted by bias." (Doc. No. 25 at 237.)

### (1) **Dr. Ford's Testimony**

Petitioner argues prosecution witness, Dr. Ford, was biased in favor of intentional poisoning by his employment with Chevron Chemical Company. He argues Dr. Ford's work with Chevron's Ortho Division, the maker of paraquat, biased him in favor of that company's position that "Paraquat could not harm humans by any other means than felonious conduct." (Doc. No. 25 at 238 citing 1SHCP Ex.'s 165, 174, 175.)

Petitioner faults the prosecutor for presenting in the Kern County proceeding Dr. Ford's testimony that Paraquat caused Joyce's death even though paraquat was not found in her tissue. (Doc. No. 25 at 203-06; s*ee also* 1SHCP Ex. 206 at 7-8.) He argues Dr. Ford's bias in favor of his employer caused him to discount possibilities other than intentional paraquat poisoning, especially so given the absence of paraquat in Joyce's tissue and varying expert opinion as to the cause of Joyce's death. (*Id.*)

Petitioner argues such bias was apparent in Dr. Ford's discounting the possibility of accidental paraquat poisoning and opining a six-day ingestion to death scenario that was contrary to the opinion of predecessor prosecution expert, Dr. Buteau. (*Id.*)

Petitioner suggests the prosecution kept Dr. Ford's bias from the jury by providing only delayed and partial discovery of the basis for Dr. Ford's opinion. (Doc. No. 25 at 238-39 citing 1SHCP Ex.'s 202-204, 206.)

However, Petitioner has not demonstrated on the record that Dr. Ford's expert testimony was false or inadmissible. Dr. Ford testified to his credentials and employment. (RT 3880-86.) Dr. Ford's expert testimony including his opinions and the basis thereof was properly admitted and the jury was free to, and presumably did weigh its persuasive value consistent with the instructions.

As noted, under *Napue*, to warrant habeas relief a petitioner must establish that: 1) the testimony was actually false; 2) the prosecution knew or should have known it to be false; and 3) there is a reasonable likelihood that the false testimony could have affected the jury's verdict. 360 U.S. at 269. Notably, Petitioner does not provide clearly established Supreme Court authority that disagreement on the record among the parties' experts alone violates his federal rights.

Petitioner's contention Witt knowingly presented Dr. Ford's false testimony reasonably lacks support in the record. (*See* claim 3, *ante*); *see also Briscoe*, 460 U.S. at 326 n.1 (noting that while the Supreme Court had "held that the prosecutor's knowing use of perjured testimony violates due process," the Court had "not held that the false testimony of a police officer in itself violates constitutional rights").

Petitioner has not demonstrated Dr. Ford's expert opinion was false. Moreover, the jury was aware Dr. Ford credentials and employment. The suggestion that Chevron through Dr. Ford discounted the possibility of a non-agricultural paraquat poisoning event appears countered by the end-user warnings Chevron provided with it paraquat. (*See e.g.,* Pet. Ex.'s 165, 174.) Dr. Ford's testimony acknowledged non-agricultural use poisoning events. (RT 3884-85.)

Even if arguendo the prosecution knowingly presented false testimony, the state supreme court reasonably could find Petitioner did not demonstrate a reasonable likelihood the alleged false testimony could have affected the judgment of the jury. The involvement of paraquat in Joyce's death was extensively litigated and substantially supported in the evidentiary record. (*See e.g.,* claims 3, *ante*, and 30 and 31, *post*.)

**(2)     Edith Ballew's Testimony**

Petitioner argues Witt failed to disclose evidence impeaching prosecution witness Ballew. He

argues Witt knowingly presented her false testimony that she did not tell the Kern County Sheriff's Department that she believed Joyce had died from paraquat poisoning. (RT 3998-4005, 4075.)

Petitioner contends it was Ballew who first broached and then pursued the paraquat poisoning allegation as a vendetta against him and to sell movie rights in the matter. (*See* Doc. No. 25 at 242-43 citing RT 4004-05, 4572, 5089, 5133; 1SHCP Ex.'s 31, 120, 140-142; CT 91, 1221-1224.) He contends Ballew was one of the last persons to be at Martha's house prior to Martha's death (Doc. No. 25 at 242 citing RT 5133) suggesting Ballew may have been involved in Martha's death.

Petitioner argues the prosecution presented testimony from Ballew falsely denying she raised paraquat during conversations with Kern County sheriff detective Josephine Koelzer and Brad Singleton. (*See* Doc. No. 25 at 242-43.) Petitioner argues Ballew falsely testified that she rarely spoke with Joyce and falsely denied that it was she (Ballew) who spontaneously and initially raised the suggestion Joyce had been poisoned with paraquat. (Doc. No. 25 at 243; CT 1124; RT 4005, 4069.)

Additionally, Petitioner argues the prosecution presented Ballew's false testimony regarding her allegedly illegal 1984 search of Petitioner's financial records at the bank where Ballew worked for evidence of financial gain from the death of Glenna. (Doc. No. 25 at 243.) Ballew initially denied that detective Johansen asked her to check these records but later testified that Johansen had asked her to check the records after the prosecutor informed defense counsel of this fact. (RT 3988, 4084-85.)

Petitioner argues such false testimony deflected suspicion away from Ballew; elevated her stature with the jury; and increased her marketability relative to the entertainment industry's interest in movie rights. (Doc. No. 25 at 244 citing RT 5089; 1SHCP Ex.'s 32, 120, 130, 140.) He suggests other unspecified witnesses were similarly motived by considerations of a deal with the entertainment industry. (Doc. No. 25 at 245.) He faults the prosecutor for not providing "the full extent of this impeachment evidence" to defense counsel. (*Id.*)

However, the state supreme court reasonably could find any discrepancies in Ballew's testimony a mere contradiction or failure of recollection and simply inconsistent testimony. Ballew's testimony related to events remote in time as to which her recollection might have faded and subject to begin refreshed. To the extent of any alleged movie deal, Ballew's husband testified his wife was not marketing the case and that movie companies contacted them. (RT 5088-89; *see also* Pet. Ex. 120.)

Even if arguendo the prosecution knowingly presented false testimony, the state supreme court reasonably could find Petitioner did not demonstrate a reasonable likelihood the alleged false testimony could have affected the judgment of the jury. *Bagley*, 473 U.S. at 678. The involvement of paraquat in Joyce's death was extensively litigated and substantially supported in the evidentiary record. (*See e.g.,* claims 3, *ante*, and 30 and 31, *post.*) Whether and when Ballew broached the issue of paraquat, checked petitioner's financial records at the bank where she worked, and aspired to a movie deal reasonably appear insubstantial matters that presumably were considered by the jury in weighing Ballew's testimony and credibility.

To the extent Petitioner suggests the prosecution presented false testimony by other witnesses mentioned above, he fails to provide any factual support.

### iii. Conclusions

The state supreme court reasonably rejected claimed prosecutorial misconduct by violating the trial court's recusal order, presenting altered and tainted expert testimony, and presenting false evidence relating to the credibility of prosecution witnesses.

It does not appear that the California Supreme Court's rejection of claim 24 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 24 shall be denied.

### D. Claims Alleging Ineffective Assistance at the Guilt Phase

Petitioner alleges in multiple subclaims that counsel was ineffective at the guilt phase, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendment. (Doc. No. 25 at 252-309, 309-16, 361-66, 443-44, and 518-20.)

#### 1. Legal Standard

The Sixth Amendment right to effective assistance of counsel, applicable to the states through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial. *See Murray*, 745 F.3d, at 1010-11: U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; *Gideon v. Wainwright*, 372 U.S. 335, 34345 (1963); *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002).

The Supreme Court explained the legal standard for assessing a claim of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 685-87 (1984). *Strickland* propounded a two-prong test for analysis of claims of ineffective assistance of counsel. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. *Richter*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 688); *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).

Petitioner must show that counsel's errors were so egregious as to deprive him of a fair trial, one whose result is reliable. *Strickland*, 466 U.S. at 688. Judicial scrutiny of counsel's performance is highly deferential, and the habeas court must guard against the temptation "to second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689. Instead, the habeas court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*; *see also Richter*, 562 U.S. at 107. A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). This presumption of reasonableness means that not only do we "give the attorneys the benefit of the doubt," we must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Pinholster*, 563 U.S. at 196.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688). However, "general principles have emerged regarding the duties of criminal defense attorneys that inform [a court's] view as to the 'objective standard of reasonableness' by which [a court must] assess attorney performance, particularly with respect to the duty to investigate." *Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005). "[S]trategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. *Strickland* permits counsel to "make a reasonable decision that makes particular investigations unnecessary." *Richter*, 562 U.S. at 106 (citing *Strickland*, 466 U.S. at 691).

However, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

A reviewing court "need not determine the actual explanation for counsel's [strategic choices], so long as his [choices fall] within the range of reasonable representation." *Morris v. State of California*, 966 F.2d 448, 456 (9th Cir. 1991). Moreover, mere conclusory allegations are insufficient to raise a cognizable claim of ineffective assistance. *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (conclusory suggestions that counsel provided ineffective assistance "fall far short of stating a valid claim of constitutional violation").

In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment. *Wiggins***,** 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690–91); *see also Thomas v. Chappell*, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); *Reynoso v. Giurbino*, 462 F.3d 1099, 1112–1115 (9th Cir. 2006) (counsel's failure to cross-examine witnesses about their knowledge of reward money cannot be considered strategic where counsel did not investigate this avenue of impeachment); *Jennings v. Woodford*, 290 F.3d 1006, 1016 (9th Cir. 2002) (counsel's choice of alibi defense and rejection of mental health defense not reasonable strategy where counsel failed to investigate possible mental defenses).

The petitioner also must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Strickland*, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is

reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). Under this standard, we ask "whether it is 'reasonably likely' the result would have been different." *Richter*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696).

That is, only when "the likelihood of a different result [is] substantial, not just conceivable," has the petitioner met *Strickland's* demand that defense errors were "so serious as to deprive [him] of a fair trial." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 687). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner because of the alleged deficiencies. *Strickland*, 466 U.S. at 697. Since the petitioner must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

"[W]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.]

To make the prejudice assessment, the court "compare[s] the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Hernandez v. Chappell*, 923 F.3d 544, 551 (9th Cir. 2019) (citing *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014)) (quoting *Murtishaw*, 255 F.3d at 940).

Under AEDPA, the Court does not apply *Strickland de novo*. Rather, the Court must determine whether the state court's application of *Strickland* was unreasonable. *Richter*, 562 U.S. at 99-100. Establishing that a state court's application of *Strickland* was unreasonable under 28 U.S.C. § 2254(d) is very difficult. *Richter*, 562 U.S. at 100. Since the standards created by *Strickland* and § 2254(d) are both "highly deferential," when the two are applied in tandem, review is "doubly" so. *Richter*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

"The multiple layers of deference create a standard that is difficult to meet, and even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. . . ." *Cain v. Chappell*, 870 F.3d 1003, 1019 (9th Cir. 2017).

Further, because the *Strickland* rule is a "general" one, courts have "more leeway . . . in reaching outcomes in case-by-case determinations" and the "range of reasonable applications is substantial."

*Richter*, 562 U.S. at 101; *see also Premo v. Moore*, 562 U.S. 115, 127 (2011) (noting the leeway afforded state courts under AEDPA in applying general standards).

If the petitioner makes an insufficient showing as to either one of the two *Strickland* components, the reviewing court need not address the other component. *Strickland*, 466 U.S. at 697.

2.  Claim 26(A)

Petitioner alleges counsel was ineffective by failure to investigate and impeach prosecution witness Conward Hardin. (Doc. No. 25 at 254-61.)

**a.  State Direct and Collateral Review**

Petitioner raised the claim in his first state habeas petition which was summarily denied on the merits. (Order No. S090636.)

Petitioner also raised the claim in the second state habeas petition and it was denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*). (Order No. S173793.)

**b.  Analysis**

*i.  Deficient Performance*

Petitioner argues that counsel failed to investigate and discover benefits Hardin received in exchange for his testimony against Petitioner. (Doc. No. 25 at 254; *see also* Doc. No. 84 at 39.) He argues counsel failed to impeach Hardin with evidence he lied under oath at both the preliminary hearing and at trial; he had a reputation as a liar; he had mental problems and drug addictions that would raise a doubt about his truthfulness and reliability; he obtained many benefits from law enforcement other than those he acknowledged; and he bragged about his ability to con others. (Doc. No. 25 at 254.)

Capital defense counsel has "a duty to make reasonable investigations or to make reasonable decisions that makes particular investigations unnecessary," and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also Babbitt v. Calderon*, 151 F.3d 1170, 1173 (1998) (a lawyer may make a reasonable decision that a particular investigation is unnecessary). The relevant inquiry is not what counsel could have pursued, but whether the choices counsel made were reasonable. *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).

However, as discussed above, counsel investigated Hardin's criminal background, his

relationship with Petitioner, the confession and Hardin's deal with law enforcement in exchange for testimony against Petitioner including as to the confession. As noted, counsel had Hardin's rap sheet prior to Kern County trial. (*See* Doc. No. 25 at 228:13-14; RT 4166-67; *see also* 1SHCP Ex.'s 1-11.) Petitioner conceded that "[counsel] obtained through his own investigation copies of Hardin's court files from Fresno County case numbers M008109-1, M008200-8, M006924-5, M005694-5, 029533-7, 040159-6, and M005693-7. Exhibits 8, 7, 6, 5, 4, 12, 15 [and discovered that] [n]othing in those court files … states the terms of Hardin's deal in exchange for his testimony." (Doc. No. 25 at 230 n.91.)

The state supreme court reasonably could have found counsel's investigation was sufficient to allow an informed strategic decision that further investigation was not needed to implement the guilt phase defense that Petitioner was not involved in the deaths of Joyce and Martha, for the reasons stated. (*See also* claim 23, *ante*.) Particularly, the state supreme court reasonably could have determined interviewing victims and witnesses to Hardin's criminal conduct was unnecessary given the nature and content of Hardin's criminal files, as discussed above. (Doc. No. 25 at 257; *see* claim 23, *ante*; *see also Davis v. Woodford*, 384 F.2d 628, 641 (9th Cir. 2004) (no error from failure to impeach on one ground where witness was actually impeached on many others). For example, that court reasonably could find the amount of potential jail time faced by Hardin related to other than issues of undisclosed favorable treatment, custody status, and the potentially varying explanations why Hardin had a gun in his car so as not to warrant further investigation. (*See* e.g., Doc. No. 25 at 256-58 citing 1SHCP Ex.'s 10, 11, 13, 16, 49, 51.)

Decisions about cross-examination "are given great deference and must . . . meet only objectively reasonable standards." *Dows v. Wood,* 211 F.3d 480, 487 (9th Cir. 2000) (the extent and nature of cross-examination is also a matter of trial tactics entrusted to the judgment of counsel). Even if a witness could have been subjected to more vigorous examination, no prejudice lies where evidence of guilt is strong. *Murtishaw*, 255 F.3d at 953.

Petitioner faults counsel for failing to otherwise investigate Hardin's untruthfulness, abuse of drugs and alcohol, symptoms of mental problems, and criminal behavior. (Doc. No. 25 at 258 citing 1SHCP Ex.'s 49, 51.) Particularly, he argues counsel failed to interview victims witnesses for evidence of bad character, a reputation for lying, and mental state evidence. *(See* Doc. No. 25 at 256-57 citing

1SHCP Ex.'s 49, 51.)

However, counsel reasonably could have determined the investigation of issues of Hardin's credibility was strategically adequate. Especially so, as the primary guilt phase defense was that Petitioner did not kill Joyce and Martha. The state supreme court reasonably could find counsel as a matter of tactics could conclude mental state defenses might serve to undermine this defense. Unsuccessful trial strategies are not alone ineffective assistance. *Sloan v. Delo*, 54 F.3d 1371, 1384 (8th Cir. 1995) ("Although the [defense] closing apparently was not persuasive, a strategy need not be successful to be reasonable."). "The mere criticism of trial tactics is insufficient to establish ineffectiveness or prejudice." *United States v. Ferreira-Alameda*, 815 F.2d 1251, 1254 (1986).

### ii. Prejudice

Even if counsel was deficient as alleged, the state supreme court could find no reasonable probability that, absent the errors, a juror would have had a reasonable doubt respecting guilt. *See Strickland*, 466 U.S. at 695. Counsel extensively cross-examined Hardin including as to matters of impeachment relating to his criminal background, status as an informant, the circumstances of Petitioner's confession, and benefits received in exchange for his testimony. (*See* RT 4164-4238; *see also* claim 23, *ante*.) Furthermore, the noted evidence against Petitioner as substantial. (*See* e.g. claims 30 and 31, *post*.)

Petitioner's proffer of the habeas declarations of his girlfriend Ms. Shrum and Shrum's mother Ollie York does not suggest otherwise. (*See* 1SHCP Ex.'s 49, 51, respectively.) Petitioner does not point to evidentiary facts therein supporting the alleged undisclosed benefits. (*Id.*) Particularly, the generalized averments that Hardin suggested to these declarants he was released from jail because of his status as a witness in Petitioner's case reasonably could be seen as merely consistent with his 1985 deal. (*See* 1SHCP Ex. 49 at 8, Ex. 51 at 5.) Moreover, generalized averments that detectives Little and Johansen got Hardin a motel room "a couple times" and bought food for his family "once about $100 worth" (1SHCP Ex. 49 at 8), even if arguendo competent evidence, could be seen not to suggest a reasonable probability that, absent the errors, a juror would have had a reasonable doubt respecting guilt. *See Strickland*, 466 U.S. at 695.

### iii. Conclusions

The state supreme court reasonably rejected claimed ineffective assistance by failure to investigate, develop, and present evidence impeaching prosecution witness Hardin.

It does not appear that the California Supreme Court's rejection of claim 26(A) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 26(A) shall be denied.

3.      Claim 26(B)

Petitioner alleges counsel was ineffective by failing to investigate forensic evidence and testimony that paraquat was in Glenna's tissue samples. (Doc. No. 25 at 261-64.)

**a.      State Direct and Collateral Review**

Petitioner raised the claim in the first state habeas petition which was summarily denied on the merits. (Order No. S090636.)

Petitioner raised the claim in the second state habeas petition and it was denied on procedural grounds including as repetitive (*In re Miller*). (Order No. S173793.)

**b.      Analysis**

*i.      Deficient Performance*

Petitioner argues counsel was deficient by failing to meaningfully test the evidence that Glenna had paraquat in her body tissue.

Petitioner faults counsel for not retaining an expert to challenge the qualifications and testimony of prosecution expert, Chevron technician Edmond Hui who opined paraquat was present in Glenna's tissues in concentrations suggesting it was intentionally given to her. (Doc. No. 25 at 261; RT 3377-78; *see also* 1SHCP Ex.'s 206, 208.) He points to defense habeas expert Dr. Kuo who opines Dr. Hui's tissue testing assumptions and methodology fell below then existing professional standards such that his test results may have been skewed and his opinions consequently flawed. (Doc. No. 25 at 262 citing 1SHCP Ex. 206.) Especially so, he argues given the extremely small amount of paraquat found in Glenna's body. (Doc. No. 25 at 264.) Such anomalous testing, according to Petitioner also calls into question Dr. Hui's finding that Martha had paraquat in her tissue. (Doc. No. 25 at 262 citing Ex. 206.)

192

However, Petitioner has not pointed to clearly established Supreme Court authority that conflicting expert opinion relating to uncharged crime evidence alone suggests deficient performance. Especially so here, in that Petitioner had been convicted of the murder of Glenna and that conviction had been upheld on appeal. Moreover, the jury was aware from testimony in the charged crimes that expert opinion varied as to ingestion timelines, as discussed above. (*See e.g.*, claims 3, 5, 16, *ante*.)

*ii.*     *Prejudice*

Petitioner argues prejudice by suggesting that uncharged crime evidence of Petitioner's alleged murder of Glenna was central to the prosecution's Kern County case for the deaths of Joyce and Martha including findings on special circumstance and in aggravation. (Doc. No. 25 at 262.)

However, even if counsel was deficient as alleged, the state supreme court could find no reasonable probability that, absent the errors, a juror would have had a reasonable doubt respecting guilt. *See Strickland*, 466 U.S. at 695. The noted evidence against Petitioner apart from the other crimes evidence of Glenna's death, was substantial. (*See* claims 30, 31.)

*iii.*     *Conclusions*

The state supreme court reasonably rejected claimed ineffective assistance by failure to investigate forensic evidence and testimony that paraquat was in Glenna's tissue samples.

It does not appear that the California Supreme Court's rejection of claim 26(B) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 26(B) shall be denied.

4.     Claim 26(C)

Petitioner alleges counsel was ineffective by failing to object to the warrantless search of his premises by Glennon Emery. (Doc. No. 25 at 264-68.)

**a.**     **State Direct and Collateral Review**

Petitioner raised claim on direct appeal and it was denied on the merits. *Catlin*, 26 Cal. 4th at 163.

Petitioner raised aspects of the claim in the first state habeas petition which was summarily denied

on the merits.   (Order No. S090636.)

Petitioner raised the claim in the second state habeas petition and it was denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*).  (Order No. S173793.)

### b.   Analysis

#### i.   *Deficient Performance*

Petitioner argues that Glennon Emery, as an agent of law enforcement, conducted a warrantless and unlawful search of his shop during which the bottle of Paraquat was found.  (Doc. No. 25 at 264-67.) He argues counsel deficiently failed to move to suppress this evidence (Doc. No. 25 at 266) and ensure the jury was aware the bottle was seized under unreliable circumstances.  (*Id. citing Strickland*, 466 U.S. at 668; *Wiggins*, 539 U.S. 510.)

The record reflects that when Petitioner was arrested on February 14, 1985, the Fresno County Sheriff's Office executed a search warrant at Petitioner's residential and business property at 1758 American Avenue including garage space used by Petitioner pursuant to search warrant.  (Doc. No. 25 at 265 citing 1SHCP Ex.'s 144.)  No paraquat was found.  (RT 3129-56.)

Petitioner states that about five days later his father-in-law, Glennon Emery, (hereinafter "Emery"), at the request of Fresno County Sheriff Deputy Little, searched Petitioner's portion of the garage shared by Petitioner and Emery that was exclusively used by Petitioner and not previously searched by law enforcement, and found a bottle of paraquat.  (Doc. No. 25 at 265-66; CT 402, 404, 407, 419, 422; RT 3129-51, 3471-75.)  Petitioner's fingerprint was found on the bottle cap.  (RT 3619-21.)

Petitioner argues Emery was then an "agent of the police" whose search was not per warrant and thus unlawful.  (Doc. No. 25 at 266-67.)  He argues the bottle of paraquat, on proper motion, would have been suppressed, denying the prosecution evidence connecting Petitioner to the paraquat.

The state supreme court considered and rejected the allegation on direct appeal, stating that:

> Defendant contends that his trial counsel should have moved to suppress the bottle of paraquat discovered by Mr. Emery, Glenna's father, who conducted a search at the request of the police. It is evident that such a motion would have been without merit. Mr. Emery discovered the paraquat in a cabinet in the garage or shop in which Mr. Emery and defendant had conducted their businesses. The search, even assuming Mr. Emery should be considered to have acted as an agent of the police, was consensual. (*People v. Jenkins, supra*, 22 Cal.4th at p. 976 ["it is settled that 'the consent of one who possesses common

194

> authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared' "].) Although Emery stated that he predominantly used one side of the garage/shop, the evidence established that Emery and defendant had common authority over the entire garage, including the cabinet. Defense counsel was not required to make a meritless motion.

*Catlin,* 26 Cal. 4th at 163.

Petitioner has not shown the state supreme court unreasonably denied the claim.

A court "need not determine the actual explanation for defense counsel's failure to object, so long as his failure to do so falls within the range of reasonable representation." *Morris,* 966 F.2d at 456; *see also Pop v. Yarborough*, 354 F. Supp. 2d 1132, 1144 n.11 (C.D. Cal. 2005).

Here, Emery testified to his joint control of the entire garage including the cabinet where the bottle was found. (RT 3136-41.) Counsel was not ineffective by failing to make a futile motion to suppress this evidence. *United States v. Aguon*, 851 F.2d 1158, 1172 (9th Cir. 1988) (futile objection), overruled on other grounds in *Evans v. United States*, 504 U.S. 255 (1992).

Petitioner has not pointed to clearly established Supreme Court precedent that search by one with joint authority to do so violated the Fourth Amendment. *See also Stone v. Powell*, 428 U.S. 465, 486 (1976) (primary justification for exclusionary rule is deterrence of police conduct that violates the Fourth Amendment).

### ii. Prejudice

Petitioner argues prejudice by suggesting that absent counsel's allegedly deficient failure to move to suppress and had a motion to suppress this evidence been granted, Petitioner would not have been connected to the bottle of paraquat and cap with his fingerprint. (Doc. No. 25 at 266.)

However, even if counsel had moved to supress this evidence, the motion would have lacked merit, for the reasons discussed above.

Counsel's failure to bring a motion that lacks merit is not ineffective assistance.

Moreover, the noted evidence against Petitioner was substantial. (*See e.g.,* claims 30 and 31, *post.*)

Accordingly, the state supreme court could find no reasonable probability of a different outcome, i.e. that absent the allegedly deficient conduct, at least one juror would have a reasonable doubt respecting guilt. *See Strickland*, 466 U.S. at 695.

*iii.* *Conclusions*

The state supreme court reasonably rejected claimed ineffective assistance by failure to object to the warrantless search of his premises by Glennon Emery.

It does not appear that the California Supreme Court's rejection of claim 26(C) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 26(C) shall be denied.

5.     Claim 26(D)

Petitioner alleges counsel was ineffective by failing to challenge fingerprint evidence. (Doc. No. 25 at 268-72.)

**a.     State Direct and Collateral Review**

Petitioner raised the claim in the first state habeas petition which was summarily denied on the merits. (Order No. S090636.)

Petitioner also raised in the second state habeas petition the entirety of claim 26. (2SHCP 321-409.) Subclaim D was denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*). (Order No. S173793.)

**b.     Analysis**

*i.     Deficient Performance*

Petitioner argues that counsel was deficient by failing to object on grounds of deficient chain of custody to introduction of evidence relating to his fingerprint on the paraquat bottle cap. (Doc. No. 25 at 268-69.) He argues there was no sufficient foundation for this evidence due to breaks in the chain of custody. (*Id.*)

The state supreme court rejected Petitioner's chain of custody argument in the context of Joyce's tissue samples, stating that:

> In a chain of custody claim, "'[t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not

accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight.' [Citations.]" (*People v. Diaz, supra*, 3 Cal.4th at p. 559; see also Mendez, Cal. Evidence (1993) § 13.05, p. 237 ["While a perfect chain of custody is desirable, gaps will not result in the exclusion of the evidence, so long as the links offered connect the evidence with the case and raise no serious questions of tampering"].) The trial court's exercise of discretion in admitting the evidence is reviewed on appeal for abuse of discretion. (*County of Sonoma v. Grant W*. (1986) 187 Cal.App.3d 1439, 1448.)

*Catlin*, 26 Cal. 4th at 134.

Petitioner argues that consistent with his trial theme he did not kill Glenna, the bottle had been planted by Emery, or Edith Ballew (*see* Doc. No. 25 at 269), and possibly altered (*id.*) He argues chain of possession is not sufficiently established because it is unclear who brought the bottle to the police station and the bottle was left unattended and only later booked into evidence at the station by persons unknown. (Doc. No. 25 at 270; *see also* RT 4125, 4136-39.)

Petitioner argues that while Deputy Sheriff Preheim testified in the Monterey proceeding that the bottle of paraquat was brought into the Sheriff's office by a detective and placed into evidence (1SHCP Ex. 101 at 424), in the Kern County proceeding Preheim testified that the bottle was located in the supervisor's office. (*See* RT 4125-36.)  Based thereon, Petitioner argues "[i]t [was] as likely as not that the evidence analyzed was not the evidence originally received." *Diaz*, 3 Cal.4th at 559 (the burden on the party offering the evidence is to show it is reasonably certain that there was no alteration); *People v. Lucas*, 12 Cal.4th 415, 444 (1995) ("[T]he requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for.")  He argues an exclusion motion, if made, would have been granted pursuant to *Lucas*.

However, the state supreme court reasonably could find chain of custody was established reasonably ensuring the bottle analyzed by Preheim was the bottle originally seized.

Preheim testified at the Kern County proceeding that he observed and photographed the bottle on scene at the American Avenue address and the following day analyzed the bottle cap for prints at his office. (RT 4113-23.) He testified the bottle was transported to the Fresno Sheriff's Department office by detective Little where Preheim saw it later that same day in the office of his supervisor, Don Justice, wherefrom Preheim retrieved the bottle the next day to test it for prints. (RT 4125.) Preheim explained

that he did not maintain possession of the bottle during this time because it contained a hazardous substance (RT 4125-26)

Particularly, Preheim testified that "on the 19th [i.e. the day the bottle was seized] it was taken into our office and locked up for security and booked into evidence later on." (RT 4136.) He testified that during the time the bottle was locked up in the supervisor's office, access to it was controlled by the supervisor and Preheim (Id.) and the door to the supervisor's office was normally closed when unoccupied. (RT 4138.) Preheim testified the bottle was not then booked into the evidence room, the normal procedure, because of its hazardous contents. (*Id.*)

Based thereon, the state supreme court reasonably could find Petitioner failed to demonstrate a break in the chain of custody suggesting and reasonable uncertainty as to alteration. *Lucas*, 12 Cal.4th at 444.

Additionally, that court reasonably could find Preheim's testimony at the Monterey trial to be consistent with his Kern County testimony. In the Monterey trial, Preheim testified he was present when the bottle was seized at the American Avenue address; that he photographed it; and next saw it "later that day in our office, and I saw it again the next day in our office." (1SHCP Ex. 102 at 423-24.) His testimony that "[the bottle] was brought into the office by the detectives and placed into evidence" (*id.* at 424) is not temporally limited and not necessarily inconsistent with his Kern County testimony.

Petitioner also faults counsel for failing to object on foundational grounds to the testimony of FBI fingerprint expert, Randall Fitzwater, that the fingerprint on the bottle cap matched Petitioner's print. (Doc. No. 25 at 270-71.) Petitioner argues deficient chain of custody of both the paraquat bottle cap on grounds an FBI identifying tag placed by Fitzwater was missing from the cap at the Kern County trial. (1SHCP Ex. 183), and Petitioner's fingerprint card from his February 14, 1985 arrest which he contends was unaccounted for during the two weeks after the prints were rolled by jail technician James Whitton and then sent to the FBI agent Fitzwater by Preheim. (Doc. No. 25 at 271.)

The state supreme court reasonably could reject the bottle cap foundational claim consistent with the above discussion. That court reasonably could find the chain of custody established by Fitzwater's testimony in the Monterey proceeding and Preheim's testimony in both proceedings. (*See also* claim 21, *ante*.) Notably, the photos of the cap in the record relied upon by Petitioner include

photos with the cap with an FBI tag. (See 1SHCP Ex. 183.) Petitioner does not support with facts in the records his argument this is a tag different from that placed by Fitzwater. Detective Little testified at the Fresno preliminary hearing that the original bottle cap with evidentiary markings was replaced with a different cap by technician Preheim during the course of his examination. (1SHCP Ex. 101 at 943).

The state supreme court also could reasonably reject a chain of custody challenge to Petitioner's fingerprint card rolled by Fresno Sheriff's Jail technician James Whitton at the time of his February 14, 1985 arrest. Petitioner argues the card was unaccounted for during the two-week period following February 14, 1985 at which time it was delivered to Preheim. He apparently bases the argument on the fact that on March 1, 1985 Fitzwater received the print card from Fresno Sheriff technician Preheim. (*See* 1SHCP Ex. 101 at 15-17.)

However, the record suggests the fingerprint card remained in the custody of the Fresno Sheriff's Office until sent by Preheim to Fitzwater. Whitton identified the card in the Monterey proceeding at that which he rolled on Petition on February 14, 1985. (1SHCP Ex. 102 at 430.) FBI fingerprint analyst Fitzpatrick, during his testimony in the Monterey proceeding, identified the card as the one he received from the Preheim. (1SHCP Ex. 102 at 435.) Petitioner fails to point to facts in the record suggesting otherwise.

Moreover, Petitioner discounted the evidentiary value of the bottle and fingerprint during his testimony. He told the jury the bottle of paraquat was not his and that if he touched the bottle he did so unknowingly while reaching into the cabinet where the bottle was stored. (RT 4810-11, 4837, 4934-35.)

*ii.    Prejudice*

Petitioner argues prejudice by suggesting that absent counsel's allegedly deficient failure to challenge the fingerprint evidence, Petitioner would not have been connected to the bottle of paraquat and bottle cap. (Doc. No. 25 at 266.)

However, even if counsel had moved to supress this evidence on the grounds asserted, the motion would have lacked merit as unsupported on the factual record, for the reasons discussed above.

Counsel's failure to bring a motion that lacks merit is not ineffective assistance. *Aguon*, 851 F.2d

at 1172.

Moreover, the noted evidence against Petitioner was substantial. (*See e.g.,* claims 30, 31.)

Accordingly, the state supreme court could find no reasonable probability of a different outcome, i.e. that absent the allegedly deficient conduct, at least one juror would have a reasonable doubt respecting guilt. *See Strickland*, 466 U.S. at 695.

### iii.    Conclusions

The state supreme court reasonably rejected claimed ineffective assistance by failure to challenge fingerprint evidence.

It does not appear that the California Supreme Court's rejection of claim 26(D) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 26(D) shall be denied.

### 6.    Claim 26(E)

Petitioner alleges counsel was ineffective by failing to file a change of venue motion. (Doc. No. 25 at 272-79.)

### a.    State Direct and Collateral Review

Petitioner raised the claim in the first state habeas petition which was summarily denied on the merits. (Order No. S090636.)

Petitioner raised the claim in the second state habeas petition and it was denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*). (Order No. S173793.)

### b.    Analysis

### i.    Deficient Performance

Petitioner faults counsel for failing to seek a change in venue.

The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury. *Skilling v. United States*, 561 U.S. 358, 377-78 (2010); *Irvin*, 366 U.S. at 722. The Constitution further provides that the trial shall occur "in the State where the . . . Crimes . . . have been committed." Art. III, § 2, cl. 3; *see also* U.S. Const., Amend. 6 (right to trial by "jury of the State and district wherein the

crime shall have been committed"). "The Constitution's place-of-trial prescriptions, however, do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling*, 561 U.S. at 378.

Nevertheless, "juror impartiality, we have reiterated, does not require ignorance." *Skilling*, 561 U.S. at 381 (citing *Irvin*, 366 U.S. at 722) (jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."); *Reynolds v. United States*, 98 U.S. 145, 155-156 (1879) ("[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.").

To merit relief for violation of his due process rights due to pretrial publicity, petitioner must demonstrate that the case is one in which prejudice is presumed, or he must demonstrate actual prejudice. *Skilling,* 561 U.S. at 379, 385.

Under California law, "[a] motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had." *Maine v. Superior Court*, 68 Cal. 2d 375, 383 (1968); (*see* CT at 257). The factors to be considered in granting or denying a motion for change of venue are: "1) the nature and gravity of the offense, 2) the size and nature of the community, 3) the status of the victim, 4) the status of the defendant, 5) the nature and extent of the publicity." *Martinez v. Superior Court*, 29 Cal. 3d 574, 578 (1981).

Petitioner argues the facts and circumstances of this case suggested a reasonable likelihood that an impartial jury could not be seated in Kern County and dictated a change of venue. (Doc. No. 25 at 272-73 citing *Irvin,* 366 U.S. at 722; *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); Pen. Code section 1033; *Williams v. Superior Court*, 34 Cal.3d 584, 588 (1983).)

However, the state supreme court reasonably could find counsel made an informed tactical decision not to seek a change of venue, for the reasons discussed below.

**(1)     Factors Relating to a Fair Trial in Kern County**

**Extent of Publicity**

Petitioner argues the Kern County proceeding involved extensive and sensational publicity. He points to local newspaper stories that Petitioner was a paraquat killer at high risk for violence (1SHCP Ex.'s 18, 126, 127) and implicating Petitioner in the death of his father, Glenn Catlin, even though there was no evidence Glenn Catlin died of any cause other than cancer. (Doc. No. 25 at 273 citing 1SHCP Ex. 35, 124, 125, 129, 130, 133.)

Petitioner points to entertainment industry contact with Edith Ballew and other trial witnesses regarding a movie project focusing on the killings. (Doc. No. 25 at 273; *see also* RT 5089; 1SHCP Ex.'s 120, 128.)

Petitioner points to the Monterey County conviction in the death of Glenna which he argues was widely reported in Kern County media. (*See* 1SHCP Ex.'s 19, 126-139.)

Petitioner points to multiple requests for television coverage of his pre-trial hearings (CT 1324-1329) and televised news reports about his Monterey County and Kern County proceedings. (*See* 1SHCP Ex. 19; *see also* Doc. No. 25 at 274.) He suggests the media likened him to Charles Manson and that media reports constantly referred to the Monterey County proceeding. (Doc. No. 25 at 273; *see also* 1SHCP Ex. 128.)

 Petitioner points to a post-conviction juror interview demonstrated awareness of the Monterey County proceeding and confused it with the Kern County charges. (Doc. No. 25 at 278 citing 1SHCP Ex. 143.)

Petitioner points to change of venue jury surveys in Kern County conducted by Dr. Wayne Holder, the psychologist who conducted a similar survey in Petitioner's Fresno County case where venue was changed to Monterey County. (Doc. No. 25 at 275.) The record reflects Dr. Holder conducted surveys in April and June 1986 (1SHCP Ex. 20), contacting 244 individuals on a "jury list" released by the judge of which 165 completed the survey. (*Id.*)

The April 1986 survey found: 53% of respondents remembered the crime with 36% remembering the details of the crime, 19% were likely to be influenced by publicity, 44% relied upon the local newspaper for news, 25% saw something about the crime on television, 22% felt the case against Petitioner was strong, and 51% felt Kern County residents could be impartial. The June 1986 survey

which was conducted after increased media coverage of the case, found that: 64% of respondents remembered the crime with 50% remembering the details of the crime, 23% were likely to be influenced by publicity, 56% relied upon the local newspaper for news, 30% saw something about the crime on television, 23% felt the case against Petitioner was strong, and 47% felt Kern County residents could be impartial. Dr. Holder recommended a change of venue hearing based upon these results, noting that change of venue had been granted in other cases upon similar results. (Doc. No. 25 at 275; *see also* 1SHCP Ex. 20 at 2; Doc. No. 95 at 169.)

### Nature of the Crimes and Relationship to Victims

Petitioner argues the unusual and sensational facts of his proceedings – the murder of two of his wives and his mother; all three apparently poisoned with paraquat, a chemical meant for agricultural application; and the efforts of one of his ex-wives, Edith Ballew, to implicate him in these crimes for which the state sought the death penalty in two separate proceedings.

### Size of Community

Petitioner argues that at the time of his trial in 1990, Kern County had a population of 543,477 (*see* 1SHCP Ex. 180); the majority of whom lived in the city of Bakersfield (*see* 1SHCP Ex. 181). He points to the saturation of the sole daily newspaper, the Bakersfield Californian, which was read by two out of every three households in Bakersfield. (*See* 1SHCP Ex. 20.)

### Political Climate

Petitioner argues that local politics influenced his proceedings. (*See* Doc. No. 25 at 277 citing 1SHCP Ex. 130.) He points out that Kern County law enforcement was accused of failing to prevent Petitioner from committing the charged offenses over a number of years and motivated to gain a death sentence but was recused from the proceeding following the Kern County district attorney's failure to comply with the trial court's applicable order. (*See Id.*) He suggests the recusal reflected a power struggle between the court and the District Attorney. (*See* Doc. No. 25 at 277 *citing* 1SHCP Ex. 134, 135, 136, 182.)

### (2) Likelihood Petitioner Would Not Receive a Fair Trial in Kern County

Petitioner argues the foregoing factors demonstrate counsel unreasonably failed to seek a venue change given a reasonable likelihood a fair trial could not be had. *Maine*, 68 Cal. 2d at 383.

However, the state supreme court reasonably could find counsel investigated possible venue change (Doc. No. 25 at 275 citing 1SHCP Ex. 109 at 6619A (Bates)) and made an informed strategic decision not to seek a change of venue given a dearth of evidence of extraordinary local prejudice preventing a fair trial. *Skilling*, 561 U.S. at 378.

The level of media interest and coverage that surrounded the Fresno and Monterey proceeding in 1985-86 attenuated in subsequent years leading up to the 1990 Kern County trial. (*See* 1SHCP Ex.'s 19, 103, 124-130; *cf.*, 1SHCP Ex. 103 at 6579A, 6580A (Bates).) The sparse media coverage leading up to the Kern County trial dealt only with trial scheduling and recusal of the Kern County District Attorney's Office. (*See* 1SHCP Ex.'s 132-136.) Newspaper coverage during the Kern County trial only occurred once at the beginning of the guilt phase and once at the end of that phase. (*See* 1SHCP Ex. 138-139.) Subsequent newspaper coverage occurred years after trial and focused on the made for television movie. (*See* 1SHPC Ex.'s 140-142.) The requests for media coverage relied upon by Petitioner relate only to his 1985 arraignment. (*See* CT 1324-1327, 1329.)

The state supreme court could find counsel reasonably determined Dr. Holder's venue surveys did not support a venue change. The surveys were conducted in 1986 during period of relatively intense media coverage attendant to Glenna's trial which subsequently appeared to wane. (*See* Doc. No. 25 at 275 n.102; 1SHCP Ex. 20.) Moreover, the results of the two surveys varied somewhat and lacked support in the noted voir dire, reasonably suggesting inconclusive results.

The state supreme court reasonably could find Petitioner failed to show counsel was deficient in voir dire by failing to flesh out jurors who were partial based on media exposure (*see* Doc. No. 25 at 278 citing Ex. 143), for the reasons stated. (*See* claim 9, *ante*.) Particularly, Petitioner has not demonstrated voir dire suggested the need for a change of venue based upon partiality and prejudice. (*Id.*); *see also Skilling*, 561 U.S. at 378, n. 11; *Harris v. Pulley*, 885 F.2d 1354, 1363 (9th Cir. 1988). Petitioner has not shown on the evidentiary record that, apart from juror Lefler who "remember[ed] hearing or reading about Catlin being arrested", any of his jurors had prior knowledge of the case.

For the reasons discussed above, even assuming arguendo the relative sensational nature of the crimes and media saturation of the Kern County venue, the state supreme court reasonably could find Petitioner not to demonstrated counsel was deficient on grounds the noted factors weigh in favor of a

reasonable likelihood that publicity pervaded his proceeding so as to give rise to any inference or presumption of prejudice. *See Murphy* v. *Florida*, 421 U.S. 794, 800 (1975) (jurors need not be totally ignorant of the facts and issues involved). Furthermore, that court could find the alleged influence of local politics to be based upon mere speculation arising from recusal of the Kern County district attorney rather than inference from fact in the record. (*See* 1SHCP Ex. 134, 135, 136, 182.)

### ii. Prejudice

Even if counsel was deficient as alleged, the state supreme court reasonably could find Petitioner did not show prejudice under *Strickland.*

Given the death qualification voir dire in this case, the state court reasonably could find Petitioner not to demonstrate actual prejudice (i.e., "actual partiality or hostility that could not be laid aside.") *See* claim 9, *ante*; *see also Harris*, 885 F.2d at 1363.

*Strickland* analysis is informed by whether it is reasonably likely that venue would have been changed from Kern County because of presumed prejudice. *Styers v. Schriro*, 547 F.3d 1026, 1030 (9th Cir. 2008) (citing *Strickland*, 466 U.S. at 695) ("[T]he governing legal standard plays a critical role in defining the question to be asked in assessing prejudice for counsel's errors."); *see also Thomas v. Borg*, 159 F.3d 1147, 1149-52 (9th Cir. 1998) (rejecting an ineffective assistance claim relating to jury composition by applying the *Strickland* prejudice standard); *Hamilton v. Ayers*, 458 F. Supp. 2d 1075, 1093 (E.D. Cal. October 30, 2006), reversed in part on other grounds, 583 F.3d 1100, 1135-36 (9th Cir. 2009) (citing *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996) (presumed prejudice standard requires the community be "saturated with prejudicial and inflammatory media publicity about the crime.").

The state supreme court reasonably could find this case not to be one of "presumed prejudice" necessitating a change of venue. A presumption of prejudice is "rarely invoked and only in extreme situations." *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998), *partially overruled on other grounds by Hooks v. Ward*, 184 F.3d 1206, 1227 (10th Cir. 1999). The Supreme Court has determined that pretrial publicity so manifestly tainted a criminal prosecution that prejudice must be presumed in only three cases: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

"The foundation precedent is *Rideau*." *Skilling*, 561 U.S. at 379. In *Rideau*, the case turned on an actual filmed confession broadcast to the entire community. 373 U.S. at 724. "What the people [in the community] saw on their television sets," the Supreme Court observed, "was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder." *Id.* at 725. "[T]o the tens of thousands of people who saw and heard it," the Supreme Court explained, the interrogation "in a very real sense was Rideau's trial—at which he pleaded guilty." *Id.* at 726. The Supreme Court therefore "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that "[t]he kangaroo court proceedings" trailing the televised confession violated due process. *Id.* at 726–727.

In the two cases to follow *Rideau*, the analyses and holdings turned on the massive media interference with court proceedings and the constant and pervasive media coverage during trial. *See Skilling*, 561 U.S. at 379-80. In *Estes,* "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed]...the community with the sights and sounds of the pretrial hearing. The media's overzealous reporting efforts, we observed, 'led to considerable disruption' and denied the 'judicial serenity and calm to which petitioner was entitled.' " *Id.* (quoting *Estes*, 381 U.S. at 536). In *Sheppard*, the Supreme Court noted that "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom," thrusting jurors "into the role of celebrities." 384 U.S. at 353, 355. Pretrial publicity consisted of "months [of] virulent publicity about [the defendant] and the murder." *Id.* at 354. Ultimately, the Supreme Court "upset the murder conviction because a 'carnival atmosphere' pervaded the trial." *Skilling*, 561 U.S. at 380 (quoting *Sheppard*, 384 U.S. at 358).

The state supreme court reasonably could find the media coverage in this case falls short of the type of massive media attention that manifestly tainted proceedings in *Rideau*, *Estes*, and *Sheppard*. In those cases, "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings. *Crater v. Galaza*, 491 F.3d 1119, 1135 (9th Cir. 2007), (citing *Murphy,* 421 U.S. at 799). Those cases "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Id.*

Moreover, the size and characteristics of the community from which the instant venire was drawn suggest as much. For example, in *Rideau*, defendant's jailhouse interrogation and confession were broadcast three times to a total of some 97,000 (i.e., 65%) people living in the parish of 150,000 from which the venire was drawn. 373 U.S. at 724. Kern County, on the other hand, was more than triple that size with a population of 543,477, of which the two Community Survey suggested between 50% and 64% remembered the crime and between 36% and 50% remembered the detail of the crimes.

Moreover, the taped interrogation and confession in *Rideau* had been created **"**with the active cooperation and participation of the local law enforcement officers, [citation] **a**nd two local deputy sheriffs later were seated on Rideau's trial jury for what the Supreme Court denounced as "kangaroo court proceedings." *Rideau*, 373 U.S. at 726. Here, Kern County authorities seemingly were uninvolved in the media coverage.

The state supreme court reasonably could find the publicity in this case was not pervasive and constant. The coverage during the period following the first trial in Monterey County subsided over the approximately four-year period prior to jury selection and trial in the Kern County trial and was not persistent and pervasive. Jurors were admonished to avoid information about the case. (See e.g., RT 3040.)

The state supreme court reasonably could find that prejudice cannot be presumed in this case. *See Hamilton*, 458 F. Supp. 2d at 1093 (prejudice is not established where the nature of the news coverage was factual and not inflammatory and the bulk of the publicity occurred months before jury selection began); *Casey v. Moore*, 386 F.3d 896, 910 (9th Cir. 2004) (whether a jury was biased is a question of fact and trial court's finding on this question is entitled to a presumption of correctness); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976) (pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial); accord *McVeigh*, 153 F.3d at 1181 (noting that presumed prejudice is "rarely invoked and only in extreme situations"). Notably, the Monterey County conviction was excluded from Petitioner's guilt phase proceeding.

In the rare case that prejudice is presumed, there will have been a "'barrage of inflammatory publicity immediately prior to trial,' . . . amounting to a 'huge . . . wave of public passion.'" *Patton v. Yount*, 467 U.S. 1025, 1033 (1984) (quoting *Murphy*, 421 U.S. at 798 and *Irvin,* 366 U.S. at 728). For

the reasons stated, such was not the case here.

Even if there was a violation of state law as Petitioner contends, *see Coleman*, 48 Cal. 3d at 136, such is not alone a sufficient basis for federal habeas relief. *Pulley v. Harris,* 465 U.S. 37, 41 (1984).

### iii. Conclusions

The state supreme court reasonably rejected claimed ineffective assistance by failure to file a change of venue motion.

It does not appear that the California Supreme Court's rejection of claim 26(E) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 26(E) shall be denied.

### 7. Claim 26(F)

Petitioner alleges counsel was ineffective by failing to renew his motion for separate juries. (Doc. No. 25 at 279-81.)

### a. State Direct and Collateral Review

Petitioner raised the claim on direct appeal and it was denied on the merits. *Catlin*, 26 Cal. 4th at 163-64.

Petitioner raised the claim in the second state habeas petition and it was denied on procedural grounds. (Order No. S173793.)

### b. Analysis

### i. Deficient Performance

Petitioner argues trial counsel was ineffective by failing to renew his *in limine* motion for separate guilt and penalty phase juries. (Doc. No. 25 at 279, 438; *see also* claims 6 and 19 *ante* and 37 *post*.)

Petitioner states the motion was denied without prejudice (RT 46-47) and not renewed. (Doc. No. 25 at 279.) He argues that on multiple grounds separate juries were necessary for a fair trial. He argues the Kern County guilt phase jury heard testimony relating to Glenna's murder that was different from and more inculpating than that presented in aggravation to the penalty phase jury. He argues the

penalty phase jurors may have been negatively impacted when counsel failed to introduce psychological testimony at the penalty phase contrary to his representations during voir dire. (Doc. No. 25 at 280.)

Petitioner argues that given the constraints of Penal Code section 190.1(a) and the instructions of the trial court, counsel was unable to voir dire and challenge guilt phase jurors regarding knowledge of the Monterey County conviction. He suggests that that jurors must have known of the Monterey conviction given the media reports, death qualification and witness testimony referring to a prior trial and were biased thereby at the penalty phase. (Doc. No. 25 at 280.)

Petitioner argues that separate juries were necessary to avoid juror confusion arising from guilt phase special circumstances being found true seemingly to both murders (Joyce and Martha) whereas at the penalty phase only Martha's murder was susceptible of a death sentence (Doc. No. 25 at 279-80 citing CALJIC 8.84; *see also* CT 2042 [re CALJIC 8.84]; RT 5530.) Particularly, he argues defense counsel lost credibility at the penalty phase because he argued at the guilt phase that Petitioner did not murder Glenna; only to have Petitioner later admit his Monterey County conviction for murdering Glenna. (*See e.g.,* Doc. No. 25 at 438.)

The state supreme court denied the allegation on direct appeal, stating that:

Defendant contends trial counsel provided ineffective assistance in failing to renew the motion he had made before trial for separate juries. We have determined above, however, that in his initial motion for separate juries, counsel did not demonstrate good cause for separate guilt and penalty phase juries. Defendant does not point to other claims or record evidence not cited by counsel in his original motion that would have supplied good cause for separate juries. Defendant's contention that had the court empanelled separate juries, the penalty phase jury would not have heard any details regarding the murder of Glenna, but would have been presented only with the record of defendant's conviction for that crime, is inconsistent with settled case law. (*People v. Stanley* (1995) 10 Cal.4th 764, 818; *People v. Zapien* (1993) 4 Cal.4th 929, 986-987; *People v. Kelly* (1992) 1 Cal.4th 495, 550.)

Defendant claims that counsel should have argued on a renewed motion that, because he no longer intended to present evidence of defendant's psychological condition, a new jury should be empanelled that was untainted by his voir dire questions on attitudes toward such testimony. As an example, defendant points to an instance in which defense counsel asked a prospective juror (who did not serve on the jury) about his attitude concerning evidence of an accused's psychological status-having preceded the questioning with the statement that he was not talking about the evidence in this case, but was exploring the prospective juror's attitudes. Such questioning would not suggest a promise to introduce psychological evidence at the penalty phase, nor does defendant cite record evidence to support his claim that defense counsel changed his mind about defense strategy between the time he made the motion for separate juries and the time the penalty phase commenced. In any event, as we have stated above, counsel's general desire to voir dire one way for the guilt phase and another way for the penalty phase

209

does not constitute good cause for empanelling separate juries.

*Catlin*, at 163-164.

The state supreme court reasonably denied the claim for the reasons stated by that court and those that follow.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722; *see also Skilling*, 561 U.S. at 377-78.

As noted in the discussion of claim 19, Petitioner does not point to clearly establish Supreme Court law supporting separate juries in his case. *See Spencer*, 385 U.S. at 556 ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure.")

The trial court gave a limiting instruction regarding the "other crimes" evidence. (RT 5353-54.) The jury was informed at the penalty phase of the statutory requirement precluding earlier disclose of the prior conviction. (*Id.*) Jurors are presumed to understand and following instructions. *Weeks*, 528 U.S. at 234; *see also Davis*, 46 Cal.4th at 626 (statutory preference for a single jury to decide both guilt and penalty does not violate a capital defendant's federal or state rights to due process, to an impartial jury, or to a reliable death judgment); *Prince*, 40 Cal. 4th at 1282 (good cause to discharge the guilt phase jury in a capital case and to impanel a new one for the penalty phase must be based on facts that appear in the record as a demonstrable reality, showing the jury's inability to perform its function).

Petitioner has not demonstrated that death qualification in the capital count denied him an impartial jury on the non-capital count. (*See* claims 60, 61, *post*); *see also McCree*, 476 U.S. at 173-184 (death qualification does not violate fair cross-section requirement of the Sixth Amendment or the constitutional right to an impartial jury). Notably, California law also calls for a single jury to determine both guilt and penalty. *People v. Balderas*, 41 Cal. 3d 144, 205 (1985).

Although the guilt phase jury also had been exposed to hypothetical prior murder conviction voir dire questioning that related to Petitioner's ultimate admission to his conviction for murdering Glenna following the Kern County convictions (*see* Doc. No. 25 at 192-96), Petitioner has not established that these questions disclosed to prospective jurors the prior conviction for Glenna's murder.

Given these considerations, the state supreme court reasonably could find counsel was not deficient in failing to renew a futile motion. *Aguon*, 851 F.2d at 1172.

ii.     *Prejudice*

Assuming arguendo counsel was deficient as alleged, the state supreme court could find no reasonable probability of a different outcome, i.e. that absent the allegedly deficient conduct, at least one juror would have a reasonable doubt respecting guilt. *See Strickland*, 466 U.S. at 695.]

Counsel's failure to bring a motion that lacks merit is not ineffective assistance. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (counsel not incompetent for failing to file meritless suppression motion).

Moreover, the noted evidence against Petitioner was substantial. (*See* e.g., claims 30 and 31, *post*.)

iii.     *Conclusions*

The state supreme court reasonably rejected claimed ineffective assistance by failure to renew his motion for separate juries.

It does not appear that the California Supreme Court's rejection of claim 26(F) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 26(F) shall be denied.

8.     Claim 26(G)

Petitioner alleges counsel was ineffective by failing to object, move to strike, and seek a mistrial upon improper references to his prior Monterey County proceeding. (Doc. No. 25 at 281-83.)

**a.     State Direct and Collateral Review**

Petitioner raised the claim on direct appeal and it was denied on the procedural grounds as properly the subject of habeas corpus. *Catlin*, 26 Cal. 4th at 164-65.

Petitioner raised the claim in the first state habeas petition and it was summarily denied on the merits. (Order No. S090636.)

Petitioner raised the claim in the second state habeas petition and it was denied on procedural

grounds including as raised in the prior state habeas petition (*In re Miller*).  (Order No. S173793.)

**b.  Analysis**

*i.  Deficient Performance*

Petitioner argues that counsel was ineffective by failing to object to trial witness references to his prior trial in the murder of Glenna (Doc. No. 25 at 281-82), references that were improper under Penal Code section 190.1(a) and the trial court's admonition based thereon.  Particularly, he observes the prior trial was mentioned by witnesses Ruby Torres (RT 3745); Dr. Kilburn (RT 4035); and detective Johansen (RT 4636-38).

Petitioner observes Penal Code section 190.1(a) stated that:

> The question of defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder. it shall . . . determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder.

(Doc. No. 25 at 281 n.105.)

Petitioner notes the trial court, outside the jury's presence, took exception to detective Johansen's mentioning the prior trial, stating "[t]hat's getting dangerously close to a mistrial in this case and I don't appreciate it."  (Doc. No. 25 at 282 citing RT 4637-38.)   Petitioner suggests counsel made matters worse by himself referring to the preliminary hearing in the Monterey matter when cross-examining detective Johansen in the Kern County matter.  (RT 3745.)

The state supreme court considered and rejected the claim on direct appeal, stating that:

> During cross-examination by defense counsel, two witnesses volunteered a reference to prior trials. Seeking to suggest flaws in the chain of custody, defense counsel asked histotechnician Ruby Torres whether, at any time between 1976 and 1985, she had seen tissue blocks that had been gathered from Joyce during the autopsy, and the witness volunteered that she had seen them "once before in Fresno when I was in the trial there." Defense counsel asked the witness to clarify that she was referring to a preliminary hearing. In another instance, defense counsel was attempting to impeach Dr. Kilburn with prior statements regarding the cause of Joyce's death that the witness had made under oath at a prior "hearing." (Apparently the preliminary hearing in this case.) Dr. Kilburn explained that he had received additional expert opinion evidence subsequent to the autopsy and also that he had learned of defendant's connection with the paraquat murders of two other women. Defense counsel asked who had told the witness of defendant's connection with those

212

murders, and the witness stated: "Well, it came out in a previous trial for the death of Glenna and Martha Catlin that I was a participant in Monterey." Counsel stated that this was not the import of his question, but that he was asking whether anyone outside the courtroom had explained the police investigation of the other crimes to the witness, and whether this explanation had affected the witness's opinion regarding the cause of Joyce's death.

In a third instance, under direct examination by defense counsel, investigator Johansen was asked questions relating to informant Hardin's refusal to answer a defense investigator's questions. The questions evidently were intended to attack the credibility of the informant. The prosecutor asked further questions regarding the time of the meeting between the informant and the investigator, and elicited testimony that when the two met, the informant already had testified under oath and had answered questions by defense counsel. On redirect examination, defense counsel asked whether the officer remembered whether informant Hardin had met the defense investigator on November 18, 1985. When the witness expressed uncertainty, defense counsel asked "whether Hardin had testified in court before at any hearing before November 19 of 1985?" The witness responded: "I don't remember what the trial dates were."

Defendant contends that defense counsel provided ineffective assistance in failing to move to strike the testimony referring to a prior trial and to seek an admonition of the jury.

On several occasions during trial, witnesses properly were asked questions regarding their prior testimony. On most occasions, the prior testimony was referred to not as trial testimony but as testimony in a "prior proceeding," a "prior hearing," or a "prior appearance." The jury was aware, as a general matter, that there had been previous proceedings, but every effort was made not to disclose the fact that defendant previously had been convicted of the murder of Glenna. We do not believe that the comments defendant now complains of would have disclosed to the jury that defendant previously had been convicted of murder in connection with the death of Glenna. In any event, the decision whether to object, move to strike, or seek admonition regarding such testimony is highly tactical, and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to highlight the undesirable testimony. (See *People v. Williams* (1997) 16 Cal.4th 153, 215; *People v. Bradford, supra*, 14 Cal.4th at p. 1052.) On this record, we cannot conclude that counsel's inaction could not have had any legitimate tactical basis. (See *People v. Lucas, supra*, 12 Cal.4th at p. 437.)

*Catlin*, at 164-165.

The state supreme court reasonably could find on habeas review that counsel determined as a matter of trial strategy not to call further attention to the Monterey trial by objecting moving to strike or for any admonishment. The jury heard properly admitted other crimes evidence from the Monterey proceeding. (*See* e.g., claims 1-4, *ante*.)

The instances of improper reference to the prior trial noted by Petitioner were minimal and passing comments as to participation in prior proceedings of which the jury was presumably already aware given the other crimes evidence. Ms. Torres testified to her participation in the Fresno preliminary hearing when she testified in the Kern County proceeding regarding foundation of the

213

paraffin blocks of Joyce's tissue. (RT 3745-50.) Dr. Kilburn in discussing his opinion regarding the cause of Joyce's death alluded to his participation in the Monterey County trial. (RT 4035.) Detective Johansen testified to the effect that prosecution witness Hardin had testified at the prior trial. (RT 4636-38.)

### ii. Prejudice

The state supreme court could find no reasonable probability of a different outcome, i.e. that absent the allegedly deficient conduct, at least one juror would have a reasonable doubt respecting guilt. *See Strickland*, 466 U.S. at 695. As that court noted, jurors heard extensive other crimes evidence relating to the Monterey proceeding. An objection or admonishment as suggested by Petitioner likely would ring the bell again, highlight Petitioner's separate proceeding in Glenna's death the result of which was not then before the jurors.

Moreover, the noted evidence against Petitioner was substantial. (*See* claims 30, 31, *post*.)

Any failure to preserve such an objection reasonably appears harmless, for the reasons stated.

### iii. Conclusions

The state supreme court reasonably rejected claimed ineffective assistance by failure to object, move to strike, and seek a mistrial upon improper references to his prior Monterey County proceeding.

It does not appear that the California Supreme Court's rejection of claim 26(G) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 26(G) shall be denied.

9.      Claim 26(H)

Petitioner alleges counsel was ineffective by failing to object to the trial court's exclusion of spectators from the courtroom. (Doc. No. 25 at 283-87.)

### a.      State Direct and Collateral Review

Petitioner raised the claim on direct appeal and it was denied on the merits. *Catlin*, 26 Cal. 4th at 163-66.

Petitioner raised the claim in the first state habeas petition and it was summarily denied on the

merits.  (Order No. S090636.)

Petitioner raised the claim in the second state habeas petition and it was denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*).  (Order No. S173793.)

### b.  Analysis

#### i.  Deficient Performance

Petitioner argues that counsel was ineffective by failing to object to the trial court's repeated exclusion of the public from portions of his trial, denying his Sixth Amendment to a public trial.  (Doc. No. 25 at 283-86 citing *Waller*, 467 U.S. at 46; *Oliver*, 33 U.S. at 273; Penal Code § 686(1).

The Constitution guarantees the right to a public trial.  *Oliver*, 333 U.S. at 266-72.  This right is applicable to the states.  *Duncan*, 391 U.S. at 147-48.

However, the right to public trial is not absolute.  "The presumption of openness maybe overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Waller*, 467 U.S. at 45 (quoting Press-*Enterprise Co.*, 464 U.S. at 510).

Petitioner states that on fifteen occasions described below, the trial court cleared the audience from the courtroom during discussion of evidentiary, procedural and related matters including some testimony by both prosecution and defense witnesses, largely outside the presence of the jury.  (Doc. No. 25 at 283-85):

> The judge abruptly interrupted the testimony of prosecution witness, Mr. Emery, asked the jury to leave, and told the audience to step out into the hall. Thereafter the judge engaged in a colloquy with the prosecutor concerning control of the witness. The judge then told the witness not to volunteer information.  (RT 3130-31.)

> Defense counsel requested a hearing outside the presence of the jury to make a motion to strike the testimony of a witness, at which point the judge ordered "Everyone in the audience out in the hall, please."  (RT 3201.)

> The prosecutor requested a hearing outside the presence of the jury to discuss the expected testimony of certain witnesses he intended to call, and the involvement of Kern County investigator Mr. Newport therein. Again, the court excluded the entire audience from the courtroom.  (RT 3267-76.)

> The judge interrupted the testimony of a prosecution witness and ordered the jury and all spectators from the courtroom. The judge then questioned the witness briefly and entered into a colloquy with the prosecutor.  (RT 3324-25.)

> Following defense counsel's objection to certain questions asked of a prosecution witness

concerning appellant's reaction to the word "paraquat," the judge ordered the jury and all spectators to leave the courtroom. Thereafter, the judge and both counsel engaged in a discussion concerning the merits of the defense objection. (RT 3336-41.)

During the defense's cross-examination of Mrs. Guinan, the prosecutor requested a hearing outside the presence of the jury to discuss his hearsay objection to the witness's testimony. Again, the judge ordered the audience to leave the courtroom while the court and counsel discussed the merits of the objection. (RT 3352-54.)

After the judge ordered the jury and the audience to leave the courtroom, the prosecutor, defense counsel and the judge discussed the anticipated testimony of two prosecution witnesses. The judge ruled some of the proposed testimony was admissible and some was not admissible. (RT 3691-95.)

Defense counsel requested a hearing outside the presence of the jury to renew an objection, on the ground of a break in the chain of custody, to testimony to be elicited from Dr. Stephens, the next prosecution witness, concerning tissue taken from the body of Joyce Catlin. The judge ordered the jury and the audience to leave the courtroom. (RT 3754-56.)

During the cross-examination of prosecution witness John Ford, the prosecutor requested a hearing outside the presence of the jury; the judge ordered the audience to leave the courtroom. The matters discussed outside the presence of the public included whether Ford had changed his prior opinion concerning ingestion of paraquat and discussions he had with the prosecutor. (RT 3941-45.)

During the defense's cross-examination of Edith Ballew after she stated in response to a question: "I'm not supposed to discuss that part of the testimony," the judge ordered the jury and the audience to leave the courtroom. Thereafter, a discussion ensued among the judge and both counsel concerning permissible and impermissible testimony of this witness. (RT 4081-84.)

Following the prosecution's objection to a defense question during the cross-examination of a prosecution witness, the judge ordered the courtroom cleared. The matters discussed in the absence of the public concerned the past criminal record of the witness. (RT 4166.)

When the prosecution called Mrs. Schalwitz to testify, the judge ordered the jury and the audience to leave the courtroom, and out of the presence of the public, the witness was questioned concerning her ability to identify Petitioner. Following her examination, the judge sustained the defense's objection to the witness's testimony. (RT 4273-92.)

When the defense called Phyliss Bryan to testify, the prosecutor requested a hearing outside the presence of the jury, and the judge ordered the jury and the audience to leave the courtroom. Thereafter, an Evidence Code section 402 hearing was held outside the presence of the public. (RT 4493-4500.)

After defense counsel announced he had no more witnesses that day, the court asked the audience to leave the courtroom. Thereafter, various witness scheduling problems were discussed. (RT 4576-78.)

After defense counsel called John Faulkenberry as its next witness, the prosecutor requested an offer of proof hearing outside the presence of the jury. The judge ordered the jury and the audience to leave the courtroom. (RT 4598-4601.)

Petitioner argues these exclusions of the public occurred without any discussion on the record of the reasons for the court's actions and balancing of the Petitioner's interest in a public trial. (Doc. No. 25 at 286.) He argues the exclusion of the public from significant portions of the proceeding was unjustifiable, arbitrary and constitutes structural error without any showing of prejudice. (Doc. No. 25 at 286 citing *Fulminante*, 499 U.S. at 310; *Waller*, 467 U.S. at 49-50.)

The state supreme court considered and rejected the allegation on direct appeal, stating that:

> Defendant contends that trial counsel's failure to object to the exclusion of the public at various points during the trial constituted ineffective assistance of counsel. Defendant's pro forma contention fails to address possible tactical considerations or the potentially legitimate contention that the brief closures were too trivial to constitute a violation of defendant's basic public trial right. (See *People v. Woodward, supra*, 4 Cal.4th at pp. 383-385, and cases cited; see also *Bowden v. Keane* (2d Cir. 2001) 237 F.3d 125, 128-129; *Gonzalez v. Quinones* (2d Cir. 2000) 211 F.3d 735, 737-738; *Peterson v. Williams* (2d Cir. 1996) 85 F.3d 39, 40-41; *Girtman v. Lockhart* (8th Cir. 1991) 942 F.2d 468, 471-472.) In addition, because the contention is that defendant's right to the effective assistance of counsel was violated, defendant is obliged to demonstrate prejudice, an obligation he fails to address. We reject defendant's claim.

*Catlin*, at 165-166.

The state supreme court reasonably rejected the claim for the reasons stated by that court and those that follow. Petitioner has not pointed to clearly established law that excluding the public during discussion of matters outside the presence of the jury violated his right to a public trial.

To any extent the public was excluded while proceedings continued before the jury, the state supreme court reasonably could find counsel was strategically motivated in not objecting on public trial grounds. Such proceedings were on the record and Petitioner does not argue such record was insufficient to show a reasoned exclusion of the public by the trial court. Nor does he point to facts suggesting the noted exclusions of the public denied him a fair proceeding. *See Waller*, 467 U.S. at 46 ("The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.").

Petitioner has not demonstrated on the facts that an objection by counsel would have been meritorious. *See Waller*, 467 U.S. at 44 (public has a qualified right to attend a criminal trial).

    *ii.*     *Prejudice*

Even if counsel was deficient as alleged, Petitioner has not demonstrated prejudice under *Strickland*. The state supreme court reasonably could find Petitioner made no showing that absent counsel's allegedly deficient conduct, at least one juror would have had a reasonable doubt in the outcome, for the reasons stated.

### iii.    Conclusions

The state supreme court reasonably rejected claimed ineffective assistance by failure to object to the trial court's exclusion of spectators from the courtroom.

It does not appear that the California Supreme Court's rejection of claim 26(H) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 26(H) shall be denied.

### 10.    Claims 26(I), (J), (M)

Petitioner alleges that counsel was ineffective by failing to object to improper testimony by prosecution trial expert, Dr. Ford, regarding Glenna's death (i.e. claim 26(I)), failing to rebut tainted testimony by Dr. Ford regarding Martha's death (i.e. claim 26(J)), and inconsistent prosecution theories in the Monterey and Kern County proceedings (i.e. claim 26(M)). (Doc. No. 25 at 287-89, 293-94.)

### a.    State Direct and Collateral Review

Petitioner raised the claims in the first state habeas petition and they were summarily denied on the merits. (Order No. S090636.)

Petitioner raised the claims in the second state habeas petition and they were denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*). (Order No. S173793.)

### b.    Analysis

### i.    Deficient Performance

Petitioner argues that counsel was ineffective by failing to object to biased and inconsistent testimony by prosecution expert Dr. Ford relating to the cause of Glenna's death. (Doc. No. 25 at 287.) Petitioner relies heavily upon his allegations discussed in claims 3 and 24, *ante,* that Dr. Ford, by virtue of his employment by Chevron, was biased in favor of death by intentional paraquat poisoning even

though no paraquat was found in Joyce's tissue.  (Doc. No. 25 at 238-39, 288, 293 citing 1SHCP Ex.'s 165, 174, 175, 202-206.)  He argues that to this end, Dr. Ford provided an ingestion timeline that was inconsistent with that of prior prosecution expert Dr. Buteau.  (*Id.*)  As discussed above, Petitioner suggests Dr. Ford reverse-engineered his ingestion timeline in order to overcome Petitioner's alibi defense.  (*Id. citing* 1SHCP Ex.'s 165, 174, 175, 206; *see also* RT 3929-76.)

Petitioner also faults counsel for failing to retain a defense toxicologist to rebut Dr. Ford's December 2, 1984 ingestion timeline and rehabilitate the opinion of Dr. Buteau that in Martha's case the ingestion of paraquat occurred on December 5 or 6, 1984 as concurred in by defense habeas expert Dr. Kuo (*see* Doc. No. 25 at 288 citing 1SHCP Ex. 206) and consistent with the alibi defense.  (*See* Doc. No. 95 at 173 citing 1SHCP Ex.'s 165, 174, and 175.)  Especially so, he argues, given that Dr. Buteau's testimony in the Monterey County proceeding was fundamentally in conflict with that of Dr. Ford in the Kern County proceeding.  (Doc. No. 25 at 288-89; *see* Evid. Code section 352.)

Petitioner faults counsel for failing to object and move to strike Dr. Ford's testimony and to appeal the trial court's erroneous ruling allowing the testimony to be introduced.  He argues that upon a timely and proper motion Dr. Ford's testimony would have been stricken as prejudicially inconsistent theories of prosecution in the Monterey and Fresno proceedings.  (*See* Doc. No. 25 at 288.)

However, the state supreme court reasonably could reject these allegations.  Dr. Ford's testimony was properly admitted and subject to cross-examination.  (*See* claims 3 and 24, *ante*.)  The state supreme court reasonably could reject Petitioner's argument as going to weight rather than admissibility.  Notably, Dr. Buteau was examined on his evolving opinions relating to time of ingestion.  (*See* RT 4531-46).  *See Reynoso*, 462 F.3d at 1112-13 (cross-examination motivated by strategic choices rather than glaring failure to ask even basic questions not ineffective assistance).

The California Supreme Court reasonably could have discounted any such difference of opinion as mere disagreement among experts which alone does not demonstrate that one expert is unqualified.  *See e.g.*, *Toler v. Troutt*, 2015 WL 1408490 at *9 (W.D. Okla., Feb. 20, 2015) (medical difference of opinion not actionable under the Eighth Amendment).

As discussed above Petitioner has not demonstrated Dr. Ford's expert opinion was false.  Moreover, the jury was aware Dr. Ford credentials and employment.  The suggestion that Chevron,

219

through Dr. Ford discounted the possibility of a non-agricultural paraquat poisoning event appears countered by the end-user warnings Chevron provided with it paraquat. (*See e.g.,* Pet. Ex.'s 165, 174.) Dr. Ford's testimony acknowledged non-agricultural use poisoning events. (RT 3884-85.) As discussed above, prosecutors in both proceedings theorized that Petitioner poisoned Glenna and Martha with paraquat and that timelines for paraquat ingestion were somewhat variable. (*See* claims 3, 24.)

### ii.    Prejudice

Even if counsel was deficient as alleged, Petitioner has not demonstrated prejudice under *Strickland* that at least one juror would have had a reasonable doubt in the outcome, for the reasons stated. The noted testimony of Dr. Ford was properly admitted, and the jury presumably considered and weighed it consistent with their instructions. *Weeks*, 528 U.S. at 234.

Moreover, the involvement of paraquat in Joyce's death was extensively litigated and substantially supported in the evidentiary record. (*See e.g.,* claims 3 and 24, *ante,* and 30, 31, *post*.)

Failure to bringing a non-meritorious objection is not deficient conduct. *See Lockhart v. Fretwell*, 506 U.S. 364, 374 (1992) (counsel's failure to make a meritless objection is not prejudicial under *Strickland*).

### iii.    Conclusions

The state supreme court reasonably rejected claimed ineffective assistance by failure to object to improper testimony by Dr. Ford, regarding Glenna's death, rebut tainted testimony by Dr. Ford regarding Martha's death, and object to inconsistent prosecution theories in the Monterey and Kern County proceedings.

It does not appear that the California Supreme Court's rejection of claims 26(I), (J), and (M) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). ]

Claims 26(I), (J), and (M) shall be denied.

11.    Claim 26(K), (L)

Petitioner alleges counsel was ineffective regarding the guilt phase jury instructions by failing to request (i.e. claim 26 (K)) and object (i.e. claim 26(L)) thereto. (Doc. No. 25 at 289-93.)

#### a.    State Direct and Collateral Review

Petitioner raised aspects of the claims on direct appeal which were denied on the merits.  *Catlin*, 26 Cal. 4th at 154-57, 166.

Petitioner raised the claims in the first state habeas petition which were summarily denied on the merits.  (Order No. S090636.)

Petitioner raised the claims in the second state habeas petition and they were denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*).  (Order No. S173793.)

#### b.    Analysis

##### i.    *Deficient Performance*

Petitioner argues that counsel was ineffective by failing to request CALJIC 3.41 regarding concurrent causation, and by acquiescing in modified CALJIC 8.55, and CALJIC 8.58, which he argues placed before the jury a confusing and improper definition of the term "proximate cause" that relied upon a temporal sequence of events.  (Doc. No. 25 at 291-93 citing *People v. Roberts*, 2 Cal. 4th 271, 312 (1992) (suggesting CALJIC 8.58 is grammatically confusing).  Particularly, he observes counsel stated no objection to CALJIC 8.58.  (*See* RT 5166)

As to CALJIC 3.41, Petitioner notes Martha's underlying geriatric medical conditions and argues their involvement in her death.  (*See* Doc. No. 25 at 290.)  He argues CALJIC 3.41 "should be given where the evidence places in issue two or more causes of the result of the crime."  (Doc. No. 25 at 290 *citing* Use Note to CALJIC 3.41; *see also* claim 18, *ante*.)  He argues the evidence showed Martha suffered serious medical conditions which alone may have caused her death.  (Doc. No. 25 at 289.)  He points to the initial finding of Dr. Dollinger, who performed the autopsy on seventy-nine year old Martha was that she suffered coronary artery disease and died from acute coronary insufficiency. (RT 3260-63.)

CALJIC 3.41 provided that:

> There may be more than one cause of the [death]. When the conduct of the persons contributes concurrently as a cause of the [death], the conduct of each is the cause of the [death] if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the [death] and acted with another cause to produce the [death].

(Doc. No. 25 at 290 n.106.)

Petitioner faults counsel's decision to instruct with the modified CALJIC 8.55, and CALJIC 8.58 in lieu of CALJIC 3.41. (Doc. No. 25 at 291 citing RT 5163-66.) He argues that without CALJIC 3.41, the jury lacked guidance in instances like Martha's where pre-existing conditions of coronary artery disease may have been a proximate cause of death. (Doc. No. 25 at 291.) He argues CALJIC 3.41 could have cured the noted defects in CALJIC 8.55 and 8.58. (*See* claim 18, *ante*.)

Particularly, Petitioner argues CALJIC 8.58 improperly instructed that "proximate cause" was reliant upon a temporal sequence of events. (Doc. No. 25 at 291-93 *citing Roberts*, 2 Cal. 4th at 312 (suggesting CALJIC 8.58 is grammatically confusing).) He argues use of CALJIC 8.58 in combination with the modified CALJIC 8.55 (also a proximate cause instruction) effectively removed Martha's pre-existing medical condition and treatment from juror's proximate cause deliberations. (Doc. No. 25 at 292-93.)

Petitioner argues these deficiencies cumulatively made the instructions confusing and reduced the prosecution's burden of proof resulting in an unfair trial. (*Id.,* citing *Yates*, 500 U.S. at 402; *see also* Doc. No. 95 at 175.)

The California Supreme Court on direct appeal rejected the claim as to CALJIC No. 8.58, stating that:

> Defendant contends that trial counsel provided ineffective assistance in failing to object to the giving of CALJIC No. 8.58. We have determined, however, that the giving of the instruction was not error.

*Catlin*, 26 Cal. 4th at 166.

The record reflects the jury was instructed on proximate cause as follows

CALJIC 8.58

> If a person unlawfully inflicts a physical injury upon another person and that injury is a proximate cause of the latter's death, such conduct constitutes an unlawful homicide even though the injury inflicted was not the only cause of the death. Moreover, that conduct constitutes unlawful homicide even if: 1. The person injured had been already weakened by disease, injury physical condition or other cause, 2. It is probable that a person in sound physical condition injured in the same way would not have died from the injury, 3. It is probable that the injury only hastened the death of the injured person, and 4. The injured person would have died soon thereafter from another cause or other causes.

222

(CT 1966; *see also* Doc. No. 25 at 291-92 n.108.)

CALJIC 8.55 Modified

To constitute murder there must be, in addition to the death of a human being, an unlawful act which was a proximate cause of that death. The proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred. In this case, the prosecution has the burden of proving beyond a reasonable doubt that paraquat poisoning was a proximate cause of Martha Catlin's death. If the evidence in this case fails to prove beyond a reasonable doubt that paraquat poisoning was a proximate cause [of] Martha Catlin's death, Mr. Catlin is entitled to a verdict of not guilty as to Count Two.

(CT 1965.)

Petitioner argues modified CALJIC 8.55, and CALJIC 8.58 taken together removed from the jury's proximate causation considerations the matter of Martha's underlying medical condition and treatment and instead guided the jury toward the timing and sequence of events leading up to Martha's death. He argues these instructions conflicted with the presumption of innocence and lightened the prosecution's burden of proving every element of the charged offense. (Doc. No. 25 at 293 *citing Yates*, 500 U.S. at 402.)

The state supreme court considered and rejected aspects of the claims couched as trial court error on direct appeal, stating that:

Defendant contends that the jury instructions on proximate cause erroneously would have permitted conviction for the murder of Martha even if the jury believed that the principal cause of her death was a circulatory disease.

The court instructed the jury on the issue of proximate cause pursuant to modified versions of former CALJIC Nos. 8.55 and 8.58, as follows: "[¶] To constitute murder, there must be, in addition to the death of a human being, an unlawful act which was the proximate cause of that death. [¶] The proximate cause of a death is a cause which in natural and continuous sequence, produces the death and without which the death would not have occurred. [¶] In this case, the Prosecution has the burden of proving beyond a reasonable doubt that paraquat poisoning was a proximate cause of Martha Catlin's death. If the evidence in this case fails to prove beyond a reasonable doubt that paraquat poisoning was a proximate cause of Martha Catlin's death, Mr. Catlin is entitled to a verdict of not guilty as to Count II. [¶] If a person unlawfully inflicts a physical injury upon another person and that injury is a proximate cause of the latter's death, such conduct constitutes an unlawful homicide, even though the injury inflicted was not the only cause of the death. [¶] Moreover, that conduct constitutes unlawful homicide even if one, the person injured had been already weakened by disease, injury, physical condition or other cause. [¶] Two, it is probable that a person in sound physical condition injured in the same way would not have died from the injury and three, it's probable that the injury only hastened the death of the injured person and four, the

223

injured person would have died soon thereafter from another cause or causes.

Defendant claims that these instructions misstated the law by permitting the jury to return a guilty verdict on a charge of murder if it found concurrent causes of death, even if the criminal act was not a principal cause of death. The law provides, however, that as long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death. Rather, it is required that the cause was a substantial factor contributing to the result: " '[N]o cause will receive judicial recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a substantial factor in bringing about the particular result.' " (*People v. Caldwell* (1984) 36 Cal.3d 210, 220; see also *In re M.S.* (1995) 10 Cal.4th 698, 719-720.)

This is true even if the victim's preexisting physical condition also was a substantial factor causing death. (*People v. Wattier* (1996) 51 Cal.App.4th 948, 953.) "So long as a victim's predisposing physical condition, regardless of its cause, is not the only substantial factor bringing about his death, that condition ... in no way destroys the [defendant's] criminal responsibility for the death." (*People v. Stamp* (1969) 2 Cal.App.3d 203, 210; see also *People v. Wattier, supra*, 51 Cal.App.4th at p. 953; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1523; 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements, § 37, p. 243 ["A defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause"].)

Defendant also contends that the court should have given CALJIC No. 3.41, which states expressly that when there are concurrent causes of death, the defendant's conduct is a proximate cause of death "if that conduct was also a substantial factor contributing to the result."

Even if defendant is correct that the clarifying instruction should have been given, we do not believe it was reasonably probable that its omission affected the verdict. (See People v. Flood, supra, 18 Cal.4th at p. 490.) The evidence was overwhelming that Martha and Joyce died of paraquat poisoning and not from natural causes, and even as to Martha, who had some preexisting physical problems, the evidence was overwhelming that paraquat poisoning was at least a substantial factor in, if not the sole cause of, her death.

Defendant also complains that the instructions the court gave on causation subsequently were criticized by this court in *People v. Roberts* (1992) 2 Cal.4th 271, 311-313. He complains that under the instructions as given, "some jurors may have believed that [he] did an unlawful act which nevertheless did not bring about Martha's death; however, based on the instructions read, those jurors could have erroneously convicted [him] of a capital offense if they concluded Martha's death sequentially followed that act."

We do not believe that under the instructions given, requiring that defendant's act constitute a cause that "produces ... death and without which the death would not have occurred," the jurors reasonably could have concluded that they could convict defendant of the murder of Martha if they believed defendant committed an unlawful act that did not bring about her death, but was only followed temporally by her death. The instructions made it clear that the prosecution had the burden of proving that defendant's administration of paraquat was a cause of Martha's death, not just that it occurred near the time of her death. In fact, as respondent points out, at defendant's request the jury also was instructed on attempted murder to cover just the eventuality posited by defendant here-an attempt to poison Martha that did not cause her death.

As for our criticism of the proximate cause instruction in *People v. Roberts, supra*, 2

Cal.4th 271, we acknowledged a concern previously expressed in *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1050-1051, in the context of another instruction, that the proximate cause instruction placed "undue emphasis on physical or temporal nearness." (*People v. Roberts, supra*, 2 Cal.4th at p. 313.) We had expressed the fear in *Mitchell v. Gonzales, supra*, 54 Cal.3d 1041, that the proximate cause instruction might cause jurors "to focus improperly on the cause that is spatially or temporally closest to the harm." (*Id*. at p. 1052.) But in the present case, as we also explained in *Roberts*, "any such confusion on the jury's part could only benefit defendant," because defendant's act was not necessarily close in time-or place-to the death of each victim. (*People v. Roberts, supra*, 2 Cal.4th at p. 313.)

*Roberts* also recognized that the instruction on proximate cause might be confusing simply because of its poor grammar and the uncertainty of the meaning of the term "proximate cause." (*People v. Roberts, supra*, 2 Cal.4th at p. 313.) We do not believe, however, that these ambiguities in the instruction could have caused a juror to conclude that defendant's act might be a proximate cause of either victim's death simply because it occurred near the time of the death or illness of the victim, even though that juror did not believe that defendant's act caused the death.

Defendant contends that the proximate cause instructions lightened the prosecutor's burden of proof because they "removed from the jury's consideration other factors concerning Martha's medical condition and treatment which should have been considered in the jury's determination of 'proximate cause." He claims a violation of his right to due process of law and to a reliable determination of guilt and penalty.

Defendant does not specify what "other factors" he believes the jury should have been permitted to consider. The instructions did not direct the jury to ignore evidence regarding Martha's poor health or her age. Rather, they asked the jury to determine whether defendant's administration of poison was a cause without which Martha would not have died. The instructions did not relieve the prosecution of any of its burden of proof.

*Catlin*, at 154-157.

Defendant contends that trial counsel provided ineffective assistance in failing to object to the giving of CALJIC No. 8.58. We have determined, however, that the giving of the instruction was not error.

*Catlin*, 26 Cal. 4 th at 166.

The state supreme court reasonably could find the jury was adequately instructed on proximate causation including as to consideration of Martha's pre-existing medical conditions and the sequence of events leading up to her death, for the reasons stated by that court.

"Although the Constitution does not require jury instructions to contain any specific language, the instructions must convey both that a defendant is presumed innocent until proven guilty and that he may only be convicted upon a showing of proof beyond a reasonable doubt." *Gibson v. Ortiz*, 387 F.3d 812, 820 (9th Cir. 2004) (overruled on other grounds by *Byrd v. Lewis*, 566 F.3d 855, 866 (9th Cir.

2009)).  "Any jury instruction that reduces the level of proof necessary for the Government to carry its burden is plainly inconsistent with the constitutionally rooted presumption of innocence."  *Id.*  "Any challenged instruction must be considered in light of the full set of jury instructions and the trial record as a whole."  *Id.* at 821.

Any state law instructional error is not alone a basis for federal habeas relief.  *Dunckhurst*, 859 F.2d at 114.  The instructions given required the jury find Petitioner's criminal acts were a substantial factor contributing to Martha's death even if her allegedly predisposing medical conditions also contributed.  The instructions reasonably did not suggest temporal proximity alone constituted proximate cause.  Moreover, the jury was required to make it findings of the essential elements of the charged crimes beyond a reasonable doubt.   (*See* CT 1955.)

Additionally, the state supreme court reasonably could find the evidence that Martha died from paraquat poisoning was substantial.  (*See* e.g., claims 30 and 31, *post.*)

### ii.      Prejudice

Even if counsel was deficient as alleged, Petitioner has not demonstrated prejudice under *Strickland* that at least one juror would have had a reasonable doubt in the outcome, for the reasons stated.  The state supreme court reasonably could find that Petitioner failed to show the evidence before the jury reasonably was insufficient to support substantial concurrent causation by paraquat poisoning.  (*Id.*)

Counsel's failure to make a non-meritorious objection to, or request for instructions is not deficient conduct.  *See Fretwell*, 506 U.S. at 374 (counsel's failure to make a meritless objection is not prejudicial under *Strickland*).

### iii.      Conclusions

The state supreme court reasonably rejected claimed ineffective assistance by failure to object to and request guilt phase jury instructions.

It does not appear that the California Supreme Court's rejection of claims 26(K) and (L) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).  ]

Claims 26(K) and (L) shall be denied.

12.    Claim 26(N)

Petitioner alleges that counsel was ineffective by failing to litigate the prosecution's violation of the trial court's order recusing the Kern County District Attorney's Office.   (Doc. No. 25 at 294-98.)

### a.    State Direct and Collateral Review

Petitioner raised the claim in the first state habeas petition which was summarily denied on the merits.  (Order No. S090636.)

Petitioner raised the claim in the second state habeas petition and it was denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*).  (Order No. S173793.)

### b.    Analysis

#### i.    *Deficient Performance*

Petitioner revisits his claim 24 (prosecutorial misconduct) allegations, here couched as ineffective assistance of counsel and faults counsel for failing to press for a favorable ruling of his pre-trial motion seeking enforcement of the trial court's prior order recusing the Kern County District Attorney's Office.  (Doc. No. 25 at 294-95 *citing* RT 59-66.)

As noted, the record shows that prior to voir dire in the Kern County proceeding, defense counsel stated that:

> I have a concern that . . . I will put it in the form of a motion. The motion would be to limit Mr. Witt's [the Deputy Attorney General prosecuting the case for the People] contact with members of the Kern County District Attorney's Office, and specifically Investigator Walter Newport . . . There was a motion to recuse, which was granted, which was litigated on appeal, was affirmed . . . I believe that Mr. Witt is still basically using the services of the District Attorney's Office, . . . basically [he] has set up a temporary office in the office that's been recused. It's a concern to me in light of the fact that the office was recused. More (sic) specific concern is contact between Mr. Witt and Mr. Newport.

(RT 59-60.)

The trial court deferred and never ruled on the motion.  (RT 66.)  Petitioner argues counsel effectively abandoned a meritorious motion.  He observes the trial court's recusal order had been affirmed on state appeal and was law of the case.  (Doc. No. 25 at 296.)  He complains principally that investigator Newport continued to liaise between Felice and Witt, contrary to the recusal order.  (Doc. No. 25 at 296.)

Petitioner argues that as a result prosecutor Witt continued to receive cooperation and unspecified

227

confidential (attorney-client) information from the Kern County District Attorney's Office and in particular from investigator Newport. (*See* Doc. No. 25 at 294-95 *citing* RT 62-64, Penal Code § 1424 (a motion to recuse a prosecuting attorney shall be granted where there is evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial); *see also* CT 1781A.) Petitioner observes evidence in the record that Newport interviewed a witness and wrote a report more than one year after his office had been recused. (Doc. No. 25 at 295 *citing* 1SHCP Ex. 17.)

The state supreme court rejected the allegation on direct appeal, stating that:

> Defendant claims that his attorney's failure to press for a ruling on the issue of the alleged violation of the order recusing the Kern County District Attorney's Office constituted ineffective assistance of counsel. This violation must fail in the absence of any evidence suggesting prejudice.

*Catlin*, at 166.

For the reasons stated by that court and as discussed in claims 24 and 25 above and summarized here, counsel reasonably could have determined not to pursue the oral motion for enforcement of the recusal order. Petitioner has not supported his argument that Witt contravened the recusal order. As noted, the trial court explained recusal was motivated by the need to isolate Baird and Newport from Felice. The Court of Appeal for the Fifth Appellate District in affirming the recusal order in an unpublished November 8, 1989 decision also found the need for isolation was the basis for the recusal. (*See* SCT Vol. IX-B at 3-11.)

During the 1988 recusal hearing, Felice and Newport testified that no confidential information had been passed or would be passed. (8/23/88 RT 17.) Witt, prior to trial, confirmed that he had not and would not have any contact with Felice and that Newport had not disclosed any information about Petitioner received from Felice. (RT 3274.) The isolation of Felice from Petitioner's proceeding required by the trial judge reasonably was meant to ensure Baird and Newport would not become tainted by Felice.

Petitioner's suggestion that Witt, upon replacing Baird as prosecutor somehow became tainted by his alleged use of Kern County District Attorney offices and resources is supported only by speculation. Petitioner does not demonstrate how Witt's alleged use of Kern County District Attorney offices, office

resources, and investigator Newport impinged upon the isolation upon which recusal was based. Evidence in the record suggested that no confidential information was received or imparted by deputy district attorney Felice or investigator Newport regarding Petitioner's proceeding. (*See* claim 24, ante; *see also* RT 4-28, 59-67.)

### ii. Prejudice

Even if counsel was deficient as alleged, Petitioner has not demonstrated prejudice under *Strickland* that at least one juror would have had a reasonable doubt in the outcome, for the reasons stated. The state supreme court reasonably could find that Petitioner failed to show the ongoing violation of the recusal order and prejudice therefrom.

Counsel's failure to make or renew a non-meritorious motion is not deficient conduct. *See Fretwell*, 506 U.S. at 374 (counsel's failure to make a meritless objection is not prejudicial under *Strickland*).

### iii. Conclusions

The state supreme court reasonably rejected claimed ineffective assistance by failure to litigate the prosecution's violation of the trial court's order recusing the Kern County District Attorney's Office.

It does not appear that the California Supreme Court's rejection of claim 26(N) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).]

Claim 26(N) shall be denied.

13. Claims 26(O) and 27

Petitioner alleges that counsel was ineffective by failing to investigate, develop, and present evidence of his incompetency and mental impairments (i.e. claim 26(O)) and consult appropriate mental health experts to assist with guilt and penalty phase mental state defenses (i.e. claim 27). (Doc. No. 25 at 298-302; 309-16.)

### a. State Direct and Collateral Review

Petitioner raised the claims in the first state habeas petition on Fifth, Sixth, Eighth, and Fourteenth

Amendment grounds and they were summarily denied on the merits. (Order No. S090636.)

Petitioner raised the claims in the second state habeas petition and they were denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*). (Order No. S173793.)

**b.     Analysis**

*i.     Deficient Performance*

Petitioner alleges that counsel was ineffective by failing to retain competent mental health professionals and investigate his competency to stand trial, admit guilt, give knowing and intelligent and voluntary waivers of constitutional rights, and develop mental state defenses. (Doc. No. 25 at 298-311; *see also Ake v. Oklahoma*, 470 U.S. 68, 83 (1985); Evid. Code § 730 (trial court has authority to appoint expert when it appears that expert evidence is or may be required); Penal Code § 987.9 (regarding capital defense funding for indigent defendants).

Petitioner argues his alleged family history of mood disorder and depression suggested predisposition to mental health issues. (Doc. No. 25 at 300.) He argues his alleged personal history of abandonment, poverty, mood disorder, closed brain injury secondary to workplace exposure to pesticides, fuels, solvents, neurotoxins and trauma from unspecified car racing accidents exacerbated by addiction to alcohol and drugs, and psychological and sexual abuse and molestation placed him at risk for mental health issues. (Doc. No. 25 at 300-13; 1SHCP Ex. 199.)

Petitioner relies upon habeas neuropsychologist, Dr. Natasha Khazonov, who opined the noted risk factors left Petitioner moderately brain impaired at the time of his arrest, the crimes and the trials. (Doc. No. 25 at 300 *citing* 1SHCP Ex. 199.) Dr. Khazanov opined Petitioner then suffered organic brain (frontal lobe) damage variously affecting his memory and ability to plan. (*Id.*) Dr. Khazanov opined serious long-standing neuropsychological impairments that would have affected numerous areas of functioning during much of Petitioner's adult life including at the time of the crimes and his trials. (Doc. No. 25 at 311.) Dr. Khazanov opined behavioral and memory deficits that were not immediately obvious precluded Petitioner's formation of the mental states necessary for the charged offenses. (Doc. No. 25 at 311-12; Ex. 199 at ¶¶ 14-40.)

**(1)     Defense Investigation**

The state supreme court reasonably could find counsel adequately investigated Petitioner's

psychosocial history and made a reasoned and strategic decision not to further investigate and present such matters.

As noted, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "[A] lawyer may make reasonable decisions that render particular investigations unnecessary." *Babbit v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998). Counsel is not put to further investigation where reasonable initial investigation suggests such would not bear fruit. *See Hensley v. Crist*, 67 F.3d 181, 186 (9th Cir. 1995). In *Hensley*, the Ninth Circuit recognized that a petitioner must show that counsel was somehow put on notice to investigate a particular matter. 67 F.3d at 186; *see also Langford v. Day*, 110 F.3d 1380, 1387 (9th Cir. 1997) (citing *Strickland*, 466 U.S. at 691) (the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."); *Dyer v. Calderon*, 113 F.3d 927, 941 (9th Cir. 1997) (vacated on other grounds 151 F.3d 970 (9th Cir. 1998) (petitioner never told attorney that he smoked PCP, and doctors were also unaware, so no need to investigate despite current declarations).

The Ninth Circuit has observed that:

> Under *Ake*, a defendant is entitled to an independent psychological examination to assist in his defense during "a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness." 470 U.S. at 83, 105 S.Ct. 1087. Under our precedent, the right to a mental health expert is not limited to when the state presents evidence of future dangerousness. *Williams v. Ryan*, 623 F.3d 1258, 1268–69 (9th Cir. 2010) ("[O]ther circuits have interpreted *Ake* to require a state to provide a defendant expert psychiatric assistance at sentencing only where the state also planned to rely on psychiatric testimony. Yet, we have never read *Ake* so narrowly."). Indeed, "[w]here the mental health of an accused person is genuinely in issue, due process requires the opportunity to have an independent mental health expert to assist the defense." *Williams v. Stewart*, 441 F.3d 1030, 1049 (9th Cir. 2006).

*Ramirez v. Ryan*, 937 F.3d 1230, 1248-49 (9th Cir. 2019).

Here, counsel observed Petitioner in and out of court including during his trial testimony, reviewed his adoption file and institutional and criminal histories, and interviewed percipient witnesses. (*See* claim 35, *post*.)

Petitioner has not pointed to facts in the record and habeas proffer suggesting counsel reasonably was on notice of the need to further investigate Petitioner's mental state.

Petitioner's sociopsychological and life histories and level of functionality reasonably did not place counsel on notice of organic and psychological impairment or noticeable cognitive or functional deficits. Significantly, Petitioner then had not been diagnosed or treated for mental health issues and his IQ testing and level of functionality belied such issues. (*See* claim 35.) Notably, neither the trial court nor counsel raised a doubt regarding Petitioner's ability to follow proceedings in court and assist counsel in the defense and conduct himself appropriately in court.

**(2)    Competency**

The state supreme court reasonably could find counsel was not deficient by failing to raise a doubt as to testimonial and trial competency.

"A criminal defendant may not be tried unless he is competent." *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *accord Medina v. California*, 505 U.S. 437, 439 (1992). The trial or conviction of a person who is legally incompetent is a substantive due process violation. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *see also Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010) (quoting *Robinson*, 383 U.S. at 378) ("It is undisputed that 'the conviction of an accused person while he is legally incompetent violates due process.'").

"[T]he standard for competence to stand trial is whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960); *see Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997) (whether defendant is competent is dependent upon any evidence of irrational behavior, his demeanor in court, and relevant medical opinions).

Testimonial competence requires "a sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue." *District of Columbia v. Arms*, 107 U.S. 519, 521-22 (1883); *see also* Evid. Code § 701 (regarding disqualification of witnesses).

Here, the defense investigation and Petitioner's conduct and demeanor prior to and during trial and testifying from the stand did not reasonably raise a doubt he was unable to rationally understand and assist in his defense. Petitioner's extensive trial testimony appeared coherent, circumspect, at time

confrontational, and grounded in the factual record. (RT 4767-5028.) His testimony reflected an understanding of the proceedings in court, an ability to testify from recollection in furtherance of the defense, and an understanding he was under oath at trial. (RT 4767-5028); *see also Moran*, 509 U.S. at 396.

Furthermore, for the reasons discussed below, Petitioner's undiscounted psychosocial history does not suggest he was ever diagnosed or found incompetent, or that his competency had been or reasonably could have been placed in doubt. Notably, neither the trial court nor counsel raised a doubt regarding Petitioner's ability to follow proceedings in court and assist counsel in the defense and conduct himself appropriately in court.

The state supreme court reasonably could find Petitioner failed to rebut the presumption of trial competency. *See Medina*, 505 U.S. at 446.

### (3) Mental State Defenses

The state supreme court reasonably could find counsel was not deficient by failing to raise a guilt phase defense that Petitioner lacked the mental state required for intentional murder by the administration of poison, malice, deliberation and premeditation, and to admit culpability for the crimes. (Doc. No. 25 at 301.)

The question under *Strickland* is whether, on the facts and circumstances known to counsel, the decision not to further investigate, develop and present mental defenses was objectively reasonable. For the reasons discussed above and below, it was.

As noted, the primary guilt phase defense theory was that Petitioner was not involved in the deaths of Joyce and Martha. The state supreme court reasonably could find further mental state investigation and development of guilt phase mental state defenses would undermine the guilt phase defense theory.

Furthermore, the record and habeas proffered evidence only thinly supports mental state defenses. (*See* claim 35, *post*; *see also Wallace v. Stewart,* 184 F.3d 1112, 1118 (9th Cir. 1999)) (counsel not ineffective at guilt phase by failing to provide facts of mental dysfunction to defense experts where the evidence was insufficient to show lack of trial competency or credible insanity defense).

The state supreme court reasonably could discount Dr. Khazanov's *post hac* opinions rendered sixteen years after the crimes and ten years after the trial. Her opinions, unsupported in Petitioner's

prior mental health history, contravene the more contemporaneous opinion of the Dr. Errol Leifer, Ph.D. Dr. Khazanov acknowledged a 1986 psychological examination of Petitioner by Dr. Leifer found no evidence of organic brain pathology. (1SHCP Ex. 199 ¶ 34.) Moreover, Dr. Khazanov's attempt to distinguish Dr. Leifer's opinion based upon testing methodology does not address Petitioner's seeming lack of functional deficits at the time of the crimes and trial. Dr. Khazanov herself observed that Petitioner had consistently been reported to be of average to high average intelligence with one IQ test returning results in the superior intelligence range. (1SHCP Ex. 199 at ¶ 16.)

Counsel was entitled to formulate a strategy that was reasonable at the time consistent with effective trial tactics and strategies. *Richter,* 562 U.S. at 107. "[T]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough,* 541 U.S. at 8. Applying that standard here, it is significant that Petitioner's conduct and demeanor did not raise doubts as to competency with counsel or the trial court. Also, Petitioner testified extensively and coherently at trial. (RT 4767-5028.) Notably, neither petitioner nor counsel proffered a declaration in support of ineffective assistance of trial counsel.

Additionally, the state supreme court reasonably could reject the allegation that counsel's failure to develop and present mental state defenses at the guilt phase impaired Petitioner's penalty phase defense. (Doc. No. 25 at 310.) Counsel investigated mental state evidence and presented mitigating evidence. (*See* claim 35.) The state supreme court reasonably could find counsel's decision not to present mental state evidence at the penalty phase was strategic and not deficient, for the reasons stated *ante* and *post*. (*See id.*)

### ii. Prejudice

Petitioner argues that absent counsel's allegedly deficient conduct, he might have found incompetent for trial, or at least one juror might have entertained a reasonable doubt that he could plan and carry out the killings or even form the mental state for the crimes, such that he would not have been convicted and sentenced to death. (*See* Doc. No. 25 at 309, 314.)

However, a petitioner faces a higher burden of showing prejudice at the guilt phase than at his death penalty sentencing. *See Raley*, 470 F.3d at 802 ("The bar for establishing prejudice is set lower in death-penalty sentencing cases than in guilt-phase challenges and noncapital cases.").

The Ninth Circuit has emphasized that a court is "particularly likely to find prejudice from a failure to present a mental defense "where the defense that was presented at trial was weak or meritless." *Daniels v. Woodford*, 428 F.3d 1181, 1207 (9th Cir. 2005); *see also Seidel v. Merkle*, 146 F.3d 750, 755–56 (9th Cir. 1998) (holding that petitioner was prejudiced where "trial counsel failed to conduct any investigation at all into his client's psychiatric history and therefore neglected to pursue a potentially successful defense" at the guilt phase).

Here, even if counsel had raised an incompetency defense, the state supreme court reasonably could find Petitioner failed to demonstrate by a preponderance of the evidence that he was then incompetent, for the reasons stated. *Hayes v. Woodford*, 301 F.3d 1054, 1078 at n.28 (9th Cir. 2002) (citing *Simmon v. Blodgett*, 110 F.3d 39, 41 (9th Cir. 1997)) (*rehearing en banc Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005)) (panel decision reversed on other grounds).

Additionally, that court reasonably could find mental state defenses lacked factual support and served to undermine the primary trial defense, so not to suggest a reasonably probability of a different result, for the reasons stated. Petitioner's further argument that his condition at the time of the offenses was admissible to establish that he did not "harbor[] malice aforethought," possibly reducing the charged murder to manslaughter based on the absence of the required mental state reasonably appears unavailing. (*See* Doc. No. 95 at 180 citing Penal Code § 28.)

Petitioner acknowledged that he was charged with first-degree murder in circumstances where specific intent is an element of the defense but is conclusively presumed where the murder is by poison. (*Id.*; *see also Boyde v. Brown*, 404 F.3d 1159, 1168-69 (9th Cir. 2004), amended by 421 F.3d 1154 (9th Cir. 2005) (holding that if new mental health evidence, obtained after the trial, were sufficient to establish the petitioner's innocence, the petitioner could "always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion").

*iii.    Conclusions*

The state supreme court reasonably rejected claimed ineffective assistance by failure to investigate, develop, and present evidence of his incompetency and mental impairments, and consult with appropriate mental health experts to assist with the guilt and penalty phase mental state defenses.

It does not appear that the California Supreme Court's rejection of claims 26(O) and 27 was

235

contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claims 26(O) and 27 shall be denied.

14.    Claim 26(P)

Petitioner alleges that counsel was ineffective by failing to assert the constitutional basis for guilt phase objections.  (Doc. No. 25 at 302-03.)

**a.    State Direct and Collateral Review**

Petitioner raised the claim in the second state habeas petition and it was denied on procedural grounds.  (Order No. S173793.)

**b.    Analysis**

*i.    Deficient Performance*

Petitioner argues that trial, appellate and habeas counsel were ineffective to the extent any constitutional and international law objections available at the guilt phase were not then raised.   (Doc. No. 25 at 302.)   Particularly, he argues counsel failed to articulate and waived constitutional grounds for objecting to evidence of prior crimes discussed in claim 1 above.  (*See* Doc. No. 95 at 97-98.)

Here, Petitioner does not identify unasserted meritious constitutional and international law bases for guilt phase objections.

Additionally, Petitioner has no right to effective assistance of habeas counsel.  *Coleman*, 501 U.S. at 752 (no right to counsel beyond first appeal as a matter of right).

In any event, upon *de novo* review, the claim lacks merit, for the reasons stated.  (*See* claims *ante* and *post*; *see also Engle v. Isaac*, 456 U.S. 107, 134 (1982) ("[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.").

*ii.    Prejudice*

Even assuming arguendo that counsel was deficient as alleged, Petitioner has not demonstrated prejudice under *Strickland* in the form of a reasonable probability of a different outcome.  Petitioner has not shown that absent counsel's allegedly deficient conduct, at least one juror would have had a

reasonable doubt in the outcome. He does not sufficiently allege constitutional error, for the reasons stated. (*See* claims *ante* and *post*.)

### iii.     Conclusions

Petitioner fails to demonstrate upon *de novo* review that counsel was ineffective by failing to assert the constitutional basis for guilt phase objections.

For the reasons stated, claim 26(P) shall be denied.

15.     Claims 26(Q) and 34

Petitioner alleges that counsel was ineffective by conferring with a Fresno County prosecutor who represented Petitioner in the Monterey County proceeding (i.e. claim 26(Q)) and who was herself conflicted (i.e. claim 34). (Doc. No. 25 at 303-06, 361-66.)

### a.     State Direct and Collateral Review

Petitioner raised claim 26 in the second state habeas petition which was denied on procedural grounds. (Order No. S173793.)

Petition raised claim 34 was raised in the first state habeas petition and denied on the merits by the California Supreme Court. (Order No. S090636.)

Petitioner raised claim 34 in his second state habeas petition and it was denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*). (Order No. S173793.)

### b.     Analysis

### i.     Deficient Performance

### (1)     Trial Counsel's Conflict

Petitioner alleges that counsel in the Kern County proceeding was ineffective as conflicted due to consultations with Nancy Craddock, then a deputy district attorney with Fresno County and previously Petitioner's counsel in the Monterey proceeding. He argues that counsel discussed the investigation and trial strategy and relied upon Craddock's work product and client confidences. (Doc. No. 25 at 303-05; *see also Wood v. Georgia,* 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."); *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980) (a defendant who failed to object to conflicted representation at trial must "demonstrate that an actual conflict of interest adversely affected his lawyer's

performance.").

The Supreme Court has defined an "actual conflict" by the effect a potential conflict had on counsel's performance. *Houston v. Schomig*, 533 F.3d 1076, 1081 (9th Cir. 2008) (citing *Mickens v. Taylor,* 535 U.S. 162, 171 (2002)).

On *de novo* review, the claim 26(Q) allegation lacks merit. Petitioner has not identified Supreme Court authority or facts in the evidentiary record that counsel's communication with and review of the file of Petitioner's prior counsel in the Monterey proceeding gave rise to divided loyalties or compromised client confidences and strategies in the Kern County proceeding. (See Doc. No. 25 at 303-06.) Nor has he pointed to facts suggesting counsel's handling of the matter was adversely affected by the alleged conflict. *Sullivan*, 446 U.S. at 350.

Moreover, Petitioner's rehash of his claims relating to deputy attorney general Witt's alleged improper contacts with the Kern County District Attorney's Office falls short, for the reasons stated. (*Id.; see also* claims 24-26(N), *ante*.)

To the extent Petitioner alleges prosecutor Witt may have gained some advantage in the Kern County case by virtue of Craddock's involvement with the defense team, the allegation is unsupported in the evidentiary record. (*Id.*; *see also* Doc. No. 25 at 366.)

### (2) Monterey Counsel's Conflict

Petitioner alleges Craddock represented conflicting interests during his Monterey County proceeding, tainting the defense in the Kern County proceeding and invalidating the separate Kern County conviction and sentence. (Doc. No. 25 at 306, 361-66; *see also* Doc. No. 95 at 181-82, 191.)

Petitioner argues Craddock, then a Fresno County Public Defender and co-defense counsel in the Monterey proceeding, created an actual conflict of interest by applying for a job with the Fresno District Attorney's Office, the prosecuting agency in Glenna's death, while representing Petitioner. (*See* Doc. No. 25 at 361-63 citing *People v. Steven David Catlin*, Fresno Case No. 327088-1, Monterey Case No. CR 11388; *see also Sullivan*, 446 U.S. at 348 (a defendant who fails to object to conflicted representation at trial must "demonstrate that an actual conflict of interest adversely affected his lawyer's performance."). He surmises that "[Craddock] did not vigorously investigate and present a solid defense" in the Monterey proceeding because she wanted to please her prospective future employer. (Doc. No. 25

at 364.)

However, that states supreme court reasonably reject claim 34 by finding Petitioner failed to demonstrate on the factual record that Craddock's personal interest in employment with the Fresno County District Attorney threatened or affected her loyalty to Petitioner in a way that adversely affected her representation of him. Craddock's future employment plans did not alone create an actual conflict. *See Garcia v. Bunnell,* 33 F.3d 1193, 1198-99 (9th Cir. 1994) (future job with the prosecutor's office not a conflict). Even if arguendo Craddock was so conflicted, Petitioner has not alleged that his co-counsel in the Monterey County proceeding was similarly burden by conflict such that Petitioner was constructively denied counsel in that proceeding.

The state supreme court reasonably could find Petitioner's related argument that counsel in the Kern County proceeding relied upon Craddock's tainted work produced by "adopt[ing] Craddock's investigation and strategic decisions as their own without question" necessarily fails, for the reasons stated. (*See* Doc. No. 25 at 363-64.)

The state supreme court reasonably could reject Petitioner further argument that Craddock, then a Fresno County deputy district attorney, invaded the Kern County defense team camp through unspecified conversations with an unidentified defense investigator. Petitioner suggests the investigator disclosed "confidential information regarding Petitioner's birth and witnesses who knew Martha, his adoptive mother and one of the alleged Kern victims" based upon Craddock's incorrect statement she was "still the attorney of record" and "cannot disclose anything she is told." (Doc. No. 25 at 364.) He suggests Craddock shared defense camp information with the prosecution in the Kern County case.

Still, Petitioner has not pointed to evidentiary facts that Craddock received confidential Kern County case information at a time she did not represent Petitioner. (*See* Doc. No. 25 at 361-66.) Even if arguendo Craddock received such information, Petitioner has not pointed to evidentiary fact that such information was communicated to prosecutor Witt. (*Id.*)

Petitioner alleges that the Fresno Public Defender had a further potential conflict because that office and Craddock in particular had represented Jerald Volz, "a jailhouse snitch who testified at the Kern preliminary hearing as part of an alleged deal with the Fresno Sheriff's Department[.]" (Doc. No.

25 at 364; *see also* Ex.'s 76, 100 at 85-88; CT 1260-1301.)  Petitioner argues that although Volz did not testify in the Monterey proceeding, he was an important witness because he had seen Hardin talking with Petitioner and had talked with Hardin about Petitioner's case.  (Doc. No. 25 at 365.)  Petitioner argues Craddock was conflicted because she continued to represent him in the Monterey case even though she had represented Volz.  (Doc. No. 25 at 365 citing 1SHCP Ex. 100 at 85-88; CT 1260-1303.)

However, the record reflects the conflict issue involving Volz was the subject of a hearing in the Fresno proceeding whereupon that court acknowledged the prosecutor's statement that Volz would not be called as a witness and determined that no conflict existed; Craddock continued representation of Petitioner at the request of the Monterey trial court.  (1SHCP Ex. 100 at 85-93.)  Volz did not testify at the Kern County trial.  (*Id.; see also* RT i-iv.)

Petitioner has not shown Craddock's alleged discussions with the Kern County defense team created in her an attorney client relationship in that proceeding.

To the extent the prior Monterey County conviction was the basis for a special circumstance in the Kern County proceeding, the record shows that Petitioner stipulated to that conviction.  (*See* CT 2025.)

Notably, Craddock did not provide a habeas declaration in support of the claim.

ii.     *Prejudice*

Even if counsel was deficient as alleged, the state supreme court reasonably could find no prejudice.

As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

However, an exception exists for cases in which counsel actively represents conflicting interests.  *Mickens*, 535 U.S. at 166; *Sullivan*, 446 U.S. at 345-50.  In such a case, prejudice is presumed.  *Id.*

To the extent the presumed prejudice standard does not apply, Petitioner must meet the *Strickland* prejudice standard by establishing a reasonable probability that, but for counsel's deficient conduct, the result of the proceedings would have been different.  *See Strickland,* 466 U.S. at 694; *see also Chaidez v. Knowles*, 258 F. Supp. 2d 1069, 1082-83 (N.D. Cal. 2003), *aff'd*, 111 F. App'x 899 (9th Cir. 2004)

240

(*Strickland* applicable where no constructive denial of assistance of counsel).

Here, on *de novo* review, Petitioner has not demonstrated presumptive or *Strickland* prejudice relating to the alleged conflict of trial counsel. Petitioner has not shown constructive denial of counsel due to conflicting interests, for the reasons stated. *See Cronic*, 466 U.S. at 658 (a presumption of prejudice is warranted if the failures of counsel make the adversary process presumptively unreliable).

Petitioner has not shown *Strickland* prejudice by pointing to evidentiary facts of acts or omissions by counsel as a result of the alleged involvement of Craddock that adversely affected the guilt phase defense. (*See* Doc. No. 25 at 303-06.) He has not pointed to facts suggesting counsel's handling of the matter otherwise was adversely affected by the alleged conflict. *Sullivan*, 446 U.S. at 350. He has not pointed to facts suggesting prosecutor Witt gained some advantage in the Kern County case by virtue of Craddock's alleged prior involvement with the defense team.

Additionally, the state supreme court reasonably could find Petitioner failed to show presumptive or *Strickland* prejudice relating to the alleged conflict of Monterey County counsel. That court reasonably could find Petitioner has not shown the alleged conflict of Craddock constructively denied him counsel in the Kern County proceeding, for the reasons stated above. *Cronic*, 466 U.S. at,658. Moreover, that court reasonably could find Petitioner has not demonstrated *Strickland* prejudice by pointing to evidentiary facts of acts or omissions by Kern County counsel as a result of the alleged conflict of Craddock that adversely affected the guilt phase defense. (*See* Doc. No. 25 at 303-06.) He has not pointed to facts suggesting counsel's handling of the matter otherwise was adversely affected by the alleged conflict. *Sullivan*, 446 U.S. at 350. He has not pointed to facts suggesting prosecutor Witt gained some advantage in the Kern County case by virtue of Craddock's alleged prior involvement with the defense team.

In sum, on *de novo* and deferential review, Petitioner has not established presumed prejudice in this proceeding from a constructive denial of counsel in either proceeding; or prejudice under *Strickland* that absent the allegedly deficient conduct of counsel in both proceedings there is a reasonable probability at least one juror would have had a reasonable doubt in the guilt phase verdict in this proceeding.

iii.     Conclusions

Claim 26(Q) ineffective assistance by conflict of interest from conferring with Craddock fails on

241

*de novo* review.

The state supreme court reasonably rejected claim 34 ineffective assistance relating to Craddock's alleged conflict in the Monterey proceeding and prior adjudication.

For the reasons stated, the state supreme court reasonably could find counsel in the Kern County proceeding was not ineffective by virtue of alleged conflicts in and contact with Craddock.

Accordingly, it does not appear that the California Supreme Court's rejection of claim 34 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claims 26(Q) and 34 shall be denied.

16.    Claims 26(R), 39 and 56

Petitioner alleges that trial counsel was ineffective through the cumulative prejudicial effect of his noted deficiencies, complete breakdown in the attorney-client relationship, and failure to act as a zealous advocate (i.e. claims 26(R) and 39), and that appellate and habeas counsel were ineffective to the extent they failed to raise such claims (i.e. claim 56). (Doc. No. 25 at 306-08, 443-44, 518-20.)

**a.    State Direct and Collateral Review**

Petitioner raised aspects of claims 26 (R) and 56 on direct appeal which were denied on the merits. *Catlin*, 26 Cal. 4th at 166.

Petitioner raised claim 26(R) in the second state habeas petition and it was denied on the merits and on procedural grounds. (Order No. S173793.)

Petitioner raised aspects of claim 39 in the first state habeas petition which was denied on the merits. (Order No. S090636.)

Petitioner raised claim 39 in the second state habeas petition which was denied on the merits. (Order No. S173793.)

Petitioner raised claim 56 in the second state habeas petition and it was rejected on procedural grounds. (Order No. S173793.)

**b.    Analysis**

*i.    Deficient Performance*

Petitioner alleges counsel's deficiencies discussed *ante* and *post* resulted in a complete breakdown in the adversarial process, depriving him of counsel, constituting structural error. (Doc. No. 25 at 443 *citing Cronic*, 466 U.S. at 659-66 (no showing of prejudice required where counsel fails to subject the prosecution's case to meaningful adversarial testing). Particularly, he alleges that counsel failed to subject the prosecution case to meaningful adversarial testing and effectively abandoned him, resulting in presumptive prejudice. (*See* Doc. No. 25 at 443 citing *Cronic*, 466 U.S. at 648, 659.)

Petitioner purports to incorporate by reference all the claims in the petition with specific reference to Claims 1-13, 24, 26 and 35. (*See* Doc. No. 25 at 443, 518-19; *see also* SECT 2254 Rule 2 (habeas petition must state the facts supporting each ground).

Particularly, Petitioner argues that cumulative prejudice from counsel's deficient conduct: (i) impacted his ability to impeach Hardin, (ii) impacted his ability to respond to forensic tissue evidence, (iii) resulted in the admission of a bottle of paraquat bearing his fingerprint where it was seized in violation of his constitutional rights, (iv) resulted in his inability to meaningfully challenge fingerprint evidence, (v) resulted in a trial that occurred in a prejudicial venue and that was conducted outside of the presence of the public, (vi) resulted in a continuing violation of the court's recusal order, and (vii) resulted in a failure to present mental disease evidence which it is reasonably likely would have raised a reasonable doubt as to Petitioner's state of mind.

"Although individual errors looked at separately may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial as to require reversal." *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993). "In reviewing for cumulative error, the court must review all errors preserved for appeal and all plain errors." *Id.* "[T]he combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle*, 505 F.3d at 927; *see also Chambers*, 410 U.S. at 302. Cumulative error warrants habeas relief where the errors "so infected the trial with unfairness," *DeChristoforo*, 416 U.S. at 643, as to have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637.

Here, to the extent Petitioner argues the individual and cumulative effect of alleged ineffective assistance resulted in an unfair trial and unreliable verdict and prejudice under *Strickland, (see* Doc. No. 25 at 307, 518), the California Supreme Court rejected aspects of the allegation on direct appeal,

stating that:

> Defendant contends that the cumulative effect of the above instances of asserted incompetence of defense counsel establish prejudice. We disagree on the basis of the record before us.

*Catlin*, at 166. That court reasonably reject these allegations and claims 26(R) and 39 because the predicate incorporated claims upon which he relies lack merit, for the reasons stated *ante* and *post*. (See claims 1-13, 24, 26 and 35.)

Claim 56 lacks merit on *de novo* review, for the reasons stated. (*Id.*)

In sum, there are no constitutional errors to cumulate. *Parle*, 505 F.3d at 928 (citing *Donnelly*, 416 U.S. at 643.)

### ii. Prejudice

Even if counsel was deficient as alleged, Petitioner has not demonstrated prejudice under *Strickland* in the form of a reasonable probability of a different outcome, or actual, presumed, or structural error as applicable, for the reasons stated.

### iii. Conclusions

Claim 56 alleging cumulative ineffective assistance of trial, appellate, and habeas counsel fails on *de novo* review.

The state supreme court reasonably rejected claims 26(R) and 39 alleging cumulative ineffective assistance.

For the reasons stated, the state supreme court reasonably could find counsel in the Kern County proceeding was not ineffective through the cumulative prejudicial effect of the alleged deficiencies, complete breakdown in the attorney-client relationship, and failure to act as a zealous advocate. (i.e. claims 26(R) and 39).

Accordingly, it does not appear that the California Supreme Court's rejection of claims 26(R) and 39 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claims 26(R), 39 and 56 shall be denied.

**E.     Claims Alleging Trial Court Error at the Penalty Phase**

1,     Legal Standard

Trial court error violates due process where it renders the resulting criminal trial fundamentally unfair.  *Chambers*, 410 U.S. at 294, 303.

In evaluating a claim of instructional error, a single instruction is not viewed in isolation, but rather in the context of the overall charge.  *Spivey*, 194 F.3d at 976.  "[T]he proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the challenged instruction [in an unconstitutional manner].  *Boyde,* 494 U.S. at 380.

Additionally, a reviewing court does not engage in a technical parsing of the instruction's language, but instead approaches the instructions in the same way that the jury would -- with a "commonsense understanding of the instructions in the light of all that has taken place at the trial."  *Johnson*, 509 U.S. at 368.  Lastly, federal courts presume that juries follow instructions, including cautionary instructions.  *Weeks*, 528 U.S. at 234; *see also Boyde*, 494 U.S. at 381-85; *Tan*, 413 F.3d at 1115.

Any error in the state court's determination of whether state law supported an instruction in this case cannot form the basis for federal habeas relief.  *See McGuire*, 502 U.S. at 71 ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules").

Even if constitutional instructional error has occurred, the federal court must still determine whether petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.  A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given.  *Clark*, 450 F.3d at 916.

2.     Claim 37

Petitioner alleges that the trial court conducted the entire trial under a mistake of law which confused the jury, presented them with differing evidence and law applicable to the 1976 death of Joyce and the 1984 death of Martha, skewing the penalty deliberations toward death, violating petitioner rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 25 at 436-39.)

## a.     State Direct and Collateral Review

Petitioner raised the claim in his first state habeas petition and it was denied on the merits and aspects of which were denied on procedural grounds.  (Order No.  S090636.)

Petitioner raised the claim in his second state habeas petition and it was denied on procedural ground including as repetitive of aspects of claims raised in the prior state habeas petition (*In re Miller*).  (Order No. S173793.)

## b.     Analysis

Petitioner alleges the trial court committed multiple errors which contributed to juror confusion in deciding the Count I death of Joyce and the Count II death of Martha.  Petitioner's allegations are discussed separately below.

### i.     *Vague and Misleading Instructions as to Joyce's Sentence*

Petitioner alleges the trial court erred by giving penalty instructions that were vague as to the fact only Martha's murder qualified Petitioner for the death penalty and that Joyce's death was a non-capital count.  (Doc. No. 25 at 436-37.)

Petitioner argues that vague and misleading penalty phase instructions confused the jury into believing both Counts were capital counts when in fact death was an option only in Martha's murder.  (Doc. No. 25 at 436.)  He suggests the jury incorrectly believed Petitioner faced the death penalty for the 1976 death of Joyce when in fact California then had no death penalty in the wake of *Furman v. Georgia*, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 25 at 436 *citing* 408 U.S. 238 (1972).)

The record reflects the jury was given CALJIC 8.84 that:

> It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which the special circumstances alleged in this case have been specifically found to be true.

(Doc. No. 25 at 436 citing CT 2042.)  Petitioner argues "[t]he jury probably reached unanimity on the death penalty only when the death penalty weighing process was applied to Joyce's death as well as Martha's."  (Doc. No. 25 at 437; *see also* 1SHCP Ex.'s 143, 145-150.)  He argues instruction with

CALJIC 8.84 was confusing on the facts of his case because convictions were returned on two murders (Joyce and Martha) and special circumstances "in the case" were found true, yet only Martha's murder was subject to the death penalty. (Doc. No. 25 at 436.) Petitioner observes even the trial judge at sentencing was under the impression the murder of Joyce was a capital charge. (Doc. No. 25 at 437 n.144 *citing* RT 5530.)

Petitioner points to post-conviction juror interviews which he contends suggest jurors may have considered aggravating factors applicable only to Joyce, a mother of eight children, in arriving at their death verdict on the death of Petitioner's elderly mother. (Doc. No. 25 at 437, citing to 1SHCP Ex.'s 143, 145-150.) He argues that "[h]ad the jurors known that they were only debating Petitioner's sentence for the death of Martha, they would have weighed the aggravating and mitigating factors differently. Deciding the appropriate sentence for one death is vastly different than setting the appropriate sentence for two." (Doc. No. 25 at 439.)

However, the record reflects that only Count 2 charged special circumstances. (*See* CT 1777.) At the start of the penalty phase, the court advised the jury that:

> The Defendant in this case has been found guilty of murder of the first degree. The allegation that the murder was committed under special circumstances has been specifically found to be true. It is the law of this State that the penalty for a Defendant found guilty of murders of the first degree shall be death or confinement in the state prison for life without the possibility of parole in any case in which the special circumstance is alleged which in this case have been specially found to be true. So you understand the law of this State, you must now determine which of these penalties shall be imposed upon the Defendant; after you have heard the evidence and the law and then you retire to begin your deliberations.

(RT 5362-63.)

The state supreme court reasonably could find the instructions allowed for a death verdict only as to Martha, for whom at least one special circumstance had been found true.

Prosecutor Witt, in his penalty phase closing did not argue for or request a death verdict as to Joyce's murder. (RT 5486-90.) The jury in their verdict form confirmed this, stating that "[w]e, the Jury, empaneled to try the above entitled cause, having found the defendant, STEVEN DAVID CATLIN, guilty of First-Degree Murder and having found special circumstances in this case to be true, do hereby determine that the penalty shall be Death." (CT 2075; RT 5503-05, 5515-17.) The jurors

asked no questions in these regards and confirmed their verdict individually on the record. (*Id.*)

To the extent Petitioner bases his argument upon cross-admissible evidence, it fails for the reasons discussed below. Moreover, Petitioner's argument the prosecution case for Martha's death was much stronger that the case for Joyce's death appears to undermine his argument the jury relied upon the facts and circumstances of Joyce's death in aggravation for Martha's death.

To the extent the trial court's noted initial misapprehension that Joyce's count was a non—capital count occurred at the hearing on Petitioner's motion for modification of the verdict, weeks after the jury had been dismissed and outside its presence, the state supreme court reasonably could find the jury's instructions and verdict were not influenced thereby. (July 6, 1990 RT 5330-31; *see also Catlin*, 26 Cal. 4th at 179.)

### ii.  Failure to Sever Counts I and II

Petitioner revisits allegations discussed above in claim 6 that the trial court erred by not severing and trying separately the Count I death of Joyce and the Count II death of Martha. (Doc. No. 25 at 438.)

However, the allegations fail for the reasons discussed in claim 6 above and as follows. (*See* claim 6, *ante.*)

Misjoinder violates the constitution only where the prejudicial effect denies defendant a fair trial. *Lane*, 474 U.S. at 446, n.8 (1986). Here, the state supreme court reasonably could find Petitioner was not denied a fair trial, for the reasons stated. Significantly, the jury was instructed that Counts I and II charged separate crimes which were to be decided separately. (RT 5323.) The evidence relating to Counts I and II was cross-admissible for the reasons stated by the California Supreme Court. (*See Catlin*, 26 Cal. 4th at 110.) Petitioner's argument that the jury's penalty deliberations were unreliable because of cross-admissible evidence fails for the reasons discussed above.

Furthermore, the jury was aware the experts qualified their opinions and were not all in agreement as the whether and the extent to which paraquat might have been involved in Joyce's death. Their opinions were admissible and for the jury to weigh, as discussed above. (*See* claims 6 and 19, *ante.*)

### iii.  Failure to Provide Separate Guilt and Penalty Juries

Petitioner revisits allegations discussed above in claim 19 that the trial court erred in denying

248

without prejudice his pretrial motion for separate guilt and penalty phase juries. (Doc. No. 25 at 438 citing RT 46-47.) He argues the guilt phase other crimes testimony regarding Glenna's death was prejudicial at the penalty phase, especially so as to the allegedly altered toxicology evidence and the loss of defense credibility arising from guilt phase argument that Petitioner did not murder Glenna juxtaposed with the penalty phase admission of petitioner's conviction for murdering Glenna. (*See* claim 8, *ante*.)

However, the allegations fail for the reasons stated, summarized here. (*See* claim 19.) Petitioner does not point to clearly establish Supreme Court law supporting the allegations. *See Spencer*, 385 U.S. at 556 ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure.")

The trial court gave a limiting instruction regarding the "other crimes" evidence. (RT 5353-54.) The jury was informed at the penalty phase of the statutory requirement precluding earlier disclose of the prior conviction. (*Id.*) Jurors are presumed to understand and following instructions. *Weeks*, 528 U.S. at 234.

Furthermore, the state supreme court reasonably could find the other crimes evidence was properly admitted.

Petitioner has not demonstrated that death qualification in the capital count denied him an impartial jury on the non-capital count. (*See* claims 60, 61, *post*); *see also McCree*, 476 U.S. at 173-184 (death qualification does not violate fair cross-section requirement of the Sixth Amendment or the constitutional right to an impartial jury). Notably, California law also calls for a single jury to determine both guilt and penalty. *Balderas*, 41 Cal. 3d at 205.

Although the guilt phase jury also had been exposed to hypothetical prior murder conviction voir dire questioning that related to Petitioner's ultimate admission to his conviction for murdering Glenna following the Kern County convictions (*see* Doc. No. 25 at 192-96), Petitioner has not established that these questions disclosed to prospective jurors the prior conviction for Glenna's murder.

The fact the LWOP sentence in Petitioner's Monterey County proceeding was imposed by a separate penalty phase jury alone is not evidence otherwise or a basis for judicial estoppel. (*See* claim 19, *ante*.)

*iv.     Harmless Error*

Even if the trial court erred as alleged, the California Supreme Court reasonably could find such error had no substantial and injurious effect on the jury's penalty selection. *Brecht*, 507 U.S. at 637. A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. *Clark*, 450 F.3d at 916.

The other crimes evidence was properly admitted in the guilt phase and available in the penalty phase as aggravating evidence consistent with the trial court's instructions. Death qualification voir dire was not improper in relation thereto, for the reasons stated. (*See* claims 60 and 61, *post*.)

The jury instructions and verdict forms considered *in toto* reasonably provided for a capital sentence only as to Martha's murder. A common-sense application of the instructions given to the charges, facts and circumstances of this case suggests the possibility of prejudice from the omitted instructions is only remote.

Moreover, Petitioner has not demonstrated the penalty phase closing argument of the prosecutor was inconsistent with the instructions and verdict forms.

For the reasons stated, the state supreme court could find no reasonable probability the jury would have arrived at a different verdict absent the alleged error by the trial court. *Clark*, 450 F.3d at 916.

*v.     Conclusions*

The state supreme court reasonably could find the trial court did not mistakenly provide the jury with differing evidence and law applicable to the 1976 death of Joyce and the 1984 death of Martha and did not err in denying severance of Counts I and II and separate juries.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claim 37 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claim 37 shall be denied.

### 3.    Claim 42

Petitioner alleges the trial court erred by admitting evidence of unadjudicated criminal activity, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 25 at 466-67.)

#### a.    **State Direct and Collateral Review**

Petitioner raised the claim on direct appeal which the California Supreme Court denied on the merits and on procedural grounds.  *Catlin*, 26 Cal. 4th at 172.

Petitioner raised as prosecutorial misconduct alleged presentation of false (not credible) testimony by Linda Catlin regarding the chocking incident in the first state habeas which was denied on the merits and on procedural grounds.  (Order No.  S090636.)

Petitioner raised the claim in his second state habeas petition and it was denied on the merits and on procedural grounds including that it was raised and rejected on direct appeal (*In re Waltreus*).  (Order No. S173793.)

#### b.    **Analysis**

##### i.    *Admission of Unadjudicated Criminal Conduct*

Petitioner alleges the trial court erred in admitting as aggravating unadjudicated criminal activity evidence (i.e. pursuant to Penal Code section 190.3(b)) an incident that occurred twenty-five years prior to trial, where petitioner allegedly choked his first wife, Linda Catlin, who did not then seek medical care or notify law enforcement.  (Doc. No. 25 at 466 citing RT 5334, 5351-59; *see also* claim 36, *post,* and claims 43-68, *post*, purportedly incorporated herein.)

Petitioner argues the incident was minor and so remote in time as to be not relevant.  (Doc. No. 25 at 466.)  He argues the allegation was scantly supported by just testimony of Linda, whom jurors may have credited more than warranted because they were not re-instructed at the penalty phase on the credibility of a single witness.  He argues admission of this Penal Code section 190.3 evidence made his trial unfair and denied him due process.

Under California law, otherwise relevant evidence is precluded if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Evid. Code §§ 350, 352.

A state law error that renders the trial fundamentally unfair violates the Due Process Clause. *Chambers*, 410 U.S. at 298, 302-03; *Hicks v. Oklahoma,* 447 U.S. 343, 346 (1980) (due process protects defendant from arbitrary deprivation of expectations under state law).

The California Supreme Court denied the claim direct appeal, stating that:

Defendant contends that the introduction, at the penalty phase, of evidence of his assault on his first wife "violated due process and the Fifth, Sixth, Eighth and Fourteenth Amendments." He contends that the incident, which occurred between 1964 and 1966, was too remote in time to be relevant and that the only evidence came from a biased witness-the victim. He claims that because the evidence was weak, the jury should not have been permitted to rely upon it. He adds that the jury may have placed too much reliance upon the incident because, at the penalty phase, they were not reinstructed concerning the credibility of a single witness.

This claim is waived because defendant failed to object at trial. (People v. McPeters (1992) 2 Cal.4th 1148, 1188 [9 Cal.Rptr.2d 834, 832 P.2d 146].) In any event, defendant's contentions lack merit. The remoteness of the incident goes to its weight, not to its admissibility. (People v. Anderson (1990) 52 Cal.3d 453, 476 [276 Cal.Rptr. 356, 801 P.2d 1107]; see also People v. Williams, supra, 16 Cal.4th at p. 233 [rejecting constitutional and statutory claims against the admission of penalty phase evidence of prior criminal activity that could not be prosecuted because of a statute of limitations]; People v. Rodrigues, supra, 8 Cal.4th at p. 1161 [rejecting various constitutional claims regarding the admission of evidence of an assertedly remote prior offense].) Similarly, it was for the jury to consider whether the witness was too biased to be credible, and the jury was instructed to consider instructions that were given at the guilt phase that were relevant (which included those concerning the credibility of witnesses).

*Catlin*, 26 Cal. 4th at 172.

The state supreme court reasonably denied the claim. Petitioner does not point to clearly established Supreme Court precedent that admission of prior unadjudicated criminal conduct in aggravation violates due process. *See Sharp v. Texas*, 488 U.S. 872 (1988) (Marshall J, dissenting) ("I would grant the petition to resolve the question whether the Eighth and Fourteenth Amendments preclude the introduction of evidence of unadjudicated criminal conduct at the sentencing phase of a capital case."); *accord Miranda v. California*, 486 U.S. 1038 (1988); *see also Spencer*, 385 U.S. at 563-564 (approving limited use of other crimes evidence for purposes other than propensity). Given the Supreme Court has not decided the issue, the California Supreme Court's above decision could not be contrary to or an unreasonable application of United States Supreme Court precedent. *Carey*, 549 U.S. at 76.

Petitioner's reliance upon *Johnson v. Mississippi* as authority otherwise is misplaced. 486 U.S. 578, 585 (1988). The Court in *Johnson* disallowed use of a prior conviction that had been reversed,

which is not the case here.

The Ninth Circuit has held that in a capital case, evidence of unadjudicated criminal conduct may constitute an aggravating circumstance and be admissible at sentencing. *See Campbell v. Kincheloe*, 829 F.2d 1453, 1461 (9th Cir. 1987) (holding unadjudicated criminal conduct may be introduced to support the aggravating factor of probable future violence).

Furthermore, California's death penalty statute expressly provides that a capital defendant's prior violent conduct is relevant to the penalty determination. The United States Supreme Court has upheld the constitutionality of California's death penalty law, including § 190.3(b), which permits evidence of prior criminal activity involving violence or threats of violence. *California v. Brown*, 479 U.S. 538, 543 (1987); s*ee also Tuilaepa v. California,* 512 U.S. 967, 975-80 (1994).

### ii. Harmless Error

Even if the trial court erred as alleged, the California Supreme Court reasonably could find such error had no substantial and injurious effect on the jury's penalty selection. *Brecht*, 507 U.S. at 637. A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. *Clark*, 450 F.3d at 916.

Here, the evidence presented in aggravation including the facts and circumstances of the instant killings was substantial. (See RT 5486-89; claims 30 and 31, post; *cf.* RT 5490-5503.)

For the reasons stated, the state supreme court could find no reasonable probability the jury would have arrived at a different verdict absent the alleged trial court err in admitting the unadjudicated evidence of the choking incident involving Linda Catlin. *Clark*, 450 F.3d at 916.

### iii. Conclusions

The state supreme court reasonably could find the trial court did not err by admitting evidence of unadjudicated criminal activity involving his former wife, Linda Catlin.

Moreover, that court reasonably could find Petitioner failed to show more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claim 42 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts

253

in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claim 42 shall be denied.

4.      Claims 43, 45 and 49

Petitioner alleges the trial court erred in its penalty phase instructions by rejecting his proposed instruction on mitigation and instead instructing on vague and misleading sentencing discretion (claim 43); by failing to instruct on unanimity regarding aggravating factors (Claim 45); and by failing to instruct on a reasonable doubt standard (Claim 49), violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 25 at 468-70, 473-74, 491-96, respectively.)

**a.      State Direct and Collateral Review**

*i.      Claim 43*

Petitioner raised claim 43 on Eighth Amendment grounds on direct appeal and it was denied on the merits.  *Catlin*, 26 Cal. 4th at 172-74.

Petitioner raised claim 43 in the second state habeas petition and it was denied on procedural grounds (as to other than ineffective assistance of counsel and the constitutionality of the death penalty) as raised and rejected on appeal (*In re Waltreus*).  (Order No. S173793.)

*ii.      Claim 45*

Petitioner raised claim 45 in his second state habeas petition and it was denied on procedural grounds.  (Order No. 173793.)

*iii.      Claim 49*

Petitioner raised claim 49 on Eighth and Fourteenth Amendment grounds on direct appeal and it was denied on the merits.  *Catlin*, 26 Cal. 4th at 178.

Petitioner raised Claim 49 in the second state habeas petition and it was denied on procedural grounds (as to other than ineffective assistance of counsel and the constitutionality of the death penalty) as raised and rejected on appeal (*In re Waltreus*).  (Order No. 173793.)

**b.      Analysis**

*i.      Mitigation Instructions*

Petitioner alleges the trial court erred by rejecting his proposed Special Instruction No. 8, a pinpoint instruction under Penal Code section 190.3(k) which included thirteen specific mitigation factors

that related to petitioner. (CT 2071-72; RT 5479-80; *see also* Doc. No. 95 at 223.) He argues the proposed instruction provided relevant law supporting his "theory of the [penalty phase] defense" in mitigation relating to CALJIC 8.85 catchall sentencing factor k.[17] (*See* Doc. No. 95 at 224; *see also Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (abrogated on other grounds by *Atkins v. Virginia*, 536 U.S. 304 (2002)) (the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime). Petitioner argues that without Special Instruction No. 8 "there is a reasonable likelihood that Petitioner's jury, in violation of the Eighth Amendment, did not understand it could consider all the factors outlined in the instructions as mitigation." (Doc. No. 25 at 469.)

Additionally, Petitioner argues the trial court erred in giving CALJIC 8.88 (i.e. the "Penalty Trial Concluding Instruction") which he characterizes as a vague and misleading sentencing discretion instruction for Eighth Amendment purposes. (*See* CT 2056-57.) He argues the instruction "failed to inform the jurors that unless they found the factors in aggravation outweighed the factors in mitigation, they could not impose a sentence of death." (Doc. No. 25 at 469.) He argues the instruction "failed to inform the jurors of the statutory mandate that if mitigation outweighed aggravation, they were required to impose a sentence of life without possibility of parole." (*Id.*) He argues that instruction's "so substantial" standard for comparing aggravating and mitigating factors is "impermissibly vague" and "conducive to arbitrary and capricious decision-making[.]" (*Id.* at 469-70.)

Petitioner argues these errors denied him due process, an impartial jury, and a reliable sentencing determination. He purports to incorporate by reference Claims 44-68. (Doc. No. 25 at 470; *see also* SECT 2254 Rule 2 (habeas petition must state the facts supporting each ground).

The California Supreme Court rejected these allegations, stating that:

Defendant proffered the following pinpoint instruction, rejected by the trial court, on the factors that the jury could consider in mitigation:

These [mitigating] aspects of the Defendant include, but are not limited to the following:

---

[17] CALJIC 8.85 factor (k) mitigates for "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less then death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle.

(1) whether the Defendant was a helpful and caring man in his relationships with his friends and business associates;

(2) whether the Defendant, by his actions, saved the life of another human being;

(3) the Defendant's ability to engender feelings of love and/or respect for him by his friends, fellow inmates, prison staff and correctional officers;

(4) whether the Defendant has positively adjusted to the type of structured and institutionalized environment in which he will live the rest of his life if given a sentence of life in prison without the possibility of parole;

(5) whether Defendant has made positive contributions to the prison environment in which he now lives and whether he will continue to make such contributions if he serves a sentence of life without the possibility of parole;

(6) whether Defendant, by his advice and concern for others, has positively [affected] both inmates and staff with whom he has associated during his incarceration in prison;

(7) whether Defendant has a calming and guiding effect upon younger inmates;

(8) the Defendant's educational background and his willingness and ability to use that background for the benefit of other inmates;

(9) whether the Defendant will contribute skilled labor which will help in the operation of the State Prison system;

(10) the Defendant's willingness and ability to comply with the terms of a sentence of life without possibility of parole;

(11) the Defendant's potential for [rehabilitation] and for contributing affirmatively to the lives of his friends and fellow inmates;

(12) the likelihood that Defendant will not be a danger to others if sentenced to life in prison without the possibility of parole;

(13) whether there are any other facts which may be considered as extenuating or reducing the Defendant's degree of moral culpability for the crimes he has committed, or which might justify a sentence of less than death even though such facts would not justify or excuse the offense."

We repeatedly have concluded, however, that an instruction such as the one actually given in the present case, directing the jury that it may consider in mitigation "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial," adequately conveys the full range of mitigating evidence that may be considered by the jury. (People v. Edwards (1991) 54 Cal.3d 787, 841-842 [1 Cal.Rptr.2d 696, 819 P.2d 436]; see also People v. Smithey, supra, 20 Cal.4th at p. 1007; People v. Carpenter, supra, 15 Cal.4th at p. 416.) In addition, we have explained that special instructions such as the one requested by defendant may be refused as argumentative and duplicative of standard instructions. (People v. Earp (1999) 20 Cal.4th 826, 901 [85 Cal.Rptr.2d 857, 978 P.2d 15]; People v. Noguera (1992) 4 Cal.4th 599, 648 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) We reject defendant's claim that these grounds for the refusal of an instruction may not be considered unless relied upon below by the prosecution. (People v. Braeseke (1979) 25 Cal.3d 691, 700 [159 Cal.Rptr. 684, 602 P.2d 384]; see 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 340, pp. 382-383.)

Defendant contends that the standard instruction on the weighing of mitigating and aggravating factors [CALJIC No. 8.88 (1989 rev.] was impermissibly vague and misleading in that it failed to inform the jury that unless it found that the factors in aggravation outweighed the factors in mitigation, it could not impose a sentence of death,

and in that it failed to inform the jury that if factors in mitigation outweighed those in aggravation, it must impose a sentence of life in prison without the possibility of parole. He also complains that the instruction's direction that before the jury may return a verdict of death, it must find that the aggravating circumstances are "so substantial" as to warrant a sentence of death and not life imprisonment without possibility of parole, was vague and led to arbitrary decisionmaking. He claims violation of his right to due process of law and to a reliable and nonarbitrary penalty determination under the Eighth Amendment of the United States Constitution.

We repeatedly have rejected identical claims and decline defendant's invitation to reconsider our prior rulings. (See People v. Mendoza, supra, 24 Cal.4th at p. 190, and cases cited; People v. Kipp, supra, 18 Cal.4th at p. 381, and cases cited.)

Catlin, 26 Cal. 4th at 172-74.

The state supreme court reasonably rejected the allegations. The trial court properly could reject Petitioner's proposed jury instruction if other instructions adequately covered the issues about which the defense is concerned. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996) ("It is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory."); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir. 1979) ("there is no right to have the instruction phrased in the precise terms requested by defendant").

In reviewing penalty phase instructions, the test is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* 494 U.S. at 380. Further, a single instruction "may not be judged in artificial isolation," but must be considered in light of the instructions as a whole and the entire trial record. *Estelle*, 502 U.S. at 72. A reviewing court does not engage in a technical parsing of the instruction's language, but instead approaches the instructions in the same way that the jury would, with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Johnson*, 509 U.S. at 368.

Here, the state court reasonably could find the jury was not precluded from considering constitutionally relevant mitigating and sympathetic evidence during their sentence deliberations. The Supreme Court has never required a sentencing court to instruct a jury on how to weigh and balance factors in aggravation and mitigation. In *Tuilaepa*, the Supreme Court stated, "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." 512 U.S. at 979. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible

for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Id.* (quoting California v. *Ramos*, 463 U.S. 992, 1008 (1983)).

In *Kansas v. Marsh*, the Supreme Court stated:

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here. "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."

548 U.S. 163, 175 (2006) (quoting *Franklin v. Lynaugh,* 487 U.S. 164, 179 (1988)).

Here, the trial court, in explaining the factors the jury was to consider in reaching its decision specifically instructed the jury that it could consider:

> [A]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.

(CT 2044-45.)

The Supreme Court has stated a claim that a court violated a petitioner's due process rights by omitting an instruction requires a showing that the error "so infected the entire trial that the resulting conviction violate[d] due process." *Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp*, 414 U.S. at 147). The burden on Petitioner is especially heavy "where . . . the alleged error involves the failure to give an instruction." *Clark*, 450 F.3d at 904. Petitioner failed to carry that burden, for the reasons stated.

Petitioner further argues the trial court's instruction with CALJIC 8.88 was vague and misleading as to weighing aggravating and mitigating factors and returning LWOP unless aggravating factors outweighed (were "so substantial" as to) mitigating factors. (Doc. No. 25 at 469 citing CT 2056-57; Penal Code § 190.3.)

However, the California Supreme Court has cited the *Tuilaepa* case in rejecting a claim that the phrase "so substantial" is too vague. *See, e.g., People v. Davenport*, 11 Cal. 4th 1171, 1231 (1996), abrogated on other grounds by *People v. Griffin*, 33 Cal. 4th 535, 555 n.5 (2004). The U.S. Supreme Court has approved language in California's death penalty statute that the jury "shall impose" a death

sentence if "the aggravating circumstances outweigh the mitigating circumstances." *Boyde*, 494 U.S. at 373-77; *see also Ayers v. Belmontes*, 549 U.S. 7 (2006) (the Supreme Court has examined the language in California's jury instructions on mitigation multiple times and has upheld it against constitutional challenges).

The U.S. Supreme Court has noted that once a jury finds the defendant to be death eligible, the jury may be given "unbridled discretion in determining whether the death penalty should be imposed" upon a death eligible defendant. *Tuilaepa*, 512 U.S. at 979-80. In *Boyde*, the Supreme Court held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Boyde*, 494 U.S. at 377 (quoting *Franklin*, 487 U.S. at 181) (plurality opinion); *see also Marsh*, 548 U.S. at 175 (no specific method for balancing aggravating and mitigating factors in a capital case sentencing proceeding is constitutionally required).

Moreover, jury instructions are considered in their entirety and in the context of the entire trial record. *Estelle*, 502 U.S. at 72. Here, the jury was aware from all the instructions given them that they were to consider all the evidence received at trial unless otherwise instructed; be guided by the sentencing factors; weigh the totality of aggravating and mitigating circumstances; and return a death verdict only if persuaded the aggravating circumstances were so substantial in comparison with the mitigating circumstances that death was warranted. (CT 2044, 2056-57.)

There is no clearly established authority from the United States Supreme Court holding that a jury must be instructed in a particular manner. Accordingly, since the Supreme Court has not decided the issue, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent. *Carey*, 549 U.S. at 76.

Any error in the state court's determination of whether state law supported an instruction in this case cannot form the basis for federal habeas relief. *Estelle*, 502 U.S. at 71.

Aspects of the allegations discussed above that were not adjudicated by the state court fail on *de novo* review, for the reasons stated.

ii. *Instruction Regarding Unanimity and Beyond a Reasonable Doubt*

Petitioner alleges the trial court erred by failing to instruct the jury that findings on aggravating

259

circumstances had to be unanimous and beyond a reasonable doubt. (*See* Doc. No. 25 at 494.) He argues this error denied him due process and in impartial jury, caused his penalty determination to be unreliable, and denied him protections afforded non-capital defendants facing sentence enhancing allegations. (Doc. No. 25 at 473-74, citing *Schad v. Arizona*, 501 U.S. 624, 632-633 (1991).)

Petitioner argues the burden of proving appropriate punishment should be the same as that of proving guilt or special circumstances; namely, beyond a reasonable doubt. (*See* Doc. No. 25 at 494.)

Even if that is not the case, he argues, the failure to provide any standard of proof risks each juror applying the standard he or she believes appropriate in any given case. He argues a guilt phase finding of first-degree murder with special circumstances found true carries a maximum sentence of LWOP. (Doc. No. 25 at 492 citing Penal Code § 109.2.) He cites *Apprendi* rationale and suggests that before a defendant to may sentenced to death the jury must make additional factual findings unanimously and beyond a reasonable doubt in the penalty phase including that aggravating factor(s) are true and outweigh mitigating factor(s). (*Id. citing* Penal Code § 190.3; *see also* claim 49, *post;* Doc. No. 25 at 491-96 *citing Apprendi v. New Jersey*, 530 U.S.466, 490 (2000) (facts supporting an increase in sentence greater than jury's guilt verdict must be proved beyond a reasonable doubt); *see also* Doc. No. 25 at 579.)

The California Supreme Court rejected this aspect of Petitioner's claim on direct appeal, stating that:

> The jury need not find beyond a reasonable doubt that aggravating factors exist [except for other-crimes evidence], that they outweigh mitigating factors, or that death is the appropriate penalty.

*Catlin*, 26 Cal. 4th at 178.

Petitioner has not pointed to clearly established Supreme Court authority that under California's death penalty statute penalty phase determinations implicate any burden of proof much less a reasonable doubt standard of proof, for the same reasons discussed in claim 63, *post*, summarized here. *See Floyd v. Filson*, 940 F.3d 1082, 1097 (9th Cir. 2019) (observing that the federal courts of appeals have uniformly rejected the argument that *Apprendi* and *Ring v. Arizona*, 536 U.S. 584 (2002) require a reasonable doubt instruction at the penalty phase because a jury's balancing inquiry in a capital case is a subjective and moral one, not a factual one).

Accordingly, Petitioner's reliance upon *Ring* and *Apprendi* is misplaced.

Petitioner argues that even if no burden of proof appends at the penalty phase, the trial court erred in not so informing the jury. (Doc. No. 25 at 495.) Petitioner suggests the jury may have been less than unanimous regarding aggravating factors and treated "other crimes" evidence regarding Petitioner's prior criminal history as an aggravating factor. (*See* Doc. No. 25 at 474.)

However, the jury was instructed to consider the applicable matters set forth in Penal Code section 190.3 (a-k), if applicable, as aggravating or mitigating factors (Doc. No. 25 at 949 *citing* CT 2044-45; RT 5505-06); and to consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances and to weigh the various circumstances by considering the totality of the aggravating and mitigating circumstances. (CT 2056-57; RT 5510.) The jury also was told that to return a death sentence, each juror "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without the possibility of parole." (CT 2057; RT 5510.)

Finally, Petitioner does not point to clearly established Supreme Court precedent that a jury needs to unanimously agree on aggravating factors.

Aspects of the allegations discussed above that were not adjudicated by the state court fail on *de novo* review, for the reasons stated. (*See* claim 63, *post*.)

iii.     Harmless Error

Petitioner argues the above alleged errors by the trial court denied him due process and an impartial jury and resulted in an unreliable sentence determination that exceeded the factual findings made by the jury, resulting in structural error or more than harmless error under *Brecht*. (Doc. No. 25 at 493-96.)

Even if arguendo constitutional instructional error has occurred, the federal court must still determine whether Petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. A "substantial and injurious effect" means a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. *Clark*, 450 F.3d at 916.

For the reasons stated, the state supreme court could find no reasonable probability the jury would

have arrived at a different verdict absent the alleged instructional error by the trial court. Petitioner has not demonstrated the jury was precluded from considering relevant evidence consistent with the totality of the instructions, weighing aggravating and mitigating factors in accordance therewith.

The result is the same upon *de novo* review of unadjudicated aspects of the claims, for the reasons stated.

### iv.     Conclusions

The state supreme court reasonably could find trial court did not err in its penalty phase instructions as alleged.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claims 43, 45, and 49 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

The allegations unadjudicated in state court fail on *de novo* review, for the reasons stated.

Claims 43, 45, and 49 shall be denied.

**F.     Claims Alleging Prosecutorial Misconduct at the Penalty Phase**

1.     Legal Standard

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *DeChristoforo*, 416 U.S. at 643.

To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Miller*, 483 U.S. at 765. "Before a federal court may overturn a conviction resulting from a state trial . . . it must be established not merely that the [State's action] is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Phillips*, 455 U.S. at 221.

Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial.

*Greer*, 483 U.S. at 765-66; *Weitzenhoff*, 35 F.3d at 1291. The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Phillips*, 455 U.S. at 219. "Improper argument does not, per se, violate a defendant's constitutional rights." *Thompson,* 74 F.3d at 1576.

Furthermore, the Supreme Court has stated:

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence ... and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. Arguments of counsel which misstate the law are subject to objection and to correction by the court. This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made.

*Boyde*, 494 U.S. at 384-85.

If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in *Brecht*. *See Thompson*, 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless."). A petitioner is entitled to relief in this context only where the constitutional violations exerted a "substantial and injurious" effect on the judgment. *Brecht*, 507 U.S. at 620; *Fields*, 309 F.3d at 1109.

### 2.    Claims 36 and 44

Petitioner claims the prosecutor engaged in misconduct by arguing false testimony, criminal propensity (i.e. claim 36), non-statutory aggravating factors relating to state of mind and victim impact (i.e. claims 36 and 44), and diminished juror responsibility to consider mitigating factors (i.e. claim 36), denying his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 430-35, 471-72.)

### a.    State Direct and Collateral Review

Petitioner raised claim 36 and 44 allegations that the prosecutor improperly argued his intelligence, demeanor, and attitude as non-statutory aggravating factors in his direct appeal and the allegations were denied on the merits. *Catlin*, 26 Cal. 4th at 174-76.

Petitioner raised the claims in his first state habeas petition and they were denied on the merits and on procedural grounds. (Order No. S090636).

Petitioner raised the claims in his second state habeas petition and they were denied on procedural grounds including as to claim 44 that it was raised and rejected on appeal (*In re Waltreus*), and as to claim 36 that it was repetitive of the prior state habeas petition (*In re Miller*). (Order No. S173793).

**b.     Analysis**

Petitioner alleges multiple events of prosecutorial misconduct, analyzed separately below, which he claims weighed in favor of death and denied him due process, an impartial jury, confrontation of witnesses and the right to present witnesses and experts. (Doc. No. 25 at 430, 471-72.)

As discussed above, the knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional. *Napue*, 360 U.S. at 269. The knowing use of false testimony to obtain a conviction, even false testimony that goes only to the credibility of the witness, violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared. 360 U.S. at 269.

A conviction obtained by the knowing use of perjured testimony "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Bagley*, 473 U.S. at 678. Nevertheless, simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony. *Zuno–Arce*, 44 F.3d at 1423. "Discrepancies in ... testimony ... could as easily flow from errors in recollection as from lies." *Id.*

To warrant habeas relief, Petitioner must establish that: 1) the testimony was actually false; 2) the prosecution knew or should have known it to be false; and 3) there is a reasonable likelihood that the false testimony could have affected the jury's verdict. *Tayborn*, 251 F.3d at 1130.

The Supreme Court has held that "the prosecutor's knowing use of perjured testimony violates due process[.]" *Briscoe*, 460 U.S. at 326 n.1.

*i.     Linda Catlin's Testimony*

264

### (1) Presentation of False Evidence

Petitioner argues the prosecution presented materially false testimony by Petitioner's first wife, Linda Catlin, that twenty-five years earlier Petitioner choked and hit her and threw her out of a car. (Doc. No. 25 at 431, 466-67, 607.) He argues Linda Catlin lacked credibility because she had a financial interest in seeing Petitioner convicted. He suggests that Linda stood to benefit from a movie deal relating to the case; Linda's daughter Gretchen stood to take a portion of Martha's estate if Petitioner was convicted; and Gretchen had taken and used one of Martha's credit cards after her death. (Doc. No. 25 at 431 citing CT 860-73; 1SHCP Ex. 140.)

Additionally, Petitioner argues that Linda's credibility should be discounted because Edith Ballew, Petitioner's third wife, had convinced Linda the Petitioner had poisoned Joyce and that Linda should communicate this to the police. (Doc. No. 25 at 431-32 citing CT 851-869.)

Petitioner states the foregoing impeachment evidence was known to the prosecution, but not presented to the jury. (Doc. No. 25 at 432.)

However, the state supreme court reasonably could find Petitioner failed to demonstrate facts that prosecutor Witt knowingly presented false testimony by Linda Catlin. Petitioner does not identify facts that Linda's noted testimony was actually false. (*See* claim 42, *ante*.)

The state supreme court reasonably could find Petitioner's mere surmise as to credibility went to weight of evidence properly before the jury. Moreover, the record reflects defense counsel elected not to cross-examine Linda on these matters. (RT 5357-59.) Notably, the record suggests that Petitioner gave Gretchen permission to use the credit card. (RT 5357-59; *see also* CT 873.)

The jury was properly instructed on matters of witness credibility and bias, matters going to weight rather than admissibility. (*See* CT 1938, 1940-44, and 2043.) The jury presumably understood and followed their instructions. *Weeks*, 528 U.S. at 234.

### (2) Presentation of False Argument

Petitioner argues the prosecutor engaged in improper argument by keeping from the jury facts showing Linda's noted testimony was false. (See Doc. No. 25 at 432.) However, the argument fails for the reasons discussed above and those that follow.

In determining whether claimed comments by the prosecutor amounted to misconduct, federal

courts look to the various *Darden* factors, i.e., the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in its summation and whether defense counsel had an adequate opportunity to rebut the comment. *See Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010).

As the Supreme Court emphasized in *Darden*, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned," Darden, 477 U.S. at 181 (citation omitted), because the effect on the trial as a whole needs to be evaluated in context. *See United States v. Young*, 470 U.S. 1, 17–20 (1985) (prosecutor's exhortation that the jury "do its job" and statements of personal belief were improper, but they did not have prejudicial effect on the trial as a whole in light of the comments' context and overwhelming evidence of guilt).

Here, Prosecutor Witt was free to argue relative credibility and lack of truthfulness based upon reasonable inference raised by admitted evidence. *See Duckett v. Godinez*, 67 F.3d 734, 742 (9th Cir. 1995). At closing, a prosecutor is allowed wide latitude to argue reasonable inferences from the evidence, including casting a witness's testimony as lies or fabrication. *See Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995), overruled on other grounds by *Tolbert*, 182 F.3d at 685.

The state supreme court reasonably could find Petitioner failed to identify argument by the prosecutor that "so affect[ed] the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment." *Caldwell,* 472 U.S. at 340. The record reflects that jury also was instructed that: they must weigh the aggravating and mitigating evidence (CT 2056-57.) The jury was aware the arguments of counsel were not evidence. (CT 1929.)

Petitioner's reliance upon *Penry v. Lynaugh* is misplaced. In *Penry*, the jury was not instructed that it could consider and give effect to mitigating evidence. 492 U.S. at 320; *see also U.S. v. Potter*, 616 F.2d 384, 392 (9th Cir. 1979) (prosecutor's closing contained some improprieties albeit not purposeful or flagrant or requiring reversal); *Furman v. Wood*, 190 F.3d 1002, 1006-07 (9th Cir. 1999) (rejecting habeas claim where, although some of prosecutor's arguments were improper, jury was told comments were not evidence, and evidence against defendant was substantial).

   *ii.*     *Informant Hardin's Testimony*

266

**(1)     Presentation of False Argument**

Petitioner argues the prosecution improperly argued during closing that Petitioner had threatened Ballew and wanted to hire Hardin to beat up Ballew.  (Doc. No. 25 at 432 *citing* RT 5297.)   He argues the prosecutor relied upon Hardin for this argument and that the prosecutor should have known Hardin lacked credibility and was motivated by the noted 1985 deal providing benefits for his testimony, as discussed in claims 23, 26(A), *ante*.

As above, the state supreme court reasonably could reject the allegation.  Petitioner has not demonstrated that presentation and argument of otherwise admissible facts going to Hardin's credibility was improper and made his trial fundamentally unfair.  Moreover, the defense was free to, and did cross-examine Hardin.  (*See* claim 23, *ante*.)

*iii.     Non-Statutory Aggravating Evidence*

**(1)     Presentation of False Argument**

Petitioner argues the prosecutor improperly urged the jury to disregard mitigating evidence and to consider non-statutory aggravating evidence.  (Doc. No. 25 at 432-34 *citing Boyd*, 38 Cal. 3d at 772-76 (evidence of defendant's conduct which is not probative of a listed aggravating factor is irrelevant).

Particularly, Petitioner argues the prosecutor implicitly and improperly argued that his background, history and intelligence, and victim impact evidence were aggravating factors (Doc. No. 25 at 432-33, 471; *see also* RT 5486-87; claim 35(E), post.)  He suggests the prosecutor improperly argued for aggravation under Penal Code section 190.3(k) by suggesting that Petitioner was indifferent to the victims, smiled inappropriately and had a bad attitude (RT 5486-87).  He points to prosecution argument that the jury:

> [C]onsider [Petitioner's] attitude when committing the crimes  … that [he] actually took pleasure in committing these crimes … [that he] knew when he murdered Joyce, she was the mother of eight children … [that] when he murdered Glenna, he knew that she was the mother of one child … [that he] knew Glenna's parents would witness her horrible death … [and that] we should not kill our parents.
>
> […]
>
> [Petitioner] expressed no regrets about the killing that he's committed.]

(Doc. No. 25 at 471 *citing* RT 5486-90.)  Petitioner observes that no victim impact witnesses testified

267

such that evidence of such was not before the jury (Doc. No. 95 at 227; CT 2034-35).

Petitioner suggests the prosecutor argued that Petitioner should be sentenced to death because of his criminal propensity given the joinder of proceedings in the deaths of Joyce and Martha and the presentation of evidence relating to the prior conviction in the death of Glenna. (Doc. No. 25 at 432.) He points to the prosecutor's guilt phase argument that "common sense established Petitioner was guilty of three murders." (*Id. citing* RT 5299.) He points to the prosecutor's argument that petitioner showed no remorse. (*See* e.g., RT 5489.)

Petitioner suggest that in this fashion, the prosecutor exploited the vagueness of Penal Code section 190.3. (Doc. No. 25 at 471 citing CT 2044).

The California Supreme Court considered and rejected on direct appeal alleged prosecution argument of non-statutory aggravating factors, stating that:

> Defendant contends that the prosecutor, over defense objection, urged the jury to consider nonstatutory factors in aggravation, thereby taking advantage of the asserted vagueness of section 190.3.

> At the commencement of his opening argument to the jury at the penalty phase of the trial, the prosecutor asked the jury to "consider Mr. Catlin's attitude when he was committing these crimes. Mr. Catlin's total indifference to the pain and suffering these people suffered at the time that ... he gave paraquat to Martha Catlin or with the death of Joyce and Glenna Kaye, he knew the horrible pain and suffering that the persons would go through. He also knew at the time he murdered Joyce Catlin, she was the mother of eight children and at the time he murdered Glenna Kaye, he knew that she was the mother of one child. [¶] He knew that Glenna Kaye's parents ... would witness her horrible death in the hospital. Mr. Catlin had a total indifference of taking their lives, absolutely no respect for their lives. [¶] Mr. Catlin actually took pleasure in committing these crimes. Think of the planning and the premeditation ...." Later, defendant complains, the prosecutor argued "we should not kill our parents."

> Contrary to defendant's claim that these comments were not relevant to any of the factors set forth in section 190.3, comments on the culpable mental state of a defendant at the time he or she committed the charged crimes are permissible characterizations of the circumstances of those crimes under section 190.3, factor (a). (See People v. Millwee, supra, 18 Cal.4th at pp. 151-152; People v. Hines (1997) 15 Cal.4th 997, 1062 [64 Cal.Rptr.2d 594, 938 P.2d 388]; People v. Lucas, supra, 12 Cal.4th at p. 495.) The prosecutor's comments were drawn from the evidence at trial regarding the circumstances of the crimes or were based upon reasonable inferences to be drawn from that evidence.

> Furthermore, under authority decided after the trial in defendant's case, comments on the impact of the crime on the victim's family also are permissible under section 190.3, factor (a), as long as the comments are based on evidence that "logically shows the harm caused by the defendant." (People v. Edwards, supra, 54 Cal.3d at p. 835.) Contrary to defendant's claim, this authority properly is applicable retroactively to cases not yet final on appeal. (People v. Ashmus, supra, 54 Cal.3d at p. 991; see also People v. Kirkpatrick (1994) 7

Cal.4th 988, 1017 [30 Cal.Rptr.2d 818, 874 P.2d 248]; People v. Clair, supra, 2 Cal.4th at p. 672.) We believe that the prosecutor's allusions to the surviving children of the victims fall within the bounds of appropriate comment. Contrary to defendant's claim that the suffering of Glenna's parents was irrelevant to the charged crimes, the prosecutor's reference was permissible in that it related to the prior-murder special-circumstance finding in the present case, and the evidence of Glenna's murder also was highly relevant to the charged murders. That a prosecutor may comment on the moral opprobrium incurred by a person who kills his or her parent is too obvious to require discussion. Finally, we consistently have rejected the claim that factor (a) is too vague to satisfy constitutional requirements. (See People v. Lucero, supra, 23 Cal.4th at p. 728, and cases *176 cited; see Tuilaepa v. California (1994) 512 U.S. 967, 976-977 [114 S.Ct. 2630, 2637, 129 L.Ed.2d 750].)

*Catlin*, 26 Cal. 4th at 174-76.

That court reasonably denied the allegation. Particularly, Petitioner's rehash of his claim 42 argument regarding admissibility of the uncharged crime evidence of Glenna's killing fails for the reasons stated. (*See* claim 42, *ante*.)

The state supreme court reasonably could find the prosecution's argument was based in the admissible evidence and reasonable inference therefrom. Petitioner fails to point to clearly establish federal law precluding the jury's consideration of non-statutory aggravating circumstances. *See e.g., Barclay v. Florida*, 463 U.S. 939, 947 (1983) (federal court review of state law sentencing findings "is limited to the question whether they are so unprincipled or arbitrary as to somehow violate the United States Constitution."). To the extent California precludes the jury's consideration of non-statutory aggravation, Petitioner has not shown his trial was fundamental unfair on this basis, for the reasons stated. *See e.g., Boyd*, 38 Cal. 3d at 772-76.

Notably, the trial court considered and overruled counsel's objection to the prosecutor's argument the jury should "consider [Petitioner's] attitude when he was committing these crimes [that Petitioner showed] total indifference to the pain and suffering these people suffered at the time [he]. . . gave paraquat [to the victims]." (RT 5486.)

Additionally, to the extent Petitioner revisits his above discussed arguments relating to admissibility of prior criminal activity and the trial court's failure to sever the Kern County counts, those arguments fail for the reasons stated. (*See* claims 6 and 42, *ante*.)

iv.    *Diminished Juror Responsibility*

(1)    **Presentation of False Argument**

Petitioner argues the prosecution misled jurors as to their responsibility to consider mitigating evidence by arguing that any sentence imposed would not be the jurors' "fault." (Doc. No. 25 at 433 citing RT 5489; see *Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985) (the Eighth Amendment makes it "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.").

However, the state supreme court reasonably could find prosecutor Witt's argument, taken in context, highlights Petitioner's responsibility for his actions and lack of remorse, rather than the jury's avoidance of their oath and duty. The record reflect Witt argued to the jury that:

> [Petitioner] regrets being convicted, but that won't be [Petitioner's] fault, that is my fault or Mr. Eyherabide's fault or your fault or the witnesses' fault but it won't be [Petitioner's] fault. He has expressed no regrets about the killings that he's committed.

(RT 5489.) The state supreme court reasonably could find Petitioner's argument that prosecutor Witt improperly argued juror responsibility to be unsubstantiated.

Furthermore, the jury was instructed on the Penal Code section 190.3 factors. (CT 2044-45.) The jury presumably understood and followed their instructions *in toto* including that arguments and opinions of counsel are not evidence. (CT 1929, 2043.)

### v. Prejudice

Petitioner argues the alleged misconduct prevented the jury from considering all the mitigating evidence and played to juror biases not exposed during inadequate voir dire. (*See* Doc. No. 25 at 433-34 citing Ex.'s 145-150.)] However, even if the prosecutor engaged in misconduct as alleged, the state supreme court reasonably could find it did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

A jury generally accords less weight to the arguments of counsel than to the instructions it is given. *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) (citing *Boyde*, 494 U.S. at 384) (jurors generally accord less weight to arguments of counsel than the court's instructions and such arguments must be viewed in the context of all argument and the instructions); *see also Darden*, 477 U.S. at 182 (claim of prosecutorial misconduct rejected where the prosecutor's comments "did not manipulate or

270

misdate the evidence, nor . . . implicate other specific rights of the accused, such as the right to counsel or to remain silent").

Here, the evidence presented in aggravation including the facts and circumstances of the instant killings was substantial. (*See* RT 5486-89; claims 30 and 31, *post*; *cf.* RT 5490-5503.) The state supreme court reasonably could find any errant argument by the prosecutor did not have a substantial and injurious effect or influence on the penalty judgment. (Doc. No. 25 at 435 citing *Brecht*, 507 U.S. at 638 n.9.)

Assuming without finding that Petitioner could incorporate claims 1-35 as he purports to do (see Doc. No. 25 at 430-35; *see also* SECT 2254 Rule 2 (habeas petition must state the facts supporting each ground)), the incorporated claims are unpersuasive for the reasons stated *ante* and *post.*

Accordingly, the state supreme court reasonably could find Petitioner has not demonstrated the alleged constitutional violations exerted a "substantial and injurious" effect on the penalty phase judgment. *Brecht*, 507 U.S. at 620; *Fields*, 309 F.3d at 1109.

*vi.    Conclusions*

The state supreme court reasonably could find the prosecutor did not engage in penalty phase misconduct as alleged.

Moreover, that court reasonably could find Petitioner failed to show structural or more than harmless error as a result of the alleged constitutional deprivations.

Accordingly, it does not appear that the California Supreme Court's rejection of claims 36 and 44 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claims 36 and 44 shall be denied.

**G.    Claims Alleging Ineffective Assistance at the Penalty Phase and Thereafter**

1.    Legal Standard

The Sixth Amendment right to effective assistance of counsel applies through the sentencing phase of a trial. *See Murray*, 745 F.3d, at 1010-11: U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; *Gideon*, 372 U.S. at 343-45; *Silva*, 279 F.3d at 836.

The *Strickland* propounded two-prong (i.e. deficient performance and prejudice) test for analysis

271

of claims of ineffective assistance of counsel and its doubly deferential application in AEDPA cases is set out in section VII, D, 1, *ante*.

The analysis of prejudice at the penalty phase involves multiple steps. The first step is evaluating the totality of the available mitigating evidence. *Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 534-35. After the mitigating evidence is identified, a court weighs the strength of the mitigating evidence by assessing its likely impact on a jury. This weighing process includes evaluating whether its impact on the jury might be aggravating rather than mitigating. *Pinholster*, 563 U.S. at 201-02. Courts may "consider the fact that mitigation may be in the eye of the beholder, and juries may find that some evidence offered as mitigation cuts the other way." *Burger v. Kemp*, 483 U.S. 776, 794 (1987). We have also noted the Supreme Court's observation that "on one hand, a jury could react with sympathy over the tragic childhood of the defendant, while on the other hand, the same testimony could establish the defendant's unpredictable propensity for violence that resulted in murder." *Id.* "Similarly, evidence of mental and emotional problems might suggest an increased likelihood that a defendant would be dangerous in the future. . . ." *Pinholster*, 563 U.S. at 201.

"The second step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is evaluating the weight of the aggravating evidence and any rebuttal evidence that the government could have adduced had the mitigating evidence been introduced." *Williams*, 529 U.S. at 397-98. "Aggravating evidence may include evidence relating to the circumstances of the crime. Thus, in *Strickland*, the Court found the aggravating evidence to be overwhelming where the defendant had repeatedly stabbed the three murder victims during a robbery. . . ." 466 U.S. at 674.

Rebuttal evidence may also directly undermine the value of the mitigation evidence. *See Pinholster*, 563 U.S. at 201. "For example, the Supreme Court [has] noted . . . that it would be of questionable mitigating value for defense counsel to introduce expert testimony diagnosing a defendant with bipolar mood disorder and seizure disorders, because such evidence would invite rebuttal by a state expert, who could reject the diagnosis of bipolar disorder and offer a different diagnosis of antisocial personality disorder." *Id.* at 177.

The third and final step in assessing prejudice at the penalty phase "is to reweigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins*, 539 U.S. at 534, in order to

determine "whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

As at the guilt phase, when a defendant challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "A reasonable probability is a level of probability that undermines confidence in the outcome. . . ." *Id.* "The likelihood of a different outcome must be substantial, not just conceivable." *Id.* "The Court has found a reasonable probability of a different outcome when scant and weak aggravating evidence could have been presented in rebuttal to strongly mitigating evidence." *Id.* "By contrast, the Court has found no prejudice when the aggravating evidence is overwhelming, even though the mitigating evidence is strong." *Id.*

### 2. Claim 35

Petitioner alleges counsel was ineffective at the penalty phase by failing to investigate, develop and present then available psychosocial evidence including that alluded to by counsel during death qualification voir dire (i.e. claim 35 subclaims A-D and F), and by failing to object to the prosecution's improper penalty phase closing argument (i.e. claim 35 subclaims E and F), violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 25 at 367-429.)

#### a. State Direct and Collateral Review

Petitioner raised claims 35(D) and 35(F), alleging prejudicially deficient failure to investigate and present mitigating psychosocial evidence alluded to by counsel during death qualification voir dire, on Fifth and Sixth Amendment grounds, on direct appeal and the California Supreme Court denied the claims on procedural grounds including as appropriate for resolution in habeas corpus. *Catlin*, 26 Cal. 4th at 176.

Petitioner raised claims 35(A-C) and 35(F), alleging prejudicially deficient investigation and failure to present psychosocial evidence in his first state habeas petition and the claims were denied on the merits. (Order No. S090636.)

Petitioner raised claim 35 in its entirety in his second state habeas petition and it was denied on

the merits as to 35(F), and otherwise denied on procedural grounds including that claims 35(A-C) were repetitive of claims raised in the prior state habeas petition (*In re Miller*). (Order No. S173793).

### b. Analysis

Petitioner faults counsel for allegedly inadequate investigation, development and presentation of the mitigation defense including as to psychosocial evidence. (Doc. No, 25 at 367-429.) Particularly, he faults counsel's alleged failure to present mental state evidence alluded to during death qualification voir dire, and to object to the allegedly improper penalty phase closing of prosecutor Witt. (*Id.*)

In the penalty phase, defense counsel has an "obligation to conduct a thorough investigation of the defendant's background," *Williams*, 529 U.S. at 396, and defense counsel has a duty to investigate, develop, and present mitigation evidence during penalty phase proceedings. *Wiggins*, 539 U.S. at 521-23. Counsel has a duty to make a "diligent investigation into his client's troubling background and unique personal circumstances." *Williams*, 529 U.S. at 415.

Nonetheless, the Supreme Court has recognized that the duty to investigate does not require defense counsel "to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 382-83 (2005) (citing *Wiggins*, 539 U.S. at 525) (further investigation is excusable where counsel has evidence suggesting it would be fruitless); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"). As the *Strickland* court stated:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91.

"In assessing counsel's investigation, the court must conduct an objective review of their performance, measured for reasonableness under prevailing professional norms," *Strickland*, 466 U.S. at 688, which includes a context-dependent consideration of the challenged conduct as seen "from counsel's

274

perspective at the time." *Id.* at 689.

Further, the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigative decisions are reasonable depends critically on such information. *Strickland*, 466 U.S. at 691.

Petitioner's allegations, analyzed separate below, lack merit upon deferential (regarding claims 35(A-C and F) and *de novo* review (regarding claims 35 (D-E), as discussed below.[18]

### i.    Counsel's Investigation, Development and Presentation of the Mitigation Defense

**(1)    Qualifications of Penalty Phase Counsel, Michael Dellostritto**

Petitioner argues that co-counsel, Michael Dellostritto, who was primarily responsible for the penalty defense, was unqualified as capital habeas co-counsel. He argues that Dellostritto, who was appointed shortly after Petitioner's arraignment at the request of lead counsel Dominic Eyherabide, lacked capital habeas experience. (*See* Doc. No. 25 at 369.)

**(2)    Penalty Investigation and Defense**

Petitioner argues counsel failed to timely and adequately investigate the penalty defense such that the defense team was unable to make strategic decisions including as to presentation of multi-generational life and family history, medical history, and psychological and other mitigation evidence. (Doc. No. 25 at 367-71 *citing Sanders v. Ratelle*, 21 F.3d 1446, 1456-57 (9th Cir. 1994 (counsel found to be ineffective where he neither conducted a reasonable investigation nor made a showing of strategic reasons for failing to do so).

Petitioner suggests that Dellostritto failed to perform the minimum work necessary to make informed decisions and that lead counsel Eyherabide was distracted by his workload in other matters. (Doc. No. 25 at 369 citing CT 1376.) He alleges that during the four years intervening appointment and the start of trial, Dellostritto spent less than four weeks total working on the penalty defense. (Doc. No. 25 at 369-70; *see also* Ex. 24.) He points to Dellostritto's billing records which suggest that during the

---

[18] Alleged ineffectiveness of appellate and post-conviction counsel (*see* Doc. No. 25 at 428-29) lacks merit, for the reasons stated.

period 1986-1990 Dellostritto billed for a total of 127 attorney hours of which, he argues, only 70 hours related to the penalty defense. (Doc. No. 25 at 369 citing 1SHCP Ex. 24.) He argues Dellostritto was appointed in 1986 and in that year worked on the case a total of 52.4 hours; 38.3 hours in 1987; 12.9 hours in 1988; 23 hours in 1989; and 10.7 hours in January 1990; and 13.5 hours in February 1990, the month trial began. (*See* Doc. No. 84 at 46-47 and Ex.'s DD and EE thereto.) He argues that during this time, Dellostritto met with Petitioner perhaps four times for about thirteen hours in total. (*See* Doc. No. 95 at 194.)

Petitioner argues that as a result the penalty strategy was unclear, and the defense team lacked direction as to matters they should have been investigating. (Doc. No. 25 at 370; *see also* Doc. No. 84 at 47 and Ex. FF.)

*ii.     Unpresented Habeas Proffer Evidence*

Petitioner argues counsel was deficient by failing to adequately investigate, develop and present habeas proffered psycho-social evidence, as follows.

**(1)     Multi-Generational Mental and Emotional Risk Factors**

Petitioner argues evidence of multi-generational physical, mental and emotional risk factors and impairments and suggests he was predisposed in these regards. (Doc. No. 25 at 376-77.) He suggests that his birth mother, Barbara Williams, may have suffered mental or emotional problems including possible depression. (Doc. No. 25 at 400-02; *see also* 1SHCP Ex.'s 33-34, 113, 186.) He notes Williams, herself the product of a broken home and unstable homelife while being raised by her grandmother (Doc. No. 25 at 377 citing Ex. 186), was nineteen-years-old and unmarried when she gave birth to him. (Doc. No. 25 at 376-77 citing 1SHCP Ex.'s 33-34, 113, 186.)   He contends that Williams demonstrated manic behavior and underperformed academically. (Doc. No. 25 at 377-78; *see also* 1SHCP Ex.'s 186, 111-13, 105.)

Petitioner points to his adoption at age 1 week by a middle-aged couple who at that time had been married for 17 years, Glenn and Martha Catlin. (Doc. No. 25 at 376-82 citing Ex.'s 34, 39, 42, 43, 81, 114.) He suggests his adoptive parents may have suffered mental or emotional problems which in combination with his unstable, dysfunctional, and deprived upbringing near areas where agricultural chemicals were used may have left him brain damaged and mentally impaired. (Doc. No. 25 at 415-

16).  He points to allegedly poor personal and business decisions made by his adoptive parents.  (Doc. No. 25 at 383, 415-16 citing 1SHCP Ex.'s 44-48, 50.)  He notes that he was not told that he was an adopted child until his teens (*see* RT 4067) and that his mother punished him as a youth by dressing him as a girl in public.  (Doc. No. 25 at 375, 401; RT 4067, 5148-49; *see also* CT 209.)

### (2)    Petitioner's Psychosocial Risk Factors

Petitioner argues mental health risk factors that arose during his adolescence.  He argues that he struggled in high school receiving grades ranging from "B+" to "F."  (Doc. No. 25 at 384 citing 1SHCP Ex.'s 68-70.)  He argues that while in high school, his parents then sent him to live with a known pedophile named John Brown, a police officer in Wasco, California, a small town north of Bakersfield, who molested him and performed sex acts with him.  (Doc. No. 25 at 384 citing 1SHCP Ex.'s 70-75, 104-107.)

Petitioner points to his subsequent detention as incorrigible at Camp Erwin Owen, a notoriously harsh juvenile facility run by the Kern County Probation Department (Doc. No. 25 at 419-20; *see also* 1SHCP Ex.'s 80-85, 88, 190, 223, 226-29), and then Chino State Prison on a forgery conviction.  (Doc. No. 25 at 419-20.)  He argues that during his institutionalization he suffered physical and psychological abuse and was not provided needed substance abuse and psychological therapy.  (*Id.*; *see also* 1SHCP Ex.'s 84, 92, 104, 119-120, 190, 221-228.)

Petitioner points to evidence that he then returned home and to public high school with a heavy drinking habit.  (Doc. No. 25 at 393; *see also* 1SHCP Ex.'s 119-120); that he dropped out of high school, worked a variety of jobs, and attempted to join the Navy but was rejected as "unsuitable."  (*See* 1SHCP Ex.'s 69, 87, 191, 197.)

Petitioner points to his unstable domestic life.  At age 19, he married 17-year-old Linda Brothers and they had a daughter.  (1SHCP Ex.'s 89, 196.)  They divorced several years later.  (1SHCP Ex. 90.)  Petitioner then moved back in with his abuser, John Brown, for about a month, allegedly drinking excessively during this time.  (1SHCP Ex. 104.)   Petitioner then met and had a son with Sharon Dailey.  (1SHCP Ex. 87, 91-93.)  The couple struggled financially with petitioner working at a gas station.  (Doc. No. 25 at 396 citing 1SHCP Ex.'s 87, 92.) The couple divorced in 1971.  (1SHCP Ex. 94.)

A few months later, petitioner married Edith Beard, a divorcee with two young children.  (1SHCP

277

Ex.'s 96, 118.) They divorced in 1973. (1SHCP Ex. 97.) In late 1973, petitioner married Joyce Neilsen, a divorcee with eight children. (RT 3707-08; 1SHCP Ex. 99.)

Petitioner found steady employment as an auto mechanic and farm mechanic. (RT 4767-5028; 1SHCP Ex.'s 87.) In 1976-1977, Petitioner worked at Superior Farms on spray rigs used to apply, and sometimes containing, agricultural chemicals. (1SHCP Ex. 87; CT 314-315.) He was a good worker and was promoted. (1SHCP Ex. 26.)

Joyce became ill in April of 1976 and died a month later from what the coroner determined was a "natural death" with "no evidence of trauma or foul play involved with this death." (1SHCP Ex. 21, 23, 25, 121; CT 314-15.) In 1977, petitioner married divorcee Glenna Emery. (1SHCP Ex.'s 27, 66.) He moved to Fresno and took a job with the Fresno County Maintenance Yard. (1SHCP Ex. 87.) He continued to be well thought of professionally. (*See* 1SHCP Ex. 117.)

In 1981, he opened his own auto repair business, Action Engineering (CT 346) with Glenna serving as bookkeeper. (See e.g., CT 405.) The couple moved to property owned by Glenna's parents on American Avenue in Fresno where petitioner lived until his arrest in 1985. (RT 3113-16.)

### (3)     Mental Impairments at Time of Crimes and Trial

Petitioner argues the noted risk factor combined with alleged head trauma left him mental impaired by the time of the crimes and continuing to trial. He points to opinion of his habeas neuropsychologist, Dr. Khazanov, that during this time he suffered brain (frontal lobe) injury from a closed head injury suffered in a car racing accident (Doc. No. 25 at 410) exacerbated by exposure to pesticides during his youth and employment as a farm mechanic, substance abuse, abuse by pedophile John Brown, and victimization and retraumatization during institutional life. (Doc. No. 25 at 403-14; 1SHCP Ex. 199.)

Dr. Khazanov opined Petitioner was severely functionally impaired with memory and learning problems and inability to plan and adapt behavior to changed circumstances. (1SHCP Ex. 199.) Specifically, Dr. Khazanov opined that:

> Petitioner suffered from significant impairment of his frontal lobes and that he functioned in the moderately to severely impaired range overall. Because of this impairment, Petitioner suffers from striking memory deficits. He lacks the ability to plan complex actions adequately, learn from his mistakes, or shift his thinking or behaviors in response to environmental or verbal cues. He lacks the capacity to adapt to changed circumstances.

278

Petitioner's impairments have greatly contributed to his behavior, functioning, and personality throughout his life.

(Doc. No. 25 at 417 citing 1SHCP Ex. 199.)

    *iii.*    *Counsel Was Not Deficient in the Investigation, Development, and Presentation of the Penalty Defense*

Petitioner argues counsel should have further investigated and developed the above noted mental health risk factors and mental impairments and developed and presented a defense based thereon as suggested by Dr. Khazanov. (Doc. No. 25 at 373, 420 citing Ex. 199.) Particularly, he argues counsel could not adequately assess his mental state or make a rational decision regarding the presentation of mental state evidence at either guilt or penalty phase without knowledge of his organic brain damage. (Doc. No. 25 at 417 citing 1SHCP Ex. 199.)

Petitioner also faults counsel for broaching mental state issues during death qualification voir dire and then not presenting any mental state evidence during the penalty phase.

The California Supreme Court considered these allegations and direct appeal and found them appropriate for habeas corpus, stating that:

Defendant contends that defense counsel provided ineffective assistance in failing to present evidence in mitigation at the penalty phase "about appellant's background, childhood or psychological profile." Defendant suggests the jury should have been informed that defendant was an adopted child who, at the age of 13 or 14 years, first was informed of his adoptive status. In support, he refers to guilt phase testimony as to which a relevance objection was sustained. He also refers to preliminary hearing testimony indicating that his mother, Martha, had punished him as a child by placing him in public view dressed in girls' clothing. Mental health professionals, defendant surmises, would have testified that such conduct caused psychological damage, and could have testified "about any other psychological problems appellant may have manifested."

We cannot determine on the basis of the record on appeal whether counsel's failure to present evidence of defendant's alleged adoptive status or childhood trauma constituted ineffective assistance. (See People v. Diaz, supra, 3 Cal.4th at p. 566.) As in previous cases, "[t]he appellate record does not disclose what mitigating evidence was available that was not presented, or what reasons defense counsel may have had for not presenting it." (People v. Cudjo (1993) 6 Cal.4th 585, 634 [25 Cal.Rptr.2d 390, 863 P.2d 635]; see also People v. Samayoa, supra, 15 Cal.4th at p. 857.) Although the record suggests that defendant had been adopted and that his mother had punished him as a child by dressing him in girls' clothing, the record does not disclose whether these circumstances caused defendant psychological damage. "The record does not establish defense experts would have provided exculpatory evidence if called, and we decline to speculate in that regard ...." (People v. Bolin, supra, 18 Cal.4th at p. 334.) In addition, counsel reasonably may have concluded that the evidence that was presented at the penalty phase, consisting of testimony concerning defendant's excellent adjustment to prison confinement and ability to provide assistance and comfort to persons outside of prison even during his

incarceration, was likely to persuade the jury to spare his life, whereas assertions regarding his mother's conduct toward him when he was a child would not. Defendant's claims in this regard should be presented in a petition for writ of habeas corpus.[20]

--------------------FOOTNOTE--------------------

n.20 Contrary to defendant's claim, questions asked by defense counsel during voir dire, regarding prospective jurors' attitudes toward mitigating evidence related to psychological trauma, do not establish that evidence of psychological trauma in fact existed that was available to counsel and that should have been presented.

--------------------END FOOTNOTE--------------------

*Catlin*, 26 Cal. 4th at 176.

The state supreme court's summary rejection of claims 35(A-C and F) was not unreasonable and claims 35(D-E) lack merit upon *de novo* analysis. The record suggests counsel reasonably investigated the mitigation defense and based thereon strategically determined not to further investigate mental state defenses in favor of the mitigation defense presented that was consistent with the guilt phase defense and Petitioner's competent testimony that he was innocent (RT 4767-5028). Petitioner's special allegations are discussed separately, as follows.

**(1)     Qualifications of Penalty Phase Counsel**

The state supreme court reasonably could find co-counsel Dellostritto's qualifications as capital co-counsel are reflected in the record and unimpeached. The record reflects that lead defense counsel Eyherabide offered unimpeached testimony attesting to Dellostritto's abilities and experience at the time of appointment and that the trial court relied thereon. (CT 1353-54.) The state supreme court reasonably could find Petitioner has not demonstrated otherwise on the factual record.

**(2)     Mitigation Investigation and Defense**

The state supreme court reasonably could find counsel was not put to further investigate and develop inferential mental state defenses that would have been inconsistent with (i) Petitioner's lack of any history of mental health issues, (ii) Petitioner's apparent functionality at the time of the crimes and trial including his extensive trial testimony which was fully oriented and grounded in the factual record, and (iii) the primary guilt phase defense of innocence and lingering doubt therefrom.

That court reasonably could find that counsel's investigation of family, social, employment, criminal, and institutional history was sufficient to inform the penalty defense strategy of mitigation by

good acts and suitability for LWOP. *See Gustave v. United States*, 627 F.2d 901, 904 (9th Cir. 1980) ("Mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation.").

Strategic decisions based upon investigation conducted by counsel are accorded deference:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. "The scope of a defense counsel's pretrial investigation necessarily follows from the decision as to what the theory of defense will be." *Soffar v. Dretke*, 368 F.3d 441, 473 (2004). In determining whether counsel made reasonable tactical decisions about certain evidence, a court focuses on whether the investigation supporting counsel's decision to introduce or omit certain evidence was itself reasonable. *Wiggins*, 539 U.S. at 523.

Here, Petitioner concedes counsel obtained a copy of his adoption file containing the circumstances of his birth and adoptive family at least 6 months before trial. (Doc. No. 25 at 414 citing 1SHCP Ex.'s 40, 122.) Relatedly, co-counsel Dellostritto's billings suggest that he consulted with and reviewed materials from an adoption syndrome expert, Dr. Kirschner, prior to trial. (*See* Doc. No. 84-3 at 28.) Petitioner concedes that trial counsel had and presumably considered evidence of John Brown's alleged sexual molestation of Petitioner and other young boys. (*See* Doc. No. 25 at 414 citing Ex.'s 104, 106.)

Moreover, the jury was aware of certain of the fruits of the defense psychosocial investigation. For example, the jury was aware Petitioner's adoptive mother allegedly disciplined him when he was young by dressing him as a girl. (RT 5148-49; *see also* CT 209.)

Additionally, the penalty defense team interviewed and presented lay and expert witnesses in mitigation, as follows:

> Kevin, John, Gail, Courtney, and Christian Faulkenberry described their long and close friendship with Petitioner. (RT 5366-5389.)

Virginia Bennett testified about Petitioner saving her son's life. (RT 5392-5397.)

Kenneth Howard, a sergeant with the California Correctional Institution at Tehachapi, testified concerning his four years of contact with Petitioner in prison (RT 5439-5441) and that in his view Petitioner was a model prisoner who supervised other prisoners on furniture building. (RT 5441-5452.)

Charles McKillip, the Assistant Superintendent of the Industries Program at Tehachapi, testified similarly. (RT 5442-5452.)

Terry Olson, Mr. McKillip's supervisor, also testified about Petitioner's excellent work in prison; he stated that Petitioner was a very motivated and highly skilled worker who helped motivate younger inmates. (RT 5459-5465.)

Defense expert, Dr. Craig Haney testified about institutional environments. (RT 5398-5438.) He mentioned Petitioner's positive prison adjustment, which included unusually positive file entries from correctional officers and the lack of a discipline record. (RT 5417-5421.)

The state supreme court reasonably could find the mitigation defense presented was consistent with the primary guilt phase defense of innocence including Petitioner's denial that he knowingly possessed paraquat or was aware of its lethal properties or used paraquat to kill Joyce and Martha or confessed to the killings to Hardin. (*See* RT 4764-5028.)

Notably, neither trial counsel provided a habeas declaration relating to the ineffective assistance allegations. Petitioner argues that trial counsel refused to cooperate with post-conviction counsel in the investigation of this claim. (See e.g., Doc. No. 95 at 192 citing Doc. No. 84-1 at 1.) However, the state supreme court reasonably could discount the evidentiary value of such in the absence of any supporting declaration from state habeas counsel. (*See* Doc. No. 84-1 at 1.)

Additionally, the state supreme court reasonably could find counsel was not deficient in determining not to further investigate mental state defenses. Petitioner revisits the claim 27 discussion (of ineffective assistance at the guilt phase) above and argues that counsel unreasonably failed to consult with necessary mental health experts to assess his psychiatric, neuropsychological, or psychological dysfunction over time. (Doc. No. 25 at 404.) Particularly, he argues counsel unreasonably failed to: (i) obtain an accurate sociomedical history from him and from independent sources; (ii) conduct physical and neuropsychological testing to assess his possible organic causes of cognitive and behavioral problems, and (iii) present the fruits of (i) and (ii) to a retained mental health expert. (Doc. No. 25 at

404-10; 1SHCP Ex. 199.)

Petitioner observes defense habeas expert Dr. Khazanov's opinion that "[w]ithout this crucial knowledge of Petitioner's organic brain damage, trial counsel could not adequately assess his mental state or make a rational decision regarding the presentation of mental state evidence at either guilt or penalty phase." (Doc. No. 25 at 417 citing 1SHCP Ex. 199.)   Particularly, he argues counsel failed to develop the psychological effects of his traumatic sexual abuse by John Brown (Doc. No. 25 at 403-19) which effects might have impeached prosecution witness testimony at the guilt phase of his seemingly inappropriate and thus inculpating statements around the time of the crimes (*see e.g.*, RT 3175-3177, 3182-3184, 4097-4103; 4149-4156).  (*See* Doc. No. 25 at 418.)  He points to Dr. Khazanov's opinion that he lacked mens rea in mitigation of his seemingly inculpatory and inappropriate responses and comments noted by trial witnesses.  ((Doc. No. 25 at 417; *see e.g.,* RT 3175-3177, 3182-3184, 4097-4103; 4149-4156.)

However, as discussed in claims 26(O) and 27 above, the state supreme court reasonably could find counsel adequately investigated Petitioner's psychosocial history and was strategically motivated in discounting mental defenses at trial.   That court reasonably could find counsel's adequate investigation did not provide facts suggesting Petitioner might be mentally impaired.  *See e.g., Wallace*, 184 F.3d at 1117 (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995)) (recognizing that where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance).   Significantly, Petitioner's employment evaluations appeared uniformly positive; he operated what was from all accounts a successful auto repair business; he was well thought of professionally and received positive reviews from prior employers; and he was able to program at a high-level during incarceration.

The state supreme court reasonably could find Dr. Khazanov's opinions subject to discount to the extent based on *post hac* surmise unsupported by deficits in Petitioner's functionality (see claims 26(O) and 27) and his institutional records (see e.g., 1SHCP Ex. 107).  Dr. Khazanov herself observed that a 1986 psychological examination of Petitioner found no evidence of organic brain pathology.  (Ex. 199 at 13-14.)

Furthermore, Petitioner's habeas proffer does not point to facts that he suffered abuse or demonstrated untreated mental health issues during confinement at Camp Owen and Chino state prison. To the extent a sentencing court recommended institutional treatment for addiction, Petitioner has not pointed to facts and undiscounted opinion suggesting what treatment he was denied and how that impacted his mental state, if at all.

For the reasons stated, Petitioner fails to demonstrate on *de novo* review that counsel was deficient by failing to investigate and present mental state evidence in light of death penalty voir dire wherein counsel tested willingness of prospective jurors to consider emotional and psychological evidence.

At bottom, the state supreme court reasonably could find in this case, as the Supreme Court noted in Van Hook, that:

> This is not a case in which the defendant's attorney [] failed to act while potentially powerful mitigating evidence stared [him] in the face [Citation] or would have been apparent from documents any reasonable attorney would have obtained, [Citation]. It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

558 U.S. at 11-12 (quoting *Strickland*, 466 U.S. at 699); *see also Pinholster*, 563 U.S. at 180-81 ("There is no constitutional duty to investigate, but only to provide reasonable representation.").

iv.    *Counsel Was not Deficient By Failing to Object to the Prosecution Closing*

Petitioner faults counsel for failing to object to the prosecution penalty phase closing argument which he argues was based upon "false testimony . . . [and] aggravating circumstances that are not authorized by statute or the Constitution . . . [and that misled] the jury as to their responsibility to consider mitigation." (Doc. No. 25 at 427 citing claim 36, *ante.*)

The record shows that counsel's objection to the prosecutor's argument relating to Petitioner's "attitude" was overruled by the trial court. (RT 5486.) The state supreme court reasonably could find the objection lacked merit for the reasons discussed in claim 36, *ante.*

Additionally, "[b]ecause many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during opening statement and closing argument is within the 'wide range' of permissible professional legal conduct." *Necoechea*, 986

F.2d at 1281 *(citing Strickland*, 466 U.S. at 689) (finding no ineffectiveness for failure to object to the prosecutor's argument).

Upon *de novo* review, Petitioner's claim that counsel was deficient by failure to object or further object to the prosecution closing on the noted grounds fails, for the reasons stated.

### v. Prejudice

Petitioner argues counsel's allegedly deficient conduct was prejudicial under *Strickland*. He argues that absent counsel's deficient conduct the jury would have been aware of habeas proffer facts suggesting brain damage and mental deficiencies and the harshness of Petitioner's prior incarceration and that which he would have experienced in LWOP. (Doc. No. 25 at 373, 425.) He argues a reasonably probability of different sentencing outcome had the jury been aware of such facts. (Doc. No. 25 at 425.)

As noted above, assessing prejudice at the penalty phase implicates a three-step inquiry: first, the court evaluates and weighs the totality of the available mitigating evidence; second, it evaluates and weighs the aggravating evidence and any rebuttal evidence that could have been adduced by the government had the mitigating evidence been introduced; and third, it reweighs the evidence in aggravation against the totality of available mitigating evidence to determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Apelt v. Ryan*, 878 F.3d 800, 832-33 (9th Cir. 2017) (quoting *Strickland*, 466 U.S. at 695).

Here, the California Supreme Court was not unreasonable in finding counsel's alleged deficiencies not to be prejudicial upon reweighing the total mitigating evidence against the evidence in aggravation and rebuttal. The jury was aware of mitigating facts from Petitioner's troubled social and institutional history including: testimony that his adoptive mother, Martha, dressed Petitioner as a girl when he was young; that he had done good deeds; that he adjusted well to prison life, and did not present future danger while incarcerated. Although the prosecution's penalty case included presentation of only one witness, Petitioner's first wife, Linda Catlin, who testified to the above noted strangling incident, (s*ee* RT 5353-59), the state supreme court reasonably could find the aggravating evidence including circumstances of the crimes, Petitioner's prior criminal convictions and violent acts, and potential rebuttal mental health opinions to be substantial. (*See* RT 5486-89; claims 30 and 31, *post*; *cf.* RT 5490-5503.)

285

The state supreme court reasonably could find Petitioner's habeas mental state proffer was subject to discount and subject to rebuttal on that basis. The lingering doubt value thereof reasonably could be seen as insubstantial on that basis. For example, the state supreme court reasonably could find the totality of undiscounted mitigating evidence would not have impeached prosecution witness testimony that Petitioner responded inappropriately following the killings. (*See e.g.*, Doc. No. 25 at 418 citing RT 3175-3177, 3182-3184, 4097-4103; 4149-4156.)

Furthermore, the state supreme court reasonably could find counsel's failure to present mental state evidence referred to during death qualification voir dire not to be prejudicial. Petitioner argues that interviews with jurors established they expected psychological evidence in mitigation given counsel's death qualification voir dire regarding susceptibility to mitigation evidence including background, upbringing and development, emotional disturbances, and psychological problems. (*See* Doc. No. 25 at 371-75; *see also* 1SHCP Ex.'s 145-150; *see also Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1989) ("[O]verwhelming evidence of guilt does not ameliorate the failure to present mitigating evidence at penalty phase."). He points out that jurors were questioned about their view on mitigating psychological evidence during voir dire. (*See e.g.*, Doc. No. 25 at 425-26 citing RT 398-401.) He suggests that as a result the jury could have concluded that no such mitigating evidence existed. (Doc. No. 25 at 376.)

However, that state supreme court reasonably could have found the argument that jurors expected psychological evidence to be mere surmise. As that court noted:

> Contrary to defendant's claim, questions asked by defense counsel during voir dire, regarding prospective jurors' attitudes toward mitigating evidence related to psychological trauma, do not establish that evidence of psychological trauma in fact existed that was available to counsel and that should have been presented.

*Catlin*, 26 Cal. 4th at 176, n.20. Petitioner has not demonstrated otherwise on the evidentiary record. The noted voir dire appears only to probe prospective juror susceptibility to various generic mitigation.

Additionally, the state court reasonably could find objection to the prosecution closing argument on the grounds stated would have lacked merit, for the reasons stated. Counsel's failure to make a meritless objection is not prejudicial under *Strickland*. *See Fretwell*, 506 U.S. at 374.

*vi.    Conclusions*

For the reasons stated, a fair-minded jurist could find that petitioner failed to sufficiently allege

facts that counsel was unqualified and ineffective by failing to investigate, develop and present then available psychosocial evidence (i.e. claims 35(A-C and F).

It does not appear that the California Supreme Court's rejection of claims 35(A-C and F) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

On *de novo* review, Petitioner fails to sufficiently allege facts that counsel was ineffective in his investigation, development and presentation of mitigating evidence in light of death qualification voir dire (i.e. claim 35(D), and by failing to object to the prosecution's improper penalty phase closing argument (i.e. claim 35(E).

Claims 35(A-F) shall be denied.

3.      Claim 39

Petitioner claims counsel failed to subject the prosecution case to meaningful adversarial testing, resulting in a total breakdown in the adversarial process and effective abandonment by and denial of counsel and an unreliable sentence, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Doc. No. 25 at 443-44.)

**a.      State Direct and Collateral Review**

Petitioner raised the claim of a total breakdown in the adversarial process on Fifth, Sixth, Eighth, and Fourteenth Amendment grounds in his first state habeas petition and it was denied on the merits. (Order No. S090636.)

Petitioner raised the claim in his second state habeas petition which was denied on the merits (Order No. S173793).

**b.      Analysis**

Petitioner argues that counsel's failure to meaningfully test the prosecution case denied him effective assistance of counsel and resulted in abandonment by counsel and a "global" breakdown in the adversarial process.  (Doc. No. 25 at 443-44.)

Petitioner supports the claim by purporting to incorporate all claims in his federal petition, particularly noting claims 1-13, 24, 26, and 35.

A breakdown in the attorney-client relationship can result in a denial of the right to effective assistance of counsel. *Frazer v. United States*, 18 F.3d 778, 782-83, 785 (9th Cir. 1994) (overruling on other grounds recognized by *Ellis v. Harrison*, 891 F.3d 1160, 1165-66 (2018)); *see also Brown v. Craven*, 424 F.2d. 1166, 1169-70 (9th Cir. 1970) (trial court's failure to conduct inquiry into irreconcilable conflict arising from the client's refusal to communicate or cooperate with counsel resulted in denial of effective assistance of counsel); *Schell v. Witek*, 218 F.3d 1017, 1026, (9th Cir. 2000) (citing *Smith v. Lockhart,* 923 F.2d 1314, 1320 (8th Cir. 1991)) (the overarching constitutional question is whether the attorney-client conflict has become so great that "it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment").

The state supreme court reasonably could find Petitioner's allegations, analyzed separate below, fail for the reasons stated.

### i. Deficient Performance

Petitioner's reliance upon the other claims in his federal petition as predicate for claimed global breakdown in the adversarial process is unavailing. The state supreme court reasonably rejected certain of the predicate claims and the remaining claims fails upon *de novo* review, individually and cumulatively, for the reasons stated *ante* and *post*.

### ii. Prejudice

Petitioner argues structural and more than harmless error and a fundamentally unfair trial. (*Id.* at 444; *see also Cronic*, 466 U.S. 659-66 (no showing of prejudice required where counsel fails to subject the prosecution's case to meaningful adversarial testing).

However, the state supreme court reasonably rejected certain of the predicate claims and the remaining claims fails upon *de novo* review, individually and cumulatively, for the reasons stated *ante* and *post*.

### iii. Conclusions

A fair-minded jurist could find that petitioner failed to sufficiently allege facts of a global breakdown in the adversarial process.

It does not appear that the California Supreme Court's rejection of claim 39 was contrary to, or

an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claim 39 lacks merit as to predicate claims reviewed *de novo*.

Claims 39 shall be denied.

4.      Claims 51 and 52

Petitioner alleges he received ineffective assistance on direct appeal and habeas review due to California's procedure allowing for appointment of the same attorney to act as appellate and habeas counsel thereby creating an inherent conflict of interest (i.e. Claim 51), and the inadequate and disparate funding of state appointed post-conviction counsel as versus state employed post-conviction counsel (i.e. Claim 52), violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 25 at 500-05.)

**a.      State Direct and Collateral Review**

Petitioner raised Claim 51 in his second state habeas which was rejected on procedural grounds. (Order No. S173793).

Petitioner raised Claim 52 in his second state habeas petition and it was rejected on procedural grounds.  (Order No. S173793).

**b.      Analysis**

Petitioner alleges California's procedure for appointing capital counsel for direct appeal and habeas representation leaves counsel conflicted and denies resources for state appointed post-conviction counsel.

The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of Counsel for his defense."   Petitioner has the right to counsel unburdened by conflicts of interests. U.S. Const., Amend. VI; *Wood*, 450 U.S. at 271; *People v. Bonin*, 47 Cal.3d 808, 833 (1989).

As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  However, an exception exists for cases in which counsel actively represents conflicting interests. *Mickens*, 535 U.S. at 166; *Sullivan*, 446 U.S. at 345-50.

289

In such a case, prejudice is presumed. *Id.*

To the extent the presumed prejudice standard does not apply, Petitioner must meet the *Strickland* prejudice standard by establishing a reasonable probability that, but for counsel's deficient conduct, the result of the proceedings would have been different. *See Strickland,* 466 U.S. at 694.)

Petitioner's allegations, analyzed *de novo* separate below, fail for the reasons stated.

i.    *Deficient Performance*

**(1)    Inherent Conflict of Interest**

Petitioner alleges that consistent with California's then applicable procedures private post-conviction counsel, attorneys Freedman and Schwartz were appointed to represent him on both his direct appeal and state habeas proceedings during the period prior to the filing of his state habeas petition. (Doc. No. 25 at 500-05, citing *Hicks*, 447 U.S. at 346-47 (recognizing due process and equal protection right to an appeal). Petitioner argues this procedure created a direct conflict of interest because counsel appointed to represent him on automatic appeal was concurrently obligated to investigate all potential claims to be raised in a petition for writ of habeas corpus – creating an inherent conflict because counsel is evaluating and investigating his own conduct. *See Del Muro*, 87 F.3d at 1080-1088 (an attorney cannot competently argue his own ineffectiveness). Based thereon, Petitioner contends he was denied the fundamental right to unconflicted counsel. (Doc. No. 25 at 504.)

Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant has the right to the effective assistance of counsel. *Strickland,* 466 U.S. at 686. This right extends not only to effective assistance at trial, but also to effective assistance of counsel on state appeals as of right. *Evitts v. Lucey*, 469 U.S. 387, 394-397 (1985) (a criminal defendant has the right to effective assistance of counsel at trial and on state appeals of right).

However, Petitioner has not identified clearly established Supreme Court precedent supporting these allegations. Successive representation alone does not demonstrate a conflict of interest. *See, e.g., Whiting v. Burt*, 395 F.3d 602, 619 (6th Cir. 2005) ("the rather common occurrence of trial counsel [filing a direct appeal based on ineffective assistance of counsel] does not create any obvious prejudice."); *see also Jackson v. Ylst*, 921 F.2d 882, 887-88 (9th Cir. 1990) (requiring a trial court to appoint substitute counsel whenever a defendant seeks a new trial on the basis of counsel's incompetence is unsupported

290

by case law and would be a "new rule" under *Teague*).

"Until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Sullivan*, 446 U.S. at 350 (regarding presumed prejudice in cases of actual conflict of interest); *see also Earp v. Ornoski*, 431 F.3d 1158, 1184 (2005) (finding that the *Sullivan* line of cases is limited to conflicts involving joint representation). Petitioner has not pointed to evidentiary facts suggesting an actual conflict arising from post-conviction counsel's active representation of a competing interest. *See Garcia*, 33 F.3d at 1198 (no actual conflict where record discloses no active representation of competing interest).

Additionally, Petitioner fails to point to any constitutional right to effective assistance of counsel in state habeas proceedings. *See Coleman*, 501 U.S. at 756-57. Nor has he shown any due process right to collateral review. *See Ryan v. Gonzales*, 568 U.S. 57, 67 (2013). Petitioner may not mount a federal claim for ineffective assistance of collateral review counsel. *See e.g. Strickland*, 466 U.S. 668; *Wiggins*, 539 U.S. 510.

Even if Petitioner could incorporate here the allegations of claims 52-68 as he purports to do, those predicate claims fail, for the reasons stated, *post*. *See* SECT 2254 Rule 2 (habeas petition must state the facts supporting each ground).

### (2) Inadequate and Disparate Funding of Post-Conviction Counsel

Petitioner alleges California's procedures provided inadequate funding for appointed private counsel's habeas investigation.

Petitioner argues that the disparity between the limited state funding available to his appointed private counsel as versus the substantially greater funding available to state employed capital appellate (i.e. State Public Defender) and habeas (i.e. Habeas Corpus Resource Center) counsel denied his right to effective assistance of counsel. (Doc. No. 25 at 503 *citing* California Supreme Court Policies Regarding Cases Arising from Judgments of Death, Policy 3, Standard 2-2.1.) He suggests that his appointed counsel was limited to spending $25,000 on the habeas corpus investigation absent an order to show cause while state employed counsel is not so limited. (*Id.*) He argues this state two-tier appointment system infringes his fundamental right to counsel. (Doc. No. 25 at 504.)

However, the Court disagrees. As with Claim 51 above, Petitioner fails to demonstrate a federal

right to counsel on state habeas corpus proceedings. It does not assist him in this civil proceeding that "the right to counsel is a fundamental right of criminal defendants." (Doc. No. 95 at 240.) His further argument that the two-tier appointment system otherwise impinges on his fundamental constitutional rights [to life, access to the courts] is unsupported and unpersuasive. (*See* Doc. No. 95 at 240-41.)

Furthermore, Petitioner has not demonstrated that California's procedure for appointment and funding of counsel suggests more than state error unredressable on federal habeas. (*See* Doc. No. 25 at 259 citing *Pennsylvania v. Finley,* 481 U.S. 551, 559 (1990); *Franzen v. Brinkman,* 877 F.2d 26 (9th Cir. 1989) ("a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings").

Even if Petitioner could incorporate here the allegations of claims 53-68 (*see* Habeas Rule 2), those predicate claims fail, for the reasons stated, *post*. *See* SECT 2254 Rule 2 (habeas petition must state the facts supporting each ground).

### ii. Prejudice

Petitioner argues counsel's allegedly deficient conduct gave rise to structural and more than harmless error. (Doc. No. 25 at 502.)

However, the Court finds no structural error and no prejudice under *Strickland.* Petitioner has not pointed to facts showing a conflict of interest or level of funding impaired the performance of prior post-conviction counsel.

Particularly, Petitioner has not pointed to evidentiary facts suggesting an actual conflict arising from post-conviction counsel's active representation of a competing interest. He has not demonstrated that in the absence of California's process for appointment and funding of post-conviction counsel, there is a reasonable probability of a different outcome.

Furthermore, the predicate claims Petitioner purports to incorporate lack merit, for the reasons stated. (*See* claims 52-68, *post*.) These rejected claims individually and cumulatively are not predicate for prejudice.

### iii. Conclusions

Upon *de novo* review, Petitioner's claims of ineffective assistance on direct appeal and habeas review due to California's then procedure allowing for appointment of the same attorney to act as

appellate and habeas counsel and funding of such appointed counsel, lack merit.

Claims 51 and 52 shall be denied.

5.      Claims 54, 55 and 56

Petitioner alleges that appellate counsel was ineffective to the extent claims raised in this petition were not raised properly on direct appeal (i.e. claim 54); post-conviction counsel was ineffective to the extent claims raised in this petition were not raised properly on state habeas (i.e. claim 55); and trial, appellate and post-conviction counsel were ineffective by the cumulative effect of their noted alleged errors (i.e. claim 56), violating his rights under the Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 25 at 513-20)

Petitioner's allegations, analyzed *de novo* separate below, fail for the reasons stated.

**a.      State Direct and Collateral Review**

Petitioner raised claims 54, 55, and 56 in his second state habeas petition which were denied on procedural grounds.  (*See* Order No. S173793.)

**b.      Analysis**

*i.      Deficient Performance*

Petitioner alleges ineffective assistance of trial, appellate, and habeas counsel, and cumulative error therefrom.

The *Strickland* standard applies to trial and appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2002).  The Sixth Amendment does not provide for effective assistance of post-conviction counsel.

**(1)      Trial Counsel**

Petitioner alleges ineffectiveness of trial counsel by purporting to incorporate other claims, notably claims 26 and 35.  (*See* Doc. No. 25 at 514, 517, 519.)  Assuming arguendo such incorporation of claims could be permissible, the incorporated predicate claims lack merit, for the reasons stated.  *See* claims 26 and 35, *ante*); *see also* SECT 2254 Rule 2 (habeas petition must state the facts supporting each ground).  Particularly, re-argument that trial counsel was deficient fails, for the reasons stated. (*Id.*)

**(2)      Appellate Counsel**

To the extent Petitioner alleges that appellate counsel was ineffective by failing to raise claims

properly on appeal (*see* Doc. No. 25 at 513-14), the Court observes aappellate counsel has no constitutional obligation to raise every non-frivolous issue, even if requested by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding that an attorney need not advance every colorable argument on appeal). The Supreme Court has recognized that "since time beyond memory" experienced advocates "have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751-52; *cf. Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) (failure to raise a "dead-bang winner" - an issue obvious from the record which would have resulted in reversal - is ineffective).

The appropriate inquiry is not whether raising a particular issue on appeal would have been frivolous, but whether raising it would have led to a reasonable probability of reversal. *Miller v. Keeney*, 882 F.2d 1428, 1435 (9th Cir. 1989). Where a petitioner had only a remote chance of obtaining reversal based upon an issue, neither of the *Strickland* prongs is satisfied. *Id.*

Here, the record reflects that appellate counsel filed a 256-page opening brief raising 40 issues of law with numerous sub-issues. (*See* Appellant's Opening Brief lodged December 18, 2007.) Appellate counsel also filed a 164-page reply brief (*see* Appellant's Reply Brief lodged December 18, 2007) and a 27-page petition for rehearing (*see* Appellant's Petition for Rehearing lodged December 18, 2007). The appeal was disposed of by the noted lengthy merits opinion by the California Supreme Court. Catlin, 26 Cal. 4th 81 (2001).

Petitioner has not demonstrated appellate counsel was deficient by failing to raise on direct appeal any of the claims included in this federal petition. (*See* Doc. No. 25 at 513-14.) Petitioner's federal claims all fail, for the reasons stated *ante* and *post*.

### (3)    Habeas Counsel

Petitioner alleges that habeas counsel was ineffective by failing to raise claims properly on habeas. (Doc. No. 25 at 515-17.) However, he fails to identify clearly established authority showing a right to effective assistance of counsel in habeas proceedings.

Additionally, Petitioner has not demonstrated habeas counsel was deficient by failing to raise on state habeas any of the claims included in this federal petition. (*See* Doc. No. 25 at 515-17.) Petitioner's federal claims all fail, for the reasons stated *ante* and *post*.

To the extent Petitioner revisits arguments discussed above in claims 51 and 52 regarding California's process for appointing appellate and post-conviction counsel (*see* Doc. No. 25 at 516-17), those claims fail, for the reasons discussed above. (*See* claims 51 52, *ante*.)

### ii. Prejudice

Petitioner argues the noted deficiencies individually and cumulatively resulted in prejudice under *Strickland*. (Doc. No. 25 at 518.) He argues that but for counsel's deficiencies there is a reasonable likelihood the result of trial would have been more favorable.

Petitioner argues structural error arising from an alleged global cumulative ineffective assistance of trial, appellate, and habeas counsel. (Doc. No. 25 at 518.) Alternatively, he argues that absent counsel's individual and cumulatively deficient performance, there is a reasonable probability of a more favorable outcome at trial and on appeal and state habeas. Particularly, he argues prejudice by observing that "society has long believed that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, maybe less culpable than defendants who have no such excuse." *Penry,* 492 U.S. at 319.

However, the Court is unpersuaded, for the reasons discussed in claims 32, 38, and 68, *post*.

### iii. Conclusions

Upon *de novo* review, Petitioner's claims of ineffective assistance by individual and cumulative errors of trial, appellate and habeas counsel lack merit.

Claims 54, 55, and 56 shall be denied.

## H. Claims Alleging Unconstitutionality of California's Death Penalty Process

Petitioner alleges in multiple claims that California's death penalty process is unconstitutional. *Catlin*, 26 Cal. 4th, at 178-80.

A state capital sentencing system must rationally narrow the class of death-eligible defendants and permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime. *Marsh*, 548 U.S. at 173-74.

"Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so

as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).

A death penalty law must narrow the class of death-eligible defendants and provide for individualized penalty determination. *McCleskey v. Kemp*, 481 U.S. 279, 308 (1987).

If the reviewing court finds constitutional error, it must additionally decide whether the error had "[a] substantial and injurious effect or influence in determining [the] jury's verdict," under *Brecht*. *Coleman*, 525 U.S. at 145-46.

The state court's findings as to purely state law points raised by Petitioner are final and its interpretation is binding on this Court. State law error, if any there be, is not alone a basis for federal habeas relief. *See Pulley*, 465 U.S. at 41 ("A federal court may not issue the writ on the basis of a perceived error of state law.").

Petitioner's claims are discussed separately below.

1.      Claims 40, 48, 58, 59 – Narrowing Murderers Eligible for Death

Petitioner alleges California's death penalty process including as to capital murder by administration of poison (i.e. claim 40), persons eligible for the death penalty (i.e. claims 48 and 58), and evolving standards of decency (claim 59) is unconstitutional for failure to narrow the class of murders eligible for the death penalty, violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. No. 25 at 445-51, 485-90, 566-93.)

**a.      State Court Direct and Collateral Review**

i.      Claim 40

Petitioner's allegation that Penal Code section 190.2(A)(19), the special circumstance for killing by the administration of poison, as applied to Martha's homicide violated the Eighth Amendment for failure to narrow the class of persons eligible for the death penalty was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4 th at 157-59.

ii.      Claim 48

Petitioner's allegation that California's sentencing scheme violated the Eighth Amendment for failure to narrow the class of persons eligible for the death penalty was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 178-79. The claim was raised in the second state habeas petition

and denied on the merits.  (Order No. S173793.)

Petitioner's claim 58 allegation that California's death penalty scheme violates the Fifth, Sixth, Eight, and Fourteenth Amendments, was raised on direct appeal and denied on the merits.  *Catlin*, Cal. 4th at 178-79.  The claim was raised in the second state habeas petition and was denied on the merits with certain aspects also denied on procedural grounds including raised and rejected on appeal (*Waltreus*).  (Order No. S173793.)

Petitioner's claim 59 allegation that California's death penalty scheme as administrated, violates the Eighth Amendment and international law, customs, norms, and treaties was raised in the second state habeas petition and denied on the merits.  (Order No. S173793.)[19]

## b.    Analysis

Petitioner argues California's death penalty scheme is contrary to *Furman* because it defines death eligibility so broadly that it fails to ensure the constitutionally required "narrowing" function is performed.  (*See* Doc. No. 25 at 565-67; *see also Gregg*, 428 U.S. at 189 ("[D]iscretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.")

Supreme Court cases have established that a state capital sentencing system must: "(1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."  *Marsh*, 548 U.S. at 173-74.   If the "state system satisfies these requirements," then the "state enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." *Id.* (citing *Franklin*, 487 U.S. at 179 and *Zant,* 462 U.S. at 87576, n.13.)

A state may narrow the class of murderers eligible for the death penalty by defining degrees of murder.  *Sawyer v. Whitley*, 505 U.S. 333, 342 (1992).  A state may further narrow the class of murderers by finding "beyond a reasonable doubt at least one of a list of statutory aggravating factors."  *Id.*; *see also* Gregg, 428 U.S. at 196-97.

In California, a defendant may be sentenced to death for first-degree murder if the trier of fact

---

[19] Petitioner's additional argument relating to his "co-defendant, a cop killer and a serial killer [who] will not be [sentenced to death]" (*see* Doc. No 25 at 591 ¶ 11) appears misplaced on the facts of this case and is disregarded.

finds the defendant guilty and also finds true one or more of the special circumstances listed in Penal Code § 190.2.  As relevant here, one of the circumstances is: "[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second-degree."  Penal Code § 190.2(a)(3).  There is no question that this sentencing scheme satisfies clearly established constitutional requirements.  First, the subclass of defendants eligible for the death penalty is rationally narrowed to those who have committed multiple murders.  *Tuilaepa*, 512 U.S. at 969-73.  The multiple murder special circumstance sufficiently guides the sentencer and is not unconstitutionally vague.  *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (the sentencer's discretion must be guided by "clear and objective standards.").

In *California v. Ramos*, the United States Supreme Court stated that "[o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty" the jury's consideration of a myriad of factors and exercise of "unbridled discretion" in determining whether death is the appropriate punishment is not arbitrary and capricious.  463 U.S. at 1008-09.  At the selection stage, an individualized determination includes consideration of the character and record of the defendant, the circumstances of the crime, and an assessment of the defendant's culpability.  *Tuilaepa*, 512 U.S. at 972-73.  However, the jury "need not be instructed how to weigh any particular fact in the capital sentencing decision."  *Id.* at 979.

> i.      *Overbreadth - Murder by Poison Special Circumstance*

Petitioner alleges that California's special circumstance relating to intentional killing by administration of poison (Penal Code section 190.2(a)(19)) is co-extensive with the elements of first-degree murder by the administration of poison and fails to provide rational, meaningful, and objective criteria narrowing the class of first-degree murderers eligible for death.  (Doc. No. 25 at 485-90 and 445-51); *see also Harris*, 465 U.S. at 51, n.13.

Petitioner was charged by special circumstance that Martha's murder was "intentional an was carried out by [Petitioner] . . . by administration of poison, with the meaning of Penal Code Section 190.2(a)(19)."  (CT 1768.)

Penal Code section 190.2(a)(19) provided that:

The penalty for a defendant who is found guilty of murder in the first degree is death or

298

imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true . . . (19) The defendant intentionally killed the victim by the administration of poison.

Penal Code § 190.2 (West 1978).

Petitioner argues that as applied to him, the murder by poison special circumstance charged as Count II in the murder of Martha, merely repeats an element of the underlying (Penal Code § 189) murder count of first-degree murder by poison, such that his death sentence was arbitrary. (Doc. No. 25 at 445 citing CT 1762-63.)

Penal Code section 189 provided that:

All murder that is perpetrated by means of … poison …, or by any other kind of willful, deliberate, and premeditated killing … is murder of the first degree.

Penal Code § 189 (West 1982)

The California Supreme Court considered and rejected the failure to narrow allegation as to Martha's killing by poison, as follows:

Defendant contends that section 190.2, subdivision (a)(19), setting forth the murder-by-poison special circumstance, violates the Eighth Amendment of the United States Constitution. He contends that this special circumstance merely repeats the definition of first degree murder by poison, and that a special circumstance allegation that merely repeats the elements that render a homicide a first degree murder fails to narrow the class of persons eligible for the death penalty, in violation of the Eighth Amendment of the United States Constitution and *Zant v. Stephens* (1983) 462 U.S. 862, 877-878. He relies upon cases from other jurisdictions in which courts have held that a felony-murder special circumstance that merely repeats the elements of a first degree felony murder fails adequately to narrow the class of persons eligible for the death penalty. Defendant also complains that there is no objective reason why murder by poison is so reprehensible as to be singled out for punishment by death.

"To comport with the requirements of the Eighth Amendment, the legislative definition of a state's capital punishment scheme that serves the requisite 'narrowing' function must 'circumscribe the class of persons eligible for the death penalty.' (*Zant v. Stephens, supra*, 462 U.S. 862, 878.) Additionally, it must afford some objective basis for distinguishing a case in which the death penalty has been imposed from the many cases in which it has not. [Citation.] A legislative definition lacking 'some narrowing principle' to limit the class of persons eligible for the death penalty and having no objective basis for appellate review is deemed to be impermissibly vague under the Eighth Amendment." (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 465.)

Defendant's contentions are flawed in several respects. First, it is not the case that the

299

elements of the murder-by-poison special circumstance merely repeat the elements that render a homicide a first degree murder when committed by means of poison. The special circumstance allegation, unlike the definition of first degree murder by poison, requires proof that the defendant intentionally killed the victim. For the purpose of a first degree murder conviction based upon an unlawful killing by means of poison, proof of implied malice would suffice, as we have discussed above. (See *People v. Diaz, supra*, 3 Cal.4th at p. 568.)

Second, we have determined that first degree murder liability and special circumstance findings may be based upon common elements without offending the Eighth Amendment. (*People v. Marshall* (1990) 50 Cal.3d 907, 945-946; see also *People v. Wader, supra*, 5 Cal.4th at p. 669; *Lowenfield v. Phelps* (1988) 484 U.S. 231, 241-246.) We observe that in asking us to reconsider our numerous decisions, defendant relies in part upon authority that since has been overruled (see *Collins v. Lockart* (8th Cir. 1985) 754 F.2d 258, overruled in *Perry v. Lockhart* (8th Cir. 1989) 871 F.2d 1384, 1393; see also *Lockhart v. Fretwell* (1993) 506 U.S. 364, 371 [113 S.Ct. 838, 843-844, 122 L.Ed.2d 180]), and on authority from states in which the death penalty statute does not provide the narrowing function of special circumstance findings at the guilt phase, as well as on authority based upon independent state grounds. (See *State v. Bigbee* (Tenn. 1994) 885 S.W.2d 797, 816; *State v. Howell* (Tenn. 1993) 868 S.W.2d 238, 259, fn. 7.)

Third, we have determined that special circumstances involved in types of murders that occur with more frequency than murders by poison-such as lying in wait or felony murder-adequately narrow the class of persons eligible for the death penalty. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1023 [lying in wait]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [felony murder]; see also *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1266 [same].) Murder by means of poison, to judge by the reported cases discussing that type of murder, is a relatively rare crime, and the existence of the special circumstance of murder by poison does not have the potential of sweeping into the death-eligible category most persons who commit first degree murder.

Finally, defendant's claim that murder by poison is not particularly reprehensible as a type of first degree murder is unpersuasive. The poisoner acts surreptitiously, thus avoiding detection and defeating any chance at self-defense, and often betrays the most intimate trust. (See 4 Blackstone, Commentaries 196 ["Of all species of deaths the most detestable is that of poison; because it can of all others be the least prevented either by manhood or forethought .... And, therefore, ... it was made treason ...."].)

Catlin, 26 Cal. 4th at 157-59.)

The state supreme court reasonably rejected the allegation for the reasons stated. The Supreme Court has upheld California's death penalty process which narrows the class of murderers eligible for the death penalty by defining degrees of murder and finding beyond a reasonable doubt at least one of a list of statutory aggravating factors. *See Tuilaepa*, 512 U.S. at 972-79; *Karis v. Calderon*, 283 F.3d 1117, 1141 n.11; *see also Sawyer*, 505 U.S. at 342; Gregg, 428 U.S. at 196-97.

>   *ii.*      *Overbreadth – Other Special Circumstances*

Petitioner argues the large number of special circumstances which he suggests are overinclusive and repeat elements of the underlying (Penal Code section 189) murder count. (*See e.g.,* Doc. No. 25 at

566.) For example, he suggests a felony murder, even if unintentional, may provide the basis for finding a special circumstance upon showing no more than the elements of the underlying felony. (*Id.* at 565-67.) He suggests the "prior murder" special circumstance is not limited to murders that occurred prior to the charged crime. (*Id.*)

Petitioner contends the prosecution may argue any conceivable fact and circumstance as an aggravating factor even though present in every homicide. (*See e.g.* Doc. No. 25 at 570.) He cites to empirical data supporting his argument that California's death penalty scheme fails under *Furman* because it does not narrow the death-eligible class sufficiently so that a significant percentage of the class is in fact sentenced to death. (*See* Doc. No. 25 at 488 citing Shatz and Rivkind, *The California Death Penalty Scheme: Requiem for Furman?* 72 N.Y.U.L. REV. 1283, 1332 (1997).)

Petitioner argues juries might impermissibly double-count or even triple-count special circumstances and aggravating factors. (*See e.g.*, Doc. No. 25 at 569.) Especially so, he complains, given the vagueness of California's sentencing scheme and its failure to its failure to provide for unanimity and a standard of proof (except as to other crimes evidence) and written sentencing findings. (*See e.g.*, Doc. No. 25 at 569-87 citing Penal Code § 190.3.)

Petitioner argues that there is "no objective reason why first-degree murders by poison, in contrast to other methods of murder should be singled out for [the death penalty]." (Doc. No. 25 at 446; *see also People v. Ceja*, 4 Cal. 4th 1134, 1146-47 (lying-in-wait special circumstance must provide a meaningful basis for distinguishing capital and noncapital cases to ensure death penalty is not arbitrarily applied.) He reasons this is so because the special circumstance adds no mental requirement not already present in the above noted first-degree murder definition of Penal Code section 189. (Doc. No. 25 at 445.) He argues Penal Code section 189 suggests that "by definition, a murder by means of poison is included among the class of deliberate and premeditated murders" because proof of the means of committing the offense is "the functional equivalent of proof of premeditation, and intent to kill." (Doc. No. 25 at 445 *citing People v. Stanley*, 10 Cal.4th 764, 794-795 (1995).)

Petitioner argues that "there is no objective reason why first-degree murders by poison, in contrast to other methods of murder should be singled out for the most dire of punishments." (Doc. No. 25 at 446; *see also Zant*, 462 U.S. at 877.) He argues the jury instructions in his Kern County failed to guide

the jurors in finding a more culpable state of mind than that required for first-degree murder, resulting in a failure to narrow.   (Doc. No. 25 at 446 at n.146.)

However, California Supreme Court was not unreasonable in finding this sentencing scheme satisfies clearly established constitutional requirements.  *See Karis*, 283 F.3d at 1141 n.11 (California's sentencing scheme adequately narrows the class of persons eligible for death).  First, the subclass of defendants eligible for the death penalty is rationally narrowed to those who intentionally kill by administration of poison.  The poison special circumstance sufficiently guides the sentencer and is not unconstitutionally vague.  *See Godfrey*, 446 U.S. at 428 (the sentencer's discretion must be guided by "clear and objective standards.").

At the penalty phase, an individualized sentence includes consideration of the character and record of the defendant, the circumstances of the crime, and an assessment of the defendant's culpability. *Tuilaepa*, 512 U.S. at 972-73.  The jury "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Id.* at 979.  Similarly, the Supreme Court in *Ramos* stated that "once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty" the jury's consideration of a myriad of factors and exercise of "unbridled discretion" in determining whether death is the appropriate punishment is not arbitrary and capricious. 463 U.S. at 1008-09.

As noted, California's scheme, which narrows the class of death eligible offenders to less than the definition of first-degree murder and permits consideration of all mitigating evidence, has been approved by the Supreme Court. *Tuilaepa*, 512 U.S. at 972-79; *Pulley*, 465 U.S. at 38.

**c.      Conclusions**

A fair-minded jurist could find that Petitioner failed to establish California's death penalty process fails to constitutionally narrow the class of murders eligible for the death penalty on it face and as applied to him.

It does not appear that the California Supreme Court's rejection of claims 40, 48, 58 and 59 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claims 40, 48, 58 and 59 shall be denied.

2.     Claims 47, 57[20], 58, 59, 62, 63 – Sentencing Discretion, Factors and Findings

Petitioner alleges that California's death penalty process is vague as applied, fails to guide juror discretion, allows consideration of irrelevant evidence, and fails to require written findings on aggravating factors, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and International Law.  (Doc. No. 25 at 478-84, 566-93, 607-14.)

a.     **State Court Direct and Collateral Review**

Petitioner's claim 47 and 57 allegation that California's death penalty scheme and statute (Penal Code section 190.3(a) is vague as applied and fails to require written findings on aggravating factors, violating rights under the Eighth Amendment, was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 178-79.  The allegation was raised in the second state habeas petition and denied on the merits.  (Order No. S173793.

Petitioner's claim 58 allegation that California's death penalty scheme as administered violates the Fifth, Sixth, Eight, and Fourteenth Amendments was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 178-79.  The claim was re-presented in the second state habeas petition and denied on the merits with certain aspects denied on procedural grounds including raised and rejected on appeal (*Waltreus*).  (Order No. S173793.)

Petitioner's claim 59 allegation that California's death penalty scheme as administrated, violates the Eighth Amendment, and international law, customs, norms, and treaties, was raised in his second state habeas petition and denied on the merits.  (Order No. S173793.)[21]

Petitioner's claim 62 allegation that admission of irrelevant "prior unadjudicated criminal activity" involving his stipulated killing of Glenna and choking of his first wife Linda (pursuant to Penal Code section 190.3(b)(c)) denied him rights under the Fifth, Sixth, Eighth and Fourteenth Amendments was raised on direct appeal and denied on the merits with aspects denied on procedural grounds.  *Catlin*, 26 Cal. 4th at 172.

Petitioner's claim 62 allegation that the California Penal Code section 190.3(b-c) sentencing

---

[20] Claim 57 is erroneously included in the federal petition as a second iteration of claim 47.  (*See* Doc. No. 25 at 478, 521.)
[21] See n.19.

303

factors violate the Eighth and Fourteenth Amendments, and International Law, was raised in his second state habeas petition and denied on the merits.  (Order No. S173793.)

Petitioner's claim 63 allegation that the failure to require sentencing findings unanimously and beyond a reasons doubt violates the Constitution under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002) was raised in his second state habeas petition and presumed denied on the merits.  See Johnson v. Williams, 568 U.S. 289, 300–01 (2013) (federal habeas court presumes a state court failure to expressly address claim is a merits denial, subject to rebuttal); *see also Richter*, 562 U.S. at 99 ("[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary).

**b.    Analysis**

*i.    Vague and Overbroad Sentencing Factors*

Petitioner argues the aggravating and mitigating factors are unduly broad and arbitrary.  (Doc. No. 25 at 569.)  Particularly, he argues the Penal Code section 190.3(a) "circumstances of the crime" factor fails to guide juror discretion and is unconstitutionally vague as applied.  (Doc. No. 25 at 570.)

Petitioner argues that Penal Code section 190.3(b) "unadjudicated violent criminal activity" factor lacks guidance for the jury and is vague and overbroad.  (Doc No. 25 at 571; Doc. No. 95 at 231-32.)  He argues the jury is allowed to consider remote and uncorroborated evidence that may be barred by collateral estoppel, speedy trial rights and/or double jeopardy protections should not be considered by the jury.  (Doc. No. 25 at 572.)  Petitioner re-visits claim 42 allegations discussed above, relating to the prosecution's eliciting of testimony from his prior wife, Linda Catlin, about an event twenty-five years earlier where Petitioner allegedly choked her and threw her from a car.  (Doc. No. 25 at 466-67, 607.)  He argues the jury's consideration of such un-adjudicated criminal activity resulted in an unreliable sentence of death.  (Doc. No. 25 at 466 citing *Johnson,* 486 U.S. 578.)

Petitioner argues that Penal Code section 190.3(c) "prior felony conviction" factor allows the jury to consider unrelated conduct as an aggravating factor.  He points to the parties' stipulation that Petitioner was convicted of felony forgery in 1966 (RT 5350), and to his admission of a June 1986 conviction of the first-degree murder of Glenna (RT 5351) and argues this evidence of prior transgression lacks

304

sufficient relationship to the instant proceeding. He argues these factors do not preclude the jury's counting more than once aggravating facts and circumstances. (Doc. No. 25 at 569.)

"[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. 586 at 604; *Eddings*, 455 U.S. at 113-114 (adopting rule in *Lockett*). "The standard against which we assess whether jury instructions satisfy the rule of *Lockett* and *Eddings* was set forth in *Boyde,* 494 U.S. 370 (1990)." *Johnson*, 509 U.S. at 367-68. In *Boyde*, the Supreme Court held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" 494 U.S. at 377 (quoting *Franklin*, 487 U.S. at 181).

In evaluating the instructions, the "reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Johnson*, 509 U.S. at 367 (quoting *Boyde*, 494 U.S. at 380). "[W]e do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would - with a commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.* at 368 (quoting *Boyde*, 494 U.S. at 381). Further, a single instruction "may not be judged in artificial isolation, but must be considered in light of the instructions as a whole and the entire trial record." *Estelle*, 502 U.S. at 72.

The failure to identify whether factors are aggravating or mitigating is not contrary to or an unreasonable application of Supreme Court authority. In *Pulley*, the Supreme Court reviewed California's sentencing system, including the manner in which the jury considered relevant factors in deciding the penalty. 465 U.S. at 51. The Supreme Court noted that the 1977 death penalty law (like the 1978 law applicable in this case) did not identify or separate the aggravating or mitigating factors. *Id.* at 53 n.14. The Court found California's death penalty law to be constitutional. *Id.* at 51 ("Assuming that there could be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review, the 1977

California statute is not of that sort.").

The California Supreme Court rejected the allegation on direct appeal, stating that:

Defendant's vagueness challenge to section 190.3 has been rejected. (*People v. Jenkins*, *supra*, 22 Cal.4th at pp. 1050-1053; *People v. Arias* (1996) 13 Cal.4th 92, 187-188 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Sanchez*, *supra*, 12 Cal.4th at p. 81; see also *People v. Lucero*, *supra*, 23 Cal.4th at p. 737.) The claim that the jury was instructed in vague terms that erroneously would permit it to consider the murder of Joyce and the murder of Glenna as circumstances in aggravation is rejected; such consideration was appropriate. (See § 190.3, factors (a), (b).) Defendant's claim that the trial court's original belief that the murder of Joyce could be punished by a separate death sentence-a belief expressed outside the presence of the jury-might have affected the jury's consideration of factor (a) is rejected as based only upon speculation. Defendant's contention that this state's death penalty statute fails adequately to narrow the class of persons subject to the death penalty already has been rejected above. (See also *People v. Jenkins*, *supra*, 22 Cal.4th at p. 1050.) We also have rejected his claim that the death penalty law violates the Eighth Amendment by vesting unlimited discretion in prosecutors to determine whether to seek the death penalty. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Arias*, *supra*, 13 Cal.4th at p. 189.) We reject as unsupported by relevant authority defendant's claim that, because this is a capital case, any failure of defense counsel to object to asserted errors at trial cannot be deemed a waiver or forfeiture of such claims.

Catlin, 26 Cal. 4th at 179.

Notably, the trial court instructed the jury that "[i]n weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (CT at 2056-57.) That court also instructed the jury on the meaning of a mitigating circumstance, noting that such a circumstance may be used "in determining the appropriateness of the death penalty." (CT at 2056.)

"The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." *Blystone v. Pennsylvania*, 494 U.S. 299, 307 (1990); *Boyde*, 494 U.S. at 377.

Here, the instructions given by the trial court could reasonably be seen as satisfying the *Blystone* and *Boyde* standards. Moreover, a mere state law instructional error, if there were one, is not a basis for federal habeas relief. *Dunckhurst*, 859 F.2d at 114 ("a state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding.").

Upon consideration of the entire charge to the jury and related argument, it is unlikely on the

facts and circumstances of this case that the alleged vagueness prevented consideration of constitutionally relevant evidence in the sentence determination. *Boyde*, 494 U.S. at 380. As noted, a reviewing court approaches the instructions in the same way that the jury would, with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Johnson*, 509 U.S. at 368. It can be presumed that the jury followed the instructions, including the cautionary instructions. *Weeks*, 528 U.S. at 234.

Even if there was constitutional error, Petitioner has not demonstrated error under *Brecht*, i.e., that there is a reasonably likelihood the jury improperly applied the allegedly ambiguous terms in determining their verdict, for the reasons stated and given the noted substantial evidence against Petitioner. (*See e.g.*, claim 30 and 31, *post*; *cf.*, *Coleman*, 525 U.S. at 145 (inaccurate sentence commutation instruction was *Brecht* error).

Here, the California Supreme Court confirmed that "[t]he trial court need not instruct the jury as to which factors under section 190.3 are aggravating and which are mitigating. *Catlin*, 26 Cal. 4th at 178.

In *Tuilaepa*, the Supreme Court revisited California's death penalty sentencing scheme. The Supreme Court rejected the argument that California's "single list of factors" was unconstitutional. The Court stated:

> This argument, too, is foreclosed by our cases. A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision. In *California v. Ramos*, for example, we upheld an instruction informing the jury that the Governor had the power to commute life sentences and stated that "the fact that the jury is given no specific guidance on how the commutation factor is to figure into its determination presents no constitutional problem." [Citation] Likewise, in *Proffitt v. Florida*, we upheld the Florida capital sentencing scheme even though "the various factors to be considered by the sentencing authorities [did] not have numerical weights assigned to them." [Citation] In *Gregg*, moreover, we "approved Georgia's capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." [Citation] We also rejected an objection "to the wide scope of evidence and argument" allowed at sentencing hearings. [Citation] In sum, "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. [Citation] "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." [Citation] Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the

defendant is a member of the class made eligible for that penalty." [Citations] In contravention of those cases, petitioners' argument would force the States to adopt a kind of mandatory sentencing scheme requiring a jury to sentence a defendant to death if it found, for example, a certain kind or number of facts, or found more statutory aggravating factors than statutory mitigating factors. The States are not required to conduct the capital sentencing process in that fashion. [Citation]

*Tuilaepa*, 512 U.S. at 979-80.

Here, at the penalty phase, the jury was instructed with CALJIC No. 8.85, which sets forth the factors the jury should consider in determining penalty:

In determining which penalty is to be imposed on this defendant, you shall consider all of the evidence which has been received during any part of the trial in this case. You shall consider, take into account and be guided by the following factors, *if applicable....*

(CT at 2044.) The court then read the applicable of the statutory factors from Penal Code § 190.3 (CT at 2044-45), including that the jury that it could consider any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial; and that it must disregard any instruction given in the guilt or innocence phase which conflicted with the foregoing instruction. (*Id.*)

There is no clearly established authority from the United States Supreme Court holding that a jury must be instructed in a particular manner. The Eighth Amendment does not require that a jury be instructed on particular statutory mitigating factors. *Buchanan v. Angelone*, 522 U.S. 269, 275-77 (1998). Accordingly, since the Supreme Court has not decided the issue, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent. *Carey*, 549 U.S. 76.

Petitioner has made no evidentiary showing that the instructions given in this case in any way foreclosed the jury from considering any relevant mitigating evidence. The Supreme Court has examined the language in California's jury instruction on mitigation multiple times and upheld it against constitutional challenges every time. *See Belmontes*, 549 U.S. at 24.

Even if there was instructional error by failing to distinguish between aggravating and mitigating circumstances, the California Supreme Court could reasonably have found no "substantial

and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638. The jury was instructed that:

> An aggravating factor is any fact, condition or event in the commission of a crime which increases its guilt or enormity or adds to the injurious consequences which is above and beyond the elements of the crime itself.
>
> A mitigating circumstance is any fact, condition or event which if such does not constitute a justification or excuse for the crime in question but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

(CT 2056.)

The jury was instructed that it could consider any non-statutory extenuating, sympathetic, or other basis for a sentence less than death, whether or not related to the conviction, and that the jury must disregard any instruction given in the guilt or innocence phase which conflicted with the foregoing instruction. (CT 2044-45.)

There also appears additional reason that the state supreme court could have found no prejudicial error. Counsel referred to and argued mitigating factors in his closing argument. (*See* RT 5490-5500.) The noted circumstances of the instant murders and evidence of adjudicated and unadjudicated past criminal acts also suggest substantial aggravating evidence. (*See e.g.*, claims 30 and 31, post.)

Petitioner argues the jury improperly considered non-statutory aggravation, i.e. consideration of circumstances of the crime evidence received during any part of the trial, future dangerousness as an aggravating factor, and the absence of mitigation evidence as itself aggravating. (Doc. No. 25 at 575-77.) However, there is no constitutional prohibition against non-statutory aggravating factors. *Harris v. Pulley*, 692 F.2d 1189, 1193-94 (1982), overruled on other grounds, 465 U.S. 37 (1984); *Zant*, 462 U.S. at 878-79. *People v. Taylor*, 26 Cal.4th 1155, 1180 (2001).

For the reasons stated by the California Supreme Court and those discussed above, it is unlikely that the jurors improperly and prejudicially applied CALJIC 8.85 as a result of the alleged failure to distinguish between aggravating and mitigating factors. Moreover, an error solely of state law is not a basis for federal habeas relief.

Accordingly, the state supreme reasonably could find California's death penalty process including the CALJIC 8.85 (Penal Code section 190.3) sentencing factors did not fail to guide juror's discretion

and was not unconstitutionally vague, ambiguous, or overbroad.

       *ii.     Unanimous Written Sentencing Findings According to a Standard of Proof*

Petitioner argues that the statute lacks any requirement for written findings, unanimity, and proof of aggravating circumstances that outweigh mitigating circumstances beyond a reasonable doubt. (Doc. No. 25 at 483.) He argues this is improper because the jury must determine, beyond a reasonable doubt, any fact that may increase the maximum punishment. (Id. at 609 *citing Apprendi v. New Jersey* 530 U.S. 466, 476, 482-83 (2000), *Ring v. Arizona* 536 U.S. 584, 589 (2002); *Jones v. United States*, 526 U.S. 227, 243, n.6 (1999).) He argues the Constitution requires that aggravating factors be alleged in the charging document and that the jury make penalty phase findings unanimously and beyond a reasonable doubt in order to increase the statutory maximum sentence to death - such that *Apprendi* applies to the penalty phase findings. (Doc. No. 25 at 612.)

Petitioner argues that in non-capital cases, the sentencer is required to state on the record the reason(s) for the sentence imposed (Doc. No. at 521 citing Penal Code § 1170), and that capital defendants are entitled to more rigorous protections that non-capital defendants (*Id.*) Especially so, he argues, given the broad discretion of California's unitary capital juries in weighing sentencing factors (Doc. No. 25 at 522) and the noted risk in this case that the jury may have counted the same aggravating factor(s) multiple times during their sentencing deliberations. (*Id.*) For example, he argues that that absent written findings, the extent to which the jury may have relied upon the financial gain special circumstance which he contends lacks evidentiary support cannot be determined. (Doc. No. 25 at 522-23.) He argues that absent written findings it cannot be determined whether the jury double or triple counted aggravating circumstances of the crime and special circumstances or relied upon an aggravating circumstance that might be held invalid on appeal. (See Doc. No. 95 at 247.)

Petitioner argues here the jurors were not told which aggravating factors had to be proven. (*Id.; see also* Doc. No. 25 at 575-76.) He argues that absent unanimous written findings on the "undifferentiated unitary list" of sentencing factor(s) relied upon by the jurors, his judgment cannot be reviewed for constitutional deficiency. (Doc. No. 25 at 473, 575.) He argues unanimity in written findings is required given the "acute need for reliability in capital sentencing proceedings" (Doc. No. 25 at 473 *citing Monge v. California*, 524 U.S. 721, 732 (1998); *Johnson*, 486 U.S. at 584) and because

California requires unanimity in certain non-capital matters (*id.*, *citing* Penal Code sections 1158, 1158a relating to enhancement allegations). He suggests the jury may have been less than unanimous regarding aggravating factors and treated "other crimes" evidence regarding Petitioner's prior criminal history as an aggravating factor. (Doc. No. 25 at 474.)

However, the sentencing determination by California jurors is moral and normative and does not require unanimous written findings pursuant to a standard of proof or presumption in favor of life.

The record reflects the jury was instructed with CALJIC 8.88, that

> In weighing the various circumstances [the jury] determine[s] under the relevant evidence which penalty is justified and appropriate considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each [juror] must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

(CT 2056-57.)

As noted, the Supreme Court has held that no "specific method of balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Marsh*, 548 U.S. at 175. California's death penalty sentencing scheme has been consistently upheld as constitutional by the Supreme Court. *Tuilaepa*, 512 U.S. at 975-80; *Pulley*, 465 U.S. at 53; *see also Williams v. Calderon*, 52 F.3d 1465, 1485 (9th Cir. 1995) (failure to require a specific finding that death is the appropriate penalty beyond a reasonable doubt does not render California's death penalty statute unconstitutional).

*Apprendi* does not require a jury to find beyond a reasonable doubt the applicability of a specific section 190.3 sentencing factor. *See Tuilaepa*, 512 U.S. at 975; (*see also* claim 49, *ante*.) Moreover, Petitioner has not demonstrated that *Ring*, which was decided on June 4, 2002, applied to his proceeding in which his conviction became final on April 1, 2002.

Petitioner was not being tried for the unadjudicated conduct offered at the penalty phase. Thus the unanimity safeguard was unnecessary. Aggravating circumstances are not separate penalties but are standards to guide the making of the choice between death and life imprisonment. *People v. Raley*, 2 Cal. 4th 870, 910 (1992) (superseded by statute as stated in *People v. Brooks*, 3 Cal. 5 th 1 (2017)). A factor set forth in Penal Code § 190.3 does not require a "yes" or "no" answer to a specific question but

points the sentencer to the subject matter which guides the choice between the two punishments. T*uilaepa*, 512 U.S. at 975.

Petitioner does not identify any clearly established Supreme Court precedent that a jury must unanimously find Petitioner's prior unadjudicated criminal activity to be true in order to consider it as a factor in aggravation during the penalty phase of a capital case.

Rather, the United States Supreme Court has made clear that "the constitutional prohibition on arbitrary and capricious capital sentencing determinations is not violated by a capital sentencing 'scheme that permits the jury to exercise unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty by statute." *Ramos*, 463 U.S. at 1008 n.22, (quoting *Zant*, 462 U.S. at 875).

Under California law "neither death nor life is presumptively appropriate or inappropriate under any set of circumstances, but in all cases the determination of the appropriate penalty remains a question for each individual juror." *People v. Samayoa*, 15 Cal. 4th 795, 853 (1997); *see also Walton v. Arizona*, 497 U.S. 639, 651 (1990) (overruled on other grounds by *Ring v. Arizona*, 536 U.S. 584, 589 (2002)) (a defendant constitutionally may be required to establish by a preponderance of the evidence the existence of mitigating circumstances, a conclusion manifestly inconsistent with Petitioner's assertion that the Constitution requires the jury to determine beyond a reasonable doubt that death is the appropriate penalty).

Accordingly, the state supreme court reasonably could find California's death penalty process does not require unanimous written findings pursuant to a standard of proof or presumption in favor of life.

### iii.     Weighing Process

Petitioner argues California fails to instruct on the process for weighing sentencing factors.

However, jurors need not be instructed at the penalty phase on the weighing process. *Tuilaepa*, 512 U.S. at 979-80. Nor was Petitioner's jury precluded from considering all mitigating evidence. Jurors were instructed to consider sentencing factors to the extent that they are applicable. (CT 2044.) Petitioner concedes as much. (*See* Doc. No. 25 at 583.)

Accordingly, the state supreme court reasonably could find California's death penalty process

does not require instruction on the process of weighing sentencing factors.

    *iv.    Limiting Descriptive Phrases*

    Petitioner alleges the Penal Code section 190.3 sentencing factors (CALJIC 8.85) including improper limiting phrases and adjectives.

    Petitioner notes the trier of fact is to take into account if relevant "whether or not the offense was committed while the defendant was under the influence of *extreme* mental or emotional disturbance" and argues the language is vague such that jury may be precluded thereby from considering all mitigating evidence or that the prosecution may use the factor in aggravation. (Doc. No. 25 at 573 citing Penal Code § 190.3(d)).

    Petitioner argues section 190.3 is vague by its reference to "reasonably believed . . . moral justification" (Penal Code § 190.3(f)); "extreme duress or . . . substantial domination" (Penal Code § 190.3(g)); "whether . . . at the time of the offense . . . defendant . . . was impaired. . . ." (Penal Code § 190.3(h)); "[t]he age of the defendant at the time of the crime" (Penal Code § 190.3(i)); and "[a]ny other circumstance which extenuates the gravity of the crime . . ." (Penal Code § 190.3(k)). (Doc. No. 25 at 569, 573-75.) He suggests based thereon that prosecutors are able to argue essentially every feature of a crime is aggravating. (*Id.*)

    However, the state supreme court reasonably could find the nature and meaning of terminology used in the aggravating and mitigating sentencing instructions is self-evident and within common knowledge and is considered by jurors in the context of all the instructions. Notably jurors are free to submit questions to the court.

    The Constitution requires that the jury must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604. The test is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380.]

    In *Pulley v. Harris*, the Supreme Court reviewed the California's sentencing system, including the manner in which the jury considered relevant factors in deciding the penalty. *Pulley*, 465 U.S. at 51. The Supreme Court noted that the 1977 law (like the 1978 law applicable in this case) did not identify or separate

the aggravating or mitigating factors. *Id.* at 53 n. 14. The Court found California's death penalty law to be constitutional. *Id.* at 51. As noted above, in *Tuilaepa* the Supreme Court rejected the argument that California's "single list of factors" was unconstitutional. *Tuilaepa*, at 979-80.

Additionally, Petitioner's jury was instructed with a modified version of CALJIC 8.85 that excluded the adjective and modifiers above noted. (*See* CT 2044-45.)

*v.*    *Conclusions*

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish California's death penalty process is unconstitutional for vagueness, failure to guide juror sentencing discretion, allowing consideration of irrelevant evidence, precluding consideration of all mitigating evidence, and failing to require written findings on aggravating factors.

It does not appear that the California Supreme Court's rejection of claims 47, 57, 58, 59, 62, and 63 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Petitioner's allegation that California's death penalty statute is arbitrary and capricious, violating rights under the Eighth, and Fourteenth Amendments, and International Law, Treaties, Norms, and Customs, reviewed *de novo*, fails in the absence of any Constitutional error, for the reasons stated. (*See* claim 67(2), *post*.)

Claims 47, 57, 58, 59, 62, and 63 shall be denied.

3.    Claims 50, 58 and 59 – Proportionality Review

Petitioner alleges California's death penalty statute fails to provide for proportionality review, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 497-99; 584-86.)

**a.    State Court Direct and Collateral Review**

Petitioner raised claim 50 on direct appeal and it was denied on the merits. *Catlin*, 26 Cal. 4th at 178-79. Petitioner raised claim 50 in his second state habeas petition and it was denied on the merits. (Order No. S173793.)

Petitioner raised claim 58 on direct appeal and it was denied on the merits. *Catlin*, 26 Cal. 4th at

178-79. Petitioner raised claim 58 in his first state habeas petition and it was denied on the merits. (Order No. S090636.)

Petitioner raised claim 59 in his second state habeas petition and it was denied on the merits. (Order No. S173793.)

**b.  Analysis**

*i.  Inter-Case Proportionality Review*

Petitioner argues the failure to provide inter-case proportionality violated his federal rights. He argues particularly this omission denied his right that the death penalty not be imposed arbitrarily or capriciously. He argues the lack of proportionality review denies him the greater protection due capital defendants (*see Ford v. Wainwright*, 477 U.S. 399, 414 (1986)) because at the time of Petitioner's sentence, California required intercase proportionality review for non-capital cases. (Doc. No. 25 at 497-98 citing Penal Code § 1170.)

Petitioner argues he was exposed to arbitrary sentencing and the risk the jury did not consider all sentencing factors. (Doc. No. 25 at 498-99 *citing Gregg,* 428 U.S. at 198.) He suggests the jury may not have considered his personal responsibility and moral culpability such that his death sentence is potentially invalid. (Doc. No. 25 at 584-85.)

The California Supreme Court considered and rejected the allegation on direct appeal, stating that:

> Intercase proportionality review is not required (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 420), and to the extent that defendant claims in this connection that the death penalty is disproportionate to his own culpability, the claim is rejected. "To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is "grossly disproportionate to the defendant's individual culpability [citation] or, stated another way, that the punishment [] shocks the conscience and offends fundamental notions of human dignity [citation] the court must invalidate the sentence as unconstitutional." (*People v. Riel*, *supra*, 22 Cal.4th at pp. 1223-1224.) In light of the circumstances of the present crimes, for which this mature defendant was solely responsible, defendant's repeated offenses over a period of time, and the dire consequences of his acts, we do not believe that the punishment imposed is grossly disproportionate, even taking into account the mitigating evidence regarding his character, past acts of kindness, and successful adjustment in prison.

*Catlin*, 26 Cal. 4th at 178–79.

The California Supreme Court reasonably could find Petitioner's intra-case and inter-case proportionality claims to be foreclosed by the Supreme Court's decision in *Pulley v. Harris*. *See* 465 U.S. at 41. Therein, the Supreme Court reviewed California's death penalty procedure and considered the fact that California did not require any sort of comparative proportionality review. The Supreme Court found that the Eighth Amendment did not require a "state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner." *Pulley*, 465 U.S. at 43-44.

The Supreme Court also held that "on its face, [California's] system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman v. Georgia*, [408 U.S. 238 (1972)] and our subsequent cases." *Pulley*, 465 U.S. at 53. The Supreme Court considered and upheld California's 1977 scheme where "a person convicted of first-degree murder is sentenced to life imprisonment unless one or more special circumstances are found, in which case the punishment is either death or life imprisonment without parole", *Pulley*, 465 U.S. at 51; "the judge is required to state on the record the reasons for his findings [denying a] motion for modification [of the verdict]", *id.* at 53; and "there is an automatic appeal [from denial of a motion for modification]", *id.* at 53.

### ii.    Conclusions

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish California's death penalty process is unconstitutional for lack of proportionality review.

It does not appear that the California Supreme Court's rejection of claims 50, 58, and 59 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Petitioner's allegation that California's death penalty scheme as administrated violates the Eighth Amendment, and international law, customs, norms, and treaties, reviewed *de novo*, fails in the absence of any Constitutional error, for the reasons stated. (*See* claim 67(2), *post*.)

Claims 50, 58, and 59 shall be denied.

316

4.      Claims 53, 58 and 59 – Prosecutorial Charging Discretion

Petitioner alleges California's death penalty process allows county prosecutors unlimited discretion in seeking the death penalty without any statewide uniform standards (i.e. claim 53), violating his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments (i.e. claim 58) and International Law (i.e. claim 59). (Doc. No. 25 at 506-12, 566-88, 589-93.)

a.      **State Court Direct and Collateral Review**

Petitioner's claim 53 allegation that California's death penalty scheme allows prosecutor's unlimited discretion in seeking the death penalty, violating the Eighth Amendment, was raised on direct appeal as an arbitrariness claim and denied on the merits. *Catlin*, 26 Cal. 4th at 179.  Petitioner raised claim 53 in his second state habeas petition and it was denied on the merits.  (Order No. S173793.)

Petitioner's claim 58 allegation that California's death penalty scheme violates the Fifth, Sixth, Eight, and Fourteenth Amendments was raised on direct appeal denied on the merits. *Catlin*, 26 Cal. 4th at 178-80.)  The claim was re-presented in the second state habeas petition and denied on the merits and on procedural grounds (as to other than ineffective assistance of counsel and the constitutionality of the death penalty) as raised and rejected on appeal (*In re Waltreus*).  (Order No. S173793.)

Petitioner's claim 59 allegations that California's death penalty scheme violates the Eighth Amendment, and international law, customs, norms, and treaties, was raised in his second state habeas petition and denied on the merits.  (Order No. S173793.)

b.      **Analysis**

i.      *Prosecutorial Charging Discretion*

Petitioner argues county prosecutors have unlimited discretion in deciding whether to seek the death penalty against a potentially death eligible defendant, resulting in arbitrary, inconsistent and irrational sentencing.  (Doc. No. 25 at 506 *citing* Government Code § 26501; *Keenan v. Superior Court*, 126 Cal.App.3d 576, 581-585 (1981)) (standard less sentencing violates the Eighth Amendment); *see also* Doc. No. 25 at 568.)

Petitioner argues that the California Attorney General, who oversees county prosecutors has not imposed any statewide standard for county prosecutors to use in deciding which defendants will face the death penalty, such that race, income and status may affect the charging decision.  (*Id.*)  He notes a

317

relative few of California's fifty-eight counties are responsible for the bulk of the death prosecutions. (Doc. No. 25 at 507-11.) He suggests this disparity permits arbitrary treatment of individual defendants based upon provincial budgetary, political and ideological considerations and denies death eligible defendants equal protection (*id. citing Bush v. Gore,* 531 U.S. 98, 109 (2000)) and risks arbitrary and capricious imposition of the death penalty (*id.*).

The California Supreme Court considered and rejected the allegation on direct appeal, stating that:

> We also have rejected his claim that the death penalty law violates the Eighth Amendment by vesting unlimited discretion in prosecutors to determine whether to seek the death penalty. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1078; *People v. Arias*, *supra*, 13 Cal.4th at p. 189.)

*Catlin*, 26 Cal. 4th at 179.

That court reasonably rejected the claim. The charging discretion of California prosecutors is not unconstitutional and does not violate due process or separation of powers. The United States Supreme Court has repeatedly held that prosecutorial discretion to select among eligible cases those in which the death penalty will actually be sought does not in and of itself offend principles of equal protection, due process, or constitute cruel and unusual punishment. *McCleskey*, 481 U.S. at 311-12 (1987).

Prosecutorial discretion "is essential to the criminal justice process," and does not violate the federal Constitution. *Id.* at 297. Instead, the Constitution forbids only "purposeful discrimination" in the exercise of prosecutorial discretion, *id.* at 292-93, and in order to prevail in that regard, the Supreme Court emphasized that "we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297. The fact California's statutory scheme gives the prosecutor discretion does not alone violate the Constitution. *See Gregg*, 428 U.S. at 225.

Petitioner has not demonstrated that *Bush v. Gore* is authority otherwise, and courts have held that it is not. *See Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) (finding *Bush v. Gore* inapplicable in context of criminal procedure); *Black v. Bell*, 181 F. Supp. 2d 832, 879 (M.D. Tenn. 2001) (*Bush v. Gore* is not authority that unbridled prosecutorial discretion is unconstitutional). The claim that California's death penalty scheme is unconstitutional by virtue of prosecutorial discretion is

318

foreclosed by precedent. *See United States v. Mitchell*, 502 F.3d 931, 982, (9th Cir. 2007).

    *ii.*    *Conclusions*

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish California's death penalty process is unconstitutional on grounds of prosecutorial charging discretion.

It does not appear that the California Supreme Court's rejection of claims 53, 58, and 59 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Petitioner's allegation that aspects of California's death penalty process discussed above violates international law, customs, norms, and treaties, reviewed *de novo*, fails in the absence of any Constitutional error, for the reasons stated. (*See* claim 67(2), *post*.)

Claims 53, 58, and 59 shall be denied.

    5.    Claims 58 and 59 - Cruel and Unusual Punishment; Unitary Jury; Three-Strikes

Petitioner challenges California's death penalty process on grounds it constitutes cruel and unusual punishment and allows for the use of the same (i.e. a "unitary") jury at the guilt and penalty phases, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. He also mounts an additional challenge on grounds California's Three-Strikes statute precludes the death penalty.

    **a.**    **State Court Direct and Collateral Review**

Petitioner's claim 58 allegation that California's death penalty scheme violates the Fifth, Sixth, Eight, and Fourteenth Amendments was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 178-79. The claim was re-presented in the second state habeas petition and denied on the merits and on procedural grounds (as to other than ineffective assistance of counsel and the constitutionality of the death penalty) as raised and rejected on appeal (*In re Waltreus*). (Order No. S173793.)

Petitioner's claim 59 allegation that California's death penalty scheme violates the Eighth Amendment, and international law, customs, norms, and treaties, was raised in his second state habeas petition and denied on the merits. (Order No. S173793.)

    **b.**    **Analysis**

    *i.*    *Cruel and Unusual Punishment*

Petitioner alleges the death penalty as administered in California is cruel and unusual punishment based upon evolving domestic and international laws, norms and morals. (*See* Doc. No. 25 at 589-93.)

However, for the reasons discussed in claim 67(2) below, summarized here, the allegation lacks merit. The death penalty, when applied in accord with state and federal statutory and constitutional requirements, does not violate international law.

The California Supreme Court has found that international norms of human decency do not render the death penalty, applied as a regular form of punishment, violative of the Eighth Amendment. *People v. Cowan*, 50 Cal. 4th 401, 510 (2010). That court specifically has rejected international law as a basis for finding unconstitutional capital punishment and the lengthy delays it can entail. *See People v. Bolden* 29 Cal. 4th 515, 567 (2002) ("[W]e are not persuaded that international law prohibits a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.").

Petitioner fails to point to clearly established Supreme Court precedent at the time his conviction became final that capital punishment was illegal in this country based on international law. To the contrary, it appears that such challenges to imposition of the death penalty have been repeatedly rejected. In *Carter v. Chappell*, 2013 WL 781910, (C.D. Cal. Mar. 1, 2013), the district court noted that "[c]learly established federal law does not hold the death penalty to violate international law or the federal Constitution." Similarly, in *Rowland v. Chappell*, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012), the district court rejected an essentially identical claim, stating that "Petitioner cannot demonstrate that any claim of a violation of international law is even cognizable on federal habeas review, given that such review is designed to address claims that a Petitioner is in custody in violation of the Constitution or laws or treaties of the United States."

Finally, to the extent Petitioner supports alleged international law violations with the claims stated in this proceeding, those claims all fail for the reasons stated above and below. *See Medellin v. Dretke*, 544 U.S. 660, 664 (2005) (any claim based upon violation of a treaty obligation must point to an "objectively unreasonable" state court adjudication, of a clearly established right and meet the fundamental defect test, i.e. result in a complete miscarriage or deny fair procedures); *accord Benitez v. Garcia*, 495 F.3d 640, 642-44 (9th Cir. 2007).

Accordingly, the state supreme court reasonably could find California's death penalty process

does not constitute cruel and unusual punishment.

ii.     *Unitary Jury*

Petitioner argues California's preference that the same jury hear both the guilt and penalty phases results in bias in favor of death, denying him a reliable verdict.  (Doc. No. 25 at 586.)

However, Petitioner fails to point to clearly established Supreme Court precedent holding that the use of a single jury to determine both guilty and penalty constitutes a denial of due process or violate a defendant's right to a fair trial and a reliable guilt and penalty determination.  Petitioner's argument is insufficiently supported.  (*See* claims 19, 26(F), 37(C), *ante.*)

Accordingly, the state supreme court reasonably could find California's unitary jury process is not unconstitutional as alleged.

iii.     *California's Three-Strikes Law and the Death Penalty*

Petitioner argues that California's death penalty law is precluded by the state's three strikes law. (*See* Doc. No. 25 at 587 citing Penal Code § 667).  He argues the three strikes law including amendments abolished the death penalty for those capital defendants having one or more prior convictions for serious or violent felonies, and for all other capital defendants on equal protections grounds.

However, Petitioner does not cite to clearly established Supreme Court precedent that California's three strikes law precludes the death penalty.  The state supreme court has found otherwise.  *See People v. Parsons*, 44 Cal.4th 332, 370 (2008) (capital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection or due process).

Accordingly, the state supreme court reasonably could find California's death penalty law is not unconstitutional in light of the state's three strikes law as alleged.

iv.     *Conclusions*

For the reasons stated, a fair-minded jurist could find that Petitioner failed to establish California's death penalty process is unconstitutional on grounds it constitutes cruel and unusual punishment and allows for the use of a unitary jury and subsists within the state's enacted a three strikes law.

It does not appear that the California Supreme Court's rejection of claims 58, and 59 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme

Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Petitioner's allegation that aspects of California's death penalty process discussed above violates international law, customs, norms, and treaties, reviewed *de novo*, fails in the absence of any Constitutional error, for the reasons stated. (*See* claim 67(2), *post.*)

Claims 58, and 59 shall be denied.

6. Claims 60 and 61 – Death Qualification Constitutional Infirmities

Petitioner alleges that California's death qualification process denied him a jury that was unbiased and drawn from a fair cross-section, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and international law (i.e. claim 60), and violating the federal rights of prospective jurors (i.e. claim 61). (*See* Doc. No. 25 at 524-65 and 594-606.)

**a. State Court Direct and Collateral Review**

Petitioner's claim 60 allegation that death qualification violates rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and International Law, customs, norms, and treaties, was raised in his second state habeas petition and denied on procedural grounds. (Order No. S173793.)

Petitioner's claim 61 allegation that death qualification violates the rights of prospective jurors under the Fourteenth Amendment, and International Law, was raised in his second state habeas petition and denied on procedural grounds. (Order No. S173793.)

**b. Analysis**

*i. Biased Jury Denying Due Process*

Petitioner alleges California's death qualification process lacks guidelines, excludes jurors with any reservations about the death penalty, denies a jury made up of a fair cross-section of the community, and results in a jury biased toward conviction and death. (Doc. No. 25 at 524-25, 545.)

Petitioner points to the lack of any statutory or caselaw guidance as to how death qualification should be implemented and argues such is "inconsistent with the minimum procedures necessary to protect the fundamental right" to an impartial jury. (Doc. No. 25 at 544.)

Petitioner argues the federal standard for voir dire death qualification, "whether the juror's views about the death penalty would prevent or substantially impair the performance of his duties as a juror in

accordance with his instructions and his oath," conflicts with the juror's duty to make individual "moral and sympathetic judgment" on the various sentencing factors. (Doc. No. 25 at 524-30 citing *Witt*, 469 U.S. at 424; *People v. Ashmus,* 54 Cal. 3d 932, 961-962 (1991) (abrogation on other grounds recognized by *People v. Daveggio and Michaud*, 4 Cal. 5 th 790, 830 n.6 (2018) (trial court finding as to whether and how the prospective juror's views on capital punishment would affect his performance not entitled to deference where the evidence otherwise is so opposed to the trial court's decision that the question becomes one of law). He argues this conflict leads to an irrational and unconstitutional result. (Doc. No. 25 at 524-30.)

Petitioner argues that the "substantially impair" prong above, a product of Supreme Court jurisprudence, *see Witt*, 469 U.S. at 421-22, impermissibly expands upon the statutory basis for death qualification in California. He points out that under state law a challenge for implied bias may be taken for one or more of the following causes and for no other:

> [I]f the offense charged is punishable with death, the entertaining of such conscientious opinions as would preclude the juror finding the defendant guilty; in which case the juror may neither be permitted nor compelled to serve.

(See Doc. No. 25 at 530 citing Civ. Proc. Code § 229(h).) Accordingly, he argues *Witt's* "substantially impair" language is not applicable to California's death penalty scheme which allows challenges only where a prospective juror's opinions would preclude a guilt phase conviction. (Doc. No. 25 at 532.)

Furthermore, Petitioner argues *Witt* excludables represent community values and are the very individuals who set the barometer for "evolving standards of decency" necessarily implicated in determining whether a punishment is "cruel and unusual" for purposes of the Eighth Amendment. (Doc. No. 25 at 533-38 citing *Furman,* 408 U.S. at 278-279. He argues removing these potential jurors "because they represent community values as to their views on the death penalty" disserves Eighth Amendment considerations and results in jury skewed toward death. (Doc. No. 25 at 535 *citing Hovey,* 28 Cal. 3d. at 73 ("A penalty jury can speak for the community only insofar as the pool of jurors from which it is drawn represents the full range of relevant community attitudes.".) He notes the Supreme Court has suggested that "'death qualification' in fact produces juries *somewhat* more 'conviction-prone' than 'non-death-qualified' juries." *Buchanan v. Kentucky,* 483 U.S. 402, 415, n.16 (1987) (quoting

*McCree,* 476 U.S. at 173).

Petitioner cites to empirical data curated from case studies and argues such a conviction prone jury denied him equal protection. (Doc. No. 25 at 542-48.) Particularly, he suggests that death qualification removes "at least eleven to seventeen percent of all fair and impartial jurors." (Doc. No. 25 at 553 citing Byrne, *Lockhart v. McCree: Conviction-Proneness and the Constitutionality of Death-Qualified Juries,* 36 Cath. U. L. Rev. 287, 314 (1986).

Petitioner argues the potential jurors strategically removed by the prosecution during death qualification constitute a distinctive group for purposes of the fair cross-section requirement. (Doc. No. 25 at 550-51.) He argues the exclusion of their community viewpoint enabled the exercise of arbitrary power by the prosecution; undermined public confidence in the criminal justice system; and deprived the criminal justice system of shared civic responsibility. (Doc. No. 25 at 551-53.) He argues removal of these potential jurors denied him a fair guilt phase trial and effectively prevented consideration of all mitigating circumstances at the penalty phase. (Doc. No. 25 at 540, 563.)

However, "[i]t is well established that death qualification does not violate a defendant's right to a fair and impartial jury. . . ." *Nogurera v. Davis*, 290 F.Supp.3d 974, 1086 (C.D. Cal. 2017) (citing *McCree*, 476 U.S. at 178). The state has a strong interest in having jurors who are able to apply capital punishment within the framework the law prescribes. *Uttecht v. Brown*, 551 U.S. 1, 9, citing *Witt*, 469 U.S. at 416. As noted, in a capital case, "a prospective juror may be excluded for cause because of his or her views on capital punishment . . . if the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright*, 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45). Thus, "a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan*, 504 U.S. at 728.

A criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. *Brown*, 551 U.S. at 9. Furthermore, peremptory challenges are not of constitutional dimension. *Ross*, 487 U.S. at 88. The Supreme Court has upheld use of peremptory challenges that do not discriminate on a constitutionally suspect basis. *See e.g., Holland*, 493 U.S. at 478 (rejecting argument that "a prosecutor's use of peremptory challenges to eliminate a distinctive group in the community deprives the defendant of a Sixth Amendment right to the 'fair

possibility' of a representative jury").

Here, Petitioner argues the prosecution misused peremptory challenges to remove prospective jurors who had reservations about the death penalty but could not be excluded for cause during death qualification. (Doc. No. 25 at 549-60.) He argues such misuse of peremptory challenges "stacked the deck against [him] by intentionally creating a tribunal organized to convict and . . . return a verdict of death." (Doc. No. 25 at 560 *citing Witherspoon v. Illinois,* 391 U.S. 510, 521-523 (1968).)

But as discussed above in claims 7-9, Petitioner failed to demonstrate his jury was unconstitutionally constituted. Particularly, he failed to demonstrate peremptory challenges by the prosecutor discriminated on a constitutionally suspect basis. (*See* claims 7-9, ante.)

The Court finds the allegation that the jury was unconstitutionally biased by death qualification voir dire fails on *de novo* review.

### ii. Denial of Third-party Right to Serve on Jury

Petitioner argues that death qualification violated the due process and equal protection rights of those prospective jurors who were excluded by the prosecution for cause and upon peremptory challenges; rights Petitioner contends he has standing to assert for the venire. (Doc. No. 25 at 594-606.)

Petitioner argues these excluded potential jurors were denied the fundamental right to serve as juror without protections of procedural due process or any rational relationship to a legitimate state interest. (Doc. No. 25 at 598-604 citing *Vitek v. Jones,* 445 U.S. 480, 488 (1980) (state created liberty interest entitled to due process protection). He argues the lack of any established standard for death qualification and disqualification and review thereof renders such disqualification arbitrary and disparate and a denial of equal protection and due process. He argues these jurors were excluded absent any showing they would not follow a juror oath. (Doc. No. 25 at 600.)

Petitioner further argues that even if a fundamental right is not implicated, the discriminatory classification implicit in death qualification is unconstitutional because it is not rationally related to a legitimate state interest. (Doc. No. 25 at 600.)

However, Petitioner does not point to clearly established Supreme Court precedent that he has standing to assert third-party federal rights held by prospective jurors in his case. The Supreme Court has held that a defendant in a criminal case can raise the third-party equal protection claims of jurors

325

excluded by the prosecution because of their race. *Powers*, 499 U.S. at 415.

Here, Petitioner concedes he makes no such claim. (*See* Doc. No. 25 at 524 n.194 and 595 n.208 observing prospective jurors removed for cause and by peremptory challenge at death qualification.) He fails to demonstrate any of these prospective jurors was successfully challenged on the basis of race or discriminatory animus. (*See* also claims 7-9, *ante; Powers,* 499 U.S. at 415.)

The Court is unpersuaded California's jury service law created federal due process rights enforceable by Petitioner on the facts and circumstances of this case.

To the extent Petitioner alleges only state law error, such alone is not a basis for federal habeas relief. (*See* Doc. No. 25 at 597); *see also* Civ. Proc. Code § 229(h); Estelle, 502 U.S. at 71.

The Court finds the allegation that prospective jurors were denied state law jury service rights protectable by Petitioner under the federal Constitution fails on *de novo* review.

### iii. Conclusions

Petitioner's allegations the jury was unconstitutionally biased upon by death qualification voir dire and prospective jurors were denied state law jury service rights protectable by Petitioner as federal rights violation fails on *de novo* review.

Claims 60 and 61 shall be denied.

## I.    Claims Alleging Other Bases for Relief

### 1.    Claims 28 and 66 – Unconstitutional Delay

Petitioner alleges the nine-year delay in charging him with Joyce's death denied due process (i.e. claim 28), and the decades-long delay in carrying out his death sentence amounts to cruel and unusual punishment (i.e. claim 66), denying his rights under the Fifth, Eighth and Fourteenth Amendments and in the case of claim 66 international law. (Doc. No. 25 at 317-21, 637-40.)

### a.    State Court Direct and Collateral Review

Petitioner's claim 28 allegation that the delay in charging him with Joyce's death denied him due process under the Fifth Amendment was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 106-10. Petitioner presented the claim on all grounds alleged in his second state habeas petition and it was denied on procedural grounds including raised and rejected on direct appeal (*Waltreus*). (Order No. S173793.)

Petitioner's claim 66 allegation that the delay in carrying out his death sentence constitutes cruel and unusual punishment was raised in his second state habeas petition and because it was not addressed by the court is deemed denied on the merits. (Order No. S173793); *see also Richter*, 562 U.S. at 99 ("[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary); *accord Williams*, 568 U.S. at 300-01.

### b. Analysis

#### i. Delayed Charges in Joyce's Death

Petitioner alleges the nine-year delay in charging him with Joyce's 1976 death was unjustified and denied due process under the Fifth and Fourteenth Amendments. (Doc. No. 25 at 317 *citing* CT 1330, 1333, 1463-71.) He argues the prejudice he suffered by virtue of evidence that was lost or became unavailable due to the delay outweighs the prosecution's justification for the delay. (*See* Doc. No. 25 at 317-21.)

Petitioner argues the state was aware early on that Joyce's death was suspicious. He observes that Joyce's attending physicians, Drs. Bruschi and Einstein, suspected Paraquat poisoning. (CT 1740-1748; RT 3219-20.) The Kern County District Attorney's Office opened a suspicious death investigation in 1976. (CT 1748.) Petitioner observes that because of these suspicions, Dr. Dominic Ambrosecchia, the Kern County forensic pathologist, and Primus Jones, an employee of the Kern County Coroner's Office, were present at the 1976 autopsy of Joyce's body by Dr. Swinyer, a pathologist at Mercy Hospital in Bakersfield, California. (Doc. No. 25 at 317-18 citing 3452-54.) Petitioner alleges the suspicious death investigation was terminated nearly a decade prior to the Kern County trial and the evidence collected therein destroyed. (Doc. No. 25 at 320.)

The record reflects that in 1988, Petitioner moved to dismiss the charged murder of Joyce (i.e., Count I of his criminal proceeding) on grounds the noted delay in bringing criminal proceedings against him denied due process. (CT 1463-1471, 1715-1739.) The trial court denied the motion. (CT 1785.)

The California Supreme Court considered and reject the instant allegation on direct appeal, stating that:

Defendant contends that the trial court erred in denying his motion to dismiss count one,

charging him with the murder of Joyce. He claims that the court should have granted his motion because of the nine-year delay between the murder of Joyce and the date he was charged with the crime, and he contends the failure to dismiss constituted a denial of due process of law.

Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay. (*Scherling v. Superior Court* (1978) 22 Cal.3d 493, 504-507; see also *People v. Morris* (1988) 46 Cal.3d 1, 37, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5; *People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 910-912.) A claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant. (See *United States v. Lovasco* (1977) 431 U.S. 783, 795; see also *People v. Frazer* (1999) 21 Cal.4th 737, 774.) We have observed that "[p]rejudice may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay." (*People v. Morris, supra*, 46 Cal.3d at p. 37.)

In support of his motion, defendant offered the testimony of several witnesses. Joyce's treating physician, Dr. Einstein, testified that at the time of her illness he suspected paraquat poisoning and requested an autopsy. He believed he had conveyed his suspicion to the district attorney's office, but he did not form an educated conclusion that she died of paraquat poisoning until the mid-1980's. Joseph Johnson, who in 1976 was chief investigator for the Kern County District Attorney's Office, confirmed that in 1976 defendant's third wife, Edith Ballew, had contacted the office and accused defendant of murdering Joyce. Johnson assigned investigator Skinner to look into the accusation, although he did not have any admissible evidence of paraquat poisoning. In 1978 or 1979, a sergeant in the Kern County Sheriff's Department received a similar communication from another of defendant's ex-wives, but found that his office had no record of an investigation against defendant. He contacted the district attorney's office regarding the matter. An investigator at the Kern County Sheriff's Department also received a communication from Edith Ballew accusing defendant of murdering Joyce by the administration of paraquat, but the office took no further action beyond conveying the information to the Bakersfield Police Department.

Defendant also called as a witness John Armendariz, who had been an investigator for the Kern County Coroner's Office until 1978. While he was so employed, Edith Ballew related her suspicions to him and he examined the coroner's records regarding Joyce's death. Dr. Ambrosecchia, also of the coroner's office, instructed him regarding the symptoms of paraquat poisoning, and Armendariz decided to send slides prepared at the time of the autopsy to the Bethesda Naval Hospital in Maryland for forensic examination. Dr. Ambrosecchia did not suggest he had any information about the case and, in fact, the autopsy had not been performed by the coroner's office but by staff at Mercy Hospital. At the end of 1977, Armendariz received a letter from the Bethesda laboratory stating that the slides were consistent with paraquat poisoning, but that because they had been prepared incorrectly in an inappropriate preservative, the laboratory could not test for paraquat.

In opposition to the motion, the prosecutor offered the testimony of Dr. Bruschi, who admitted Joyce Catlin to the hospital in 1976. The witness declared that at the time of her death he suspected paraquat poisoning but had no proof, particularly because he was informed at the time that no existing laboratory tests on autopsy tissue could disclose paraquat poisoning. Ronald Smith, a forensic toxicologist for the Kern County

328

Coroner's Office, testified that in 1977 a coroner's investigator presented him with a tissue specimen jar containing Joyce's tissue (brain, liver, lung, kidney, and spleen) and asked whether he could analyze the contents for paraquat. After investigation, he determined that there was no toxicological test that could disclose paraquat in the tissue, because the tissue had been preserved improperly. Joyce's tissue was kept in the office for a longer period than normally would be the case, and ultimately was destroyed when a new coroner took office. When Martha died, however, the coroner's office requested an autopsy, and tissue from Martha's body was properly preserved and was tested for paraquat.

Defendant contends the delay in charging him with the murder of Joyce caused him prejudice, in that two persons who had attended the autopsy performed on Joyce's body had died before the 1990 trial, namely Dr. Ambrosecchia and Primus Jones, who also was employed by the Kern County Coroner's Office. Defendant also complains of the loss of the letter from the Bethesda Naval Hospital stating that the slides of Joyce's tissue had some characteristics of paraquat poisoning but that no paraquat could be found because of the preservative used. He further complains that the jar of tissue samples referred to by Ronald Smith had been destroyed before he was arrested, that the Bakersfield Police Department records relating to Joyce's murder had been destroyed, and that some of the labels on the tissue blocks that were prepared after Joyce's autopsy had been lost. Finally, defendant contends he was prejudiced by his own loss of memory of the events of 1976 and by his inability to produce alibi witnesses to testify concerning his whereabouts when paraquat or to testify regarding his lack of access to paraquat at the time.

Defendant's claims of prejudice are weak. The evidence indicates that Dr. Ambrosecchia did not perform the autopsy, and there is no evidence suggesting that Ambrosecchia or Primus Jones would have testified favorably for the defense. Various witnesses testified that Joyce's tissue could not be subjected to a chemical analysis for paraquat because it was preserved in formalin rather than frozen, and it appears that the missing letter from the Bethesda Naval Hospital was consistent with this view. The loss of the jar containing tissue samples was insignificant, because preservation in formalin made it impossible to test for paraquat. Defendant does not suggest how records of the police investigation of the crime would have been relevant to his defense. As for defendant's loss of memory and alibi witnesses, the details of defendant's whereabouts at the time Joyce ingested paraquat were not highly significant, given his unlimited access to the victim and the circumstance that the paraquat could have been administered at any point over a lengthy period.

Moreover, the delay in prosecution was justified. Because of limitations in forensic science and because of the manner in which Joyce's tissue had been preserved, it would have been extremely difficult or impossible to make out a case against defendant at or near the time of the murder. Even when foul play is suspected, when available medical evidence does not support the suspicion further investigation certainly is justified. (See *People v. Archerd* (1970) 3 Cal.3d 615, 641-642.) "Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.... Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused .... A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt." (*People v. Dunn-Gonzalez, supra*, 47 Cal.App.4th at pp. 914-915; see also *People v. Webb* (1993) 6 Cal.4th 494, 528.) By the time defendant was charged, of course, additional evidence of his guilt had emerged- particularly his involvement in the paraquat poisoning of two more persons. (See *People v. Archerd, supra*, 3 Cal.3d at pp. 641-643 [developing medical and forensic techniques

and defendant's additional murders justified the filing of charges 11 years after the commission of a murder].)

Contrary to defendant's claim, the justification for the delay far outweighed the weak showing of prejudice presented by defendant. We also observe that there was no evidence that the delay was undertaken in order to gain an advantage over defendant, but instead the evidence suggested the delay was caused by the limits of existing laboratory tests, by a mistake in preserving Joyce's tissue in formalin, and by the early caution of medical experts as to whether to state an opinion on the cause of Joyce's death. The trial court did not err in denying the motion to dismiss for delay in prosecution.

*Catlin*, 26 Cal. 4th at 106-110.

The state supreme court reasonably found the noted delay in prosecution was not motivated by any desire in the prosecution for tactical advantage. *See United States v. Lovasco*, 431 U.S. 783, 796 (1977) (to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time). As that court noted, "there was no evidence that the delay was undertaken in order to gain an advantage over defendant, but instead the evidence suggested the delay was caused by the limits of existing laboratory tests, by a mistake in preserving Joyce's tissue in formalin, and by the early caution of medical experts as to whether to state an opinion on the cause of Joyce's death." Petitioner has not demonstrated otherwise on the evidentiary record.

Furthermore, the state supreme court reasonably found the alleged error was not prejudicial for the reasons stated by that court. The evidence allegedly lost appears of minimal exculpatory value. (*See also* claims 21-22, *ante.)*

Aspects of the claim reviewed *de novo* fail for the reasons stated.

ii.     *Delay in Carrying Out Death Sentence*

Petitioner argues that execution of his death sentence after such a long delay results in extreme mental torture and degradation and disserves any notions of deterrence and retribution, amounting to cruel and unusual punishment violating the Eighth and Fourteenth Amendments and international law. (Doc. No. 25 at 636-40, *citing Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., memorandum respecting the denial of certiorari) (claim that execution following seventeen years on death row constitutes cruel and unusual punishment would benefit from further study); *Knight v. Florida*, 528 U.S. 990, 993 (1999) (Breyer, J., dissenting) ("Where a delay, measured in decades, reflects the State's own

failure to comply with the Constitution's demands, the claim that time has rendered the execution inhuman is a particularly strong one. I believe this Court should consider that claim now."); *Soering v. United Kingdom*, 11 Eur. Ct. H.R. 439, ¶ 111 (1989) (protracted delays in carrying out death sentences in Virginia, which it averaged at six to eight years, constituted inhuman and degrading punishment in violation of Article 3 of The European Human Rights Convention Charter).

Petitioner argues that his lengthy incarceration under a death sentence has caused him prolonged and extreme mental torture and degradation, "violat[ing] international treaties and laws prohibiting cruel and unusual punishment, including, but not limited to, the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the 'Torture Convention'), adopted by the General Assembly of the United Nations on December 10, 1984, and ratified by the United States ten years later." (Doc. No. 25 at 638-39 citing the Torture Convention.)

The noted record reflects that Petitioner has been continuously confined since 1985 and under sentence of death since 1990. Appointment of post-conviction counsel and resolution of non-waivable state automatic appeal and separate collateral review proceedings spanned seventeen years. Petitioner contends these delays are not attributable to any exercise of discretion on his part, but rather have been caused by the "negligence or deliberate action of the State." (Doc. No. 25 at 637-38.) He argues such delays undermine society's notion of retribution and deterrence underlying the modern death penalty and constitute cruel and unusual punishment. (*See* Doc. No. 25 at 639 citing *Lackey*; *see also* Doc. No. 95 at 257-58.)

However, it remains that Petitioner fails to establish execution of his death sentence following lengthy confinement is unconstitutional. He does not cite any clearly established authority from the United States Supreme Court addressing a prolonged detention claim. *See Allen v. Ornoski*, 435 F.3d 946, 958-59 (9th Cir. 2006) ("[t]he Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment. . . . Allen cannot credibly claim that there is any clearly established law, as determined by the Supreme Court, which would support this . . . claim"); *accord Lackey,* 514 U.S. 1045; *Knight*, 528 U.S. 990. In *McKenzie v. Day*, the Ninth Circuit rejected such a *Lackey* claim involving a twenty-year delay, stating that "[a] defendant must not be penalized for pursuing his constitutional rights, but he also should not be able to benefit from the ultimately

unsuccessful pursuit of those rights." 57 F.3d 1461, 1466 (9th Cir. 1995); *see also Jones v. Davis*, 806 F.3d 538, 553 (9th Cir. 2015) (rejecting, as *Teague*-barred, a challenge to California's death penalty on the basis of the lengthy delay between sentencing and execution).

The California Supreme Court in *People v. Ochoa* concluded that "execution notwithstanding the delay associated with defendant's appeals was not unconstitutional and furthered both the deterrent and retributive functions; and that shielding defendant from execution solely on this basis would frustrate these two penological purposes." 26 Cal. 4th 398, 464 (2001) (abrogation recognized on other grounds by *People v. Harris*, 43 Cal. 4 th 1269, 1306 (2008).

Here, Petitioner concedes that "there is currently no clearly established Supreme Court law mandating the relief Petitioner seeks here." (Doc. No. 95 at 257.) Since the U.S. Supreme Court has not decided the issue, the state supreme court's decision could not be contrary to or an unreasonable application of United States Supreme Court precedent. *Carey*, 549 U.S. 76; *see also White v. Johnson*, 79 F.3d 432, 439 (5th Cir. 1996) ("White has benefitted from [the] careful and meticulous [review] process and cannot now complain that the expensive and laborious process of habeas corpus appeals which exists to protect him has violated other of his rights.").

Petitioner's further allegation in his reply brief that claim 66 nonetheless "falls outside of the strictures of § 2254(d)" on grounds the claim "rests on an ongoing factual premise – Petitioner's continued incarceration" (*id.*) is unavailing. To the extent the allegation is supported by his above discussed arguments, the state supreme court reasonably could find it fails for the reasons stated. To the extent the allegation is unexhausted, it fails for want of supporting Supreme Court authority, as discussed above.

It reasonably appears that the duration of Petitioner's appeal, as well as his collateral review proceedings, "is a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life." *Johns v. Bowersox*, 203 F.3d 538, 547 (8th Cir. 2000) (quoting *Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir. 1998)).

Petitioner's further allegation that execution after prolonged incarceration violates international human rights law and jus cogens theories (citing *Pratt v. Attorney General for Jamaica*, 4 All. E.R. 769 (Privy Council) 1993; *Soering*, 11 E.H.R.R. 439, ¶ 111 [Euro. Ct. of Human Rights]; International

Covenant on Civil and Political Rights ("ICCPR"), article 7; Torture Convention, articles 1 and 16; and the American Convention on Human Rights, article 5), fails for the reasons discussed in claim 67(2), *post*.

Aspects of the claim reviewed *de novo* fail for the reasons stated.

### iii. Conclusions

For the reasons stated, a fair-minded jurist could find meritless Petitioner's allegations that the nine-year delay in charging him with Joyce's death denied due process, and the decades-long delay in carrying out his death sentence amounted to cruel and unusual punishment and violated international law.

Accordingly, it does not appear the California Supreme Court's rejection of claim 28 and presumed rejection of claim 66 was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Aspects of the claims reviewed *de novo* fail for the reasons stated.

Claims 28, and 66 shall be denied.

### 2. Claim 30

Petitioner alleges the evidence that he killed Joyce and Martha by paraquat poisoning was inaccurate, unreliable and insufficient to support his conviction and multiple murder special circumstance findings, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 328.)

### a. State Court Direct and Collateral Review

Petitioner's allegation that his conviction for first-degree murder with multiple murder special circumstance found true was supported by insufficient evidence, violating rights under the Fifth, Sixth, and Eighth Amendments, was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 139-43.

Petitioner presented the claim in his second state habeas petition and it was denied on procedural grounds including raised and rejected on appeal (*In re Waltreus*) and denied as not cognizable on habeas corpus (*In re Lindley*). (Order No. S173793.)

### b. Analysis

Petitioner argues the evidence offered by the prosecution in support of its theory that he intentionally poisoned Joyce and Martha using paraquat could not support the jury's findings on every element of the charged offenses and special circumstances beyond a reasonable doubt. (Doc. No. 25 at 328 citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (evidence is sufficient to support a conviction where viewed most favorably to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt). He argues the prosecution's evidence failed to connect him, the victims and the paraquat at the times of the deaths. However, the state supreme court reasonably found otherwise. He suggests the prosecution's decision to charge a poison murder special circumstance only in Martha's murder, even though it charged first-degree murder by poison in the deaths of both Martha and Joyce, demonstrates the weakness of the evidence. (*Id.*).

However, the claim lacks merits on deferential and *de novo* review, as follows.

#### i. Petitioner's Specific Arguments

#### (1) Joyce's Death

Petitioner argues prosecution expert testimony at trial opining paraquat as the more likely cause of Joyce death lacked evidentiary weight because the crime occurred more than ten years earlier, and the opinions relied not upon scientific information and testing but rather upon the similar symptoms and histories of the subsequent victims, Martha and Glenna. (Doc. No. 25 at 330-31.) He notes the coroner's original cause of death, contemporaneously concurred in by Joyce's attending physician Dr. Einstein, was respiratory failure secondary to a lung infection. (*Id.; see also* RT 3239-40.) He notes the coroner found no paraquat in Joyce's tissues. (*See* RT 3244-47.) He notes expert pathology testimony that lung infection was a common cause of the type of lung damage seen in Joyce. (*Id.* citing RT 3241, 3823, 4382.)

Petitioner argues the testimony does not show he used or possessed paraquat in the course of his employment. (Doc. No. 25 at 331.) He notes that the bottle of paraquat found by Glennon Emery in 1985 in their adjoining shops was manufactured nearly one year after Joyce's death. (*Id.* citing RT 4248-49.)

Petitioner argues the testimony suggesting he was familiar with paraquat and its potential as a

poison was unreliable and based upon statements he allegedly made many years prior to Joyce's death. (Doc. No. 25 at 332 citing RT 4140-42.)   He argues that even if he told his stepson, Joyce's son Lawrence Nielsen, to stay aware from nearby fields that had been sprayed with paraquat which could be absorbed through the skin (RT 3697-3700); and told Nielson and his siblings to "stay out of the garage area and not to mess around with any bottles on the shelves without first checking with Petitioner [or Joyce]" (*id.*) - these statements do not show Petitioner possessed paraquat or had special expertise as to it.

Petitioner argues that prosecution theory that he murdered Joyce for financial gain from credit union and insurance benefits is based solely upon surmise.  (Doc. No. 25 at 333 citing RT 4103-04, 4149, 5199, 5296-97.)   He argues the evidence that he or anyone murdered Joyce is insufficient for the reasons stated above.

Petitioner further argues that although the Monterey County trial court found the evidence in that proceeding insufficient to support a finding that Petitioner killed Joyce; the Kern County trial court nonetheless used the same evidence to convict Petitioner of Joyce's murder in the Kern County proceeding.  (*See* Doc. No. 25 at 330 *citing* CT 1864, 1SHCP Ex. 102 at 181; RT 5193, 5197-5199, 5281-5285.)

### (2)    Martha's Death

Petitioner argues the prosecution failed to support its theory that he murdered Martha by poisoning her with paraquat.  (Doc. No. 25 at 334.)  He points to the testimony of prosecution expert Dr. Buteau in the Monterey County proceeding (*see* 1SHCP Ex. 102 at 298, 302-13, 345, 590-92, 600; CT 769-74) supporting his alibi defense.  (*See* 1SHCP Ex. 102 at 941-943, 947, 954-957, 986-87; RT 4415, 4428-4429. 4471-4473, 4522, 4563-4566, 4589-4593, 4601-4608, 4709-12.)  He discounts the evidence tending to impeach his alibi defense including the noted conflicting testimony of prosecution expert Dr. Ford in the Kern County proceeding (*see* RT 3921); and the noted testimony of Petitioner's co-worker Mr. Skinner (*see* RT 3557, 3565-3566, 4251-52).  (*See* Doc. No. 25 at 334-35.)  He argues the prosecution closing argument suggesting that he poisoned Martha within the timeframe suggested by Dr. Ford, by putting paraquat in Martha's cough medicine is not based on substantial credible evidence.  (*Id. citing* RT 5195, 5293.)

Petitioner argues the prosecution failed to demonstrate "beyond a reasonable doubt that

Petitioner's fingerprint was placed on the cap of the paraquat bottle at a time relevant to when the alleged murders were committed." (Doc. No. 25 at 337; *see also* RT 3619-20.) Petitioner suggests here, as he did at trial that the bottle had been planted by Glen Emery or Edith Ballew. (*See* Doc. No. 25 at 269; CT 402, 404, 407, 419, 422; RT 3129-51, 3471-89; 1SHCP Ex.'s 5, 6, 29.) He argues that fingerprint evidence alone is insufficient to support conviction because there is no evidence the print was left at the time of the crime. (Doc. No. 25 at 336 citing 1SHCP Ex. 102 at 1385; *see also Mikes v. Borg*, 947 F.2d 353, 361 (9th Cir. 1991) (in fingerprint only case the record must support reasonable inference the fingerprint was left at time of crime). Especially so here, he argues, because the single left index finger print was found on the bottle cap; yet to leave a print there the individual would necessarily have grasped the bottle upon which no fingerprint was found. (Doc. No. 25 at 337 *citing* RT 3629, 3638.)

### ii. Sufficiency of the Evidence

A federal habeas court reviews challenges to the sufficiency of the evidence by determining whether in "viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990); *see also Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992).

"A reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously." *McDaniel v. Brown*, 558 U.S. 120, 131 (2010). Sufficiency of the evidence claims raised in § 2254 proceedings must be measured with reference to substantive requirements as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (federal court is bound by "a state court's interpretation of state law[.]").

In cases where the evidence is unclear or would support conflicting inferences, the federal court "must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflict in favor of the prosecution and must defer to that resolution." *Jackson*, 443 U.S. at 326.

To prevail, a petitioner must show "that the prosecution's case against him "was so lacking that the trial court should have entered a judgment of acquittal." *McDaniel*, 558 U.S. at 131.

AEDPA adds another layer of deference over the already deferential *Jackson* standard. Under AEDPA, the federal court may not grant a habeas petition unless it finds that the state court unreasonably

applied the principles underlying the *Jackson* standard when reviewing petitioner's claim. *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1275 n.12 (9th Cir. 2005); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997) (recognizing that "unreasonable application" standard applies to insufficient evidence claim). "Expressed more fully, this means a reviewing court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *McDaniel*, 558 U.S. at 133.

California law provided that, "[m]urder is the unlawful killing of a human being . . . with malice aforethought." Pen. Code § 187(a). "For purposes of Section 187, malice may be express or implied . . . [m]alice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature . . . [m]alice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned or malignant heart." Pen. Code § 188. "[A]ll murder which is perpetrated by . . . poison . . . or by any kind of willful, deliberate, and premeditated killing . . . is murder of the first-degree." Pen. Code § 189; *see People v. Berryman*, 6 Cal. 4th 1048, 1085 (1993), overruled on other grounds by *People v. Hill*, 17 Cal. 4th 800, 822-23 (1998).

Premeditation and deliberation are generally established by proof of (1) planning activity; (2) motive (established by a prior relationship and/or conduct with the victim); and (3) manner of killing. *People v. Anderson*, 70 Cal. 2d 15, 26-27 (1968). The California Supreme Court "sustains verdicts of first-degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." *Id.* at 27.

The jury convicted Petitioner on Count I first-degree murder of Joyce and Count II first-degree murder of Martha and as to Count II found true the special circumstances of (i) murder carried out for financial gain (Penal Code § 190.2(a)(1)); (ii) multiple murder (Penal Code § 190.2(a)(3)); and (iii) intentional killing by administration of poison (Penal Code § 190.2(a)(19); and Petitioner stipulated to the additional charged special circumstance of his prior first-degree murder conviction for the killing of Glenna (Penal Code § 190.2(a)(2)). (CT 1777, 2024-33.)

The state supreme considered and rejected the claim on direct appeal, stating that:

Defendant contends that there was insufficient evidence to support his conviction for the

337

murders of Martha and Joyce, and to support the true finding on the multiple-murder special circumstance. His conviction, he asserts, constituted a violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and parallel provisions of the California Constitution. Defendant asserts that "for both Joyce's and Martha's deaths, the crucial link between appellant, victim and poison *at the time of the crime* simply did not exist."

A reviewing court faced with such a claim determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319, italics omitted; see also *People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft, supra*, 23 Cal.4th at p. 1053.) This standard applies whether direct or circumstantial evidence is involved. "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*Id*. at pp. 1053-1054.) As we shall explain, we conclude that the evidence clearly is sufficient to sustain defendant's conviction for the murders of both Joyce and Martha.

The elements of a charge of murder are an unlawful killing with malice aforethought. (§ 187, subd. (a).) Murder perpetrated by means of poison is murder of the first degree. (§ 189.)

With respect to the murder of Joyce, we believe that there was evidence that is "reasonable, credible and of solid value" that defendant perpetrated an unlawful killing with malice aforethought, and that he did so by means of poison. Credible evidence established that in 1970 he made statements indicating his awareness of the extreme toxicity of paraquat and its danger to human life. He said he kept his parents' garden attractive with herbicides he obtained at work, and he displayed to a witness a poison defendant stated would achieve the "perfect murder" because it could not be detected in the victim's body and there was no antidote. In the summer of 1975, he warned his stepson, Joyce's child, about agricultural poisons, including paraquat, and stated that he had been acquainted with a person who sprayed nearby fields with such poisons, including paraquat, for a couple of years. He told the child not to enter the garage because of the dangerous chemicals stored in it. Credible evidence also established that defendant had access to paraquat when he worked for Superior Farming from February to July 1976 and from November 1976 to April 1977. Defendant had access to Joyce, with whom he was living at the time of the murder. In 1985, a bottle of paraquat (dated after Joyce's murder) bearing his fingerprint was found in a garage to which he had access, although he denied knowingly possessing the substance.

Although defendant's possible motive was not an element of the prosecution's burden of proof, prosecution evidence disclosed that defendant had engaged in extramarital affairs while married to Joyce, that the couple had argued over his infidelity, and that he received several thousand dollars in insurance proceeds upon Joyce's death. There was evidence of consciousness of guilt, in that defendant exhibited grief at Joyce's funeral but seemed lighthearted immediately thereafter. A jailhouse informant also testified that defendant, after his 1985 arrest, had stated that he had "killed the bitches."

338

Substantial, reliable, and credible expert opinion testimony, based upon the clinical course of Joyce's illness and the results of an autopsy, supported the conclusion that Joyce died of paraquat poisoning, despite the circumstance that, in light of the tests available at the time of Joyce's death, it had not been possible to detect the presence of paraquat in her tissue. Her symptoms, from the vomiting and diarrhea that characterized the early phase of her illness, to fever, kidney dysfunction, respiratory distress, and ultimately respiratory failure due to extensive fibrosis in the lungs, constituted a typical progression of paraquat poisoning. The appearance and weight of her lungs after death, and the appearance of lung tissue slides examined by several experts, also were typical of paraquat poisoning and, indeed, were not consistent with any other cause of death, in the view of several experts.

Finally, other-crimes evidence demonstrated that defendant also had killed Martha and Glenna pursuant to the same scheme or plan, a circumstance that, we have concluded, legitimately could be considered by the jury in finding guilt.

"Defendant points to evidence that assertedly demonstrates Joyce did not die of paraquat poisoning, including her death certificate indicating that she died of respiratory failure caused by undetermined microorganisms, the failure of any laboratory or physician to find paraquat in her tissue, the lack of direct evidence of paraquat administration by defendant or anyone else, and the testimony of a defense expert that Joyce's death could have had a cause other than paraquat poisoning. He also asserts that there was no direct evidence that he possessed paraquat, and he points out that the container of paraquat that bore his fingerprint was manufactured or filled in April 1977, almost a year after Joyce's death, and was seized after his 1985 arrest. He contends that testimony concerning his statements indicating his familiarity with paraquat was unreliable due to the passage of time and the youth of the witness, and that the statements did not constitute direct evidence that he possessed or administered paraquat. He also notes some inconsistencies in testimony regarding the timing of his statements suggesting financial gain as one motive for the murder of Joyce. Finally, he stresses that Dr. Stephens, a prosecution expert, testified that he would be unable to conclude beyond a reasonable doubt that paraquat caused Joyce's death without relying in part on the evidence that Martha and Glenna also died of paraquat poisoning, and that Drs. Einstein and Kilburn had testified only that paraquat was the likely cause of Joyce's death, with Dr. Kilburn retaining some doubt as to the cause of death.

Defendant's contentions essentially constitute an effort to relitigate the question of his guilt. Although defendant presented some evidence and arguments in his favor at trial, the record discloses substantial credible evidence in support of the jury's verdict. Our examination of the record discloses that Dr. Kilburn testified that he believed beyond a reasonable doubt that Joyce died from ingesting paraquat. Dr. Einstein was strongly of the opinion that she died of paraquat poisoning. Dr. Stephens stated that the tissue slides alone would not have demonstrated the cause of Joyce's death but, properly relying upon clinical evidence regarding the course of her disease and upon the paraquat poisoning of defendant's mother and another of defendant's wives, he expressed the opinion, held beyond a reasonable doubt, that Joyce died of paraquat poisoning. The experts' reliance upon evidence of other paraquat poisonings attributed to defendant does not demonstrate that their opinion that Joyce died of paraquat poisoning did not constitute credible evidence of solid value, or that the opinion of the experts was based upon conjecture and speculation. (See Evid. Code, § 801.) The expert opinion testimony did not constitute, nor did it rely upon, character or propensity evidence, nor did it go to any question of defendant's intent or mens rea. (Cf. *People v. McFarland* (2000) 78 Cal.App.4th 489 [it is error for an expert to testify, based on defendant's prior convictions, that in the current case the defendant was motivated by abnormal sexual interest].) Rather, it was reasonable to conclude that the probability was exceptionally

low that Joyce's death, which bore the clinical signs of paraquat poisoning, was not actually a paraquat poisoning, when defendant had murdered another wife and his mother by means of paraquat.

Defendant's insistence that there was no direct evidence that he possessed paraquat at the time of Joyce's death, or that he administered it to her, is misplaced. Circumstantial evidence may constitute substantial evidence of guilt. (See *People v. Kraft, supra,* 23 Cal.4th at p. 1053; *People v. Millwee* (1998) 18 Cal.4th 96, 132; *People v. Bean* (1988) 46 Cal.3d 919, 932-933.) A defendant's responsibility for administering poison most frequently must be proved circumstantially (see *People v Diaz, supra,* 3 Cal.4th at p. 530; *People v. Archerd, supra,* 3 Cal.3d at pp. 621, 638 [evidence that defendant had killed relatives by insulin poisoning was admissible to prove that he murdered other relatives by insulin poisoning]; *People v. Cuff* (1898) 122 Cal. 589, 591, and in the case of the murder of a spouse, it is particularly likely that the evidence will be circumstantial. (See *People v. Ruiz, supra,* 44 Cal.3d at pp. 605-606 [the abrupt disappearance of defendant's third wife under suspicious circumstances indicating foul play would be admissible to establish the identity of the perpetrator of the murder of defendant's fifth wife, who disappeared under similar circumstances]; *People v. Helwinkel* (1962) 199 Cal.App.2d 207, 217-218.)

With respect to the murder of Martha, there was evidence that defendant had tired of caring for his mother, that she had expressed disapproval of his many marriages and had threatened to disinherit him, and that he had secured funds from her for the purpose of purchasing her a new residence but had not used the funds for that purpose. It was established by overwhelming evidence that she had received a toxic dose of paraquat. Other-crimes evidence also indicated that it was defendant who had administered the paraquat.

Defendant contends that inconsistencies between the testimony of the prosecution's experts at his Monterey County trial for the murder of Glenna and in the present case regarding the time at which the paraquat would have had to have been administered in order to produce the symptoms displayed by Martha, and to have caused her death at the time it occurred, demonstrate that there was not substantial evidence that it was defendant who administered the poison.

Defendant was able to cross-examine the prosecution experts with respect to any inconsistencies in their testimony. Evidence admitted only at the prior trial is not before us. Inconsistent testimony by defendant's employee regarding defendant's presence or absence from Fresno during the week preceding his mother's death was fully explored at trial. The question whether he was present at work in Fresno during those days was not of the greatest significance, however, because Fresno and Bakersfield are less than two hours' drive apart, and defendant could have visited his mother, who lived alone, at various times during the week. The exact method of paraquat administration was not determinative-the poison could have been administered in many different ways, including by placing it in a medicine bottle, the contents of which Martha would administer to herself. Indeed, the poison could have been introduced into Martha's cough syrup on the Sunday preceding her murder, when defendant visited her.

Defendant claims that the sole evidence against him was his fingerprint on the bottle of paraquat found in his shop/garage, and that a fingerprint alone does not constitute sufficient evidence of guilt unless the prosecution proved beyond a reasonable doubt that defendant placed the fingerprint on the bottle at the time of the murders.

As our discussion above demonstrates, defendant is mistaken in his premise that the sole evidence against him was the fingerprint. The fingerprint evidence may have been equivocal in some respects, because defendant's fingerprint could have been placed on

340

the bottle at any time, even after the crimes, and in any event the bottle was filled after Joyce's death, but these points were made to the jury by the defense. Moreover, the presence of the fingerprint was significant with respect to the issue of defendant's credibility, even without proof of the time at which the fingerprint had been applied, because defendant denied that he ever had possessed paraquat "that I have known of."

In sum, we conclude that there was credible evidence of solid value from which a reasonable jury could conclude beyond a reasonable doubt that defendant was guilty of the charged crimes.

*Catlin*, at 139-143.

Petitioner has not demonstrated the state supreme court unreasonably applied the *Jackson* standard in rejecting the claim. This Court defers to the state supreme court's reasoning and decision consistent with the *Jackson* standard and AEDPA. *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (AEDPA sufficiency review only asks whether the state court disposition was an unreasonable application of the *Jackson* standard). The Court on sufficiency review must presume that the trier of fact resolved any conflicting inferences in favor of the prosecution and must defer to that resolution. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994).

The trial record included substantial direct and circumstantial evidence and reasonable inference therefrom supporting Petitioner's planning, motive, and intentional, premeditated and deliberate use of the poison paraquat to kill Joyce and Martha as charged, including that: (i) prior to and after 1976, Petitioner had access to paraquat (*see e.g.*, RT 3134-38, 3282-89, 3619-21, 3835, 4142, 4767-5028), (ii) prior to 1976, Petitioner knew of the lethal characteristics of paraquat (*see e.g.*, RT 3697-3700, 4140-42) and believed paraquat could not be detected in its victims (*see e.g.*, RT 4142), (iii) Petitioner had personal and financial motives to kill Joyce (RT 4103-04, 4145-49, 4963-64, 5296-97) and Martha (RT 4150, 4727-29, 5148-50), (iv) at times a lethal amount of paraquat could have been administered, Petitioner had access to Joyce (RT 3218, 4943-45) and Martha (RT 4709-19, 4721), (v) paraquat poisoning was a proximate cause in the death of Joyce (RT 3218-19, 3240-43, 3458, 3765-3771, 3823-26, 3916, 4032-45) and Martha (RT 3257-63, 4049), and (vi) Petitioner told his cellmate Hardin that he "killed the bitches." (RT 4164.)

The state supreme court reasonably could find that to the extent circumstantial evidence was before the jury, such evidence was consistent with the prosecution theory of Petitioner's guilt in the crimes and not reconcilable with any other rational conclusion. (*See* CT 1932-1933.) As noted, "if the

341

record of historical facts supports conflicting inferences, we must presume that the trier of fact resolved any such conflicts in favor of the prosecution [ ] and we must defer to that resolution." *McMillan*, 19 F.3d at 469.

### iii. Conclusions

For the reasons stated, a fair-minded jurist could find meritless Petitioner's claim his conviction on Counts I and II, with Count II special circumstances found true was based upon insufficient evidence.

Accordingly, it does not appear the California Supreme Court's rejection of claim 30 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Aspects of the claim reviewed *de novo* fail for the reasons stated.

Claim 30 shall be denied.

### 3. Claims 31 and 33

Petitioner alleges he is factually innocent of murder in the deaths of Joyce, Martha and Glenna (i.e. claim 31), such that his prior conviction in Glenna's death and special circumstance based thereon and death sentence (i.e. claim 33) are in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. No. 25 at 339-57, 360.)

### a. State Court Direct and Collateral Review

Petitioner's claim 31 allegation that his conviction and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments because he is factually innocent of the murders of Glenna, Joyce, and Martha was raised in his first state habeas petition and denied on the merits. Order No. S090636. Petitioner raised the claim in his second state habeas petition and it was denied on procedural grounds including as raised in the prior state habeas petition (*In re Miller*). (Order No. S173793.)

Petitioner's claim 33 allegation that his prior murder conviction and special circumstance based thereon violates the Fifth, Sixth, Eighth, and Fourteenth Amendments because he is factually innocent of Glenna murder was raised in his second state habeas petition and denied on procedural grounds. (Order No. S173793.) Petitioner raised a similar claim based on different facts (from those alleged in claim 31

342

1    above) in his first state habeas petition which was denied on the merits.  (Order No. S090636.)

2    **b.    Analysis**

3    Petitioner alleges that he is factually innocent of poisoning Joyce, Martha, and Glenna.  He

4    argues forensic and other evidence that he contends was not presented to the jury.[22]

5    The showing required for a free-standing claim of actual innocence, i.e., a claim irrespective of

6    constitutional error at trial or sentencing, is "extraordinarily high" and must be "truly persuasive."

7    *Herrera v. Collins*, 506 U.S. 390, 417, (1993).  To carry this burden Petitioner must affirmatively prove

8    he is innocent.  *See Carriger v. Stewart*, 132 F.3d 463, 476-77 (9th Cir. 1997).

9    The Supreme Court has not held that a substantive claim of actual innocence is available.

10   *House v. Bell*, 547 U.S. 518, 554-55 (2006).  But in *Schlup v. Delo*, 513 U.S. 298 (1995) the Supreme

11   Court reached actual innocence as a gateway claim to consideration of otherwise barred Constitutional

12   claims.  "If a habeas petitioner . . . presents evidence of innocence so strong that a court cannot have

13   confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-

14   harmless constitutional error, the petitioner should be allowed to pass through the gateway and argue

15   the merits of his underlying claims."  *Schlup*, 513 U.S. at 316.  The *Schlup* court held that the proper

16   standard is that a procedurally defaulted petitioner must show that a constitutional violation has

17   *probably* resulted in the conviction of one who is actually innocent.  513 U.S. at 326.  That is, "[t]he

18   petitioner must show that it is more likely than not that no reasonable juror would have convicted him

19   in the light of the new evidence."  513 U.S. at 327.

20   It follows that petitioner's burden is to demonstrate that more likely than not, any reasonable juror

21   would have reasonable doubt.  *House,* 547 U.S. at 538.  *See Sawyer*, 505 U.S. at 346 (holding that in

22   order to prove actual innocence, petitioner must show fair probability that rational trier of fact would

23   have entertained reasonable doubt regarding the existence of facts which are prerequisites under state or

24   federal law for imposition of the death penalty).

25   The Court finds that on deferential and *de novo* review Petitioner fails to establish his factual

26   innocence, as discussed below.

27

28   _____

[22] As discussed throughout this order, Glenna's killing was not a charged offense in the instant Kern County proceeding.

*i.* *Factual Innocence in Joyce's Death*

Petitioner argues the noted expert testimony discussed above opining that paraquat was the likely cause of Joyce's death was based upon lay information surrounding the deaths of Glenna and Martha rather than forensic and medical facts and evidence. (Doc. No. 25 at 341-43.) He argues this testimony did not rise to the level of expert testimony. *See People v. Torres,* 33 Cal.App.4th 37, 45 (1995) ("Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness."). He argues this purportedly expert testimony usurped the function of the jury. (Doc. No. 25 at 343.)

Petitioner revisits the above discussed evolution of medical opinion regarding the cause of Joyce's death. He observes the autopsy report by Dr. Swinyer stated Joyce's cause of death as "acute respiratory failure due to severe bilateral pneumonitis due to microorganisms undetermined." (Doc. No. 25 at 342 citing RT 3240, 3456-57.) He observes that Joyce's treating physician, Dr. Einstein, initially suspected her death was caused by a viral infection, at that time agreeing with the coroner's report in this regard. (Doc. No. 25 at 341 citing RT 4455-59.) He observes that Dr. Einstein stated Joyce had "other physical problems" which could have caused her death and that no single cause of death could be identified. (*Id.*)

Petitioner observes the consulting experts, Drs. Kilburn (a professor of medicine) Russell (a pathologist), and Stephens (a pathologist) were likewise equivocal, opining that Joyce's lung damage could have been caused by paraquat or any number of natural causes including influenza or pneumonia. (Doc. No. 25 at 342 citing RT 3823, 4030-34, 4382.)

Petitioner argues these experts came to opine paraquat poisoning as the likely cause of Joyce's death only upon considering information about the deaths of Glenna and Martha. (Doc. No. 25 at 342 citing RT 4035-36.) He observes that even with this additional information, Dr. Kilburn testified that there was still a "5-precent possibility" Joyce's death was caused by something other than paraquat. (RT 4045.)

Petitioner relies upon the testimony of his habeas toxicologist, Dr. Kuo, Ph.D., who opined that there can be no scientific conclusion Joyce died from paraquat poisoning because no paraquat was found in her tissue. (Doc. No. 25 at 344 *citing* 1SHCP Ex. 206 at 7-8.) Petitioner observes Dr. Kuo agrees with the conclusions initially reached by Drs. Kilburn, Russell and Stephens before they were

influenced by information from the deaths of Glenna and Martha.

However, Petitioner merely reargues evidence supporting his above discussed meritless insufficiency of the evidence claim. (*See* claim 30, *ante*.) Notably, the state supreme court in rejecting Petitioner's sufficiency of the evidence claim on direct appeal, stated that:

> Substantial, reliable, and credible expert opinion testimony, based upon the clinical course of Joyce's illness and the results of an autopsy, supported the conclusion that Joyce died of paraquat poisoning, despite the circumstance that, in light of the tests available at the time of Joyce's death, it had not been possible to detect the presence of paraquat in her tissue. Her symptoms, from the vomiting and diarrhea that characterized the early phase of her illness, to fever, kidney dysfunction, respiratory distress, and ultimately respiratory failure due to extensive fibrosis in the lungs, constituted a typical progression of paraquat poisoning. The appearance and weight of her lungs after death, and the appearance of lung tissue slides examined by several experts, also were typical of paraquat poisoning and, indeed, were not consistent with any other cause of death, in view of several experts.

*Catlin*, 26 Cal. 4th at 140.

As the record reflects, Drs. Kilburn, Russell and Stephens ultimately came to believe paraquat may have been in Joyce's body even though paraquat was not detected in improperly prepared and preserved tissue samples. (Doc. No. 25 at 343-45 citing RT 3771, 3823.) Albeit, Dr. Russell testified that the absence of any finding of paraquat in Joyce's tissue left her with a reasonable doubt whether paraquat caused Joyce's death. (RT 4405.)

Notably, Dr. Swinyer ultimately distanced himself from the coroner's cause of death finding, that Joyce died of "acute respiratory failure due to severe bilateral pneumonitis due to microorganisms undetermined", stating this was not his finding at autopsy and that he found no proof of micro-organism involvement. (RT 3458.)

To the extent Petitioner revisits argument that prosecution expert, toxicologist Dr. Ford was not qualified to opine on cause of death because he is neither a medical doctor nor a pathologist (*see* Doc. No. 25 at 341; s*ee also* claims 3, 16, 17, 30 *ante*), the same appears to hold true for his expert Dr. Kuo. Moreover, the jury heard Dr. Ford's testimony that he was not licensed to opine on cause of death. (RT 3932.) Petitioner has not pointed to evidence in the record that Dr. Ford did so opine.

Petitioner further argues that even if Joyce died from paraquat poisoning, he was not responsible. He suggests that Joyce suffered environmental exposure to paraquat. (Doc. No. 25 at 346 citing 1SHCP Ex. 206.) He points to Dr. Einstein's testimony that in his practice, during the course of

which he treated Joyce, he saw deaths with nearly identical symptoms resulting from agricultural spraying/over-spraying. (RT 3667.) He points to his habeas proffer that paraquat was available to farmers for weed control from 1971 until 1985, when health risks resulted in its discontinuance, and the possible consequences of overspray and drift exposure. (See 1SHCP Ex.'s 160, 161, 162, 165, 168, 169, 170, 172, 177.) He suggests Joyce lived near fields where paraquat was applied and points to Dr. Kuo's opinion that any paraquat in Joyce's tissue might have come from environmental exposure.

However, Petitioner does not point to evidence old or new or reasonable inference therefrom that Joyce was environmentally exposed to paraquat. Particularly, such exposure within the ingestion timelines presented at trial is unsupported, as is any argument Joyce suffered the lethal effects of cumulative environmental exposure to paraquat.

It does not appear that Petitioner points to evidence in the record and habeas proffer showing that it is more likely than not that no reasonable juror would have convicted him in the light of the trial record and the alleged new evidence. 513 U.S. at 327.

### ii. Factual Innocence in Glenna's Uncharged Death

Petitioner revisits paraquat ingestion timeline evidence discussed above. (*See* claims 3, 16, 17, 30, *ante*.) He argues factual innocence in Glenna's death on grounds he did not have access to Glenna within the paraquat ingestion timeframe provide by prosecution expert Dr. Buteau; he discounts opinion otherwise, particularly the opinion of Dr. Ford. (Doc. No. 25 at 354-55 citing 1SHCP Ex. 102 at 307-08; CT 768-70.) He also argues tissue testing did not reliably establish that Glenna ingested Paraquat. (Doc. No. 25 at 354-55.)

Petitioner points to the approximately forty-eight-hour paraquat ingestion period opined by Dr. Buteau as an alibi to Glenna's February 19, 1984 onset of her symptoms in Las Vegas. (*Id.*) He notes Dr. Russell, consistent with his alibi, believed Glenna's February 19, 1984 symptoms experienced while she was in Las Vegas were likely caused by paraquat. (RT 4389-90.)

Petitioner points to Dr. Kuo's noted habeas opinion that no scientific method existed to determine when paraquat was ingested. (1SHCP Ex. 206 at 6.) He notes Dr. Kuo discounted Dr. Ford's testimony that Glenna likely ingested paraquat at a time Petitioner had access to her as speculative and unsupported. (*See* 1SHCP Ex. 151, 206 at 6; RT 3928-80.)

However, these re-arguments are unpersuasive for the reasons stated. (*See* claims 1-3, 16, 17, 30, *ante*.) Additionally, the record reflects Dr. Buteau consistently tied his ingestion timelines to the amount of paraquat ingested, the larger does killing more quickly. (*See* RT 4532-33.)

To the extent Petitioner argues that Glenna may have ingested paraquat from over-spraying of nearby vineyards and resultant contamination of wells on her property (Doc. No. 25 at 356 n.128 citing Ex.'s 161-162, 206), the trial record and habeas proffer evidence and reasonable inference therefrom is unsupportive, for the same reasons discussed above.

Petitioner's further argument of factual innocence based upon lingering doubt suggested by the LWOP sentence in Glenna's death returned by the Monterey County jury (*see* Doc. No. 2 at 355 n.127) reasonably appears without merit. Petitioner's conviction in Glenna's death was final by the time of the Kern County proceeding and properly admitted as other crimes evidence. His re-argument of other crimes evidence presented in the Kern County proceeding as a basis for factual innocence fails, for the reasons stated. (*See* claims 1-3, 16, 17, 30, *ante*.)

It does not appear that Petitioner points to evidence in the record and habeas proffer showing that it is more likely than not that no reasonable juror would have convicted him in the light of the trial record and the alleged new evidence. 513 U.S. at 327.

### iii. Factual Innocence in Martha's Death

Petitioner revisits his noted alibi in Martha's death that he was not in Bakersfield and did not have access to Martha at the time she must have ingested Paraquat according to Dr. Buteau's noted opinion rendered in earlier proceedings. (*See* Doc. No. 25 at 351 citing Ex.'s 210-217, 219; RT 4415, 4428-4429, 4521-23, 4563-67, 4587-4593, 4709-12.) He notes Dr. Kuo's concurrence in Dr. Buteau's opinion that Martha likely ingested Paraquat no earlier than December 5, 1984. (1SHCP Ex. 206 at 7.)

Petitioner again discounts Dr. Ford's opinion as unqualified, biased in favor of his employer Chevron (the maker of paraquat), impeached by Dr. Buteau, and to the extent supported by the modified testimony of prosecution witness and Petitioner's co-worker, Mark Skinner. Regarding the latter, Petitioner argues Mark Skinner's testimony in the Monterey proceeding regarding dates Petitioner traveled from Fresno to Bakersfield to see Martha was modified in the Kern County proceeding specifically to avoid his alibi defense. (*See* Doc. No. 25 at 348-49; *see also* RT 3557, 3565-3577, 4158,

4251-4271.)

Petitioner also revisits his argument Martha may have died from a pre-existing condition. (*See* claim 18(E), *ante*.) He notes in this regard Dr. Kuo opinion that high levels of paraquat such as found in the elderly Martha's system could have caused a quick death by congestive heart failure before damaging her lungs, also militating against Dr. Ford's suggestion that Martha ingested paraquat as early as December 2, 1984, a date on which Petitioner had access to her. (*See* Doc. No. 25 at 353 citing Ex. 206 at 7; *see also* 1SHCP Ex. 17.)

Here again, Petitioner's re-argument of his claim of insufficient evidence, rejected above, is unavailing. *(See* claim 30, *ante*.) Notably, the record reflects Dr. Buteau consistently tied his ingestion timelines to the amount of paraquat ingested, the larger doses killing more quickly. (*See* RT 4532-33.)

It does not appear that Petitioner points to evidence in the record and habeas proffer showing that it is more likely than not that no reasonable juror would have convicted him in the light of the trial record and the alleged new evidence. 513 U.S. at 327.

iv.     *Factual Innocence Based Upon Third-Party Liability*

Petitioner alleges his former wife, Edith Ballew, had motive and opportunity and may have been responsible for the deaths of Glenna, Joyce and Martha. (*See e.g.*, Doc. No. 25 at 354 n.126.)

Petitioner observes it was Ballew who first broached and then pursued the paraquat poisoning allegation as a vendetta against him and to sell movie rights in the matter. (*See* claim 24, *ante*; *see also* Doc. No. 25 at 242-43, 360.) He observes Ballew was one of the last persons to be at Martha's house prior to Martha's death, suggesting Ballew may have been involved in Martha's death. (Doc. No. 25 at 242 citing RT 5133.) He contends Ballew falsely denied that she broached paraquat during conversations with Joyce and Kern County sheriff detectives. (*See* Doc. No. 25 at 242-43.) He contends Ballew falsely testified regarding her allegedly illegal 1984 search of Petitioner's financial records at the bank where Ballew worked for evidence of financial gain from the death of Glenna. (Doc. No. 25 at 243.) He contends Ballew's allegedly false testimony served to deflect suspicion away from her. (Doc. No. 25 at 244.)

However, the allegation lacks merits for the reasons discussed above, summarized here. (*See* claims 14, 24.) Any inconsistency in Ballew's testimony reasonably appears a mere contradiction or

348

failure of recollection of events remote in time as to which her recollection might have faded and subject to begin refreshed.

Furthermore, Petitioner cannot rely upon the habeas declaration of juror Diane Danley Bryson, whom he argues stated that the jury voted to convict Petitioner after finding he had not proven his ex-wife Edith Ballew was guilty of the crimes. (*See* claim14, *ante.*) Even if juror Bryson's habeas statements regarding her deliberative considerations could be admissible, she merely states therein that:

> During the guilt phase of the trial, I thought all the testimony about Glenna's death up ion Fresno was a little confusing. In my mind, I kept coming back to Edith Ballew. I thought she could have killed Joyce and Martha. Finally, I voted guilty with the other jurors, after ruling Edith Ballew out.

(1SHCP Ex. 149 at 1.) Petitioner does not show that based thereon it is more likely than not that no reasonable juror would have convicted him in the light of such evidence. 513 U.S. at 327.

At bottom, whether and when Ballew broached the issue of paraquat, checked petitioner's financial records at the bank where she worked, and aspired to a movie deal reasonably appear insubstantial matters that presumably were considered by the jury in weighing Ballew's testimony and credibility. (*See* claim 14, *ante*; 1SHCP Ex. 149 at 1.) The involvement of paraquat in these deaths was extensively litigated and Petitioner's guilt sufficiently supported in the trial record. (*See e.g.,* claims 3, 30, 31.)

It does not appear that Petitioner points to evidence in the record and habeas proffer showing that it is more likely than not that no reasonable juror would have convicted him in the light of the trial record and the alleged new evidence. 513 U.S. at 327.

*v. Conclusions*

For the reasons stated, a fair-minded jurist could find meritless Petitioner's claimed factual innocence of murder in the deaths of Joyce, Martha and Glenna.

Accordingly, it does not appear the California Supreme Court's rejection of claim 31 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

The Court finds that claim 33 reviewed *de novo* fail for the reasons stated.

Claims 31 and 33 shall be denied.

4.    Claims 41, 64, and 65

Petitioner alleges that he was denied an accurate and reliable record on appeal and assistance of counsel in record settlement (i.e. claim 41) and fair consideration of his automatic appeal (i.e. claim 64) and habeas challenges (i.e. claim 65), depriving him of rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and International Law.  (Doc. No. 25 at 452-65, 615-36.)

### a.    State Direct and Collateral Review

Petitioner's claim 41 allegation that he was denied an accurate and reliable appellate record, violating rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, was raised on direct appeal and denied on the merits.  *Catlin*, 26 Cal. 4th at 166-71.   Petitioner re-presented the claim in his second state habeas petition and it was denied on procedural grounds including raised and rejected on appeal (*In re Waltreus*).  (Order No. S173793.)

Petitioner's claim 64 allegation that the California Supreme Court did not fairly consider his automatic appeal, violating rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and International Law, Customs, Treaties, and Norms, was raised in the second state habeas petition and presumably denied on the merits.  (Order No. S173793.)

Petitioner's claim 65 allegation that the California Supreme Court did not fairly consider his habeas petition, violating rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and International Law, Customs, Treaties, and Norms, was raised in the second state habeas petition and presumably denied on the merits.  (Order No. S173793.)

### b.    Analysis

Petitioner alleges he was denied an accurate and complete record on appeal, effective assistance of counsel on appeal, and that the California Supreme Court did not fully and fairly consider his appeal and habeas petition.

The allegations are discussed separately below.

### i.    *Accurate and Reliable Record on Appeal*

Petitioner argues the settled record on appeal certified to the state supreme court omitted four items, denying him full and fair appellate review.  (Doc. No. 25 at 452-55 citing *Griffin v. Illinois*, 351

U.S. 12, 20 (1956) (under the Fourteenth Amendment, the record of the proceedings must be sufficient to permit adequate and effective appellate review); *People v. Stanworth*, 71 Ca1.2d 820, 832-834 (1969) (emphasizing need for complete and accurate record on appeal in order to ensure reliability of death judgments).

Petitioner identifies the missing items as: (i) a May 31, 1990 note from jury foreman Mr. Rodriguez to Judge King during deliberations, (ii) the record of numerous off-the-record conferences held by Kern County Superior Court Judge Staley during his preliminary hearing, (iii) the record of August 24, 1988 proceedings concerning testimony of then prosecutor Baird relating to the order recusing the Kern County District Attorney's Office, and (iv) the record of a September 7, 1988 proceeding concerning his June 28, 1988 motion to dismiss Count I (murder of Joyce) on grounds of the alleged nine-year delay in bringing charges.  (Doc. No. 25 at 452-60 citing Penal Code §§ 190.7 (petitioner is entitled to correction of all errors in the transcript), 190.8 (petitioner entitled to full and correct transcript on appeal); California Rules of Court, rule 39.5(c) (the entire record on appeal includes papers, records and transcripts pertaining to the case).)

To satisfy the constitutional guaranties of due process and equal protection, the state must provide a defendant with a "record of sufficient completeness to permit proper [appellate] consideration of his claims." *Dvorak v. Figueroa*, No. CV 12-5305 JFW FFM, 2014 WL 4627382, at *25 (C.D. Cal. Apr. 2, 2014), report and recommendation adopted, No. CV 12-5305 JFW FFM, 2014 WL 4639389 (C.D. Cal. Sept. 15, 2014) (quoting *Mayer v. City of Chicago,* 404 U.S. 189, 193–94 (1971)).

The record reflects that following the retirement of Kern County Superior Court Judge Lewis King, who presided over Petitioner's trial, Kern County Superior Court Judge Roger Randall issued a March 13, 1995 order settling the state record as corrected and augmented.  (Doc. No. 25 at 452 citing SCT Vol. IX-B at 55.)  Petitioner alleges that on November 15, 1995, the California Supreme Court denied Petitioner's motion to recall the record and for suspension of briefing in order to clarify regarding the missing jury note.  (Doc. No. 25 at 452.)

The California Supreme Court considered and rejected these allegations on direct appeal, stating that:

Defendant contends that the record on appeal is inadequate in various respects.

351

"A criminal defendant is indeed entitled to a record on appeal that is adequate to permit meaningful review. That is true under California law. [Citation.] It is true as well under the United States Constitution-under the Fourteenth Amendment generally, and under the Eighth Amendment specifically when a sentence of death is involved. [Citation.] The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. [Citation.] It is the defendant's burden to show prejudice of this sort." (*People v. Alvarez, supra*, 14 Cal.4th at p. 196, fn. 8.) We also have explained that "[u]nder the Fourteenth Amendment, the record of the proceedings must be sufficient to permit adequate and effective appellate review. [Citations.] Under the Eighth Amendment, the record must be sufficient to ensure that there is no substantial risk the death sentence has been arbitrarily imposed." (*People v. Howard* (1992) 1 Cal.4th 1132, 1166.)

Defendant complains of four omissions in the record. First, he claims that a note sent by the jury to the court during deliberations is not in the record, and he contends that the court's response to the note also is missing. During a proceeding to settle the record, however, the court determined, based upon the testimony of the court reporter who had reported the proceedings and who referred to her journal, that the note had contained a request received on May 30, 1990, that testimony of Dr. Stephens be read back to the jury, and that on May 31, 1990, the reporter had read back the witness's entire testimony. Contrary to defendant's claim, the record on appeal supports this conclusion. It reflects that the court received a note from the jury on May 30, 1990, and responded, "we will read that to you in the morning." The following morning, the court stated at the outset of the proceedings: "We have a note from the jury foreman ... asking for the transcript of Dr. Boyd Stephens's testimony on Joyce Catlin, and I propose to have the reporter read from the transcript." The prosecutor and defense counsel indicated that they agreed that the reporter could read from the transcript. After some discussion about what portion of the testimony would be read, the court determined that the reporter should read the testimony in its entirety. The transcript states that "the transcript of Boyd Stephens's testimony was read." Defendant's claim that there was a second missing note received on May 31, 1990, after Dr. Stephens's testimony had been read, and that further testimony was read on June 1, 1990, apparently is based upon a typographical mistake in the reporter's transcript as to the date the note was received-a mistake that has been corrected in the record and that, upon examination of the surrounding portion of the reporter's transcript, appears obviously to be merely typographical. The clerk's transcript confirms that the note from the jury regarding Dr. Stephens's testimony was received on May 30, 1990. It does not contain any reference to a subsequent note or to a reading of testimony on June 1, 1990. The record clearly is adequate for appellate review.

Defendant also complains of omissions in the record of the hearing on his recusal motion. On August 23 and 24, 1988, the trial court conducted a hearing on defendant's motion to recuse the Kern County District Attorney's Office. In connection with the hearing, Deputy District Attorney Baird, who then was prosecuting the case, testified on the second day of the hearing in support of the district attorney's opposition to the recusal motion. After an in camera hearing from which Baird was excluded, the court denied the recusal motion, ordering merely that Baird not be supervised by Felice, the attorney then in the district attorney's office who previously had represented defendant, and that Newport, the investigator then working on the case, also not work with Felice. Subsequently, when these conditions proved impracticable, the entire Kern County District Attorney's Office was recused.

Defendant complains that the reporter's notes of Baird's testimony were destroyed, so that no record survives of the content of his testimony.

352

The motion under consideration on the date in question was defendant's motion to recuse the entire Kern County District Attorney's Office. Ultimately, defendant prevailed on that motion. Defendant does not contend on appeal that it was error to recuse the district attorney's office. Therefore, it seems highly unlikely that he could have been prejudiced by the destruction of the reporter's notes of Baird's testimony regarding the recusal. In any event, as respondent notes, the record of the remainder of the proceedings with respect to the recusal motion has survived, including testimony of Felice and Newport and the arguments of counsel. We note also that in his written opposition to the recusal motion, Baird discussed his very limited contact with Felice and denied discussing the case or receiving any confidential material from Felice. Defendant's claim that the absence of Baird's testimony undermined his ability to demonstrate that the deputy attorney general who prosecuted the case was tainted by his contact with the Kern County District Attorney's Office is not persuasive under the circumstances, particularly because defendant offers only speculation that Baird may have testified in a manner that would have supported this claim. Furthermore, the claim was abandoned at the trial level and is waived on appeal. Accordingly, we believe that the record on appeal is adequate for our review.

Defendant next complains that several discussions between the magistrate and counsel during the preliminary hearing were unreported. After a hearing, however, a settled statement was prepared establishing that the discussions were unrelated to the present case. Defendant does not suggest how unrelated discussions, particularly at the preliminary hearing stage, could be the basis for any claim on appeal. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 820-821; *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 522.) Defendant also fails to offer any persuasive reason why this court should not credit the recollection of the magistrate that the discussions were unrelated to this case - particularly because trial counsel participated in the hearing and did not disagree-or require that the magistrate specify the subject matter of the unrelated discussions. (See *People v. Freeman* (1994) 8 Cal.4th 450, 510.)

Defendant also complains that the record lacks a reporter's transcript of a pretrial hearing at which the parties presented argument on defendant's motion to dismiss for delay in prosecution. The reporter stated that her notes from the hearing had been lost. After conferring with defendant's trial counsel and the prosecutor, the trial court prepared a settled statement, asserting that at the hearing, defense counsel and the prosecutor had repeated the contentions contained in their points and authorities (items that are in the record) on the motion to dismiss. The trial court also stated that the court and counsel had no recollection whether any testimony was given or whether documentary evidence was introduced at the hearing, but observed that the clerk's minute order does not reflect that testimony was presented or evidence was admitted. The settled statement relates: "Custom and practice of court clerks at that time dictated that, if such occurred, they be reflected in the Minute Order."

Defendant claims that the missing transcript might have contained Baird's testimony regarding an investigator with the Kern County Coroner's Office who, as other witnesses stated, had approached various experts in the late 1970's regarding Joyce's tissue samples and had been told they could not be analyzed for paraquat. Defendant also claims that the missing transcript might have noted the prosecutor's production of a letter from the Bethesda Naval Hospital indicating that the hospital's records did not contain any indication of work having been done on the case for Kern County.

There is no indication, other than speculation offered by defendant, that even if (contrary to the suggestion of the clerk's transcript) the missing transcript did contain the claimed testimony and a reference to the introduction of the letter, this evidence-which defendant assumes would have been offered by the prosecution-would have assisted defendant in establishing either prejudice arising from delay in prosecution, or lack of justification for

the delay. This court has before it the testimony of all the witnesses called by the defense in support of its motion to dismiss and the testimony of one prosecution witness, as well as the related points and authorities filed by both sides. Under the circumstances, the record is adequate for our review of defendant's claim of delay in prosecution.[19] Defendant seems to contend that the missing transcript also might have contained generally exculpatory evidence, and thereby might have supported other claims on appeal, or at least have been of assistance to appellate counsel in determining which claims to raise. Again, this claim is speculative and does not satisfy defendant's obligation to establish that omissions in the record are prejudicial to his ability to prosecute his appeal.

--------------------FOOTNOTE--------------------------

n.19.  Because we reach this conclusion, we need not consider defendant's claim that the trial court should have permitted defendant's appellate counsel to participate in the trial court's record settlement conference with defendant's trial counsel and the prosecutor, held in conjunction with the motion to settle the record.

--------------------END FOOTNOTE--------------------

Defendant also claims that this court's refusal to augment the record in the present case to include the record of his trial in Monterey County or to take judicial notice of the record of that trial has deprived him of a record adequate to prosecute the present appeal. He claims that the omission of this record has deprived him of adequate appellate review, effective assistance of counsel on appeal, and a complete review of his capital sentence, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

Normally, the transcripts of a prior trial would be irrelevant to an appeal from a judgment in a prosecution for different crimes, except to the extent excerpts from the earlier proceeding may have been introduced in the trial, whether for impeachment or some other purpose, or may have been relied upon by the trial court in ruling on a motion. Such excerpts already would be part of the normal record on appeal, and defendant does not contend they are missing from this record. The trial court in the present case was presented with evidence, for example, that in the prior trial for the murder of Glenna, the trial court in that case had determined that insufficient evidence supported the financial-gain special-circumstance allegation, but the trial court below concluded that such determination did not bar introduction of testimony in the present case that suggested a potential financial motive for the murder of Glenna.

The evidence before the trial court in the prior case-as opposed to that court's finding that there was insufficient evidence to support a true finding on the financial-gain special-circumstance allegation-was not before the court that tried the present case, nor was it relevant to the trial court's determination that the order relating to the special circumstance allegation in the prior case did not, under the collateral estoppel doctrine, bar admission of evidence in the present prosecution that the murder was committed for financial gain. The circumstance that witnesses may have testified differently at an earlier proceeding, or that a different court evaluating the particular evidence before it found certain evidence inadmissible or certain charges unsupported by sufficient evidence, does not suggest that the record of the previous proceeding must be included in the present appeal from conviction of different crimes when the trial court and the trier of fact in this proceeding did not consider or rely upon such evidence from the earlier proceeding. (See *People v. Peevy* (1998) 17 Cal.4th 1184, 1207-1208 & fn. 4 [appellate courts generally do not take judicial notice of matter not presented to and considered by the trial court]; *People v. Jones, supra*, 15 Cal.4th at p. 171, fn. 17 [the record on appeal should not be augmented to include " 'material that was not a proper

part of the record in the trial court' "]; *People v. Sanchez* (1995) 12 Cal.4th 1, 59, fn. 5 [refusing to take judicial notice of the record of a subsequent prosecution of an asserted coperpetrator to demonstrate an assertedly inconsistent prosecutorial position taken in the subsequent prosecution]; *People v. Rowland, supra,* 4 Cal.4th at p. 268, fn. 6 [refusing to take judicial notice of irrelevant matter]; *People v. Bean, supra,* 46 Cal.3d at p. 944 ["The scope of an appeal is limited to the record of the proceedings below"].)

As we stated in connection with a claim that the transcript of the trial of a coperpetrator should be included in the record on appeal from a capital conviction on the ground that the prosecutor proffered conflicting theories of guilt to the juries in each case, "any due process claim defendant can state should be 'presented by petition for writ of habeas corpus rather than by appeal.' [Citation.] [¶] The transcripts of [the coperpetrator's] trial are, of course, physically available to us, and notice of their contents would be permissible under Evidence Code sections 452 and 459. [Citation.] But we would be unable to take notice of any factual explanation the trial prosecutor may have for any material inconsistencies we might find by comparing the transcripts of the two trials. Nor could we take notice of other extra-record evidence of the prosecutor's state of mind.... Defendant's claim is based on the existence of contrary testimony and argument in the earlier ... trial [of the coperpetrator], of which we could take notice. If we did so, however, we would still be unable to determine whether, in the period between the two trials, significant new evidence surfaced on this point ..., the medical examiner reevaluated his opinion, or other events occurred such that the prosecutor, at the time of defendant's trial, neither knew nor had reason to know his argument was false.... [¶] In short, this is an instance of the general rule that an appellate court should not take notice of matters not first presented to and considered by the trial court, where to do so would unfairly permit 'one side to press an issue or theory on appeal that was not raised below.' [Citation.]" (*People v. Sakarias, supra,* 22 Cal.4th at pp. 635-636.) Defendant's contention that the record of the earlier proceeding should have been made part of the appellate record because it may be relevant to his petition for writ of habeas corpus is unconvincing; he may make a request for judicial notice in connection with that separate proceeding.

*Catlin,* at 166-171.

The California Supreme Court reasonably denied the allegations for the reasons stated by that court and those that follow.

### (1)    Jury Note

Petitioner argues Judge Randall inadequately settled the record as to a May 31, 1990 note from jury foreman Mr. Rodriguez to Judge King during deliberations, which could not be located by the criminal appeals clerk.  (Doc. No. 25 at 452-53 citing RT 5340; *see also* SCT Vol. VII at 68.)

Petitioner refers to the trial transcript captioned May 31, 1990, wherein trial judge King stated on the record that he had a note from jury foreperson Rodriguez and stated in response to the note that "we will read that to you in the morning."  (Doc. No. 25 at 452 citing RT 5340.)  Petitioner notes the record of June 1, 1990 does not reference the note or anything being read to the jury.   (Doc. No. 25 at 455 citing RT 5341-51.)  He notes Judge Randall purported to settle the record as follows:

355

> [T]he note from the jury foreman, Mr. Rodriguez, referred to at reporter's transcript page 5340 cannot be located and its specific contents are unknown. It is ordered, based on the hand written journal maintained by judge King's court reporter, Elizabeth Rae Foreman, that on May 31, 1990, pursuant to a request contained in [the jury's] … note said court reporter, in open court with all parties present, read back to the jury the entire testimony of Dr. Boyd Stephens.

(Doc. No. 25 at 456 citing SCT Vol. VII at 120.) Petitioner argues this settling of the record is inadequate because the record does not demonstrate any response to the note was read to the jury on May 31, 1990, or on June 1, 1990. As such, he argues the contents of the note and any response to it are unclear on the settled record. (*Id.*) He argues this is important as Dr. Stephens's testimony supported the prosecution's cause of death theory.

However, the state supreme court reasonably denied the claim for the reasons stated by that court. That court, viewing the trial transcript in context, reasonably could find the daily transcript from May 30, 1990, RT 5339, mis-captioned May 31, 1990 and mis-paginated as RT 5340, referred to the jury note. That court reasonably could further find the daily transcript from May 31, 1990, RT 5340, was correctly captioned for that date though mispaginated as RT 5339, referred to reading of the note, as follow:

> We have a note form the jury foreman, Mr. Rodriguez, asking for the transcript of Dr. Boyd Stephens's testimony on Joyce Catlin, and I propose to have the reporter read from the transcript. I believe yesterday all counsel agreed that the reporter could read from the transcript . . . All right. The jury has joined us, and in response to the note we'll have the reporter read the testimony of Dr. Boyd Stephens. (Whereupon the transcript of Boyd Stephens's testimony was read.)

(RT 5340 (corrected).)

### (2)     Off-The-Record Conferences

Petitioner argues Judge Randall inadequately settled the record as to numerous off-the-record conferences held by Kern County Superior Court Judge Staley during Petitioner's preliminary hearing. (Doc. No. 25 at 453 citing SCT Vol. VII at 120.) He argues the settled record included "only conclusions but no factual statement of what transpired during the off-record conferences." (*Id.*) He argues that Judge Staley's settled statement is simply to the effect that the discussions which took place were "totally unrelated to the proceeding or those concerning the scheduling of witnesses or the handling of the

exhibits." (Doc. No. 25 at 458-59 citing SCT Vol. II at 399-400.) He argues that all death penalty proceedings should be conduct on the record (Doc. No. 25 at 459 citing Penal Code § 190.9) and that the failure to do so here coupled with the inadequate settled statement deprived him of potential issues on appeal and habeas.

However, Petitioner has not demonstrated on the settled record that any missing factual statements were relevant to and impacted his pursuit of post-conviction relief.

The state supreme court reasonably found the conferences were, according to Judge Staley unrebutted recollection, unrelated to Petitioner's preliminary hearing. Petitioner has not demonstrated otherwise or entitlement to a record of unrelated matters.

### (3) Testimony at Recusal Proceeding

Petitioner argues Judge Randall inadequately settled the record as to August 24, 1988 proceedings concerning testimony of then prosecutor, Deputy District Attorney Andrew Baird, and District Attorney Investigator Wally Newport relating to recusal of the Kern County District Attorney's Office, where the court reporter filed an unsworn declaration stating that the notes of the proceedings had been destroyed. (Doc. No. 25 at 453 citing SCT Vol. VII at 121; SCT Vol. VIII at 38; *see also* Doc. No. 25 at 457 citing Gov't Code §§ 69503(a) and 6995(d).)

Petitioner complains Judge Randall settled the record merely "by referring to and incorporating the subsequent Court of Appeal opinion which affirmed [his] prior recusal order" and denying the record reconstruction hearing requested by appellate counsel (that a hearing be held to allow participants in the August 24, 1988 proceeding to reconstruct an agreed record). (Doc. No. 25 at 457 citing SCT Vol. IX–B at 16, 55.)

Petitioner argues that alleged "gap in the record on appeal" was important because the Kern County District Attorney's office continued to be involved in the case even after its recusal under Judge Randall's order. (Doc. No. 25 at 458.) He argues prejudice to the extent the nature and extent of this involvement and confidential defense information which may have been disclosed by the Kern County District Attorney's Office was absent to the to the alleged gap in the record.

However, the state supreme court reasonably found the record adequate. As noted by that court, the settled record includes the parties briefing and testimony by investigator Newport and deputy district

attorney Felice, who allegedly created the conflict, regarding a recusal motion upon which the defense ultimately prevailed. Moreover, as discuss above in claims 24 and 25, Witt stated on habeas that Baird did not pass confidential client information to him. (*See* claims 24 and 25, *ante*.) Petitioner merely speculates Baird's missing testimony might have been helpful to support his claim that Witt was tainted by the Kern County District Attorney's Office. (*Id*.)

### (4)    Proceedings on Petitioner's Speedy Trial Motion

Petitioner argues that Judge Randall inadequately settled the record as to proceedings convened on September 7, 1988 and culminating on September 29, 1988 regarding Petitioner's June 28, 1988 motion to dismiss Count I (murder of Joyce) on grounds of the alleged nine-year delay in bringing charges. (Doc. No. 25 at 459; *see also* CT 1463-71, 1715-39, 1781-85; SCT Vol. VII at 120.)

Petitioner argues the settled statements prepared by Judge Randall following an October 9, 1996 teleconference with trial counsel Eyherabide and prosecutor Baird concerning events of September 7, 1988 and filing of their respective declarations regarding settlement of the record, as supplemented, is an inadequate reconstruction of the record. (Doc. No. 25 at 460.)

The record reflects that the reporter's transcript of the September 7, 1988 argument, submittal and ruling on the speedy trial motion was lost or was destroyed. (Doc. No. 25 at 460; see also CT 1783; SCT Vol. VIII at 38.)

Petitioner complains the settled record does not factually address the missing letter from Bethesda Naval Hospital and possible testimony from coroner investigator Christy, who at times had custody of Joyce's tissue samples. (Doc. No. 25 at 463.) He argues the settled statement reflects only a lack of recollection and speculation. (Doc. No. 25 at 464 citing *People v. Gzikowski*, 32 Cal. 3d 580, 584 n.2 (1982) (trial judge may decline to settle a statement if affirmatively convinced of an inability to do so). He argues the settled record including supplemental declarations from Baird and Eyherabide and Judge Randall regarding such matters does not factually address the testimony, if any there was, of Christy.

However, the state supreme court reasonably found the settled statement adequate in these regards, for the reasons stated by that court. As that court noted, the settled statement and record on appeal included the pleadings and testimony of defense and prosecution witnesses in support of and opposition to the motion. Here again, Petitioner only speculates as to exculpatory value of the missing

358

transcript.

Petitioner's further argument relating to augmentation with transcripts from the Monterey County proceeding that were before the trial court and part of the record on appeal was reasonably denied for the reasons stated above by the state supreme court and by this Court. (*See* section VIII, *post*.)

**(5)      Right to Appellate Counsel at Record Settlement Hearing**

Petitioner argues he was denied representation by appellate counsel during October 9, 1996 record settlement proceeding convened by Judge Randall that included trial counsel Eyherabide and Deputy District Attorney Baird. (Doc. No. 25 at 460.) He argues the proceeding was a critical stage at which he was entitled to and denied representation. (Doc. No. 25 at 462 n.156; *see also* Doc. No. 95 at 219-20.)

A critical stage entitling Petitioner to assistance of counsel is one where the substantial rights of a criminal defendant may be affected, i.e.:

> Pursuant to the Sixth Amendment and Supreme Court jurisprudence, a criminal defendant is entitled to the effective assistance of counsel at every critical stage in the proceedings. *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Lopez v. Thompson,* 202 F.3d 1110, 1116 (9th Cir.2000). A critical stage is one in which "potential substantial prejudice to the defendant's rights inheres in the ... confrontation and the ability of counsel to help avoid that prejudice." *Coleman v. Alabama,* 399 U.S. 1, 9, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) *quoting* *1176 *U.S. v. Wade,* 388 U.S. 218, 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (internal quotations omitted).

> [---]

> Thus, a defendant is entitled to the assistance of counsel at every proceeding, "where substantial rights of a criminal accused may be affected." *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). The Supreme Court has also focused on whether a defendant could benefit from the expertise of counsel at the proceeding to determine if it is a critical stage. *U.S. v. Ash,* 413 U.S. 300, 312, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973).

> The Ninth Circuit has elaborated on the Supreme Court's holdings and noted three separate factors to be analyzed in determining whether a particular proceeding is a critical stage. *Menefield v. Borg,* 881 F.2d 696, 698–9 (9th Cir.1989); *U.S. v. Bohn,* 890 F.2d 1079, 1080–1 (9th Cir.1989). First, a proceeding is critical if it could result in the loss of significant rights of the defendant. Second, a stage is critical where the presence of counsel could help the defendant understand the proceeding. Third, a proceeding is critical if it tests the merits of the case. *Menefield,* 881 F.2d at 698–9.

*United States v. Furrow*, 100 F. Supp. 2d 1170, 1175–76 (C.D. Cal. 2000).

The right to counsel attaches whenever "counsel's absence might derogate from the accused's right to a fair trial." *Wade*, 388 U.S. at 226. The right to a public trial under the Sixth Amendment,

"taken together with the right to due process, includes a right of . . . defendant[] and [his] counsel to be present at all stages of the trial from arraignment to verdict and discharge of the jury." *Polizzi v. United States*, 550 F.2d 1133, 1137 (9th Cir. 1976).

The Court finds on *de novo* review that Petitioner fails to demonstrate clearly established Supreme Court precedent that post-judgment record settlement constitutes a critical stage requiring the presence of appellate counsel in addition to trial counsel.

The state supreme court found that the settled statement adequately allowed for appellate review. That court did not decide the issue of appellate counsel's absence from the record settlement conference, stating that:

> Because we reach this conclusion, we need not consider defendant's claim that the trial court should have permitted defendant's appellate counsel to participate in the trial court's record settlement conference with defendant's trial counsel and the prosecutor, held in conjunction with the motion to settle the record.

*Catlin*, 26 Cal.4 th at 169 n.19. Notably, in ordering preparation of the settled statement, the state supreme court directed Kern County Superior Court Judge Randall to enlist the assistance only of defense counsel and the pre-trial prosecutor who attended the underlying proceeding. (*See* Doc. No. 84-2 at 8.)

The Court, on *de novo* review and assuming arguendo the record settlement conference was a critical stage, finds Petitioner has not shown denial of his right to counsel. Trial counsel, presumably more knowledgeable than appellate counsel in matters relating to the trial record, was present at record settlement proceedings. Moreover, the state supreme court found the record adequate for review on appeal, reasonably suggesting appellate counsel's absence from the record settlement conference did not impact Petitioner's significant rights to his prejudice. *See Coleman v. Alabama,* 399 U.S. 1, 9 (1970) ("The determination whether the hearing is a 'critical stage' . . . [depends] upon an analysis 'whether potential substantial prejudice to defendant's rights inheres in the * * * confrontation and the ability of counsel to help avoid that prejudice.")

### ii. Review on Automatic Appeal

Petitioner argues that the California Supreme Court failed to provide meaningful, non-arbitrary and non-capricious review of his automatic appeal of conviction and sentence. (Doc. No. 25 at 615-

30.)

Petitioner argues the state supreme court routinely dismisses constitutional violations by citing to the harmless error rule and past applications of it, rather than independently analyzing the cases before it. (*See* Doc. No. 25 at 624-27 and cases cited therein.) For example, he argues that the California Supreme Court fails to reweigh sentencing factors or conduct harmless error analysis. (*Id.*) He suggests the California Supreme Court's denial of his appeal and habeas petitions despite the noted imperfect state record was a result of such a misapplication of the harmless error rule. (Doc. No. 25 at 624.)

Petitioner argues California's high appellate affirmance and habeas corpus denial rates, nearing 100%, show politics rather than law drives the result.

Petitioner argues the lengthy delay in appointing post-conviction counsel (five years in his case) and completing appellate and habeas review constitutes cruel and unusual punishment and fails to fairly resolve these matters.

Petitioner argues the state supreme court fails to follow *stare decisis* (Doc. No. 25 at 620, 626) and "merely affirms capital cases based on the improper decisions of the 1986-1996 Court without further analysis." (Doc. No. 25 at 600.)

Although the Constitution does not require states to grant appeals as of right to criminal defendants seeking review of their convictions, if a state does so, its appellate procedures must comport with due process. *See Lucey,* 469 U.S. 387, 405 (1985); *Griffin,* 351 U.S. at 18; *Coe v. Thurman,* 922 F.2d 528, 530 (9th Cir.1990) ("Where a state guarantees the right to a direct appeal, as California does, the state is required to make that appeal satisfy the Due Process Clause.").

The Ninth Circuit has reasoned that, although the Sixth Amendment only guarantees the criminally accused a speedy *trial,* excessive delay in the appellate process may also rise to the level of a due process violation. *Coe,* 922 F.2d at 530.

However, California's death penalty process including direct review on appeal has been upheld by the Supreme Court.

Here, the state supreme court reasonably could find Petitioner failed to demonstrate that California's death penalty process violated his federal rights, for the reasons stated *ante* and *post*. (*See*

claims 1-40, 42-63, 66-67.)

### iii.    *Review on State Habeas*

Petitioner argues that the California Supreme Court failed to provide meaningful and non-arbitrary and non-capricious review in his state habeas corpus proceedings.  He argues that court summarily denied both of his meritorious habeas petitions without issuing an order to show cause and allowing for factual development.  *See* Doc. No. 25 at 634-35, citing *Morales v. Calderon*, 85F.3d 1387, 1390 (a state procedural rule does not bar federal habeas review where the rule is so unclear it does not provide the habeas petitioner with a fair opportunity to seek relief in state court).

Petitioner argues his state petitions and exhibits demonstrated a prima facie challenge of facts underlying his conviction and sentence entitling him to issuance of an order to show cause why discovery and an evidentiary hearing were not warranted in state court.  (Doc. No. 25 at 631-32.)

Petitioner revisits his arguments above that his conviction and sentence are unreliable because the prosecution did not carry its burden of proof at the guilt and penalty phases; the jury was improperly instructed; and the jury was denied the opportunity to consider all mitigating evidence.  (Doc. No. 25 at 631-32.)

However, that court reasonably rejected Petitioner's state habeas claims, for the reasons stated *ante* and *post*.  (*See* claims 1-40, 42-63, 66-67.)

### iv.    *Conclusions*

For the reasons stated, a rational trier of fact could have found Petitioner was not denied an accurate and reliable record on appeal and assistance of counsel in record settlement and fair consideration of his automatic appeal and habeas challenges.

Accordingly, it does not appear that the California Supreme Court's rejection of claims 41, 64, and 65 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Claims 41, 64, and 65 shall be denied.

### 5. Claim 67(1)[23]

Petitioner alleges that California's methods for execution, lethal injection and lethal gas, are cruel and unusual punishment, violating his rights under the Eighth and Fourteenth Amendments and international law. (Doc. No. 25 at 641-52.)

#### a. State Court Direct and Collateral Review

Petitioner's allegation that California's methods of lethal injection violates the Eighth and Fourteenth Amendments and international law was raised in his first state habeas petition and denied as premature without prejudice to renewal upon setting of an execution date. (Order No. S090636.)

Petitioner's allegation that California's method of lethal gas and lethal injection violates the Eighth and Fourteenth Amendments and international law was raised in his second state habeas petition and denied as premature without prejudice to renewal upon setting of an execution date. (Order No. S173793.)

#### b. Analysis

Petitioner argues that California's procedures for execution by lethal gas and lethal injection constitute cruel and unusual punishment and deny due process under the Eighth and Fourteenth Amendments; customary international law; the International Covenant on Civil and Political Rights (ICCPR), March 23, 1976, G.A. Res. 2200A (XXI), Article 7, at Article 6 (preventing arbitrary deprivation of life), Article 7 (preventing cruel and inhuman treatment or punishment), Article 9 (preventing unlawful deprivation of liberty) Article 14 (guarantee of a fair, speedy and public trial) and Article 26 (right to equal protection regardless of religion, race, or political opinion); the Universal Declaration of Human Rights; and the American Declaration of the Rights and Duties of Man (American Declaration). (*Id.* at 655-56.) He argues these treaties protect human rights and must be construed as self-executing. (*Id.* at 656.)

Petitioner argues that lethal injection, the method of execution authorized at the time he filed his petition (*see Fierro v. Terhune*, 147 F.3d 1158 (9th Cir. 1998); Cal. Code Regs. tit. 15 § 3349), has been

---

[23] The federal petition's two claims 67 (*see* Doc. No. 25 at 641-56) are referred to as claim "67(1)" (i.e., the first in order) and "67(2)" (i.e., the second in order).

enjoined since 2006 due to systemic failures. (Doc. No. 25 at 651 *citing Morales v. Tilton*, 465 F. Supp. 2d. 972 (N.D. Cal. 2006), *Morales. v. Hickman*, 415 F. Supp. 2d. 1037 (N.D. Cal. 2006.)).[24]  (Doc. No. 25 at 642-51.)

The Eighth Amendment prohibits punishments that are "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102 (1976).  Executions that "involve the unnecessary and wanton infliction of pain," *Gregg,* 428 U.S. at 173, or that "involve torture or a lingering death," *In re Kemmler,* 136 U.S. 436, 447 (1890), are not permitted.

The Court, on *de novo* review finds that Petitioner's federal habeas claim relating to lethal injection is premature and shall be dismissed without prejudice for the reasons that follow.

### i.     Standing to Challenge Lethal Injection

California allows inmates to choose execution by either lethal injection or lethal gas not later than 10 days following service upon the inmate of an execution warrant.  Penal Code § 3604(b).

Here, it appears Petitioner retains the option of choosing either statutory method of execution because no execution warrant has issued.  *See Fierro*, 147 F.3d at 1160 (inmate lacked standing to challenge constitutionality of California's method of execution by lethal gas where inmate did not choose and was not subject to execution by lethal gas).

### ii.     Habeas Challenge to California's Lethal Injection Protocol is Premature

To the extent Petitioner challenges the use of lethal injection generally, his claim is precluded by the Supreme Court's decision in *Baze v. Rees,* 553 U.S. 35 (2008).  Therein the Supreme Court*,* reviewing an Eighth Amendment challenge to Kentucky's lethal injection protocol, upheld the use of lethal injection as a method of carrying out the death penalty. *Id.* at 48, 62-63. The Court observed that the Eighth Amendment prohibits "wanton exposure to objectively intolerable risk, not simply the possibility of pain." *Id.* at 61-62.

To the extent Petitioner challenges California's lethal injection protocol, his claim is premature on the grounds discussed below.

---

[24] At the time of Petitioner's September 24, 2008 petition, California used a three-drug cocktail of sodium pentothal, pancuronium bromide and potassium chloride.  (Doc. No. 25 at 644.)

**(1)     Petitioner's Execution is not Imminent**

Petitioner has not shown an execution date has been set in his case.  His execution is not imminent.  *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998) (claim concerning competency to be executed previously dismissed as premature because execution was not imminent); *Poland v. Stewart*, 117 F.3d 1094, 1104-05, (9th Cir. 1997) (claim relating to lethal gas as method of execution not ripe for judicial decision); *Cook v. Brewer*, 649 F.3d 915, 918 (9th Cir. 2011) (Eighth Amendment violation requires showing of risk that is sure or very likely to cause needless suffering and sufficiently imminent dangers).

**(2)     California is Without a Lethal Injection Protocol**

The execution protocol in place when Petitioner filed his 2008 petition was subsequently revised and then repealed by gubernatorial executive order in the form of an executive moratorium on the death penalty.  *See* Cal. Code Regs. tit. 15 § 3349.1(i) (2018); *Briggs v. Brown*, 3 Cal. 5th 808, 831 (2017); Executive Order N-09-19 (repealing California's lethal injection protocol).

A method-of-execution challenge is not ripe when the respondent state has no protocol that can be implemented at the time of the challenge.  *See Payton v. Cullen*, 658 F.3d 890, 893 (9th Cir. 2011) (claim unripe because no protocol in place following state court invalidation of existing protocol); *accord Floyd v. Filson*, 940 F.3d 1082, 1105 (9th Cir. 2019).

For the reasons stated, claim 67(1) fails to allege the unconstitutionality of California's repealed lethal injection protocol.

Additionally, to the extent Petitioner requests that his death sentence be vacated, he fails to provide legal authority that the alleged unconstitutionality of California's method of execution of sentence impacts the validity of his death sentence.  (*See* Doc. No. 25 at 661; *see e.g.*, *People v. Welch*, 20 Cal. 4th 701, 771 (1999) (constitutionality of the method of execution bears solely on the legality of the execution of sentence and not on the validity of the sentence itself).

*iii.      §1983 Challenge to California's Lethal Injection Protocol*

To the extent Petitioner asserts an as applied challenge under 42 U.S.C. § 1983 to application of a state lethal injection protocol on grounds of unnecessary suffering, without challenging his underlying conviction or sentence (*see* Doc. No. 25 at 641, 651-52) habeas relief reasonably appears unavailable

for such a claim. *See Hill v. McDonough*, 547 U.S. 573, 582 (2006); *Brown v. Ornoski*, 503 F.3d 1006, 1017 n.5 (9th Cir. 2007).

### c.      Conclusions

The Court, on *de novo* review finds that Petitioner lacks standing to challenge and does not challenge a currently effective state lethal injection protocol; any habeas challenge to a state protocol is premature; and habeas relief is unavailable to the extent Petitioner challenges a state lethal injection protocol under 42 U.S.C. § 1983.

Claim 67(1) shall be denied, without prejudice, as premature.

### 6.      Claim 67(2)

Petitioner alleges the constitutional violations claimed in his federal petition also violate international law.[25]  (Doc. No. 25 at 653-56.)

### a.      State Court Direct and Collateral Review

Petitioner's claim 67(2) allegation that his death sentence violated international law, customs, treaties, and norms, was raised in the second state habeas petition and denied on the merits.  (Order No. S173793.)

### b.      Analysis

Petitioner argues his death sentence is unconstitutional because it violates treaties ratified by the United States as well as international law and human rights norms.  (Doc. No. 25 at 653-56.)  Petitioner points to alleged denial of: a fair trial, equal protection by an independent tribunal, a reliable sentencing determination, and freedom from torture.  He points to alleged cruel, inhuman or degrading treatment and punishment.

Petitioner argues these deprivations denied him the minimum guarantees for an accused under customary international law as informed by the United Nations Charter, the Organization of American States Charter, the Universal Declaration of Human Rights (Universal Declaration), Convention on the Prevention and Punishment of the Crime of Genocide (Genocide Convention), the International Covenant on Civil and Political Rights (ICCPR) (March 23, 1976, G.A. Res. 2200A (XXI), Article 7), the American Declaration of the Rights and Duties of Man (American Declaration), the International Convention

---

[25] Petitioner's claim 67(2) was included in the second state habeas petition as claim 68.  (*See* Doc. No. 98.)

366

Against All Forms of Racial Discrimination (the Race Convention), and the International Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the Torture Convention). (Doc. No. 25 at 653-54.) He argues these treaty commitments are self-executing so as to bind the United States.

Particularly, Petitioner points to ICCPR Article VI (prohibiting the arbitrary deprivation of life), Article VII (prohibiting cruel, inhuman or degrading treatment or punishment), Article IX (prohibiting deprivation of liberty except in accordance with established law), Article XIV (prohibiting unfair trials), and Article XXVI (providing for equal protection), as ratified by the United States in 1990. (Doc. No. 25 at 655.) He argues the ICCPR prohibits his death sentence given the noted alleged improprieties in the capital sentencing process, conditions of incarceration, excessive delays between sentencing and appointment of appellate counsel, and excessive delays between sentencing and execution, as apparent in his case. Moreover, he argues the Race Convention prohibits the discretion given jurors which cloaks racism in the death penalty process. (See Doc. No. 95 at 262-66.)

Petitioner argues international norms are incorporated into the Eighth and Fourteenth Amendments (*see* Doc. No. 25 at 656.); *see also Soering,* 161 Eur. Ct. H.R. (ser. A), at 34 [reprinted in 11 Eur. Hum. Rts. Rep. 439]. The European Court in *Soering*, facing a decision whether to extradite an EU national to Virginia to face capital murder charges, held that the protracted delays in carrying out death sentences in Virginia, which it averaged at six to eight years, constituted inhuman and degrading punishment in violation of Article 3 of The European Human Rights Convention Charter, a provision that "enshrines one of the fundamental values of the democratic societies making up the Council of Europe." *Soering,* 161 Eur. Ct. H.R. (ser. A) at 26.

Federal habeas relief lies for violations of the Constitution, laws, and treaties of the United States. 28 U.S.C. § 2254(a). Federal courts may grant habeas relief to persons who are in state custody as a result of judgment rendered in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2241(c)(3).

"[T]he Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and inhuman punishments. The State, even as it punishes, must treat its members with respect for their intrinsic worth as human beings. A punishment is 'cruel and unusual,' therefore, if it does not comport with human

dignity." *Furman*, 408 U.S. at 270.

The mental suffering, demoralization, uncertainty and consequent psychological hurt inherent in the punishment must be considered in interpreting Eighth Amendment. *Id.* at 271, 272.

An execution "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg,* 428 U.S. at 183.

The assessment should be whether punishment is cruel and unusual in consideration of the standards of decency that mark the progress of a maturing society, or standards of decency that are more or less universally accepted. *Id.*

Here, the California Supreme Court reasonably could reject the claim. That court has found California's death penalty process, when applied in accord with state and federal statutory and constitutional requirements, does not violate international law. *People v. Lewis,* 43 Cal.4th 415, 539 (2008) (rejected on other grounds by *People v. Black*, 58 Cal. 4 th 912 (2014)). International norms of human decency do not render the death penalty, applied as a regular form of punishment, violative of the Eighth Amendment. *People v. Curl,* 46 Cal.4th 339, 362-63 (2009).

Petitioner fails to point to clearly established Supreme Court precedent at the time his conviction became final that capital punishment was illegal in this country based on international law. *See Rowland v. Chappell*, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012) (there is no clearly established federal law holding that the California death penalty violates international law, and that this alleged violation creates a cognizable claim on federal habeas review). To the contrary, it appears that such challenges to imposition of the death penalty have been repeatedly rejected.

In *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), the Sixth Circuit explained that "the claim that international law completely bars this nation's use of the death penalty is unsupportable since the United States is not party to any treaty that prohibits capital punishment per se, and since total abolishment of capital punishment has not yet risen to the level of customary international law." *Id., at* 443 n.12; *Medellin*, 544 U.S. at 664 (Vienna Convention did not create individual judicially enforceable rights); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 734-35 (2004) (UN Charter, Universal Declaration of Human Rights, and International Convention on Civil and Political Rights do not create obligations enforceable in federal court); *Jamison v. Collins,* 100 F. Supp. 2d 647, 766 (S.D. Ohio 2000).

(International Covenant on Civil and Political Rights is not self-executing); *People v. Ghent*, 43 Cal. 3d 739, 778-79 (1987) (United Nations charter does not supersede domestic legislation); People v. *Brown*, 33 Cal. 4th 382, 404 (2004) ("International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.").

In *Carter v. Chappell*, the district court noted that "[c]learly established federal law does not hold the death penalty to violate international law or the federal Constitution." 2013 WL 781910 at * 80. Similarly, in *Rowland v. Chappell*, the district court rejected an essentially identical claim, stating that "Petitioner cannot demonstrate that any claim of a violation of international law is even cognizable on federal habeas review, given that such review is designed to address claims that a Petitioner is in custody in violation of the Constitution or laws or treaties of the United States." 902 F. Supp. 2d at 1339. "International law is not United States law, and Petitioner does not demonstrate that the International Covenant of Civil and Political Rights creates a form of relief enforceable in United States courts." *Id.; see also Am. Baptist Churches in the U.S.A. v. Meese*, 712 F. Supp. 756, 770 (N.D. Cal. 1989) (treaties that are not self-executing do not provide a basis for private lawsuit absent appropriate implementing legislation); *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas Petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.").

Petitioner's claim is not cognizable to the extent it relies on the Universal Declaration of Human Rights and the American Declaration as freestanding authority, that is, to the extent these documents are used for anything other than determining a body of customary International Law which falls short of abolishing the death penalty. *See* 28 U.S.C. § 2254(a) (limiting the scope of these proceedings to alleged violations of the Constitution, laws, and treaties of the United States). The California Supreme Court reasonably could find the Universal Declaration of Human Rights is not a law or treaty within the meaning of 28 U.S.C. § 2254(a); it "does not of its own force impose obligations as a matter of international law." *Sosa*, 542 U.S. at 734; *accord Siderman de Blake v. Argentina*, 965 F.2d 699, 719 (9th Cir. 1992).

Similarly, the American Declaration is not a treaty. *See, e.g., Jamison,* 100 F. Supp. 2d at 767.

Thus, to the extent Petitioner relies on these documents for anything other than help defining customary International Law, the California Supreme Court reasonably could view his argument as non-cognizable.

Moreover, Petitioner lacks standing to invoke the jurisdiction of international law. The principles of international law apply to disputes between sovereign governments and not between individuals. *Hanoch Tel-Oren v. Libyan Arab Republic*, 517 F. Supp. 542, 545-47 (D.D.C. 1981). It is only when a treaty is self-executing, that is, when it prescribes rules by which private rights may be determined, that it may be relied on for the enforcement of such rights. *Dreyfus v. Von Finck*, 534 F.2d 24, 30 (2d Cir. 1976) (*disavowed on other grounds by Filaratiga v. Pena-Irala*, 630 F.2d 876, 884-85 (2d Cir. 1980)).

The California Supreme Court reasonably could find unpersuasive Petitioner's argument the treaty upon which he relies is self-executing. *(See* Doc. No. 25 at 656; *see also* 28 U.S.C. § 2254(a); *Medellin, 544 U.S.* at 664 (2005) (violation of Vienna Convention may not be cognizable in federal habeas); *see also Jamison*, 100 F. Supp. 2d at 766 (International Covenant on Civil and Political Rights is not self-executing); *People of Saipan v. United States Dept. of Interior*, 502 F.2d 90, 97 (9th Cir. 1974) ("The extent to which an international agreement establishes affirmative and judicially enforceable obligations without implementing legislation must be determined in each case by reference to many contextual factors: the purposes of the treaty and the objectives of its creators, the existence of domestic procedures and institutions appropriate for direct implementation, the availability and feasibility of alternative enforcement methods, and the immediate and long-range social consequences of self- or non-self-execution."); *Ghent*, 43 Cal. 3d at 778-79 (United Nations charter does not supersede domestic legislation).

Even if the ICCPR were viewed as self-executing, its provisions do not prohibit the death penalty, but rather merely limit its application including as to arbitrary deprivation of life and execution of the severely mentally ill. *See e.g.*, *Atkins*, 536 U.S. at 316 n.21 (death penalty held unconstitutional for the intellectually disabled); *see also Roper v. Simmons*, 543 U.S. 551, 575 (2005) (in holding death penalty unconstitutional for minors, the Court noted that it has "referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of "cruel and unusual punishments.").

To the extent Petitioner supports alleged international law violations with the claims stated in this proceeding, those claims all fail for the reasons stated *ante* and *post*. (*See* claims 1-67(1), 68); *see also Medellin*, 544 U.S. at 664 (any claim based upon violation of a treaty obligation must point to an "objectively unreasonable" state court adjudication, of a clearly established right and meet the fundamental defect test, i.e. result in a complete miscarriage or deny fair procedures); *accord Benitez*, 495 F.3d at 642-44.

To the extent Petitioner argues that the noted international law is at least instructive as to interpretation of the Eighth Amendment, *see Roper*, 543 U.S. at 575, nothing in his argument suggests an available basis for federal habeas relief for him, a convicted multiple first-degree murderer. Even if Petitioner had standing to argue international law, the United States ratified the ICCPR subject to reservation of the right to impose capital punishment subject only constitutional constraints. *See* 138 Cong. Rec. S-4781-01, S4783 (1992).

Finally, Petitioner does not demonstrate any other international law and custom to which he refers precludes capital punishment in his case.

**c.    Conclusions**

For the reasons stated, a rational trier of fact could find Petitioner failed to demonstrate his death sentence violated international law, customs, treaties, and norms.

Accordingly, it does not appear that the California Supreme Court's rejection of claim 67(2) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

Claim 67(2) shall be denied.

**J.    Claims Alleging Cumulative Error**

1.    Legal Standard

The Ninth Circuit has stated "the Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal." *Parle*, 505 F.3d at 928 (citing *DeChristoforo*, 416 U.S. at 643). In the Ninth Circuit, the cumulative effect of trial errors can be a basis

for habeas relief where there is a "substantial and injurious effect or influence in determining the jury's verdict[.]" *Brecht,* 507 U.S. at 637.

Although individual errors looked at separately may not rise to the level of reversible error, their cumulative effect may nevertheless be so prejudicial as to require reversal. *Necoechea*, 986 F.2d at 1282; *see also Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003) ("[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

However, the fact that errors have been committed during a trial does not mean that reversal is required. "While a defendant is entitled to a fair trial, [she] is not entitled to a perfect trial, for there are no perfect trials." *United States v. Payne*, 944 F.2d 1458, 1477 (9th Cir. 1991).

Errors of state law, such as whether instructions were correct under state law, are not cognizable in federal habeas, *McGuire*, 502 U.S. at 71-72, and therefore should play no part in cumulative error analysis. *See Parle v. Runnels,* 387 F.3d 1030, 1045 (citing *Jeffers*, 497 U.S. at 780) (no habeas relief for state law errors whose combined effect does not violate the federal constitution).

2.      Claims, 32, 38, and 68[26]

Petitioner alleges the cumulative effect of guilt phase errors (i.e. claim 32), penalty phase errors (i.e. claim 38), and errors at both trial phases and post-conviction (i.e. claim 68) made his trial unfair and imposed a cruel and unusual punishment, denying him rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and international law. (Doc. No. 25 at 358-59, 440-42, 657-60.)

a.      **State Court Direct and Collateral Review**

Petitioner's claim 32 allegation of cumulative error at the guilt phase violating the Eighth and Fourteenth Amendments was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 180.

Petitioner's claim 38 allegation of cumulative error at the guilt phase arising from prosecutorial misconduct and ineffectiveness of counsel violating rights under the Fifth, Eighth and Fourteenth Amendments was raised in the first state habeas petition and denied on the merits. Order No. S090636. Petitioner raised claim 32 in his second state habeas petition and it was denied on the merits. (Order No.

---

[26] Petitioner's claim 68 was included in the second state habeas petition as claim 69. (*See* Doc. No. 98.)

S173793.)

Petitioner's claim 38 allegation of cumulative error at the penalty phase violating the Eighth and Fourteenth Amendments was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 180. Petitioner's claim 38 allegation of cumulative error at the penalty phase arising from prosecutorial misconduct and ineffectiveness of counsel violating rights under the Fifth, Eight and Fourteenth Amendments was raised in the first state habeas petition and denied on the merits. Order No. S090636. Petitioner raised claim 38 the second state habeas petition and it was denied on procedural grounds including as repetitive (*In re Miller*). (Order No. S173793.)

Petitioner's claim 68 allegation of global cumulative error violating his rights under the Eighth and Fourteenth Amendments was raised on direct appeal and denied on the merits. *Catlin*, 26 Cal. 4th at 180. Petitioner raised claim 68 in his second state habeas petition and it was denied on the merits. (Order No. S173793.)

### b. Analysis

Petitioner argues the prejudicial effect of alleged cumulative errors at trial, on appeal, and on collateral review.

Petitioner argues his death sentence is based largely on evidence that did not meet the constitutional requirement of heightened reliability for capital cases and was materially inaccurate. (Doc. No. 25 at 440.) Particularly so, he argues given that "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Id.*, citing *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

Petitioner points to the alleged constitutional errors discussed above. (*See e.g.*, Doc. No. 95 at 189.) He purports to incorporate all claims in his federal petition, i.e. claims 1-31, 33-37, and 39-67(2). (Doc. No. 25 at 358, 441, 657; *see also* SECT 2254 Rule 2 (habeas petition must state the facts supporting each ground).

The California Supreme Court considered and rejected alleged cumulative error on direct appeal, stating that:

> Any errors we have identified, whether considered singly or together, are nonprejudicial and do not undermine the reliability of the death judgment under the Eighth and Fourteenth Amendments or create a risk that the sentence erroneously was imposed.

*Catlin*, 26 Cal. 4th at 180. The state supreme court reasonably rejected these allegations.

Cumulative error warrants habeas relief only where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parle*, 505 F.3d, at 927-28; *see also United States v. Karterman*, 60 F.3d 576, 580 (9th Cir. 1995) ("Because each error is, at best, marginal, we cannot conclude that their cumulative effect was 'so prejudicial' to [defendant] that reversal is warranted.").

Petitioner fails to show the cumulative effect of that alleged errors at the guilt and penalty phases deprived him of due process, for the reasons stated, *ante*. (*See* claims 1-31, 33-37, and 39-67.) There is no cumulative error because there is no individual error. *Parle*, 505 F.3d at 928 (citing *Donnelly*, 416 U.S. at 643.)

The state supreme court reasonably could find Petitioner's incorporation of the balance of claims in his federal petition to be unavailing. Even if such incorporate were otherwise allowable, the incorporated claims lack merits for the reasons stated *ante* and *post*.

Petitioner has failed to demonstrate their combined effect was prejudicial by rendering his defense "far less persuasive" so as to exert a "substantial and injurious effect or influence" on the verdict. *Parle*, 505 F.3d, at 928 (citing *Chambers*, 410 U.S. at 294, and *Brecht*, 507 U.S. at 637); *see also Thompson v. Calderon*, 86 F.3d 1509, 1521 (9th Cir. 1996), amended by 109 F.3d 1358, 1369 (9th Cir. 1997), rev'd, 120 F.3d 1045, opinion reinstated, *Calderon v. Thompson*, 523 U.S. 538, 566 (1998) ("finding no prejudice from the errors considered separately, we also find no cumulative prejudice.").

Furthermore, apart from arguing *Strickland* error, Petitioner has not demonstrated and does not appear to argue clearly established Supreme Court precedent that cumulative error is a basis upon which habeas relief may be granted

### c. Conclusions

For the reasons stated, a rational trier of fact could find Petitioner failed to demonstrate cumulative effect of trial, appellate, and post-conviction error.

Accordingly, it does not appear that the California Supreme Court's rejection of claims 32, 38, and 68 was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or that the state court's ruling was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

Aspects of these claims considered *de novo* fail for the reasons stated.

Claims 32, 38, and 68 shall be denied.

**VIII. MOTIONS FOR FACTUAL DEVELOPMENT, RECORD EXPANSION, AND EVIDENTIARY HEARING**

On June 30, 2015, Petitioner filed a motion for evidentiary development including requests for fact-development discovery pursuant to habeas rules 6, record expansion pursuant to habeas rule 7, and evidentiary hearing pursuant to habeas rule 8.  (Doc. No. 84.)

The Court denies the motion in its entirety, for the reasons that follow.

**A.     Legal Standards**

As noted, § 2254(d), as amended by the AEDPA, provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
28 U.S.C. § 2254(d).

In *Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and thus "evidence introduced in federal court has no bearing on § 2254(d)(1) review."  *Pinholster*, 563 U.S. at 181, 185.  Although the central holding of *Pinholster* pertained to § 2254(d)(1), the Supreme Court observed that "§ 2254(d)(2) includes the language 'in light of the evidence presented in the State court proceeding,'" providing "additional clarity" that review under § 2254(d)(2) is also limited to the record before the state court.  *Id.* at 185 n.7. Therefore, for claims that were adjudicated on the merits in state court, a petitioner can only rely on the record that was before the state court to satisfy the requirements of § 2254(d).  *See Schriro v. Landrigan,* 550 U.S. 465, 474 (2007).

The federal court, upon motion for evidentiary hearing, is limited to the evidence presented in

state court when it assesses whether 28 U.S.C. § 2254(d) bars a claim. *Pinholster*, 563 U.S. at 185. An evidentiary hearing is unnecessary if § 2254(d) is a bar to relief. However, if § 2254(d) is not a bar, the federal court must review the substantive issues and assess evidence challenging the constitutionality of the conviction and sentence. *Panetti*, 551 U.S. at 953-954 (inadequate state court fact-finding where § 2254(d) satisfied); *accord Godoy*, 861 F.3d at 966; *accord Frantz*, 533 F.3d, at 737. This review contemplates factual development and an evidentiary hearing to the extent necessary to resolve the constitutional claim.

Also, a petitioner requesting an evidentiary hearing must "show that he has not failed to develop the factual basis of the claim in the state courts [pursuant to 28 U.S.C. § 2254(e)(2)] . . . [and] meet one of the *Townsend* factors and make colorable allegations that, if proved at an evidentiary hearing, would entitle him to habeas relief."[27] *Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005); *see also Pinholster*, 563 U.S. at 185-186 (noting that § 2254(e)(2) still applies even after § 2254(d) is satisfied). That is, once the statutory provisions of 28 U.S.C. § 2254(d) and § 2254(e) have been satisfied, the entitlement for an evidentiary hearing in a habeas case turns on two things: first, whether there was an opportunity to develop the facts in state court, and, second, whether the petitioner has pled a colorable claim entitling him to relief. *Lambright v. Stewart*, 241 F.3d 1201, 1206 (9th Cir. 2001).

**B.  Analysis**

1.    Factual-Development Discovery

Petitioner seeks discovery of facts relating to claims 7, 14(A, B, H), 23, 26(A), 35 and 39. Specifically, he seeks:

(i)  Discovery of prosecution files relating to jury selection, particularly the prosecutor's peremptory challenge of all African-American prospective jurors seated in the jury box, regarding claim 7.[28]

(ii)  Subpoenas for documents in possession of the California Department of Corrections

---

[27] In *Townsend v. Sain*, the Supreme Court concluded that a defendant is entitled to a federal evidentiary hearing on his factual allegations if: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. 372 U.S. at 313.

[28] Petitioner requested but apparently did not receive this evidence as part of production pursuant to his Penal Code section 1054.9 litigation discussed below. (*See* Doc. No. 84-2 and Ex. M thereto, discussed *post*.)

and Rehabilitation (hereinafter "CDCR") relating to juror misconduct (as to jurors McAvoy and Danley), including employment of juror Christine McAvoy and her brother by the CDCR, and the identity of the warden of Wasco State Prison at the time of Petitioner's trial, regarding claim 14(A,B, H).

(iii) Subpoenas for documents in the possession of the Kern County Sheriff's Department relating to deputies who served as bailiff at the Kern County courthouse during Petitioner's trial, relating to claim 14.

(iv) Subpoenas for documents in the possession of the Fresno County District Attorney's Office, the State Attorney General's Office, the Fresno County Probation Department, the Kern County Probation Department and their agents in law enforcement relating to informant Conward Hardin, regarding claims 23, 26A.

(v) Deposition of: juror McAvory, juror McAvoy's brother, the then Warden of Wasco State Prison, trial juror [Diane Danley] Bryson, the bailiff at Petitioner's trial who sent juror Bryson flowers, prosecution informant Hardin, Fresno County Probation Officer Tony Graves, prosecuting former deputy district attorney Andrew Baird, former Fresno County Deputy District Attorney Larry Jones, Kern County Sheriff's Deputy Mike Lage, Deputy Attorney General Jesse Witt, defense attorney Dominic Eyberabide, and defense attorney and later Kern County Superior Court Judge Michael Dellostritto. Development of this evidence relates to the above noted claims and to penalty defense claims 35 and 39.

(*See* Doc. No. 84 at 2-4.)

Habeas Rule 6 provides that:

(a) A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery. If necessary for effective discovery, the judge must appoint an attorney for a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A.

(b) Requesting Discovery. A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents.

SECT 2254 Rule 6.

"Good cause exists where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief ...." *Smith v. Mahoney*, 611 F.3d 978, 996 (9th Cir. 2010) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908–09, (1997)).

The availability of discovery during habeas is vested in the sound discretion of the district court. *Campbell v. Blodgett*, 982 F.2d 1356, 1358, (9th Cir. 1993).

*Pinholster* effectively bars a habeas court from any further factual development on claims

377

adjudicated on the merits in state court. 563 U.S. at 203 n.20. The Ninth Circuit has also followed this principle. In *Stokely v. Ryan*, 659 F.3d 802, 809 (9th Cir. 2011), the Ninth Circuit acknowledged *Pinholster's* mandate that habeas review is "confined to the record before the state courts." It explained that the limitation on consideration of new evidence in federal habeas proceedings "also forecloses the possibility of a federal evidentiary hearing." *Id.* The Ninth Circuit has acknowledged that *Pinholster* impacts discovery, albeit that court did so with little analysis. *See Runningeagle v. Ryan*, 686 F.3d 758, 773-74 (9th Cir. 2012) (petitioner not entitled to an evidentiary hearing or additional discovery in federal court because his claim is governed by 28 U.S.C. § 2254(d)(1)).

Here, predicate discovery claim 7 (relating to the trial court's denial of counsel's *Batson* motion), claim 14(A, B, H) (relating to juror misconduct), claim 23 (relating to *Brady* and *Napue* evidence as to prosecution informant/witness Hardin), claim 26(A) (relating to ineffective assistance of counsel at the guilt phase for failure to investigate and impeach prosecution informant/witness Hardin), claim 35(A-C, F) (relating to ineffective assistance of counsel and prejudice therefrom at the penalty phase), and claim 39 (relating to breakdown in the adversarial process) all were denied on the merits by the state supreme court either on direct appeal or on state petition for writ of habeas corpus.

To the extent claimed deficient conduct of counsel in the remaining predicate discovery claims 35(D-E) (relating to ineffective assistance at the penalty phase by failure to investigate and present mitigating evidence in light of death qualification voir dire, and failure to object to prosecutorial misconduct during closing argument, respectively) was not adjudicated in state court, the California Supreme Court considered and rejected on the merits any claimed prejudice therefrom. (Order No. S173793 regarding claim 35(F).) It follows that predicate claims 35(D-E) were denied on the merits. Moreover, any aspects of those claims denied upon *de novo* review above are insubstantial and meritless such that good cause for discovery thereon is lacking. (*See* claims 35, 68, *ante*; *see also Calderon v. United States Dist. Ct.*, 144 F. 3d 618, 622 (9th Cir. 1998) (good cause shown where requested discovery would bolster a non-speculative claim). Notably, the factual predicate underlying claim 35(D-E) was before the state supreme court when it considered and denied on the merits without factual development or evidentiary hearing Petitioner's related claims. (*See e.g.,* claim 35(A-C) and 36.)

To the extent Petitioner argues all these predicate claims are prima facie sufficient such that their denial by the California Supreme Court (without an evidentiary hearing) suggests improper credibility determinations and other unreasonable findings of facts, he fails to overcome the limitations of § 2254(d), for the reasons stated in the discussion of the noted claims. *See People v. Duvall*, 9 Cal.4th 464, 474-75 (1995) (conclusory allegations unsupported by the evidentiary record are not taken as true); *Taylor*, 366 F.3d at 1000 (if petitioner has unarguably presented a prima facie case for relief on a claim, the state court's summary rejection of that claim would be unreasonable).

The Court is unpersuaded by Petitioner's further argument that he is entitled to discovery under section 2254(e)(2). (*See* Doc. No. 95 at 94 citing *Ervin v. Cullen*, 2011 WL 4005389 (N.D. Cal. Sep. 8, 2011).) In this regard, the Court observes that the good cause standard set forth by Habeas Rule 6 is similar to the standard that governs whether or not a habeas Petitioner is entitled to an evidentiary hearing, i.e.: "[I]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. For the reasons stated *ante* and *post*, Petitioner falls short.

This Court has relied upon *Pinholster* to limit discovery in connection with petitions for habeas relief. *See, e.g., Coddington v. Cullen,* No. CIV S-01-1290 KJM 2011 WL 2118855, at **1-3 (E.D. Cal. May 27, 2011) (*Pinholster* limits discovery in federal habeas cases because no good cause to allow discovery whose fruits cannot be considered on § 2254(d) review); *Sok v. Substance Abuse Treatment Facility,* No. 1:11-CV-00284-JLT HC, 2011 WL 1930408, at *2 (E.D. Cal. May 19, 2011) (finding no basis to permit discovery because, "pursuant to *Pinholster,"* the court was "limited to reviewing only the record that was before the state courts"); *cf. Ervin,* 2011 WL 4005389, at *4 (finding the heightened need for discovery in capital cases justified discovery despite *Pinholster*).

Accordingly, the Court finds Petitioner fails to show good cause for the discovery sought because he is limited to the record that was before the state court. *Pinholster*, 563 U.S. at 180-81; *cf., Bracy,* 520 U.S. at 908-09 ("[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.").

Additionally, as to noted aspects of claims 35(D-E) reviewed *de novo*, the Court finds such are insubstantial and that the requested discovery would not enable Petitioner to prove allegations in his federal petition which, if true, would entitle him to federal habeas relief, for the reasons stated, such good cause for discovery is lacking.

2.      Record Expansion

Petitioner seeks to expand the record by requiring Respondent to make a supplemental lodging of:

> All records from the [post-conviction] section 1054.9 litigation in the Kern County Superior Court, the California Court of Appeal, and the California Supreme Court […] including [a]ll documents … gathered by the prosecutor regarding the jurors in Mr. Catlin's capital case …"

(Doc. No. 84 at 2, 29-31; *see also* Doc. No. 84-2, Ex. M; *Catlin v. Superior Court*, 51 Cal.4th 300 (2011). Specifically, Petitioner seeks augmentation with the entire record of the 1054.9 discovery proceeding including the 393 pages of discovery (*see* Exhibit M to Doc. No. 84) produced by the state as a result of those proceedings (hereinafter the "1054.9 Materials"). Penal Code section 1054.9 permits a defendant sentenced to a term of life imprisonment or to death to move the trial court for discovery for the purpose of facilitating his preparation of a post-conviction petition for writ of habeas corpus. (Doc. No. 84 at 29 citing Penal Code § 1054.9 eff. January 1, 2003.)

Habeas Rule 7 provides that:

> [T]he judge may direct the parties to expand the record by submitting additional materials relating to the petition … includ[ing] letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record.

SECT 2254 Rule 7(a-b).

A petitioner who seeks to expand the record without a hearing must meet the same requirements as a petitioner seeking to obtain an evidentiary hearing under 28 U.S.C. § 2254(e)(2). *See Holland v. Jackson,* 542 U.S. 649, 652–53 (2004) (finding that the restrictions of § 2254(e)(2) "apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an evidentiary hearing") (emphasis in original); *accord*

*Colegrove v. Hoshino*, No. 13-CV-00096-BLF, 2014 WL 4421393, at *2 (N.D. Cal. Sept. 5, 2014). It follows that where a state court denies the claim on the merits, an expanded record cannot be considered in determining whether the state court's decision was objectively unreasonable. *Rogovich v. Ryan*, 694 F.3d 1094, 1096-97 (9th Cir. 2012), citing *See Pinholster,* 563 U.S. at 180

The Court rejects Petitioner's argument in support of augmentation for the reasons that follow.

### a. Augmentation not Required by Prior Order of this Court

Petitioner argues the requested augmentation is required by the Court's November 2, 2007 order appointing counsel which provided therein that Respondent "lodge the state record by December 18, 2007." (Doc. No. 4 at 4.) He argues this language includes within its reach all the 1054.9 litigation materials that are the subject of the augmentation request.

A federal habeas respondent must provide with his answer relevant transcripts of pretrial, trial, sentencing, or post-conviction proceedings. (*See* SECT 2254 Rule 5.) This transcript requirement is meant to:

> [I]nform the court and petitioner as to what factual allegations can be checked against the actual transcripts. The transcripts include pretrial transcripts relating, for example, to pretrial motions to suppress; transcripts of the trial or guilty plea proceeding; and transcripts of any post-conviction proceedings which may have taken place … The court may order the furnishing of additional portions of the transcripts upon the request of petitioner or upon the court's own motion.

Advisory Committee Notes to Rule 5.

Relatedly, Habeas Rule 7 provides that "the judge may direct the parties to expand the record by submitting additional materials relating to the petition … includ[ing] letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record."  SECT 2254 Rule 7.

Here, the November 2, 2007 order directed that Respondent was to lodge the state record "in accordance with Local Rules 81-190(f) and 81-191(j)(1)." (Doc. No. 4 at 3.) Rule 190(f) speaks at a rather high level of generality, i.e., to lodging of "habeas corpus transcripts and other state court records." Rule 191(j)(1) speaks more specifically, directing that a respondent lodge "(A) transcripts of the state trial court proceedings; (B) appellant's and respondent's briefs on direct appeal to the California Supreme

Court, and the opinion or orders of that Court; (C) petitioner's and respondent's briefs in any state court habeas corpus proceedings, and all opinions, orders and transcripts of such proceedings; (D) copies of all pleadings, opinions and orders in any previous federal habeas corpus proceeding filed by petitioner that arose from the same conviction; and (E) an index of all materials described in paragraphs (A) through (D) above.

The Court observes the 1054.9 Materials relate to state discovery proceedings filed 17 years after his conviction and sentence. The 1054.9 proceedings were separate from and not placed in issue under Petitioner's state post-conviction proceedings and appear outside the ambit of Rule 191(j)(1).

Petitioner does not demonstrate either the federal petition or Respondent's answer to it place in issue the 1054.9 Materials. Petitioner argues otherwise, pointing to Respondent's reference to the 1054.9 discovery request and pending proceedings in a November 9, 2007 "Case Evaluation Form" filed in this proceeding. (*See* Doc. No. 84 at 30 citing Doc. No. 5 at 2.) However, the Form expressly provides that "[t] answers [therein] are for case management and budgeting purposes only and will not be binding in any respect on substantive issues to be raised in the course of litigation." (*Id.*)

Notably, Petitioner did not seek to amend or supplement his then pending second state habeas proceeding as to the 1054.9 Materials. Although Petitioner stated in the second state habeas petition that he would need to "supplement the petition with additional facts and claims" (*see* Doc. No. 98-1 at 71), he did not do so in this regard.

Additionally, although Petitioner contends Respondent did not lodge the state record in accordance with the Court's November 2, 2007 order, he fails to demonstrate he notified the Court of any such failure as required by Local Rule 191. *See* Local Rule 191(h)(2). This reasonably suggests Petitioner did not view the then pending 1054.9 litigation materials as part of the to-be-lodged state record.

**b.    The 1054.9 Litigation Materials Lack Relevance**

Petitioner argues the relevance of the 1054.9 Materials particularly as to claimed ineffective assistance of prior habeas counsel. (*See* claim 55, denied following *de novo* review, *ante*.) He faults habeas counsel for failing to seek discovery of the 1054.9 Materials. (*See* Doc. No. 95 at 93.)

Still, Petitioner does not identify allegedly new or different facts, theories, or claims arising

382

from the 1054.9 Materials or explain why such were not included in then-pending state habeas proceedings.

While the first state habeas petition was pending, Petitioner initiated: (i) Penal Code section 1054.9 discovery from the California Attorney General seeking "materials in the possession of the prosecution and law enforcement authorities to which he would have been entitled at the time of trial"[29] (*see* Doc. No. 84 at 29; Kern County Superior Court Case No. SC030594A - Doc. No. 84-2, Ex. N; *In re Catlin*, California Supreme Court Case No. S090636, and (ii) mandate proceedings in the California Court of Appeal – Fifth Appellate District, Case No. F053705, following denial of the discovery motion in the trial court (*see* Doc. No. 84-2 at Ex. H; Order No. S090636).

While the second state habeas petition was pending, the 1054.9 discovery proceeding concluded (*see* Doc. No. 84-2 at 63), with subsequent production to Petitioner of 393 pages of materials not previously provided (*see* Doc. No. 84-2, Ex. M; Doc. No. 98-1 at 71-72; *see also* Order No. S173793).

Even so, Petitioner did not seek to amend or supplement the pending state habeas proceeding as to the 1054.9 Materials as he suggested he would. (*See* Doc. No. 98-1 at 71.)

On the facts and circumstances of this case, the Court is unpersuaded the post-conviction 1054.9 discovery litigation materials are relevant to Petitioner's 1990 capital conviction and sentence, the petition and merits thereof, or an issue or claim before the Court other than the merits of the petition. *See* Advisory Committee Comments, 2004 Amendments, Rule 7. *See Williams v. Schriro*, 423 F.Supp.2d 994, 1003 (D. Ariz. 2006) (record expansion inappropriate where the to be added to record are not relevant to resolution of the claims in issue).

At bottom, Petitioner has not demonstrated that 1054.9 Materials include facts that provide a basis to contest his conviction and sentence. *See Williams v. Schriro*, 423 F.Supp.2d 994, 1003 (D. Ariz. 2006) (record expansion denied where record sought was not relevant to defendant's claim). To the extent Petitioner argues specifically as to claim 55, he does not point to new facts of prejudicially deficient performance by prior habeas counsel under the Strickland standard.

Additionally, as to review of Petitioner's noted claims adjudicated in state court, this Court is limited to the record that was before the state court. *See Pinholster*, 563 U.S. at 181, 185.

---

[29] As noted, Petitioner was convicted and sentenced in Kern County Criminal Case No. 30594.

### 3. Evidentiary Hearing

Petitioner seeks evidentiary hearing subsequent to or in lieu of factual development of claims 7, 14(A, B, H), 23, 26(A), 35 and 39.

Habeas Rule 8 provides that:

> If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

SECT 2254 Rule 8; see also *Townsend*, 372 U.S. at 319 (complete state-court record ordinarily includes the transcript of testimony or adequate substitute, the pleadings, court opinions, and other pertinent documents).

Here, as to the claims for which an evidentiary hearing is sought that do not survive § 2254(d) analysis (i.e. claims 7, 14(A, B, H), 23, 26(A), 35(A-C, F) and 39), Petitioner has not shown an evidentiary hearing on those claims is available. 28 U.S.C. § 2254(d); *see also Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004) (petitioner entitled to evidentiary hearing upon raising colorable claim of ineffective assistance); *accord Siripongs v. Calderon*, 35 F.3d 1308, 1310 (1994) (only a habeas petitioner who asserts a colorable claim to relief is entitled to an evidentiary hearing). *Pinholster* effectively bars a habeas court from any further factual development of these claims at evidentiary hearing. 563 U.S. at 203 n.20. Regarding these claims and to the extent Petitioner further argues that he is entitled to a hearing under 28 U.S.C. § 2254(e)(2), *Pinholster* suggests this is not so. "Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief." *Id.* at 185. Analysis of the claims under § 2254(d) must precede the granting of an evidentiary hearing under § 2254(e)(2). *Id.* at 184. Thus, only if Petitioner overcomes § 2254(d) can the Court consider a hearing under § 2254(e)(2).

Additionally, as to the claims for which evidentiary hearing is sought that fail on *de novo* review (i.e. claim 35(D-E)), the Court finds an evidentiary hearing is not necessary or desirable. The claims are insubstantial, lack merit, do not survive 28 U.S. C. § 2254(e)(2) review, and fail to satisfy a *Townsend* factor, for the reasons stated. (*See* claim 35(D-E), *ante*.)

### 4. Other Arguments

Petitioner's argues that denial of evidentiary development in this proceeding following denial of same in state court denies him a full and fair opportunity to litigate his habeas claims and constitutes an unconstitutional suspension of the writ of habeas corpus. (*See* Doc. No. 95 at 44.)

"The Suspension Clause states, "the privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it." U.S. Const., art. I, § 9, cl. 2. There appears little agreement over the scope and meaning of the Suspension Clause. *See Shove v. Chappelle*, No. CV 13-1475-R, 2013 WL 942115, at *3 (C.D. Cal. Mar. 11, 2013), aff'd sub nom. *Shove v. Chappell*, No. 13-56448, 2013 WL 7647168 (9th Cir. Dec. 17, 2013)

As the Supreme Court has stated:

> Our case law does not contain extensive discussion of standards defining suspension of the writ or of circumstances under which suspension has occurred. This simply confirms the care Congress has taken throughout our Nation's history to preserve the writ and its function. Indeed, most of the major legislative enactments pertaining to habeas corpus have acted not to contract the writ's protection but to expand it or to hasten resolution of prisoners' claims.

*Boumediene v. Bush,* 553 U.S. 723, 773 (2008).

On the facts and circumstances of this case, the Court declines to find a *de facto* suspension of the writ. Petitioner's claims relating to state's policies or the application thereof do not amount to a suspension of the writ because the Suspension Clause does not apply to the states. *Gasquet v. LaPeyre,* 242 U.S. 367, 369 (1917) (the Suspension Clause is not a limitation on state action).

Petitioner has not demonstrated that denial of evidentiary development in this proceeding amounts to suspension of the writ. Petitioner cannot argue that review of his state conviction and sentence pursuant to AEDPA amounts to suspension of the writ. The Supreme Court has upheld AEDPA against Suspension Clause challenge. *Boumediene*, 553 U.S. 774; s*ee also Riel v. Warden, San Quentin State Prison*, 2015 WL 6690127, at *12 (E.D. Cal. Oct. 30, 2015) (rejecting claim that AEDPA violates the Suspension Clause; *Thuraissigiam v. U.S. Dep't of Homeland Sec.*, 917 F.3d 1097, 1105 (9th Cir. 2019) (cert. granted sub nom. *Dep't of Homeland Sec. v. Thuraissigiam*, No. 19-161, 2019 WL 5281289 (U.S. Oct. 18, 2019)) (citing *Felker v. Turpin*, 518 U.S. 651, 663–64 (1996) ("The Suspension Clause prevents Congress from passing a statute that effectively suspends the writ absent

rebellion or invasion.").

Petitioner's particular argument that denying him any complete and fair opportunity to develop the factual predicate for his claims suspends the writ (*see* Doc. No. 95 at 44-45) omits any discussion of threshold claim colorability and good cause and is unsupported legally and factually, for the reasons stated. Moreover, the case authority upon which he relies, *Miller v. Marr*, 141 F.3d 976, 977 (10th Cir. 1998) (holding AEDPA's limitation period did not render the habeas remedy inadequate and ineffective) and *Williams v. Taylor*, 529 U.S. 420, 437-44 (2000) (a pre-*Pinholster* case applying 28 U.S.C. 2254(e)(2)), appear distinguishable and unavailing.

Additionally, the Court need not consider Petitioner's suggested referral to non-binding dispute resolution as an alternative to relief under Habeas Rules 6-8, (*see* Doc. No. 84 at 20), given rejection of his claims herein.

### C.     Conclusions

Petitioner's request for factual development relating to claims 7, 14(A, B, H), 23, 26(A), 35 and 39 shall be denied.

Petitioner's request to expand the state record with the 1054.9 Materials shall be denied.

Petitioner's request for evidentiary hearing on claims 7, 14(A, B, H), 23, 26(A), 35 and 39 shall be denied.

Petitioner request for referral to dispute resolution shall be denied.

### IX. CERTIFICATE OF APPEALABILITY

Because this is a final order adverse to the Petitioner, Rule 11 of the Rules Governing Section 2254 Cases ("Rule 11") requires this Court to issue or deny a Certificate of Appealability ("COA"). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (2002).

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. *Miller-El*, 537 U.S. at 335-36. The controlling statute in determining whether to issue a COA is 28 U.S.C. § 2253, which provides that:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district

judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
(B) the final order in a proceeding under section 2255.
(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The Court may issue a COA only "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). While a petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that, with respect to the following claims, reasonable jurists could disagree with the Court's resolution or conclude that the issues presented are adequate to deserve encouragement to proceed further:

1) Claims 10, 11, 26(A), 35(A), 35(B), 35(C), and 35(F).

Therefore, a COA shall be granted as to these seven claims.

As to the remaining claims and requests for factual development, record expansion and evidentiary hearing, the Court concludes that reasonable jurists would not find the Court's determination that Petitioner is not entitled to relief debatable, wrong, or deserving of encouragement to proceed further. The Court shall decline to issue a COA as to the remaining claims and the requests factual development, record expansion and evidentiary hearing.

## X. ORDER

Accordingly, for the reasons stated:

387

1.     The petition for writ of habeas corpus (Doc. No. 25) is DENIED, claims 1-66, 67(2) and 68 are denied with prejudice, claim 67(1) is premature and denied without prejudice.

2.     Petitioner's requests for factual development discovery, record expansion, and evidentiary hearing (Doc. No. 84) are DENIED.

3.     A Certificate of Appealability is ISSUED as to the Court's resolution of claims 10, 11, 26(A), 35(A), 35(B), 35(C), and 35(F), and DECLINED as to the remaining claims and the requests for factual development, record expansion, and evidentiary hearing.

4.     Any and all scheduled dates are VACATED, and

5.     The Clerk of the Court is directed to substitute RON DAVIS, Warden of San Quentin State Prison, as the Respondent warden in this action, and to enter judgment accordingly.

IT IS SO ORDERED.

Dated:   **December 16, 2019**          **/s/ Lawrence J. O'Neill**
                                        UNITED STATES CHIEF DISTRICT JUDGE